THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

C.B., by and through his next friend, )
Charleston DePriest, et al. )
  )
  )
     Plaintiffs, )
  )
v. )   CLASS ACTION
  )   Civil Action No. 3:10cv663
WALNUT GROVE CORRECTIONAL )
AUTHORITY, et al. )
  )
     Defendants. )

## CONSENT DECREE

On or about November 16, 2010, Plaintiffs filed the above-captioned suit asserting constitutional, statutory, and state law challenges to conditions in the Walnut Grove Youth Correctional Facility. Plaintiffs and the Mississippi Department of Corrections stipulate and agree to the following provisions in partial resolution of the litigation. This Consent Decree contains provisions related to a settlement subclass comprised of all male youth who are age 17 and under and who are in the custody of the Mississippi Department of Corrections, and as specifically further defined herein.

### I. Introduction.

(1) In order to resolve the allegations in the Complaint related to protection from harm and violence, excessive use of force, punitive isolation, and inadequate medical care with regard to individuals ages 17 and younger who are in the custody of the Mississippi Department of

1

Corrections and housed at the Walnut Grove Youth Correctional Facility ("WGYCF"), the parties have entered into this Consent Decree.

(2) The parties agree to a settlement subclass comprised of 1) all male youth who are ages 17 and under and who are now or in the future will be housed in a Mississippi Department of Corrections prison, and 2) all male youth who are ages 18 and 19 and who will be housed in the Youthful Offender Unit described in this Consent Decree. The terms of this Consent Decree apply only to this subclass. A youth who has attained the age of 18 and who is not housed in the Youthful Offender Unit is not in the settlement subclass.

(3) The Defendant in this lawsuit is Commissioner Christopher Epps, in his official capacity as Commissioner of the Mississippi Department of Corrections ("MDOC"). This Consent Decree refers to actions and inactions that will be undertaken by Commissioner Epps, his staff and contractors under his direction. For ease of reference only, this Consent Decree refers to "MDOC" through this Agreement. The Parties intend for this Agreement to bind Commissioner Epps and his assigns.

(4) The term "Walnut Grove Youth Correctional Facility" or "WGYCF" hereinafter refers to the correctional facility located in Leake County, Mississippi as provided for in Miss. Code Ann. § 47-5-943 (Rev. 2007).

(5) The parties stipulate that nothing in this Consent Decree constitutes either an admission of liability, or any evidence of liability, with respect to suits for damages or any claims asserted against the named Defendants with respect to inmates who are housed, were housed, or may be housed in the future, at the Walnut Grove Youth Correctional Facility.

2

(6) Nothing in this Consent Decree will prevent the State of Mississippi and/or MDOC from modifying the mission of, or closing WGYCF, or developing alternative community placements for the persons currently in the facility as set forth herein.

(7) This Consent Decree is not intended to have any preclusive effect except between the parties. The parties acknowledge that the remedies contained in this agreement are not necessarily appropriate for facilities other than the Youthful Offender Unit described in this Consent Decree. (8) Individuals who are not class members are not third-party beneficiaries of this agreement and may not assert any rights under this Consent Decree.

### II. Care Required by the Constitution and Federal Statutes.

The purpose of this Consent Decree is to protect certain constitutional and federal statutory rights of youth who are housed at the Youth Offender Unit as described in this Consent Decree. The terms and requirements of this Consent Decree will be interpreted to be consistent with the remedial measures necessary to protect these rights of the youth, and consistent with applicable federal law.

### III. Establishment of Youthful Offender Unit.

The Mississippi Department of Corrections will establish a Youthful Offender Unit ("YOU") at the Central Mississippi Correctional Facility ("CMCF"). WGYCF will no longer house youth who are ages 17 and under. This transition will happen as soon as is practicable but will occur no later than December 1, 2012. At two month intervals following court approval of this Consent Decree, counsel for MDOC will update counsel for Plaintiffs on the progress of MDOC's establishment of the YOU facility.

3

Subject to the exceptions set forth in this agreement, all youth who are ages 17 and under and who are assigned to a MDOC prison will be housed in the YOU, except that nothing in this agreement will prohibit MDOC from housing a youth who is 17 or under in a community work center or other environment that is less restrictive than a MDOC prison. For the duration of this agreement, MDOC will provide Plaintiffs' counsel with a list of youth who are ages 17 and under and in MDOC custody. The list will indicate where each youth is housed. MDOC will generate this list twice a month (every two weeks). The terms of this Consent Decree, unless otherwise expressly stated herein, apply only to the YOU and do not follow a Plaintiff who is transferred, discharged, or otherwise leaves the YOU.

## IV. Substantive Remedial Measures.

The Youthful Offender Unit provided for in Section III above will be operated and maintained by MDOC in accordance with the following conditions applicable to its establishment and operation:

### A. Classification and Housing System.

(1) MDOC will develop and implement policies and procedures that establish a classification system that ensures youth are appropriately and safely housed within the YOU.

(2) Youth ages 17 and under should be housed in the YOU, separate from other inmates at CMCF. No individual who is over the age of 19 will be housed in the YOU. The MDOC Commissioner will have discretion to house in the YOU 18 and 19 year olds who have been classified as vulnerable.

(3) A youth who, while housed at the YOU, has been found following a due-process hearing as specified in Section IV C(6) of this agreement to have committed: murder, attempted murder, rape,

4

attempted rape, escape, hostage-taking, or the act of urging and actually causing a group of five or more people to commit widespread, significant damage to MDOC property, or (if a youth is over the age of 16) aggravated assault may be moved from the YOU to a single cell unit located at CMCF. These youth will also receive at least four hours a day of out-of-cell programming. Out-of-cell programming will include educational services and at least one hour of large-muscle exercise daily. These youth will also be permitted to make weekly phone calls and to visit with immediate family at least twice a month. Every 45 days, the classification committee will reconsider whether any youth who is under the age of 16 and who has been found to have committed escape, hostage-taking, or the act of urging and actually causing a group of five or more people to commit widespread, significant damage to MDOC property should be reclassified and returned to the YOU. All other youth ages 17 and under who are removed from the YOU will be considered for reclassification and possible return to the YOU every 90 days. The units housing youth who are removed from the YOU will not be required to operate in compliance with the terms of this agreement except as specified above.

**B. Protection from Harm.**

(1) At all times, youth will be provided with reasonably safe living conditions and will be protected from violence and other physical or sexual abuse by staff and other youth or inmates.

(2) MDOC will ensure that there are sufficient numbers of adequately trained direct care and supervisory staff, and sufficient numbers of professional staff. Within 90 days of establishment of the YOU, MDOC will develop and implement a staffing plan for direct care, supervisory, and professional staff (i.e., social workers) to ensure that youth are adequately supervised and

5

protected from harm and that youth have adequate access to medical services and adequate time out of their cells.

(3) Mechanical, physical or chemical restraints such as O.C. spray, pepper spray and mace will not be used to punish youth. If any restraint is necessary, the force must be the minimum amount required to safely contain the youth, and the restraints must be removed as soon as they are no longer necessary. Except in emergency circumstances, no youth should be subject to restraints until staff have first attempted verbal de-escalation techniques.

(4) Physical force will not be used to punish youth. If physical force is necessary, the force must be the minimum amount required to safely contain the youth. Except in emergency circumstances, no youth will be subject to physical force until staff have first attempted verbal de-escalation techniques.

(5) MDOC will provide sufficient audio-visual recording equipment throughout the YOU to ensure the capacity to create one or more audio-visual recordings of uses of force. MDOC will develop protocols and procedures to ensure that all planned uses of force, and all unplanned uses of force except when impossible, are captured by an audio-visual recording. Audio-visual recording of use of force incidents at the YOU, of adequate quality to allow review of the incidents, will be the norm, and only in the most exigent circumstances will it be impossible to make such recordings. If less than 95% of the uses of force are recorded in a manner that allows review of the incident, MDOC will be deemed out of compliance with this provision and must revise its procedures so that the 95% threshold is met. MDOC will implement procedures for generating monthly reports on use of force. The monthly reports will include the documentation described in

6

Section IV B(7) below as well as copies of the audio-visual video, and will be shared with Plaintiffs' counsel.

(6) Except in exigent circumstances where no delay is possible because of the risk of bodily injury or serious damage to property creating a threat to security, or except when totally impracticable, the Shift Commander or Warden will be notified and his or her consent obtained before force is used. Except in emergency circumstances, the Shift Commander or Warden will visit the youth before consenting to the use of force, to determine if force is necessary. A log will be maintained recording the efforts made to obtain the presence of the Shift Commander or Warden and a mental health professional prior to the use of force. These logs will become part of the monthly reports referred to in Section IV B(7) below.

(7) All physical interventions, including use of force and mechanical and chemical restraints, must be documented in writing. The written documentation will include a detailed description of the physical intervention and the verbal de-escalation attempt(s) that occurred prior to the intervention. MDOC will use this documentation to review each physical intervention and to analyze patterns of use of force and restraint in an effort to reduce such incidents.

(8) MDOC will develop a protocol for an Incident Review Committee ("IRC") that is responsible for conducting the review and analysis described in Section IV B(7) above. The IRC will be a standing committee comprised of YOU staff and the Warden. The IRC is charged with reviewing all uses of force, uses of restraints, and incident reports, and developing strategies for reducing these incidents throughout the YOU.

(9) MDOC will develop protocols and procedures to ensure the involvement, where possible, of a mental health professional prior to use of force on youth with severe mental illness.

7

(10) MDOC will develop policies and procedures that will limit the use chemical restraints. Chemical restraints will not be used as a punishment or to gain compliance. Chemical restraints may only be used to prevent serious bodily injury or serious damage to property creating a threat to security. Only shift supervisors who have been trained on the appropriate use of chemical restraints on juveniles may regularly carry chemical restraints on the living units.

(11) Issuance of restraint equipment will be documented in a bound Restraint Equipment Log Book. Staff members who are issued restraint equipment will initial in the appropriate section of the Log Book when checking equipment out of storage. The inventory number, name of the equipment, time in, and time out should be noted in the Log Book. Containers of chemical restraints that have been signed out for a shift will be weighed at the beginning and conclusion of that shift by the YOU Unit Manager or his designee. The inventory numbers and weight of the containers will be documented in the Log Book.

(12) All youth who have been exposed to chemical restraints will be immediately removed from the contaminated area, will promptly be permitted to shower, and will be examined by medical staff to see if transport to the clinic is needed. Any contaminated living area will be decontaminated before a youth is returned to it. If emergency circumstances create an imminent threat to security and prevent staff from immediately removing youth from contaminated areas, MDOC will promptly provide the youth who have been exposed to the chemical agents with an adequate supply of appropriate decontaminating agents.

(13) All youth will be informed of their rights and responsibilities, including the consequences for rule violations and the privileges that can be earned when youth comply with the rules. Youth will not be relied on to enforce unit rules or to impose discipline or physical punishment on other youth.

8

(14) MDOC will take reasonable steps to protect all inmates of the YOU from verbal abuse and harassment. MDOC will develop policies, procedures, and practices that protect gay, bi-sexual, transgendered, and gender non-conforming youth from abuse, harassment, and punishment on the basis of their sexuality.

(15) MDOC will prohibit staff from forcing inmates of the YOU to engage in physical exertion that inflicts pain or discomfort, for example the practice of forcing youth to "alligator walk" and to "duck walk."

(16) MDOC will not employ pain aversion behavior management techniques and will develop behavior management techniques that do not rely on the use of pain.

**C. Solitary Confinement, Lockdown, and Seclusion.**

(1) MDOC will ensure that youth are never subjected to solitary confinement. Solitary confinement means confinement in a cell for more than twenty hours a day.

(2) When not expected to be asleep, youth may be subject to cell confinement for two general purposes: 1) If a youth presents an immediate, serious threat to the safety of others, he may be placed on cell confinement for a time period not to exceed 24 hours (known as "Emergency Cell Confinement"); 2) If a youth violates a major rule he may be placed on cell confinement for a time period not to exceed 72 hours (known as "Disciplinary Cell Confinement"). A youth may only be placed in Disciplinary Cell Confinement after he receives due process as specified further below.

(3) No youth may be placed on cell confinement for a time period that exceeds 72 consecutive hours, except as set forth in Section IV C(6) of this agreement. Youth on cell confinement must not be denied basic educational programming; the opportunity for daily out-of-cell and outdoor exercise (weather permitting); or opportunity for weekly contact with family through visit, phone

9

calls, and letters. Youth on cell confinement must be provided the opportunity for at least one hour daily of large muscle exercise and must be provided the same meals, clothing, access to drinking water, medical treatment, educational services, exercise, correspondence privileges, contact with parents and legal guardians, and legal assistance as is provided to other inmates.

(4) Youth may be subjected to Emergency Cell Confinement if their behavior presents an immediate threat to the safety of others. Placement in Emergency Cell Confinement will only last until the youth has regained self-control and can be returned to the general population, and under no circumstance may Emergency Cell Confinement last longer than 24 hours.

(5) When youth are placed in cell confinement for longer than 15 minutes, an incident report will be completed. When youth are placed in cell confinement for longer than 2 hours, the shift supervisor must receive permission from the Warden or the designated acting warden in the Warden's absence, and document in writing the reason for the isolation and the justification for extending the youth's time in cell confinement.

(6) No youth will be subject to Disciplinary Cell Confinement without due process protections that will include, at a minimum: 1) the youth receives notice of the alleged offense; 2) the youth is provided with a hearing during which he has the opportunity to present his version of events and call witness; and 3) the hearing is presided over by a staff member who is uninvolved in the incident, and who functions as an independent hearing officer who issues written findings that include the reasons for subjecting a youth to Disciplinary Cell Confinement. The purpose of the hearing is to determine whether cause exists for cell confinement for the purposes of punishment and gaining compliance with institutional rules. Under no circumstances may a youth be subject to Disciplinary Cell Confinement for longer than 72 hours unless an extension is approved by the

10

Deputy Commissioner or the designated individual acting in his capacity. Extensions will only be granted in extraordinary circumstances when a youth presents a continuous direct threat to the safety of others. The Deputy Commissioner or the designated individual acting in his capacity will review extensions every 72 hours to determine whether the youth continues to present a continuous direct threat to the safety of others.

(7) Every effort will be made to avoid the placement of youth on cell confinement for any reason. Whenever possible, prior to placing a youth on cell confinement, staff will first use less restrictive techniques including verbal de-escalation.

(8) During the time a youth is on cell confinement, staff will conduct visual checks at least 4 times an hour and not longer than 15 minutes apart. During the time a youth is awake the staff are required to speak to the youth during the visual checks. After each visual check, the staff will record the status of the youth on the cell detention log sheet. For the duration of cell confinement, the youth will be interviewed by medical and mental health staff at least every 24 hours.

**D. Programming and Behavior Management.**

(1) During the hours of the day that youth are not expected to be sleeping, MDOC will provide youth with the opportunity for the appropriate mix of interactive, structured rehabilitative and/or educational programming, recreational, and leisure activities outside of their cells on a daily basis, including weekends and holidays. A policy and procedure, including a schedule of activities and programming under this section, will be developed by MDOC and Mississippi Department of Education. The programming developed will, to the degree possible, be tailored to the developmental needs of adolescents. Under no circumstances will the MDOC develop youth programming that could be considered "paramilitary" or that contains elements of a "boot camp"

11

program. (2) MDOC will develop a behavior management policy that incorporates positive behavior intervention and supports for youth. This policy should include guidelines for imposing graduated sanctions for rule violations, and positive incentives for good behavior.

**E. Disciplinary Due Process and Grievances.**

(1) MDOC will revise, if needed, its disciplinary procedures to ensure that youth receive adequate due process before the imposition of disciplinary sanctions (including rule violation reports) that would affect a youth's ability to earn the following: Earned Time Allowance, pursuant to Miss. Code Ann. § 47-5-138(1); Trusty Earned Time, pursuant to Miss. Code Ann. 47-5-138.1; Meritorious Earned Time, pursuant to Miss. Code § 47-5-142(2); Intensive Supervision Program, pursuant to Miss. Code Ann § 47-5-1003; Community Work Center / Pre-release Centers, as described in Miss. Code Ann § 47-5-181; or placement in the Regimented Inmate Discipline Program.

(2) The YOU will utilize an adequate grievance procedure that is accessible to youth of varying English proficiency levels.

**F. Suicide Prevention.**

(1) MDOC will develop a suicide prevention policy that includes the following:

    a. a prohibition on placing youth on suicide watch as punishment or without medical justification;

    b. a prohibition on holding youth on suicide watch in isolation. To the extent clinically feasible, youth on suicide watch should engage in normal programming;

    c. instructions for thoroughly documenting the suicide precautions that are administered to each youth who is placed on suicide watch;

12

d.  a process for conducting a review of any and all instances of attempted suicide or suicide.
The review process will include a committee of staff (including mental health staff) who
will review every attempted suicide or suicide in order to refine policies and procedures to
decrease the number of these incidents;

e.  all youth placed on suicide watch will be assessed by a mental health professional as soon
as possible, but no later than 18 hours from being placed on suicide watch; any youth
placed on suicide watch will be re-assessed by a mental health professional at least every
18 hours; and if the initial assessment indicates that the youth is at high risk for suicide
and/or self-harm for longer than five days, that youth will be transferred to a facility that
can provide intensive mental health services. If the assessment indicates that the youth
needs less-intensive, but ongoing, supervision in order to prevent suicide and/or self-harm,
a  qualified  mental  health  professional  will  develop  an  individual  suicide
prevention/treatment plan, and the youth will be housed in his regular unit. This plan will
be updated daily until the youth is no longer judged to be on an active suicide "watch"
status.

(2) If a youth has been deprived of his regular clothing (other than shoelaces and belts), a
qualified mental health professional will determine if a medical or mental health justification
exists for the continued deprivation. The deprivation may continue only if medical and mental
health justifications exist for the continued deprivation and the mental health clinician makes
specific written findings explaining these justifications.  Each 24-hour clinical reassessment must
include written findings explaining any medical/mental health justifications for any continuing
deprivation.

13

(3) If a youth has been subject to cell confinement or deprived of access to regular programming and activities, a qualified mental health professional will determine if a medical or mental health justification exists for the continued cell confinement and/or deprivation. The cell confinement and/or deprivation may continue only if medical and mental health justifications exist for the continued cell confinement and/or deprivation and the qualified mental health professional makes specific written findings explaining these justifications. Each 24-hour clinical reassessment must include written findings explaining the medical and mental health justifications for any continuing cell confinement and/or deprivation.

**G. Medical Care.**

(1) Youth will be provided adequate, appropriate, and timely medical and dental care to meet their individualized needs, including the treatment of acute and chronic conditions. Those youth housed at the YOU who are determined by a qualified medical health professional to require necessary treatment may be assigned to a designated medical health unit.

(2) MDOC will comply with, and will ensure that the medical services provided at the YOU and those provided to inmates assigned to the designated medical unit comply with, the National Commission on Correctional Healthcare Standards for health care in Youth Detention and Confinement Facilities.

**H. Family Support and Interaction.**

(1) Visitation will not be restricted or withheld from youth unless the Warden determines that a visit will seriously compromise the security of the facility. If the Warden makes this determination, s/he must document the reason for this determination in writing. Visitation will not be restricted as a form of punishment.

14

(2) MDOC will provide accommodations that allow youth to have contact visits with their immediate families. Youth may also have contact visits with other individuals upon the approval of the Warden or the Commissioner.

(3) Immediate family visitation will be regularly scheduled at least three times per week. Each visitation time period will last for at least two hours. At least two of those three times, visitation will be scheduled in the evening or during the weekend in order to encourage family visitation. MDOC will permit the minor siblings of confined youth to participate in visitation, as long as the minors' parent or guardian is present during the visit, and will permit a confined youth's own child(ren) to participate in visitation. MDOC will make special provisions to schedule visitations outside of the regularly scheduled time for families who are traveling long distances or have an employment-related conflict with the regularly scheduled visitation times, and in instances when the confined youth is ill and requires placement in the infirmary or in an off-site medical/mental health facility.

(4) MDOC will allow all youth to make at least one free, five minute phone call a week to their parent(s) and/or guardian(s). This phone call will not be restricted as a form of punishment. In addition, MDOC will allow youth who are free from any serious Rule Violation Reports to earn at least one additional free, five minute phone call a week.

## V. Enforcement and Monitoring.

(1) The parties agree to the appointment of James Austin and Paul DeMuro as monitors responsible for tracking compliance with the terms of this Consent Decree. The monitors may, if asked by MDOC, provide technical assistance to MDOC to promote compliance with the terms of this Consent Decree. The monitors will be responsible for submitting reports to counsel every

15

four months following the establishment of the YOU as specified in Section III of this Consent Decree. The monitors will provide their reports in draft form to the parties for comments at least two weeks before issuance. Should either of the monitor positions become vacant and the parties are unable to agree on a replacement, the parties will recommend candidates to the magistrate judge and the parties agree to accept the candidate chosen by the magistrate judge. The reasonable cost for the experts' fees and expenses related to monitoring will be borne by MDOC.

(2) The monitors and Plaintiffs' counsel, with advance notice, will have full and complete access to the YOU, to all facility records (including medical and mental health records), and to staff (who will be directed to cooperate with the experts and Plaintiffs' counsel), as well as to all subclass members. State attorneys may be present at interviews of staff and tours of facilities. The experts and Plaintiffs' counsel will comply with all applicable federal and state laws with regard to confidentiality of such records and information.

(3) Within 90 days of the Court's approval of this Consent Decree, MDOC expert James Austin and Plaintiffs' expert Paul DeMuro will collaborate in a non-binding manner with MDOC to promulgate the policies, procedures, classification, and staffing plans necessary to effectuate this Consent Decree. Plaintiffs' counsel will compensate Paul DeMuro only for expenses related to drafting these policies, procedures and plans and that expense will not be the responsibility of MDOC. MDOC retains the final authority over the content, drafting, and wording of the policies and staffing plans, as long as the policies and plans are consistent with the terms of this Consent Decree. Once drafted, MDOC will submit the draft policies and plans to Plaintiffs' counsel. Plaintiffs' counsel will promptly notify MDOC of any objections, with an explanation as to how the draft is inconsistent with the terms of this Consent Decree, and will suggest revisions. MDOC

16

will revise policies, procedures, plans, and other written documents as necessary to conform with the terms of this Consent Decree. If either party is unsatisfied with the resolution, then either party may invoke the assistance of the magistrate judge for mediation. If mediation fails to resolve the dispute, the Plaintiffs may file a motion to enforce this Consent Decree.

(4) The parties agree that the terms of prospective relief afforded by the terms of this Consent Decree are narrowly drawn, pertain exclusively to the subclass defined herein, extend no further than necessary to correct the violations of federal rights at issue, are the least intrusive means necessary to correct the violations of federal rights at issue, and all terms and conditions of this Consent Decree will be construed in accord with federal law, including the Prison Litigation Reform Act.

(5) The parties agree that the terms of this Consent Decree will be submitted to the Court for approval, and the Court will retain jurisdiction to enforce the terms thereof.

(6) Nothing in this Decree alters the requirements of the Prison Litigation Reform Act, including the exhaustion requirement, with respect to any class member who seeks to assert an individualized dispute against MDOC, including a damages action, which is unrelated to the terms of this Consent Decree. Nothing in this Consent Decree bars a member of the Plaintiff class from bringing an individualized suit seeking damages or prospective relief under state and/or federal law. Only class counsel may seek to enforce the terms of this Consent Decree.

(7) If Plaintiffs believe that MDOC has substantially failed to comply with any obligation under this Consent Decree, Plaintiffs' counsel will give written notice of that failure to MDOC. The parties will conduct good faith discussions to resolve the dispute. If the parties are unable to reach agreement within 7 days of Plaintiffs' written notice, the parties will submit the dispute to

17

mediation before the magistrate judge who is assigned to this case. The parties will attempt in good faith to mediate the dispute. If the parties are unable to resolve the dispute within 21 days from the date of Plaintiffs' written notice, Plaintiffs may seek enforcement of this Consent Decree from the Court. In the case of an emergency posing an immediate threat to the health or safety of the youth housed at the YOU, Plaintiffs' counsel may omit the notice and cure requirements herein (including the provision regarding mediation) before seeking enforcement from the Court.

(8) This Consent Decree will terminate five years from the date that the YOU houses at least half of all youth who are, at that point in time, eligible for the YOU. The Consent Decree may also terminate earlier than this date if the Court determines that MDOC has substantially complied with each of the provisions of the Consent Decree and has continuously maintained substantial compliance for at least two years. Noncompliance with mere technicalities, or a brief lapse in compliance during a period of otherwise sustained compliance, will not constitute failure to maintain substantial compliance. The Court may extend this Consent Decree and/or any of its provisions twice, and each extension may be no longer than one year upon a finding that MDOC has failed to substantially comply.

Agreed:

_____
Sheila A. Bedi, Miss. Bar No. 101652
Southern Poverty Law Center
4431 Canal Street
New Orleans, LA 70119

Margaret Winter (*pro hac vice*)
The National Prison Project of
the ACLU Foundation, Inc.
915 15th Street, N.W., Seventh Floor
Washington, D.C. 20005

_____
Commissioner Christopher B. Epps
Mississippi Department of Corrections
723 North President Street
Jackson, MS 39202
**For the Defendant**

18

Robert B. McDuff, Miss. Bar. No. 2532
767 North Congress Street
Jackson, Mississippi 39202
**For the Plaintiffs**

IT IS SO ORDERED

Dated and entered this ___26th___ day of ___March___ 2012

United States District Judge Carlton W. Reeves

19