Margaret Winter
ACLU National Prison Project
915 15th Street, NW
Washington, DC 20005

Jennie Eichelberger
Southern Poverty Law Center
111 E. Capitol Street, Suite 280
Jackson, MS 39201

*Re: DePriest v. Walnut Grove Correctional Authority, Civ. Action No. 3:10cv663*

Dear Ms. Eichelberger and Ms. Winter:

This letter constitutes my report to Plaintiffs' counsel on my January 28-29, 2014 tour of Walnut Grove Youth Correctional Facility.

I undertook this tour at the request of Plaintiffs' counsel. The purpose of the tour was to look into Defendants' compliance with the provisions of the March 26, 2012 consent decree in *DePriest v. Walnut Grove Correctional Authority,* particularly those provisions relating to protection from harm and violence, excessive use of force, long-term cell confinement, programming and behavior management, discipline and grievances, and contract monitoring; to try to understand the causes of the level of violence at the facility; and, if appropriate, to make recommendations for remedial action.

I note that, as set forth in the Consent Decree, the only Defendant in this case is Commissioner Christopher Epps, in his official capacity as Commissioner of the Mississippi Department of Corrections, and that the Consent Decree sets forth responsibilities to be undertaken by Commissioner Epps, his staff and contractors. The Consent Decree specifically provides that MDOC will develop comprehensive contract-monitoring policies and procedures and will monitor the contracts with the operator of Walnut Grove in compliance with these policies and procedures, and will revise contracts currently in place with the operator of Walnut Grove to incorporate the terms of this Consent Decree. Accordingly, I understand my task to include evaluating the compliance of both MDOC and its current contractor MTC with the terms of the Consent Decree regarding operation of the Walnut Grove facility.

It is clear from certain critical elements, which were a concern at the time of the Consent Decree, that the facility has come a long way since the time that the decree was deemed necessary. For example, from my tour and from a review of documents there is no evidence that unnecessary use of force, including the overuse of chemical restraints, is currently a problem at Walnut Grove. Nor is there any evidence that staff force prisoners to engage in physical exertion that inflicts pain or discomfort or are currently using pain aversion techniques to punish prisoners. Other elements are trending in the right direction

as well but the facility still has a long way to go to become a safe and secure correctional facility. At this point in time I think it is best characterized as a work in progress.

While this report is not an exhaustive review of compliance with the Consent Decree, where possible I have attempted to connect my observations and questions to elements of the decree.

During my tour, I spoke with representatives from MTC, including Odie Washington, Marjorie Brown, Acting Warden Neil Turner, Deputy Warden Priscilla Daly, Deputy Warden Shaniece Mabry, and Major Terry Daniel, representatives from MDOC, including Tony Compton and MDOC monitor Alfreda Dodd, the Health Assurance Administrator from Health Assurance LLC, Kathy Hogue; and I conducted many interviews with inmates, some of them cell-side and some private.  Prior to the tour, I reviewed the incident reports and videotapes of use of force events that were made available as well as routine monthly reports produced by the facility. I also reviewed three reports from the contract monitors and when on site was given a copy of MTC's response to the 3rd report of the court-appointed experts.

While I was on site for the tour, I was given a packet of incident reports related to the disturbance that occurred on New Year's Eve 2013. It consists mostly of Offender Data Sheets, one-page reports of medical exams, and very short handwritten staff incident reports.

Following the tour, Defendants' counsel provided to me, at my request, a copy of the internal report which had just been issued by MTC regarding the incident that occurred at Walnut Grove on New Year's Eve 2013, and which had not yet been completed at the time of my tour.

Shortly before filing this report I also had the opportunity to review the monitors' 4th report in draft form and it increased my understanding of the challenges facing MTC in the operation of the Walnut Grove facility.

*Protection from Harm:  General Control and Safety Issues*

I address in some detail the New Year's Eve riot at Walnut Grove later in this report. But first, understanding the causes of the New Year's Eve disturbance is critically important: it appears not to have been an aberration but instead to have been a predictable outcome of a number of systemic problems requiring systemic solutions.

At a fundamental level, MTC is not in control of the living units, or of the facility in general.  It is clear that MTC and MDOC have made progress, largely, I believe, as a result of the oversight and recommendations of the court-appointed monitors Steve Martin and Dr. James Austin. Some of the security staff are doing well, some units or pods are doing well (or at least better than others). Still, serious deficiencies and problems remain, including the following:

*Physical Plant*

- The cells doors are not secure. Several inmates told us how easily the doors could be rigged to keep them open. MTC staff acknowledged this is a problem. This flaw must be corrected.

- Furnishing and supplies in the units are not physically secure. The beds are not bolted to the floor - including in some segregation cells I observed. During the New Year's incident mirrors and microwaves were used as weapons and should have been bolted down or otherwise made secure. These problems have been identified by MTC, and I assume they will be corrected. In addition mops and cleaning equipment were not secured and they were used as weapons; I have not seen evidence that that problem has been addressed.

- The unit cameras should be adjusted. From the videos we have seen it is clear that some are better positioned than others. This should be a matter of routine inspection and maintenance for facility staff.

- Weapons are far too prevalent among the prison population. MTC has identified some of the sources from their own physical plant and is in the process of addressing them. The yard fence is an area that I did not hear is being addressed. The fence in the enclosed yard is reported to be a major source of shanks: evidently it is very easy to break off pieces of the metal chain-link fence for use as weapons. Inmates are in that yard without staff presence. That is a very bad idea in general, and grossly negligent when the fence is so vulnerable. The fence should probably be replaced so it is not dismantled as a source of weapons.

*Staff behavior*

- Security officers are not consistently in the pods when inmates are out of their cells. Inmates reported to me that this is a bigger problem on the evening shift. My limited access to video surveillance confirmed the inmates' reports. This lack of security-officer presence in the pods is not acceptable. Further, one security officer in the close custody pods is not enough: There should be two.

- Inmates gave us numerous examples of how staff behavior is inconsistent with institution security. For example: Sometimes security officers leave the pod when conflicts occur. Some staff members are reported to employ inmates to enforce rules in the pods. Some security staff have extremely poor interpersonal skills, showing a basic lack of respect to the inmates (some inmates believe this is a holdover from the days when the prison was a juvenile facility). Inmates reported their belief that the staff cannot protect them, and gang influence is thereby strengthened. Inmates report that some security officers do not respond to requests involving basic needs.

- The incident reports that MTC produced to me prior to the tour provided some corroboration of the inmates' claims to me during the tour that some security staff behave unprofessionally towards inmates. In one incident report, a sergeant grabbed stolen food out of an inmate's hand. In another, a Deputy Warden grabbed a doo-rag from an inmate. Such behavior by the staff is fundamentally unsafe—and worse since both were supervisors. Both situations, not surprisingly, led to use of force events.

- While some appear to be better at this than others, inmates' case managers do not routinely see the inmates. I recommend that MDOC/MTC require that all case managers have monthly contact with each inmate on their caseloads and that this contact be documented so that the monitors can audit this for compliance.

- Case managers are not consistently in the pods. In one unit, the posted hours were for only one hour, one day a week. That is not nearly enough. Consideration should be given to making one of the cells into an office for the case managers. Whether or not that suggestion is adopted, there should be a policy in place (if there isn't already such a policy) requiring the case managers to be in the pods for a specified time, probably at least a couple of hours each day and at least one evening each week. The policy should be enforced by the unit manager and up through the chain of command. The more staff is regularly in the units, the more the units will belong to the staff and not to the inmates. There is strength in numbers.

- Inmates universally reported that the presence of the warden and other administrators in the units is a strong positive factor. Many believe that a more frequent presence of administrators in the housing units would go a long way towards solving their most serious concerns. This is an opportunity for the more experienced administrators to teach and role model to their largely inexperienced staff how to exert control of the population through meeting their needs and controlling behavior norms in the pods. If possible, the frequency of visits should be increased and documented as an on-going training tool until the facility gains more experience and expertise at the line staff level.

- Contraband flow into the facility - cell phones and drugs - is enormous. Efforts should continue to stem the flow. I am not at all confident that MTC's plan of putting a net around the facility is going to solve the biggest source of their problem - namely, staff bringing contraband into the facility. Inmates were quick to share the going price for a cell phone purchased from staff.

- I am interested in MTC's efforts, to balance gang membership in the units. What do they do about this? What are the numbers? Who is responsible for managing this? Is this routinely monitored?

- What is MTC's regular cell search schedule? How is it documented? This documentation should be regularly reviewed. Reference MTC policy, Search and Entrance Procedures, 903A-09.

- Does MTC have a rule prohibiting inmates from entering a cell to which they are not assigned? From the video camera surveillance, this appears to occur with some regularity.

All of the above are signs and symptoms that MTC and MDOC have not established basic control of the living units and therefore the prison. As I discuss below in the section on programming, establishing control must go hand in hand with measures to address profound idleness at the facility, which is certainly one of the root causes of the unacceptable level of violence at Walnut Grove.

*The New Year's Eve Event*

I attach as an appendix to my report MTC's internal "After Action Report" prepared by MTC on the December 31, 2013 riot at Walnut Grove. This undated report was finalized after my tour of Walnut Grove, and was provided to me on February 4, 2014.

In general, the After Action Report shows that MTC administrators were self-critical in several areas, and I applaud them for that. However, there is an overall lack of detail, and they did miss many things. I list below a number of questions raised by the gaps in MTC's After Action Report; these are items that I believe should be reviewed by Plaintiffs and the court-appointed monitors.

- On page 1 of the After Action Report, MTC lists 18 items. We were provided only one of these items, the videos. Plaintiffs' counsel should see them all, including notes from offender and staff interviews.

- Did the Command Post generate logs and/or time lines during the incident? If so, Plaintiffs should see them. Page 9 of the After Action Report says there was a timeline.

- First paragraph, Facts of Event: Was there a sergeant on duty for these units? Paragraph 1 of this section does not say that a sergeant was present for those units. According to an incident report by Officer Evans, at least two sergeants were hanging out in the Captain's office with her when the event kicked off.

- In the Facts of Event section, it says that at 8:08 p.m. MTC staff "reached" the units. Were security officers in the units then? There is no clear description in the report.

- From the same section, searches did not begin until MDOC arrived on the site. Why was MDOC needed to begin searching?

5

- In the "Actions" section of the Report, it states from the time code black was called until staff entered the units that, "staff were actively attempting to resolve the incident". What specific actions were they taking? It is not obvious from the videos. If the "actions" referred to was the dispersal of Oleoresin Capsicum (OC) and sting balls, why was this not coordinated with officers so that they could enter the unit and lock inmates in their cells? It appears from the videos that many inmates retreated to their cells in order to escape the effects of OC and sting ball deployment.

- Why did it take until 7:45 p.m. to even give notice to lock down the other housing units? (Actions section, page 5) This should have happened in a few minutes. It certainly appears that no one was clearly in command during the period of time following the start of this event.

- In the Policy Review section, item #4, the written instruction to staff for the "enhanced protocol" to a code black for the officers that are designated to respond should be reviewed and evaluated. This is a good idea but not if the staff does not know what they are going to do and are prepared to do it.

- In #5, Emergency Plan, is review of the Emergency Plan a one hour a year event? That is not enough. What else does MTC do to expose staff to the plan and explain their role in it?

- Same section, their NIMS/ICS training outline should be reviewed.

- 3rd recommendation on page 6: I don't know what this means. It doesn't really say anything. We need further information on the meaning of this recommendation.

- Policy Review, item #6: This should not be allowed to be labeled a "reactive unplanned" force. MTC had plenty of time to develop a plan and bring the camera. They knew they were going in to secure the unit and that resistance resulting in the need for the use of force was a distinct possibility. Given the time they had, if they did not have a plan and just barged in, that was very dangerous for all. And even if that was the case, there is still no excuse for not having a camera on all the events of the night and the early morning. I believe that this shortcoming clearly violates the Consent Decree, section III B 5, which says:

\

*Except in exigent circumstances where no delay is possible because of the risk of bodily injury or serious damage to property creating a threat to security, or except when totally impracticable, use of force will be captured on an audio-visual recording. MDOC will provide sufficient audio-visual equipment at WGYCF to ensure that use of force as specified above will be recorded, the summary use of force reports will be provided to Plaintiffs' counsel on a monthly basis, and copies of videotapes will be available for inspection by Plaintiffs'*

> *counsel. If the use of force was not recorded, the use of force report must document why a recording was not made.*
>
> This issue is larger than the New Year's Eve disturbance. Video documentation of Use of Force incidents captured by video surveillance cameras should be preserved. I recommend retention for the video surveillance from the unit cameras be expanded to sixty days - not the seven-day limit MDOC/MTC employs at Walnut Grove. Anytime there is a known UOF in the unit, the surveillance videos should be downloaded and preserved for a longer period of time.
>
> - Policy Review, items #10 & 12, staff need to know who the Incident Commander (IC) is and there needs to be a highly structured process to change the IC, including a structured notice to staff.
>
> - Why was there an absence of notice to Warden Mack? Was this a decision related to his reported health problems?
>
> - Were inmates held accountable for their behavior during the disturbance? Assuming there are RVR's, it would be good to see them. Did some end up in segregation? Were some transferred? Was protection offered to the victims?
>
> - While we were on site, I pointed out the lack of systemic communication by the Warden during the lockdown. I think that is important and would like to think it could be a lesson learned.

Hindsight is always 20/20, but what MTC probably should have done as soon as the events of December 31, 2013 began to unfold is assemble a team of security staff and position them at the door to one of the pods. When OC spray and stingers were administered from the control booth, most of the inmates returned to their cells: Staff should have been right behind them to lock them in. Then, they should have gone on to the next pod, and so forth. But it appears that security officers were not trained to do that, and that no one was in command early on. In my view, it is only by great good luck that there was no loss of life that night, considering the very serious stab wounds and beatings some inmates suffered. A good question that MDOC should be asking MTC might be: "Assuming you had the exact same incident happen again, what would you expect your staff to do"? The court-appointed monitors and Plaintiffs need to try to discover what, if anything, MDOC and MTC learned from this event.

*Programming Deficits*

The level of idleness at the facility appears to be profound at Walnut Grove. Much more information is needed to understand and address the connection between the level of idleness and the level of violence. However, I note the following based on the information I gathered during my tour:

7

- Many inmates simply said there are "no jobs". How many are employed, and for how many hours?

- Inmates told us that the limited jobs that do exist are given to inmates who are "affiliated", thus strengthening the gang culture. These complaints should be looked at in more detail. Who is responsible for the hiring into jobs? What records are there?

- How many education slots are there? What is the waiting list?

- Same question for anger management and drug and alcohol treatment: There is a long list of programs that are available in the handout they gave us (carpentry, masonry, etc.). How many are in each and how many are waiting?

- How does hiring into culinary arts work? From our interviews, we had the impression that a cook simply goes to one of the pods and selects inmates.

- There should be a comprehensive list of programs offered, numbers of slots available in each, hours of involvement each day and the number of prisoners on waiting lists.

- Does MTC have a policy on programming with expectations for inmates? The goal and the expectation should be that each inmate is programming a minimum numbers of hours per week or day. I recommend at least four hours of program each day, five days a week. Earned time should be granted accordingly. But if there are not sufficient program slots for the numbers of inmates, being on waiting lists should count for earned time, as should time spent in reception.

- What happened to earned time during the lockdown? Do uninvolved inmates lose time credits during lockdown?

- MTC has an opportunity to accomplish something meaningful in reception by having inmates work with a case manager to identify problems and establish goals. MTC doesn't seem to be using that time for anything productive.

I note that Part III.D (3) of the consent decree, on Programming and Behavior Management, provides that "Except as limited by acceptable disciplinary procedures and punishment or a specific threat to safety, the norm will be that prisoners will be allowed out of their cells most of the hours of the day, including access to at least one hour a day of outside recreation, weather permitting." The facility was still mostly locked down during my tour, nearly a month after the New Year's Eve disturbance, and it is my understanding that today, more than two months after the disturbance, it is not yet fully off lockdown status.

*Disciplinary Due Process and Grievances*

These topics are covered by Section III E of the Consent Decree. It isn't clear yet whether the grievance system is working. I am confident that court-appointed monitor Steve Martin is working on this and has identified the critical next steps. If MTC/MDOC follows Mr. Martin's guidance, more accurate information should be available soon. This is a critical piece to measure the legitimacy of the authority of the institution.

I am equally confident that Mr. Martin has the facility on the right track regarding the inmate discipline process.

### *Long Term Cell Confinement*

The monitors have raised the issue that there are some inmates who are being held in segregation by the MDOC, despite good behavior, solely because they are gang members who have not participated in the gang renunciation program. I believe this is not in compliance with item III C of the Consent Decree. MTC and MDOC, if they have not already done so, need to solve this problem. The monitors are clearly pushing for a solution and expressed the same during our tour.

### *Contract Monitoring*

I did not have the opportunity to review MDOC's contract monitoring reports. If not already available, they should be made available to Plaintiffs' counsel.

### *Additional Recommendations:*

1. It is my opinion that the security staff at Walnut Grove, looked at as a whole, does not have the necessary skill, experience, and custody expertise to manage close custody inmates. These deficits, together with the lack of adequate programming, makes the facility inadequately equipped to manage close-custody inmates until staff training and programming are sufficiently improved to properly manage this more challenging population.

   To address this issue, while we were on site, the monitors suggested defining levels of close custody and decreasing the amount of dayroom time accordingly rather than excluding close custody inmates from Walnut Grove. I believe that method is likely to have significant downsides, and I would strongly recommend that before it is adopted serious consideration should be given to the alternative approach of MDOC limiting the facility to medium and minimum custody inmates, and determining if MTC has learned to control that population before taking on the challenges that the close custody population can present.

2. MDOC should work with MTC to increase the average age of the population in order to add some stability to the institution. They should track the average age.

3. I would urge MDOC/MTC to consider creating another "privilege unit". The waiting list for the existing privilege unit was at 25 and it might be more by now.

4.      MDOC and MTC need to develop strategies that reward non-gang behavior.

5.      I recommend an expert in security hardware inspect the prison to determine if there are other areas of physical plant construction that could place prisoners or staff at risk.

Sincerely,



Eldon Vail

Cc:  Steve Martin
     Dr. James Austin
     Harold Pizzetta
     Jody Owens
     Robert McDuff
     Sheila Bedi

## **CERTIFICATE OF SERVICE**

       I, Jennie A. Eichelberger, one of the attorneys for the Plaintiffs, hereby certify that on this date, I electronically filed the Report of Plaintiffs' expert, Eldon Vail with the Clerk of Court using the ECF system which sent notification to such filing to all counsel of record.

       SO CERTIFIED, this the 14th day of March, 2014.

                                          */s/ Jennie A. Eichelberger*
                                          Jennie A. Eichelberger, MSB #102522