# Walnut Grove Correctional Facility (WGCF) Report

Submitted
October 17, 2014

Submitted by
Madeleine L. LaMarre MN, FNP-BC

# Contents

**Qualifications** ............................................................................................................... 3

**Document Review** ........................................................................................................... 4

**Overview** ......................................................................................................................... 5

**Findings** ........................................................................................................................... 9

    Access to Care ............................................................................................................. 9

    Chronic Disease Management .................................................................................. 15

    Urgent Care ............................................................................................................... 18

    Pharmacy Services and Medication Administration ................................................. 21

    Policies and Procedures ........................................................................................... 23

    Medical Audit, Quality Improvement and Infection Control Committees ............... 25

    MDOC Contract Monitoring and Revisions ............................................................. 26

**Recommendations** ........................................................................................................ 29

# Qualifications

I, Madeleine LaMarre, MN, FNP-BC have been retained by Plaintiffs' counsel as a correctional and nurse practitioner expert to review health care services at Walnut Grove Correctional Facility. Compensation for my work is being billed at $250 per hour and ½ my hourly rate for travel time, and $250 per hour for deposition or court appearances. In the following paragraphs I have summarized my background and experience in correctional health care as a prelude to this report.

I have practiced nursing for over 30 years. I am a registered nurse and certified family nurse practitioner. Since 2005, I have been self-employed as a correctional health care consultant primarily involved in monitoring prison and jail compliance with settlement agreements, and providing technical assistance to correctional agencies to improve the quality of health care services and clinical outcomes.

My experience in corrections began in 1982, when I worked as a nurse practitioner/administrator at the Atlanta Transitional Center, which is a Georgia Department of Corrections (GDC) facility. In 1984, I joined the GDC Office of Health Services full-time as a Nurse Consultant. My responsibilities expanded over time and in 1995, I became the Statewide Clinical Services Manager. My responsibilities included the development of administrative policies regarding health care delivery; clinical guidelines including the treatment of HIV and hepatitis C infection and other communicable and chronic diseases. I provided training to GDC health care staff regarding policies and clinical guidelines. I was also responsible for a clinical auditing process that surveyed health care at over 40 correctional institutions, providing consultation to clinicians and nurses to improve health care delivery and patient outcomes. I have authored or coauthored a number of publications, and was an associate editor for a textbook on correctional medicine, Clinical Practice in Correctional Medicine, 2nd edition by Michael Puisis published in 2006. I am a member of the American Nurses Association, American Association of Nurse Practitioners, and the Academy of Correctional Health Professionals.

In 2002, I was appointed by Judge Thelton Henderson to be a medical expert in the Plata v. Schwarzenegger case. This was followed by appointments as a health care monitor for other cases and at the end of 2004 I left the Georgia Department of Corrections to pursue this work full time. I am familiar with standards of nursing practice and correctional health care.

# Document Review

I reviewed the following documents for this report.

1. C.B., et al. v. Walnut Grove Correctional Authority et al. Consent Decree. Civil Action No. 3:10 cv663.The United States District Court for the Southern District of Mississippi Jackson Division. March 26, 2012.
2. Performance Based Standards for Correctional Health Care in Adult Correctional Institutions. First Edition. 2002. American Correctional Association.
3. Standards for Health Services in Prisons. 2008. National Commission on Correctional Health Care.
4. Nurse and Provider Sick Call Logs (January to April 2014).
5. Chronic Diseases and Appointment Tracking Logs (January to March 2014)
6. Emergency Room/Hospital Admission Logs (April 2013 through April 2014)
7. Specialty Consultation Log (April 2013 through April 2014)
8. Pharmacy List for Chronic Disease Patients (March 2014)
9. Quality Improvement Meeting Minutes (January 2013 through December 2013)
10. Infection Control Meeting Minutes (January 2013 through March 2014)
11. List of Deaths in the past 2 years (one death in 2012).
12. MDOC Contract Monitoring Program Policy and Procedure. SOP 16-29-01. 2/15/12.
13. Walnut Grove Correctional Facility Monitoring Report, AdminPros, December 13 2012.
14. Walnut Grove Correctional Facility Monitoring Report. AdminPros, June 25, 2013.
15. Walnut Grove Facility Monitoring Report. AdminPros. December 10, 2013.
16. Walnut Grove Facility Monitoring Report. AdminPros. May 20, 2014
17. Management Agreement between Walnut Grove Correctional Authority (WGCA) and MTC. July 2, 2012.
18. Management & Operations Agreement between MDOC and WGCA. July 2, 2012.
19. MDOC/HALLC Medical Services Contract Extension. July 1, 2010 to June 30, 2011.
20. Investigation of Walnut Grove Correctional Facility. Department of Justice. March 20, 2012.

# Overview

On May 6-8, 2014 I visited the Walnut Grove Correctional Facility (WGCF), formerly Walnut Grove Youth Correctional Facility, in Walnut Grove, Mississippi. The purpose of the visit was to determine whether, in accordance with the Consent decree:

1) Prisoners are provided adequate, appropriate, and timely medical and dental care including treatment of acute and chronic conditions. Care is provided at WGCF or the prisoners are transferred to a facility that complies with the National Commission on Correctional Health Standards for Health Care in Adult Confinement Facilities [Consent Decree II.G(1)];

2) MDOC has developed comprehensive contract monitoring policies and procedures and monitors the contracts with the operator of WGCF and the health care provider at WGCF in compliance with these policies and procedures [Consent Decree, ¶II.H(1)]; and

3) MDOC has revised its contracts with the operator of WGCF and the health care provider at WGCF to incorporate the terms of the Consent Decree (Consent Decree ¶II.H.2).

I was accompanied by Jennie Eichelberger of the Southern Poverty Law Center.   I performed the following activities in preparation for and during the site visit:

- Reviewed the medical requirements in the Consent Decree;
- Toured inmate general population and segregation housing units, main and satellite medical clinics;
- Interviewed health care and custody staff;
- Reviewed inmate health records, tracking logs and other medically related documents;
- Observed correctional and health care staff response to a medical emergency; and
- Interviewed inmates.

I would like to thank Grady Wallace, Acting Warden and Kathy Hogue RN, Health Services Administrator and staff for their assistance in conducting this review.

Although staff were very cooperative, my review was limited by frequent disconnection from the electronic health record which limited the number of records I was able to review.  This is relevant as I anticipate that review of additional records may have revealed findings consistent with those found in records for which I completed my review.

To evaluate MDOC's compliance with the requirements of II.G (1) and III.H (1) and (2) of the Consent Decree, I requested the MDOC contract with the WGCF medical services vendor, Health Assurance LLC (HALLC).  Defendants did not provide the contract in time for me to review it prior to completion of this report, thereby preventing me from fully evaluating Defendants' compliance with these provisions.

# Executive Summary

WGCF is a private prison operated by the Management and Training Corporation (MTC) and has a capacity of 1500 inmates of all custody levels.   At the time of my visit the inmate population was 1,271.  Health care services are provided by Health Assurance LLC (HALLC).

My review of health services at WGCF shows that inmates do not have adequate, timely or appropriate medical and dental care; and the facility is not in compliance with key NCCHC and ACA standards for health services in prisons.  My findings are consistent with a Department of Justice investigation in March 2012 that found that MDOC was deliberately indifferent to the serious medical and mental health needs of WGCF youthful offenders.

Since the entry of the Consent decree, the mission of WGCF has changed from housing a relatively healthy inmate population under age 22 to an older population and increasingly sicker population. Chronic disease tracking logs show that at the end of January 2014 approximately 20% of inmates at WGCF had hypertension, diabetes, asthma, chronic obstructive pulmonary disease, renal, thyroid and seizure disorders. Record review showed that chronically ill patients are scheduled to see the physician every five minutes leading to inadequate evaluations. Patients with poorly controlled disease are not monitored, as they should be, at greater frequency than patients whose disease is well-controlled disease. The failure to adequately monitor and treat these patients increases the risk of complications such as heart attack and stroke and is not adequate, appropriate or timely care.  A major contributing factor is insufficient provider[1] staffing for a population of almost 1300 inmates. HALLC employs two part-time physicians both of whom have outside medical practices.

Although I was not provided the MDOC/HALLC medical services contract, the MDOC contract monitor (AdminPros) reports indicate that the medical services contract does not specify the amount of on-site physician hours, only that a physician comes to the facility a certain number of days per week.  In addition, discussions with the health care administrator and provider appointment logs indicate that a physician comes to the facility 10 hours per week.  This is grossly inadequate for a population of almost 1300 inmates.

As a result, nurses perform the majority of health care services to inmates, including nurse sick call, chronic disease care, wound care and emergency services. However, nurses' assessments are inadequate. Record review shows that nurse assessments are lacking in history and physical examinations and nurses treat patients who should be referred to a physician.  In some cases, nurses exceed their scope of practice by independently ordering medications, x-rays and EKG's without consulting a physician. For example, nurses order prescription medication for patients with poorly controlled blood pressure and skin infections in accordance with standing orders; a practice that is not compliant with NCCHC standards.[2]  In my opinion this pattern of practice is

---

[1] The term "provider" includes physician, nurse practitioner and physician assistant.
[2] Standards for Health Services in Prisons. 2014. NCCHC. J-E-11.

dangerous to patients, directly attributable to insufficient provider staffing, and deliberately indifferent to inmates' serious medical needs.

Although I am impressed with the conscientious of Ms. Kathy Hogue RN, Health Services Administrator, and with several nurses that I met, nursing staff cannot compensate for the lack of physician hours for an increasingly sicker inmate population.  Moreover, when nurses perform duties that exceed their training and scope of practice, it increases the risk of harm to patients. This serves only to create preventable liability to health care staff, Health Assurance LLC (HALLC) and the Mississippi Department of Corrections (MDOC).

I also found delayed access to dental care for patients with severe dental pain and infection.  In addition, dentists do not consistently document examinations or use of radiographs to diagnose and treat dental disease. One patient complained of dental decay but the dentist documented no exam, only that no treatment was indicated.  Records show that for the month of March 2014, the autoclave was not tested to determine if it was properly sterilizing dental instruments. This creates a risk of transmission of viral hepatitis and other infections.

Inmates have a right to access to a health care professional trained and licensed to diagnose and treat their serious medical conditions.  Disturbingly, HALLC employs an optician rather than an optometrist to perform optometry examinations and determine referrals to an ophthalmologist. Opticians are not licensed to perform such examinations. WGCF staff refers to the optician as "doctor" although no credentialing information supports use of this title.  I identified this problem at Eastern Mississippi Correctional Facility (EMCF) where HALLC also provides health care services. EMCF inmates with eye disease lost vision due to inadequate access to a qualified health care professional and WGCF inmates face the same risks.  Not providing adequate access to a qualified health care professional even after the issue was brought to MDOC and HALLC's attention, again demonstrates deliberate indifference to inmate's serious medical needs.[3]

With respect to pharmacy and medication administration, I noted several problems, including the following:

- physicians not reviewing and authorizing nurse-entered medication orders into the electronic health record in a timely manner, if at all;
- nurse transcription errors onto medication administration records (MAR);
- physicians not documenting complete medication orders for sliding scale insulin;
- nurses not consistently documenting doses of insulin administered to the patient;
- nurses not documenting medication administration status for each dose, resulting in blank spaces on the MAR;
- Inmates not receiving medications due to problems facilitating inmate movement to the area where nurses administer medications.

---

[3] Eastern Mississippi Correctional Facility Report. Madeleine LaMarre MN, FNP-BC. June 16, 2014.

I also found that HALLC health care policies and procedures are outdated, not specific to Walnut Grove Correctional Facility, and provide insufficient operational guidance to staff. This is not consistent with HALLC's own policy and procedures, American Correctional Association (ACA) or National Commission on Correctional Health Care (NCCHC) standards. This has not been identified by AdminPros, MDOC's contract monitor.

The quality improvement program does not meaningfully identify health care problems, analyze root causes that lead to the development, implementation and monitoring of corrective action plans.  Neither of the part-time physicians attends quality improvement meetings and therefore are not active participants in efforts to improve health care services. The March 2012 DOJ report also found that the quality improvement program was ineffective. The infection control program is primarily an education program, and similarly ineffective in monitoring and addressing communicable diseases.

The consent decree requires that MDOC develop comprehensive contract monitoring policies and monitors the WGCF operator and health care services vendor in accordance with these policies and procedures. However with respect to medical services, the MDOC policy contains no specifics regarding the substance of medical monitoring.[4]  The policy states that the medical contract forms the basis of the standards for contract monitoring.  I requested the medical services contract to form an opinion as to whether the medical contract requirements were sufficient to provide adequate, appropriate and timely medical and dental services.  However, MDOC did not provide prior to the completion of my report.

MDOC has outsourced its medical monitoring obligations to AdminPros. Review of AdminPros reports describe almost 100% compliance with monitored items.  However the reports do not document the methodology for evaluating compliance or provide supporting documentation substantiating compliance.   My review showed noncompliance with items that AdminPros found WGCF in compliance, raising questions about the accuracy or effectiveness of MDOC contract monitoring.   Review of the credentials of AdminPros monitoring staff showed that none of the three staff were medical or nursing professionals. Although they may be qualified to assess compliance indicators, they do not have the qualifications to evaluate the adequacy, appropriateness, or timelines of medical care as required by the Consent decree.

In addition, as I was not provided the medical services contract, I was unable to evaluate whether MDOC incorporated consent decree medical requirements into the contract. It also prevented me from assessing whether AdminPros monitors compliance with medical contract requirements as required by MDOC policy.

In summary, my review showed that patients at WGCF do not have adequate, timely and appropriate medical care.  Key factors contributing to inadequate medical care are lack of sufficient provider hours, lack of medical leadership, inadequate policies and procedures, and an ineffective quality improvement program.

---

[4] Contract Monitoring Program. MDOC SOP 16-29-01.

# Findings

## Access to Care

*I evaluated this area by interviewing health care leadership, staff and inmates; touring medical clinics; reviewing nurse and provider appointment logs; and patient health records.*

*My review of health records and appointment logs show that WGCF patients do not have access to a health care professional trained and licensed to diagnose and treat their serious medical and dental conditions in a timely manner. There is insufficient access to a physician or other medical provider (e.g. nurse practitioner, physician assistant) at WGCF. Nurses diagnose and treat conditions beyond their training and licensure including ordering prescription medications and x-rays.*

*Of serious concern is that an optician is performing independent vision examinations. Opticians are not trained or licensed to perform optometry examinations. Therefore, inmates do not have access to a health care professional trained and licensed to screen, diagnose and treat serious eye diseases.*

WGCF inmates obtain access to routine health care by obtaining a medical services request form (MSRF) from correctional staff. Correctional officers are responsible to ensure that adequate supplies of forms are available in the housing units.[5]  Upon completion, inmates submit requests into a locked box accessed by health care staff. Health care staff is to collect and triage forms daily to identify patients with urgent complaints that should be seen the same day.  The Health Services Administrator (HSA) stated that staff schedules patients with routine complaints to ideally be seen within 24-48 hours.  Inmates are charged $6.00 for submission of health requests.

During tours of housing units I found that with the exception of 3B, each unit contained a supply of medical service request forms.  I spoke to several inmates during the tours who reported that following submission of a MSRF staff does not see them in a timely manner, and in some cases, not at all.  Inmates reported that it was difficult to see a doctor.

Health care staff assesses patients in the main or satellite medical clinics.  In the main medical clinic an exam room used by nurses and the physician was not adequately equipped and supplied in accordance with NCCHC standards.[6]  The Health Services Administrator reported that the room was not fully equipped and supplied because non-medical staff has access to the room and equipment and supplies cannot be secured.  Therefore they bring medical equipment and supplies into the room as needed.  However, satellite clinics were adequately equipped and supplied and it is unclear why the main medical examination rooms cannot be similarly secured,

---

[5] According to the HSA, nurses also have forms on the medication carts but do not go into the housing units as was done at one time.
[6] Standards for Health Services in Prisons. National Commission on Correctional Health Care (NCCHC). 2008. J-D-03.

equipped and supplied. Similarly, there is a large bay area with a stretcher in which emergency equipment and supplies cannot be readily secured. It is notable that AdminPros contract monitoring reports indicate that access to medical department keys are restricted to appropriate personnel, so the reason for not being able to secure adequately equipped and supplied examination rooms is unclear.

WGCF nurses have protocols for the evaluation of commonly occurring minor conditions that include over-the-counter (OTC) medications for treatment of minor health complaints. However, nurses also treat patients for more serious medical conditions such as poorly controlled hypertension and skin infections with prescription medications.[7]   This is not consistent with community standards of care.  Nor is it in compliance with NCCHC standards that prohibit nursing assessment protocols from containing prescription medications except for those covering emergency, life-threatening conditions.[8]

I reviewed nurse appointment tracking logs from February to April 2014.  These appointment logs show that nurses perform the majority of health care encounters at the facility including nurse sick call, chronic disease appointments, and wound care.  Nurses generally conduct clinics Monday through Sunday, although occasionally weekday and weekend nurse clinics are not conducted. The appointment log contains the scheduled duration for each appointment, with most appointments being scheduled for 5 minutes, and some for 15 minutes. With respect to appointment completion, some appointment logs contained hand-written notations as to whether the appointment was completed, rescheduled, or refused, but staff did not consistently document the disposition of each appointment on the logs.

Review of medical request forms and health record documentation shows that nurses do not perform adequate assessments.  Examples include the following:

- On 4/10/13 an LPN saw a hypertensive patient for blood pressure monitoring.[9] His blood pressure was elevated (BP=163/98 mmHg). The patient also complained of back pain. The nurse did not ask any questions related to hypertension medication adherence or perform a review of systems (ROS) for back pain. The nurse gave the patient a prescription dose of Ibuprofen (800 mg) and did not contact the physician for the patient's poorly controlled hypertension.
  - On 4/11/13 an RN saw the same patient for complaints of right shoulder pain. His hypertension was still poorly controlled (BP=151/110 and 158/100 mmHg). The nurse noted a history of right shoulder surgery in February 2013, performed a pain assessment but did not examine the patient's shoulder.  The nurse did not notify the physician of his poorly controlled blood pressure.
  - On 3/2/14 at 1912 a nurse saw the patient in the zone due to a lockdown. He had an injury to his right third finger that was still swollen. The nurses' plan was

---

[7] Patients #14, #15 and #16.
[8] NCCHC standards. J-E-11.
[9] Patient #1.

to get an x-ray of the right hand; refer to MD for pain management; and provide Ibuprofen 400 mg twice daily for 7 days. On 3/4/14 the physician signed the order for the x-ray but I did not find documentation that it was completed.  A physician did not see the patient in 7 days.  On 3/19/14 when a physician did see the patient, he did not address the reason for the sick call referral. On 4/20/14 the patient was released.

- On 10/24/13 a 31 year-old patient with a history of hypertension, asthma and latent TB infection submitted a request complaining of "real bad chest pain over my heart".[10]  On 10/25/13 a RN saw the patient noting that he had sharp stabbing chest pain for 3 days is sharp with nausea and vomiting at times. He reported being born with a hole in his heart. He also reported epigastric pain with belching and pain when lying down at night. He expressed concerned that he was losing too much weight. The nurse did not elaborate on the patient's cardiac history. She performed a pulmonary and cardiovascular assessment but did not note the presence or absence of murmurs. The nurse ordered Prilosec, an EKG and weekly weight checks.  A physician did not see the patient to independently evaluate his cardiac history. It is not appropriate for a nurse to independently evaluate a patient who presents with chest pain, especially one who gives a cardiac history.

- On 3/7/14 an RN saw another patient for complaints of back pain.[11] The nurse noted that the patient was seen on 2/10/14 for a similar complaint and was treated with ibuprofen that provided relief but when the medication stopped the pain returned. The nurse did not perform a review of systems (ROS) or perform an examination of any kind. She planned to treat the patient with Ibuprofen 400 mg twice daily x 7 days, no sports and to return if symptoms persist.
  - On 3/17/14 the same patient submitted a health request asking for an x-ray because his pain had worsened, limiting his movement. On 3/18/14 a RN saw the patient noting his previously complaints, provided acetaminophen and referred the patient to the physician. The nurse independently ordered an x-ray that was not cosigned by the physician. On 3/20/14 the x-ray was normal. A month later, on Saturday 4/19/14 a physician saw the patient but took no history of the patient's back pain and did not address the x-ray findings.  He treated the patient with muscle relaxers and anti-inflammatory medications for 3 weeks. He did not request follow-up.

These examples show that nurses perform inadequate nursing assessments and treat patients for conditions that should be referred to a provider for evaluation. Nurse to provider sick call referrals do not occur timely if at all.

---

[10] Patient #12.
[11] Patient #13.

## Access to a Medical Provider

At WGCF the health administrator reported that a physician is onsite 3 times per week. According to AdminPros reports, the MDOC/HALLC medical contract does not require that a designated number of physician hours are provided, only that a physician must be onsite a certain number of days per week.

I reviewed provider appointment logs from January to April 2014 to assess patient access to a physician. These appointment logs included sick call referrals, physical examinations, physician follow-up and chronic disease appointments.  I also reviewed the chronic disease tracking log from January through March 2014.

The provider logs showed that generally physicians conducted onsite clinics 2 to 3 times per week.  However, there were times when physicians did not conduct clinics for an entire week. In February, a physician clinic was not conducted from 2/6/14 until 2/13/14. In March, a physician clinic was not conducted from 3/15/14 until 3/25/14, a ten day span between scheduled clinics.  AdminPros did not identify this as a deficiency in their May 2014 contract monitoring report.

Clinic logs show that each clinic is scheduled for 1 to 2 hours; averaging 5-6 clinic hours per week.  Moreover, staff schedules the physician to see patients every 5 minutes. For example, on 4/12/14 the physician was scheduled to see 23 chronic disease patients every 5 minutes from 8 am to 10 am, averaging 11.5 patients per hour.[12]  While some patients may only require an abbreviated clinic visit, scheduling all patients 5 minutes does not allow sufficient time to perform adequate medical evaluations.  The logs also do not reflect whether scheduled patients were actually seen or not.

I reviewed the chronic disease tracking log from January through March 2014. The log contained names of patients with chronic diseases and the scheduled and/or completed appointment dates.[13]  It appears that for January and February 2014 nurses performed most chronic disease appointments, and for March a physician performed most chronic disease appointments.

On 3/19/14 the chronic disease appointment tracking system showed that the physician was scheduled to see 50 chronic disease patients.  There is no clinic appointment log correlating to this date showing these scheduled appointments were completed.[14]  However, scheduling this volume of patients for a chronic disease evaluation in a single day is consistent with other appointment logs showing that staff scheduled the physician to see patients every 5 minutes. Five minutes is insufficient time for providers to perform an adequate medical evaluation, particularly for chronic disease patients.   My record review found that documented

---

[12] Like the nurse appointment logs, there were hand written notations regarding appointments that were refused, rescheduled or no shows but staff did not consistently document a disposition for each appointment.

[13] The log is not clear whether the dates are scheduled appointments or completed appointments.

[14] Physician appointment logs provided for my review showed that no physician clinics were conducted from 3/16 until 3/25.

examinations of chronic disease patients were indeed inadequate.  Review showed that physicians do not perform chronic disease interval histories or examinations – which are essential to chronic disease care.  In some records, it is not clear that the physician even spoke with the patient.[15]

I interviewed Ms. Kathy Hogue, Health Services Administrator regarding provider staffing.  She reported that two physicians worked at the facility, both of whom had outside clinical practices.  She reported that the Medical Director worked 4 to 5 hours two days per week, and another physician worked one day per week.  Provider logs showed that the second physician typically conducts clinics on Saturdays for 2 hours.  Based upon this information, the facility has at most, a 0.3 physician FTE.[16]  This staffing level would be extremely low for a population of this size and medical acuity, but in fact the provider clinic appointment logs do not show that even this staffing level is being provided.[17]

Based upon multiple health encounters in which nurses should have referred the patient to a physician, I conclude that patients at Walnut Grove do not have adequate access to a health care professional that can diagnose and treat their serious medical conditions in a timely manner.  The part-time medical providers also do not participate in medical audit, quality improvement and infection control meetings that are important to identify problems and improve timeliness and quality of services. [18]  Lack of timely access to medical professional increases the risk of harm to patients and is indifferent to their serious medical needs.

## Access to Dental Care

Ms. Hogue RN, HSA reported that dental staffing consists of two dentists that alternate coming to the facility three nights per week. She reported that dental services include preventive care, restorations and extractions.

HALLC does not provide dentures to patients. A blanket policy of not providing dentures for edentulous patients regardless of baseline weight or chronic diseases may result in undesired weight loss and creates a risk of harm to patients.

A tour of the dental clinic area showed that staff had not conducted spore testing of the autoclave for the month of March 2014.  Autoclave spore testing is important to show whether the autoclave is functioning properly to sterilize dental instruments and prevent transmission of infections.  Failure to perform spore testing is a patient safety issue.  AdminPros did not identify this as an issue in their May 2014 audit report.

---

[15] The lack of physician documented interaction in some records raises the question of whether chronic disease management was performed via record review.

[16] FTE means Full time Equivalent position.

[17] Other physician activities involve reviewing labs, ordering medications, consultations with nurses regarding specific patients and being on-call. However, even taking this into consideration, record review shows that nurses manage patient's that should be evaluated by a physician, indicating that the allocation of physician hours to see patients is inadequate.

[18] Medical Audit and Quality Improvement Minutes show that Michael Reddix, HALLC Medical Director attends MA/CQI meetings.

There is dental x-ray equipment at the facility but it is not digital and must be sent out for developing which means that dentists do not have ready access to radiographs when they treat patients.

Review of health records shows that health care staff does not consistently see patients with dental pain in a timely manner.  In addition, I did not find documentation to show that dentists use radiographs for diagnosis and treatment of dental disease and in some cases there is inadequate documentation of dental examinations.  Examples are noted below.

- On 2/7/14 a patient submitted a MSRF for dental services. It was triaged on 2/8/14 and the dentist saw the patient on 2/25/14. The patient complained of decay of his right upper molar. The dentist did not document an examination and documented that no treatment was necessary.  The dentist charged the patient $6.00.[19]

- On 1/10/14 a nurse observed that a patient was holding a towel over his face during medication line due to a bad toothache. The nurse documented that no abscess was noted and gave the patient Ibuprofen 400 mg for 7 days. The nurse did not document frequency of medication administration or a referral to the dentist.  Two weeks later, on 1/23/14 the patient submitted a request for "a tooth that's hurting me day and night. I need to be seen ASAP". It was received on 1/25/14. On 1/26/14 a nurse saw the patient who reported that he had submitted two sick call requests for his pain. The nurse gave him Ibuprofen x 7 days but did not document a referral to the dentist.  On 1/29/14 a nurse saw the patient who complained of a bad toothache and facial swelling. The nurse planned to start the patient on a dental protocol and try to get the dentist to see the patient ASAP. On 2/2/14 the dentist saw the patient, noting that he had extensive caries and irreversible pulpitis of #2 and #13. He extracted both teeth. Thus, this patient had severe dental pain for 3 weeks before a dentist treated the patient.[20]  This is not timely or appropriate care.

- On 3/27/14 a patient submitted a request complaining that his wisdom tooth hurt and needed to be pulled. It was received the same day but a nurse did not see the patient. On 4/1/14 the dentist saw the patient and noted that tooth #5 had gross decay and irreversible pulpitis with retained root tips. He extracted tooth #5 and root tips. This is not timely or appropriate care. A nurse should have seen this patient to evaluate the patient for pain and infection pending his dental appointment.[21]

- On 3/22/14 the patient submitted a MSRF complaining of two painful teeth and sharp pain shooting through his mouth like a nerve is exposed. On 3/23/14 it was received but a nurse did not see the patient.  Ten days later, on 4/1/14 a dentist saw the patient, noting that he had acute gingivitis and leaking restoration. He planned to restore #6.  No

---

[19] Patient #2.
[20] Patient #5.
[21] Patient #12.

dental x-rays were noted to have been taken. He gave the patient Peridex solution. This is not timely or appropriate care.[22]

In summary, patients do not receive timely and appropriate care for moderate to severe dental pain and infection. There is no documentation in the medical records that dentists use radiographs to diagnose and treat dental disease. This is not compliant with NCCHC standards which state that radiographs are used in the development of the treatment plan.[23]

## Access to Optometry Services

Patients have a right to a medical professional who can diagnose and treat their serious medical conditions.  For patients with diseases that involve the eyes, providers trained and licensed to diagnose and treat eye diseases include optometrists and ophthalmologists. However, HALLC has contracted with an optician to provide optometry services.  Opticians are not trained or licensed to perform eye examinations, diagnose or treat eye diseases.[24] Therefore the HALLC optician is performing duties that require training and licensure beyond his training which increases the risk of harm to patients from delayed and/or inadequate treatment.

This finding was also noted during my review at EMCF where HALLC also provides medical services but the practice of using an optician continues.[25]  As of the time of my visit at WGCF neither HALLC nor MDOC had addressed lack of access to a qualified health care professional for screening, diagnosis and treatment of eye disease.

# Chronic Disease Management

*I evaluated chronic disease management by reviewing chronic disease tracking logs and patient records.  The review showed that patients are not enrolled into the chronic disease program at the time of arrival and do not receive timely and appropriate care. The chronic disease program is nurse driven and reflects inadequate physician involvement. Nurses perform inadequate chronic disease assessments and do not refer patients with poorly controlled diseases to the physician.  Physicians do not see patients' timely, document adequate assessments or monitor patients in accordance with their disease control. This increases the risk of harm to patients for complications of poorly treated chronic diseases.*

---

[22] Patient #11.

[23] NCCHC. J-E-06.

[24] An ophthalmologist is a physician who specializes in the medical and surgical care of the eyes and visual system and in the prevention of eye disease and injury. Optometrists are health care professionals who provide primary vision care ranging from sight testing to the diagnosis, treatment and management of vision changes.  An optometrist is not a medical doctor. An optometrist receives a doctor of optometry after four years of optometry school, preceded by three or more years of college. They are licensed to perform optometry, which primarily involves performing eye exams and vision tests, prescribing and dispensing corrective lenses, detecting certain eye abnormalities and prescribing medications for certain diseases. An optician is a technician trained to design, verify and fit eyeglass lenses and frames, contact lenses and other devices to correct eyesight. They use prescriptions supplied by ophthalmologists or optometrists, but do not test vision or write prescriptions for visual correction.  Opticians are not permitted to diagnose or treat eye diseases. Source:  American Academy of Ophthalmology.

[25] The MDOC/EMCF medical services contract requires HALLC to provide an optometrist one day per week, not an optician.

---

Upon transfer to WGCF nurses medically screen all newly arriving inmates and document plans to enroll chronic disease patients into the chronic disease program. However, record review shows that staff does not enroll patients into the chronic disease program at the time of transfer, rather enrollment typically occurs weeks or months later.[26]  This delayed timely treatment of patients with poorly controlled chronic diseases.

The HALLC practice is for LPNs or RNs to see patients monthly for chronic disease management and for a physician to see chronic disease patient's quarterly. When nurses see patients at these monthly visits, their assessments are not complete or pertinent to the patient's disease. Nurses do not refer patients to physicians when their chronic disease is poorly controlled.  This is not appropriate or timely medical care for chronic disease patients.

When physicians see patients, their assessments do not consistently include adequate interval history and physical examinations, acknowledgment of pertinent lab tests or assessment of medication compliance. For patients with poorly controlled diseases, follow-up visits are not ordered in accordance with disease control appointments sometimes do not take place as ordered.

As noted earlier in this report, nurses schedule chronic disease patients for 5 minute visits and on 3/19/14 the chronic disease log showed that the physician saw 50 patients.  This volume of patients is not consistent with performance of adequate evaluations, including patient education.

Examples of problems noted in the records include the following:

- A 33 year old man with diabetes, hypertension, hyperlipidemia and GERD transferred to WGCF on 10/24/13.[27] Just prior to transfer lab tests showed that the patient's diabetes was very poorly controlled (hemoglobin A1C=16%, diabetic goal=<7%).  There was a 3 week delay in enrolling the patient into the chronic disease program and a physician did not see the patient for almost 2 months after his arrival, despite the fact that his diabetes was so poorly controlled.  Over the next six months the patient gained approximately 45 pounds with accompanying bilateral lower leg edema but neither nurses nor providers noted his progressive weight gain.   Tests to rule out a blood clot in his leg (deep vein thrombosis) were still not performed two weeks after the physician determined that it was medically indicated. Nurses saw the patient for chronic disease care in between physician visits, but their visits consisted only of measuring vital signs.  Regardless of whether the patient's blood pressure was normal or abnormal, nurses did not contact the physician.     With respect to the patient's diabetes, physicians did not reference the patient's previously abnormal labs. Physicians did not writes complete medication orders for sliding scale insulin

---

[26] Patient 1 arrived on 4/8/13 and was enrolled into the program on 4/30/13; Patient #4 arrived 10/24/13 and was enrolled into the program on 11/30/13, Patient #5 arrived on 12/12/13 and was enrolled into the program on 1/2/14.  Patient #10 arrived on 4/3/14 and was enrolled into the program on 4/21/14, after he had been hospitalized.
[27] Patient #9.

in the medical record so there is no medical-legal documentation of how much insulin the patient is supposed to receive when his blood sugars are abnormally high. Likewise, nurses do not consistently document doses of insulin administered to the patient. It's therefore not possible to know from the medical record what insulin dose was ordered for the patient and whether the nurse administered the correct dose to the patient. This increases the risk of medical errors and harm to the patient. I did not find documentation that this patient received other recommended diabetes care such as immunizations, foot and eye exams, microalbumin tests and an ACE inhibitor.[28]

- A 22 year-old seizure patient transferred to WGCF on 10/24/13.[29]  He had seizures on 10/27, 10/28, 11/5, and 11/6 before he was seen by a physician on Saturday 11/9/13.  The patient had a chin laceration with sutures as a result of his seizure but the physician did not order wound care or recall the patient for suture removal. The patient developed a wound infection for which a nurse ordered antibiotics. On 11/21/13 a different physician noted his infection had not improved and ordered another round of antibiotics and an ENT consultation.  On 11/26/13 the patient refused the ENT consultation stating that he was getting out soon and was "done with medical".

- A hypertensive patient transferred to WGCF on 4/8/13.[30] Upon arrival his blood pressure was severely elevated (BP=174/104 mmHg). The LPN did not address the patient's elevated blood pressure and did not refer the patient to a provider. On 4/16/13 the physician performed a chronic disease visit. The patient's hypertension was poorly controlled (BP=161/105 mm/Hg). The physician did not perform a review of systems (ROS) pertinent to his hypertension. The physical examination was limited to lungs and heart and no other vascular exam. His assessment was HTN and right shoulder surgery. The physician's plan included Norvasc 5 mg, weekly BP checks, obtain previous medical records related to his shoulder surgery, enroll the patient in chronic disease clinic, and return in one month. The medical records regarding his shoulder surgery 2 months prior to incarceration were not obtained. On 4/24/13 the patient's hypertension was poorly controlled (BP=180/110 mmHg). A nurse contacted the physician who ordered changes in medication.  The planned provider follow-up visit due 5/16/13 did not occur and the physician did not see the patient again until 6/13/14.  This is not timely or appropriate care.

- A 36 year-old seizure patient arrived at the WGCF on 8/8/13.[31]  The patient was prescribed Neurontin and a nurse facilitated renewal of the medication order. Five 5 days later the physician changed the patient's medication from Neurontin to Dilantin without evaluating the patient. The patient refused to take the Dilantin and for several weeks did not receive any anti-seizure medication. Three weeks later the physician saw the patient and reordered the patient's Neurontin, an EEG and neurology consultation.  The neurologist took a thorough history confirming that Neurontin was appropriate for the patient.  In this case

---

[28] An ACE inhibitor is a type of medication prescribed for diabetics to protect kidney function.
[29] Patient #4.
[30] Patient #1.
[31] Patient #3.

the physician changed the patient's medication without speaking with or evaluating the patient to determine the appropriateness of changing the patient's medication.

As noted earlier in this report, nurses seeing patient for chronic disease management do not perform adequate assessments. This is not surprising given that they are not trained or licensed to manage chronic disease patients. Examples are below.

- On 1/27/14 a nurse saw an asthma patient for chronic disease care.[32] He had no history of hypertension, however his blood pressure was elevated (BP=150/90 mmHg). The patient reported taking inhaled and oral steroids in the past suggesting moderate persistent asthma. He reported using his metered dose inhaler (MDI) 8 times a day but the nurse documented that he reported no "asthma attacks, emergency department trips or infirmary admissions". His Peak expiratory Flow Rate was (PEFR=300). The nurse did not address the patient's history of inhaled steroids, frequent rescue inhaler use, elevated blood pressure or document a plan to refer the patient to the physician. This is not appropriate care.

- On 10/28/13 an RN saw a seizure patient for chronic disease care.[33] The nurse did not ask the patient about seizure activity or inquire about medication adherence. On 11/29/13 and 12/18/13 the nurse wrote the same note. This is not meaningful care with respect to chronic disease management.

In summary, the chronic disease program does not ensure that patients are scheduled, seen and monitored in a timely manner and in accordance with their disease control. The quality of nurse and provider evaluations is inadequate.

## Urgent Care

*I performed a limited evaluation of urgent care, including observation of an actual emergency. I found hospitalizations were potentially preventable if chronic disease patients had more timely access to a physician. In one case there was no documentation surrounding a patient being sent to the hospital where he was diagnosed with new-onset type 1 diabetes. With respect to observing an actual emergency, I note that the Health Services Administrator and nurses responded timely to a patient with a traumatic injury. However, there are opportunities for improvement with respect to establishing medical treatment space for emergencies. The circumstances leading to the traumatic event likely represented excessive use of force on the part of a correctional officer.*

On the afternoon of 5/6/14 I observed health care staff response to an urgent event. While reviewing health records in an office in the main medical clinic, I heard an inmate yelling in distress that his finger had been cut off. I went out into the main clinic area to observe an inmate holding his bloody hand. Health care staff responded by sitting the inmate at a desk in a

---

[32] Patient #2.
[33] Patient #3.

large bay area and providing first aid to his bleeding finger.  There was no physician at the facility.  A Sergeant was standing nearby and I asked him what happened. He stated that a door slammed shut on the inmates' finger.  I asked him how that happened, and he stated "I did it". I entered the inmate waiting area and asked inmates what happened.  They reported that the inmate had been in the clinic and as he was leaving the waiting room the Sergeant became angry that the inmate was holding the door open and slammed it shut, cutting off part of the inmates' finger.  I looked toward the doorway and noted the tip of the inmates' finger lying on the floor.  Just then, a nurse came into the waiting area with gloves and a bag of ice and retrieved the patient's finger.  I returned to the clinic area to observe the inmate still sitting at the desk.  Nurses took vital signs and brought medical supplies to treat the patient's finger because there were none in the open bay area. A few minutes later the patient became lightheaded and nurses told him to put his head down.  He was helped from the chair onto a stretcher in the bay area.  Staff called local emergency services (i.e., 911) and after a period of time EMS arrived and transported the patient to a hospital.  I learned the following day that surgeons were unable to reattach the tip of his finger.

In this case, nurses responded timely to the patient. However, the patient initially was seated at a desk rather than being placed on the stretcher in the open bay area.  The facility lacks an emergency treatment room that can be medically equipped and supplied in a secure manner, and therefore this occurred in an open space that provided no auditory or visual privacy.  Based upon witness descriptions of this incident, it appears that the Sergeant used excessive force in dealing with a situation that did not require any force.

Record review showed a case in which nurses did not perform adequate assessments over several days. The case is described below.

- A 54 year-old patient with asthma transferred to WGCF on 4/3/14.[34] He was prescribed an inhaled steroid, rescue inhaler and nebulized albuterol treatments. Upon his arrival a LPN medically screened the patient. The nurse did not ask the patient how often he was using his rescue inhaler and if he was having any asthma symptoms such as shortness of breath. The LPN entered medication orders into the electronic medical record that were signed by the physician on 4/8/14 and noted by a nurse on 4/11/14.  The patient received his inhalers on 4/7/14, prior to the physician signing the order.  The patient was not enrolled into the chronic disease program upon arrival.  On 4/10/14 at 5:08 pm a LPN saw the patient for complaints of SOB, chest tightness and wheezing. The nurse did not listen to the patient's lungs and heart or measure the patients peak expiratory flow rate (PEFR).[35] The nurse administered two nebulizer treatments to the patient but did not reassess the patient following treatment (e.g. listen to patient's lungs, vital signs, PEFR) to obtain objective data as to whether the patient improved.  At 5:22 pm the nurse documented that the patient would be transported to the hospital.  At 9:25 pm the patient discharged back to the facility and a LPN saw the patient. The hospital report indicated the patient had COPD and asthma.

---

[34] Patient #10.
[35] Peak Expiratory Flow Rate (PEFR) measures airflow obstruction to assess the status of airway disease.

The nurse documented that the patient was oriented and felt better.  His respirations were still rapid (28/minute, normal=12-24/minute) and he was borderline tachycardic (pulse=99/minute, BP=112/72 mmHg). The nurse did not listen to his lungs or heart. His oxygen saturation was 96%. The patient requested to return to his zone. The nurse told the patient to return if his symptoms worsened.[36] The nurse entered an order for Medrol dose pack and Duoneb nebulizer treatments.  On Saturday, 4/12/14 a physician saw the patient for follow-up from hospitalization. On 4/14/14 and 4/15/14 nurses administered nebulizer treatments but performed no before and after pulmonary assessments.   On 4/15/14 the physician saw the patient for follow-up, noting that the patients' breathing was improved. He was taking "ASA (aspirin) r/t (related to) heart problems. Patient admits to having a family history of heart problems. Mother and sister died of MI (myocardial infarction)." The physician did not take a personal history of the patient's heart problems or perform a cardiovascular review of systems (e.g. chest pain, palpitations, etc.).    The physician examined the patient's heart and lungs.  His vital signs were normal and oxygen saturation was borderline low (O2 sat=94%, normal=>95%). The physicians' diagnosis was asthma and he planned to give him Decadron 4 and increase his inhaled steroid dosage and take low dose aspirin daily. The provider did not order a follow-up visit to assess whether his asthma had improved.  As of 5/6/14 the patient had no further follow-up.  Given that the patient had just been hospitalized for poorly controlled asthma, the physician should have scheduled the patient for follow-up to assess whether his asthma was improved.   On 4/18/14, after the patient had been hospitalized, a LPN electronically a note to the RN for enrollment into the chronic disease program.

In another case, there was inadequate documentation of events that led to hospitalization of a patient.

- A 21 year-old man arrived at WGCF in 2011 with no significant medical problems.[37]  On 3/7/14 a nurse assessed the patient following an incident and no injuries were noted.  The next entry is a note that the patient was admitted to the hospital (BMC-Leake) for high blood sugar. The patient was diagnosed with new-onset diabetes and subsequently transferred to CMCF.    In this case, neither nurses nor a physician documented events that led to his hospitalization or his status while he was hospitalized.

In summary, these cases reflect a combination of problems that included lack of adequate assessments, delayed access to a provider, and health care staff failure to document in the health record. In the observed emergency event, although staff responded timely, the patient was treated in an open bay area that was not medically equipped and supplied and provided no privacy.

---

[36] The nurse wrote the note at 4/11/14 at 00:12 am
[37] Patient #6.

## Pharmacy Services and Medication Administration

*I evaluated this area by interviewing staff and inmates, reviewing health records, medication orders, and medication administration records (MAR's).  The review showed areas of concern related to medication administration that include the completeness of medication orders, timely physician review and authorization of nurse-initiated medication orders, MAR documentation issues and the medication administration procedure.  This review also raises questions about the pharmacy dispensing medications prior to physician review and authorization.*

Pharmacy services are provided by Independent Health Services (IHS) located in Rainsville, Alabama. When staff fax medication orders to IHS prescriptions are typically dispensed and delivered the next business day. The HSA reported that the facility also has an arrangement with a local pharmacy in the event that a patient needed medication on an urgent basis, and that the facility has a small supply of stock medications in individually labeled single doses.

In an effort to ensure medication continuity for inmates transferring into WGCF, nurses enter previous orders into the electronic health record upon the inmate's arrival. However, because physicians are not at the facility daily, the time frame for physician review and authorization of medication orders varies from the following day to several days later and in some cases not at all.  In the meantime, nurses fax medication orders to the pharmacy where the prescription is dispensed and delivered to the patient, sometimes before the physician has authorized the order.  This increases the risk of medication errors and raises questions about the legality of the pharmacy dispensing medication prior to physician authorization.

### Medication Administration

Ms. Hogue RN, HSA reported that nurses administer all medications and that they are generally administered twice daily at 7:30 am and 7:30 pm. The medication administration process has changed so that nurses no longer administer medications from medication carts in the living units but instead administer medications from a room outside the housing unit.  However, discussion with staff suggested that since the new practice was placed into effect there has been a breakdown in the process to facilitate inmate movement to the medication room to receive their medications.  This is an access to care issue. This issue should be studied and addressed under the auspices of the quality improvement program.

### Medication Orders and Order Transcription

Review of medication administration records (MAR) showed other documentation issues that increase the risk of harm to patients.  When physicians enter orders for sliding scale insulin into the electronic medical record, the medication orders do not include the dosages of insulin to be given based upon the range of glucose levels. Therefore there is no medical-legal documentation in the health record of the insulin dose the patient is supposed to receive based

upon his blood sugar value. [38] In addition, physicians do not consistently include the frequency of administration for some medication orders. For example, for some hypertensive patients physicians write orders for the medication clonidine to be given when the patients' blood pressure is above 150/100 mmHg, however the orders do not indicate the frequency that it should be given (e.g., may be given every x hours, not to exceed x doses in 24 hours…").[39]  This increases the risk that the patient will be given clonidine too frequently.

Nurses do not consistently transcribe medication orders completely onto the MAR, including the name of the ordering physician and start and stop dates.[40]  Not documenting start and stop dates increases the risk of medication error in that the patient may receive more or less medication than ordered by the physician.

When providers change medication dosages, nurses do not consistently discontinue the old order and transcribe the new order.  Instead nurses cross out the dosage on the old order and overwrite the new dosage onto the old order.[41] This does not meet standards of nursing practice for transcribing discontinuation orders and writing of new orders.  When this is done, it's not possible to know when the patient's previous medication dose was stopped and new dose began.

For patient's prescribed inhalers, nurses do not document the date that the patient was given his inhaler. Instead nurses write "KOP" (Keep on Person) onto the MAR with no accompanying date of administration.

I discussed these documentation issues with the Health Services Administrator during my visit.

**Medication Administration Record Documentation**

On the first day of the visit, I found that for two consecutive days a nurse did not document administration of morning medication doses to any of the patients in the respective housing units he was assigned.[42]   This means that the nurse either did not administer medications to any of the patients or failed to document administration of medications. In either case it is a serious issue.  The Health Services Administrator was aware of performance issues involving the nurse and planned to initiate disciplinary action.[43]

As noted above, nurses also do not consistently document dosages of sliding scale insulin administered to patients, instead nurses document "insulin given according to sliding scale". However since physicians do not write insulin dosages in their sliding scale orders, there is no valid medication order in the medical record.

---

[38] Patient #9.
[39] Patient #1.
[40] Patient #1,
[41] Patient #1.
[42] The dates were May 5 and May 6 2014.
[43] This same nurse also failed to document nurse rounds in administrative segregation the day before and day of our tour.

Record review also showed occasional blank spaces on patient MARs indicating that a nurse did not document whether the patient received the dose of medication.  Failure of nurses to document administration status can occur for a number of reasons (e.g., medication or patient not available during medication administration, nurses failing to document at the time of medication at administration, and nurses failing to reconcile MARs at the end of medication administration to determine who still needs their medications).  These blanks should be treated as errors of omission and studied under the auspices of the quality improvement program.

Review of MARs showed other documentation and medication errors.  In one case, a nurse transcribed a medication order for norvasc 10 mg and amlodipine 10 mg daily (these are the same medication).  The norvasc order did not have a start and stop date. On 12/14 and 12/15 the nurse documented that the patient received an 8 am dose for both norvasc and amlodipine. Thus, the either patient received two doses of the same medication or it was a documentation error.  The same patient missed 7 of 31 days of his antihypertensive medication in March 2014 but the neither a nurse nor physician explored or addressed the reasons the patient did not receive his medication.   For the same patient, on 1/5/14 a nurse documented he refused phenytoin, however the patient was not prescribed phenytoin.[44]   Record review also showed that Medication Administration Records from March had not been scanned into the medical record.

## Policies and Procedures

*HALLC and MTC policies and procedures are neither current nor specific to WGCF and therefore do not provide adequate operational guidance to health care staff. HALLC and MTC medical policies and procedures were last updated in 2009 and 2011, respectively.  In addition, HALLC policies and procedures reference National Commission on Correctional Health Care Standards as the basis for their policies; however the policies as written do not consistently comply with NCCHC standards for health services in prisons. Even when HALLC policies and procedures are NCCHC compliant, WGCF does not consistently comply with their own policy.*

I reviewed HALLC health care policies, and key MTC and MDOC policies and procedures.  The HALLC medical policies and procedures were last reviewed in October 2009. This is prior to HALLC providing health care services at WGCF and the policies do not provide operational guidance to WGCF staff.  Most of the MTC health care policies were last reviewed in 2011.

As noted above, HALLC corporate health care policies and procedures reference both American Correctional Association (ACA) standards and National Commission on Correctional Health Care (NCCHC) Standards for Health Services in Prisons as the applicable standards for their policies.[45] Even though HALLC policies and procedures reference the NCCHC standards as the basis for

---

[44] Patient #5.
[45] NCCHC standards are widely accepted by correctional health care professionals as useful benchmarks, though by no means definitive, in evaluating whether an institution is meeting minimal community standards of care.

their policy, in practice HALLC policies are not consistently compliant with NCCHC; and even when policy is compliant with NCCHC standards, HALLC is not consistently compliant with their own policy.

For example, the NCCHC standard regarding Policies and Procedures (P-A-05) requires that responsible health authority review the policies annually and revise them as necessary. Such review is important to ensuring that adequate care is provided.  The policy manual is to bear the date of the most recent review and the signatures of the facility responsible health authority and responsible physician.  HALLC's own policy also requires annual policy review and revision, but the policy has not been reviewed and updated since 2009, thus HALLC is not compliant either with NCCHC standards or with its own policy.[46]  AdminPros monitoring reports indicate that the Health Services Administrator reviews policies and procedures annually, but I find no documentation to support this finding.

HALLC's and MTC's failure to update policy can have exceedingly dangerous consequences,  For example, the MTC policy regarding Human Immunodeficiency Virus is dated January 1, 2010 and states that HIV patients will be treated based upon *1998 guidelines* for antiretroviral therapy. [47] This is obviously grossly outdated -- particularly because there have been radical changes in national policy on HIV treatment as recently as 2011.  This obsolete policy does not reflect the current standard of care, and indicates that the process for revising policies is cursory and inadequate.

Among other HALLC policies and procedures that are not compliant with essential NCCHC standards are Access to Care, Chronic Disease Management and Infirmary Care.   NCCHC standards are noted to be "Essential" or "Important".  Essential standards are more directly related to *"the health, safety and welfare of patients and the critical components of a health care system"*.[48]  Noncompliance with essential NCCHC standards increases the risk of harm to patients.

HALLC policy and procedure regarding Access to Care is based upon two NCCHC standards (P-A-01 and P-E-07) but in fact is not in compliance with the standards. The applicable NCCHC standard (P-E-07) states that staff reviews health requests within 24 hours of receipt and schedules nonemergency requests within the next 24 hours (72 hours on weekends).   The HALLC policy states that if an appointment is required it will be scheduled within 7 days of triage.  Thus the policy is not consistent with an essential NCCHC standard that relates to the health safety and welfare of patients.

NCCHC standards do not permit use of standing orders, but HALLC nurses use standing order to order antibiotics for skin infections and antihypertensive medications for patients with poorly controlled hypertension.

---

[46] In its May 2014 contract monitoring report, AdminPros indicated that the health care administrator reviewed the policies in January 2014, but policies provided for my review were last updated in 2009.
[47] Human Immunodeficiency Virus. MTC policy Serial Number 906.270.06. January 1, 2010.
[48] NCCHC Standards for Health Care Services in Prisons. 2014.  Page 162.

The HALLC chronic disease policy does not provide any guidelines for timeliness of scheduling initial and follow-up appointments. The policy states that the frequency of visits will be based upon the severity of the patient's condition and whether it is improving, stable or deteriorating but there are no procedures specific to WGCF to provide staff guidance to implement the policy.  Records show that physicians do not monitor chronic disease patients in accordance with their disease control.

## Medical Audit, Quality Improvement and Infection Control Committees

*I reviewed minutes of quarterly Medical Audit/Quality Improvement Committee Meeting Minutes and Infection Control Meeting Minutes for calendar year 2013. With rare exception, the minutes do not describe any significant problems related to health care services, and do not identify the significant issues noted in this report.  Moreover, the grievance process is an opportunity to identify issues related to health care services or quality, but at WGCF the grievance process does not result in a meaningful effort to identify and correct health care problems.*

Neither the MAC meetings nor the Quality Improvement meetings are performed in the respective calendar quarter (e.g. the 4th quarter 2012 MAC meeting was conducted in February 2013; and 3rd quarter CQI meeting conducted in November 2013).

The MAC attendees include the HALLC corporate Medical Director but neither of the two physicians that work at the facility.  Review of the MAC quarterly minutes show that for all categories of health care services with rare exception, no problems are identified and no discussion occurs.

With respect to quality improvement activities, data are presented regarding different aspects of care and show high rates of compliance. To the extent that compliance thresholds are not met the sole corrective strategy employed is to address the issue in staff meetings, as opposed to conducting studies to identify the root cause of a problem (i.e. system versus staff performance issue).  The CQI program is not in compliance with NCCHC standards to include two process quality improvement studies and two outcome quality improvement studies. The respective standard requires that a problem is identified, a study completed, a plan developed and implemented, results monitored and tracked and improvement demonstrated or the problem is restudied.[49]  This is not occurring at WGCF.

CQI minutes show that when problems are identified there is no meaningful analysis and discussion of the problem. For example, the 3rd Quarter 2013 MAC/QI Committee minutes noted that that compliance with suicide watch was 61 % (i.e., patients not seen within 18 hours of admission). There was no discussion of the problem, plan to perform root cause analysis, or

---

[49] NCCHC Standards. P-A-06.

identification of individuals responsible to study or develop a corrective action plan. The plan simply was "working with mental health". The following quarter compliance dropped to 56%.

CQI meetings should also include sentinel events (e.g. deaths, unexpected hospitalizations, etc.). In the 4th Quarter 2013 there was a major disturbance at the facility, resulting in 7 inmates being sent to the hospital by air or ground ambulance but there was no mention of the disturbance in the CQI minutes, including whether custody, health care and emergency medical services response was timely and appropriate. There was no discussion of any problems with coordination of response, root cause analysis or corrective actions, as applicable. There was also no mention of the facility lock-down that followed and how access to care was provided during this period of limited inmate movement.

During each of the first 3 quarterly reporting periods 12 inmate grievances were submitted, and 9 were reported during the fourth quarter reporting period. Categories of grievances included dissatisfaction with quality of medical, dental or mental health care, delays in care, and problems with medication. In none of the 45 grievances was it determined that the inmate complaints were valid or that any corrective action was taken. The sole resolution was that the inmate dropped the grievance. This is a missed an opportunity to identify and correct problems.

With respect to infection control minutes, with one exception, there is no discussion and analysis of communicable disease data. The meetings consist primarily of a licensed practical nurse conducting health education and distributing handouts for staff. There were no reports or discussion of staff complies with use of personal protective equipment, communicable disease reports; or results of environmental inspections in accordance with NCCHC and/or state public health requirements.[50] This is an ineffective infection control program. The lack of an effective infection control program increases the risk that outbreaks of communicable diseases will not identified in a timely manner, and measures promptly taken to prevent the spread of new infections.

## MDOC Contract Monitoring and Revisions

*I evaluated this area by reviewing the Walnut Grove Correctional Facility Consent Decree, MDOC contract monitoring policy, AdminPros monitoring reports and CQI meeting minutes. The Consent decree requires that MDOC develop comprehensive contract monitoring policies and procedures; and monitors the contracts with the WGCF operator (MTC) and the health care provider (HALLC) in compliance with these policies and procedures. It also requires MDOC to revise the contracts currently in place with the operator of WGCF and the health care provider at WGCF to incorporate the terms of the decree.*

---

[50] NCCHC Standards. P-B-01.

*I requested a copy of the MDOC-HALLC medical services contract in order to assess whether MDOC incorporated the requirements of the Consent decree into contract as required by the Consent decree. However, as of the publishing of this report, neither MDOC nor HALLC provided the medical contract for my review. Therefore, MDOC has not provided documentation demonstrating it has incorporated consent decree requirements:*

- *to provide adequate, appropriate and timely care, including the treatment of acute and chronic conditions; and*
- *Care is provided at WGCF or inmates are transferred to a facility compliant with NCCHC Standards for Health Services in Prison.*

MDOC has developed a Contract Monitoring Program policy and procedure (SOP 16-29-01) effective on 2/15/2012.

Provisions of the policy include the following:
- Contract facilities will comply with the Mississippi Department of Corrections procedures as specified in the contract and as updated annually in the contract renewal;
- The vendor contract shall form the basis of the standards for contract compliance monitoring;
- The monitor is to serve as the liaison between the department and the vendor of services to ensure proper interpretation and uniform application of Mississippi State Statues, ACA standards, agency policies and procedures and compliance with contractual agreements.

The policy describes a variety of areas subject to monitoring but does not include any specificity related to health care monitoring. The policy references the vendor contract, amendments and memorandums of understanding as the basis for compliance monitoring but this information was not provided to me for review.  The policy does not reference the consent decree requirement regarding use of NCCHC standards for providing health care services.

The MDOC policy includes a requirement that institutions report its activities at least quarterly to the parent agency and that these reports will include major developments in each department or administrative unit including major incidents and problems and plans for solving them.  As noted above, health care leadership conducts quarterly quality improvement meetings but minutes of these meetings lack meaningful problem identification, study and analysis, and corrective action plans.  An example noted earlier in this report is that on December 31, 2013 a major inmate disturbance occurred resulting in several inmates being hospitalized.  This was not mentioned in the 4th Quarter CQI minutes along with an accompanying assessment of health care and custody staff response and collaboration during the event.

MDOC has contracted with AdminPros to perform health care contract monitoring.  AdminPros conducts site visits approximately every six months. I reviewed four reports from December

2012 to May 2014. [51]  These reports focus primarily on compliance with structural aspects of the health care program, such as whether the facility has a health care administrator or physician services contracts are in place. The reports also focus on process measures such as whether staff performs medical screening for newly arrived inmates and whether a physician examines inmates with serious medical and mental health needs within 48 hours. The reports do not assess the adequacy or the appropriateness of care as required by the consent decree. Moreover, the reports do not describe the methodology for determining compliance including whether health records were reviewed to assess compliance with policy.

I found discrepancies in AdminPros findings of compliance.  For example, in the May 2014 report, AdminPros found WGCF in compliance with a requirement for a physician to examine inmates with serious medical or mental health conditions within 48 hours.  My review showed that inmates with serious medical conditions rarely are examined within 48 hours of admission. AdminPros also found that a physician or mid-level practitioner evaluated sick call referrals within 7 days of their complaint.  My review showed that nurse-to-physician sick call referrals did not consistently occur within 7 days, and in some cases they physician did not see the inmate at all.  The May 2014 report also indicated that the health services administrator reviewed policies and procedures in January 2014.  However, HALLC policies provided to me prior to my visit in May show that they had not been reviewed and updated since 2009.

Again, these monitoring reports do not address the quality of care provided to patients. The Consent decree requires that MDOC provide adequate, appropriate and timely medical and dental care to the individualized needs of inmates, including acute and chronic conditions. However, neither MDOC nor its contact monitor adequately assesses the adequacy, appropriateness or timeliness of health care provided to inmates at WGCF.

---

[51] Reports dated December 13, 2012, June 25, 2013, December 10, 2013 and May 20, 2014.

# Recommendations

## Health Care Leadership and Staffing

- Given the changing inmate population at WGCF, MDOC/MTC/HALLC should conduct a staffing analysis to ensure that the facility has the right mix and number of medical, dental and mental health staffing.

- At minimum, the facility should have a 1.0 to 1.5 clinical FTE.  Options include hiring a full-time nurse practitioner and half-time physician or some combination thereof.

- HALLC should immediately hire a licensed optometrist to provide optometry services at WGCF. The optician should not perform visual examinations for which he is not licensed to perform.

- The facility Medical Director should be more involved in providing clinical leadership and oversight at WGCF to include participation in the medical audit and continuous quality improvement program.

- Nurses should only perform duties within their training and licensure consistent with the Mississippi Board of Nursing and that is compliant with NCCHC standards.

## Policies and Procedures

- HALLC should revise its corporate policies and procedures and ensure that they are compliant with the 2014 edition of NCCHC Standards for Health Services in Prisons.

- Thereafter, WGCF Health Care leadership should develop local operating procedures that are site-specific and provide adequate operational guidance to staff.

- WGCF health care leadership should train and monitor staff for compliance with revised health care policies and procedures.

## Clinic Space, Equipment and Supplies

- All patient examinations should be performed in adequately equipped and supplied examination rooms that provide auditory and visual privacy in accordance with NCCHC standards.

## Access to Care

- Health care leadership should ensure that inmates have continuous access to medical services request forms. Inmates must be able to confidentially submit health care request forms into locked boxes that are accessed only by health care staff.

- Nurses should perform assessments and make referrals in accordance with assessment protocols. Nurses should not administer prescription medications via standing orders.

- Health care leadership should ensure more timely access to dental services. Nursing staff should triage dental health requests and assess patients who complain of pain and/or infection.

- Dental staff should use radiographs to diagnose and treat dental conditions.

## Intrasystem Transfer

- Nurses should document more complete patient assessments upon arrival including any current symptoms, pertinent objective data (e.g. vital signs, fingerstick blood sugars for diabetics and peak flow expiratory rates of patients with asthma or COPD). Nurses should report abnormal findings to a provider.  Nurses should also note whether medications arrived with the patient, and pending or recently completed specialty services.

- Nurses should document and initiate a plan of care for newly arriving patients including referral of chronic disease patients or those with pending or recently completed specialty services to a provider in accordance with their clinical needs and preferably within 7 days of arrival.

## Chronic Disease Management

- Health care staff should enroll eligible patients into the chronic disease program upon arrival at the facility.

- Adequate time should be allocated for physicians to evaluate chronic disease patients.

- Medical providers should perform all chronic disease visits in accordance with nationally recognized chronic disease guidelines (e.g., American Diabetes Association, etc.). At each visit providers should obtain pertinent interval history and physical examinations, note pertinent labs and assess the patient's level disease-control.  Plans should include changes in therapy, immunizations, labs or diagnostic testing, patient education, and follow-up interval.  Patients should be monitored in accordance with their disease control.

- Nurses play an important role in the management of chronic disease patients by monitoring medication adherence, providing patient education, and reporting abnormal findings to the provider (e.g., moderately or severely abnormal blood pressure or blood sugar values).

## Pharmacy and Medication Services

- Providers should timely review and authorize medication orders for newly arriving patients as well as verbal orders given to nurses.

- Providers should write complete medication orders including for sliding scale insulin.

- Nurses should document administration of medications at the time the medication is given to the patient.

- Under the auspices of the quality improvement program, health care and custody leadership should ensure that inmates are timely escorted or permitted access to medication administration lines.

- Nursing leadership should monitor medication administration under the auspices of the CQI program, to include MAR documentation.

## Medical Audit, Quality Improvement and Infection Control

- Health care leadership should use the medical audit, quality improvement; infection programs and grievance process to more actively identify opportunities for improvement in health care services, including performance of process and outcome studies in accordance with NCCHC standards.

## MDOC Contract Monitoring and Revisions

- MDOC should ensure that Consent decree requirements have been incorporated into the vendor medical contracts

- MDOC should put into effect a more robust and effective contract monitoring program that incorporates review of clinical care by qualified health care professionals.


Respectfully Submitted,

Madeleine LaMarre FNP-BC                    October 17, 2014


The opinions expressed in this report are based on the information currently available to me. If additional information is brought to my attention (for example, additional documents or depositions), I may amend or supplement my opinions.