IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

**C.B., by and through his next friend,**
**Charleston DePriest, ET AL.**                                                  **PLAINTIFFS**

VS.                                                             CIVIL ACTION NO. 3:10CV663-CWR-FKB

**WALNUT GROVE CORRECTIONAL**
**AUTHORITY, ET AL.**                                                          **DEFENDANTS**

## Report of the Court Monitors' Mental Health Care Consultant

At the direction of the Court and at the request of the Court Monitors, the Court Monitors selected and engaged Dr. Amanda Ruiz, M.D., as a correctional mental health care consultant to review mental health care being provided to inmates at Walnut Grove Correctional Facility. Dr. Ruiz has previously served as the Chief Psychiatrist for the California Department of Corrections and Rehabilitation and has served as a consultant for private attorneys and the United States Department of Justice. She is currently the Director of Consult Liaison Services at Cedars-Sinai's Emergency Department in Los Angeles California.

With respect to Walnut Grove, Dr. Ruiz conducted a multi-day on-site inspection and interviewed administrative staff, mental health staff, and inmates. Dr. Ruiz also reviewed various documents including inmate medical records. On October 10, 2014, a copy of Dr. Ruiz's report was provided to the parties by the Court Monitors. A copy of the report is attached as Exhibit A. Dr. Ruiz concluded that "although minor opportunities for improvement remain, adequate mental health care is being provided to the inmates of Walnut Grove Correctional Facility."

THIS the 22nd day of October, 2014.

> Respectfully submitted,
>
> BY: JIM HOOD, ATTORNEY GENERAL
> STATE OF MISSISSIPPI
>
>
> BY: S/Harold E. Pizzetta, III
> Harold E. Pizzetta, III (Bar No. 99867)
> Office of the Attorney General
> P.O. Box 220
> Jackson, MS 39205
> Telephone: (601) 359-3680
> Facsimile: (601) 359-2003
> hpizz@ago.state.ms.us
> jmath@ago.state.ms.us
>
> *Attorneys for State Defendants*

## CERTIFICATE OF SERVICE

I, Harold E. Pizzetta, III, Assistant Attorney General, hereby certify that on this date, I electronically filed the forgoing Report of the Court Monitor's Mental Health Care Consultant with the Clerk of Court using the ECF system which sent notification of such filing to all counsel of record.

SO CERTIFIED, this the 22nd day of October, 2014.

> */s/ Harold E. Pizzetta, III*
> Harold E. Pizzetta, III, MSB #99867

Amanda Ruiz, M.D.
3950 Laurel Canyon Blvd, #1309
Studio City, California

Report on Mental Health Care of Walnut Grove Correctional Facility
September 2014

Introduction:

On or about February 1, 2012, a Memorandum of Agreement ("MOA") was entered between the certified class of Plaintiffs described as persons imprisoned at Walnut Grove Youth Correctional Facility and Christopher Epps, in his official capacity as Commissioner of the Mississippi Department of Corrections ("MDOC"). This agreement resolved litigation concerning the mental health claims in C.B., et al. v. Walnut Grove Correctional Authority, et al., case number '3:10cv663 (S.D. Miss.).

On or about August 2014, Mr. Steve J. Martin, Court Monitor, requested that I review the mental health care provided at Walnut Grove Correctional Facility ("WGCF").

On September 16 and 17, 2014, I toured WGCF and interviewed administrative staff as well as mental health staff and patients. Specifically, I interviewed the following individuals:

- Ms. Kathy Hogue, Health Services Administrator;
- Dr. Gurdial Sandhu, psychiatrist;
- Dr. William Cartier, psychologist; and
- Ms. Brown, mental health counselor.


EXHIBIT A

1

In order to complete my review, I reviewed various documents, including the MOA, reports on compliance generated by Admin Pros, LLC, patient medical records, WGCF policies, and other pertinent documents. This list is provided in Addendum A.

This report will briefly summarize my findings.

1. Adequate Staffing:

    Mental health care at Walnut Grave Correctional Facility is provided seven days a week. The current staff is composed of one psychologist (full time), two counselors (part-time), two psychiatrists (the psychiatrists work and alternate Saturdays part-time for 6-8 hours) and one psychiatric nurse practitioner (part-time) on Sundays. On average, the psychiatrist assesses 20-25 patients per weekend. Once a month, the doctor runs treatment team, which includes a representative from custody, nursing, and the patient.

2. Access to Adequate Care:
a. Mental Health Screening and Triage

Patients at WGCF are screened upon arrival for a history of treatment for emotional problems, psychiatric illness, and prior suicide attempts. Specific to mental health concerns, patients are enrolled in one of four different levels of care.

    Level A: No mental health issue

    Level B: Non Axis I issue or a personality disorder

Level C: Axis I disorder or a mental health disorder that impairs function

Level E: Needs severe mental health treatment / developmental disability

At the time of our visit in September 2014, WGCF had 42 inmates on the mental health caseload. 71% (seventy-one percent) of these patients were being treated with psychotropic medication, primarily for either depressive or psychotic disorders. The majority of the records I reviewed (greater than 80%) demonstrated that patients were seen in a timely manner, received adequate care, had treatment plans and were followed on a regular basis, as per generally accepted practices.

b. Therapy

Group therapy programs at WGCF include: anger management, sleep therapy, and post-traumatic stress disorders ("PTSD") group. Records reviewed demonstrate that the groups are held intermittently (once or twice a month, but sometimes skip months) and average one to three attendees at a time. Attendance is low; the reasons for this are unclear. During a brief interaction, inmates I interviewed said they enjoyed the PTSD group.

Individual therapy consists largely of cell-side check-ins. It is clear that the inmates appreciate the psychologist, are familiar with him, and gravitate to his side. It is also noteworthy that the nature of mental health is such that its illness carries stigma and a fair amount of shame for those that are more severely afflicted. As such, many individuals may feel it impossible to disclose thoughts of suicide or psychosis in

3

front of cellmates or peers. Concerns regarding confidentiality may play a role in participation in therapy. Scheduled office hours or having sessions in settings that are more private may be helpful for these patients.

c. Medication / Pharmacy Issues

The psychiatrist sees patients on Saturdays and writes orders based on a face-to-face assessment accordingly. As a function of Walnut Grove pharmacy availability, orders written on Saturday afternoon are not processed until Monday. These orders are sent within 24 hours and dispensed. In order to address this issue for the most critical patients, WGCF has emergency stock medications for patients with seizure disorders and other disorders. As a result, many orders may be immediately processed without a delay. I was informed that the facility is in the process of developing a policy and a practice to ensure that necessary anti-psychotics will also be added to the back-up supply of medications for use as needed.

3. Suicide Prevention Program

In 2013, 154 inmates were placed on suicide watch for a total number of suicide watch days of 625. The average length of stay on suicide watch was 4.06 days.[1] Thus far in 2014, 17 inmates have been placed on suicide watch for a total number of suicide watch days of 42. The average length of stay on suicide watch for 2014 has been 2.47 days; this is an improvement in comparison to prior lengths of stay for suicide watch. All patients that are placed on suicide watch are seen every day face-

---

[1] Outliers were not examined.

4

to-face by a qualified mental health professional. If necessary, inmates requiring a higher level of care are transferred out to other MDOC institutions.

The suicide prevention program policy and the suicide prevention program in current practice are discordant. In interviewing mental health staff, I was informed that the suicide staging system consisted of two levels. Inmates that express suicidal ideation or exhibit self-injurious behavior are evaluated by a mental health clinician and assigned to either: psychological observation or suicide precaution. The primary difference between the two levels of care is: in psychological observation, the patient has not performed an actual act of self-injury and is allowed to keep their clothes. In suicide precaution, the patient has performed an act of self-injury and is typically placed in a suicide resistant gown. Either the psychiatrist or the psychologist discontinues psychological observation or suicide precaution after completing a face-to-face evaluation.

In contrast, the WGCF suicide prevention policy indicates that there are three different staging levels for inmates as opposed to the two levels I was informed are in practice. It notes that for inmates on 'alert,' a heightened level of observation includes constant one-on-one observation within five physical feet from the offender. This extra supervision may be necessary for patients at high risk. In addition, the WGCF policy definition of suicide risk assessment states it "involve(s) a standard protocol administered by a qualified mental health provider including a review of records, consultation with staff members, face to face interview with

5

offender, and administration of checklists and additional assessments as needed to determine risk for suicide or self-injury." This definition comports with nationally accepted practices and principles.

In order to protect patients, clinicians, and the institution, I recommend documenting the content of the suicide risk assessment that was performed. The clinicians may include what was done to mitigate suicidal ideation, depression, or other factors that were identified that could exacerbate risk for self-harm. For example, if supportive therapy, medication, a change in level of care or a change in housing was accomplished to ameliorate or address identified stressors, this should be stated in the record. In addition, targeted or anticipated follow-up dates should be stated, as well as any offers of therapy or treatment that were provided or that the patient may have rejected (and the reasons he gave for doing so).

In summary, my review demonstrated that although minor opportunities for improvement remain, adequate mental health care is being provided to the inmates of Walnut Grove Correctional Facility.

Please do not hesitate to contact me if further questions remain.

Sincerely,

Amanda Ruiz, M.D.

## Cases Reviewed

### Cases Demonstrating Adequate Treatment

BA[i]
JR[ii]
KJ[iii]
TW[iv*]
WR[v]
WM[vi]
WD[vii]
TR[viii]

### Case with Opportunity for Improvement

HL[ix*]



Case TW

6/5/14: Intake- History of taking risperidone seven years ago
6/6/14: Psychologist: Referred to MD
6/7/14: Psychiatrist: Diagnosis: Depression NOS
7/18/14: "Request by custody with management of inmate behavior to prevent use of force. Patient states, "I need Risperidone, Trazadone, Depakote." Agitated. Rambling. Facility on lockdown.
7/20/14: Psychiatrist: Diagnosis: Psychosis NOS. Prescribed: Zoloft 100 mg poqd, Risperidone 2 mg poqm.

Summary: This inmate was seen in a timely manner and as per nationally accepted standards. Use of force was prevented to the extent possible, as staff realized this patient had a mental illness. This case was managed appropriately.


Case HL

4/25/14: Intake: History of panic disorder, including prior treatment at other MDOC facilities. No mental health referral.

6/22/14: Counselor note: Patient complains of anxiety and stress; requests to see psychiatrist.
7/5/14: Psychiatrist: Depressed mood. Prescribes Paxil, an antidepressant.
7/23/14: Counselor note: Pt observed upset, rambling, ?psychotic, ligature around his neck.
7/26/14: Psychiatrist: Patient guarded, paranoid, limited eye contact, "Was observed with marks around his neck." Patient upgraded from psychological observation to suicide precaution.
7/28/14: Psychologist: "FU Mental status exam normal." Discontinue suicide precaution.
7/29/14: Counselor note: Patient described as "Rambling, flat, circumstantial. Paranoid. "

Summary: In this case, a patient with a history of mental illness was not referred to the mental health caseload in a timely manner. In addition, one of the mental health clinicians did not recognize or document the suicide risk assessment and risk factors as noted by the differences in the observations by the different clinicians on the varying days.



Addendum A

1. Health Assurances Basic Medical Services Policies:
    a. Basic Mental Health Services, last revised 10-1-2009
    b. Emergency Psychotropic Medication, last revised 10-1-2009
    c. Mental Health Screening and Evaluation, effective date 10-1-2009
    d. Suicide Prevention Program, last revised 10-1-2009
2. Mississippi Department of Corrections Medical Services Review and Monitoring Tool Report, Admin Pros, dated 5-20-14
3. Inmate Interviews of [Patients with] Severe Mental Illness, 8-15-14
4. Report by Pablo Stewart, M.D. and response, 8-8-2014