**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **C.B. by and through his** | | |
| **next friend, Charleston DePriest, et al.** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Civil Action No. 3:10cv663-CWR-FKB** |
| **v.** | ) | |
| | ) | |
| **WALNUT GROVE CORRECTIONAL** | ) | |
| **AUTHORITY, et al.** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

**AMENDED MEMORANDUM IN SUPPORT OF MOTION FOR**
**ENFORCEMENT AND MODIFICATION OF CONSENT DECREE**

**INTRODUCTION**

On August 6, 2014, Plaintiffs filed a motion asking the Court to modify and enforce the Consent Decree in this case in order to effectuate a central purpose of the decree, namely, that "at all times, prisoners will be provided with reasonably safe living conditions and will be protected from violence and other physical or sexual abuse by staff and other prisoners." Consent Decree, 03/26/12, Doc. 75-3 at 4.

The federal courts have inherent authority to modify injunctive relief, including consent decrees, in order to account for changed circumstances and to effectuate the basic purpose of the original decree. Here, a significant change in circumstances warrants modification of the decree. There was a major escalation in inmate-on-inmate violence over the past year at Walnut Grove Correctional Facility, including two riots during which MDOC lost control of the facility and twenty-five inmates were seriously wounded. The court-appointed monitors and Plaintiffs' corrections expert have proposed basic remedial measures which MDOC has either not implemented or implemented inadequately. There is

an ongoing, substantial risk of serious injury—including death—from the dangerous conditions at Walnut Grove.

## PROCEDURAL HISTORY OF THE PENDING MOTION

Plaintiffs' August 6, 2014 motion asked the Court to schedule an evidentiary hearing with testimony by the parties and the court-appointed monitors, in order to determine whether more specific remedial measures are required to effectuate the purpose of providing all prisoners at Walnut Grove with reasonably safe living conditions, and protecting them from violence by other prisoners; and, if so, to identify the specific remedial measures that are suitably tailored to achieve that purpose.

At a status conference on August 7, 2014, the parties agreed that it would be prudent to suspend briefing on the motion until after the monitors' next report and to allow time thereafter for the parties to attempt to negotiate an agreement on remedies in light of that report. The Court directed the monitors to submit their next report by October 15, 2014; set another status conference for November 18, 2014; and directed the Plaintiffs to notify the Court at that time whether they wished to proceed with the pending motion, at which time the Court would, if necessary, set a hearing date and scheduling order. Minute Entry 08/07/14.

The monitors submitted their report on October 22, 2014. On November 6, 2014, MDOC Commissioner Epps abruptly resigned from the Department and the same day the U.S. Attorneys' office released an indictment of Mr. Epps on multiple counts of bribery. That same day, the Court held a telephonic conference, at which he suspended the November 18 date for the next status conference in order to give the Department time to cope with the new developments. Plaintiffs informed the Court and the Defendants that in light of the Monitors5[th]Report Plaintiffs did intend to pursue their pending motion. The Court eventually

rescheduled the status conference for January 8, 2015. Minute Entry 12/30/14.

At the January 8, 2015 conference, the parties agreed to engage in mediation with the Magistrate Judge prior to any hearing, in conformity with the requirements of the Consent Decree, and the Court set a date for the evidentiary hearing at the end of March 2015 and a briefing schedule and deadlines for submission of expert reports.   The Magistrate Judge scheduled mediation for February 6, 2015.

### STATEMENT OF FACTS

The security issues documented in this Motion are of long standing; they were raised in the 2010 Complaint, which contained the following allegations:

> WGYCF is an extremely dangerous prison. For years, violent fights have occurred at WGYCF at least every week, and often every day. (Para. 38).
>
> In much of the prison, only one officer is assigned to guard each zone. The prison is constantly short-staffed, so officers sometimes are left responsible for two zones at a time. Youth are often left unsupervised when the assigned officer leaves the zone for other reasons. This understaffing creates violent conditions that subject youth to serious and sometimes permanent injury. (Para. 39).
>
> Defendants have long been aware that the routine understaffing of WGYCF creates a risk of serious harm to the youth incarcerated there. (Para. 40).
>
> Cell doors on many units can easily be rigged to remain unlocked when shut, allowing prisoners to leave their cells and enter the cells of others at any time, resulting in many assaults. (Para. 45).
>
> Defendants have failed to adequately supervise correctional officers to ensure that they routinely and effectively examine doors to check for rigging, or to take adequate measures to ensure that the defective doors are replaced." (Para. 45).
>
> Weapons are readily available throughout the prison. Despite Defendants' knowledge, they have failed to take reasonable measures to protect youth from suffering weapon-induced injuries." (Para. 50).

On March 26, 2012, the parties entered into a Consent Decree which was intended

to remedy these unacceptable risks to inmate safety. Consent Decree, 03/26/12, Doc. 75-3. The decree provides that "[a]t all times, prisoners will be provided with reasonably safe living conditions and will be protected from violence and other physical or sexual abuse by staff and other prisoners." *Id*. at 4. The Decree also requires MDOC to provide protection from harm by "ensur[ing] that there are sufficient numbers of adequately trained direct care and supervisory staff, and sufficient numbers of professional staff." *Id*.

Pursuant to the Consent Decree, the court-appointed monitors are to submit reports every four months that detail the defendants' compliance with all provisions of the decree. Consent Decree, *Id.* at 15-16. The Monitors filed their first report with the Court on August 27, 2012. They reported "alarming levels" of continued disruption in the facility through the first six months of the Consent Decree. First Report of Monitors, 02/02/13, Doc. 83 at 2. They reported that during the month of July 2012 alone, there were at least 15 prisoner-on-prisoner assaults, "seven of which involved prison-made weapons resulting in injuries to no less than four inmates." *Id*. at 5. The Monitors reported that a "number of these incidents involved multiple inmates assaulting a single inmate" and at least one incident involved officer complicity. *Id*. The Monitors also reported that "obvious staffing deficiencies…. remain in a transition period of hiring, training, and assigning new staff to the facility." *Id*. Consequently, the Monitors found Defendants to be in non-compliance with the requirement of the Decree requiring them to provide "reasonably safe living conditions" and in partial compliance with the requirement of "sufficient numbers of adequately trained staff." *Id*. at 3-4.

In their Second Report, the Monitors observed that Walnut Grove "continues to be plagued with clear signs of instability," including "high rates of inmate assaults,

lockdowns, contraband control issues, and management of special populations." Second Report of Monitors, 04/04/13, Doc. 86 at 2. The Monitors noted that "assaults involving weapons continue to occur at alarming levels." *Id*. They indicated that in order to be found in compliance with the "reasonably safe living conditions" provision of the Consent Decree, violence rates would need to be reduced by "at least 50 percent." *Id*. at 8. They found that staff supervision of prisoners was "lacking" and "inexperienced" as a result of the high turnover rate and consistent levels of vacancies. *Id*. The Monitors concluded that these problems were alarming and would "no doubt require continued and more effective remedial measures." *Id*. at 3. They determined that MDOC remained in non-compliance with the "reasonably safe living conditions" requirement, and in partial compliance with the "sufficient numbers of adequately trained staff" provision of the Decree. *Id*. at 7-9.

In their Third Report, the Monitors reported that there were marked improvements in assault rates and staffing levels. They noted, however, continuing problems of staff inexperience and the possibility that many assaults went unreported. Third Report of Monitors, 11/04/13, Doc. 97 at 8-9. The Monitors found that Defendants were in partial compliance with both the "reasonably safe living conditions" and "sufficient numbers of adequately trained staff" provisions of the Consent Decree.

The reduction in the level of violence during the period covered by the Third Report was short-lived. On December 31, 2013, New Year's Eve, a major disturbance erupted at Walnut Grove in Housing Unit 3D and quickly spread to the three surrounding pods, Housing Units 3A, 3B, and 3C. Fourth Report of Monitors, 04/17/14, Doc. 101 at 7. Sixteen inmates were transferred to outside medical facilities for treatment of the serious injuries they sustained during the disturbance. *Id*. at 8. These injuries included multiple

stabbing and puncture wounds, lacerations, and fractures. *Id.*

Plaintiffs' corrections expert, Eldon Vail, toured Walnut Grove January 28-29, 2014, and on March 14, 2014 he submitted a report to the Court, the monitors, and Defendants. He concluded that "at a fundamental level, MTC is not in control of the living units, or of the facility in general." Report of Eldon Vail, 03/14/14, Doc. 100 at 2. Mr. Vail found that cell doors were not secure; that furnishings and supplies, which had been used as weapons during the New Year's riot, were still not being secured; that weapons were far too prevalent; and that security officers were not present consistently in the pods when inmates were out of their cells. *Id.* at 3. He found that contraband flow into the facility was enormous, and that inmates enter cells to which they are not assigned, with some regularity. *Id.* at 4-5. He concluded that the New Year's Eve riot "appears not to have been an aberration but instead to have been a predictable outcome of a number of systemic problems requiring systemic solutions." *Id.* at 2.

Mr. Vail noted that the level of idleness among inmates "appears to be profound at Walnut Grove," *i* and that there should be inquiry into the possible connection between idleness and violence at the facility. *Id.* at 7. He offered the opinion that the security staff at Walnut Grove does not have the necessary skills, experience, and custody expertise to manage close custody inmates; and that these deficits, together with the lack of adequate programming, makes the facility inadequately equipped to manage close-custody inmates without sufficient improvement in staff training and inmate programming. *Id.* at 9. He recommended that MDOC and MTC develop strategies that reward non-gang behavior and that an expert in security hardware be tasked with determining if there are other areas of physical plant construction that could place prisoners or staff at risk. *Id.* at 10.

On April 17, 2014, the Monitors submitted their Fourth Report. The Monitors found that Defendants were in non-compliance with the provisions of the consent decree requiring reasonably safe living conditions and sufficient numbers of adequately trained staff. Fourth Report, Doc. 101 at 7-8. They addressed the New Year's Eve events and analyzed underlying problems. Among a number of other contributing factors, the Monitors found that the security staff on duty during the riot was "very inexperienced," that almost half the officers had less than six months' experience, and that the officer assigned to the pod where the disturbance began had less than two months' service. *Id.* at 8. Moreover, the average level of experience of security staff had markedly *declined* during the reporting period, while during the same period the numbers of Close Custody inmates at the facility had almost tripled:

> In March 2011, 33 percent of the security force at WGYCF had less than one year of experience. In December 2013, 48 percent of the security force had less than one year of experience. Commensurate with an increasingly inexperienced staff, between March 2-11 and December 2013, the Close Custody population at the facility increased from 121 to 346.

*Id.* at 8.

The Monitors pointed out that they had brought this issue to the attention of MTC and MDOC in strong terms as far back as October 2012, in their Second Report, and MTC's Deputy Warden of Operations had advised MDOC's Deputy Commissioner that they were implementing new operating procedures at the facility requiring the deployment of more experienced staff. *Id.* at 9. These reforms, however, if implemented, were not sustained: "Clearly, at the time of the December [2013] Disturbance, MTC management had abandoned the October 2012 Operating Procedures." *Id.* The Monitors found once again that Defendants were in Non-Compliance with the provisions of the Consent Decree

requiring reasonably safe living conditions and sufficient numbers of adequately trained staff. *Id.* at 7-8.

On May 19, 2014, at the request of the Monitors, the parties to the litigation, as well as MTC officials and leadership met with the monitors in Jackson to discuss the New Year's Eve riot and more generally the status of implementation of the consent decree. The meeting included a frank discussion of the likely underlying causes of the May 19 riot, and recommendations by the monitors and by Mr. Vail for remedial measures. The Monitors stressed the gravity of the event, and that such an event must not occur again. Report of Eldon Vail, 08/04/14, Doc. 105 at 4.

Following the May 19, 2014 meeting, Mr. Vail submitted a memo to MDOC and Plaintiffs' counsel and the monitors, summarizing his recommendations. He concluded:

> Last, Dr. Austin said at the meeting that the disturbance, which occurred this past New Year's Eve, cannot happen again. He was absolutely correct. While bad events will always happen in the prison environment, what cannot happen is for Walnut Grove to lose control of one close custody pod after another, in rapid succession, and then be so completely ill equipped to manage the incident as they were this last time. Conditions of confinement in the close units need to improve and the programs available need to be expanded. But of equal importance is that MTC must greatly improve their capacity for emergency response so that future incidents do not get as out of control as we saw happen last New Year's.

Unfortunately, the recommendations offered by the monitors and by Mr. Vail appear for the most part not to have been adopted; and what Dr. Austin cautioned against is precisely what happened again less than seven months later, on July 10, 2010. Report of Eldon Vail, 08/04/14 Doc. 105 at 4.

The security videotapes provided by MDOC to the monitors and Plaintiffs show the gravity of the July 10 riot, and how easily it could have resulted in loss of life. *Id*. at 4.

The videos prior to the outbreak of the riot show that security staff do not enforce basic security rules, and that "whether there was an officer in the unit or not, staff do not control the units, inmates are in control." *Id.* at 8. Once the riot erupted, the videos show prolonged violent skirmishes between two gangs of prisoners armed with broom handles and heavy objects, and the brutal, repeated beatings and stomping of certain inmates by others, without any effective response by security staff in Units 3 Charlie and Delta. *Id.* at 6-10. According to press reports, nine prisoners were so seriously injured in the riot that they had to be transported to a hospital for treatment.

In the opinion of Mr. Vail,

> The absence of officers in close custody living units when the inmates are out of their cells is deeply disturbing and completely irresponsible on the part of MDOC and MTC. This group, Close Custody, is the most dangerous classification of prisoners, outside of those in segregation, housed at the prison. To put a single staff person in the pod intermittently, and to allow inmates to be out of their cells without any officers in the pod at all, simply turns the operation of those units over to the inmates.

Mr. Vail had stressed this same point to MDOC and MTC in March 2014 and again in May 2014. *Id.*, at 7. Mr. Vail also pointed out that staff presence is required whenever inmates are out of their cells—not only in close custody units, but in medium and minimum custody units as well: On July 17, 2014, only a few weeks before the July 10 riot, a female security officer was first verbally abused and then physically assaulted when she was the sole officer in a unit housing medium and minimum custody prisoners. *Id.* at 7 n.1. Mr. Vail notes, "it is not surprising if officers at Walnut Grove fear for their own safety when so few staff are  provided to support efforts by the officers to actually run the living units in the prison." *Id.*

Mr. Vail found again that the ill-functioning locking mechanisms on the cell doors

at Walnut Grove was a continuing problem, that the problem is apparently one of design, and

that

> knowledge of this very dangerous situation exists at the highest levels of
> the MDOC. In the May 19 meeting in Jackson, the Deputy Commissioner
> acknowledged this is a problem in a number of their prisons and said they
> were working on it.
>
> "Working on it" is not good enough. It is astonishing to me that this
> enormous gap in basic security is not being treated as an emergency. It is a
> basic and fundamental necessity for prisoners, staff and the community to
> know that a prison can actually keep prisoners locked in their cells. Not
> having confidence that cells doors are secure can be terrifying to both staff
> and inmates and creates a severe risk of significant injury for the
> prisoners. This is a problem that demands an immediate solution.

*Id.* at 7-8. Mr. Vail concluded that he has deep concerns

> about the operation of the prison, the escalating level of violence,
> and the ongoing extreme danger to the inmates housed there—as well as
> the staff who work there. The monitors and I have already repeatedly
> made a number of strong recommendations to MDOC in the wake of
> earlier outbursts of violence, but these recommendations, it appears,
> have largely been ignored. In my view, the most recent outburst on
> July 10 reinforces the urgent necessity for these remedial measures. It has
> been shown twice in the past seven months that MTC is incapable of
> controlling the living units that house close custody inmates. The
> result, especially in the most recent event, was extreme violence and
> serious injury to several prisoners. Loss of life could have easily occurred
> as a result of the July 10 riot -- or for that matter, even during the
> disturbance last New Year's Eve.

Finally, Mr. Vail made the following recommendations:

1. Close custody inmates should not be housed at Walnut Grove.

2. Unless and until close custody inmates are removed from Walnut Grove, there should
   be a mandatory staffing requirement, 24 hours per day, 7 days per week, of two
   security officers in each close custody pod at all times, absent an occasional break for
   one officer to use the rest room. Until the cell doors are fixed and are proven to be
   secure, the pods should never be without a staff member on the floor.

3. If close custody inmates are allowed to remain at Walnut Grove, sufficient
   supervisory staff should be deployed on each shift until the rules of the pod, such as
   the prohibition from entering a cell to which a prisoner is not assigned, is routinely

followed.

4. The locking mechanism on the cell doors must be replaced with a system that cannot be readily defeated.

5. MDOC must require that MTC have an effective ERP in place, that officers have been trained to follow the plan and that their performance is tested in real time drills: Even if the close custody inmates are removed from Walnut Grove, this is a critical requirement. The ERP must include measures to ensure that officers have adequate safety equipment to respond to an emergency. Officers should be required to be actually present in the housing units at all custody levels whenever the inmates are out of their cells.

6. An independent security hardware expert should be retained to inspect the facility and identify risks, including the existence of items that could easily be turned into weapons.

7. Cleaning equipment should be secured when not in use and microwaves should be bolted down. Items such as milk crates should be removed from the units when not in use.

8. If MTC cannot attract and retain quality staff and fill their mandatory posts, then MDOC must recognize that this vendor is not qualified to house the inmates.

9. MDOC and MTC should remain focused on addressing serious allegations of staff corruption.

10. MTC officers must learn how to control the living units and the prisoners housed at their facility; they must be retrained in Direct Supervision of inmates.

11. MDOC and MTC should work to reduce the influence of gangs by offering inmates good programs as alternatives to participation in gangs.

12. Sufficient program opportunities for inmates should be offered so that they are productively occupied the better part of each day, five days a week.

On October 22, 2014, the Monitors filed their 5th Report.  The Monitors noted that there had been several major developments since their previous report:  First and foremost, between August 15, 2014 and September 15, 2014, MDOC had removed all Close Custody inmates from the facility (in part by using a discretionary over-ride to re-classify 97 Close Custody inmates as medium Custody).  5th  Report of Monitors, 10/22/14, Doc. 110 at 4.

Defendants hired a number of security staff to fill vacancies, began to properly enter needs assessments, and the inmate had population dropped to 995, from its January 2014 peak of 1,261. *Id.* at 5. Despite these positive developments, the Monitors' 5th Report made findings of Non-Compliance in four key areas relating to safety. The Monitors once more made a finding of Non-Compliance with the requirement of "Reasonably Safe Living Conditions." 5th Report, *Id.* at 5-9. They once more made a finding of Non-Compliance with the requirement of Sufficient Numbers of Adequately Trained Staff. *Id.* at 9-11. They also found Defendants to be in "Non-Compliance" with the requirements regarding Use of Force, Chemical Agents. *Id.* and Development and Implementation of Comprehensive Contract Monitoring Policies and Procedures. *Id.*, *Id.* at 11, 16-17. In addition, the Monitors deferred their compliance-findings or made findings of only partial compliance on a number of key issues.

Although MDOC expressed its intention of working to address remaining deficiencies, MTC responded to the Monitors' 5th Report by flatly rejecting as unwarranted each and every one of the Monitors' criticisms and findings of noncompliance.

With respect to *Protection from Harm*, the Monitors' 5th Report stated: "To date, MTC has not provided a copy of an after-action review of the July [2014] disturbance," and "MDOC should require that MTC have an effective Emergency Response Plan in place that officers have been trained to follow [], and performance is tested in real time drills." *Id.* at8. MTC responded, "We do not concur with the Monitor's finding of noncompliance." *Id. at* at 76.

With respect to the requirement of *Sufficient Numbers of Adequately Trained Staff,* the monitors' 5th Report stated:

> A review of the videos of the July disturbance reflected housing units with no visible officer coverage. Moreover it was evident that officers were allowing inmates to freely enter the cells of other inmates. *The high vacancy rate, the inexperience of the staffing complement, and*

> *the complicity of four officers in the July disturbance strongly suggest that MTC management continues to struggle with maintaining sufficient numbers of adequately trained staff.* It is essential that minimal staffing requirements provide for at least one security office be assigned to each medium security housing unit on the first two shifts and the third shift where the is significant out-of-cell movement."   5th Report at 10 (emphasis added).
>
> "The current pre-service training class numbers approximately 47 candidates.  While this class will certainly move WGCF toward filling badly needed vacancies, *the overall staffing complement will continue to lack experience, and thus, will require very active supervision by both mid-level and upper-level managers* …. It is noted that several Supervisory Development Programs (SDP) have taken place at WGYCF during the current reporting period."

*Id.* at 10 (emphasis added). MTC responded, "We do not concur with the Monitor's finding of non-compliance," *Id.* at 80.

With respect to the requirements on Use of Force and Chemical Agents, the Monitors' 5th Report identified multiple problems regarding use of force, including: multiple failures to make required video recordings; failure to document communication with medical staff prior to administering chemical agents; applying pepper spray at an unsafe distance; and subjecting an inmate to a dangerous takedown.  *Id.*  at 11.  "Disturbingly, neither of these incidents reflected completion of the administrative review process.  Moreover, in the August 'Analysis of Use Force' conducted by the Chief of Security and the Facility Investigator, none of these aforementioned issues were addressed."  *Id.* at 11 (emphasis added).

MTC responded, ""We do not concur with the Monitor's findings of noncompliance.  *Id.*  at 81.  MTC response was that they dealt with the two incidents that were outside of policy, and they are going to get new cameras. They did not respond to the Monitors' criticism of lack of medical review prior to use of chemical agents, the flaw in the administrative review process or the failure by the Chief of Security to address any of these issues.

With respect to the finding of noncompliance with Contract Monitoring requirements, the

Monitors' 5th Report stated: "the audit administrators may wish to more closely review the Monitors' reports to identify more substantive audit measures given the *stark inconsistencies between the WGYCF audit findings and the Monitors' findings in such key areas as Protection from harm, Staffing, and use of Force." Id.* at 84. (Emphasis added).  MTC responded, "We do not concur with the Monitor's findings of noncompliance." *Id.*  at 84.

It is difficult to see how genuine and lasting progress can be made if MDOC's operating agent at Walnut Groove strikes an attitude of defiance, rather than expressing and demonstrating in action a strong commitment to working with the Monitors, MDOC and Plaintiffs to implement meaningful remedial measures.

On November 4, 2014, in light of the findings and observations of the Monitors in their 5th Report and MTC's response, Plaintiffs asked Defendants to join them in a discussion to attempt to negotiate remedial measures that would address the concerns in Plaintiffs' motion for enforcement of the Consent Decree.  Plaintiffs provided Defendants with a Memorandum notifying Defendants of the issues they wished to pursue; requesting that MDOC provide specific information and documents pertinent to these issues; and making suggestions as to proposed remedies with respect to each issue.  Doc. 113, Plaintiffs' Exhibit to Status Conference, Memorandum from Margaret Winter to Harold Pizzetta, Proposal to Discuss Remedial Measures dated November 4, 2014.   In addition to the areas noted above, in which the monitors had made findings of non-compliance, Plaintiffs raised issues relating to a number of other requirements of the Consent Decree, including physical plant security concerns; programming; and gang management. *Id.*

On December 9, 2014, the parties participated in a telephonic conference to discuss Plaintiffs' November 4 requests for information and proposed remedies.   In addition to MDOC

officials and counsel, officials for MTC also participated in the conference. Defendants categorically rejected Plaintiffs' proposal that they enter into any kind of binding agreement with respect to any remedy.  Defendants for the most part deferred their response regarding Plaintiffs' requests for information, and also deferred taking positions on Plaintiffs' remedial proposals, stating, in general, that they did not see the need for any additional remedial measures.

At the suggestion of Defendants' counsel, the parties agreed that Mr. Vail would make another site visit to Walnut Grove where MDOC and MTC would provide for his review copies of documents Plaintiffs had requested, and that MDOC and MTC officials would meet with Mr. Vail in person at that time to address his requests for information, as well as to respond to his proposals for remedial measures.

Mr. Vail's site visit to Walnut Grove took place on January 5-6, 2015.   At that meeting, MDOC provided a number of the documents Plaintiffs had asked to review; it transpired that a number of the other key documents that Plaintiffs had asked to reviews imply did not exist:  for example, Defendants conceded that they had never prepared an after-action report on the July 2014 riot, despite the monitors' request for that document, and had never hired an independent security expert to address the insecure cell doors and other security hardware deficiencies, despite Mr. Vail's recommendation.  With respect to other documents (for example, inmate complaints and grievances regarding sexual abuse and officials' follow-up to those complaints), Defendants promised to provide the documents, which they have not yet been produced.  With respect to certain other documents, Defendants either declined to produce them on the ground that they were trade secrets (documents relating to pay and benefits packages for MTC line staff) or declined to allow Plaintiffs to retain copies on the ground that they were too sensitive to be made public (the Emergency Response Plan).

## LEGAL STANDARD

The federal courts have inherent authority to modify injunctive relief, including consent decrees, in order to account for changed circumstances and effectuate the basic purpose of the original decree. *See, e.g., United States v. Swift and Co.*, 286 U.S. 106, 114-15 (1932) ("A continuing decree of injunction directed to events to come is subject always to adaptation as events may shape the need. The result is all one whether the decree has been entered after litigation or by consent. In either event, a court does not abdicate its power to revoke or modify its mandate, if satisfied that what it has been doing has been turned through changed circumstances into an instrument of wrong."); *Chrysler Corp. v. United States*, 316 U.S. 556, 562 (1942) (stating that the test to be applied to a proposed modification of a consent decree is whether "the change served to effectuate or to thwart the basic purpose of the original consent decree."); *United States v. United Shoe Machinery Corp.,* 391 U.S. 244, 252 (1968) (finding that an existing injunction had failed to eliminate an illegal monopoly it was designed to dissolve and holding, "the time has come to prescribe other, and if necessary more definitive, means to achieve the result").

The Supreme Court has stressed that "federal courts are not reduced to issuing injunctions against state officers and hoping for compliance. Once issued, an injunction must be enforced." *Hutto v. Finney*, 437 U.S. 678, 690 (1979). In *Hutto*, the Supreme Court held that where prison officials had been given "repeated opportunities" to remedy unconstitutional conditions, the district court was justified in "entering a comprehensive order to insure against the risk of inadequate compliance." *Id.* at 687. The Court concluded, "[i]n fashioning a remedy, the District Court had ample authority to go beyond earlier orders and to address each element contributing to the violation." *Id.*

In *Rufo v. Inmates of Suffolk County Jail,* 502 U.S. 367 (1992), the Supreme Court stressed the importance in institutional reform cases for the district courts to retain discretion to modify consent decrees when warranted by changes in circumstances. The Court rejected the earlier strict test that the party seeking modification demonstrate that enforcing the decree without modification would result in "grievous injury," in favor of a more flexible standard. *Id.* at 380. The Court explained:

> The experience of the District Courts of Appeals in implementing and modifying such decrees has demonstrated that a flexible approach is often essential to achieving the goals of reform litigation. * The Courts of Appeals have also observed that the public interest is a particularly significant reason for applying a flexible modification standard in institutional reform litigation because such decrees "reach beyond the parties involved directly in the suit and impact on the public's right to the sound and efficient operation of its institutions."

*Id.* at 381 (citations omitted) The Court announced a two-part test for determining whether modification of a consent decree is appropriate in institutional reform cases. First, the party seeking modification bears the burden of establishing that "a significant change in facts or law warrants revision of the decree." *Id.* at *384*. A "significant change" may warrant modification when "changed factual conditions make compliance with the decree substantially more onerous, when the decree proves to be unworkable because of unforeseen obstacles, or when enforcement of the decree without modification would be detrimental to the public interest." *Id.* If the party seeking the modification demonstrates that a change in circumstances warrants modification of the consent decree, the court must then consider whether the proposed change is "suitably tailored" to the changed circumstance. *Id.* at 391.

More recently, in *Brown v. Plata*, 131 S. Ct. 1910 (2011), the Supreme Court upheld a population limit ordered by a three-judge court in the face of ongoing noncompliance with

earlier remedies regarding medical and mental health services in the California Department of Corrections. The Court concluded by stating that the three-judge district court retains the authority, and the responsibility, to make further amendments to the existing order or any modified decree it may enter as warranted by the exercise of its sound discretion:

> The power of a court of equity to modify a decree of injunctive relief is long-established, broad, and flexible." *New York State Assn. for Retarded Children, Inc. v. Carey*, 706 F.2d 956, 967 (C.A.2 1983) (Friendly, J.). A court that invokes equity's power to remedy a constitutional violation by an injunction mandating systemic changes to an institution has the continuing duty and responsibility to assess the efficacy and consequences of its order. *Id.*, at 969–971. Experience may teach the necessity for modification or amendment of an earlier decree. To that end, the three-judge court must remain open to a showing or demonstration by either party that the injunction should be altered to ensure that the rights and interests of the parties are given all due and necessary protection.

*Id.* at 1946.

## PLAINTIFFS' PROPOSED REMEDIES

Nearly three years into the Consent Decree, and after repeated findings by the court-appointed monitors of Defendants' non-compliance with key provisions of the Consent Decree relating to inmate safety, Defendants continue to subject the inmate population at Walnut Grove to an unreasonable risk of serious harm. As the testimony and other evidence at hearing will show, the current provisions of the Consent Decree aimed at securing a reasonably safe environment for the prisoners housed there are inadequate and have not resulted in sustained progress. Experience shows the need to modify that decree to achieve its intended purpose.

Plaintiffs filed their pending motion more than five months ago. Since then, there have been significant developments and some improvements at Walnut Grove. Notwithstanding these developments, however, the issues Plaintiffs raised in their pending motion and in their

November 4 memorandum remain essentially the same; none have been fully resolved.  The removal of Close Custody inmates from Walnut Grove and the addition of security staff are long-overdue and sorely needed remedial measure, but by no means a panacea.

The new information provided in the Monitors' 5th Report, Mr. Vail's January 2015 site visit, and the production of some (though by no means all) of the documents Plaintiffs have requested  allows Plaintiffs now to propose remedial measures more closely tailored to the conditions that are subjecting Plaintiffs to unreasonable risks.  These proposals are attached as Exhibit A to this Memorandum.

These proposals are merely examples of the remedies that the Court might determine to be appropriate if Plaintiffs prove their claims at  the evidentiary hearing.  The Court may, of course, consider remedies other than those suggested by Plaintiffs:  equitable relief is flexible and is intended to be tailored to the circumstances.  *Stukenberg v. Perry*, 294 F.R.D. 7, 48 (S.D. Tex. 2013), citing *Lemon v. Kurtzman*, 411 U.S. 192, 199–201 (1973); *Hecht Co. v. Bowles,* 321 U.S. 321, 329–30 (1944).

## CONCLUSION

If the Court determines after evidentiary hearing that additional measures are needed to protect members of the Plaintiff class at Walnut Grove from unreasonable risk of serious harm, the Court should modify the decree in this case and enter a new order providing for whatever narrowly and suitably tailored relief is necessary to achieve that goal.

Dated this 13th  day of January, 2015.

Respectfully submitted,

s/Margaret Winter
Margaret Winter
National Prison Project of ACLU
915 15th Street, NW, 7th Floor
Washington, DC 20005
Phone: (202) 393-4930
Fax: (202) 393-4931
mwinter@npp-aclu.org

(admitted *pro hac vice*)

/s/Jennie Eichelberger
Jody Owens, II, MSB No. 102333
Jennie Eichelberger, MSB102522
Southern Poverty Law Center
111 East Capitol Street, Suite 280
Jackson, Mississippi 39201
(601) 948-8882 (phone)
(601) 948-8885 (fax)
jody.owens@splcenter. Org
jennie.eichelberger@splcenter.org

Robert B. McDuff
Jacob W. Howard
McDuff & Byrd
767 N. Congress
Jackson, MS
Phone: (601) 969-0802
Fax: (601) 969-0804
rbm@mcdufflaw.com
jake@mcdufflaw.com

## CERTIFICATE OF SERVICE

I, Jennie Eichelberger, hereby certify that a true and correct copy of the foregoing document was filed electronically. Notice of this filing will be sent by electronic mail to all parties by the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

SO CERTIFIED, this 13th day of January, 2015.

/s/Jennie Eichelberger_____
Jennie Eichelberger