IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

| | |
|---|---|
| C.B. by and through his next friend,<br>Charleston DePriest, et al.  )<br> )<br> )<br>Plaintiffs,  )<br> )<br> )<br> )<br> )<br> )<br>V.  )<br> )<br> )<br>Walnut Grove Correctional  )<br>Authority, et al.  )<br> )<br>Defendants.  )<br> ) | Civil Action No. 3:10cv66<br>6th REPORT OF MONITORS<br>Pursuant to:<br>CLASS ACTION<br>CONSENT DECREE<br><br><br>March 5, 2015 |

## I. INTRODUCTION

Pursuant to Section IV of the above-referenced *Consent Decree*, the Monitors are to

submit reports to counsel every four months on the defendants' compliance with provisions

of the decree. This reporting requirement also includes the provisions of the *Memorandum*

*of Agreement Mental Health-WGYCF.* This *6th Report* chronicles the Monitors' activities

from October 2014 thru January 2015, and provides observations and findings on the

specific provisions of the Substantive Remedial Measures of the *Consent Decree* and the

*Memorandum of Agreement Mental Health-WGYCF.*

A draft of the *6th Report* was provided to the parties on February 23, 2015. Defendants provided their comments via a telephone conference call on March 3, 2015, followed by their comments in written form on March 5, 2015. Plaintiffs' counsel and their expert provided their comments via a telephone conference call on March 5, 2015.

## II. METHODOLOGY

During this reporting period, the Monitors received and reviewed a constant stream of information and data provided by the Mississippi Department of Corrections (MDOC) and Walnut Grove Youth Correctional Facility (WGYCF) officials. Much of this material is provided through routine monthly reports such as incident reports, staffing reports/rosters, inmate disciplinary data, grievance data, and classification data. In addition to the materials routinely provided during this reporting period, the Monitors also received the following reports and materials:

- Walnut Grove Correctional Facility (WGCF) Report, Amended, Madeleine L. LaMarre MN, FNP-BC, November 29, 2014;

- *Plaintiffs' Response to Defendants' Submission of the Report of Dr. Amanda Ruiz;*

- *Amended Memorandum in Support of Motion for Enforcement and Modification of Consent Decree* and Exhibit A to motion, *Remedial Measures proposed by Plaintiffs' Corrections Expert Eldon Vail;*

- Report of Eldon Vail, February 10, 2015;

2

• Medical Audit/Comprehensive Quality Improvement Committee Meeting, Health Assurance, 4th Quarter 2014 (October, November, December), January 28, 2015.

During this reporting period the Monitors also conducted the following site inspections, meetings, and telephone conference calls:

- **December 1, 2014:** Site inspection at WGYCF conducted by both Monitors;

- **December 2, 2014:** Monitors met with the MDOC Acting Commissioner, Deputy Commissioner, MTC corporate officials, and Harold Pizzetta, Chief, Civil Litigation Division, Attorney General's Office;

- **December 9, 2014:** Telephone conference call with Plaintiffs' counsel and Plaintiffs' Expert Eldon Vail;

- **January 21, 2015:** Telephone conference call with Chief, Civil Litigation Division, Attorney General's Office;

- **January 28, 2015:** Site inspection at WGYCF conducted by both Monitors; and

- **January 29, 2015:** Monitors met with MDOC Commissioner, Deputy Commissioner and General Counsel, MTC corporate officials and counsel, and Chief, Civil Litigation Division.

Finally, a random sample of 44 inmates was selected to be interviewed by the Monitors and the MDOC/MTC compliance officers. Forty-two inmates were interviewed and were used to evaluate compliance in the areas of classification, protection form harm, classification/housing, and medical care.

**III. SUMMARY**

The *5th Monitors' Report* detailed what could fairly be characterized as a troubled

and unsafe facility, which experienced a major disturbance during the reporting period (July 10, 2014) not unlike the serious disturbance that occurred in the prior reporting period (December 31, 2013). The facility was found in non-compliance in core areas such as inmate protection from harm, staffing, and staff use of force. During the reporting period, off-site hospital transport runs due to injuries resulting from assaultive behavior were frequent, as were unobserved assaults in the housing areas. The facility was in lockdown for a significant portion of the reporting period, and staff use of force incidents increased significantly, peaking with 23 incidents in August 2014.

For this reporting period, the facility has made significant gains in each of the aforementioned core areas of operation. The staffing numbers have been increased from 170 correctional officers in August 2014 (21 vacancies) to 212 officers on January 1, 2015. Significantly, in the two most recent packets of Extraordinary Occurrence Reports (EORs), officers were in position to intervene in inmate assaults/fights, thus reducing unobserved/unchecked assaultive behavior within the housing areas. While unobserved assaults continue to occur, with the increased staffing, the numbers are being reduced.

The number of off-site hospital runs due to injuries resulting from inmate assaults has also been reduced significantly in the most recent two months. It is noted that the January 2015 EORs reflected the fewest number of incidents since the July 2014 disturbance. Moreover, the number of both inmate and staff assaults were modest and did

not result in serious injuries to either staff or inmates. Staff use of force incidents have likewise been reduced significantly, with only two such incidents in December and three in January (versus 23 in August 2014).

As was detailed in the 5th Report, the Close Custody population was removed from the facility by mid-September 2014. However, a number of Close Custody inmates who had been reclassified as Medium Custody remained at the facility. The Monitors stressed the need to monitor these inmates closely to ensure that they did not prove to be problematic in terms of their conduct. During the last two site inspections, the Monitors identified a number of these inmates whose behavior was proving to be problematic. A reassessment of these inmates was completed on January 30, 2015, and 11 inmates were transferred to other facilities. In addition, the Monitors were advised by the Deputy Commissioner on February 4, 2015, that the population at the facility had been capped at 962 inmates. As of March 1, 2015, the WGCF population was 893 (Housing Units 3-D & 4-A-D vacated). This significant reduction in the facility population, combined with limiting the population to more manageable Minimum-Medium Custody inmates, bodes well for the future safe operation of WGYCF.

## IV. OBSERVATIONS AND FINDINGS OF SUBSTANTIVE REMEDIAL MEASURES

### A. Classification and Housing System
Recommended Compliance Finding: **Partial Compliance**

Observations: The MDOC continues to use a validated objective classification system

5

that meets national standards. Inmates are classified by the MDOC prior to transfer to the WGYCF. Upon arrival at the WGYCF, the inmate's classification records are reviewed and a needs assessment is completed. Inmates are then reclassified on an annual basis to determine if the inmate's custody level should be adjusted. In 2014, it was agreed by the parties that no Close Custody inmates shall be assigned to WGYCF. Three keys issues were detected during the last period of monitoring that have been re-assessed to determine if the compliance rating was appropriate.

First, as noted above, the Monitors identified approximately 96 inmates in August 2014 where the scored custody level had been over-ridden by the MDOC central classification unit from Close to Medium Custody. During the January 28, 2015, site visit, a review of these 96 cases was completed. Of the 96 cases, 38 inmates have been transferred to other MDOC facilities. Of the remaining 58 cases, 47 were over-rides that were justified by virtue of the inmates' good conduct. However, 11 of the inmates whose custody level had been over-ridden remained at WGYCF during this monitoring period after they were involved in an assault on another inmate or staff. While the MDOC immediately transferred these inmates to close security facilities, it was disturbing that the Monitors discovered this situation and not the MDOC or MTC classification staff.

To remedy this situation in the future, the MTC and MDOC must have a

6

formal policy under which any inmate who is found guilty of a serious misconduct (especially an assault or possession of a weapon) by the Disciplinary Hearing Officer must be reviewed by the Case Manager Supervisor (Stephanie Patrick) for possible change in the inmate's scored and final custody level. Recommendations to increase the inmate's custody level from Medium to Close should be reviewed by the MDOC central classification unit. Any inmate whose custody level is changed to Close Custody shall be transferred as quickly as possible from WGYCF. This policy is critical to ensure that no Close Custody inmates are being housed at WGYCF. It is inevitable that inmates in Minimum and Medium Custody will become involved in serious and assaultive institutional behavior at WGYCF. There must be a procedure whereby these inmates are reclassified in a timely manner and transferred from WGYCF *without the intervention of the Monitors* (emphasis added). In MTC's comments on the draft *6th Report*, officials will by March 15 develop a local policy to ensure that offenders who had been found guilty of serious and assaultive behaviors are reviewed and classified in a timely manner and transferred when appropriate.

As shown in Table 1, the custody levels of WGYCF are now limited to Minimum and Medium Custody. There must be assurances that none of these inmates have been over-ridden from a Close Custody score to Medium Custody even after having been found guilty of serious institutional misconduct.

7

**Table 1. Inmate Custody Levels**
**July 2012 – December 2014**

| Custody | July 2012 | | January 2014 | | August 2014 | | December 2014 | |
|---|---|---|---|---|---|---|---|---|
| | Inmates | Percent | Inmates | Percent | Inmates | Percent | Inmates | Percent |
| CLOSE | 253 | 24.3 | 327 | 25.9 | 197 | 25.0 | 0 | 0.0 |
| MEDIUM | 591 | 56.7 | 737 | 58.4 | 470 | 59.6 | 1,105 | 85.2 |
| MINIMUM-NON-COMM | 190 | 18.2 | 178 | 15.6 | 66 | 8.4 | 189 | 14.6 |
| MINIMUM-COMM | 3 | 0.3 | 0 | 0 | 5 | 0.6 | 2 | 0.2 |
| UNCLASSIFIED | 6 | 0.6 | 0 | 0 | 50 | 6.3 | 1 | 0.1 |
| Total | 1,043 | 100 | 1,261 | 100 | 788 | 100.0 | 1,297 | 100.0 |

Source: MDOC Snapshot data files

The second issue is the ongoing maintenance of a housing plan. The MTC has maintained such a plan which shows how the inmates are to be housed according to their security and programmatic needs. With the transfer out of the Close Custody inmates and the creation of the Privilege Unit, an updated housing plan was needed. The Monitors requested that plan and received a new plan from the MTC on February 19, 2015.

The third and final issue is the presence of a case management plan for the inmate population. All inmates must have such a plan which simply prioritizes programs and work assignments that will be of benefit to the inmate to help lower his risk for recidivating and enhance his opportunity for release on parole. Based on the random sample of inmate interviews, about 48 percent stated that they had not received a copy of the plan (which does require the inmate's signature). However, an audit of the 42 cases found that all but one inmate had a completed case plan. Case Managers should more carefully review the individual case plans with each

inmate and how well the inmate is progressing on that plan during regular scheduled contact meetings. In MTC's comments to the draft *6th Report*, officials will develop by March 15 a local policy to ensure that case managers document discussion of the Case Management Plan with the offender at each classification hearing.

## B. Protection From Harm

### (1) Reasonable Safe Living Conditions
Recommended Compliance Finding: **Partial-Compliance**

Observations: There are several measures that are employed to assess the level of safety within the WGYCF. On a macro-level , the MDOC records the number of assaults that are reported by each facility on a monthly basis. In previous reports we have noted that the WGYCF rate per 100 inmate population per month had declined and was comparable to the other MDOC major facilities. The overall rate for WGYCF for 2014 is eight per 100 inmates per year which means that eight percent of the average inmate population will be involved in an assault in a 12-month period. This rate is actually lower than the actual number of official assaults based on the reporting problems noted in the earlier reports. Specifically, prior to August 2014, when there was a large-scale disturbance where there were numerous assaults, the MDOC and its facilities reported the entire event as a single assault rather than the individual number of observed assaults and injuries. This reporting

discrepancy has been corrected since August 2014.

It is also noteworthy that 96 percent of the inmates at WGYCF in January 2015 have no DVRs for an assault, meaning that 46 do have such a record. Further, of the 42 inmates who were interviewed, four (10 percent) indicated that they "feared for their safety". Four inmates also stated that they have received verbal abuse in the form of cursing and one inmate stated that he had received physical abuse in the form of officers making him strip, bend over, and cough for them. He stated that this occurred about a year ago.

Collectively, these data consistently show that the vast majority of the inmate population is not involved in assaultive or violent behavior, but there remains a small and visible population that has exhibited violence, has the potential for violent behavior, or who have been abused (mostly in the form of verbal abuse).

**Table 2. Assaults by Facility January 2014 – December 2014**

| Facility | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Rate Per 100 Inmates |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **State Facilities** | | | | | | | | | | | | | |
| MSP | 23 | 14 | 9 | 22 | 10 | 13 | 12 | 13 | 26 | 31 | 31 | 33 | 7 |
| CMCF | 22 | 24 | 23 | 27 | 21 | 30 | 7 | 11 | 31 | 15 | 10 | 11 | 10 |
| SMCI | 13 | 14 | 11 | 17 | 25 | 17 | 18 | 25 | 22 | 14 | 11 | 15 | 7 |
| **Private Facilities** | | | | | | | | | | | | | |
| East MS CCF | 3 | 1 | 18 | 3 | 9 | 12 | 13 | 17 | 17 | 17 | *NR* | 10 | 11 |
| Marshall CCF | 1 | 0 | 5 | 3 | 3 | 5 | 5 | 11 | 3 | 5 | *NR* | *NR* | 5 |
| Walnut Grove CCF | 6 | 11 | 7 | 5 | 9 | 8 | 9 | 11 | 8 | 3 | 9 | 11 | 8 |
| Wilkinson CCF | 17 | 11 | 12 | 10 | 23 | 7 | 9 | 9 | 20 | 22 | 18 | 25 | 21 |

Source: MDOC. Note that East MS CCF and Marshall CCF rates were adjusted based on average number of assaults reported for the known reporting months.

Gang activity has been and continues to be a security issue. As shown in Table 3, approximately 14 percent of the December 2014 inmate population were listed by the MDOC as being an active gang member, with most of them being affiliated with the various factions of the Vice Lords or Gangster Disciples. Table 4 shows the housing location of the gang members, which is widely distributed throughout the facility. It is noteworthy that 17 gang members are in the RID programs (Units 3A- 3C); 17 are newly arrived inmates in the Orientation Unit; and 6 are in the Privilege Unit.

The influence of the gangs was made apparent when one of the inmates to be interviewed by Monitor Austin during the December 1, 2014, site visit, refused to come to the interview unless his own personal inmate security accompanied him. According to MTC security staff, it was common for active high-level gang members to be "escorted" by their own inmate security. When this incident was brought to the attention of the MTC and MDOC staff, they indicated that such a practice was unacceptable and would be discontinued. The inmate in question was immediately transferred to another facility. Nonetheless, as in the case of the misclassification of Close Custody inmates, it was the Monitor who discovered the unacceptable situation during a brief site visit rather than the MTC or MDOC officials.

Mr. Eldon Vail also noted evidence of this problem in his site visit to the WGYCF in January 2015. In order for the MDOC to reach compliance with part of the *Consent Decree*, there must be no evidence of active gang members developing and operating their own inmate-based security system.

### Table 3. Active Gang Members

| Gang Affiliation | Inmates | Percent |
|---|---|---|
| None | 1,118 | 86% |
| Aryan Brotherhoods | 9 | 1% |
| Black Gangster Disciple | 17 | 1% |
| Black Peace Stone | 4 | 0% |
| Bloods | 2 | 0% |
| Brothers Of The Struggle | 2 | 0% |
| Conservative Vice Lords | 4 | 0% |
| Four-Corner Hustler Vice Lords | 3 | 0% |
| Vice Lord | 21 | 2% |
| Insane Vice Lords | 21 | 2% |
| Gangster Disciple | 62 | 5% |
| Hoover Crip | 2 | 0% |
| Crip | 9 | 1% |
| Latin King | 5 | 0% |
| Piru Bloods | 2 | 0% |
| Simon City Royal | 13 | 1% |
| Stones | 3 | 0% |
| | | |
| Total | 1,297 | 100% |

Source: MDOC December 4, 2014 Snapshot data file

### Table 4. Gang Members by Housing Unit

| Unit | Function | Inmates | Percent |
|---|---|---|---|
| WGCF 3A | RID | 5 | 2.8 |
| WGCF 3B | RID | 9 | 5 |
| WGCF 3C | RID | 3 | 1.7 |
| WGCF 3D | Orientation | 13 | 7.3 |
| WGCF 4A | PC | 7 | 3.9 |
| WGCF 4C | NON-MIN | 10 | 5.6 |
| WGCF 4D | SEG | 5 | 2.8 |
| WGCF 5A | GP | 8 | 4.5 |

| | | | |
|---|---|---|---|
| WGCF 5B | Privilege Unit | 6 | 3.4 |
| WGCF 5C | GP | 3 | 1.7 |
| WGCF 5D | GP | 11 | 6.1 |
| WGCF 6A | GP | 6 | 3.4 |
| WGCF 6B | GP | 6 | 3.4 |
| WGCF 6C | GP | 9 | 5 |
| WGCF 6D | GP | 8 | 4.5 |
| WGCF 7A | GP | 10 | 5.6 |
| WGCF 7B | GP | 6 | 3.4 |
| WGCF 7C | GP | 4 | 2.2 |
| WGCF 7D | GP | 12 | 6.7 |
| WGCF 8A | GP | 11 | 6.1 |
| WGCF 8B | GP | 10 | 5.6 |
| WGCF 8C | GP | 5 | 2.8 |
| WGCF 8D | GP | 12 | 6.7 |
| Total | | 179 | 100 |

Source: MDOC December 4, 2014 Snapshot data file

Overall, it appears that the vast majority of inmates at the WGYCF are not being subjected to personal safety issues. However, there remains a significant presence of active gang members who are attempting on a daily basis to control certain aspects of the facility's operations. Development of a plan that identifies these gang members and then manages them using a variety of methods including a gang intervention program, internal classification methods that takes gang membership into account, and removal of high level gang members from the facility is recommended. According to MTC's comments to the draft *6th Report*, the facility recently filled the vacated STG Group Coordinator position with a lieutenant who is developing further strategies to better manage gang members.

13

During the most recent site inspection, Monitor Martin conducted inspections inside several of the tower control stations in an attempt to gauge staff ability to detect unsecured cell doors via the control panels. Monitor Martin also queried the control officers on the general operation of emergency call buttons. While both of these systems require constant maintenance, they appeared to be operable and functioning. When officers make their rounds to ensure that locking mechanisms are not blocked, the control officer's panel does detect those doors that are not fully secured.

## (2) Sufficient Numbers of Adequately Trained Staff
Recommended Compliance Finding: **Partial Compliance**

Observations: The current line staff complement is 212, with 28 supervisory staff (captains, lieutenants, sergeants). As aforementioned, this represents a very sizeable increase over the prior reporting period. A review of the shift staffing rosters for this reporting period indicates that for two of the three shifts, all facility housing pod areas have assigned officers. During the two most recent site inspections (December 2014/January 2015), the Monitors have observed improved supervision of the housing areas by line staff. Officers are more diligent in ensuring that cell doors are secure, rounding checks appear to be more frequent, and overall staff presence in the housing areas is much improved. Each major housing unit has an assigned sergeant from 8:00 a.m. to 4:00 p.m. After 4:00 p.m., Unit 4 (segregation) has an

assigned sergeant and two additional shift sergeants provide coverage for the remaining units.

Contraband control remains a problem; however, facility officials continue to conduct frequent searches and the presence of serious contraband appears to have diminished in the two most recent months.

Each shift now has CERT officers assigned to act as first responders to emergent incidents, e.g., on January 15, 2015, the second shift had four assigned CERT officers supported by a CERT sergeant.

While there continues to be too many unobserved altercations in the housing areas, there is evidence that officers, because they are more consistently present in the housing areas, are beginning to intervene in inmate altercations.

**(3-12) Use of Force and Chemical Agents.**
Recommended Compliance: **Partial Compliance**

<u>Observations</u>: Staff use of force incidents have decreased during the reporting period. The incidents for November through January have been few in number and have not resulted in injuries to staff or inmates due primarily to the modest level of force employed by staff. Facility officials have improved their review of these incidents. However, reviewing officials continue to fail to fully document their reviews on the computerized reporting form. While the December incidents were all reviewed and documented by no less than three supervisory officials (shift captain,

chief of security and DW of Security), the January incidents were lacking in documented reviews. In MTC's comments to the *6th Report*, officials committed to identifying those incidents for the Monitor that are pending review at the time they are submitted to the Monitors.

One of the January incidents (15-027) involved a closed-fist strike to an offender. A review of the incident packet indicated that the officer utilized the strike while in the grasp of the offender. While there is evidence that the strike was in response to targeted and active aggression directed toward the officer, it is just such incidents that must be carefully reviewed by upper level and detached facility officials.

In the single planned incident during December (14-600), the incident was adequately recorded with a hand-held camera that included an attempt with verbal strategies by a health care provider to avoid using OC spray.

It is noted that among the remedial measures proposed by Plaintiffs' expert (see Exhibit A to Plaintiffs' Amended Motion for Modification, January 13, 2015), was a recommendation to provide more timely decontamination of inmates subjected to OC spray. During the January 29, 2015, meeting with MTC and MDOC officials, it was agreed that protocols would be revised to provide decontamination immediately after the inmate has been secured rather await his movement to the

facility infirmary. In MTC's comments to the *6th Report,* officials provided a copy of

a local policy for OC decontamination (Effective February 23, 2015). The policy now

provides an immediate opportunity for the subject to be decontaminated prior to

being escorted to medical.

**(13) Use of Prisoners to Enforce Rules or Impose Discipline**
Recommended Compliance Finding: **Compliance**

**(14) Protection of Inmates from Abuse, Harassment, and Punishment on the Basis of their Actual or Perceived Sexual Orientation, Gender Identity, and Gender Non-Conformity**
Recommended Compliance Finding: **Compliance**

**(15) Prohibition of Forcing Inmates to Engage in Physical Exertion that Inflicts Pain or Discomfort**
Recommended Compliance Finding: **Compliance**

**C. Long-Term Confinement**
Recommended Compliance Finding: **Compliance**

Observations: The MDOC had removed all prisoners who have been assigned to

long-term administrative segregation by July 30, 2014. As long as these inmates

are no longer at the WGYCF, this issue is moot.

**D. Programming and Behavior Management**

**(1) Removal of the Paramilitary Elements of the Regiments Inmate Discipline Program**
Recommended Compliance Finding:  **Compliance**

**(2) MDOC Will Develop a Behavior Management Policy that incorporates Graduated Sanctions for Rule Violations and Positive Incentives for Good**

**Behavior**
Recommended Compliance Finding: **Compliance**

**(3) Out-of-Cell Time and Outside Recreation**
Recommended Compliance Finding: **Compliance**

[**Note**: In terms of program and work assignments, approximately 70 percent of the inmates are assigned to either a job/work detail and or a rehabilitative/self improvement program (see Table 5). It is noted that 18 percent of the inmates have multiple work and program assignments. The inmate interviews showed that 30 of the 42 inmates (71 percent) interviewed had either a program or work assignment.]

**Table 5. Current Primary Program and Work Assignments**
**January 29, 2015**

| Primary Assignment | Inmates | Percent |
|---|---|---|
| Total Inmate Population | 1,157 | 100.0% |
| | | |
| No Assignment | 356 | 30.8% |
| Zone Orderly | 45 | 3.9% |
| A&D | 55 | 4.8% |
| ABE | 256 | 22.1% |
| Culinary Arts | 24 | 2.1% |
| GED | 82 | 7.1% |
| Horticulture | 28 | 2.4% |
| RID | 25 | 2.2% |
| Pre-Release | 30 | 2.6% |
| Kitchen | 26 | 2.2% |
| One Program/Work Assignment | 589 | 50.9% |
| Multiple Programs/Work Assignments | 212 | 18.3% |

Source: MTC Program Listings

**E. Disciplinary Due Process and Grievances**

**(1) Due Process for Imposition of Disciplinary Sanctions**
Recommended Compliance Finding: **Compliance**

**(2) Adequate Grievance Procedures**
Recommended Compliance Finding: **Compliance**

Observation: As previously reported, the new Grievance Coordinator came into her position facing a backlog in processing grievances. As recommended by the Monitor, she was provided clerical assistance to enable her to properly carry out her duties. She had made improvements to her tracking log and made gains on addressing and processing inmate grievances. Monitor Martin reviewed the tracking log and selected grievance files to review while on-site. While a number of grievances reviewed could have been more timely disposed of through the informal process, the Grievance Coordinator is clearly and consistently attempting to process in a substantive manner inmate grievances. She was encouraged to work with facility officials to address inmate grievances informally when appropriate.

### F. Suicide Prevention

**(1) Housing of Prisoners on Suicide Watch**
Recommended Compliance Finding: **Compliance**

Observations: In reviewing the Health Assurance Medical Audit, 4th Quarter 2014, it is noteworthy that inmates on suicide watch have decreased significantly from 154 in 2013, to 43 in 2014. The total number of suicide watch days have decreased from 625 in 2013, to 115 in 2014.

**(2) Development of Suicide Prevention Policy**
Recommended Compliance Finding: **Compliance**

Observations**:** The Facility Health Care Administrator confirmed that the WGYCF suicide policy utilizes three different staging levels for suicide risk inmates. Moreover, clinicians are documenting the suicide risk assessments performed which include steps to mitigate suicidal ideation.

## G. Medical Care

**(1) Provision of Adequate, Appropriate, and Timely Medical and Dental Care**
Recommended Compliance Finding: **Deferred**

Observations: Since the last reporting period, the MDOC contract with AdminPros was terminated. Monitor Martin attended the Medical Audit/Comprehensive Quality Improvement Committee Meeting (4th Quarter) on January 28, 2015. This committee, attended by a wide array of health care officials and facility administrators, reviews facility health care services by using data for clinical visits, off-site specialists visits, community referrals, hospital/emergency services, and ancillary services. Members review the data in "Questions and/or Concerns, Answers and/or Discussion" format. The processing of inmate medical grievances is also addressed. Monitor Martin, in reviewing medical grievances with the facility health care administrator, was very impressed with how timely these grievances are addressed and that the responses often provide favorable resolution to the inmate.

It should also be noted that inmate interviews indicated that virtually all of the inmates were very satisfied with the level of medical care they have been receiving at WGYCF. All indicated that they had received a medical screening upon arrival. Sick call requests are handled promptly and the services provided address the inmate's medical issue. There were no complaints on medication not being received. There was some concern from a few inmates that their special diet food was not always available for their meals. This issue was brought to the attention of the MTC officials at the January 29, 2015, meeting. In MTC's response to the *6th Report*, officials reported that the Warden is attempting to identify the scope of inmates concerns and to develop improvements for the delivery of special diets with a completion date of March 15.

**(2) Prohibition of Housing Inmates with "Serious Mental Illness."**
Recommended Compliance Findings: **Deferred**

Observations: As of February 16, 2015, there were 36 inmates at the facility with a SMI designation. Twenty-six of these inmates are assigned to the RID program. There are transfer requests pending for those SMI inmates not assigned to the RID program. In MTC's comments to the *6th Report*, dated March 4, there were no SMIs at the facility other than those assigned to the RID program. It was further reported than an alert system has been established so that management at WGYCF can expedite transfer of SMI inmates who are approaching the 14 day transfer deadline.

**H. Contract Monitoring**

**(1-2) Development and Implementation of Comprehensive Contract Monitoring Policies and Procedures**
Recommended Compliance Finding: **Deferred**

Observations: A review of the *Consent Decree* Audits for November 2014 thru January 2015 indicated the completion dates for quality checks on all provisions of the consent decree. While it is clear that provisions are being audited based on the materials provided, the audit tracking documents do not provide detail on specific action items that require corrective responses. The Monitors will continue to work with facility personnel to determine how this information can be captured and included on the monthly audits.

The MTC corporate officials recently advised the Monitors that they are developing a quarterly validation process using random sampling to determine compliance with the *Consent Decree*. The validation tool will be shared once it is fully developed and utilized as an additional audit tool.

## CERTIFICATE OF SERVICE

I, Harold E. Pizzetta, III, Assistant Attorney General, hereby certify that on March 6, 2015, I electronically filed the foregoing Sixth Report of Monitors with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

SO CERTIFIED this 6th day of March, 2015.

/s/Harold E. Pizzetta, III
Harold E. Pizzetta, III, MS Bar No. 99867

# IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

### JACKSON DIVISION

| | | |
|---|---|---|
| **C.B. by and through his next friend,** | ) | |
| **Charleston DePriest, et al.** | ) | |
| | ) | **Civil Action No. 3:10cv66** |
| **Plaintiffs,** | ) | |
| | ) | **MANAGEMENT & TRAINING** |
| | ) | **CORPORATION RESPONSE TO 6th** |
| **V.** | ) | **MONITOR'S REPORT** |
| | ) | **Pursuant to:** |
| | ) | **CLASS ACTION** |
| | ) | **CONSENT DECREE** |
| **Walnut Grove Correctional Authority,** | ) | |
| **et al.** | ) | **March 4, 2015** |
| **Defendants.** | ) | |

This is the Management & Training Corporation (MTC) response to the 6th Monitor's Report concerning Defendant's compliance with the provisions of the Consent Decree. The reporting period covers activities from October 2014 through January 2015.

As the Monitors have documented, during this period the MTC/MDOC Team at Walnut Grove have made considerable progress toward achieving substantial compliance with the provisions of the Consent Decree. This response will further document that progress.

The dramatic improvements at Walnut Grove during this period have been highlighted by the Monitors in their evaluation. Zero elements were graded as non compliant in the 6th Report, compared with 4 in the 5th report. **Reasonably Safe Living Conditions, Sufficient Numbers of Adequately Trained Staff, Use of Force, and Chemical Agents,** all major safety issues, were all upgraded from Non Compliance to Partial Compliance, a major achievement. **Contract Monitoring** had been listed as Non Compliance, and is now listed as Deferred. **Suicide Prevention Policy, Grievance Mechanism,** and **Out of Cell Time** have all been upgraded to Compliance.

After listing major decree related achievements during this period, this response will address each issue evaluated as Partial Compliance or Deferred.

## MAJOR CONSENT DECREE RELATED ACHIEVEMENTS

1. **Accreditation**

   Due in part to the publicity surrounding the Consent Decree, the American Correctional Association elected to perform a monitoring visit on January 12-13, 2015. The result is



documented in Attachment 1, Commission on Accreditation for Corrections, Standards Compliance Monitoring Visit. Walnut Grove remains in 100% compliance with ACA Standards for Adult Correctional Institutions:

> "All mandatory standards remained in compliance with documentation to substantiate ongoing acceptable practices provided in an organized and comprehensive manner. All not applicable standards continued in that status. There were no new standards determined not applicable or non compliant." American Correctional Association, p 14.

## 2. Community Forum

Management & Training Corporation also opened the institution for community review and tour January 8, 2015. Citizens, including mayors, aldermen, sheriffs, judges, police chiefs, and citizen leaders attended a presentation and institutional tour. The Warden emphasized: "We are going to run a clean, constitutional institution". (Attachment 2, The Carthaginian, January 15, 2015).

## 3. DePriest v. Walnut Grove Compliance Audit Tool

During the quarter, MTC staff completed and tested a quarterly validation process which uses random sampling to determine compliance with each element of the consent decree. The process is coordinated outside of the institution at MTC Corporate Headquarters. The last quarter of 2014 is currently being audited.

The goal of the Audit Tool is to validate compliance or substantial compliance with each of the provisions of the Consent Decree, as outlined on page 15 of the Court Order. Substantial compliance means any identified deficiencies pose no greater risk of injury or harm than minimal. Since corrections manages human behavior, there is always some element of risk in all decisions.

# AREAS EVALUATED BY MONITORS AS PARTIAL COMPLIANCE OR DEFERRED

## A. Classification and Housing System

Monitors Recommended Compliance Finding: **Partial Compliance**

MTC's Recommended Compliance Finding: **Substantial Compliance**

### Monitors 1st Concern: Disposition of Offenders who may have custody raised to Close

MTC's Response to Monitors Concern: The Walnut Grove Team understands the need to closely track offenders whose behavior may lead to a change in custody to Close.

MDOC Disciplinary Procedures (SOP 18-01-01) allow the Disciplinary Hearing Officer (DHO) to refer an inmate to Reclassification "**if warranted**" (p 15). Consistent with this discretionary policy, the Hearing Officer historically has referred offenders with patterns

of misbehavior or serious offenses. Other offenders would be subject to review at their annual reclassification. The DHO in the past has not had access to classification score information. This is being corrected.

The purpose of the institutional classification reassessment process is "to ensure the inmate's placement in the least restrictive environment while ensuring public safety and the security of the institution, staff, and all inmates." (MDOC Institutional Classification Handbook, 10/19/2012, p. 17.) Custody points are associated with the type and level of risk of misbehavior by an inmate. As with any classification system, except for a few mandatory restrictions, selection of points and the final custody decisions involve an element of experience, judgment, and discretion of the classification hearing officer.

Reviewing past cases, it appears that the Disciplinary Hearing Officer and Classification Hearing Officers have acted consistently within the discretionary guidelines of MDOC procedures. However, being mindful of the need to transfer Close Custody offenders from Walnut Grove, by March 15 the Disciplinary and Classification team will develop a local policy. This local policy will track offenders who may be eligible to have their custody altered to Close status through the Disciplinary and Classification process, until final MDOC endorsement. This will ensure that the offenders are reviewed and classified in a timely manner.

### Monitors 2nd Concern: Maintenance of a Housing Plan

MTC's Response to Monitors Concern: As the Monitors noted this document was delivered 2/19/2015. The Housing Plan is a living document that will be used to meet changing needs of the inmate population.

### Monitors 3rd Concern: Case Management Plans

MTC's Response to Monitors Concern: As the Monitors point out offenders are receiving a completed case plan, as validated by a signed document in the hard case file. It appears that when interviewed with pattern questions they often do not know the technical title of the plan, so they cannot respond to questions. Case Managers do comment on progress toward case plan goals in the narrative section of reclassification computerized recording. To insure clearer offender understanding and involvement in this process, by March 15 the Walnut Grove Team will amend local procedures to insure that case managers document discussion of the Case Management Plan with the offender at each classification hearing. Also, the Team will prepare, by March 15, an ongoing educational forum for all offenders to continually familiarize them with the importance of the Case Management Plan.

## B. Protection from Harm

### 1. Reasonable Safe Living Conditions

Monitors Recommended Compliance Finding: **Partial Compliance**

MTC's Recommended Compliance Finding: **Substantial Compliance**

**Monitors 1ˢᵗ Concern: Documenting Disruptive Behavior**

<u>MTC's Response to Monitors Concern</u>: The Monitors document that the vast majority of the offender population is not involved in assaultive or violent behavior. However, there are outliers who must be managed.

Under this category the Monitors indicate that four of the offenders interviewed "feared for their safety." Four also stated that they have received verbal abuse in the form of cursing, and one offender stated that he had received physical abuse about a year ago. In any situation of potential injury we have a long established mutual duty to warn and to protect. The Walnut Grove Team has insufficient information in these 9 situations to act to protect potential victims or correct alleged assailants, as is our duty. Being mindful of the confidentiality of Monitor interviews, we request that the Monitors assess the situation, to determine if the risk of injury in any of these nine situations outweighs confidentiality.

Similarly, on pages 5 and 17 the Monitors refer to declining "unobserved assaults" and "unobserved altercations". The Walnut Grove Team is not clear on the source of this data, perhaps the Extraordinary Occurrence Reports. Assuming that may be the source, staff retrieved reports for October through January, eight in all, in which staff identified an offender with a probable injury from an unobserved assault.

In all eight "unobserved assault" cases institution staff had obtained medical care for the injured offender, placed him in safe housing, identified the assailant, and initiated the disciplinary process against the alleged assailant.

Again, being mindful of the confidentiality of Monitor and Plaintiff interviews, if there is an alternative source of "unobserved altercation" data, we request the same assessment of risk of injury versus confidentiality. (For examples from across the country see <u>A Tarasoff Duty for California's Attorneys.</u> Southern California Law Review. 73:139.

Our mutual goal is a safe and secure institution.

**Monitors 2ⁿᵈ Concern: Gang Activity**

<u>MTC's Response to Monitors Concern</u>: Gang activity is a security issue which is managed according to the Mississippi Department of Corrections Security Threat Group Management Policy (16-19 Restricted). The Walnut Grove Team agrees that observation by managers, supervisor, and all custodial staff during tours of the institution is necessary to validate that there are no inmate-based security systems. MDOC policy is clear:

> "Staff will not condone existence of an offenders STG membership or acknowledge the STG as an organization."(MDOC STG Management 16-19, p.2, Restricted)

Also, staff must:

"Refuse to acknowledge or give status/attention to offenders as STG members (MDOC STG Management 16-19-01, p.3, Restricted)

The institution has recently filled the vacated Security Threat Group Coordinator (Lieutenant), with a widely experienced individual who identifies gang members and submits names to MDOC for validation. All validated gang members are identified on Offendertrak, and this data is available to custody and casework employees.

Gang members are managed through the MDOC STG Management system which includes a variety of methods, which depend on offender behavior. As the Monitor's report documents, there are validated gang members adjusting successfully in the RID program and in the Privilege Unit. Others have programmed successfully long term in General Population. Using the disciplinary system and classification system to correct misbehavior, a very few others have faced separation and removal to Administrative Segregation. High profile gang members who meet specified criteria and who misbehave are transferred to special STG Management Units elsewhere in MDOC, and a few enter the multi stage Gang renunciation process. Walnut Grove, like all Mississippi institutions is governed by this procedure, which is integrated with the inmate classification process. (MDOC STG Management 16-19-01 Restricted).

In summary inmates are housed using the inmate classification system, which "identifies those who pose a significant concern to the safety, security, and orderly management" of the institution. This is consistent with American Correctional Association Standards and accepted correctional practice. (MDOC STG Management 16-19-01, p.6 Restricted)

About 70% of Walnut Grove offenders are assigned to either a job or work detail or a rehabilitative/self-help improvement program, as the Monitors have documented under **D. Programming and Behavior Management. (3) Out-Cell-Time and Outside Recreation.** If PC, Ad Seg, and Medical inmates are added to this list, the number of unassigned inmates falls even lower. The availability of meaningful programming to most of the Walnut Grove offender population is another strong deterrent to gang activity.

In order to insure continuous staff awareness of offender gang activities, MDOC requires that staff attend training in STG membership and activities. This training is required at MTC Walnut Grove as part of the pre-service and in-service curriculum for employees.

### Outside Reviewer Comments: Gangs

The MDOC policy and procedure for identification and management of inmate gangs meets American Correctional Association Standards 4-4312-1 and 4-4530, identification and management of inmate gangs and security threat groups, as an element of ACA accreditation. (MDOC SOP 16-19-01 p. 1)

5

**Monitors 3rd Concern: Cell Doors**

MTC's Response to Monitors Concern: As the Monitors document, cell doors are operable and functioning. Officers are routinely reinforced to ensure that locking mechanisms are not blocked. The control station panels do correctly report the status of each door.

**Outside Reviewer Comments: Reasonable Safe Living Conditions**

It is important to document the comments of an outside observers, the American Correctional Association Audit Team, concerning safe living conditions and the disturbances of December 2013 and July 2014.

"The MDOC in conjunction with MTC began the transfer of the Close Custody population in early August, 2014 to other facilities within the MDOC. In addition, all long term segregation inmates were likewise transferred to other MDOC facilities. **The living units involved in the noted disturbances had primarily housed these classes of offenders** (boldface ours)". (ACA p. 11)

It should also be noted that the ACA auditor reported as follows:

**"Overall, the auditor did not sense any particular tension or hostility between inmates and staff or between inmate groups."** (ACA, p. 13)

2. **Sufficient Numbers of Adequately Trained Staff**

    Monitors Recommended Compliance Finding: **Partial Compliance**

    MTC's Recommended Compliance Finding: **Substantial Compliance**

    **Monitors 1st Concern**: All Correctional Officer posts are filled, all watches.

    MTC's Response to Monitors Concern: This policy is being validated quarterly by the new Walnut Grove Compliance Audit Tool.

    As the Monitor reports, housing unit supervision has improved, and the presence of serious contraband has diminished. The priority is to always have all posts filled, so that coverage is consistent across watches. Post orders require "All officers to remain on post until properly relieved." The Chief of Security has repeatedly given specific written instructions to all shift commanders to always, without exception, fill all posts on the shift roster using voluntary or mandatory overtime.

    a. **Outside Reviewer Comments: Adequate Staff**

       An outside reviewer, the American Correctional Association documents that on the date of their review, January 12 – 13 2015, WGYCF had no vacancies, and in fact was over hired by 18 officers. (ACA, p. 6)

The ACA also noted that institution security had been enhanced by several training programs and expansions of others, in response to the Court Monitor. The institution has also been aggressively prosecuting all staff involved in fraternization and introduction of contraband. (ACA, p. 6)

## 3. Use of Force and Chemical Agents:

Monitors Recommended Compliance Finding: **Partial Compliance**

MTC's Recommended Compliance Finding: **Substantial Compliance**

### Monitors 1st Concern: Documentation

MTC's Response to Monitors Concern: As the Monitors report, staff use of force incidents have decreased, and the reviews of incidents have improved. A survey of incidents during the reporting period shows that all incidents were documented timely on the computerized reporting form.

Three January incidents appeared to lack signature reviews because an incomplete paper copy of the computer log was routinely placed in the working file after each incident as a place holder and alert until the actual computerized logs were signed. That practice has been eliminated to avoid future miscommunication. Also, all reportable incidents for each monitoring period are conveyed to the Monitors, and those late in the period may not complete the routine review process prior to forwarding. In the future those still in review at the institution or at MDOC Headquarters will be flagged prior to submission to the Monitors.

### Monitors 2nd Concern: OC Decontamination

MTC's Response to Monitors Concern: The OC Spray decontamination procedure has been revised to allow for decontamination at a nearby location immediately after the inmate has been secured. (Attachment 3, WGCF Policy: Oleoresin Capsicum).

## G. Medical Care

## 1. Provision of Adequate, Appropriate, and Timely Medical and Dental Care:

Monitors Recommended Compliance Finding: **Deferred**

MTC's Recommended Compliance Finding: **Substantial Compliance**

### Monitors Concern: Special Diets

MTC's Response to Monitors Concern: The Monitors highlighted the comprehensive quality improvement systems in place, the timely and appropriate nature of inmate grievances related to health care, and the high level of satisfaction with the level of medical care among the inmate population.

To address the Monitors comment that there was some concern from a few inmates that their special diet food was not always available for their meals, the Warden initiated a committee to identify the scope of inmate concerns and to identify potential improvements to the current procedure for improved delivery of special diets. Recommendations will be incrementally introduced with a scheduled completion date of March 15.

2. **Prohibition of Housing Inmates with "Serious Mental Illness."**

Monitors Recommended Compliance Finding: **Deferred**

MTC's Recommended Compliance Finding: **Substantial Compliance**

### Monitors Concern: Transfer of Serious Mental Ill (SMI) Inmates

MTC's Response to Monitors Concern: The Monitors identified the SMI population was 36 inmates on February 16, 2015 (down from 117 in May 2013) and twenty-six of these inmates are assigned to the RID program. Those SMI inmates that had transfer requests pending have now been transferred. As of this report there are no long-term SMIs at the facility other than those enrolled in the RID program. An alert system has been established so that executives at Walnut Grove and MDOC can take action to expedite transfer of SMI inmates who are approaching the 14 day transfer deadline.

## H. Contract Monitoring

Monitors Recommended Compliance Finding: **Deferred**

MTC's Recommended Compliance Finding: **Deferred**

### Monitors Concern: Lack of detail on items requiring corrective responses.

MTC Response to Monitors Concern: The Walnut Grove compliance coordinator collects the documents needed to monitor compliance with the Consent Decree on a monthly basis. Any errors, omissions, or corrective action is resolved in the day to day management of the institution.

The Walnut Grove Compliance Audit Tool is a validation process which uses random sampling to determine compliance with each element of the Consent Decree. This process is coordinated out of MTC headquarters, and will generate direction for specific corrective action to achieve compliance.

# Attachment 1

# Commission on Accreditation for Corrections
# Standards Compliance Monitoring Visit

**COMMISSION ON ACCREDITATION FOR CORRECTIONS**

**STANDARDS COMPLIANCE MONITORING VISIT**

Management and Training Corporation
Walnut Grove Correctional Facility
Walnut Grove, Mississippi

January 12-13, 2015

## VISITING COMMITTEE MEMBERS

Paul S. Hastmann, Chairperson
Correctional Consultant
1406 Leafy Court
Sykesville, Maryland 21784
(410) 222-6356
Psh795@yahoo.com

## A.  Introduction

The monitoring visit of the Walnut Grove Correctional Facility, Walnut Grove, Mississippi was conducted on January 12-13, 2015, by Paul S. Hastmann, Chairperson.

## B.  Facility Demographics

| | |
|---|---|
| Rated Capacity: | 1,461 (versus 1,476 in November 2013) |
| Actual Population: | 1,221 (versus 1,299 in November 2013) |
| Average Daily Population for the last 12 months: | 1,278 (versus 1,183 in November 2013) |
| Average Length of Stay: | 10 years |
| Security/Custody Level: | |
|     Medium: | 1,062 |
|     Non Minimum: | 159 |
| Age Range of Offenders: | 18-71 |
| Gender: | Male |
| Full-Time Staff: | 305.9 (versus 295 in November 2013) |
| Administrative/Supervisory: | 36 |
| Support: | 22 |
| Program: | 50 Full-time and 2.9 Part-time |
| Security: | 189 |
| Other | |
|     Maintenance: | 6 |
|     Contract Medical: | 26 |
|     Contract Food Service: | 10 |

Of the inmate population, 24 were in administrative segregation, 43 on protective custody and none on suicide watch at the time of the visit. In addition, 898 were Black, 18 Hispanic, 5 Asian and 300 Caucasian. Most inmates were between 22 and 40 years of age.

Of the staff complement there were no reported vacancies. In fact they had over hired by over 9%, particularly correctional officers by 18 positions. The demographics reflect that 94% of the staff is minorities and 77% females with almost ¾ of officers being female and 94% minority.

A significant number of line personnel are relatively inexperienced and new to corrections, a point which is emphasized by the Federal Court Monitor in their regular reports to be discussed later.

As will be discussed further, the facility no longer houses Long Term Segregation offenders as of June 3, 2014 and Close Custody offenders as of September 10, 2014.

A new Facility Warden, the third in the past two years, came to the facility in July 2014, a new Deputy Warden of Operations in February 2014 and a new Human Resources Manager in December 2014. The Deputy Warden above transferred the day after the monitoring visit and was replaced by a new one on January 15, 2015.

**C.    Facility Description**

The facility continues to operate under a contractual agreement between the Management and Training Corporation (MTC) and the Mississippi Department of Corrections (MDOC). It is located in Leake County, the only square shaped county in the state at exactly 24 miles square. The facility is located in a predominately rural part of the county in Walnut Grove, which is about 55 miles from Jackson, the state capital.

The general population is less than 1,000 with corrections being a major employer along with farming and the chicken industry.

The buildings are primarily of pre cast concrete construction and there is only one building outside the secure perimeter containing maintenance. Of the 10 buildings within the perimeter, six [6] are for inmate housing. There have been no significant physical plant changes since the November 2013 initial accreditation audit.

The Mission Statement is to manage and provide rehabilitative programs for convicted offenders in a safe, secure and humane environment utilizing professionals who are committed to public safety and to the positive re-entry of offenders into society.

**D.    Pre-Audit Meeting**

The Chairperson met with facility officials on January 11, 2015 at a local restaurant for about two hours in Forest, Mississippi, to discuss the information provided by the Association staff and the accreditation staff from the Walnut Grove Correctional Facility. The attendance included the Warden, Lepher Jenkins, who had picked the Chair up from the airport in Jackson, Mississippi earlier in the afternoon, Marjorie Brown, the VP of Region 4 of the Management and Training Corporation, Tracie Carr, ACA Compliance, Beverly Patrick, Compliance and several other ranking personnel. The dinner provided an excellent opportunity to get acquainted and finalize the schedule of activities for the next day.

The chairperson, according to the ACA Consultant Manual relevant to monitoring visits, evaluates the mandatory standards and those standards determined to be not applicable at the time of the formal audit. There were no standards previously assessed as non compliance which warranted further review.

E.    **The Audit Process**

1.    Transportation

The Chairperson was escorted to and from the facility by Warden Lepher Jenkins each day of the onsite visit.

2.    Entrance Interview

The Chairperson proceeded to the office of Warden Jenkins at about 8:20 a.m. on January 12, 2015 and met with him and Marjorie Brown. He expressed the appreciation of the Association for the opportunity to be involved with the Walnut Grove Correctional Facility in the accreditation process. He briefly reiterated what had been discussed at the dinner the night before and received the welcome book and other relevant materials concerning the facility since the November, 2013 initial audit.

Warden Jenkins escorted the Chairperson to a nearby training room at 8:45 a.m. where the formal entry meeting was held.

The following persons were in attendance:

> Lepher Jenkins, Warden
> Marjorie Brown, Regional VP
> Ed Porter, Operations Director
> Robyn Williams, Corporate Director
> Grady Wallace, Deputy Warden of Operations
> Beverly Patrick, Compliance
> Tracie Carr, ACA Compliance
> Terry Daniel, Chief of Security
> Evangeline Harvey, Administrative Assistant to the Warden
> Kathy Hogue, Health Services Administrator
> Thomas Hays, Maintenance Supervisor
> Orlando Glass, Food Services Director

In addition, 15 other personnel of various ranks and disciplines were in attendance.

It was explained that the goal of the visiting auditor was to be as helpful and non-intrusive as possible during the conduct of the visit.

The Chairperson emphasized the goals of the monitoring visit toward ensuring that the efficiency and effectiveness of the accreditation process had been maintained since the formal onsite audit in November, 2013. The audit schedule was also reiterated at this time. The Chairperson briefly shared his professional background and historical involvement in the standards and accreditation process and asked that all attendees introduce themselves. The entrance interview concluded at about 9:00 a.m.

3.   Facility Tour

The Chairperson then toured the most of the facility and grounds from 9:05 a.m. to 12:30 p.m. prior to breaking for lunch. The following persons accompanied the Chairperson on the tour and responded to questions concerning facility operations:

> Lepher Jenkins, Warden
> Marjorie Brown, Regional VP
> Robyn Williams, Corporate Director
> Grady Wallace, Deputy Warden of Operations
> Shaniece Mabry, deputy Warden of Programs
> Terry Daniel, Chief of Security
> Tracie Carr, ACA Compliance
> Sgt. Richard Lyons, Armorer
> Ashley Fortune, Administrative Assistant for the Deputy Warden [scribe]

On January 13, 2015, the remainder of the facility was toured for about an hour or so in the company of Deputy Warden Wallace, Beverly Patrick, Compliance and Amanda Parrott, Records Clerk [scribe]. This period also allowed the auditor to perform follow up visits to certain areas where minor issues were originally identified to verify that they had been satisfactorily addressed.

Facility notices were prominently posted throughout the facility including inmate housing and program areas. No specific inmate, staff member or outside entity/citizen requested to speak with the auditor.

4.   Conditions of Confinement/Quality of Life

During the tour, the auditor evaluated the conditions of confinement at the facility. The following brief narrative description of the relevant programmatic services and functional areas summarizes the findings regarding the quality of life. The Chairperson included any significant changes including physical plant modifications, major equipment acquisitions, and addition or deletion of programs and services since the formal initial accreditation audit in November 2013.

## Security

The facility has no towers but rather utilizes a perimeter patrol vehicle around the clock. There is a vehicle sally port for the delivery of supplies and materials, trash truck pick up and inmate transportation. There is also a secure entrance for staff and visitors which now includes a body scanner and parcel scanner. The camera surveillance system includes 192 interior and 20 exterior devices. Security netting has relatively recently been placed around most of the fence line to minimize the introduction of contraband being tossed over the 14' high double fencing. This fencing is 20' apart and includes several strands of razor ribbon as well as a microwave system to detect movement which alarms in the 24 hour manned central control center. Inmate movement is controlled by escort and a call out system observed by video surveillance from central control and correctional officers posted throughout the corridors. Housing unit supervision is indirect by observation from an elevated satellite control center and hallway officers who enter the unit on a random basis. An assessment of the armory, located outside the security perimeter, indicated that the considerable number and variety of equipment was secure, well controlled and routinely inspected/inventoried. The same applies to items within the central and satellite control stations.

Staff security training has been enhanced by the introduction since 11/13 of several additional training programs and modification/expansion of others. This was most likely accomplished to counter the claims of the Court Monitor that the correctional personnel were inexperienced and not adequately trained.

The administration has initiated a program of aggressively prosecuting all staff involved in fraternization and introduction of contraband. In fact, on the first day of the monitoring visit, the Deputy Warden for Programs was set to testify in several court cases regarding this issue.

## Environmental Conditions

The smoke free facility is climate controlled. Lighting, noise levels and circulated air all seemed to be in accordance with the standards requirements. There was no evidence of or complaints about vermin and pests. Trash removal was regular from both the living units and the compound. All toilets, showers and wash basins were operable and auditor testing of the availability of hot water substantiated the inmate statements of no problems with access. All toxic, caustic and flammable materials were secure, accounted for and well controlled. An emergency generator, regularly tested, is available as needed.

## Sanitation

The grounds were well maintained and landscaped and made a good "first impression". The interior, especially the common areas, was clean, orderly and appeared to be routinely maintained by assigned inmate workers. The housing units

likewise were not cramped, crowded or cluttered. To the contrary they were spacious and there were no obvious maintenance issues. Though doubled, the cells were in good shape with little excess personal or issued property and items.

**Fire Safety**

The facility continues to provide for a fire safe working and living environment through the existence of a fire/smoke detection system monitored constantly from the central control center. There are sprinklers, charged and routinely checked fire extinguishers, lighted exit signs, posted evacuation routes, and regular emergency drills. The staff is trained in responding to emergencies during pre and in service training programs. The inmates are made aware of their responsibilities during initial orientation and in the inmate handbook. The facility had a fire safety inspection from the local authority in October 2014 and had to be placed on a "fire watch" due to problems with the fire alarm system. By late November 2014, the deficiencies had been corrected and the facility returned to normal operations.

**Food Service**

Food services continues to be contracted with Trinity Services Group since 2012 and is managed by a Food Services Director and nine [9] staff. In addition, approximately 50 offenders assist in food service activities to provide the over 3,000 meals daily including almost 150 special diets, mostly medical. The four [4] week cycle menu is approved by a Registered Dietician annually, most recently in September 2014.

The auditor sampled a midday meal on January 13, 2015 and found the quality, quantity, temperature, presentation, appearance and texture to be acceptable. There is no inmate dining hall so they are fed in their housing units in the dayrooms. There is also no staff dining area so staff generally bring in their meals in clear plastic containers and eat at the work stations. The regular inspection by the Mississippi Health Department representatives occurs at least annually. The most recent inspections were conducted in April and July 2014 and no issues of substance were identified. The contractor provides when feasible a 40 hour culinary certificate for selected inmates assigned to the kitchen. The relatively small but well organized and equipped kitchen area was clean and well maintained. Temperature controls for all freezers and refrigerators was according to standards requirements. Kitchen utensils were secure and appropriately controlled. For those inmates who opt to supplement their meals, there is an inmate commissary operated under a contract with the Keefe Company to purchase items up to an amount again determined by the custody level.

**Medical Care**

The spacious, well-staffed, and equipped medical unit is still operational 24 hours a day, seven days a week by personnel employed by Health Assurance, LLC under contract with the MDOC. The HSA is also the DON as of 1/14. The staff complement consists of 5 RNs with one vacancy, an EMT/X-Ray Technician, 7 full time and 3 PRN LPNs, a CNA, and four clerks, of which there continues to be a vacancy for one. There continues to be 2 part time Physicians, 2 Dentists, one Dental Assistant, a Neuro Psychologist, two part time Psychiatrists, and one full time and 2 part time Mental Health Counselors. A Reentry Coordinator position was created in 7/14 to assist in ensuring continuity of care upon release.

Sick call, chronic care and specialty clinics/services are provided as noted in the VCR from 11/13. A review of counts of sharps, medical instruments, medications and needles verified accountability and security. There are no negative pressure rooms so inmates in need are transferred to other facilities. A significant change that is in progress is the plan to provide dentures to qualifying inmates in the near future.

**Recreation**

There are two full time Recreation Specialists that provide an array of opportunities for exercise and leisure time activities to include three (3) scheduled hours per week in the well equipped gymnasium or outdoor main exercise yard, weather permitting, several hours per week per inmate in the common/shared covered/uncovered recreation areas adjacent to the housing units and games/cards available in the dayrooms. Nine inmate workers assist the staff in the provision of these services.
Eight universal machines were recently purchased, per the suggestion of the initial accreditation audit team in November 2013 and will soon be placed in the above mentioned shared recreation areas. Each dayroom also has two televisions with basic cable connections.

**Religious Programming**

There continues to be a full time chaplain who, with the assistance of almost 70 religious volunteers, provides a considerable number of religious services and programming to meet the varied spiritual needs of the inmate population, which is mostly of the Protestant faith. Nevertheless, services for the Muslim faith are scheduled each Friday. Bible study classes and mentoring are regularly scheduled as well. Religious diets are approved as warranted.

**Offender Work Programs**

There are several opportunities for inmates to participate in work assignments including but not limited to: administration workers, canteen/commissary, ILAP, orderly, property, laundry, maintenance, education tutors, library aide, barber, shower crew, mural painters, hall porters, painters, chaplain assistants, recreation assistants, landscape crew and food service. Inmates in good standing may earn Meritorious Earned Time [MET] for satisfactory performance of assigned tasks. On the days of the monitoring visit there were 287 inmates involved in work related activities.

The facility is also involved in a number of community service projects which resulted in the provision of 480 hours of service in the period January-September 2014. These community events which primarily involved staff, included such programs as Daycare Donations, Blood Drive, Holiday Food Drive, Winter Coat and Food Drive and Food Pantry Donations.

**Academic and Vocational Education**

The large program is supervised by a principal and operated by 15 teachers. The area consists of 12 classrooms, the library and offices. The programs are accredited by the Mississippi Department of Education. The program includes academic classes consisting of ABE, Pre-GED and GED offerings in which 355 inmates were participating on the days of the monitoring visit. In 2014, 3 had completed their GED. The vocational programs include culinary arts, masonry, horticulture, carpentry and the barber school and had 184 participants on 1/12/15 and 49 graduates in 2014. All the programs are 500 hours except barbering which is 1500 hours. The carpentry program was not being held at the time due to a vacant instructor position and the culinary arts position had just been filled.

**Social Services**

The facility has 12 case management positions that provide programming services to the inmate population. They meet with each inmate at least monthly to make recommendations for job, educational and/or vocational placement. They also assist in parole and release preparation. The facility involves inmates who have substance abuse problems with non residential programming. One is for three [3] and the other is for six [6] months. These teach inmates the dangers of these substances and how not to relapse. On the days of the monitoring visit 262 inmates were participating. There is also the court ordered Regimented Inmate Discipline Program [RID] which involved 286 inmates while this auditor was onsite. This intense six [6] month program consists of discipline therapy, substance abuse counseling, anger management, and pre-release counseling. There is also a stand-alone Pre-Release Program for offenders within a year of release which had 87 offenders on 1/12/15. A separate Anger Management Program had 226 enrolled on the day of the auditor's visit.

Additional programming added since the initial accreditation audit in 11/13 includes Moral Reconation Therapy, Thinking for Good, Inside Out Dads, Money Matters, Choice and Change, Challenge Series, Corrective Actions and Alcoholics Anonymous run by a volunteer.

**Visitation**

A schedule of visitation in the large contact visiting area is based on custody level with the lower security rating entitled to more frequent visitation. Visitors are approved from an established individual visiting list. There is an outdoor area with tables and seating when the weather is appropriate. Conjugal visitation, previously permitted for eligible inmates, was terminated system wide in 2/14. Inmates also have the opportunity to communicate with friends and family as well as attorneys through the mail and collect call only telephones located in the dayrooms.

**Library Services**

A library is available according to an established schedule M-F from 7:30 a.m. to 8:00 p.m. so that each housing unit has an opportunity to visit for an hour. In addition, library carts are available to each housing unit during the evenings and weekends. Legal reference materials are available upon request with copies returned to the inmate at a reasonable cost. In addition, the facility has a rather comprehensive and formal Inmate Legal Assistance Program [ILAP] which includes not only duplicating services but also the provision of notary and typing services, postage, supplies like paper and proper forms as well as the assistance of an assigned attorney.

**Laundry**

The laundry is operated by one full time staff person who utilizes the assistance of 2-5 inmate laundry aides. The large area has 9 commercial size washers and 10 dryers with all but 3 of each operable. Work orders have been placed to repair those. Nevertheless, a sufficient supply of uniforms, linens and bedding was observed to ensure each inmate has a clean exchange at least weekly.

**F.    Examination of Records**

Following the facility tour, the auditor proceeded to a small conference room to review the accreditation files for the previously referenced mandatory and non applicable standards and to evaluate compliance levels of selected policies and procedures. The referenced paper files were extremely well organized, complete and pertinent and accompanied by a reference table with additional materials to further demonstrate compliance. The Compliance staff was readily available to clarify issues, provide additional documentation as needed and provide escort as required to other locations within the facility. The agency provided an informative welcome book and lots of additional information as requested to assist in drafting this report.

The facility has no notices of non-compliance with local, state, or federal laws or regulations. In fact, the facility underwent its' initial PREA audit in 8/14 and received 100% compliance with the applicable standards. One positive note from this assessment was the installation shortly thereafter of privacy screens in several areas where the predominately female staff was prevented from directly observing the male inmates in varying states of undress.

1.    Litigation

    Over the last year, the facility had no new consent decrees, class action lawsuits or adverse judgments. It, however, remains under the consent decree which was active at the time of the November, 2013 audit. The case in question was filed in the United States District Court for the Southern District of Mississippi Jackson Division on or about November 16, 2010 asserting constitutional and statutory challenges to conditions in the then Walnut Grove Youth Correctional Facility. The consent decree based on the Civil Action No.3:10cv663 was entered into on March 26, 2012. A separate Memorandum of Agreement resolved litigation concerning mental health claims as executed on February 1, 2012. Both of the above will terminate five years from the filing date. It can be terminated earlier with court determination of substantial compliance with each provision for at least two years or extended for two one year periods if MDOC fails to substantially comply as stipulated. The Court Monitors are required to submit to counsel every four months reports on the defendant's compliance with the provisions of the consent decree. The fifth report was submitted on October 10, 2014. The report indicated the concern over the major disturbances in December, 2013 and July, 2014 and concluded that there were issues with the number of staff vacancies, an overall inexperienced staffing complement and the involvement to varying degrees of officers in the introduction of contraband.

    The MDOC in conjunction with MTC began the transfer of the Close Custody population in early August, 2014 to other facilities within the MDOC. In addition, all long term segregation inmates were likewise transferred to other MDOC facilities. The living units involved in the noted disturbances had primarily housed these classes of offenders. This reduction of troubling inmates and increased staffing has resulted in a small overall reduction in the inmate count and assaults. In addition, the MDOC/MTC have enhanced security by upgrading security hardware and increased programmatic opportunities to minimize idleness and inmate inactivity. The Court Monitors acknowledged progress but cautioned that more time was needed to adequately assess the extent and degree of improvement.

2.    Significant Incidents/Outcome Measures

    The SIS for calendar year 2014 indicated that there were no deaths, no escapes, and no use of four/five point restraints, and only one occasion in which the special reaction team was used during the one disturbance in July. There were no inmate assaults on staff using a weapon but an average of almost six [6] inmate on staff

assaults without a weapon per month during this reporting period. The SIS indicated four [4] inmate on inmate assaults with a weapon and none in July, which seems to contradict the media coverage and court monitor statements relative to the major disturbance. In addition, the report reflects an average of five [5] assaults by offenders on offenders per month without a weapon, which is less than on staff. Also, there were an average of three [3] forced moves per month. The Health Outcome measures did not indicate any major issues of concern.

The facility provided this auditor a binder with media/newspaper articles and editorials since 12/13 to 1/15. They primarily reported the aforementioned disturbances of 12/13 and 7/14 as well as a couple of instances of staff being involved in inappropriate/sexual liaisons with inmates and/or smuggling contraband into the facility. There was also an article about a prominent citizen of the county being arrested for attempting to smuggle contraband. A few stories reflected MTC's efforts to address these issues through additional staff training, acquisition of security netting and scanning equipment and a zero tolerance policy of addressing staff involvement in such activities. The most recent articles mentioned the ongoing debate between MTC/MDOC and the Court Monitor over the extent and degree of compliance with the consent decree. The couple editorials were complimentary of MTC's efforts to handle the difficult situation of trying to "fix" issues they inherited from the previous vendor.

3.  Departmental Visits

    The auditor revisited the medical suite on day one afternoon and spent a couple hours interacting with personnel and examining medical documentation, particularly that related to the mandatory medical standards. In addition, on day two, the Chairperson visited central control and the main outdoor exercise yard as well as Intake and the Armory.

    In addition, the auditor revisited areas at the warden's request to validate that minor issues of sanitation and maintenance had been satisfactorily addressed.

4.  Shifts

    a.  Day Shift

        The auditor was present at the facility during the day shift scheduled from 6:00 a.m. to 2:00 p.m. On 1/12/15 the auditor was onsite during this shift from 8:15 a.m. to the conclusion of this shift and on 1/13/15 from 8:00 a.m. to 12:45 p.m. The tour took place during much of this shift on both days. The staff interactions were positive with considerable cooperation and willingness to share their job duties and responsibilities. The staff seemed relaxed, confident and knowledgeable and aware of the presence of this auditor. Inmate movement was well controlled and without issue. Several counts were observed as well as pill call and meal delivery. Inmate

programs, both educational and vocational, were observed without incident. The housing units were relatively calm and under control.

b.  Evening Shift

The team was present at the facility during the evening shift scheduled from 2:00 p.m. to 10:00 p.m. from 2:00 p.m. until 5:45 p.m. on day one only. Again, all staff seemed to be aware of the auditor onsite and was cooperative and helpful. During much of this time however, the auditor was assessing standards files. .

c.  Night Shift

The auditor was not present at the facility during the night shift which is from 10:00 p.m. to 6:00 a.m. due to time constraints to complete the monitoring task.

5.  Status of Previously Non-compliant Standards/Plans of Action

There were no standards determined in November, 2013 to be in no compliance so there were no plans of action to review.

## G.  Interviews

During the course of the audit, the chairperson met with both staff and offenders to verify observations and/or to clarify questions concerning facility operations.

1.  Offender Interviews

Approximately 10 inmates were interviewed to some degree during the tour and follow up visits. They did not express any particular issues of concern. Overall, they acknowledged that the facility had become safer and less disruptive with the arrival of the new Warden and the transfer of the Close Custody and long term segregation inmates, who they submitted were the primary "troublemakers". They indicated that access to medical care was without difficulty and that health care was timely and appropriate to their needs. The inmates universally stated that the food was acceptable in quality and variety and better than at most other facilities in the MDOC. Their only issue was a request for increased portions. All but one presented that they felt respected by staff and had no real issues with inmate/staff relations. They acknowledged that emergency drills were held but could not agree on the frequency. The inmates did not express any specific complaints as to living conditions and were generally complimentary of the several program and work opportunities provided. Overall, the auditor did not sense any particular tension or hostility between inmates and staff or between inmate groups.

2.  Staff Interviews

The Chairperson interviewed to one degree or another about 25 staff of different departments and statuses. Overall, the staff seemed to verify that improvements have been made in recent months to make the facility safer and more secure. They felt that they get along reasonably well with the inmate population and that they were adequately trained to perform their job duties. The staff verified that emergency drills were held on a regular basis. In addition, they mentioned that there are frequent interactions with supervisors and administrators who are not strangers to the housing/living units. They stressed they believed themselves to be properly supervised and led by generally experienced and competent superiors. There were no major issues related as to concerns with the working environment. Overall staff morale could best be described as satisfactory. A concern was expressed by the supervisory and administrative personnel about the lingering effects of the bad publicity related to the inmate disturbances and issues surrounding the relatively recently resigned Commissioner of the MDOC. Some senior staff queried why they were undergoing a monitoring inspection.

## H.  Exit Discussion

The exit interview was held from 12:25 p.m. to 12:45 p.m.. on January 13, 2015 in the training room with many of the same persons in attendance as at the entrance interview and 27 total staff in attendance. It should be noted that an executive out briefing was presented to the Warden and Regional VP from 5:20 to 5:35 p.m. at the end of day one to provide a status update and tentative schedule of audit activities for day two.

The following persons were in attendance:

>Marjorie Brown, Regional VP
>Robyn Williams, Corporate Director
>Lepher Jenkins, Warden
>Ed Porter, Operations Director
>Grady Wallace, Deputy Warden of Operations
>Shaniece Mabry, Deputy Warden of Programs
>Chandra Willis, MDOC Assistant Director
>Alfredia Dodd, MDOC Compliance Monitor
>Terry Daniel, Chief of Security
>David Glaude, Principal
>Percy Wright, Chaplain

In addition, there were other personnel of varying ranks and disciplines in attendance.

The chairperson explained the procedures that would follow the audit. The auditor discussed the compliance levels of the mandatory and the status of the previously noted not applicable standards. All mandatory standards remained in compliance with documentation to substantiate ongoing acceptable practices provided in an organized and comprehensive

manner. All not applicable standards continued in that status. There were no new standards determined not applicable or non compliant.

The chairperson expressed appreciation for the cooperation of everyone concerned and congratulated the facility team for the progress made and encouraged them to continue to strive toward even further professionalism within the correctional field.

Attachment 2

The Carthaginian
January 15, 2015

# Warden defends facility

## Jenkins promises 'clean, constitutional' program

News reports and court complaints to the contrary, Warden Lepher Jenkins wanted everyone to know Thursday his prison was running well.

Jenkins addressed a gathering of Leake County, Walnut Grove and Carthage leaders in an open house at the Walnut Grove Correctional Facility, and he stated clearly that while problems existed, conditions were improving and the worst was behind the 1,500-bed institution.

The facility has been plagued by detractors since it was named in a federal lawsuit complaining about conditions at what was at the time a youthful offenders' correctional facility.

While one report referred to the prison then as "a cesspool of humanity," he chal-lenged anyone to tour the prison and find such conditions.

A lot of things had changed since the prison was named in the federal lawsuit, from its operators to its mission and more, Jenkins said.

The lawsuit lead to a court order removing all youthful offenders from the facility.

All youthful offenders, he said, had long since been moved to a state facility.

Two incidents after Management and Training Corp. took the reins there and three other private prisons in Mississippi, he said, had besmirched the 'Grove facility's reputation, leading to a call to have all "close custody offenders"



**JENKINS**

pulled from the prison.

The prison now houses only medium-security inmates.

"Medium-custody inmates," Jenkins said, "drive this institution."

Despite all that, plus the change in operators from Cornell, which had the contract when the youth prison complaints were filed, to GEO and then to MTC, he said plaintiffs in the federal suit continued to dog the prison.

"I just spent two and a half days dealing with it," he said.

It appeared, he said, the next round of discussion would center on "program-

• See WARDEN on 4A

# • Warden

from 1A

ming."

He said of the 1,209 inmates in the prison as of Thursday, all but about 200 were involved in some sort of program for academies, vocational training, religion, substance abuse, parenting and more.

"I'll match that," he said, "with anybody."

He said the enrollment had progressed even though there was a push for four hours of programming per day per inmate. "There's not enough hours in the day to do that," Jenkins said.

Meanwhile, he said, he and MTC had set their top priority on public safety.

The prison, he said, had 14 employees whose history traced all the way back to "day one. We are your community."

To that end, he said, he and MTC had cracked down on violations of policy and state law by employees.

"It is no longer acceptable, if you are compromised as an employee, that we will accept your resignation," Jenkins said. "We will file charges.

"If you endanger the safety of our inmates, if you endanger the safety of our employees, if you endanger the public, I'll prosecute your ***. Excuse my French."

Inmates, meanwhile, were being treated as well as possible, but there would always be issues.

"The only predictable situation we can predict," he said, "is the unpredictability."

"They're going to con us if we give them opportunity," he said of inmates. "They're good at what they do.

"We're going to treat them with humanity. We're going to be firm and consistent. We're going to

give them every opportunity to improve themselves."

MTC, meanwhile, he said, would run a "clean, constitutional institution."

The public relations reception and subsequent tour came as a March 30 hearing date, according to the Associated Press, was set for a hearing before U.S. District Judge Carlton Reeves.

That date was set after a three-hour hearing Thursday in Jackson dealing with the 2012 consent decree that pulled juveniles out of the prison.

The American Civil Liberties Union and the Southern Poverty Law Center reportedly said the state and MTC had not met terms of that order.

MTC officials contended it was in substantial compliance and that the plaintiffs continued to raise issues without giving the company proper notice.

# • Suspect

from 1A

Carthage PD received several calls starting at 12:34 a.m. that Wednesday reporting the shooting.

Officers reportedly arrived to find McDonald on the ground outside the apartments seven, 40-cal.

shell casings scattered about him.

McDonald had been hit about five times in the back, arms and legs according to early reports.

Information indicated McDonald and Linn had been involved in a day-

long argument prior to the shooting.

McDonald's body was sent to Jackson for an autopsy, but Moore said Monday afternoon no results from the autopsy had been received at that time.

Attachment 3

WGCF Policy: Oleoresin Capsicum

| Management & Training Corporation | Pages: 2 |
| --- | --- |
| | Related ACA Standards: 4-4092 |
| | Related Policies: MDOC 16-23, MDOC SOP 16-23-01 |
| **MTC** Walnut Grove Correctional Facility | |

| Chapter 8: Security Control | Review Date: Annually |
| --- | --- |
| Subject: Oleoresin Capsicum Decontamination | Reviewer: Warden/Designee |

| Revised: | Effective: February 23, 2015 |
| --- | --- |

**A.**     **AUTHORITY**

This policy is issued in compliance with Mississippi Department of Corrections Policy 16-23 and SOP 16-23-01 Use of Capsicum Spray and the decontamination process which is to be used when an offender becomes contaminated from the above listed chemical agent. This policy delegates to the Warden of the Walnut Grove Correctional Facility (WGCF) the authority to manage and direct the total operations of the facility and to establish such rules and regulations as the Commissioner prescribes.

**B.**     **PURPOSE**

It is the position of the Walnut Grove Correctional Facility (WGCF) to decontaminate both offenders and staff, when security permits, immediately following contamination from Oleoresin Capsicum (OC) with either water or air or both prior to conducting the escort to Medical. Whenever possible, the officer will be relieved of duty for decontamination purposes immediately following contamination.

**C.**     **POLICY**

The Walnut Grove Correctional Facility will utilize all applicable Mississippi Department of Corrections rules, regulations and policies regarding the use of Oleoresin Capsicum and decontamination from Oleoresin Capsicum.

**D.**     **PROCEDURES**

When an offender has been contaminated from Oleoresin Capsicum (OC), he will immediately be afforded the opportunity to be decontaminated with water (when security permits) prior to being escorted to Medical.

1. An offender contaminated with Oleoresin Capsicum (OC) will be escorted to the eyewash stations between Housing Units 5 and 6 or Housing Units 7 and 8 for decontamination with water, if possible.

2. Upon decontamination, the offender will be escorted to Medical for a medical screening and further decontamination if needed.

3. The decontamination process will be videotaped, when possible.

4. Incident statements will be collected from all staff that observed or participated in the incident.

5. The decontamination process will be conducted in a professional manner.

In the event of the deployment of chemical agents inside of a building where inmates and staff members may be present, the following will be required for consideration and/or activation:

- Exhaust venting fans will be turned on to ventilate the affected area.

- Any individuals in the affected area will be relocated, if necessary.

- Non-participants in the incident will be checked to determine if medical attention is required.

- Medical will be notified of any affected offender so that contraindication can be checked.

- Contraindication should be checked after a Spontaneous Chemical Use of Force and prior to a Planned Use of Force, where chemical agent may be utilized.

## MONITORING-EVALUATION

This policy shall be reviewed at least annually and have the signature of the facility Warden or Designee.

Warden / Designee
Walnut Grove Correctional Facility

Comments: