Expert Report of Tom Roth

DePriest v. Walnut Grove Correctional Authority, et al.

Motion to Modify Consent Decree, 3/26/12, Doc. 75-3

March 3, 2015

**INTRODUCTION**

I was retained by defendant's counsel in January 2015 to evaluate and render opinions regarding the current operations of the Walnut Grove Correctional Facility (WGCF) located in Walnut Grove, Mississippi. In reviewing the motion, the plaintiffs requested the court to set an evidentiary hearing which has been scheduled for April 1, 2015 to take testimony on the issue of whether additional remedial measures are required to provide reasonably safe living conditions and freedom from violence for the inmates housed at the WGCF, and if determined by the court, to modify the decree to provide for additional measures to maintain a reasonably safe environment. I have been asked to examine safety and inmate protection from harm conditions, inmate classification, operating policies and practices, integrity of the physical plant, staffing levels, staff preparedness and control of contraband measures used at the facility.

**BACKGROUND**

I have worked in the field of corrections for over 36 years and have been involved in virtually every facet of correctional detention management including central office leadership, facility management, operational assessment, national and state accreditation, training and education. I have served as Deputy Chief of Administration for the Illinois Department of Corrections, as regional director of facility operations, warden of multiple correctional institutions over a span of ten years including a 2100-bed maximum security facility, 2000-bed medium security facility and the state corrections psychiatric center. I also served as a national accreditation auditor and chairperson for the American Correctional Association for a period of nine years.



EXHIBIT
**A**

1

Upon retiring from the state corrections system I became a detention management consultant with MGT of America, Inc. and remained with the firm for eleven years. As a senior consultant at MGT, I served as a core member of a team of professional detention specialists conducting large-scale operational assessments of several state-wide corrections systems, including Florida, Illinois, Massachusetts, New Hampshire, New Mexico, Oklahoma and Virginia. I was also instrumental in conducting on-site operational assessments of approximately 30 correctional facilities in the Commonwealth of Puerto Rico and have previously conducted on-site assessments of select facilities in Texas and Mississippi including the Walnut Grove Youth Correctional Facility in February, 2011.

In the past two years I served as a team leader in completing a comprehensive study on the operations and effectiveness of special housing units (segregation) located in the Department of Justice Federal Bureau of Prisons (BOP). The study was commissioned by the National Institute of Corrections and involved an on-site assessment of high security and special management units located in twelve different BOP facilities. Included in this study was an assessment of the Florence ADMAX which operates in Florence, Colorado and serves as the administrative segregation unit for the highest risk offenders housed in the Bureau of Prisons.

In addition I have previously served as lead trainer and subject matter expert conducting on-site inspections at facilities housing Immigration and Customs Enforcement (ICE) detainees. The project was commissioned through a contract with the U.S. Department of Homeland Security. The training consisted of preparing inspectors to effectively conduct facility compliance reviews based on established national standards regarding Healthcare, Facility Operations, Security, NCCHC and ACA standards. I trained over 130 compliance facility inspectors on national standards and performed over 50 annual and pre-occupancy inspections of detention facilities to ascertain facility compliance with the standards.

Other relevant corrections consultant work includes completing facility needs assessment studies, staffing reviews and/or operational assessments of several major jails through the United States. These projects include in part the following jurisdictions:

- Cook County, Illinois (Chicago, Illinois)
- Dallas County, Texas (Dallas, Texas)
- Harris County, Texas (Houston, Texas)
- Maricopa County, Arizona (Phoenix, Arizona)
- Wake County, North Carolina (Raleigh, North Carolina)
- Santa Clara County, California (San Jose, California)

- Miami-Dade County, (Miami, Florida)
- New Orleans Parish, (New Orleans, Louisiana)
- Fresno County, California (Fresno, California)
- Pinal County, Arizona (Florence, Arizona)
- Riverside County, California (Riverside, California) and
- Newport News, Virginia (Newport News, Virginia)

In addition to the above I have conducted a variety of corrections and detention management operational assessments in approximately 30 additional jurisdictions.  After retiring from the Illinois Department of Corrections I have continued working on a full-time basis in the field of corrections on a national level serving as a senior consultant for the past twelve years.

The attached Exhibit 1 is a current copy of my resume. It details work experience and lists projects for which I have been retained as a consultant.

## APPROACH TO THE ASSESSMENT

In forming the opinions contained in this report I reviewed a large number of documents provided by all parties involved in the motion to modify the *consent decree.*   These documents included the following:

- Court filings;
- *Consent decree* entered on March 26, 2012;
- Plaintiff's motion to modify the existing *consent decree;*
- Monitor reports submitted to the court including the 6th draft report;
- Plaintiff's expert reports and memorandum including the most recent report filed on February 10, 2015;
- MTC responses to monitor reports;
- *Management and Operations Agreement*[1] between the Mississippi Department of Corrections (MDOC) and Walnut Grove Correctional Authority;
- MDOC applicable policies;
- MTC operational policies,
- Internal reports and memorandums;

---

[1] Management and Operation Agreement between Mississippi Department of Corrections and Walnut Grove Correctional Authority, July, 2012.

- Incident reports and select surveillance videos of major incidents and Use of Force/Chemical Agent cases; and
- Assorted data summary reports.

A large number of the incident reports and videos reviewed were the videos cited in the monitor's reports and/or the plaintiff's expert reports. The remaining incident reports and videos reviewed were selected randomly and were based on incidents that occurred within 120 days of my site visit.

On February 16, 17 and 18, 2015 I conducted on-site inspections of the facility and was present on all three operating shifts. In addition while on-site the following was completed and specific areas were reviewed:

- Interviewed both staff and inmates;
- Reviewed staff deployment patterns;
- Assessed inmate population levels by type;
- Examined statistical data covering incidents occurring at the facility;
- Reviewed bed space utilization practices;
- Examined facility activity schedules;
- Reviewed Post Orders;
- Reviewed videos and incident reports;
- Reviewed Inmate Classification Process;
- Reviewed Facility operational schedule;
- Evaluated disciplinary hearing process;
- Examined staff training curriculum and records; and
- Reviewed physical plant maintenance reports

During the course of completing the site inspections, as noted, I spoke with numerous correctional line staff, subject matter experts, supervisory personnel and administrative personnel. In addition inmates were interviewed during the course of the site reviews. A group of inmates were selected from the daily housing rosters and were interviewed in private without the presence of any MDOC or WGCF staff. The inmates were selected on a random basis with the one qualifying stipulation that they had been at the facility for at least 90 days. Nine separate formal private interviews were completed and six informal interviews were conducted while the inmate was on his work/program assignment.

4

This report summarizes my current opinions on the issues given the available information that had been reviewed as of this date.

## OBSERVATIONS AND OPINIONS

### Facility Overview

The Walnut Grove Correctional Facility located in Walnut Grove, Mississippi is currently operated by Management and Training Corporation (MTC) of Centerville, Utah.  The facility was most recently accredited by the American Correctional Association (ACA) in January 2015[2].  Based on the *Management and Operations Agreement* MTC began operating the facility on July 2, 2012 and has continued to operate the facility since that date.  Immediately prior to July 2, 2012, *The GEO Group* managed the facility commencing in August, 2010 at which time they acquired *Cornell Companies* who had previously operated the facility since 2003.

### Design

The facility was originally opened in 2001 and expanded in 2008 to include two additional housing units. At WGCF the area where inmates are housed is commonly referred to as a "zone".  There are four zones located in each of the six primary housing units. Each zone has a maximum capacity of between 60 and 64. There is one additional housing unit that contains (16) cells and was being used to house inmates over the age of 60. Zones are identified by the housing unit number followed by a letter prefix, i.e., '5A', '5B', '7C' and '6D'.  In total there are (25) twenty-five separate air-conditioned housing zones at WGCF. All of the housing is provided through single and/or two person cells. The cell size and furnishings have been recognized by the American Correctional Association (ACA) as meeting established national standards.

Each housing zone is designed to function as a self-contained unit. Inmates assigned to general population normally eat their meals in a communal setting in their assigned zone, dayroom space is available and an outdoor recreation yard is located between two housing zones. Each of the housing zones within the six primary units contains a minimum of six showers, wall-mounted telephones, a microwave and at least one large television.

---

[2]The American Correctional Associations (ACA) is a nationally recognized private, nonprofit organization whose mission includes the development and promotion of effective standards for the care, custody, training, and treatment of offenders.

The housing zones located in the six primary units contain two levels incorporating a mezzanine configuration that extends from an elevated secure control center which is strategically located in the center of each of the four zones. The control center, referred to at WGCF as "pod control", is staffed on a continuous basis and provides a 360-degree view including a view into each of the respective four housing zones located within the unit. Staff assigned to the control center is responsible for monitoring activity levels in each of the zones, operating the control panel, supporting staff on the floor, controlling access to/from the housing zone including the cell doors, recording activity levels and monitoring radio communications.

The table below identifies the housing options and the maximum capacity of each zone. The inmate transition cells located in the intake area and the medical beds are not included in the table as they are not used to provide permanent housing.

Table 1. WGCF Housing and Bed Space Capacity

| Walnut Grove Correctional Facility | | | | | |
|---|---|---|---|---|---|
| Housing Unit | Capacity | Housing Unit | Capacity | Housing Unit | Capacity |
| HU 3 | | HU 5 | | HU 7 | |
| Zone A | 60 | Zone A | 60 | Zone A | 60 |
| Zone B - (RID) | 60 | Zone B – Preferred | 60 | Zone B | 60 |
| Zone C - (RID) | 64 | Zone C | 60 | Zone C | 60 |
| Zone D | 64 | Zone D | 60 | Zone D | 60 |
| HU 4 | | HU 6 | | HU 8 | |
| Zone A | 60 | Zone A | 60 | Zone A | 64 |
| Zone B | 60 | Zone B | 60 | Zone B | 64 |
| Zone C | 64 | Zone C | 60 | Zone C | 60 |
| Zone D | 64 | Zone D | 60 | Zone D | 60 |
| | | | | HU 9 | 16 |

*Source: WGCF compliance unit. February 2015.*

The design capacity of the facility is approximately 1,480 and the population count on the last day of my site visit was 957[3] which included only adult male inmates at least 18 years of age. All of the inmates housed at WGCF are Mississippi Department of Corrections inmates which is consistent with the terms of the management and operations agreement.

At the time of the site visit all of the housing zones in unit four and two of the housing zones in unit three were closed due to the reduced inmate population level.

---

[3] Walnut Grove Records and Classification Department, February 2015.



*February 2015: Typical WGCF housing zone located in units five, six, seven and eight.*



*February 2015: Typical WGCF housing zone located in units three and four.*

In addition to providing housing a number of key support areas are available throughout the facility. These areas include:

- Secure central control center;
- Kitchen;
- Medical unit;
- Laundry;
- Gymnasium,
- Indoor and outdoor recreation;
- Library;
- Program space;
- Academic and vocational educational classrooms;
- Visitation;
- Warehouse;
- Maintenance and;
- Administrative space.

The photos displayed throughout the report were taken at WGCF during the February 2015 site visit.

In reviewing the overall inmate population profile at Walnut Grove there has been a number of changes since the *consent decree* was initially entered. The following factors identify some of the more significant differences:

*Inmate Custody Levels*

The Walnut Grove Correctional Facility has been considered a multi-security facility designed to house male inmates that normally have a custody classification level of either; *non-community minimum, medium or close custody.* A brief description of the three security custody levels are identified below:

- **Non-Community Minimum:**  This custody status requires the least security and supervision level of an inmate incarcerated in an institution. Usually this level of custody is housed under minimum security circumstances and may participate in activities on institutional grounds without direct supervision. Inmates in this status are normally not housed with inmates in close custody status. At WGCF no minimum custody inmates were allowed to be housed with a close custody inmate and these inmates are often used to fill minimum custody work assignments.
- **Medium:**  Medium custody is a level where the inmate has demonstrated a desire to be considered responsible and presents a moderate level of risk. Inmates are permitted to move about in the housing unit or while in their approved secure work/program area. At Walnut Grove currently over 85 percent of the inmates are classified as medium custody.
- **Close Custody:**  Close custody status is the designation given for those inmates in general population considered the highest risk status at the facility. Inmates in this level have been identified as possessing one or more of the following risk factors: escape; periodic demonstration as a threat to staff/inmates and or recent or serious disciplinary record. No close custody inmates are currently housed at Walnut Grove.

The custody level profile of the inmate population has significantly changed when compared with previous reporting periods. The change has been the result of recommendations made by the court monitors in 2014 and a decision made by the Mississippi Department of Corrections (MDOC) to remove long-term segregation and inmates classified as close custody from the Walnut Grove Correctional Facility. Each inmate classified as close custody was individually screened by personnel assigned to the MDOC classification unit and beginning on August 7, 2014, (67) close custody classified inmates were transferred out of the facility. Additional transfers continued until

September 10, 2014 when the final (30) close custody inmates were removed from the facility. In total (201) close custody inmates were initially removed from the facility during that time period. Based on the MDOC classification review process, (96) close custody inmates were reclassified as medium security as a result of applying an over-ride to the classification instrument and initially remained at the facility. During the February site visit all but (21) of those inmates that had been initially reclassified from close custody to medium custody were no longer housed at the facility. The decision to review and change the custody level of several of the close custody inmates was made by personnel assigned to the MDOC Classification Unit.

As shown in the table below, there has been a significant change in the custody profile of the inmate population housed at WGCF since July of 2012. There are no close custody classified inmates housed at the facility.

Table 2. WGCF Inmate Custody Levels

| Custody | July 2012 | | January 2014 | | August 2014 | | Feb. 2015* | |
|---------|-----------|-----|--------------|-----|-------------|-----|------------|-----|
| | Inmates | % | Inmates | % | Inmates | % | Inmates | % |
| Close | 253 | 24.3 | 327 | 25.9 | 197 | 25 | 0 | 0 |
| Medium | 591 | 56.7 | 737 | 58.4 | 470 | 59.6 | 848 | 88.6 |
| Non-Community Minimum | 190 | 18.2 | 178 | 15.6 | 66 | 8.4 | 109 | 11.4 |
| Other | 9 | 0.9 | 0 | 0 | 55 | 6.9 | 0 | 0 |
| Total | 1,043 | 100 | 1,242 | 100 | 788 | 100 | 957 | 100 |

*February 2015 represents the inmate custody levels on February 18, 2015.

In addition to the removal of all close custody inmates in June 2014 long-term segregation inmates were also removed from Walnut Grove. Long-term segregation is an administrative status designed for an inmate who has demonstrated violent and aggressive behavior, requires separation from the general population and has received sanctions to be placed in segregation for more than 60 days. MDOC standard operating procedure, 19-01-03[4] describes specific details of the long-term segregation program. In total over 250 inmates[5] classified as high risk inmates have been transferred out of the facility since June 2014.

---

[4] MDOC 19-01-03 Long Term Segregation.
[5] Walnut Grove Records and Classification Department.

*Inmate Age Profile*

The age profile of the inmate population has dramatically changed over the past several years. Originally when the facility was opened in 2001 as the *Walnut Grove Youth Correctional Facility* it was authorized to house "juvenile offenders" between the ages of 13 and 19. Since then, the Mississippi legislature has amended legislation several times to increase the maximum age of those individuals housed at the facility. In 2010 the maximum age was raised to 22[6] as cited in the following Mississippi state statute:

> 2010 Mississippi Code 47-5-943: *The Mississippi Department of Corrections may contract with the Walnut Grove Correctional Authority or the governing authorities of the Municipality of Walnut Grove, Leake County, Mississippi, to provide for the private housing, care and control of not more than one thousand five hundred (1,500) juvenile offenders who are in the custody of the Department of Corrections at a maximum security facility in Walnut Grove. **The maximum age of any offender housed in this facility shall be twenty-two (22) years of age, and upon reaching his or her twenty-second birthday, the offender must be removed from the facility speedily and within a reasonable amount of time.***

The legislation later amended the statute removing any reference to the age of the inmate to be housed at the facility. The 2013 Mississippi state statute cites the following:

> 2013 Mississippi Code (47-5-943*) The Mississippi Department of Corrections may contract with the Walnut Grove Correctional Authority or the governing authorities of the Municipality of Walnut Grove, Leake County, Mississippi, to provide for the private housing, care and control of not more than one thousand five hundred (1,500) offenders who are in the custody of the Department of Corrections at a maximum security facility in Walnut Grove.*

The Walnut Grove Correctional Facility is no longer referred to as the *Walnut Grove Youth Correctional Facility* by the MDOC or MTC and does not house any inmate under the age of 18. According to the following state statute alternative housing has been designated:

> 2013 Mississippi Code (47-5-1401) *Establishment of Youthful Offender Unit at Central Mississippi Correctional Facility; age limitations on youth housed in unit.* A youth unit has been established at the Central Mississippi Correctional Facility in Pearl, Mississippi.

---

[6] 2010 Mississippi Code 47-5-943, Juvenile offenders; contracts for incarceration; maximum age; compliance with standards and statutes.

The average age of the inmate population housed at the Walnut Grove Correctional Facility in February 2015 was 33.28. The average age reported in October 2012 was 21.5[7]. Approximately 16 percent of the inmate population currently is below the age of 23[8]. In March of 2012 at the time of the *consent decree*, 100 percent of the population was below the age of 23.

### Inmate Population Level

The overall inmate population level at Walnut Grove has also decreased from an average of 1,299[9] during calendar year 2013 to 957 on February 18, 2015. The Mississippi Department of Corrections and Walnut Grove Correctional Authority are in the process of amending their contract to operate the Walnut Grove Correctional Facility reducing the number of inmates that are allowed to be housed at the facility. The previous contract allowed for no more than 1,500 inmates and the current pending amendment has reduced the capacity to 962, a 35.9 percent reduction in capacity. As a result fewer inmates will be allowed to be housed at the facility which may prove to be extremely beneficial to overall operations.

During calendar year 2013 the average daily population (ADP) at Walnut Grove was 1,299; during calendar year 2014 the ADP was 1,242; during January 2015 the ADP was 1,184 and on the last day of my site visit (2/18/2015) the inmate count was 957. The population on February 18, 2015 reflects a 26.3 percent reduction from the ADP during calendar year 2013.

As noted there have been a number of significant changes in the profile of the inmate population at the Walnut Grove Correctional Facility since 2012. The changes in population appear to be the direct result of initiatives recommended by the court monitors and instituted by the MDOC to more effectively address the areas cited in the *consent decree*. In summary the primary profile changes include the following:

- The contract to house inmates at Walnut Grove is in the process of being amended to reduce the population level to no more than 962 reflecting a 36 percent reduction in the maximum number of inmates that can be housed at the facility;
- All close custody classified inmates have been removed from the facility;
- Long-term segregation status inmates (more than 60 days) have been removed from the facility;

---

[7] 2nd Monitors report, dated April 1, 2013, page 5.
[8] Walnut Grove Correctional Facility Records and Classification Division, February, 2015.
[9] Mississippi Department of Corrections Monthly Fact Sheet, April 2010.

- A state statute[10] has been amended eliminating the age criteria for inmates to be housed at Walnut Grove which previously existed. This amended statute has resulted in approximately 16 percent of the total population being under the age of 23 compared with 100 percent at the time when the *consent decree* was entered.

## Inmate Classification and Housing

In reviewing the MDOC and MTC policies and court monitor reports several significant developments have occurred in the area of inmate classification and housing since 2012. Interviews were completed with the on-site classification and case manager supervisor, a case manager, deputy warden and the warden. The proposed housing plan was discussed, documents and files were reviewed and housing units were inspected.

MTC has established an internal inmate classification policy, *Policy Number 05-01,* dated October 4, 2013 which is aligned with the requirements cited in both the MDOC classification policies and ACA classification standards. Incorporated in the policy is the requirement to ensure a case management plan is developed for each inmate and that a *needs assessment* is completed by the case manager. At a minimum a one-on-one session is to be conducted with every inmate at least once a month and an annual reassessment is required on all inmates unless circumstances have changed regarding their sentence or they have been involved in a disciplinary issue which would result in a more frequent assessment.

All inmates currently assigned to the facility are classified as either non-community minimum or medium custody. The custody level profile on February 18, 2015 reflected 88.6 percent of the inmates had a custody classification level of medium and 11.4 percent had a custody classification level of non-community minimum. There were no inmates classified as close custody housed at WGCF.

The implementation of the current internal classification plan developed by MTC and the requirement for staff to complete an inmate *needs assessment* is consistent with nationally recognized best practices in the corrections industry. These are both initiatives designed to improve the overall management of the inmate population.

---

[10]2013 Mississippi Code (47-5-943) *Contracts for incarceration; compliance with standards and statutes.*

Based on the development of an updated case management plan, housing assignments for the inmates are currently being determined. An interim housing plan has been developed instead of a more permanent plan as a result of the relatively recent changes in the profile of the inmate population. These changes impacting the current interim status of the housing plan at Walnut Grove include the following:

- Removal of (185) minimum and medium custody inmates on February 4th and 5th 2015;
- Reduction in the operational capacity of the facility from 1,500 to 962 in February 2015;
- Increase in the number of medium custody classified inmates (approximately 400) received during the months of October and November 2014;
- Designation and development of an elderly housing zone (over 60 yrs. of age);
- Designation and development of a "preferred" housing zone;
- Removal of all Long-Term Segregation Inmates during the period April through June, 2014;
- Removal of all close custody classified inmates during the period August through September 2014;
- Follow-up removal of the majority of inmates who had previously been classified as close custody, reclassified to medium custody and initially remained at the WGCF; and
- Recognition of STG inmate affiliation and impact on housing placement.

A more finalized housing plan is scheduled to be developed once it is determined the major shifts in the population have been made. Discussion with the warden and classification supervisor indicated there were plans to expand the number of "preferred" housing zones once the overall population becomes more stable. The expansion in the number of preferred housing zones should be highly encouraged provided specific selective criteria are maintained.

As a result of the numerous adjustments and developments made in the inmate classification plan since 2012 and the demonstrated buy-in displayed by both the MDOC and MTC the current process in place appears to be addressing critical components representative of an effective inmate classification plan. Once the population level has stabilized the development of a more finalized housing plan should be secured.

**Protection From Harm**

*Assaults/Violence*

In FY2012 the Walnut Grove Correctional Facility averaged 27 assaults per month[11]. In January of 2015 the facility reported there were nine inmate-initiated assaults occurring at the facility[12]. None of the assaults in January resulted in a serious injury. Based on the assault rate data provided the average number of assaults has been reduced to one third of what they had been in FY2012.

MTC uses the Association of State Correctional Administrators (ASCA) Performance-Based Measure System[13] for recording assaults. The measuring system is a nationwide automated instrument created under the direction of ASCA for the purpose of collecting uniform performance information. It is designed to record and report performance indicators in a comparable way with other similar jurisdictions that are using the instrument. The performance-based system is based on the use of prescribed definitions. One indicator included under the standard *Institutional Safety* is "assaults". Assaults are broken into several different categories and sub-categories. For example one category may be Inmate-on-Inmate assaults; another category may be Inmate-on-Staff Assaults. Each individual category contains several sub-categories, i.e. assault with injury, assault without injury. Specific definitions have been established to provide uniform direction and consistency between jurisdictions.

Comparing assault rates between different jurisdictions throughout the country can often be misleading because of differences in the definition of assault and what each jurisdiction includes. Some may include fights, others may not, some may include staff assaults others may not and some may count and define an assault differently. In this report comparisons are provided only between facilities housing MDOC inmates.

Table 3. 2014 Reported Assaults at Walnut Grove by Source

| 2014 Assaults Reported by Month | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Source | Jan | Feb | March | April | May | June | July | Aug | Sept | Oct | Nov | Dec | Total |
| MDOC | 6 | 11 | 7 | 5 | 9 | 8 | 9 | 11 | 8 | 3 | 9 | 11 | 97 |

Source: MDOC monthly assault reports, 2014.

The above figures reflect the number of assaults reported through the MDOC data system.

---

[11] Court monitor's report dated April 1, 2013 page 8.
[12] MTC Monthly Summary Report, January 2015.
[13] ASCA Performance-Based Counting Rules, September, 2014.

In total 97 assaults were reported during the calendar year. The overall annual assault rate for the calendar year is approximately 8 per 100 inmates.  In FY2012 the rate was 27 per 100 inmates per year.

Table 4 below, identifies the annual assault rate for the two most recent completed calendar years comparing seven different facilities housing Mississippi Department of Corrections adult inmates.

When compared with the six other adult facilities the assault rate is lower than three of the other facilities and slightly higher than three. Table 4 shows the comparisons.  When compared with the FY2012 reported rate the current assault rate is less than one-third.  During calendar year 2014 more than half of the assaults reported were directed on staff not inmates. None of those assaults on staff resulted in serious injury.

Table 4. Annual Assault Rate per 100 for CY2013 and CY2014

| Assaults by Facility - CY2013 - CY2014 | | |
|---|---|---|
| Facility | CY2013 Annual Assault Rate Per 100 Inmates | CY2014 Annual Assault Rate Per 100 Inmates |
| *State Facilities* | | |
| Mississippi State Penitentiary | 6 | 7 |
| Central Mississippi CF | 12 | 10 |
| Southern Mississippi CF | 6 | 7 |
| *Private Facilities* | | |
| East Mississippi CCF | 11 | 11 |
| Marshall CCF | 4 | 5 |
| Walnut Grove CCF | 9 | 8 |
| Wilkinson CCF | 22 | 21 |

Source: Monitor Reports dated February 23, 2015 and April 7, 2014

A further review of local documentation and reports made available reflect there are a number of indicators that measure the level of violence occurring at the facility. The following variables are provided. The data was taken from a 2011-2014 MTC data summary report.

- In calendar year 2012 there was an average of 3.08 assaults per month that resulted in a serious injury. In calendar year 2014 there was an average of one every other month. In January 2015 there were no assaults resulting in serious injury reported;
- In calendar year 2012 the most frequent type of assault reported was Inmate-on-Staff Assaults without Serious Injury which included (84) incidents. In calendar year 2014 the most frequent type of assault was also Inmate-on-Staff Assaults without Serious Injury

which included (42) separate incidents. In January 2015 the most frequent type of assault occurring at the facility was Inmate-on-Staff Assaults without Injury (5);

- In calendar year 2012 the most frequent inmate as a victim related assault involved Inmate-on-Inmate Fights (76). In calendar year 2014 there were (32) inmate-on-inmate fights reported which was considered the most frequent type of assault with an inmate being the victim. In January 2015 there was one inmate fight reported;
- In calendar year 2014 there were (8) inmate-on-inmate assaults that involved a weapon. In January 2015 there were no inmate or staff assaults reported that involved a weapon; and
- 92 percent of the inmates at WGCF in August 2014 did not have a RVR for Assault. 96 percent of the inmates at WGCF in January 2015 did not have a RVR for an assault[14].

I had the opportunity to interview a total of fifteen inmates during the three day visit, nine in a formal one-on-one setting in a case manager's office and six inmates while they were on their work/program assignment. The inmates who were selected for a formal interview were randomly chosen with the one qualifying factor being that they had been at the facility for at least ninety days. The inmates interviewed on their assignment were strictly random. In response to the question: "Do you generally feel safe here". One inmate responded he did not and one inmate responded "it depends on the day". The remaining thirteen inmates reported they felt safe.

When you take into consideration the current trends that have been identified based on the data provided, the level of violence at the Walnut Grove Correctional Facility has drastically reduced when compared with 2012. Over 90 percent of the inmate population is reported to not be involved in assaultive behavior and the overall assault rate has been reduced to a third compared to what it was in 2012.

### Security Fixtures and Hardware

### Cell Doors and Locks

All of the inmate housing units located at the Walnut Grove Correctional Facility contain cells. There is no dormitory housing available at the facility. Two of the housing units (8 zones) contain cells that are equipped with doors commonly referred to as sliding doors. This includes the two housing units that were added in 2008. The remaining housing units contain cells that are equipped with swing doors that are connected to the wall through a hinge. The doors swing out into the open area and do not swing into the cell. Both types of doors are powered electronically through an electronic control panel which

---

[14] Court Monitor Reports dated February 23, 2015 and October 10, 2014.

is located in a secure pod control room. If power is lost to the control panel a manual release option is available. The two primary cells doors and locks used at the Walnut Grove are discussed below.

- Sliding Doors. All of the sliding doors in housing units three and four have been inspected and modified to ensure they operate in a manner consistent with their intended purpose. The cell doors are operated by an electric motor through a rack and pinion drive mechanism that is located in the header directly above the door outside the cell. The doors are locked at top and bottom by means of a concealed vertical lock bar positioned at the rear jamb of the door. These security doors are commonly used on a national basis throughout the corrections industry and were manufactured by *Southern Folger* a nationally recognized detention equipment company.

There was no indication that there was currently any concern with the cell doors or locks located in these two units. In the past there were reported incidents where inmates had been able to breach the cell door by gaining access to a latch which was located inside the header. Access to the latch was gained through a small emergency release port located on the header cover. This port is designed to allow additional manual operation of the door when electric power has been lost to the electric control panel. To manually open the door without the appropriate tool when it was secure would require a significant period of time, knowledge and a specially designed tool to accomplish this task. Apparently previous reports have indicated this has happened in the past. As a result, MTC has taken the initiative to prevent access to the emergency release port on all cell doors located in housing units three and four by installing a hasp and lock to the header cover of each door. This adjustment has no impact on the electronic operation of the door or the secondary manual release option that is available. The doors are reported as secure and there has been no indication that inmates have been able to open a secure door since the hasp and lock has been installed. Even though there has been no report of a recent breach in the sliding doors, hands-on door checks by staff continue to be conducted on a regular basis.



*WGCF hasp and lock is pictured covering the manual port*

- Swing Doors. All of the *Southern Folger* cell doors located in housing units five, six, seven and eight are considered swing doors. The cell doors are attached to security hinges located on the door frame. Each cell door is equipped with a *Southern Steel # 10120AMD* solenoid operated electro-mechanical dead latch. These locks are widely used in the corrections industry and designed for medium and maximum security housing. The doors have both electric and manual operating capabilities. Electrically a remote switch from the pod control center activates a solenoid that controls the latch bolt. Manually a mogul key is inserted into the lock to control the latch bolt.

The facility maintenance supervisor and maintenance technician who have worked on these doors and locks for 14 years were interviewed and reported that the locking devices have been in place since the opening of the facility and there has been no indication the locking device is ineffective or there is a pattern where the control panel fails to identify whether the door is secure or unsecure. The exception is when a bulb has worn out in the control panel and has to be replaced or as a result of extended wear and tear to the lock. Staff working the pod control centers were interviewed and reported that they have not experienced a false reading, but have had to submit a work order when a bulb on the control panel needed to be replaced. Staff working the housing zone floor indicated the issue was not the locking device but the fact inmates occasionally stick an item in either the locking bolt or "pocket" to prevent the door

from locking when it is closed. This is commonly referred to in the corrections industry as "jamming" the lock and is not unique to Walnut Grove or the Mississippi Department of Corrections. Several of the inmates interviewed indicated they had previously been at a facility where housing was provided in an "open bay" setting and were accustomed to the freedom of movement within the zone and preferred the ability to come and go from their cell when they choose.

The current facility policy is for the cell doors to be secured when the inmate(s) are out of their cell, including during the dayroom recreation time. It is recognized as a positive security practice to secure the cells doors when inmates are assigned to the dayroom as it limits unauthorized movement into the cells and expands the ability of staff to observe inmate activity. It was verbally reported that a percentage of inmates attempt to occasionally keep their cell doors open in order to control their ability to come and go from the cell as they choose. In order to accomplish this an inmate has to insert for example toilet paper, a battery, broken domino, toothpaste container, toothpaste cap or miscellaneous debris into the "pocket" or bolt slot to attempt to prevent or prevent the bolt from latching or leave their door open.

Staff assigned to the housing unit floor indicated they are required to check the security of every cell door during the shift and when notified of a potential breach by the control pod officer. If they find a lock is jammed the material is to be removed if possible, the inmates are issued an RVR (violation report) and if needed maintenance personnel are to be contacted. The facility maintenance supervisor advised that lock repair is assigned as a *high priority maintenance issue* and as such, locks are generally repaired the same day a work request is received. The maintenance supervisor reported that over 80 percent of the damage done to the locks are the result of inmates tampering with the lock. The remaining percentage is the result of normal wear and tear. There was no supportive evidence provided that indicated the control panel would routinely show a door as secured when it was not.

On February 18, 2015 while accompanied by the shift commander I checked and tested every cell door in two housing zones and it was our experience that every cell door was secure. There is no indication that the cell door locking systems or doors currently in use are ineffective or should be considered a contributing factor that could cause an unsafe housing environment at Walnut Grove. MTC policies are in place for staff to check all cell doors, memorandums have been issued requiring staff to check the security of the doors and formal reports identify no systematic concern with the cell door locks themselves. MTC has taken the initiative to place a hasp and lock on every cell door in the units having

20

sliding doors and instructed staff to ensure the security of the cell doors of all housing units are frequently checked and considers staff inspecting cell doors a fundamental post responsibility.



*WGCF housing zone with swing doors.*

### Emergency Call Buttons

All cells were designed to have an emergency call button. The call button is to be used by the inmate for emergency purposes to notify staff of a possible emergency. The call button is located on the interior wall near the cell door and consists of a button that when depressed sends a signal (illuminated light) to the control panel located in pod control. The pod control officer notifies the floor staff of the alarm and they are required to respond. Several staff including the maintenance supervisor, (2) pod control officers and (3) floor officers were interviewed regarding the use of the call buttons. Pod control officers reported that the control panel for the call buttons is located in pod control and is operational. When an alarm occurs the floor officer is notified. The floor staff reported incidents rarely involve an emergency. The maintenance supervisor reported he receives work orders to repair call buttons however not on a frequent basis. The floor officers all reported they are required to respond to a call button alert.

During a recent three day visit at the facility in February, 2015 I had the opportunity to enter (28) cells and (26) of the cells contained call buttons. Maintenance and security personnel were both familiar with their responsibility to respond when notified and indicated the call buttons were operational. Maintenance staff further reported that when they are notified of a damaged or missing call button they respond.



*Call button located in WGCF housing cell.*

### Cell lights

Each cell is designed to contain one electrical light fixture and to have natural light coming from a window located on the exterior wall of the cell. Maintenance and security personnel reported that inmates have historically tampered with the light fixtures to gain access to the ballasts or the metal frame which was part of the light fixture. Staff reported that a significant portion of the sheet metal used to manufacture sharpened objects came from the light fixture previously located in the cell. MTC management personnel decided to replace the existing light fixtures. In November, 2013 MTC started replacing the light fixtures in the cells and continued through February of 2014. The maintenance supervisor reported that every light fixture in housing units three through eight has been replaced. A smaller single "pot metal" fixture has been installed to eliminate a source of material previously used on occasion to fashion as a weapon while still maintaining ACA standards regarding required levels of illumination in the cell.

### Cell Mirrors

All cells have had their mirrors removed. The mirrors in the cells in all the housing units were removed after a number of them were found to be damaged, tampered with, removed from the wall by inmates and/or found to be altered into sharp objects. Management staff reported that for the safety of both inmates and staff the mirrors were removed from the cells.

*Security Threat Group Management*

In reviewing earlier external reports submitted concerning the conditions of confinement at Walnut Grove there was reference to the lack of recognition by management staff that there is a gang presence in the facility. Fourteen months prior at WGCF there had been a large scale disturbance in the close custody housing units involving inmates representing opposing gangs that resulted in a number of serious inmate injuries. Approximately six months later there was a second major incident in a close custody unit that resulted in additional inmate injuries and was the result of a dispute between inmates representing opposing gangs. In the 6th court monitors draft report approximately 14 percent of the population at Walnut Gove was identified by MDOC as being active gang members[15].  I was compelled to interview separately the Warden, CID Lieutenant, STG Lieutenant, Chief of Security and review videos of related incidents. All of the staff acknowledged that there are validated members of security threat groups housed at the facility and that both incidents were initiated by inmates recognized as being affiliated with a security threat group. They also acknowledged that they collectively seek intelligence daily regarding individual(s) that may be considered a threat to others, the facility or the community.

Security Threats Group (STG) is a term that often refers to formal or informal groups or individuals that are considered a serious threat or disruption to normal operations. This includes gangs but may also include other individuals or groups that may not be affiliated with a gang.  Specific definitions of STG's may vary from jurisdiction to jurisdiction.  Prison gangs are not unique to Walnut Grove or the Mississippi Department of Corrections.  The presence of prison gangs exist in every state corrections system in the United States and are considered a disruptive force requiring proactive management intervention.  It has been my experience that every medium and/or maximum security facility I have inspected housed varying degrees of gang members. Walnut Grove also houses inmates who are gang members.

Management staff recognizes that gang members are housed at the facility and the fact the earlier disturbances did occur, they view those incidents as both learning and training opportunities, they have established new policies and practices, transferred all close custody inmates out of the facility and recognize disturbances can still occur.  After the July 2014 incident there were multiple meetings

---

[15] 6th Court Monitors Draft Report, dated February 23, 2015, page 5.

between MTC and MDOC officials regarding the incident and recommended corrective actions were discussed. As a result of those meetings significant changes occurred. Close custody inmates were removed from the facility, a new warden was hired and in October 2014 a dedicated lieutenant's position was established and filled for the purpose of coordinating security threat group intelligence at the facility. Previously the responsibilities were managed by a staff member who had served in this capacity but also had several additional responsibilities.

The current security threat group (STG) coordinator is experienced in the field of intelligence gathering and prison threat groups and previously worked for the Mississippi Department of Corrections Investigations Division and at the East Mississippi Correctional Facility. The STG Coordinator reported that he works daily with the investigations lieutenant and chief of security and through a team approach are currently proactively working together on identifying potential threats and trends.

Because the Walnut Grove STG Coordinator has a previous favorable working relationship with the MDOC Corrections Investigation Division, previously worked at the East Mississippi Correctional Facility and has worked with the MDOC regional STG coordinator, there is a strong networking relationship that has already been established which can prove to be beneficial to Walnut Grove.

Staff reported that several STG strategies are currently in place to better address the challenges presented by inmates who pose a threat to the facility or the community.  These strategies include the following:
- Enhanced staff training;
- Encourage inmate renunciation;
- Assist inmates in completing renunciation paperwork;
- Aggressively identify individuals that may be considered a threat;
- Recommend security threat group validation;
- Provide input to classification/case management personnel ;
- Monitor activities and property;
- Provide input into housing placement;
- Encourage and utilize shared information and networking;
- Identify and confront individuals considered in a leadership role;
- Recommend transfers;

- Refer inmates for criminal prosecution when appropriate; and
- Provide status reports to management personnel.

In addition to the above strategies the re-enforcement of appropriate inmate movement procedures has been addressed as an agenda item during line-up (pre-shift briefings) to clarify the policy that no inmate escorted movement is allowed. This had previously not been the facility policy however some staff were occasionally allowing this practice to occur.

There have been no disturbances in the most recent seven and one-half months at the facility. A new warden has been hired, a new deputy warden of security operations has been hired and a new STG Coordinator has been hired all seasoned corrections personnel.

Based on my observations there is currently a level of awareness by the facility management team that individuals affiliated with a threat group can pose a serious management concern. Security personnel have been trained, a dedicated supervisory position has been established and proactive strategies have been put in place to help address this issue. The two incidents that are frequently referenced in earlier reports that resulted in multiple inmate injuries involved close custody inmates associated with gangs. I firmly believe the management team of both MDOC and MTC recognize that fact, realize the importance of proactively applying strategies to meet this challenge and have demonstrated through the implementation of several initiatives, as discussed above, a sincere effort to more effectively address this concern.

### Contraband

A review of the 2014 and 2015 statistical data reports for the Walnut Grove Correctional Facility reflect that contraband is consistently found and recovered on a regular basis at the facility. The 5th monitors report dated October 10, 2014 referenced that control of contraband continues to be a serious management issue and the July 10, 2014 incident was precipitated by an attempt to introduce contraband into the facility[16]. Several staff were identified as being aware of the attempt to bring contraband into the facility and were later found to be complicit with the actions. The contraband was intercepted prior to entry and reportedly contained cell phones, cell phone chargers, tobacco and spice

---

[16] October 10, 2014 Monitor's Report, page 7.

("synthetic marijuana").  The most recent monitors draft report dated February 23, 2015 states "contraband control remains a problem; however facility officials continue to conduct frequent searches and the presence of serious contraband appears to have diminished in the two most recent months".

The control of contraband is an integral part of operating any correctional facility. Whether it is in Mississippi or any other jurisdiction controlling access to contraband is a daily challenge that requires at a minimum fundamental security practices to be in place. It would be hard pressed to find a correctional agency where contraband did not exist. I have had the opportunity to conduct operational assessments at some of the most secure detention facilities in the United States and contraband was being recovered.  At Walnut Grove contraband is recovered on a regular basis and can vary from unauthorized clothing to a weapon.  A number of controlling initiatives have been put in place and appear to have an effect on the level of contraband introduced into the facility.  In January 2015 a total of 38 major contraband finds were reported while the number of searches increased. During the three months immediately prior an average of 59 major contraband finds were reported[17] each month. CERT members were deployed to enhance searches throughout the facility on multiple occasions during 2014.

The Mississippi Department of Corrections and MTC have both engaged in enhanced efforts to address the issue of providing a secure and safe environment at WGCF. Policies have been established including *MDOC 16-07 Control of Contraband/Body Searches – Offenders, MDOC 16-18 Control of Contraband/Body Searches – Staff and MTC 903A.07 Contraband Control*. Each of these policies are consistent with ACA recognized national standards.

Part of the ongoing efforts at WGCF includes the development of several initiatives targeted at controlling contraband within the facility. These initiatives range from establishing new staff post assignments, purchasing and using contraband detection and prevention equipment, enhancing searches, modifying the physical plant, tracking contraband recovered, removing high risk cell fixtures, staff training and revising facility operational practices. The security initiatives in place are comprehensive and address specific areas that focus on both inside the facility and outside the facility. There is no indication that MDOC or MTC has ignored this issue, in fact just the opposite. The following are some of the more significant initiatives implemented:

---

[17] MTC monthly summary data report, February 2015.

- Installation of a 40 foot netting over the top of the existing perimeter fence in 2014 designed to deter contraband from being thrown over the fence;
- Front entry check point *Rapiscan* body scanner installed designed to detect contraband on staff and visitors;
- Front end procedural changes requiring staff to remove shoes and be subject to additional search procedures;
- Installation of a *Rapiscan* parcel scanner to detect contraband concealed in packages and mail;
- Additional Walk-Through metal detectors strategically located throughout the facility;
- The establishment of a K-9 unit developed to conduct searches to identify and recover contraband at the facility. The K-9 conducted searches at WGCF as recent as December 2014;
- Increased number of inmate and staff searches;
- Random drug testing is conducted on a monthly basis. In 2014 over 2000 random drug tests were administered on inmates[18];
- Removal of high risk items from the facility including cell lighting fixtures which contained sheet metal, mirrors located in cells, angle iron, expanded metal and beaded oven racks;
- Expanded surveillance camera coverage;
- Deployed CERT team on multiple occasions to conduct searches; and
- Referred staff and inmates involved in contraband for criminal prosecution.

Controlling contraband is a concern and it should be a concern in every prison. In most jurisdictions contraband introduced from the outside enters through a combination of methods: staff, visitors, mail/packages, delivery/service personnel and/or volunteers. Advanced steps have been taken to install and operate detection equipment and enhanced perimeter netting that is not widely considered in the corrections industry. Violators are held accountable and individuals have been referred for criminal prosecution. Internal initiatives have also been implemented to include removal of high risk items and modification of existing equipment. Contraband seizure should be considered an ongoing challenge that requires attention every day on every shift.

---

[18] MDOC Monthly Reports for 2014.

In respect to the frequency of contraband recovered by type, data provided for 2014 reflects that cell phones were the most predominant form of major contraband recovered at Walnut Grove[19].  Under the Communications Act of 1934[20] current federal law does not allow state and local governments to use cell phone jamming devices. On a national basis cell phones have become a leading form of contraband found in a prison setting. Controlling contraband will continue to be an ongoing challenge that should be at the forefront of every facility manager.

Two issues stand out in respect to contraband control measures at Walnut Grove. The first is they have invested significant resources to contraband prevention/detection equipment at the facility as evidenced by the perimeter netting, body scanner, video monitors, additional surveillance cameras, package/property scanner and several walk-through metal detectors located throughout the facility. The second is they have had a significant number of staff terminated and referred for prosecution for contraband-related activities. MTC reported that in calendar year 2013 there were twelve staff terminated for conspiracy to introduce contraband, attempt to introduce contraband or introduce contraband into the facility. In 2014 there were eleven staff terminated.

Mississippi Code: 47-5-193 cites the following:

> It is unlawful for any officer or employee of the department, of any county sheriff's department, of any private correctional facility in this state in which offenders are confined or for any other person or offender to possess, furnish, attempt to furnish or assist in furnishing to any offender confined in the state any weapon, deadly weapon, unauthorized electronic device, cell phone, or any of it components or accessories to include, but not limited to, Subscriber Information Module (SIM) cards, chargers, etc., or contraband item. It is unlawful for any person or offender to take, or assist in taking any weapon, deadly weapon, unauthorized device, cell phone or any of its components or accessories to include but not limited to SMI cards, chargers, etc. or contraband item on property belonging to the department which is occupied or used by offenders, except as authorized by law[21].

---

[19] MDOC Monthly Reports for 2014.
[20] Federal Communications Commission (FCC), US Communications Act of 1934, 47 U.S.C. Section 333.
[21] Mississippi Code 47-5-193.

The positive aspect is the number of staff involved represents a small percentage of the overall staff working at the facility and the initiatives instituted by both MDOC and MTC to detect intrusion have proven to work. The down-side is that the intrusion or attempt at intrusion to introduce contraband by staff and others does happen.

Based on my observations and review of data presented  the Mississippi Department of Corrections and MTC have both engaged in a number of enhanced efforts to address the issue of controlling contraband at WGCF.



*Photo of Body Scanner, Package scanner and controlled front entry at WGCF.*



*Package and property scanner located at front entry at WGCF.*



*Secure tool control inventory in education department at WGCF.*



*Housing zone cleaning supply staging area.  Supplies and tools no longer remain in the housing zone.*



*Walk-Through metal detector outside housing zones.*



*Walk-Through metal detector located outside gymnasium.*



*Walk-Through Metal Detector at Education Department point of entry.*



*Hallway leading to education department at WGCF.*

## Staffing Levels

In order to gain a better perspective of the staffing and utilization plan at WGCF several facets of staffing were examined. The authorized and actual staffing levels were reviewed with the warden, chief of security and the human resource manager at the facility; post orders and shift assignment rosters were examined; line and supervisory staff were interviewed, inmates were interviewed and observation of staff deployment practices were made over a three day period.

Previous external reports reflect concerns with the number of staff assigned, staff supervision, training, retention and the requirement for staff assigned to the housing zone floors to remain in the zones. The 6th court monitor's draft report states: "During the two most recent site inspections (December 2014/January 2015), the Monitors have observed improved supervision of the housing areas by line staff. Officers are more diligent in ensuring that cell doors are secure, rounding checks appear to be more frequent, and overall staff presence in the housing areas is much improved."

The focus of my review was primarily on security positions, their training, how they were being deployed and the level provided. The number of vacancies in non-security positions based on a review of the last

two years has never been considered a significant issue as the vacancy rate varied from zero to six percent.

In February 2015 the process of amending the *Management and Operations Agreement* between the Mississippi Department of Corrections (MDOC) and Walnut Grove Correctional Authority was started with the primary purpose of reducing the number of inmates allowed to be housed at WGCF to 962. The inmate population on February 18, 2015 was 957. Considering the adjustment in the operational capacity fewer housing zones are required to operate and fewer inmates are required to be serviced. As a result a RIF (reduction-in-force) program was instituted by MTC to reduce the number of staff assigned to the facility.  A new staffing plan was developed and became effective February 16, 2015.

The current designated security positions as of February 16, 2015 reflect the following:

Table 5. Uniformed Security Positions

| Uniformed Security Positions - February 2015 | | |
|---|---|---|
| Position | Actual | Approved |
| Chief of Security | 1 | 1 |
| Captain | 5 | 5 |
| Lieutenant | 8 | 8 |
| Sergeant | 17 | 16 |
| Correctional Officer | 158 | 147 |

Source: WGCF Human Resources, February 2015.

The revised staffing schedule was reviewed to identify approved post assignments, the frequency the post assignments were to be filled and whether a relief factor was applied when needed. The schedule was developed based on two housing units (8 zones) being closed and the average daily population being reduced. The actual number of officers and sergeants assigned exceeded the approved level because two additional housing zones were being temporarily staffed to provide supervision to the RID program.

The following table identifies the **housing, housing support, and housing unit-related supervisory posts** that were identified in the revised schedule. The table below does not identify the other approved posts that were included in the revised staffing schedule, i.e. training, ARP, kitchen, etc.

Table 6 specifically identifies the position required to be filled; number of days per week the position is to be filled; the number of posts to be filled by shift; the relief factor (RF); total number of full-time staff

34

required to fill the post when applying the relief factor and a brief description of the post
responsibilities.

Table 6. Housing Unit and Housing Unit Support Posts

| Housing Units | | Posts | | | | Personnel | Comments |
|---|---|---|---|---|---|---|---|
| Position | Days | 1st | 2nd | 3rd | RF | Total | |
| Housing Unit Sergeant | 5 | 4 | 0 | 0 | 1 | 4 | M/F Housing Unit supervision |
| Segregation Sergeant | 7 | 1 | 1 | 1 | 1.57 | 4.71 | Short-term segregation supervision |
| Utility Sergeant | 7 | 1 | 1 | 1 | 1.57 | 4.71 | Housing/Facility supervision |
| Central Control | 7 | 2 | 2 | 1 | 1.57 | 7.85 | Central Control operations |
| Housing 5 Control | 7 | 1 | 1 | 1 | 1.57 | 4.71 | Housing Pod Control Officer |
| Housing 5 Zone | 7 | 4 | 4 | 2 | 1.57 | 15.7 | Zone floor officer |
| Housing 6 Control | 7 | 1 | 1 | 1 | 1.57 | 4.71 | Housing Pod Control Officer |
| Housing 6 Zone | 7 | 4 | 4 | 2 | 1.57 | 15.7 | Zone floor officer |
| Housing 7 Control | 7 | 1 | 1 | 1 | 1.57 | 4.71 | Housing Pod Control Officer |
| Housing 7 Zone | 7 | 4 | 4 | 2 | 1.57 | 15.7 | Zone floor officer |
| Housing 8 Control | 7 | 1 | 1 | 1 | 1.57 | 4.71 | Housing Pod Control Officer |
| Housing 8 Zone | 7 | 4 | 4 | 3 | 1.57 | 17.27 | Zone floor officer |
| Housing Unit 9 | 7 | 1 | 1 | 1 | 1.57 | 4.71 | Floor Officer |
| Utility Officer | 7 | 4 | 4 | 2 | 1.57 | 15.7 | Staff relief, facility support |

Source: WGCF Warden's Office, February 2015

In reviewing the revised shift schedule, appropriate post coverage is provided to meet the existing
workload.  For example during the first and second shifts (6:00 am – 10:00 pm) seven days per week a
correctional officer is assigned to each housing zone. On the third shift (10:00 pm – 6:00 am) a minimum
of two officers are assigned to each housing unit, with the exception of housing unit eight where three
officers are assigned with one remaining in the segregation unit. The segregation unit is used for housing
administrative segregation, short-term disciplinary segregation (20 days or less) and inmates pending
protective custody status. Administrative segregation includes inmates that require separation from the
general population on a short-term basis pending further review. There is no long-term segregation unit
at Walnut Grove.  On the third shift five days per week all the zones are secured during the majority of
the shift with no access to the dayroom is scheduled from approximately 10:00 pm to 5:00 am. At 5:00
am the first housing zone is fed breakfast on a rotating scheduled basis. Two days per week in the
general population housing zones dayroom opportunities are currently available until 11:45 pm.

Staff supervision in the housing zones is also being provided seven days per week on all three shifts. A
minimum of 14 (rounded) sergeants are available to provide supervision to housing staff and housing

activities. A minimum of two sergeants are scheduled to be assigned at all times, seven days per week, in addition to the lieutenant and captain. There are currently seventeen sergeants assigned to the facility. When properly scheduled sufficient supervisory personnel are present considering the custody level, activity schedules, physical plant design, workload activity and number of line staff assigned. The revised staffing schedule reflects the appropriate number and type of security post for each shift provided two housing units remain closed and the population capacity remains at or below 962.

### Identifying and Enforcing post responsibilities

In addition to having a sufficient number of trained personnel that are properly scheduled it is critical to ensure staff understand their post responsibilities and are properly trained. The post responsibilities need to be clear and reflect the expectations of management and supervisory personnel.

During my three day site visit I had the opportunity to interview and observe a number of staff on all three shifts while both on and off their post assignment and examined shift assignment rosters. Staff were able to clearly describe their post responsibilities and explain the initial steps to be taken in case of an emergency. In observing the housing units while accompanied by staff it was my experience that personnel assigned to the zones were physically present on the zone. Line staff and supervisory staff were able to describe the approved protocol when requesting to leave the zone. It was clear this issue had been discussed previously during line-up (pre-shift briefing) and by the sergeants. Additional issues that had been previously discussed included conducting wellness checks (security rounds) and checking the securing of cell doors. Every officer I spoke with was able to explain their responsibility in this area which required the zone officer to remain in the zone unless authorized to leave, conduct security rounds and ensure the cell doors were secure. Expectations appeared to be clear, ensuring consistent application of expectations requires holding staff accountable, appropriate follow-up and supervision. A review of January 2015 staff discipline records reflect two staff were disciplined for failing to ensure cell doors were secure.

In reviewing the post description for the correctional officer and correctional sergeant positions general responsibilities were described. In respect to housing zone responsibilities the essential functions described for staff and supervisors assigned to the zones appeared appropriate however were not extremely comprehensive. I suggest updating the correctional officer and housing sergeant post description to reflect more accurately current expectations.

*Security personnel training*

The Mississippi Department of Corrections and MTC both have established updated policies regarding staff training. These policies[22] were reviewed (MDOC 04-02, MTC200.5, MTC 901D.02) to determine current staff training requirements for security personnel. In addition to examining the policies, training schedules, attendance files and curriculums were reviewed and the Walnut Grove Training Coordinator, Chief of Security, CERT Commander and Warden were interviewed.

The training policies in place are consistent with ACA nationally recognized training standards. The training policies require that all new correctional officers receive 120 hours of training during their first year of employment. At a minimum, this training is required to cover the following areas: *security and safety procedures; emergency and fire procedures; supervision of offenders; suicide intervention/prevention; use of force/chemical agents; offender rights; key control; interpersonal relations; communication skills; standards of conduct; cultural awareness; sexual abuse/assault intervention and code of ethics.* In addition new correctional officers receive one week (40 hours) of on-the-job training (OJT) prior to filling a post assignment.

In 2014 MTC expanded the number of pre-service training hours for new correctional officers to include one additional pre-service training week. Pre-service security personnel now receive the following additional training:

- (8) Hours: Chemical Agent Training (expanded from 1.5 hrs.);
- (1) Hour: Critical Incident Management;
- (3) Hours: Discretion and Decision Making;
- (1) Hour: Escapes;
- (1) Hour: Non-Crisis Intervention;
- (1) Hour: Logbook Training;
- (1) Hour: Cell Extraction;
- (8) Hours: Principles of Direct Supervision;
- (1) Hour: Overview of Riot Situations;
- (2) Hours: Administrative Segregation; and

---

[22] Mississippi Department of Corrections Policy MDOC 04-02, Orientation and In-Service Training, MTC Policy 200.5. Staff Training, MTC Policy 901D.02 Training Requirements.

- (30) Hours: Additional miscellaneous training.

In total there were (191) security personnel that graduated from the training academy during calendar year 2014. Training is delivered by the Training Coordinator and through different subject matter experts. The records reviewed reflected that training is being provided based on established policy.

In addition to pre-service training all correctional officers are required to receive at least 40 hours of in-service annual training. This training includes at a minimum the following areas: *standards of conduct/ethics; security/safety/fire/medical/emergency procedures; supervision of inmates including training on sexual abuse and assault and use of force.* The policy is also consistent with ACA nationally recognized standards. The lieutenant who is assigned on a full-time basis to the training unit provided documentation related to both pre-service and in-service training. Included in the documentation were training records, training material and current training curriculums. The in-service security training currently requires staff to receive (4) hours of chemical agent training on an annual basis.

The staff training schedule and curriculum that was being used covers all the areas required in the staff training standards set by the American Correctional Association and more. During 2014 MTC enhanced their focus on staff training and staff preparedness beyond the (40) hour annual training to include the following:

- Four staff completed MTC's Supervisory Development Program Training;
- Forty-three employees completed eight hours of Critical Incident Command Training in January;
- Seven employees attended the Mississippi Association of Professionals in Corrections Training Conference;
- Fifteen employees completed 24 hours of Critical Incident Command Training in June;
- Seventeen employees attended the Mississippi Association of Professionals in Corrections training conference in September;
- Nineteen supervisory staff completed MTC's expanded supervisory development program in December;
- The Corrections Emergency Response Team (CERT) has expanded to include (20) staff members. The CERT Commander and one Team Leader completed an instructor training class in October to be certified to provide CERT training; and

- Plans have been initiated to refine the Field Officer Training (FTO) program at Walnut Grove to include qualified personnel to provide staff mentoring and training based on established written guidelines.

In reviewing staff training records there has been an added focus on the part of MTC to develop staff and provide opportunities for staff to become more confident in their abilities and be better prepared to meet position responsibilities. The development of staff takes time, commitment by all of those involved, proper guidance and repetition. Recognition of the fact that 39 percent[23] of the officers have less than one year of experience working in a detention environment, providing continued training tailored toward addressing and reinforcing the fundamental principles of effective security practices should continue to be strongly encouraged.

### Use of Force and Chemical Agents

The Mississippi Department of Corrections and MTC has adopted the ACA standards relative to the use of force within adult correctional facilities and included the requirements into their policy and procedures. The current applicable MDOC policy, 16-13, *Use of Force*, became effective March 1, 2014. The policy states in part the following:

> "It is the policy of the Mississippi Department of Corrections to restrict the use of physical force to instances of justifiable self-defense, protection of others, protection of property, prevention of escapes, and to maintain or regain control, and then only as a last resort and in accordance with appropriate statutory authority".

The policy incorporates the standards of ACA including the requirement that "in no event is physical force justifiable as punishment". The policies in place at Walnut Grove are consistent with national standards.

In evaluating use of force incidents at the Walnut Grove Correctional Facility I reviewed the policies, incident reports, videos and interviewed staff.  What was initially alarming was the number of use of force incidents reported in 2012. On average 16.33 use of force incidents were reported per month during the calendar year[24]. The peaking months included August and September where the number of assaults were 27 and 30 respectively.  In an attempt to provide a comparison the number of use of force

---

[23] WGCF Human Resources, February 16, 2015.
[24] MTC Monthly Statistical Reports, 2011 – 2014.

incidents for calendar years 2013 and 2014 were identified as well as the most recent month completed at the time of this report, January 2015. The following table identifies the reported frequency of use of force incidents at Walnut Grove during the time identified periods.

Table 7. Use of Force Reported Incidents

| Walnut Grove Correctional Facility - Use of Force Incidents Average Per Month | | | |
|---|---|---|---|
| 2012 | 2013 | 2014 | January 2015 |
| 16.33 | 7.33 | 6 | 3 |

Source: MTC Monthly statistical reports.

What appeared to be clear was the number of use of force related incidents had significantly decreased starting in calendar year 2013 and the trend has continued through January 2015. There were two months in 2014 where the number of incidents were significantly higher one of which was in August when the transfer of close custody inmates was initiated and the other month was March (11).  The overall average for the year remained the lowest in the past three full calendar years.  Approximately 81 percent[25] of the incidents during this three year time period were reported as spontaneous and not considered pre-planned situations.

The MDOC/MTC policy identifies the situations when force may be utilized[26].  The policy notes that force may be authorized in the following instances but does not limit its use to solely these instances.

- To protect staff, the public and offenders;
- To prevent escape;
- To prevent the destruction of state property;
- To gain compliance from an offender;
- In instances of justifiable self-defense;
- To prevent the commission of a felony or misdemeanor;
- To enforce regulations and orders;
- To prevent or quell a riot.

---

[25] MTC monthly statistical reports, 2011 -2014.
[26] MDOC Policy 16-13, page 2.

After examining the policies and summary data reports I had the opportunity to review (13) video tapes of incidents where use of force was applied and several additional incident reports that did not have a video.  Video recording is required by policy for all planned use of force incidents[27] and if feasible in every spontaneous situation.  The overwhelming majority of incidents reviewed resulted from incidents where the inmate(s) refused to cuff-up, be searched or refused to remove their arms from the food slot in the door. Reports reflect that during calendar year 2014, (78) percent of the incidents were considered spontaneous. In every instance reviewed there were multiple verbal orders directed by staff to the inmate(s) to comply with the given order. I did not observe or read one incident where multiple orders were not provided prior to force being applied.

What was evident in the incidents I reviewed was a level of inconsistency in the application of the use of force and the variation in skill level of staff that were assigned to assist. Some of the incidents appeared to be handled in a manner consistent with policy, including when possible, contacting medical personnel (Video 14-405) prior to the application of force, appropriate and timely documentation and follow-up documentation and reviews.  Other situations reflected occasions where chemical agents were applied after opening a secure door when the door could have remained closed, the distance (to close) in which chemical agents was applied may have been questionable, the video quality when used did not always fully capture the events or staff responses, proper equipment was not used, all documentation was not available or the decontamination process after the application of chemical agents was inconsistent.

In the aftermath of the use of chemical agents, policy requires decontamination and medical attention be provided. In February a facility decontamination policy was prepared and approved[28]. The policy requires inmates to be allowed to decontaminate with water prior to arriving at the medical unit.  In each case reviewed the documents supported that medical attention was provided after the incident. A secure eye wash station has been established outside of the housing zone in route to the medical unit to minimize the length of time before an individual is allowed to decontaminate themselves.  This provides the opportunity to remove the inmate from the area in which the application was applied while addressing the issue of decontamination in a more timely fashion.

---

[27] MDOC SOP 16-13-01, Use of Force, page 7.
[28] MTC *Use of Oleoresin Capsicum Spray – Decontamination*, February 23, 2015.



*Eye wash station in hallway leading to the medical unit.*



*Inside of designated wash station.*

One incident reviewed that occurred in August 2014, (Video 14-390) deserves mention as it was viewed as an exception rather than common practice. The incident is described in a condensed summary format and not intended to be a full description of every detail of the incident. The incident occurred in a close custody housing unit.

Two inmates assigned to close custody had been refusing to take their arms out of the food slot located in the door and after repeated orders were sprayed with chemical agents and removed from the cell. Upon being escorted back to the cell the first inmate was secured in the cell. The inmates' cellmate was escorted back to the cell and when the door was open the inmate in the cell proceeded to push himself passed the officer and walk out of the cell. The inmate was still in restraints. The officer held the inmate with his hands holding the hand-cuffs that were applied while attempting to escort the inmate back into the cell. The video shows the inmate had been refusing for several minutes and the officer is verbally talking to the inmate. The inmate continues to be resistant as evidence by his attempting to walk/pull away from the officer and walk away from the cell door. This continues for several minutes. The inmates' cellmate is also refusing to enter the cell and is being restrained by another security employee. The first inmate continues to resist, attempts to walk away, becomes more aggressive and quickly attempts to turn around and pull away from the officer. At this point the officer lifts the inmate where his feet leave the ground and throws him to the floor. Medical staff is called and after further review and investigation the officer is terminated for his actions. This 2014 incident was previously noted by the monitors in their 5th report[29] and the plaintiff's expert report dated February 10, 2015. This was the only incident I reviewed where excessive force may have been used and the incident should be considered the exception rather than a common practice occurring at Walnut Grove.

The 6th court monitors draft report reflects that facility officials have improved their review of incidents however reviewing supervisors continue to be inconsistent in documenting their reviews on the computerized reporting form. [30] January incidents were specifically cited as lacking appropriate documentation. Staff indicated they were very aware of the requirement to provide supervisory review of incidents and to conduct after action reviews. They perceive these reviews as learning opportunities and opportunities designed to improve the existing process.

---

[29] Monitors 5th report dated October 10, 2014, page 11.
[30] Monitors 6th draft report dated February 23, 2015.

It is not unusual for staff in spontaneous and/or threatening situations to not consistently adhere to policy nor is it unique to just the Walnut Grove Correctional Facility, as it can be found in various degrees in other facilities throughout the United States. Effective policies are in place at Walnut Grove, however consistent follow-up, training, resources, supervision and productive reviews are areas that will assist staff in being able to better perform in difficult situations. Efforts are in place as evidenced by the enhanced training provided to staff in the area of use of force and application of chemical agents which has more than doubled during 2014 and continues to be a primary focus during 2015.

### Emergency Response Plan

In the past two years there have been two occasions at Walnut Grove where the application of the emergency response plan was required. I had the opportunity to review the facility emergency response plan, related videos and the reports for both the December 31, 2013 and July 10, 2014 disturbances. The purpose of the review was to gain a better perspective of what occurred and the staff response. Both incidents occurred in zones housing close custody inmates and presented several serious challenges to the staff as both incidents involved a large number of inmates located in multiple housing zones. Dealing with simultaneous disturbances can be a challenge for the most seasoned employee.

The December 2013 incident in housing unit three was the first actual serious disturbance that most of the staff had ever encountered in a correctional environment and many staff appeared based on a review of the videos to be responsive but uncertain on how to proceed after their initial response. There had not been a previous disturbance of this size or magnitude at the facility. Several after action meetings occurred amongst MTC staff and between MDOC and MTC staff. An additional meeting occurred between the court monitors and MTC management/executive staff, MDOC executive staff, MDOC General Counsel and the Attorney General's Office to identify and discuss the *After Action Report* and the status of 18 items identified during the review process requiring further action.

Approximately six months after the first disturbance a second disturbance occurred in the close custody housing units that again revealed several deficiencies and concerns regarding the staff's response. MDOC and MTC staff both reported that numerous meetings occurred immediately after the disturbance and the decision to remove the close custody inmates from Walnut Grove was made.

Additional *After Action* reviews were conducted regarding the disturbance for the purpose of collaborating and identifying corrective action. Although no formal report was prepared the purpose and intent of having a review was completed. The Wardens position was vacant and the Deputy Warden of Operations at the time is no longer employed at the facility.  In August 2014 the first large group of close custody inmates were removed from the facility and a new warden was appointed.  Incident reports, use of force, medical emergency response, and a comprehensive investigation report were completed and multiple meetings took place that focused on the July disturbance.

In reviewing the internal emergency preparedness and response plan, it includes several requirements that would better prepare staff to respond to an emergency. Some of these issues include the following:

- Requiring all staff to engage in emergency response drills at a minimum of at least two drills annually;
- After action reviews to be conducted;
- Realistic site specific contingency plans including disturbances/riots, evacuation, and hostage situations;
- Command post development; and
- Staff training.

The plan in place provides the framework to effectively prepare and respond to various emergencies. Since the two disturbances, occurred the Emergency Operation Plan for Walnut Grove has been updated, the Corrections Emergency Response Team has expanded to a point where CERT members are assigned to every shift, response personnel are designated on the roster, staff training has become a priority, not perfunctory, challenging and site appropriate mock exercises have increased to a point where drills and exercises have occurred every month since October.

## Programming and Behavior Management

### Inmate Out of Cell/Structured Time

In reviewing the 5th monitors report reference was made to a large number of inmates spending a significant portion of their day in the dayrooms of the housing units engaged in un-

programmed/unstructured time[31]. A fundamental goal of any correctional facility is to establish a safe environment which should incorporate the development of an inmate management behavior plan.  As discussed recent efforts have been established to ensure that a *needs assessment* is completed and a case management plan be developed for each inmate.

It has been my experience that offering a significant number of positive structured activities to the inmate population can be considered an essential contributing factor to the overall goal of maintaining a safe and secure environment. Structured activities that are viewed as productive generally represent activities in which staff controls the nature of the activity. Allowing an excessive amount of unstructured activities considered unproductive or viewed as "time-fillers" can often lead to an inmate population looking for alternative ways to spend their time. Sometimes this unstructured time leads to less than positive outcomes.

I have reviewed the daily activity schedules, work and program assignments, attendance levels, interviewed both staff and inmates and was on-site at the facility on all three shifts in order to gain a better perspective of the inmate time management plan at the Walnut Grove Correctional Facility. My observations and comments are addressed through the separation of "structured time" with "out of cell time"

### Structured Time

In reviewing the program activity report dated February 5, 2015 approximately 73 percent of the inmate population was assigned to either a specific program or work assignment during the week.

This included involvement in one of the following primary areas:

- Academic and Vocational education;
- Work Assignment;
- Regimented Inmate Discipline Program (RID);
- Pre-Release;
- Moral Recognition Therapy;
- Religious Programs;
- Substance Abuse education; and/or

---

[31] Court Monitors 5th report dated October 10, 2014, Page 4.

- Life skills programming.

At WGCF structured programming is available seven days a week, however academic and vocational education programs are normally available Monday through Friday. Of those inmates assigned to an activity approximately 71.7 percent were assigned to an activity that was scheduled for at least fifteen hours per week. The length of time the assignment was scheduled varied from 45 hours per week to 15 hours per week. The remaining inmates assigned to a program or job were scheduled for less than fifteen hours per week. These programs generally address specific life skills, substance abuse programming, pre-release and/or religious education classes.

Based on the data provided, approximately 27 percent of the inmate population was not assigned to a specific program or work activity. A small portion of those inmates may be ineligible for participation in a structured program due to their pending status, placement in segregation, recent date of arrival or medical status.

In total the data provided for that date indicates approximately 52 percent of the total inmate population was assigned to at least 15 hours per week to a program/job activity. In addition to having an assignment, the inmate had access to the dayroom and general recreation opportunities.  As indicated earlier in this section of the report the more positive structured time made available to the inmate population generally the more influential the program development plan can serve in contributing to establishing and maintaining a safe and secure environment. Having over half of the population assigned to a program/work activity for at least fifteen hours per week is a programming level that many facilities I have reviewed have not been able to achieve.

With the elimination of the close custody inmates the demand for programming may increase. Striving to maximize positive structured time for the inmate population may prove to benefit both the inmate population, the facility and ultimately enhance the overall safety and security of the facility.



*WGCF entrance to education department*



*WGCF inmate library.*



*WGCF vocational classroom.*



*WGCF inmate computer lab*

*Out of Cell Time*

The current daily operational schedule was provided and reflects that the first opportunity for large group movement out of the cell generally starts at approximately 5:00 am. The breakfast meal is served on a rotating schedule commencing at approximately 5:00 am. The first housing zone that is fed does not always eat first as the feeding schedule is rotated on a regular basis. In a general population zone breakfast is normally served and consumed in the housing zone dayroom. Upon completion of breakfast the inmates are required to return to their cells. Prior to and directly after breakfast there is limited out of cell movement for inmates assigned to food services, laundry or work as zone orderlies. The next large movement within the dayroom generally begins at approximately 7:00 am once the morning count has checked.  At this point inmates are generally allowed out of their cell for the majority of the day. Sunday through Thursday general population inmates are allowed the opportunity to remain in the housing zone dayroom normally until 9:45 pm. On Friday and Saturday general population inmates are allowed to remain in the dayroom until 11:45 pm. The exception under normal circumstances is during counts which occur multiple times per day at which time inmates are required to return to their cells.

Based on the operating schedule general population inmates are normally allowed the opportunity to be out of their cell between 12 and 14 hours per day. During this time inmates that are not assigned to a program or work activity not only have access to the housing zone dayroom, they have access to various additional services that take place outside the dayroom. These additional services may include the following:

- Access to the gymnasium which begins at 8:20 am and continues until 7:15 pm and is scheduled on a zone-by-zone basis seven days per week;
- Case Manager contacts;
- Access to the "slab yard" which is the recreation area adjacent to the housing unit and is available on a daily basis, weather permitting;
- Access to weekly religious services;
- Weekly Library access;
- Haircuts scheduled five days per week;
- Family Visitation which is available on a scheduled basis; and
- Sick call and pill lines occurring on a daily basis.

Most of the activities mentioned above have a degree of structure. For example access to the gymnasium does not always consist of just an "open gym" concept. Staff are always present and for example in February, 2015 the facility completed an ongoing facility-wide basketball tournament consisting of teams from each housing zone. Case manager contacts are generally scheduled as are visits, haircuts, religious services and library access.

Structured programming does exist at Walnut Grove and over 50 percent of the inmate population is assigned to at least 15 hours per week to a program/job activity. For those inmates who are not schedule to work or attend a program activity, as previously reported access to the dayroom can normally be between 12 and 14 hours per day. The housing zone dayroom in a general population housing unit provides the opportunity for inmates to take a shower, make telephone calls, watch television, read, play cards and partake in passive recreation activities. The current dayroom schedule allows for the above mentioned opportunities and also allows for inmates to participate in structured activity in which 73 percent of the population were assigned.



*WGCF housing zone dayroom.*



*WGCF gymnasium.*