Walnut Grove Correctional Facility
After Action Report
Incident Date: December 31, 2013
Prepared By
Neil Turner, Warden North Central Correctional Center

**This report is being written pursuant to WGCF Policy Phase Process, Section VIII item 11.**

On December 31, 2013, at 6:51 p.m. a disturbance occurred at the Walnut Grove Correctional Facility (WGCF). It occurred in Zone 3 and involved all four (4) housing units 3A, 3B, 3C and 3D. The disturbance began in 3D and then spread to 3C, 3B and 3A. The disturbance involved approximately 230 offenders in the four (4) housing units. The remainder of the facility was not involved in the incident and was secured by on duty staff. At 8:45 p.m. all of zone three (3) was secured. A Total of 16 offenders were treated at outside medical facilities for injuries sustained during the incident. One correctional officer was locked in cell 3D with four (4) offenders in the cell. The offenders and staff report this was done to reduce the risk to the officer.

During the course of the After Action Review the following items were reviewed:

1. Mississippi Department of Corrections (MDOC) SOP 16-06-02 Offender Transport
2. MDOC SOP 17-04-01 Emergency Plans
3. MDOC SOP 16-13-01 Use of Force
4. MDOC SOP 17-05-03 Threats to Security
5. MDOC SOP 16-06-02 Offender Transport
6. MDOC SOP 16-23-01 Use of Oleoresin Capsicum (OC) Spray or Chemical Agent
7. WGCF Policy Phase Process
8. WGCF Policy Emergency Response Plans
9. WGCF Policy Riot and Disturbance Plans
10. WGCF Policy One Call Now Emergency Notification Service
11. WGCF Post Order 003-1 Units 3A, 3B, 3C, 3D and 4B
12. WGCF 004 Housing Unit 3 and 4 Pod Control
13. WGCF 2013 Pre-Service Curriculum
14. WGCF 2013 In-Service Curriculum
15. MDOC EOR Number WGCF-13-638
16. Offender interviews
17. Staff interviews
18. Video footage in all four units and the vestibule of Zone 3 and Zone 4

## Atmosphere of Facility

Prior to the incident at WGCF on December 30, 2013, MDOC issued a "High Alert". It was issued as a result of an incident at another facility. The atmosphere at WGCF was calm with no noted behavior changes in the offenders. The day prior to the incident one Code Black was called. The Code Black was on 3D for a single offender being combative with staff. Staff, Major Daniels and Capt. Moorehead, actively sought intelligence from offenders and found no intelligence to suggest WGCF Offender behavior patterns were changing. This is supported by the lack of significant incidents prior to the disturbance.

## Staffing

On the date of the disturbance the positions in Zone 3 were fully staffed.



1

**Facts of Event**

On December 31, 2013 at approximately 6:51 p.m. a disturbance occurred at Walnut Grove Correctional Facility (WGCF). The disturbance occurred in Zone 3. Zone 3 consists of four (4) housing units which are identified as 3A, 3B, 3C and 3D. Each unit has a 30 or 32 cell configuration and are double bunked for a capacity of either 60 or 62 offenders per housing unit. The total inmate capacity for Zone 3 is 244. The population at the time of the disturbance was 232. The status of the facility at the time of the incident was normal operations with a "High Alert". The facility was High Alert due to incidents that had occurred at other MDOC Facilities that involved the "Gangster Disciples and Vicelords". These are Security Threat Groups (STG) who are active in the penitentiary system. At the time of the incident second shift was fully staffed at 39 Correctional Staff. Zone 3 had four (4) housing unit Officers, one (1) Rover and one (1) Pod Control officer assigned at the time. The facility had not seen any unusual activity prior to the incident.

On December 31, 2013 at approximately 6:51 p.m. a Code Black was called in housing Unit 3D. Two offenders on the second tier of 3D began to engage in a physical altercation. Offenders on the housing units were out of the cells on recreation. Inmates on the zone were engaged in normal recreation. Zone Three (3) was out until 10PM on a normal Tuesday. The two offenders that were in the initial physical altercation were ▮▮▮▮▮▮ ▮▮▮▮▮ MDOC #▮▮▮▮▮ and ▮▮▮▮▮▮▮ MDOC #▮▮▮▮. The two offenders both have STG affiliations and are members of the Gangster Disciples and Vice Lords. The on duty officer, CO Wilder, observed the altercation and called a Code Black. The Zone 3 Pod Control Officer, CO Hawkins, also heard the call and states he repeated the Code Black. CO Hawkins states he saw the offenders siding up. He then heard CO Brookshire ask for access out of her zone. CO Hawkins stated he did not hear CO Wilder request access off the unit once the disturbance began. He stated he did not access any doors due to the fear the disturbance would jeopardize other staff, that the incident had already spread to housing unit 3C. Other offenders on the units quickly split into two groups supporting each of the fighters and also began to engage in physical altercations. Staff responded to the Code Black, however prior to entry into 3D a Code Black was called for 3C at approximately 6:55 p.m. and a third Code Black was called at approximately 6:57 p.m. for 3B. As staff were responding, 3A also began to be disruptive. In each of the housing units in zone 3, the offenders were engaged in physical altercations. The offenders were utilizing homemade knives (shanks), plastic meal tray, coolers from the housing units, trash cans and other housing unit equipment to engage in the disruptive behavior. Housing unit 3D also utilized the microwaves and televisions as weapons. They also broke the camera in the unit.

While the incident was ongoing the remainder of the facility was secured with no other zones participating in the disturbance. All staff were accounted for with the exception of CO T. Wilder. Officer Wilder was in Housing Unit 3, cell 5416 where the risk to further harm was reduced.

The responding shift commander, Captain Moorehead, made a decision to use chemical agent. That was made due to the large number of offenders involved. The chemical agent was then utilized to disperse the offenders and to stop the disruptive behavior. The first use of chemical agent was made from the vestibule. It was administered around the door of housing unit 3D. All the housing units did have chemical agent administered in them in attempt to control the disturbance. The chemical agent was dispersed from the zone 3 control center utilizing hand held chemical agent, MK9 and MK4 as well as the single and multiple launch 37mm gas guns.

Deputy Warden Mabry initiated Critical Incident Management and utilized the control center as a command post. A recall of staff was initiated. Major Daniels notified Walnut Grove Police and asked for assistance. Subsequently the Leake County Emergency Response was activated to report to the facility. The Leake County Sheriff and Deputies did report to the facility at 7:40 p.m. They were not utilized inside the facility but set up perimeter security and assisted with traffic control. The medical unit established a triage area in the corridor leading to zone 3 that was secure. At approximately 7:23 p.m. MDOC was notified by investigator Brady

2

Sistrunk. At approximately 8:08 p.m. all units had been reached, CO Wilder recovered, and injured offenders removed from the housing units to receive medical treatment. At approximately 11:07 p.m. the MDOC Response team entered the facility. At approximately 11:20 p.m. MDOC and WGCF personnel developed a plan to search all of zone 3. At approximately 12:30 a.m. on January 1, 2014 the search of zone 3 begins. At approximately 4:05 a.m. the searching of zone 3 was completed.

A total of 16 offenders were treated at outside medical facilities from injuries received during the incident. Of those, four were admitted to outside medical facilities.

At the time of the incident 2nd shift was fully staffed at WGCF. Present at the facility was Deputy Warden Sheniece Mabry and Major Terry Daniel, Administrative Duty Officer (ADO). Deputy Warden Priscilla Daly and Warden Lawrence Mack were both out of state at the time of the incident. The shift was supervised by Captain Moorehead.

Response

The initial response, which is normal given the multiple Code Black calls, in Zone 3 included the following staff:

| | | | |
|---|---|---|---|
| Capt. Moorehead | C/O Gill | C/O Hawkins | Major Daniel |
| Sgt. Germany | C/O Curran | C/O Doss | Deputy Warden Mabry |
| Sgt. Anderson | C/O John | C/O Canady | |
| C/O Triplett | C/O Evans | C/O Hunter | |
| C/O Brookshire | C/O Grant | C/O Billie | |

Additional Staff responded from home due to the staff recall activation included:

| | | | |
|---|---|---|---|
| Capt. Jones | Sgt. White | Inv. Sistrunk | C/O Burkes |
| Capt. Garrett | Sgt. Miles | UM Triplett | C/O Purnell |
| Lt. Gardner | Sgt. Grant | C/O J Johnson | C/O L. Rodriguez |
| Sgt. Hall | C/O Bourrage | C/O J. Lewis | C/O N. McWilliams |
| Sgt. Lyons | C/O Pickens | C/O B. Carter | |

Local Law Enforcement:

Walnut Grove Police Chief
Leake County Sheriff
Four (4) Deputy Sheriffs

MDOC Resources:

CID three (3) Staff
Tony Compton
MDOC Emergency Response Team

Medical Response:

Ambulances – 4
Air Ambulance – 2

3

WGCF Medical Director
WGCF Medical Staff -3

Chemical Agent Utilized:

4 - Fox MK4
3 - Def-Tec MK9
1 - Fox MK9
7 - Def-tech 60 Cal. 37mm
4 - 37 mm Mussle Blast
1 - ALS Stinger Grenade

**Actions**

On December 30, 2013, WGCF received information from MDOC that the facility should be on "High Alert". This information was disseminated to supervisory staff. Staff completed intelligence gathering and determined the mood of the facility had not abruptly changed. On December 30, 2013 there was on Code Black in 3D for a disruptive offender. No other offenders were involved at that time. On December 31, 2013 the mood of the facility was calm. First shift was uneventful. Second shift began without any issues. At approximately 6:51 p.m. a Code Black was called in 3D. The staff assigned to Zone 3 responded immediately. Officer Wilder was in the unit, Officers Gill and Triplett responded as soon as the first (1st) Code Black was called. Within two (2) minutes C/O Brookshire, C/O Dixon, C/O Doss, Sgt. Grant, Sgt. Germany, Sgt. Anderson and Capt. Moorehead responded. Within three (3) minutes C/O Canady responded. Eleven (11) minutes after the initial Code Black Major Daniel responded to Zone 3. The initial physical altercation began in 3D. Within one (1) minute the offenders in the unit were actively engaged in multiple physical altercations. Within two (2) minutes 3C had also begun engaging in disruptive behavior. Within four (4) minutes 3B had also begun engaging in disruptive behavior. Within 12 minutes 3A had begun engaging in disruptive behavior. Upon the arrival Capt. Moorehead two (2) of the Housing Units had already become actively engaged in the disruptive behavior. The other two (2) soon followed. The offenders were at the doors of their pods watching staff arrive and the offenders in other pods believed a call had went out to engage in disruptive behavior and assault each other. The fight on 3D began as an unplanned event. Current intelligence from the ongoing investigation states the fight occurred as a result of one of three (3) reasons; a cell phone, a bad business deal, or an assault on another offender. It was unplanned and spontaneously moved to the other housing units within the zone. Capt. Moorehead, Sgt. Germany and C/O Sheppard (Control) reported Capt. Moorehead called repeatedly for the unit door to 3D be opened at the initial response. C/O Sheppard also reported she heard C/O Wilder asking for the door to be opened. C/O Hawkins did not open the 3D door. He stated he did not hear any staff except Brookshire call for door access. C/O Hawkins states he was afraid if the door was opened the disturbance would spread beyond Zone 3 POD Control. Staff on Zone 3 reported C/O Wilder was being protected by offenders on the unit. When she was unable to leave the housing unit she went to cell 5416 where, she reported, the offenders were keeping her safe. During the time period from the initial Code Black until staff's first entry into a Housing Unit occurred staff were actively attempting to resolve the incident. Staff present in Zone 3 were utilizing chemical agents: Fox MK-4, Def Tech MK9, Fox MK9 and 37 mm muzzle blast. In addition staff utilized 7 Def Tec 60 Cal., Rubber Ball, and 37mm Foam Baton. These less than lethal and chemical agent uses occurred from the Pod Control utilizing the gas ports in the Pod Control Pod windows. Chemical agents were dispersed into all four (4) housing units to disperse the offenders and also utilized in 3D to disperse offenders attempting to gain entry into Cell 5416. In addition some less lethal munitions were used to cover for staff during the entry into housing 3D. External to Zone 3 staff were actively working to resolve the situation. Capt. Moorehead reported she sent C/O Doss to retrieve the multi launch 37 mm and chemical agent that had been depleted due to usage. In addition C/O Evans was sent to the Control Center to retrieve Chemical Agent for Zone 3 as well. She stated she went there during the early moments of the incident as staff prepared to control the incident. She states she met Major Daniel and Deputy Warden Mabry who assisted in

4

carrying Chemical Agent to Zone 3. Major Daniel reported he realized the incident was larger than on duty staff could resolve. Major Daniel and Deputy Warden Mabry left zone 3. Major Daniel reports he went to the parking lot to discuss the incident with Deputy Warden Mabry and check the exterior of Housing Zone 3. He also established the west parking lot as the external staging area. Deputy Warden Mabry left the checkpoint area and went to the Control Center to establish the Command Post. Major Daniel then called Investigator Sistrunk and Walnut Grove Police Chief K. Polk. He states he also called C/O Sheppard in Control and instructed her to call in all staff. Major Daniel then notified Vice President Brown of the incident. Major Daniel states he also called Sgt. Lyons to assist. Upon arrival, Investigator Sistrunk states he spoke with Major Daniel and then went to Zone 3 to assess the situation. He stated he began to put a tactical plan together to secure the units. At about 7:30 p.m. Chief Polk arrived at the facility. At about 7:40 p.m. Leake County Sheriff and four (4) deputies arrive at the facility. At approximately 7:45 p.m. all housing units were notified to lock down the units. At approximately 8:00 p.m. Capt. Jones and a few more staff arrive. They responded to Zone 3. With the responding staff and on duty staff it is determined staffing was sufficient to enter the unit. A team entered units to extract the injured offenders and the staff member from the offender cell. Initially staff entered 3D and then the other Housing Units on Zone 3. Staff then went from cell to cell securing the units once injured offenders were cleared. Staff also checked for injured offenders in each cell so medical could assist those who needed medical attention. At approximately 8:00 p.m. the Leake County Sheriff left the facility with his deputies. At approximately 8:45 p.m. an emergency count is conducted and cleared at 10:30 PM. The MDOC Response Team enters the facility at approximately11:07 p.m. Staff stated a plan is developed jointly with WGCF and MDOC Staff to search all of Zone 3. At approximately 12:30 a.m. January 1, 2014 the search of Zone 3 starts. At approximately 3:30 a.m. three (3) of the four (4) housing units are completed and MDOC Response Team exits the facility. The WGCF Response Team continues the search of the housing unit on Zone 3 and completes it at approximately 4:05 a.m. January 1, 2014. The Response Team is debriefed and released to exit the facility. At 11:30 AM the remaining offenders that were sent to outside medical facilities for medical treatment are returned to WGCF. Four offenders were admitted to outside medical facilities.

**Policy review and further actions**

During the After Action Review multiple MDOC and WGCF policies and procedures were reviewed.

During the review of the MDOC and WGCF policies all were found to be within timeline compliance for annual review.

1. **Physical structure**

    A. Food serving slots - all food serving slots have been cleared of items used to jam them and secured. They are being monitored on a daily basis to ensure they are secure.

    B. Mirrors - Mirrors on the Close Custody units in each cell are made from metal. To enhance security they have all been removed. A replacement to these mirrors is being sought by WGCF. The facility is also reviewing the others units on the facility to determine if the mirrors should be removed.

    C. Beds - The beds in each Close Custody cell will be bolted to the floor. This will prevent offenders from moving the beds within their cells or out of their cells. A design has been developed and an implementation plan will begin by January 27, 2014.

5

2. **Staffing**

WGCF is reviewing current method of assigning staff to shifts.   The review is to provide a mixture of experienced staff on all shifts.

3. **Close Custody review**

WGCF is conducting a review of Close Custody procedures to determine if a privilege level system would be appropriate for the close custody population.

4. **Code Black Response**

WGCF has developed an enhanced protocol for Code Black calls. Designated officers in each Zone will respond to a Code Black call. Each of these officers will carry chemical agent This allows for a rapid and significant response to control the event.

5. **MDOC policy 17-04-01 Emergency Plan**

This MDOC policy establishes the guidelines for developing and implementation of emergency plans within the facility.

When the policy was reviewed it was determined staff did have access to the emergency plans. The plans are available in the Captain's Office and Control Center, as well as other areas.

The plans had been reviewed per policy and the timelines were compliant.

All staff have received Emergency Plan Implementation training.   This is completed in Annual In-Service.   This has been part of Fire and Safety until October 2013.   At that time it was separated into its own time block of one (1) hour.

All staff have been trained on all aspects of the Institutional Emergency Plans Manual.

All new employees are trained with respect to emergency plans.

The Emergency Plans Manual Procedures are included into Post Orders where applicable.

**Recommendation:**

WGCF had implemented Emergency Plans training prior to the disturbance.   This training did not focus on the incident management by an organized method that is nationally recognized.   WGCF will utilize a program that is similar to the National Incident Management System (NIMS), also known as Incident Command System, (ICS).   This system offers six (6) training courses I-100, I-200, I-300, I-400, I-700, and I-800.   These can be taken online or field trained. This training will begin January 28,2014 at WGCF.

WGCF will develop and implement a method to ensure Emergency Response Team (ERT) members have ready access to the equipment needed when deployed.

WGCF will develop and implement required documentation and protocols to be placed in the Emergency Response Plans.

6

6. **MDOC policy 16-13-01 Use of Force**

This policy establishes the parameters of when a staff member may legally use force in the performance of their positions as correctional employees and the requirements/training that enable that force to be used.

The force utilized during the disturbance was appropriate.

The force utilized during this incident was both justified and not excessive.

All staff are currently trained in the MDOC use of force policy in the Training Academy and annually, but not quarterly.

The decision to use of force in Zone 3 was made by the Shift Commander on scene as reactive unplanned force. The decision to enter the Zone 3 Housing Units to resolve the disturbance was made by Investigator Sistrunk and Captain Jones. Deputy Warden Mabry was the highest ranking correctional staff on duty and she was not involved in the decision to use force to enter the housing units. It was made by on scene staff. The decision to enter the units was made by the highest ranking staff at the scene.

There was not a video recording made of the zone entry during the planned Use of Force Phase. In addition there are not post disturbance videos or photographs.

All staff and inmates did receive immediate medical attention after the disturbance occurred.

The Use of Force Incident Reports were not completed timely.

**Recommendations:**

WGCF will define what quarterly Use of Force Training is required and implement that training.

WGCF will develop and implement additional ICS training for staff to understand the ICS Command Structure, the decision making process and the chain of command for use of force during a critical incident. This training will begin January 28, 2014.

WGCF will develop and implement a procedure to ensure the documentation from a use of force is timely and complete.

7. **MDOC Policy 17-05-03 Threats to Security (Administrative Emergency Lockdown)**

This policy defines the conditions in which a lockdown may occur at a MDOC facility. Furthermore it defines the levels and privileges that are used during the lockdown

Facility has and used the MDOC Policy appropriately.

**Recommendations:**

There are no recommendations related to this policy.

7

8. **MDOC Policy 16-06-02 Offender Transport**

This policy defines the parameters and procedures when an offender is transported outside the secure confines of the correctional facility.

Staff maintained appropriate supervision of offenders while outside of the facility.

Offenders were appropriately secured during the transport.

The supervision was appropriate for the air transports.

Recommendations:

While the policy was adhered to, the multiple transports made the process more difficult. A procedure will be developed and implemented for transportation of a large number of offenders to outside medical facilities. It will be practiced during required Emergency Action Plan Drills.

9. **MDOC Policy 16-23-01 Use of Oleoresin Capsicum Spray or Chemical Agents**

This policy defines the training and conditions when a staff member may carry and utilize chemical agent.

Staff that utilized Chemical Agent during disturbance were trained and current with the required certification.

The reason for the use of force fell within the guidelines established.

The force was both justified and appropriate.

Recommendations:

There are no recommendations related to this policy.

10. **WGCF Policy Riot and Disturbance Plan**

This policy defines the response procedures the facility should utilize during a riot or disturbance. It also includes the applicable checklist and Incident Commander responsibilities during the incident.

The Control Center did utilize the CCTV Cameras as required.

Staff did respond as required.

A Portable Video Camcorder was not utilized as required.

Staff did utilize good judgment in approaching offenders.

The Shift Captain did respond and Chemical Agent was applied appropriately.

8

The remaining housing units in the facility were on lockdown, however, WGCF wants to improve the process for a lockdown.

A timeline of events was documented.

Trained staff did deploy chemical agents and less-than-lethal munitions.

Health services staff did refer the offenders to outside medical treatment that required it.

There was not a clear Chain of Command for the staff responding to the incident.   The Shift Captain was the initial Commander.   However, staff were unclear on the role of Administrative Duty Officer, Major Daniel.

**Recommendations:**

WGCF will provide refresher training for supervisory staff to reinforce the need for appropriate video and photographic documentation. It will be completed by February 14, 2014.

WGCF will implement Advanced ICS training for Shift Supervisor and Administrators to enhance their ability to respond to and manage a large incident. The first requirement of that training will be conducted January 28 and 29, 2014.

WGCF will develop and implement an improved process to secure the facility in the event of a critical incident.

**11. WGCF Policy  Phase Process**

This policy outlines the process staff should utilize to resolve a critical incident. It is organized into five phases.

| | |
|---|---|
| Phase 1 | Locate and Verify |
| Phase 2 | Isolate and Contain |
| Phase 3 | Evacuate |
| Phase 4 | Resolve |
| Phase 5 | Deactivate |

Staff at WGCF did follow the phase process.   The response lacked a structured organization that hampered effective communication.

The Emergency Response Plans do contain the Emergency Checklist ICS Organizational Chart and ICS Emergency Locations cited.   However, these require additional time to search and find as staff review the policies.

**Recommendations:**

WGCF will develop and implement the Emergency Plans with all necessary supplements for the individual policy to allow for quick reference and usage.

9

WGCF will provide ICS training to Shift Commanders. The first of this training will occur on January 28 and 29, 2014

## 12. WGCF Policy Emergency Response Plans

The Emergency Command Structure was partially implemented but not communicated effectively to all staff.

Both the Deputy Warden and the Chief of Security saw themselves as the incident Commander.

The staff did not engage in the required emergency response training requirements.

Notifications

- MDOC was notified one (1) hour after the incident started
- MTC Vice-President was notified 45 minutes after the incident started
- Warden Mack was not notified by the facility

### Recommendations:

WGCF will develop and implement a Comprehensive Notification Checklist specific to each Emergency Response Plan.

WGCF will utilize ICS training to implement the use of the Emergency Response plans and appropriate checklist

WGCF will develop and implement a protocol to effectively declare the ICS activation and structure.

WGCF will train executive staff on the ICS structure. This will be included in the ICS training conducted on January 28 and 29, 2014

WGCF will conduct the required Emergency Response Plan training (drills) with a process to document the drills. These will be conducted quarterly.

## 13. WGCF Policy One Call Now Emergency Notification Service

This policy establishes a procedure to recall staff in the event it becomes necessary. The "one call" is a commercial application that enables all off duty staff to be recalled through one phone call.

The policy indicates there is a One Call system in place. This does not exist at WGCF. The off duty staff recall is conducted using a staff roster in the Main Control Center.

### Recommendations:

WGCF will implement the one call system or develop and implement a structured off duty staff recall method. WGCF will update the policy with the appropriate language.

10

### 14. WGCF Post Order 003-1
### Units 3A, 3B, 3C, 3D /4B

This policy outlines the duties and responsibilities of an officer assigned to a security post. The post is 3A, 3B, 3C 3D/4B.

Staff on Zone 3 maintained security of the Pod doors during the disturbance.   They did not address movement into the 3 Vestibule by two (2) offenders from Zone 4.

Zone 4 officers did not maintain security of offenders in Zone 4 and allowed two (2) offenders to go to Zone 3.

#### Recommendations:

WGCF has initiated the Management and Training Corporation (MTC) discipline process for staff having been identified as violating MTC rules and will continue to investigate and initiate appropriate actions in regards to staff identified violating MTC and WGCF policies and procedures.

### 15. WGCF Post Order 004
### Housing Unit 3 and 4 Pod Control

The policy outlines the duties and responsibilities of an officer assigned to a security post. The post is Housing Unit 3 and 4 Pod Control.

The Pod Officer assigned to Zone 3 pod did not read the Post Orders.   In addition he did not sign the Post Order acknowledgement sheet.

The Zone 4 Pod Officer did not maintain secure housing units doors or sliders during the incident. They did allow two (2) offenders to leave Zone 4.

#### Recommendations:

WGCF has initiated the Management and Training Corporation (MTC) discipline process for staff having been identified as violating MTC rules and will continue to investigate and initiate appropriate actions in regards to staff identified violating MTC and WGCF policies and procedures.

### 16. Staffing

Once the incident began, additional staffing was not provided to the Control Centers to address increased functions placed on duty post.

#### Recommendations:

WGCF will develop and implement an enhanced staffing plan that addresses needs of facility based on the incident and emergency response needed.

11

## 17. Equipment Failure

During the disturbance the pepperball gun was inoperable due to the $CO_2$ Cartridge not being charged.

**Recommendations:**

WGCF will purchase two additional $CO_2$ cartridges for the pepperball gun. The purchase order was processed for this purchase on January 6, 2014.

WGCF will develop and implement a procedure to conduct regular checks on security equipment to test their operability for use when needed. This will be developed and implemented by January 31, 2014.

## 18. Video

Staff did not capture the entire incident after the event. In some areas the cameras were destroyed by the offenders. The Pelco camera system in place at WGCF is only capable to retain video digitally for 7 days as the system is currently configured due to limitations of storage. Part of the video was captured after the incident, but not all.

**Recommendations:**

WGCF will include video preservation in the procedure developed for Use of Force Process. The process will require the video is captured by the end of shift for small events and within 24 hours for large events.

The process of this After Action Report involved the reviewing of MDOC policies and WGCF policies and procedures. During this review, it has been noted through recommendations, areas that WGCF may utilize to further enhance the overall operations of the facility. The facility investigator is also conducting a review of the incident to determine if criminal charges should be pursued against those offenders that may have engaged in inappropriate behavior. In addition, if it is found staff performed contrary to policy, the MTC disciplinary process will be utilized to address these issues.

12