IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT
NORTHERN DIVISION

C.B., by and through his next friend,
Charleston DePriest, et al.

              Plaintiffs,

v.

                                        CIVIL ACTION NO. 3:10-cv-663 (DPJ-FKB)

WALNUT GROVE CORRECTIONAL
AUTHORITY, et al.

              Defendants.

## REPORT OF ELDON VAIL

## INTRODUCTION

      I have been asked by Plaintiffs' counsel to offer my opinions about the Walnut Grove Youth Correctional Facility and its operation in the wake of the riot that occurred at that facility on July 10, 2014. The Plaintiffs originally retained me in July of 2013 to review materials from the facility, conduct a site inspection and provide expert-consulting services related to the *C.B., et al v. Walnut Grove Correctional Authority et al* lawsuit.

      I have reviewed Plaintiffs' November 16, 2010 Complaint in this case, and am familiar with the March 26, 2012 consent decree covering the subclass of prisoners confined to the Walnut Grove facility; with policies of the Mississippi Department of Corrections (MDOC) and post orders of Management and Training Corporation (MTC); as well as other documents associated with the operation of the prison. I have reviewed each of the monitors' quarterly reports to the court. I have viewed videos of recent use of force (UOF) incidents at the prison, and surveillance videos of the December 31, 2013 New Year's Eve riot and the July 10, 2014 riot at the prison.

Shortly after the New Year's Eve riot I inspected the facility, while the monitors were present, and had the opportunity to speak with some staff, and conduct confidential interviews with some inmates and cell front interviews with several more. On May 19 of this year I attended a meeting, called for by the monitors, in Jackson, Mississippi with the Deputy Commissioner of MDOC, MTC officials, and counsel for both parties, to discuss the state of the institution's operation in light of the lessons learned from the New Year's Eve disturbance.

Following my inspection of the prison on January 28 and 29, 2014, I offered my observations, questions and opinions in a memo to Plaintiffs' counsel that was submitted to the monitors and counsel for Defendants and filed with the Court on March 14, 2014. *See* ECF No. 100, Status Report Plaintiffs' Expert Eldon Vail's Report.

Following the meeting of the monitors and the parties in Jackson on May 19, 2014, I provided a memo to the monitors and the attorney for MDOC containing my observations and recommendations about the future operation of the prison. That memo is attached to this report as Exhibit 1.

I spoke briefly on the phone with monitor Steve Martin on July 25, 2014 and again on July 28, 2014 to share observations about the riot and the videos that had been made available by MDOC.

## MY BACKGROUND

I am a former corrections administrator with nearly 35 years of experience working in and administering adult institutions. I have served as Superintendent (warden) of three adult institutions (including two facilities with maximum-security inmates). I served for seven years as the Deputy Secretary for the Washington State Department of Corrections, and for four years as Secretary. For the past two years, since retiring from the Department, I have served as an

expert witness and correctional consultant for cases and issues in ten different states. My resume is attached to this report as Exhibit 2 and offers more detail regarding my skills and experience.

During my career in Corrections I have had to respond to a number of disturbances and riots. To offer one example, shortly after my appointment as the Superintendent of the McNeil Island Corrections Center in 1992, a riot occurred at the facility, resulting in the death of one prisoner and the loss of control of a 400- bed minimum-security unit that lasted nearly 12 hours. As a result of that experience I determined that the prison did not have an effective Emergency Response Plan (ERP) and lacked the capacity to control a serious disturbance. Together with my supervisor, Deputy Director Jim Blodgett, we relied on instruction by the National Institute of Corrections of the United States Department of Justice to completely revamp not only my facility's ERP but also the plan for the entire department. As the Deputy Secretary of the Washington State Department of Corrections, I instituted uniformity in the procedures and training for the Emergency Response Teams (ERT) of individual prisons and developed a joint training academy for the ERT and agency leadership charged with command roles in emergency situations. The result was the creation of a very effective emergency response system with well-trained staff from the level of correctional officer to the Incident Commander that served and continues to serve the agency very well. Serious incidents occur in the Washington prison system but their successful management is one of the reasons, I believe, that the overall level of violence has been trending downward for over a decade now.

In addition to my experience running a prison system with decreasing levels of violence and little class action litigation, my experience in emergency response, I believe, qualifies me to opine on the current operation of the Walnut Grove Correctional Facility.

## EVENTS AND BACKGROUND PRIOR TO THE JULY 10, 2014 RIOT

**Twice in the past seven months,** MDOC and MTC have shown that they cannot effectively respond to a security emergency at Walnut Grove. The events of the 2013 New Years' Eve riot are summarized in the April 17, 2014 4th Report of the Monitors, and in my memo to Plaintiffs' counsel, which was filed with the Court on May 14, 2014.

On May 19, 2014, at the request of the monitors, the parties to the litigation as well as MTC officials and leadership met with the monitors in Jackson to discuss the New Year's Eve riot and more generally the status of implementation of the consent decree.   The meeting included a frank discussion of the likely underlying causes of the May 19 riot, and recommendations by the monitors and myself for remedial measures

Following the May 19, 2014 meeting, I submitted a memo to MDOC and Plaintiffs' counsel and the monitors again summarizing my recommendations.  I concluded:

> Last, Dr. Austin said at the meeting that the disturbance, which occurred this past New Year's Eve, cannot happen again. He was absolutely correct. While bad events will always happen in the prison environment, what cannot happen is for Walnut Grove to lose control of one close custody pod after another, in rapid succession, and then be so completely ill equipped to manage the incident as they were this last time. Conditions of confinement in the close units need to improve and the programs available need to be expanded. But of equal importance is that MTC must greatly improve their capacity for emergency response so that future incidents do not get as out of control as we saw happen last New Years.

Unfortunately, the recommendations that were offered appear for the most part not to have been adopted and what Dr. Austin cautioned against is precisely what happened again less than seven months later, on July 10, 2014.

As of this writing, I have not had the opportunity to view MDOC or MTC's internal review of the event. News accounts report that Commissioner Epps has said the riot was due to a

failed attempt to smuggle contraband into the institution and that some staff may have been involved. Whatever the cause of the riot, it was very poorly handled by the staff on duty that night.

## THE JULY 10, 2014 RIOT

To fully understand the gravity of the July 10 riot, and how easily it could have resulted in loss of life, it is important to review excerpts of the surveillance videotapes. I attach here as Exhibit 4 copies of the surveillance tapes received from MDOC. I suggest reviewing an excerpt of the tape labeled 3 Charlie Front and Rear 2230-2330, beginning at 10:30 p.m. and ending at 10:44 p.m.[1]

The July 10 riot seems to have broken out nearly simultaneously in each of the four pods of Housing Unit 3. Unit 4 Bravo also was involved. From the videos you can see inmates communicating through the windows of the pods beginning at approximately 9:40 p.m. In one video you can see an inmate access what appears to be a staff telephone. The activity level in the pods also begins to pick up at about this time.

From my conversation with Mr. Martin I learned that what had previously been reported to him is that lock-up time for the night in Housing Unit 3 should have been 9:15 p.m. in pods Bravo, Charlie and Delta, and 9:45 p.m. in Alpha, the privilege pod. From the surveillance videos it is clear that there was no activity signaling or moving towards locking up any of these pods at the required time, evidence that the staff were not in control of the population in the moments prior to the riot.

It is my strong opinion that the lack of constant presence of custody staff in the pods when inmates are out of their cells is a primary contributing factor that caused the recent riot as

---

[1] Defendants, Plaintiffs and the monitors are already in possession of the CDs containing copies of these videotapes. Plaintiffs' counsel is delivering a set of the CDs to the Court.

well as many other problems MTC has with managing the close custody population. From the videos it is clear that staff are not routinely or regularly required to be in the pods when the inmates are out of their cells.

Prior to the riot kicking off in Unit 4 Bravo, the video shows only one officer in the unit for about 3 minutes during the entire hour before the riot begins. During that time the video shows a fight between two inmates in this pod that begins and ends without any response from security staff.

In Unit 3 Delta, there is one officer in the pod sitting with his back to the activity in the unit. At 9:47 p.m., an inmate passes by him twirling a broom handle and the officer makes no effort to correct the inmate or confiscate the broom handle. The officer exits the unit at about 9:52 p.m.

In Unit 3 Charlie an officer enters the unit at approximately 9:41 p.m. and other officers enter and quickly exit the unit about 9:54 p.m.

In Unit 3 Alpha there was an officer in the unit who winds up locking himself in a cell at about 9:55 p.m., presumably for his own safety.

In Unit 3 Bravo there was one officer in the unit. At 9:38 p.m., other officers escort a nurse and a medical cart into the unit. They exit at about 9:45 p.m. Officers return to the unit at 9:53 p.m., presumably to try and establish control in the unit, but by this time the inmates have separated into two groups and about 9:54 p.m. one of those groups chase the staff from the units and then take command of the vestibule, a critical moment in the evolution of the riot.

I am informed that Walnut Grove has a rule that inmates cannot go into any cell to which they are not assigned. It is clear from the videos prior to the riot (as well as other videos I have seen of the facility) that this rule is not enforced. The behavior of staff regarding this issue as

well as the undetected fight and the unaddressed brandishing of the broom handle make it clear that whether there was an officer in the unit or not, staff do not control the units, inmates are in control.

The absence of officers in close custody living units when the inmates are out of their cells is deeply disturbing and completely irresponsible on the part of MDOC and MTC. This group, Close Custody, is the most dangerous classification of prisoners, outside of those in segregation, housed at the prison. To put a single staff person in the pod intermittently, and to allow inmates to be out of their cells without any officers in the pod at all, simply turns the operation of those units over to the inmates.

As I said in my March 14, 2014 memo, "This lack of security officer presence in the pods is not acceptable.  Further, one security officer in the close custody pods is not enough: There should be two." I reiterated this concern in my memo to the monitors and the MDOC attorney in May.[2]

The lack of staff supervision is greatly compounded by the fact that the locking mechanisms on the cell doors at Walnut Grove are readily defeated and control of the cell doors is a continuing problem. Officers at the facility do not always know if an individual cell door is secure. The problem is apparently one of design, and knowledge of this very dangerous situation exists at the highest levels of MDOC. In the May 19 meeting in Jackson, the Deputy

---

[2] Not having staff present when inmates are out of their cells in medium and minimum custody units is also a concern. On July 17, 2014, only a few weeks before the July 10 riot, a female security officer (Officer Boone) was first verbally abused and then physically assaulted when she was the sole officer in a unit housing medium and minimum custody prisoners. Having viewed the video and read the incident report regarding the assault on Officer Boone, I can only conclude that it is not surprising if officers at Walnut Grove fear for their own safety when so few staff are provided to support efforts by the officers to actually run the living units in the prison.

Commissioner acknowledged this is a problem in a number of their prisons and said they were working on it.

"Working on it" is not good enough. It is astonishing to me that this enormous gap in basic security is not being treated as an emergency. It is a basic and fundamental necessity for prisoners, staff and the community to know that a prison can actually keep prisoners locked in their cells. Not having confidence that cells doors are secure can be terrifying to both staff and inmates and creates a severe risk of significant injury for the prisoners. This is a problem that demands an immediate solution.

I do not know how or if this problem figures into what happened during the riot of July 10. But based on my experience, I am confident that it contributes to officers not feeling safe when assigned alone to work in the living units at Walnut Grove, a feeling that likely contributes to their finding ways to stay out of the units.

As I said above, at 9:54 p.m., one of the group of inmates in Unit 3 Bravo chase staff out of the pod and take control of the vestibule connecting all of the pods, a critical moment in the evolution of the riot. This signals the moment when the serious riot begins. You can then see most inmates separate into 2 groups in each of the pods, presumably based on gang affiliation. Inmates quickly begin to arm themselves with broomsticks, milk crates and whatever they can get their hands on. The fighting and the assaults begin almost immediately. The level of violence is extreme.

**In Unit 3 Charlie:**

- 9:59:35, an inmate is dragged into the rear-view camera and he is kicked and struck by another inmate wielding a broomstick. Blood is visible on the assaulted inmate and he is struck approximately 11 times.

- 10:00:03, another inmate picks up a thick stick-like object and strikes the man on the ground in the head twice.

- 10:00:14, another inmate with what looks to be a tray hits the battered inmate in the head.

- 10:00:27, the inmate being attacked gets up and runs.
- 10:02:40, an inmate is seen being dragged across the floor on the bottom tier of the zone. He leaves a trail of blood as he is dragged by his legs towards the rear of the zone.

- The inmate is taken to the rear of the zone and appears to be hit repeatedly with a plastic crate. This assault goes on until about 10:03:20. He appears to be left on the floor

- 10:23:45, what appears to be an inmate who was beaten previously is dragged across the floor of the rear of the lower tier. He is left behind the stairs at 10:24:10.

- 10:30:50, an inmate is dragged out of a cell on the lower tier. He is on his back and does not appear to be moving

- 10:31:05, 3 inmates with what look like plastic crates start hitting the inmate on the floor.

- 10:31:15, another inmate joins in the assault with what looks like a broomstick. The inmate is struck approximately 14 times with the broomstick, mostly to his upper body.

- 10:31:29, another inmate with 2 plastic crates continues the attack on man on the floor, striking him approximately 11 times.

- 10:31:43, an inmate gets onto a table, under which the battered man lies, and jumps off, stomping onto the injured man.

- 10:31:52, 2 inmates with crates continue to hit the main in the head and face.

- 10:31:56, the battered man stands and runs into a cell, and is followed by 5 or 6 other inmates. What transpires is not visible on camera.

- 10:33:26, another inmate is forced out of his cell and is beaten by approximately 10 other inmates. They are using what appear to be trays and other unidentifiable objects.

- 10:33:53, the microwave is lifted from its place on a small table and an inmate raises it into the air, and drops it onto the man on the ground.

9

- The inmate is stomped on, hit, kicked, and hit with broomsticks and the microwave until 10:36:08.

- 10:36:10, one inmate appears to be instructing the others to get back as he stands on a table with is back to the camera. He is in this position, his actions not visible, for approximately 30 seconds. It appears that he may have urinated on the man. At 10:36:40, the battered man is left on the ground.

- 10:40:18, the man still lying bloodied on the floor is assaulted again by an inmate with a food tray who strikes him an additional 10 times. The battered man is soon after dragged a few feet by another inmate and left there.

- 10:41:36, an inmate walking by the injured inmate on the floor throws a tray at him.

- 10:43:21, the initial battered inmate is dragged out of his cell by his legs by two inmates. There had been three in his cell. The inmate's head is clearly bloodied, and his pants are down around his ankles. He still has his boxers on.

- 10:43:31, the second battered man is dragged out of the camera's view.

- 11:01:10, an inmate walks over to the injured inmate still on the ground and appears to strike him.

**In Unit 3 Delta:**

- At 10:03, inmates can be seen with a broomstick, what appears to be a cooler, and a bucket that they are wielding like weapons.

- 10:03:58, an inmate can be seen entering a cell swinging a broomstick, the inhabitant runs out the cell and is chased around the zone as things are thrown at him.

- 10:04:30, the inmate is seen bloodied, stumbling around.

- At 10:58:57.228 you see an inmate come downstairs with his shirt covered in blood. Approximately 7-8 other inmates pursue him with weapons such as long sticks, and milk crates. The man being chased runs in the direction of the showers but gets cornered.

- At 10:59 the man being pursued grabs one of the milk crates and tries to use it as a shield. You can also see a large group of inmates just outside of the pod door looking in as the assault is happening. He continues to try and break away and fend off the attacks but he is unsuccessful.

- At 11:00 you can see a separate assault taking place in the showers on the bottom tier. You can see a milk crate being used as a weapon but there is no clear view of the victim.

- At 11:01 the man who was being chased around the zone is left lying on the floor directly in front of the pod door. You see inmates leave the shower. The inmate by the cell door is beaten some more.

- At 11:06 the inmate who was left lying in front of the pod door is still lying motionless. The inmate who was standing on the dayroom table then takes a white cloth and lays it across the man lying motionless on the floor. A couple more inmates appear and the assault begins again.

The same level of violence cannot be seen in 3 Alpha, the privilege pod that presumably houses the inmates with more self-control.[3] However, the inmates do split into 2 groups and skirmish by throwing things and controlling turf in the pod. Primarily one group occupies the upper tier and one the lower tier. Efforts to fight up the stairs are unsuccessful.

In Unit 3 Bravo, the inmates split into 2 groups and begin fighting. One group chases the officers off of the unit and then occupies the vestibule, and is locked into that area.

In all of the pods you can see a lull in the violence that corresponds to staff administering gas into the pods from the elevated booth. Gas is administered from approximately 10:12 p.m. until 10:26 p.m. in Unit 3 Charlie, Delta and Bravo. Little violence can be seen during this time period, but it then resumes and serious assaults continue.

Viewing the video of the elevated booth explains the reason for the gas stopping. You can see officers arrive in the booth, joining the officer assigned to that post, at about 10:11 p.m. They begin to administer gas into the pods but within a minute it looks as if the officers are having trouble with the weapon used to administer the gas. The officer assigned to operate the booth does not have a gas mask and begins to show signs of exposure to the gas. At 10:16 p.m. she is out of the camera's view but returns briefly at 10:19 p.m., apparently unable to withstand

---

[3] The close custody "privilege zone" is a recent change as a result of prompting by the monitors.

the impact of the chemical spray. After the officers first administer gas from about 10:12 p.m. to 10:14 p.m., they appear to struggle with the equipment for about 10 minutes and then administer additional gas at about 10:22 p.m. At 10:27 p.m., however, the security officers somehow explode gas inside the booth itself. The booth is effectively abandoned for about a half an hour, while the assaults in the unit resume and continue, eliminating a critical vantage point to view and coordinate response to the pods that are rioting.

**In Unit 4 Bravo:**

- When the footage begins at 10:30 p.m., a majority if not all of the inmates on Unit 4B are out in the dayroom. The large group divides into two different groups.

- At 10:31 p.m. the fighting begins with each group throwing objects at the other group. Shortly after the fighting begins, chemical agents are dispersed from the control tower onto the pod.

- At 10:32 p.m. the pod is almost completely fogged up with a chemical agent but the fighting continues.

- By 10:33 p.m. you see inmates in the front view of the camera using mats as shields as they advance towards the group in the rear view of the camera. More chemical agents are dispersed.

- At 10:34 p.m. the inmates run upstairs and briefly it appears that some fighting continues on the top tier from the front view of the camera. Most of the inmates go inside of a cell.

- By 10:35 p.m. the pod is clear except for the fog.

- From 10:35 p.m. until 10:38 p.m. there is no visible inmate movement.

- By 10:39 p.m. five officers walk onto the zone and start going door by door and pulling on doors, presumably to make sure they are secure.

The contrast in the effective use of gas in Unit 4 Bravo and what happened in Unit 3 could not be more graphic. The failure of staff to properly respond to the extreme level of violence taking place in Unit 3 could have and should have been effectively stopped much

12

earlier had staff had the proper equipment and training to deploy gas as it was deployed from the elevated booth in Unit 4.   Since I have not yet been provided any documents regarding the internal investigation of this event, I await information that might explain the failure in the elevated booth in Unit 3.

It is unclear to me as of this writing how the staff regained control of the facility.[4] Staff can be seen on the videos entering Unit 3 Charlie at about 11:10 p.m., Unit 3 Delta at 11:08 p.m., and Unit 3 Bravo at 11:13 p.m.  Officers remain in the unit long enough to identify and remove those obviously injured and do a manual check to make certain each cell door is secure. Unit 4 Bravo was entered earlier, at about 10:39 p.m.

As Mr. Martin pointed out to me, it is likely that Walnut Grove had the advantage of this riot kicking off roughly at the time they were changing shifts so that they probably had twice as many staff available to respond than they would have had if it had occurred earlier or later—a fortuitous break that may well have kept even more inmates from being assaulted.

## RECOMMENDATIONS

From the historical record I can see and understand the progress that has been made at Walnut Grove under the supervision and urging of the monitors. Among many changes and improvements, the unnecessary use of force by the staff has been greatly reduced if not eliminated and much better classification procedures are in place as a result of the monitors' work.

---

[4] We requested copies of hand held videos presumably taken when emergency responders entered the pods to do a more formal search and to make sure inmates were in the correct cells. What we received just prior to submission of this report were four short hand held videos of blood splatter and damage to the pods.  Of note is that some of the rioting may have taken place in the outdoor recreation area adjacent to Unit 3 Charlie.   I could not see this from the surveillance videos previously provided.  This possibility raises the issue of how many inmates would have been able to breach security of the door between the day room and the recreation area.

13

Still, I have deep concerns about the operation of the prison, the escalating level of violence, and the ongoing extreme danger to the inmates housed there—as well as the staff who work there. The monitors and I have already repeatedly made a number of strong recommendations to MDOC in the wake of earlier outbursts of violence, but these recommendations, it appears, have largely been ignored. In my view, the most recent outburst on July 10 reinforces the urgent necessity for these remedial measures. It has been shown twice in the past seven months that MTC is incapable of controlling the living units that house close custody inmates. The result, especially in the most recent event, was extreme violence and serious injury to several prisoners. Loss of life could have easily occurred as a result of the July 10 riot -- or for that matter, even during the disturbance last New Year's Eve.

Accordingly, my recommendations are as follows:

1. Close custody inmates should not be housed at Walnut Grove

2. Unless and until close custody inmates are removed from Walnut Grove, there should be a mandatory staffing requirement, 24 hours per day, 7 days per week, of two security officers in each close custody pod at all times, absent an occasional break for one officer to use the rest room. Until the cell doors are fixed and are proven to be secure, the pods should never be without a staff member on the floor.

3. If close custody inmates are allowed to remain at Walnut Grove, sufficient supervisory staff should be deployed on each shift until the rules of the pod, such as the prohibition from entering a cell to which a prisoner is not assigned, is routinely followed.

4. The locking mechanism on the cell doors must be replaced with a system that cannot be so readily defeated.

14

5. MDOC must require that MTC have an effective ERP in place, that officers have been trained to follow the plan and that their performance is tested in real time drills. Even if the close custody inmates are removed from Walnut Grove, this is a critical requirement. Riots resulting in loss of life can occur even in a minimum-security environment. The ERP must include measures to ensure that officers have adequate safety equipment to respond to an emergency. For example, the videos I have reviewed show officers deploying gas in planned use-of-force situations without appropriate respirators.

6. Officers should be required to be actually present in the housing units at all custody levels whenever the inmates are out of their cells.

7. An independent security hardware expert should be retained to inspect the facility and identify risks, including the existence of items that could easily be turned into weapons. Previously MTC identified some of these items and they report they have been in the process of remedying the problems.  This work should continue but the identification and extent of the problem needs an outside expert. At one point during the riot, you can see on the video an inmate throw an object at an overhead light and it immediately shatters: clearly, it is not of detention quality. During my inspection of the prison in January inmates told me that the fences in the yard next to the units are made of material that can easily be broken off and turned into shanks. The weapons collected by the prison as a result of the riot or at any time during the past year should be made available to the outside expert so that he or she can attempt to identify the source within the prison and offer solutions.

8. During the riots inmates used broom handles, microwaves and milk crates to assault other prisoners. Cleaning equipment should be secured when not in use and microwaves should be bolted down. Items such as milk crates should be removed from the units when not in use.

9. During my phone conversation with Mr. Martin he indicated that the level of staff before the riot was well below what it should have been, and lower than anytime during his monitoring of the facility. If MTC cannot attract and retain quality staff and fill their mandatory posts, then MDOC must recognize that this vendor is not qualified to house the inmates.

10. Allegations of staff corruption are associated with the most recent riot. Similar allegations of serious staff misconduct have plagued the prison for at least the past couple of years. This issue was discussed briefly with the parties at the May 19, 2014 meeting in Jackson and was acknowledged as a problem. MDOC and MTC should remain focused on finding solutions to this recurring issue.

11. MTC officers must learn how to control the living units and the prisoners housed at their facility. I am aware that MTC has a Direct Supervision training curriculum. It should be dusted off and their officers should be retrained. "Direct Supervision" is basically an approach to supervising inmates that puts the officer in the middle of the living unit and expects that they control what happens in the unit by demonstrating and expecting pro-social behavior on the part of the prisoners. Put even more simply, the living unit is the officer's house, not the inmates' house, and behavior norms are to be established and followed. As long as the officers are only occasional visitors to

the unit, the inmates and the powerful influence of the gangs will drive the behavior norms.

12. Nearly every prison system in the country has a problem managing prison gangs and MDOC is no exception. However, it is not good enough to acknowledge the problem; you must affirmatively act to curb gang influence. In my own experience some inmates can be dissuaded from gang participation by the opportunity to participate in good programs. Other jurisdictions have had success offering specific activities that inmates enjoy as long as those activities involve all segments of the population, regardless of gang, race or ethnic affiliation. Currently the State of Washington is experimenting with the first application of a successful community based program called Operation Ceasefire. Whether or not any of these specific recommendations are followed by MDOC and MTC they should be required to affirmatively work to reduce the influence of gangs within their prisons.

13. Last, the recommendations I offer primarily concern the task of establishing greater control by the staff over the operation of the prison. Good security and control are fundamental to any prison. But the best prison security comes from establishing that control and providing sufficient program opportunities for inmates to be productively occupied the better part of each day. Without those opportunities, the vacuum will be filled by misbehavior and the rewards and status that come from gang membership. Establishing an array of good programs is not a panacea to the influence of the gangs, but such programs certainly do dilute and siphon away some of the influence of the gangs, by offering the inmate an opportunity for a program they experience as meaningful. I recommend that MDOC and MTC be required to

provide sufficient programs opportunities for most inmates to be productively occupied 5 days a week.

## CONCLUSION

These issues and recommendations are not new to MDOC or to MTC. I made reference to most of them in my earlier memos although they are further articulated here. Within the constraints of the current Consent Decree, the monitors have repeatedly put MDOC and MTC on notice regarding staffing instability and management issues, including inadequate supervision of an inexperienced staff described as "sorely deficit", ongoing contraband control issues and, most importantly, MDOC/MTC's seeming inability to "properly and safely manage" a close custody population. It is my opinion that unless these issues are promptly addressed, there will be a continuing and escalating risk of serious harm to the inmates incarcerated at Walnut Grove.

Respectfully submitted, this the 4th day of August, 2014.

s/Eldon Vail
Eldon Vail

EXHIBIT 1
Memo from Eldon Vail to Steve, Jim and Harold
re May 19, 2014 meeting with MTC

To: Steve, Jim and Harold,

I write to follow up on my comments at our meeting with MTC on May 19, 2014.

Again, I will say that Mr. Martin introducing the need for continuity at Walnut Grove was precisely the right issue to frame our discussion. The need for stability in the staff at Walnut Grove and for a Warden that stays at the facility at least 3 years are critical to the continued growth of Walnut Grove as an institution.

As I said in my report earlier this year, I am not confident that the facility has the necessary skill, experience or custody expertise to manage a close custody population. Understanding that this continues to be their charge, the issue of continuity in the daily management of those units is crucial to their potential for success. The units need to be owned by the staff and not the inmates and I do not believe that is the case today. Acceptable norms of behavior need to be established and demonstrated on a daily basis by the staff that run those units and that takes on-going team building and communication among all the staff involved. To that end I offer some specific suggestions in the hope they may be useful in improving the situation in the close custody units at Walnut Grove.

1.  One staff in the pods on the day and swing shifts is not enough. You can't be a team by yourself.
2.  There must always be a staff member in the pods when the inmates are out of their cells. Given the challenge of the locking mechanism in their cell doors, it is questionable that the pods should ever be absent a custody staff member.
3.  Administrators and supervisors should spend a portion of every working day on the floor in the close custody units. These are the most skilled staff at Walnut Grove and need to demonstrate their skills and comfort levels with inmates for the less experienced line officers.
4.  The case managers need to be spending much more time in the pods. I recommend that their offices be relocated so that they are closer to the pods or are actually in them.
5.  Not understanding the existing duties of rovers and utility officers, is it possible that some of their duties be structured to spend time in the close units? (Buildings 3 & 4 have rovers but building 5 does not? That's a puzzle for me.)
6.  The approach that the new close custody Sgt. and Lt. take is critical. In conjunction with facility administration they should develop a plan for how they want to see those units operate. While there is a need for ongoing communication between these 2 individuals and the unit supervisor, their schedules should be structured to allow for as much supervisory coverage as possible throughout the workweek. It would be a serious mistake if all 3 of these folks wound up working a Monday-Friday day shift.
7.  Officers in the individual pods should be assigned 5 days a week with consistent officers used for relief.
8.  Incentive pay to work in the close units is a great idea. That seems within the authority of a private company like MTC and worthy of their investment.

9.   I have serious concerns with MTC's plan to assign high performing cadets to the close units. If they were the second officer of a two-person team it would make sense but to assign them to work alone in the unit would be a mistake.

10.  The reference to a Field Training Officer program by MTC is good but is absent sufficient detail to evaluate. All experienced officers will not make good FTO coaches. Coaches need to be trained to perform as such and need a developed FTO program they can use in order to know and teach the skills the institution wants to have new employees learn and demonstrate.

11.  There needs to be a structured expectation that communication between shifts about the specifics of inmate behavior occurs on an on-going basis. This could be accomplished by a slight overlap between shifts or by a different approach to logging information. Without such communication the chance of sending mixed messages to the inmate population increases exponentially and consistency is critical to managing these units.

Ideally, MTC would identify who is going to work in the close custody units and develop them as a team. MTC has a Direct Supervision curriculum. It is not great but many of the principles in it are applicable to the successful management of any living unit. Refreshing the close custody team with this curriculum would be a great place to start.

On a different subject, during our meeting I did not get a chance to say much about the level of inmate programming at Walnut Grove. From the information I have been provided it looks to me that programming opportunities for inmates are pretty slim and the result is too much idleness. I know that great strides can be made in institution security and safety from expanding programming and would encourage all parties to pay more attention to this issue. I do not believe there are enough program slots for the number of inmates in the prison. I also am concerned about the process used to make program assignments, including work assignments, and believe it should be examined.

Last, Dr. Austin said at the meeting that the disturbance, which occurred this past New Year's Eve, cannot happen again. He was absolutely correct. While bad events will always happen in the prison environment, what cannot happen is for Walnut Grove to lose control of one close custody pod after another, in rapid succession, and then be so completely ill equipped to manage the incident at they were this last time. Conditions of confinement in the close units need to improve and the programs available need to be expanded. But of equal importance is that MTC must greatly improve their capacity for emergency response so that future incidents do not get as out of control as we saw happen last New Years.

Good luck with providing guidance to the facility. They have come a long way but still have some distance to travel.

Eldon

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT
NORTHERN DIVISION

C.B., by and through his next friend,
Charleston DePriest, et al.

Plaintiffs,

v.

WALNUT GROVE CORRECTIONAL
AUTHORITY, et al.

Defendants.

CIVIL ACTION NO. 3:10-CV-663 (DPJ-FKB)

## REPORT OF ELDON VAIL

## INTRODUCTION

I have been asked by Plaintiffs' counsel to offer my opinions about the Walnut Grove Youth Correctional Facility and its operation in the wake of the riot that occurred at that facility on July 10, 2014. The Plaintiffs originally retained me in July of 2013 to review materials from the facility, conduct a site inspection and provide expert-consulting services related to the *C.B., et al v. Walnut Grove Correctional Authority et al* lawsuit.

I have reviewed Plaintiffs' November 16, 2010 Complaint in this case, and am familiar with the March 26, 2012 consent decree covering the subclass of prisoners confined to the Walnut Grove facility; with policies of the Mississippi Department of Corrections (MDOC) and post orders of Management and Training Corporation (MTC); as well as other documents associated with the operation of the prison. I have reviewed each of the monitors' quarterly reports to the court. I have viewed videos of recent use of force (UOF) incidents at the prison, and surveillance videos of the December 31, 2013 New Year's Eve riot and the July 10, 2014 riot at the prison.

1

Shortly after the New Year's Eve riot I inspected the facility, while the monitors were present, and had the opportunity to speak with some staff, and conduct confidential interviews with some inmates and cell front interviews with several more. On May 19 of this year I attended a meeting, called for by the monitors, in Jackson, Mississippi with the Deputy Commissioner of MDOC, MTC officials, and counsel for both parties, to discuss the state of the institution's operation in light of the lessons learned from the New Year's Eve disturbance.

Following my inspection of the prison on January 28 and 29, 2014, I offered my observations, questions and opinions in a memo to Plaintiffs' counsel that was submitted to the monitors and counsel for Defendants and filed with the Court on March 14, 2014. *See* ECF No. 100, Status Report Plaintiffs' Expert Eldon Vail's Report.

Following the meeting of the monitors and the parties in Jackson on May 19, 2014, I provided a memo to the monitors and the attorney for MDOC containing my observations and recommendations about the future operation of the prison. That memo is attached to this report as Exhibit 1.

I spoke briefly on the phone with monitor Steve Martin on July 25, 2014 and again on July 28, 2014 to share observations about the riot and the videos that had been made available by MDOC.

## MY BACKGROUND

I am a former corrections administrator with nearly 35 years of experience working in and administering adult institutions. I have served as Superintendent (warden) of three adult institutions (including two facilities with maximum-security inmates). I served for seven years as the Deputy Secretary for the Washington State Department of Corrections, and for four years as Secretary. For the past two years, since retiring from the Department, I have served as an

2

expert witness and correctional consultant for cases and issues in ten different states.  My resume is attached to this report as Exhibit 2 and offers more detail regarding my skills and experience.

During my career in Corrections I have had to respond to a number of disturbances and riots. To offer one example, shortly after my appointment as the Superintendent of the McNeil Island Corrections Center in 1992, a riot occurred at the facility, resulting in the death of one prisoner and the loss of control of a 400- bed minimum-security unit that lasted nearly 12 hours. As a result of that experience I determined that the prison did not have an effective Emergency Response Plan (ERP) and lacked the capacity to control a serious disturbance. Together with my supervisor, Deputy Director Jim Blodgett, we relied on instruction by the National Institute of Corrections of the United States Department of Justice to completely revamp not only my facility's ERP but also the plan for the entire department. As the Deputy Secretary of the Washington State Department of Corrections, I instituted uniformity in the procedures and training for the Emergency Response Teams (ERT) of individual prisons and developed a joint training academy for the ERT and agency leadership charged with command roles in emergency situations. The result was the creation of a very effective emergency response system with well-trained staff from the level of correctional officer to the Incident Commander that served and continues to serve the agency very well. Serious incidents occur in the Washington prison system but their successful management is one of the reasons, I believe, that the overall level of violence has been trending downward for over a decade now.

In addition to my experience running a prison system with decreasing levels of violence and little class action litigation, my experience in emergency response, I believe, qualifies me to opine on the current operation of the Walnut Grove Correctional Facility.

## EVENTS AND BACKGROUND PRIOR TO THE JULY 10, 2014 RIOT

**Twice in the past seven months,** MDOC and MTC have shown that they cannot effectively respond to a security emergency at Walnut Grove. The events of the 2013 New Years' Eve riot are summarized in the April 17, 2014 4th Report of the Monitors, and in my memo to Plaintiffs' counsel, which was filed with the Court on May 14, 2014.

On May 19, 2014, at the request of the monitors, the parties to the litigation as well as MTC officials and leadership met with the monitors in Jackson to discuss the New Year's Eve riot and more generally the status of implementation of the consent decree.    The meeting included a frank discussion of the likely underlying causes of the May 19 riot, and recommendations by the monitors and myself for remedial measures

Following the May 19, 2014 meeting, I submitted a memo to MDOC and Plaintiffs' counsel and the monitors again summarizing my recommendations. I concluded:

> Last, Dr. Austin said at the meeting that the disturbance, which occurred this past New Year's Eve, cannot happen again. He was absolutely correct. While bad events will always happen in the prison environment, what cannot happen is for Walnut Grove to lose control of one close custody pod after another, in rapid succession, and then be so completely ill equipped to manage the incident as they were this last time. Conditions of confinement in the close units need to improve and the programs available need to be expanded. But of equal importance is that MTC must greatly improve their capacity for emergency response so that future incidents do not get as out of control as we saw happen last New Years.

Unfortunately, the recommendations that were offered appear for the most part not to have been adopted and what Dr. Austin cautioned against is precisely what happened again less than seven months later, on July 10, 2014.

As of this writing, I have not had the opportunity to view MDOC or MTC's internal review of the event. News accounts report that Commissioner Epps has said the riot was due to a

failed attempt to smuggle contraband into the institution and that some staff may have been involved. Whatever the cause of the riot, it was very poorly handled by the staff on duty that night.

## THE JULY 10, 2014 RIOT

To fully understand the gravity of the July 10 riot, and how easily it could have resulted in loss of life, it is important to review excerpts of the surveillance videotapes. I attach here as Exhibit 4 copies of the surveillance tapes received from MDOC. I suggest reviewing an excerpt of the tape labeled 3 Charlie Front and Rear 2230-2330, beginning at 10:30 p.m. and ending at 10:44 p.m.[1]

The July 10 riot seems to have broken out nearly simultaneously in each of the four pods of Housing Unit 3. Unit 4 Bravo also was involved. From the videos you can see inmates communicating through the windows of the pods beginning at approximately 9:40 p.m. In one video you can see an inmate access what appears to be a staff telephone. The activity level in the pods also begins to pick up at about this time.

From my conversation with Mr. Martin I learned that what had previously been reported to him is that lock-up time for the night in Housing Unit 3 should have been 9:15 p.m. in pods Bravo, Charlie and Delta, and 9:45 p.m. in Alpha, the privilege pod. From the surveillance videos it is clear that there was no activity signaling or moving towards locking up any of these pods at the required time, evidence that the staff were not in control of the population in the moments prior to the riot.

It is my strong opinion that the lack of constant presence of custody staff in the pods when inmates are out of their cells is a primary contributing factor that caused the recent riot as

---

[1] Defendants, Plaintiffs and the monitors are already in possession of the CDs containing copies of these videotapes. Plaintiffs' counsel is delivering a set of the CDs to the Court.

well as many other problems MTC has with managing the close custody population. From the videos it is clear that staff are not routinely or regularly required to be in the pods when the inmates are out of their cells.

Prior to the riot kicking off in Unit 4 Bravo, the video shows only one officer in the unit for about 3 minutes during the entire hour before the riot begins. During that time the video shows a fight between two inmates in this pod that begins and ends without any response from security staff.

In Unit 3 Delta, there is one officer in the pod sitting with his back to the activity in the unit. At 9:47 p.m., an inmate passes by him twirling a broom handle and the officer makes no effort to correct the inmate or confiscate the broom handle. The officer exits the unit at about 9:52 p.m.

In Unit 3 Charlie an officer enters the unit at approximately 9:41 p.m. and other officers enter and quickly exit the unit about 9:54 p.m.

In Unit 3 Alpha there was an officer in the unit who winds up locking himself in a cell at about 9:55 p.m., presumably for his own safety.

In Unit 3 Bravo there was one officer in the unit. At 9:38 p.m., other officers escort a nurse and a medical cart into the unit. They exit at about 9:45 p.m. Officers return to the unit at 9:53 p.m., presumably to try and establish control in the unit, but by this time the inmates have separated into two groups and about 9:54 p.m. one of those groups chase the staff from the units and then take command of the vestibule, a critical moment in the evolution of the riot.

I am informed that Walnut Grove has a rule that inmates cannot go into any cell to which they are not assigned. It is clear from the videos prior to the riot (as well as other videos I have seen of the facility) that this rule is not enforced. The behavior of staff regarding this issue as

6

well as the undetected fight and the unaddressed brandishing of the broom handle make it clear that whether there was an officer in the unit or not, staff do not control the units, inmates are in control.

The absence of officers in close custody living units when the inmates are out of their cells is deeply disturbing and completely irresponsible on the part of MDOC and MTC. This group, Close Custody, is the most dangerous classification of prisoners, outside of those in segregation, housed at the prison. To put a single staff person in the pod intermittently, and to allow inmates to be out of their cells without any officers in the pod at all, simply turns the operation of those units over to the inmates.

As I said in my March 14, 2014 memo, "This lack of security officer presence in the pods is not acceptable. Further, one security officer in the close custody pods is not enough: There should be two." I reiterated this concern in my memo to the monitors and the MDOC attorney in May.[2]

The lack of staff supervision is greatly compounded by the fact that the locking mechanisms on the cell doors at Walnut Grove are readily defeated and control of the cell doors is a continuing problem. Officers at the facility do not always know if an individual cell door is secure. The problem is apparently one of design, and knowledge of this very dangerous situation exists at the highest levels of MDOC. In the May 19 meeting in Jackson, the Deputy

---

[2] Not having staff present when inmates are out of their cells in medium and minimum custody units is also a concern. On July 17, 2014, only a few weeks before the July 10 riot, a female security officer (Officer Boone) was first verbally abused and then physically assaulted when she was the sole officer in a unit housing medium and minimum custody prisoners. Having viewed the video and read the incident report regarding the assault on Officer Boone, I can only conclude that it is not surprising if officers at Walnut Grove fear for their own safety when so few staff are provided to support efforts by the officers to actually run the living units in the prison.

7

Commissioner acknowledged this is a problem in a number of their prisons and said they were working on it.

"Working on it" is not good enough. It is astonishing to me that this enormous gap in basic security is not being treated as an emergency. It is a basic and fundamental necessity for prisoners, staff and the community to know that a prison can actually keep prisoners locked in their cells. Not having confidence that cells doors are secure can be terrifying to both staff and inmates and creates a severe risk of significant injury for the prisoners. This is a problem that demands an immediate solution.

I do not know how or if this problem figures into what happened during the riot of July 10. But based on my experience, I am confident that it contributes to officers not feeling safe when assigned alone to work in the living units at Walnut Grove, a feeling that likely contributes to their finding ways to stay out of the units.

As I said above, at 9:54 p.m., one of the group of inmates in Unit 3 Bravo chase staff out of the pod and take control of the vestibule connecting all of the pods, a critical moment in the evolution of the riot. This signals the moment when the serious riot begins. You can then see most inmates separate into 2 groups in each of the pods, presumably based on gang affiliation. Inmates quickly begin to arm themselves with broomsticks, milk crates and whatever they can get their hands on. The fighting and the assaults begin almost immediately. The level of violence is extreme.

### In Unit 3 Charlie:

- 9:59:35, an inmate is dragged into the rear-view camera and he is kicked and struck by another inmate wielding a broomstick. Blood is visible on the assaulted inmate and he is struck approximately 11 times.

- 10:00:03, another inmate picks up a thick stick-like object and strikes the man on the ground in the head twice.

- 10:00:14, another inmate with what looks to be a tray hits the battered inmate in the head.

- 10:00:27, the inmate being attacked gets up and runs.
- 10:02:40, an inmate is seen being dragged across the floor on the bottom tier of the zone. He leaves a trail of blood as he is dragged by his legs towards the rear of the zone.

- The inmate is taken to the rear of the zone and appears to be hit repeatedly with a plastic crate. This assault goes on until about 10:03:20. He appears to be left on the floor

- 10:23:45, what appears to be an inmate who was beaten previously is dragged across the floor of the rear of the lower tier. He is left behind the stairs at 10:24:10.

- 10:30:50, an inmate is dragged out of a cell on the lower tier. He is on his back and does not appear to be moving

- 10:31:05, 3 inmates with what look like plastic crates start hitting the inmate on the floor.

- 10:31:15, another inmate joins in the assault with what looks like a broomstick. The inmate is struck approximately 14 times with the broomstick, mostly to his upper body.

- 10:31:29, another inmate with 2 plastic crates continues the attack on man on the floor, striking him approximately 11 times.

- 10:31:43, an inmate gets onto a table, under which the battered man lies, and jumps off, stomping onto the injured man.

- 10:31:52, 2 inmates with crates continue to hit the main in the head and face.

- 10:31:56, the battered man stands and runs into a cell, and is followed by 5 or 6 other inmates. What transpires is not visible on camera.

- 10:33:26, another inmate is forced out of his cell and is beaten by approximately 10 other inmates. They are using what appear to be trays and other unidentifiable objects.

- 10:33:53, the microwave is lifted from its place on a small table and an inmate raises it into the air, and drops it onto the man on the ground.

9

- The inmate is stomped on, hit, kicked, and hit with broomsticks and the microwave until 10:36:08.

- 10:36:10, one inmate appears to be instructing the others to get back as he stands on a table with is back to the camera. He is in this position, his actions not visible, for approximately 30 seconds. It appears that he may have urinated on the man. At 10:36:40, the battered man is left on the ground.

- 10:40:18, the man still lying bloodied on the floor is assaulted again by an inmate with a food tray who strikes him an additional 10 times. The battered man is soon after dragged a few feet by another inmate and left there.

- 10:41:36, an inmate walking by the injured inmate on the floor throws a tray at him.

- 10:43:21, the initial battered inmate is dragged out of his cell by his legs by two inmates. There had been three in his cell. The inmate's head is clearly bloodied, and his pants are down around his ankles. He still has his boxers on.

- 10:43:31, the second battered man is dragged out of the camera's view.

- 11:01:10, an inmate walks over to the injured inmate still on the ground and appears to strike him.

**In Unit 3 Delta:**

- At 10:03, inmates can be seen with a broomstick, what appears to be a cooler, and a bucket that they are wielding like weapons.

- 10:03:58, an inmate can be seen entering a cell swinging a broomstick, the inhabitant runs out the cell and is chased around the zone as things are thrown at him.

- 10:04:30, the inmate is seen bloodied, stumbling around.

- At 10:58:57.228 you see an inmate come downstairs with his shirt covered in blood. Approximately 7-8 other inmates pursue him with weapons such as long sticks, and milk crates. The man being chased runs in the direction of the showers but gets cornered.

- At 10:59 the man being pursued grabs one of the milk crates and tries to use it as a shield. You can also see a large group of inmates just outside of the pod door looking in as the assault is happening. He continues to try and break away and fend off the attacks but he is unsuccessful.

Pl.Ex.8 - 000031

- At 11:00 you can see a separate assault taking place in the showers on the bottom tier. You can see a milk crate being used as a weapon but there is no clear view of the victim.

- At 11:01 the man who was being chased around the zone is left lying on the floor directly in front of the pod door. You see inmates leave the shower. The inmate by the cell door is beaten some more.

- At 11:06 the inmate who was left lying in front of the pod door is still lying motionless. The inmate who was standing on the dayroom table then takes a white cloth and lays it across the man lying motionless on the floor. A couple more inmates appear and the assault begins again.

The same level of violence cannot be seen in 3 Alpha, the privilege pod that presumably houses the inmates with more self-control.[3]   However, the inmates do split into 2 groups and skirmish by throwing things and controlling turf in the pod. Primarily one group occupies the upper tier and one the lower tier. Efforts to fight up the stairs are unsuccessful.

In Unit 3 Bravo, the inmates split into 2 groups and begin fighting. One group chases the officers off of the unit and then occupies the vestibule, and is locked into that area.

In all of the pods you can see a lull in the violence that corresponds to staff administering gas into the pods from the elevated booth. Gas is administered from approximately 10:12 p.m. until 10:26 p.m. in Unit 3 Charlie, Delta and Bravo. Little violence can be seen during this time period, but it then resumes and serious assaults continue.

Viewing the video of the elevated booth explains the reason for the gas stopping. You can see officers arrive in the booth, joining the officer assigned to that post, at about 10:11 p.m. They begin to administer gas into the pods but within a minute it looks as if the officers are having trouble with the weapon used to administer the gas. The officer assigned to operate the booth does not have a gas mask and begins to show signs of exposure to the gas. At 10:16 p.m. she is out of the camera's view but returns briefly at 10:19 p.m., apparently unable to withstand

---

[3] The close custody "privilege zone" is a recent change as a result of prompting by the monitors.

the impact of the chemical spray. After the officers first administer gas from about 10:12 p.m. to 10:14 p.m., they appear to struggle with the equipment for about 10 minutes and then administer additional gas at about 10:22 p.m. At 10:27 p.m., however, the security officers somehow explode gas inside the booth itself. The booth is effectively abandoned for about a half an hour, while the assaults in the unit resume and continue, eliminating a critical vantage point to view and coordinate response to the pods that are rioting.

**In Unit 4 Bravo:**

- When the footage begins at 10:30 p.m., a majority if not all of the inmates on Unit 4B are out in the dayroom. The large group divides into two different groups.

- At 10:31 p.m. the fighting begins with each group throwing objects at the other group. Shortly after the fighting begins, chemical agents are dispersed from the control tower onto the pod.

- At 10:32 p.m. the pod is almost completely fogged up with a chemical agent but the fighting continues.

- By 10:33 p.m. you see inmates in the front view of the camera using mats as shields as they advance towards the group in the rear view of the camera. More chemical agents are dispersed.

- At 10:34 p.m. the inmates run upstairs and briefly it appears that some fighting continues on the top tier from the front view of the camera. Most of the inmates go inside of a cell.

- By 10:35 p.m. the pod is clear except for the fog.

- From 10:35 p.m. until 10:38 p.m. there is no visible inmate movement.

- By 10:39 p.m. five officers walk onto the zone and start going door by door and pulling on doors, presumably to make sure they are secure.

The contrast in the effective use of gas in Unit 4 Bravo and what happened in Unit 3 could not be more graphic. The failure of staff to properly respond to the extreme level of violence taking place in Unit 3 could have and should have been effectively stopped much

earlier had staff had the proper equipment and training to deploy gas as it was deployed from the elevated booth in Unit 4. Since I have not yet been provided any documents regarding the internal investigation of this event, I await information that might explain the failure in the elevated booth in Unit 3.

It is unclear to me as of this writing how the staff regained control of the facility.[4] Staff can be seen on the videos entering Unit 3 Charlie at about 11:10 p.m., Unit 3 Delta at 11:08 p.m., and Unit 3 Bravo at 11:13 p.m. Officers remain in the unit long enough to identify and remove those obviously injured and do a manual check to make certain each cell door is secure. Unit 4 Bravo was entered earlier, at about 10:39 p.m.

As Mr. Martin pointed out to me, it is likely that Walnut Grove had the advantage of this riot kicking off roughly at the time they were changing shifts so that they probably had twice as many staff available to respond than they would have had if it had occurred earlier or later—a fortuitous break that may well have kept even more inmates from being assaulted.

## RECOMMENDATIONS

From the historical record I can see and understand the progress that has been made at Walnut Grove under the supervision and urging of the monitors. Among many changes and improvements, the unnecessary use of force by the staff has been greatly reduced if not eliminated and much better classification procedures are in place as a result of the monitors' work.

---

[4] We requested copies of hand held videos presumably taken when emergency responders entered the pods to do a more formal search and to make sure inmates were in the correct cells. What we received just prior to submission of this report were four short hand held videos of blood splatter and damage to the pods. Of note is that some of the rioting may have taken place in the outdoor recreation area adjacent to Unit 3 Charlie. I could not see this from the surveillance videos previously provided. This possibility raises the issue of how many inmates would have been able to breach security of the door between the day room and the recreation area.

13

Still, I have deep concerns about the operation of the prison, the escalating level of violence, and the ongoing extreme danger to the inmates housed there—as well as the staff who work there.     The monitors and I have already repeatedly made a number of strong recommendations to MDOC in the wake of earlier outbursts of violence, but these recommendations, it appears, have largely been ignored.  In my view, the most recent outburst on July 10 reinforces the urgent necessity for these remedial measures.  It has been shown twice in the past seven months that MTC is incapable of controlling the living units that house close custody inmates. The result, especially in the most recent event, was extreme violence and serious injury to several prisoners. Loss of life could have easily occurred as a result of the July 10 riot -- or for that matter, even during the disturbance last New Year's Eve.

Accordingly, my recommendations are as follows:

1. Close custody inmates should not be housed at Walnut Grove

2. Unless and until close custody inmates are removed from Walnut Grove, there should be a mandatory staffing requirement, 24 hours per day, 7 days per week, of two security officers in each close custody pod at all times, absent an occasional break for one officer to use the rest room. Until the cell doors are fixed and are proven to be secure, the pods should never be without a staff member on the floor.

3. If close custody inmates are allowed to remain at Walnut Grove, sufficient supervisory staff should be deployed on each shift until the rules of the pod, such as the prohibition from entering a cell to which a prisoner is not assigned, is routinely followed.

4. The locking mechanism on the cell doors must be replaced with a system that cannot be so readily defeated.

14

5. MDOC must require that MTC have an effective ERP in place, that officers have been trained to follow the plan and that their performance is tested in real time drills. Even if the close custody inmates are removed from Walnut Grove, this is a critical requirement. Riots resulting in loss of life can occur even in a minimum-security environment. The ERP must include measures to ensure that officers have adequate safety equipment to respond to an emergency. For example, the videos I have reviewed show officers deploying gas in planned use-of-force situations without appropriate respirators.

6. Officers should be required to be actually present in the housing units at all custody levels whenever the inmates are out of their cells.

7. An independent security hardware expert should be retained to inspect the facility and identify risks, including the existence of items that could easily be turned into weapons. Previously MTC identified some of these items and they report they have been in the process of remedying the problems. This work should continue but the identification and extent of the problem needs an outside expert. At one point during the riot, you can see on the video an inmate throw an object at an overhead light and it immediately shatters: clearly, it is not of detention quality. During my inspection of the prison in January inmates told me that the fences in the yard next to the units are made of material that can easily be broken off and turned into shanks. The weapons collected by the prison as a result of the riot or at any time during the past year should be made available to the outside expert so that he or she can attempt to identify the source within the prison and offer solutions.

8. During the riots inmates used broom handles, microwaves and milk crates to assault other prisoners. Cleaning equipment should be secured when not in use and microwaves should be bolted down. Items such as milk crates should be removed from the units when not in use.

9. During my phone conversation with Mr. Martin he indicated that the level of staff before the riot was well below what it should have been, and lower than anytime during his monitoring of the facility. If MTC cannot attract and retain quality staff and fill their mandatory posts, then MDOC must recognize that this vendor is not qualified to house the inmates.

10. Allegations of staff corruption are associated with the most recent riot. Similar allegations of serious staff misconduct have plagued the prison for at least the past couple of years. This issue was discussed briefly with the parties at the May 19, 2014 meeting in Jackson and was acknowledged as a problem. MDOC and MTC should remain focused on finding solutions to this recurring issue.

11. MTC officers must learn how to control the living units and the prisoners housed at their facility. I am aware that MTC has a Direct Supervision training curriculum. It should be dusted off and their officers should be retrained. "Direct Supervision" is basically an approach to supervising inmates that puts the officer in the middle of the living unit and expects that they control what happens in the unit by demonstrating and expecting pro-social behavior on the part of the prisoners. Put even more simply, the living unit is the officer's house, not the inmates' house, and behavior norms are to be established and followed. As long as the officers are only occasional visitors to

16

the unit, the inmates and the powerful influence of the gangs will drive the behavior norms.

12. Nearly every prison system in the country has a problem managing prison gangs and MDOC is no exception. However, it is not good enough to acknowledge the problem; you must affirmatively act to curb gang influence. In my own experience some inmates can be dissuaded from gang participation by the opportunity to participate in good programs. Other jurisdictions have had success offering specific activities that inmates enjoy as long as those activities involve all segments of the population, regardless of gang, race or ethnic affiliation. Currently the State of Washington is experimenting with the first application of a successful community based program called Operation Ceasefire. Whether or not any of these specific recommendations are followed by MDOC and MTC they should be required to affirmatively work to reduce the influence of gangs within their prisons.

13. Last, the recommendations I offer primarily concern the task of establishing greater control by the staff over the operation of the prison. Good security and control are fundamental to any prison. But the best prison security comes from establishing that control and providing sufficient program opportunities for inmates to be productively occupied the better part of each day. Without those opportunities, the vacuum will be filled by misbehavior and the rewards and status that come from gang membership. Establishing an array of good programs is not a panacea to the influence of the gangs, but such programs certainly do dilute and siphon away some of the influence of the gangs, by offering the inmate an opportunity for a program they experience as meaningful. I recommend that MDOC and MTC be required to

provide sufficient programs opportunities for most inmates to be productively occupied 5 days a week.

## CONCLUSION

These issues and recommendations are not new to MDOC or to MTC. I made reference to most of them in my earlier memos although they are further articulated here. Within the constraints of the current Consent Decree, the monitors have repeatedly put MDOC and MTC on notice regarding staffing instability and management issues, including inadequate supervision of an inexperienced staff described as "sorely deficit", ongoing contraband control issues and, most importantly, MDOC/MTC's seeming inability to "properly and safely manage" a close custody population. It is my opinion that unless these issues are promptly addressed, there will be a continuing and escalating risk of serious harm to the inmates incarcerated at Walnut Grove.

Respectfully submitted, this the 4th day of August, 2014.

s/Eldon Vail_____
Eldon Vail

EXHIBIT 1
Memo from Eldon Vail to Steve, Jim and Harold
re May 19, 2014 meeting with MTC

To: Steve, Jim and Harold,

I write to follow up on my comments at our meeting with MTC on May 19, 2014.

Again, I will say that Mr. Martin introducing the need for continuity at Walnut Grove was precisely the right issue to frame our discussion. The need for stability in the staff at Walnut Grove and for a Warden that stays at the facility at least 3 years are critical to the continued growth of Walnut Grove as an institution.

As I said in my report earlier this year, I am not confident that the facility has the necessary skill, experience or custody expertise to manage a close custody population. Understanding that this continues to be their charge, the issue of continuity in the daily management of those units is crucial to their potential for success. The units need to be owned by the staff and not the inmates and I do not believe that is the case today. Acceptable norms of behavior need to be established and demonstrated on a daily basis by the staff that run those units and that takes on-going team building and communication among all the staff involved. To that end I offer some specific suggestions in the hope they may be useful in improving the situation in the close custody units at Walnut Grove.

1. One staff in the pods on the day and swing shifts is not enough. You can't be a team by yourself.
2. There must always be a staff member in the pods when the inmates are out of their cells. Given the challenge of the locking mechanism in their cell doors, it is questionable that the pods should ever be absent a custody staff member.
3. Administrators and supervisors should spend a portion of every working day on the floor in the close custody units. These are the most skilled staff at Walnut Grove and need to demonstrate their skills and comfort levels with inmates for the less experienced line officers.
4. The case managers need to be spending much more time in the pods. I recommend that their offices be relocated so that they are closer to the pods or are actually in them.
5. Not understanding the existing duties of rovers and utility officers, is it possible that some of their duties be structured to spend time in the close units? (Buildings 3 & 4 have rovers but building 5 does not? That's a puzzle for me.)
6. The approach that the new close custody Sgt. and Lt. take is critical. In conjunction with facility administration they should develop a plan for how they want to see those units operate. While there is a need for ongoing communication between these 2 individuals and the unit supervisor, their schedules should be structured to allow for as much supervisory coverage as possible throughout the workweek. It would be a serious mistake if all 3 of these folks wound up working a Monday-Friday day shift.
7. Officers in the individual pods should be assigned 5 days a week with consistent officers used for relief.
8. Incentive pay to work in the close units is a great idea. That seems within the authority of a private company like MTC and worthy of their investment.

9.   I have serious concerns with MTC's plan to assign high performing cadets to the close units. If they were the second officer of a two-person team it would make sense but to assign them to work alone in the unit would be a mistake.

10.   The reference to a Field Training Officer program by MTC is good but is absent sufficient detail to evaluate. All experienced officers will not make good FTO coaches. Coaches need to be trained to perform as such and need a developed FTO program they can use in order to know and teach the skills the institution wants to have new employees learn and demonstrate.

11.   There needs to be a structured expectation that communication between shifts about the specifics of inmate behavior occurs on an on-going basis. This could be accomplished by a slight overlap between shifts or by a different approach to logging information. Without such communication the chance of sending mixed messages to the inmate population increases exponentially and consistency is critical to managing these units.

Ideally, MTC would identify who is going to work in the close custody units and develop them as a team. MTC has a Direct Supervision curriculum. It is not great but many of the principles in it are applicable to the successful management of any living unit. Refreshing the close custody team with this curriculum would be a great place to start.

On a different subject, during our meeting I did not get a chance to say much about the level of inmate programming at Walnut Grove. From the information I have been provided it looks to me that programming opportunities for inmates are pretty slim and the result is too much idleness. I know that great strides can be made in institution security and safety from expanding programming and would encourage all parties to pay more attention to this issue. I do not believe there are enough program slots for the number of inmates in the prison. I also am concerned about the process used to make program assignments, including work assignments, and believe it should be examined.

Last, Dr. Austin said at the meeting that the disturbance, which occurred this past New Year's Eve, cannot happen again. He was absolutely correct. While bad events will always happen in the prison environment, what cannot happen is for Walnut Grove to lose control of one close custody pod after another, in rapid succession, and then be so completely ill equipped to manage the incident at they were this last time. Conditions of confinement in the close units need to improve and the programs available need to be expanded. But of equal importance is that MTC must greatly improve their capacity for emergency response so that future incidents do not get as out of control as we saw happen last New Years.

Good luck with providing guidance to the facility. They have come a long way but still have some distance to travel.

Eldon

EXHIBIT 2
Eldon Vail's CV

ELDON VAIL
1516 8th Ave SE
Olympia, WA. 98501
360-349-3033
Nodleliav@comcast.net

## WORK HISTORY

Nearly 35 years working in and administering adult and juvenile institutions, and probation and parole programs, starting at the entry level and rising to Department Secretary. Served as Superintendent of 3 adult institutions, maximum to minimum security, male and female. Served as Secretary for the Washington State Department of Corrections (WADOC) from 2007 until 2011.

| | | |
|---|---|---|
| Secretary | WADOC | 2007-2011 |
| Deputy Secretary | WADOC | 1999-2006 |
| Assistant Deputy Secretary | WADOC | 1997-1999 |
| Assistant Director for Prisons | WADOC | 1994-1997 |
| Superintendent | McNeil Island Corrections Center | 1992-1994 |
| Superintendent | WA. Corrections Center for Women | 1989-1992 |
| Correctional Program Manager | WA. Corrections Center | 1988 |
| Superintendent | Cedar Creek Corrections Center | 1987 |
| Correctional Program Manager | Cedar Creek Corrections Center | 1984-1987 |
| Juvenile Parole Officer | Division of Juvenile Rehabilitation | 1984 |
| Correctional Unit Supervisor | Cedar Creek Corrections Center | 1979-1983 |
| Juvenile Institution Counselor | Division of Juvenile Rehabilitation | 1974-1979 |

## SKILLS AND ABILITIES

- Ability to analyze complex situations, synthesize the information and find practical solutions that are acceptable to all parties.

- A history of work experience that demonstrates how a balance of strong security and robust inmate programs best improves institution and community safety.

- Leadership of a prison system with very little class action litigation based on practical knowledge that constitutional conditions are best achieved through negotiation with all parties and not through litigation.

- Extensive experience as a witness, both in deposition and at trial.

- Experience working with multiple Governors, legislators of both parties, criminal justice partners and constituent groups in the legislative and policymaking process.

- Skilled labor negotiator for over a decade. Served as chief negotiator with the Teamsters and the Washington Public Employees Association for Collective Bargaining Agreements. Chaired Labor Management meetings with Washington Federation of State Employees.

- Excellent public speaking and writing abilities.

## *HIGHLIGHTS OF CAREER ACCOMPLISHMENTS*

- Reduced violence in adult prisons in Washington by over 30% during my tenure as Secretary and Deputy Secretary even though the prison population became much more violent and high risk during this same time period.

- Achieved dramatic reduction in escapes, including from minimum-security facilities.

- Increased partnerships with non-profits, law enforcement and community members in support of agency goals and improved community safety.

- Implemented and administered an extensive array of evidence based and promising programs:

    o Education, drug and alcohol, sex offender and cognitive treatment programs.
    o Implemented risk based sentencing via legislation and policy, reducing the prison populations of non-violent, low risk offenders, including the Drug Offender Sentencing Alternative and the Family and Offender Sentencing Alternative. http://www.doc.wa.gov/community/fosa/default.asp
    o Pioneered extensive family based programs resulting in reductions in use of force incidents and infractions and improved reentry outcomes for program participants.
    o Established Intensive Treatment Program for mentally ill inmates with behavioral problems.
    o Established step down programs for long-term segregation inmates resulting in significant reduction in program graduate returns to segregation. http://www.thenewstribune.com/2012/07/10/2210762/isolating-prisoners-less-common.html

- Initiated the Sustainable Prison Project; http://blogs.evergreen.edu/sustainableprisons/

- Administered the only state agency that bent the curve on health care costs while improving treatment outcomes.

- Focused the department on becoming a better asset to the community by expanding inmate and community supervision work programs.

- Improved efficiency in the agency by administrative consolidation, closing 3 high cost institutions and eliminating over 1,200 positions. Housed inmates at lowest possible custody levels, also resulting in reduced operating costs

- Successful settlement of the Jane Doe class action law suit, a PREA case regarding female offenders in the state's women's' prisons.

- Avoided class action lawsuit regarding religious rights of Native Americans. http://seattletimes.nwsource.com/html/opinion/2015464624_guest30galanda.html

- Led the nation's corrections directors to support fundamental change in the Interstate Compact as a result of the shooting of 4 police officers in Lakewood, WA.

- Dramatically improved media relations by being aggressively open with journalists, challenging them to learn the difficult work performed by corrections professionals on a daily basis.

- Long term collaboration with the University of Washington focusing on the mentally ill in prison and management of prisoners in and through solitary confinement.

## EDUCATION AND OTHER BACKGROUND INFORMATION

- Post graduate work in Public Administration - The Evergreen State College, Washington - 1980 and 1981

- Bachelor of Arts - The Evergreen State College, Washington – 1973

- National Institute of Corrections and Washington State Criminal Justice Training Commission - various corrections and leadership training courses

- Member of the American Correctional Association

- Associate member, Association of State Correctional Administrators

- Guest Speaker, Trainer and Author for the National Institute of Corrections

- Commissioner, Washington State Criminal Justice Training Commission 2002-2006, 2008-2011

- Member, Sentencing Guidelines Commission 2007-2011

- Instructor for Correctional Leadership Development for the National Institute of Corrections (NIC)

- Advisory Panel Member, *Correctional Technology—A User's Guide*

- Author of *Going Beyond Administrative Efficiency—The Budget Crisis in the State of Washington*, published in Topics of Community Corrections by NIC, 2003

- Consultant for *Correctional Leadership Competencies for the 21st Century*, an NIC publication

- Consultant for Correctional Health Care Executive Curriculum Development, an NIC training program

- Co-chair with King County Prosecutor Dan Satterberg, *Examining the Tool Box: A Review of Supervision of Dangerous Mentally Ill Offenders* http://www.dbhds.virginia.gov/documents/Adm/080101-KingCountyReport.pdf

- Guest lecturer on solitary confinement at University of Montana Law School in 2012

## CURRENT ACTIVITIES

- On retainer with Pioneer Human Services http://www.pioneerhumanservices.org/

- Serve on the Board of Advisors for Huy, a non-profit for supporting Native American Prisoners

- Retained as an expert witness in the following cases:

  - *Mitchell v. Cate,*
    No. 08-CV-1196 JAM EFB
    United States District Court, Eastern District of California,
    Declarations, March 4, 2013, May 15, 2013 and June 7, 2013
    Deposed on July 9, 2013
  - *Parsons, et al v. Ryan,*
    No. CV 12-06010 PHX-NVW
    United States District Court of Arizona
    Declarations, November 8, 2013, January 31, 2014 and
    February 24, 2014
    Deposed February 28, 2014
  - *Gifford v. State of Oregon,*
    No. 6:11-CV-06417-TC
    United States District Court, For the District of Oregon,
    Eugene Division,
    Expert report March 29, 2013
    Case settled, May 2013
  - *Ananachescu v. County of Clark,*
    No. 3:13-cv-05222-BHS
    United States District Court, Western District of Tacoma
    Case settled, February 2014
  - *Coleman et al v. Brown, et al,*
    No. 2:90-cv-0520 LKK JMP P
    United State District Court, Eastern District of California,
    Declarations, March 14, 2013, May 29, 2013, August 23, 2013
    and February 11, 2014
    Deposed on March 19, 2013 and June 27, 2013
    Testified at trial on October 1, 2, 17 and 18, 2013
  - *Peoples v. Fischer,*
    No. 1:11-cv-02694-SAS
    United States District Court, Southern District of New York
    Interim settlement agreement reached February 19, 2014
  - *Dockery v. Epps,*
    No. 3:13-cv-326 TSL JMR
    United States District Court for the Southern District of Mississippi,
    Jackson Division
  - *C.B., et al v. Walnut Grove Correctional Authority et al,*
    No. 3:10-cv-663 DPS-FKB,
    United States District Court for the Southern District of Mississippi,
    Jackson Division

- o *Graves v. Arpaio,*
  No. CV-77-00479-PHX-NVW,
  United States District Court of Arizona
  Declaration, November 15, 2013
- o *Wright v. Annucci, et al,*
  No. 13-CV-0564 (MAD)(ATB)
  United States District Court, Northern District of New York
- o *Corbett v. Branker,*
  No. 5:13 CT-3201-BO
  United States District Court, Eastern District of North Carolina,
  Western District
  Special Master appointment November 18, 2013
  Expert Report to the court January 14, 2014
- o *Fontano v. Godinez,*
  No. 3:12-cv-3042
  United States District Court, Central District of Illinois,
  Springfield Division
- o Atencio v. Arpaio
  No. CV12-02376-PHX-PGR
  United States District Court of Arizona
  Report to the court February 14, 2014

**SAMPLE REFERENCES:** contact information available upon request:

Chris Gregoire, former Governor, State of Washington
Tom McBride, Executive Secretary, Washington Association of Prosecuting Attorneys
Chase Riveland, Riveland Associates
Rowland Thompson, Executive Director, Allied Daily Newspapers