# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### NORTHERN DIVISION

**CHARLTON DEPRIEST, ET AL.**                                        **PLAINTIFFS**

**v.**                                   **Civil Action No. 3:10-cv-663(CWR)(FKB)**

**WALNUT GROVE CORRECTIONAL**
**AUTHORITY, ET AL.**                                        **DEFENDANTS**

_____

### DEFENDANT'S POST-HEARING MEMORANDUM IN SUPPORT OF MOTION TO TERMINATE PROSPECTIVE RELIEF AND IN OPPOSITION TO PLAINTIFFS' MOTION TO MODIFY/ENFORCE THE CONSENT DECREE

_____

# TABLE OF CONTENTS

I.      INTRODUCTION .................................................................. 4

II.     HISTORY LEADING TO THIS TERMINATION MOTION ........................... 9

    A.      Walnut Grove Correctional Facility. ......................................... 9

    B.      Procedural History Leading to Defendant's Termination Motion. ...................... 10

III.    CONTROLLING LEGAL STANDARDS UNDER THE PLRA .................... 11

    A.      Background of the PLRA. .................................................. 11

    B.      Pertinent Provisions of the PLRA: Consent Decrees, Entry of Relief, and Termination of Relief. .................................................. 12

        i.      Consent Decrees in Prison Condition Cases: 18 U.S.C. § 3626(c). .......... 13

        ii.     The PLRA's Dictates on the Entry of Prospective Relief: 18 U.S.C. § 3626(a). .......................................... 13

        iii.    Termination Pursuant to the PLRA: 18 U.S.C. § 3626(b)(1) .................... 15

        iv.     Limitation on Termination:  18 U.S.C. § 3626(b)(3). .............................. 16

        v.      Differing Language and Standards Between § 3626(a)(1) and § 3626(b)(3). .......................................... 17

IV.     BURDEN OF PROOF TO SHOW A CURRENT AND ONGOING EIGHTH AMENDMENT VIOLATION ................................................. 18

V.      THE PLRA'S STANDARD FOR A CURRENT AND ONGOING EIGHTH AMENDMENT VIOLATION ................................................. 19

VI.     THE EIGHTH AMENDMENT ANALYSIS ................................. 25

    A.      Eighth Amendment Framework. .............................................. 25

    B.      Deference to Prison Officials. .............................................. 29

VII.    PERTINENT CASE LAW ON WHAT CONSTITUTES A SYSTEMIC EIGHTH AMENDMENT VIOLATION DUE TO PRISON CONDITIONS ................................. 31

    A.      Cases Finding An Eighth Amendment Violation. ................................. 31

    B.      Cases Not Finding An Eighth Amendment Violation. ......................... 40

VIII.   THERE IS NO CURRENT AND ONGOING SUBSTANTIAL RISK OF SERIOUS HARM UNDER THE EIGHTH AMENDMENT AT WALNUT GROVE ................................................. 49

            Safety and Security at Walnut Grove ......................................... 50

                Alleged Violence. ................................................. 51

                Contraband. ................................................. 69

                Gangs. ................................................. 72

                Staffing and Training. ................................................. 77

                Emergency Response Plan. ................................................. 84

                Cell Doors. ................................................. 85

Programming/Idleness.................................................................. 88
Classification System. ................................................................ 89
Prison Riot.................................................................................. 90
After-Action Report. .................................................................. 92

IX.     PLAINTIFFS CANNOT DEMONSTRATE DELIBERATE INDIFFERENCE............. 93

X.      THE RELIEF PROVIDED THROUGH THE CONSENT DECREE DOES NOT
        SATISFY THE PLRA'S "NARROWNESS-NEED-INTRUSIVENESS" TEST .......... 102

XI.     PLAINTIFFS' ENFORCEMENT/MODIFICATION MOTION AMOUNTS TO
        ONLY A NON-STARTER ......................................................................... 106

XII.    CONCLUSION ........................................................................................ 110

PD.17099813.1

The Defendant, Marshall Fisher, in his official capacity as the Commissioner of the Mississippi Department of Corrections[1] ("Defendant") submits this Post-Hearing Memorandum in Support of Motion to Terminate Prospective Relief and in Opposition to Plaintiffs' Motion to Modify/Enforce the Consent Decree:

## I.      INTRODUCTION

> "*[U]nder the Constitution, the first question to be answered is not whose plan is best, but in what branch of the Government is lodged the authority to initially devise the plan. This does not mean that constitutional rights are not to be scrupulously observed. It does mean, however, that the inquiry of federal courts into prison management must be limited to the issue of whether a particular system violates any prohibition of the Constitution . . . .*"[2]

This matter dates back to a time when the correctional facility at issue was a youth facility, Walnut Grove Youth Correctional Facility, run by a private contractor, GEO Group, Inc.   Neither of those remains the case today.   The facility as it existed in 2010 when this lawsuit was brought, in fact, no longer exists.   Indeed, since that time, a new contractor, Management and Training Corporation ("MTC"), has taken over daily operation of the facility;[3] there are no inmates younger than 18 years of age; the inmate population has been reduced from approximately 1300 and capped at 962 (with a population of approximately 958 at the evidentiary hearing); close custody inmates altogether have been removed; there are no long-term segregation units; new policies, procedures, and practices have been implemented; gang management and contraband control is proactive; rates of assaults have declined; physical plant security

---

[1] Under Federal Rule of Civil Procedure 25, the Defendant now should be Marshall L. Fisher, in his official capacity as the Commissioner of the Mississippi Department of Corrections.

[2] *Bell v. Wolfish*, 441 U.S. 520, 562 (1979).

[3] Defendant notes that this memorandum does not, and the past evidentiary hearing did not, address issues related to medical care. Defendant filed a motion to terminate in whole and/or in part, and the motion to terminate included medical care. Defendant also separately filed a motion to consolidate all of the issues, which the Court denied the first day of the evidentiary hearing. Through the denial of the consolidation motion, the motion to terminate the consent decree, as well as the relief provided in the decree, was completely severed.

   While it appears that the Defendant immediately should be able to seek appeal, if necessary, of the Court's ruling on the portion of the injunctive relief at issue in the April 2015 evidentiary hearing (and at issue in this memorandum), Defendant requests that this Court also issue an order under Federal Rule of Civil Procedure 54(b), given the motion to terminate and the relief provided in the consent decree was severed.

4

has been updated and enhanced; and the facility has made significant gains in staffing and training. These are only a sample of the indicators that lead to the only conclusion that may be reached under controlling legal standards of the Prison Litigation Reform Act ("PLRA") and the Eighth Amendment: termination of the prospective relief ordered and approved under the 2012 Consent Decree.

Termination is appropriate because the Decree no longer is necessary to correct a "current and ongoing" violation of the Eighth Amendment.  The current and ongoing inquiry is not focused on past events, or future ones. As the Fifth Circuit stated in *Castillo v. Cameron Cnty., Tex.*, 238 F.3d 339, 353 (5th Cir. 2001), under the PLRA, "a court must look at the conditions in the jail at the time termination is sought, not at conditions that existed in the past or at conditions that may possibly occur in the future, to determine if there is a violation of a federal right." *Id.* Under that inquiry, the constitutional minimum, not the constitutional ceiling—or even somewhere in between—is the only requirement. This requirement encompasses proof of a **current** and **ongoing substantial** risk of **serious** harm and **deliberate** (not negligent) indifference.[4] A violation of this Eighth Amendment standard is met only in "**extreme**"[5] cases, and this is not one of those cases.

Like all other prisons, Walnut Grove is not a perfect place. This readily is seen through a tour of the (or any) prison facility, a video of any inmate fight, or even by watching an inmate in chains wearing a prisoner's gown take the stand in open court. "[A]s anyone who has visited a jail or prison well knows, the lamentable sight of humans deprived of liberty and confined together in a facility – the sight of humans whose life has gone wrong for some reason or reasons and whom the community must restrain or, at least, detain – triggers a strong emotional response . . . No one wants any of these [inmates] to be where they are, to have done what they have done [ ], and to continue on the course they are on . . ."[6]  Indeed, the visceral response to any of this is to call for immediate intervention. But, before there can be

---

[4] *Farmer v. Brennan*, 511 U.S. 825 (1994).
[5] *Gates v. Cook*, 376 F.3d 323, 332 (5th Cir. 2004).
[6] *Hughes v. Judd*, No. 8:12-CV-568-T-23MAP, 2015 WL 1737871 (M.D. Fla. Apr. 16, 2015).

PD.17099813.1

intervention by the judiciary, there must be a current and ongoing Eighth Amendment violation per legislative and constitutional dictates.

Congress's enactment of the PLRA nearly twenty years ago reaffirms this well-settled point. *See Miller v. French,* 530 U.S. 327, 328, 120 S. Ct. 2246, 147 L. Ed. 2d 326 (2000) (explaining that "curbing the equitable discretion of district courts was one of the PLRA's principal objectives. . . ."). Keystone principles of separation of powers underpin the PLRA and date back centuries. That is, prohibition on judicial intervention in the absence of a constitutional violation is a long-standing principle accepted in this nation's history.[7]

There are many cases, including this one in 2010 when Walnut Grove was a youth facility, where intervention on constitutional grounds is needed.  But, because it was once required, does not mean it always is required, or even always permitted.  In the absence of a current and ongoing Eighth Amendment violation, like here, federal law dictates that the judicial oversight must end. *Johnson v. Heffron,* 88 F.3d 404, 407 (6th Cir. 1996) (noting that it is a truism that "[j]udicial oversight over state institutions must, at some point, draw to a close."). Uncomfortable—as opposed to unconstitutional—prisons do not summon the cruel and unusual *punishment* clause of the Eighth Amendment and/or call for *systemic* relief from the federal courts.

To find a systemic constitutional violation in this case, the court would have to wrench the Eighth Amendment from its language and history and create an entire new subset of Eighth Amendment cases. This is not an understatement of the evidence presented by Plaintiffs, nor an overstatement of the constitutional standard or binding case law. Plaintiffs cannot prove the standards for a systemic Eighth Amendment violation. Instead, they attempt to create their own theory of proof that regardless of the

---

[7] A constitutional inquiry into how Walnut Grove is managed must be limited to the issue of whether the "particular system violates any prohibition of the Constitution." *Bell v. Wolfish*, 441 U.S. 520, 562 (1979). Because the "problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions," prison officials at Walnut Grove are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.* at 547.

system-wide level of (or lack thereof) violence, and regardless of the level necessary to invoke the Eighth Amendment, if that level can be reduced by their own suggested measures, which they insist are the only reasonable ones despite the utter lack of proof, Walnut Grove's policies and practices are unconstitutional. That is, Plaintiffs attempt to circumvent the proper Eighth Amendment standard by laundering opinions littered with grim adjectives, instead of objective and concrete facts, and by "substituting the governing constitutional standard for an impromptu, improvised standard equivalent to 'best practices' as understood at and for the moment by persons who are, in effect, professional advocates and critics, that is, persons other than the corrections and detention professionals whose professional judgment receives under the governing constitutional law a strong presumption of correctness and whose supervision is subject to judicial intervention under the [Eighth] Amendment only in the extraordinary circumstance."[8]

This is not the first time plaintiffs indiscreetly have tried to chip away at the proper constitutional standards in the context of prison conditions cases. And this is not the first endeavor to refashion the appropriate constitutional inquiry made by some of the same counsel involved in this litigation.  In *Hughes v. Judd*, No. 8:12-CV-568-T-23MAP, 2015 WL 1737871 (M.D. Fla. Apr. 16, 2015), for example, many of the same arguments and strategies used here were advanced there and altogether rejected by the court. As the *Hughes* court aptly reasoned, cases finding an Eighth Amendment violation present "life at a jail that is effectively a lawless, brutal, malignant jungle," and the plaintiffs, in an "uncharacteristic maneuver[,] . . . attempt to reduce a constitutional condemnation of deadly neglect and brutal malfeasance to a mere disagreement about trivial differences in staffing ratios or the provision of a happy selection of recreational activity."  *Id.*

This type of "best practices" argument is tantamount to an answer in search of a question, or a suggested fix in search of a constitutional problem. Best practices focus on the constitutional ceiling (and above) as opposed to the constitutional floor, and the best way run a prison differs between states,

---

[8] *Id.*

PD.17099813.1

facilities, wardens, and prison conditions experts and consultants. This is why the Eighth Amendment is not—and cannot be—a tool for auditing the prison system or a brute force mechanism to quash any departure from a perceived penological norm or desire. "The Eighth Amendment is a mechanism to prevent cruel and unusual punishment, to prevent deliberate indifference to a substantial risk of serious harm, and not a mechanism to enforce the latest fashion in penological theory or the latest aspiration of the consultants."[9]  This does not mean that prison officials, including those at Walnut Grove, do not want to find and adopt the best practices available, but it does mean that the Eighth Amendment is not the proper vehicle for attacking every decision made by those officials.

If the Eighth Amendment requires intervention into the management of the facility at Walnut Grove, then the Eighth Amendment requires a wholesale intervention into detention and incarceration at most—if not all—of the facilities in the United States, an intervention possible only by an unprecedented and precipitous lowering of the constitutional threshold.  Unless that Eighth Amendment threshold is, for the first time in centuries, lowered, there is no constitutional violation at play in this litigation, and the PLRA dictates termination as a result.

"The challenge, it appears, is to remember that terminating judicial oversight is an objective **to be affirmatively strived for**, not simply an event that we welcome if it happens to occur." *Glover v. Johnson*, 138 F.3d 229, 242 (6th Cir. 1998) (citing *Missouri v. Jenkins,* 515 U.S. 70, 88–89, 115 S.Ct. 2038, 2049–50, 132 L.Ed.2d 63 (1995)).  Importantly, though, "[t]ermination . . . does not mean that prison conditions will deteriorate. Rather, it means that prison professionals, rather than a federal judge, will supervise the prison. If it develops that the professionals fail and violate constitutional standards, then fresh injunctive relief may be sought by prisoners."[10]  Accordingly, while the instant relief should terminate, the safeguards built into our Constitution never will.

---

[9] *Id.*
[10] *Lancaster v. Tilton*, No. C 79-01630WHA, 2007 WL 4570185, at *6 (N.D. Cal. Dec. 21, 2007).

PD.17099813.1

## II.        HISTORY LEADING TO THIS TERMINATION MOTION

**A.        Walnut Grove Correctional Facility.**

The Walnut Grove facility is located in Walnut Grove, Mississippi. It originally was opened in 2001 and expanded in 2008 to include two additional housing units.  The area at Walnut Grove where inmates are housed commonly is referred to as a "zone." There are four zones located in each of the six primary housing units.  The zones are identified by the housing unit number followed by a letter prefix, *i.e*., 5A, 5B, 7C, 6D. In total, there are twenty-five separate air-conditioned housing zones. In addition to the housing zones, Walnut Grove contains a number of key support areas, including a secure control center, a kitchen, a medical unit, a laundry area, a gymnasium, indoor and outdoor recreation, a library, program space, academic and vocational educational classrooms, visitation, a warehouse, maintenance, and administrative space.

While the location of the facility has remained the same, the Walnut Grove Correctional Facility, as it stands now, did not exist in 2010 when this litigation began, or in 2012 when the Consent Decree was entered.  At that time, Walnut Grove was Walnut Grove *Youth* Correctional Facility, a detention center for youth ages 13-22 who were tried and convicted in the adult criminal justice system, and a private company, GEO Group, Inc., was contracted to operate the facility.  There are no longer any youth at Walnut Grove, and the GEO Group does not operate the facility.

Walnut Grove currently is operated by MTC, and the facility houses only minimum and medium custody inmates. There are no longer any close custody inmates at Walnut Grove, and the facility also does not house long-term segregation inmates. From the time this Decree was entered, prison officials at Walnut Grove have engaged in a prudent and steady course of improvement. That improvement, coupled with the reasonable actions and responses made and taken by officials over the past year, has resulted in the prospective relief provided by the Decree being no longer necessary to correct a current and ongoing

PD.17099813.1

federal right violation. This culmination of events led Defendant to file a motion to terminate pursuant to the PLRA, and that motion now should be granted.

**B.     Procedural History Leading to Defendant's Termination Motion.**

The litigation involving the youth facility began five years ago, with a federal complaint filed by Plaintiffs on November 16, 2010. *See Complaint, Docket Entry No. [1].* After months of investigation and lengthy negotiations, a Consent Decree was approved and ordered by this Court on March 26, 2012.  *See Consent Decree, Docket Entry No. [75-3].*[11]  The Decree was entered pursuant 18 U.S.C. §§ 3626(c) and (a)(1) of the Prison Litigation Reform Act ("PLRA"). *See Order, Docket Entry No. [75]*; *Consent Decree, Docket Entry No. [75-3], Exhibit P-2.*

Pursuant to the Consent Decree, monitors were appointed by the Court for the purpose of tracking compliance with the terms of the Decree. *See Consent Decree, § IV, ¶, Docket Entry No. [75-3].* The monitors are responsible for submitting reports to counsel every four months.  *See id.*  This procedure outlined by the Decree has been followed, and the monitors now have submitted a total of six separate reports. *See Monitors' Sixth Report, Docket Entry No. [121], Exhibit D-5.*

On August 6, 2014, Plaintiffs filed a motion to enforce and modify the Consent Decree, and they filed their memorandum in support of their amended motion on January 13, 2015.  *See Motion, Docket Entry No. [106]; Amended Memorandum, Docket Entry No. [115].* After Plaintiffs filed their amended motion, the monitors submitted their Sixth Report to counsel, and it was filed with the Court on March 6, 2015. *See Monitors' Sixth Report, Docket Entry No. [121], Exhibit P-15.* Because there are no current and ongoing violations of any federal right, and in light of Plaintiffs' insistent pursuit of the motion to modify, Defendant filed a motion to terminate the prospective relief approved and ordered by the Court in the Consent Decree on March 13, 2015.  *See Motion to Terminate, Docket Entry No. [129].* Much briefing

---

[11] *See* Consent Decree, Docket Entry No. [75-3]. Defendant has moved to terminate only the Consent Decree directed at Walnut Grove, and not the separate Consent Decree governing the YOU facility (Docket Entry No. [75-1]).

already has been submitted to the Court on Defendant's termination motion, and Defendant expressly incorporates by reference those previously-filed memoranda. *See Docket Entry Nos. 129, 130, 131, 136, and 138.*

There now are two motions involving the Consent Decree before the Court, one filed by Plaintiffs and one by Defendant. Plaintiffs seek to reopen the Consent Decree through modification and enforcement, while Defendant has sought to terminate the prospective relief.  An evidentiary hearing was held on the motions on April 1, 2015 through April 3, 2015 and from April 23, 2015 through April 27, 2015.

The mandates imposed by the PLRA govern both Plaintiffs' modification motion (§ 3626(a)), and Defendant's termination motion (§ 3626(b)).  The Court, however, need not reach the merits of Plaintiffs' motion because the prospective relief provided by the Decree should be terminated at this time pursuant to 18 U.S.C. §§ 3626(b)(1)(A)(i) and (b)(3) of the PLRA.

### III.      CONTROLLING LEGAL STANDARDS UNDER THE PLRA[12]

### A.      Background of the PLRA.

Congress enacted the PLRA in 1996 to offset the steep increase in prison litigation lawsuits filed in the federal court system. *Woodford v. Ngo,* 548 U.S. 81, 114, 126 S. Ct. 2378, 165 L. Ed. 2d 368 (2006) ("The PLRA contains a variety of provisions to bring this [prison condition] litigation under control."). As noted by the court in *United States v. Territory of the Virgin Islands*, 884 F. Supp. 2d 399

---

[12] The PLRA governs both the modification and termination motions pending before the Court. Plaintiffs originally followed their usual path of hurling legally-unsupported allegations at Defendant regarding the motion to terminate, including allegations that it amounted to a repudiation of a contract. The consent decree is not a private settlement agreement under the PLRA. *See* 18 U.S.C § 3626(c). Further, the Consent Decree, on its face, incorporates the PLRA and its requirements in several different provisions. *See Consent Decree, Docket Entry No. [75-3].* This Court's Order also expressly incorporates the PLRA. *See Order, Docket Entry No. [75].*

      After levying such baseless criticism, Plaintiffs changed course and conceded that the PLRA applies. Indeed, the Court already has entered an unopposed order under the PLRA postponing the automatic stay provision. This issue is, therefore, no longer in dispute.  However, Defendant notes that this precise issue has been thoroughly briefed. *See Doc. 136.*  Defendant expressly incorporates by reference all arguments previously made, including those made in the following memoranda: Docs 129, 130, 131, 136, and 138.

(D.V.I. 2012), the PLRA sponsors "criticized 'judicial orders entered under Federal law [which] have effectively turned control of the prison system away from elected officials accountable to the taxpayer, and over to the courts.'" *Id.* at 406-07 (citing 141 Cong. Rec. S144189 (daily ed. Sept. 27, 1995) (remarks of Sen. Abraham.)); 141 Cong. Rec. S14, 418 (daily ed. Sep. 27, 1995) (statement of Sen. Hatch) (Congress enacted the PLRA to stop federal courts from "micromanaging our Nation's prisons.").

"In response to these types of concerns, the PLRA was enacted to require that remedies in prison condition lawsuits 'do not go beyond the measures necessary to remedy federal rights violations,' H.R. Rep. No. 104–378, at 166 (1995), but rather are limited to the minimum necessary to correct the violation of the federal right." *Id.* at 24 n. 2. *See, e.g., Miller v. French,* 530 U.S. 327, 328, 120 S. Ct. 2246, 147 L. Ed. 2d 326 (2000) (explaining that "curbing the equitable discretion of district courts was one of the PLRA's principal objectives. . . ."); *Gilmore v. California,* 220 F.3d 987, 991 (9th Cir. 2000) ("It is clear that Congress intended the PLRA to revive the hands-off doctrine," the former "rule of judicial quiescence" that the federal judiciary not be involved with the problems of state-run prisons.).

## B.     Pertinent Provisions of the PLRA: Consent Decrees, Entry of Relief, and Termination of Relief.

The PLRA contains an explicit provision on consent decrees in prison condition cases in 18 U.S.C. § 3626(c). The mandate in § 3626(c), like much the PLRA, is not subject to waiver, even by agreement, as it is a limitation on the Court. Per § 3626(c), consent decrees entered in prison condition cases must comply with the provisions set forth under §3626(a).  Subsection (a) of the PLRA contains federal statutory directives on the entry of prospective relief.  On the other hand, termination of prospective relief is controlled by § 3626(b).  Each of these provisions is discussed in turn, with termination under Subsection (b) being appropriate for the prospective relief ordered and approved under Subsections (a) and (c) through the 2012 Consent Decree.

### i.   Consent Decrees in Prison Condition Cases: 18 U.S.C. § 3626(c).

Consent decrees constitute one of the two forms of settlements addressed by the PLRA. The PLRA's specific provision regarding settlements reads as follows:

**(c) Settlements.—**

**(1) Consent decrees.**--In any civil action with respect to prison conditions, the court shall not enter or approve a consent decree unless it complies with the limitations on relief set forth in subsection (a).

**(2) Private settlement agreements.--(A)** Nothing in this section shall preclude parties from entering into a private settlement agreement that does not comply with the limitations on relief set forth in subsection (a), if the terms of that agreement are not subject to court enforcement other than the reinstatement of the civil proceeding that the agreement settled.

18 U.S.C.A. § 3626(c).  Per the explicit language of the PLRA, consent decrees in general must comply with the PLRA's limitations on prospective relief.

The Consent Decree approved and entered by this Court is consistent with this point. The Consent Decree first explicitly notes that it is a form of "prospective relief." *See Consent Decree, Section IV, ¶ 4, Docket Entry No. [75-3], Exhibit P-2.* Second, the Decree provides that "all terms and conditions . . . will be construed in accord with federal law, including the Prison Litigation Reform Act."   *Id.*  This Court's Order approving and ordering the relief set forth in the Consent Decree also notes that nothing "alters the requirements of the Prison Litigation Reform Act." *See Order, Docket Entry No. [75], ¶ 11.* While this Court may have found the requirements of Subsection (a) satisfied in 2012, those findings no longer hold true, and termination is required under Subsection (b).[13]

### ii.   The PLRA's Dictates on the Entry of Prospective Relief: 18 U.S.C. § 3626(a).

 The relief requested in Plaintiffs' modification motion is "prospective relief" under 18 U.S.C. § 3626(a). *See, e.g., Lancaster v. Tilton*, No. C79-01630 WHA, 2007 WL 1807825, at *1-5 (N.D. Cal. June 21, 2007); *United States v. Territory of the Virgin Islands*, 884 F. Supp. 2d 399, 408-09 (D.V.I. 2012).

---

[13] *See, e.g., Cason v. Seckinger*, 231 F.3d 777, 783 (11th Cir. 2000) (discussing the new findings to be made under the PLRA's termination provisions).

PD.17099813.1

Indeed, the explicit language of the statute is conclusive on this, as the PLRA defines "prospective relief" as "<u>all relief</u> other than compensatory monetary damages." 18 U.S.C. § 3626(g)(7). "Relief," in turn, is "all relief in any form that may be granted or approved by the court, and includes consent decrees but does not include private settlements." 18 U.S.C. § 3626(g)(9).

Specifically, Subsection (a) of § 3626 reads as follows:

**(a) Requirements for relief.—**

**(1) Prospective relief.--(A)** Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of <u>the Federal right</u> of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is <u>narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right</u>. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

18 U.S.C.A. § 3626 (emphasis added).  As is clear from the statutory text, to meet § 3626(a), the Court <u>first</u> must find a violation of a "Federal right," and <u>second</u>, must ensure that any such relief is "narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal Right." 18 U.S.C. § 3626(a)(1)(A) (this second prong is commonly referred to as the PLRA's "narrowness-need-intrusiveness" test).[14]

In cases where Plaintiffs have moved for either enforcement or modification of a decree, it is especially appropriate for defendants to move to terminate when the argument to be advanced by the defendants concerns the absence of a constitutional violation.  In fact, some courts have gone so far as to question defendants as to why they did not move to terminate. *See, e.g., Lancaster v. Tilton*, 2007 WL 1807825 (N.D. Cal. 2007). This is, at least in part, because to get prospective relief through modification, Plaintiffs must prove a violation of a federal right. *See, e.g*., *Castillo v. Cameron Cnty., Tex.*, 238 F.3d 339, 354 (5th Cir. 2001) ("[W]e note that any modification of the existing relief that constituted the entry

---

[14] It also is referred to as the "need-narrowness-intrusiveness" test. *See, e.g., Cason v. Seckinger*, 231 F.3d 777, 784 (11th Cir. 2000).

14

of new relief would need to meet the requirements set out in § 3626(a)"). In the Fifth Circuit, after a

motion to terminate is filed under § 3626(b)(1)(A), Plaintiffs carry the same substantive burden under §

3626(b)(3).   Here, because the relief should be terminated, the Court need not reach Plaintiffs'

enforcement and modification motion.

### iii.    Termination Pursuant to the PLRA: 18 U.S.C. § 3626(b)(1).

The PLRA provides a specific statutory provision directed at termination of prospective relief, in

this case the relief ordered and approved through the Consent Decree.

That provision reads as follows:

**(b) Termination of relief.—**

**(1) Termination of prospective relief.--(A)** In <u>any civil action</u> with respect to prison conditions in which prospective relief is ordered, such relief <u>shall be terminable</u> upon the motion of any party or intervener--

(i) <u>2 years</u> after the date the court granted or approved the prospective relief;

**(ii)** 1 year after the date the court has entered an order denying termination of prospective relief under this paragraph; or

**(iii)** in the case of an order issued on or before the date of enactment of the Prison Litigation Reform Act, 2 years after such date of enactment.

**(B)** Nothing in this section shall prevent the parties from agreeing to terminate or modify relief before the relief is terminated under subparagraph (A).

**(2) Immediate termination of prospective relief.**--In any civil action with respect to prison conditions, a defendant or intervener shall be entitled to the immediate termination of any prospective relief if the relief was approved or granted in the absence of a finding by the court that the relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.

18 U.S.C.A. § 3626(b) (emphasis supplied); *Ruiz v. United States*, 243 F.3d 941, 943 (5th Cir. 2001);

*Guajardo v. Texas Dep't of Criminal Justice*, 363 F.3d 392, 394 (5th Cir. 2004) ("Institutional consent

decrees are not intended to operate in perpetuity . . . The PLRA strongly disfavors continuing relief

through the federal courts; indeed, its fundamental purpose was to extricate them from managing state

prisons . . .  The PLRA provides three methods for terminating such consent decrees: (1) the passage of time . . .") (internal quotations removed); *Castillo v. Cameron Cnty., Tex.*, 238 F.3d 339, 354 (5th Cir. 2001).

Defendant's termination motion was urged pursuant to § 3626(b)(1)(A)(i). Under Section 3626(b)(1)(A)(i), relief "shall be terminable" two years after the Court granted or approved the relief. Here, the Consent Decree was approved on March 26, 2012.  *See Consent Decree, Docket Entry No. [75-3]*.  Because two years have passed since the Court's order and approval of the Decree, the relief provided became "terminable" upon the filing of Defendant's motion.

### iv.    Limitation on Termination:  18 U.S.C. § 3626(b)(3).

The PLRA contains a single limitation on termination of prospective relief in § 3626(b)(3). That provision provides as follows:

> **(3) Limitation.**--Prospective relief shall not terminate if the court makes written findings based on the record that prospective relief remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation.

18 U.S.C. 3626(b)(3).

Subsection (b)(3)'s limitation on termination, to some extent, parallels Subsection (a)'s limitation on the entry of prospective relief.   Prospective relief "shall" terminate unless the Court <u>first</u> finds a "<u>current and ongoing</u>" violation of a "Federal right," in this case the Eighth Amendment.  <u>Second</u>, even if the Court finds a current and ongoing, system-wide Eighth Amendment violation, Subsection (b)(3) requires new findings on the relief under the PLRA's "narrowness-need-intrusiveness" test. *See id.* ("extends no further than <u>necessary</u> to correct the violation of the Federal right, and that the prospective

PD.17099813.1

relief is <u>narrowly</u> drawn and the least <u>intrusive</u> means to correct the violation."); *see also, e.g., Ruiz v. United States*, 243 F.3d 941, 950-51 (5th Cir. 2001).[15]

### v. *Differing Language and Standards Between § 3626(a)(1) and § 3626(b)(3).*

As a point of clarity, Defendant notes that the language in Section 3626(a) and that contained in Section 3626(b)(3) differ slightly in text.  Section 3626(a), which concerns the entry of prospective relief, states that there must be a violation of "<u>the</u> Federal right."  Section 3626(b)(3), however, couches its limitation on termination language in terms of a "<u>current and ongoing</u> Federal right."  Some courts have stated that the standards do "not differ materially." *See, e.g., Hallett v. Morgan,* 296 F.3d 732, 741–45 (9th Cir.2002) ("The . . . standard for termination does not differ materially from the standard to be applied in deciding whether prospective relief is proper.") (cited with approval in *Guajardo v. Texas Dep't of Criminal Justice*, 363 F.3d 392, 395 (5th Cir. 2004)).

While it appears the standards do not actually differ "materially," as both require a federal violation and the narrowness-need-intrusiveness test, the standards do differ.  First, Congress explicitly and purposely inserted a "current and ongoing" requirement into the termination provision governing this Court's decision. *See Austin v. Wilkinson*, 372 F.3d 346, 360 (6th Cir. 2004), *aff'd in part, rev'd in part and remanded on other grounds*, 125 S. Ct. 2384 (2005) ("But the 'current and ongoing' language comes from § 3626(b)(3), governing the *termination* of relief, not from § 3626(a), governing requirements for initial relief.").   Second, and as noted previously in Defendant's termination and consolidation memoranda, after a motion to terminate has been filed, the court must, based on the record, make the findings required by § 3626(b)(3). "The court must make new findings about whether the relief currently complies with the need-narrowness-intrusiveness requirements, given the nature of the current violations. Indeed, the Fifth Circuit has stated that it is "not enough under § 3626(b)(3) that the orders, when entered,

---

[15] *Hadix v. Caruso*, 420 F. App'x 480, 485 (6th Cir. 2011); *Bey v. Keen*, No. 1:CV-12-00732, 2012 WL 5051924, at *3 (M.D. Pa. Oct. 18, 2012); *Mounts v. Suthers*, No. 99-CV-01167-LTB, 2012 WL 3245952, at *2 (D. Colo. Aug. 7, 2012); *Hines v. Anderson*, 547 F.3d 915, 920 (8th Cir. 2008); *Cason v. Seckinger*, 231 F.3d 777, 783 (11th Cir. 2000); *Castillo v. Cameron Cnty., Tex.*, 238 F.3d 339, 354 (5th Cir. 2001).

were sufficiently narrow considering the violations that existed at that time." *Castillo v. Cameron Cnty., Tex.*, 238 F.3d 339, 353-54 (5th Cir. 2001) (citing *Cason,* 231 F.3d at 784–85); *Gates v. Cook*, 376 F.3d 323, 336 n.8 (5th Cir. 2004).

## IV.       BURDEN OF PROOF TO SHOW A CURRENT AND ONGOING EIGHTH AMENDMENT VIOLATION

Section 3626(b) contains a burden-shifting framework.   Under that framework, Plaintiffs must prove the substantive requirements of § 3626(b)(3), while Defendant must prove the appropriate passage of time (*i.e.*, two years) pursuant to §3626(b)(1)(A)(i).[16] The Fifth Circuit's case of *Guajardo v. Texas Dep't of Criminal Justice*, 363 F.3d 392, 395-96 (5th Cir. 2004) is instructive on the respective burdens under §3626(b)(1)(A) and § 3626(b)(3).

In *Guajardo*, the court explained as follows:

TDCJ, in seeking termination, must initially establish the requisite passage of time. 18 U.S.C. § 3626(b)(1)(iii) (relief terminable upon motion of any party, but "in the case of an order issued ... before the date of enactment of the [PLRA], 2 years after such date of enactment"). As held by most courts, the burden of proof then shifts to the prisoners to demonstrate ongoing violations and that the relief is narrowly drawn. 18 U.S.C. § 3626(b)(3) . . . .

We agree with the great majority of courts to address this issue: a plain reading of the PLRA, including its structure, imposes the burden on the prisoners. Section 3626(b)(3) places a limitation on the termination of prospective relief under a consent decree if the court makes the requisite written findings based on the record; but the burden of proof to support these findings is obviously on the party opposing termination. Accordingly, that burden was allocated correctly to plaintiffs.

363 F.3d at 395-96; *see also, e.g., United States v. Territory of the Virgin Islands*, 884 F. Supp. 2d 399, 415 (D.V.I. 2012).

As noted by the Fifth Circuit and other courts, the PLRA itself supports this result by providing that relief is "terminable" after the requisite passage of time. Before the relief is "terminable," *i.e.*, prior to the expiration of two years after the court's imposition of such relief or one year after the court's denial of

---

[16] Importantly, the Ninth Circuit places the termination burden <u>on the defendant prison facility</u>.  Thus, some of the Ninth Circuit's PLRA cases are inapposite due to the differing burdens of proof.

a prior termination motion, the PLRA permits any party to seek termination "to the extent that . . . termination would otherwise be legally permissible." 18 U.S.C. § 3626(b)(4).  Accordingly, under the language of the PLRA and the *Guajardo* reading, termination under § 3626(b)(1)(A) is the default, while extension under § 3626(b)(3) is the exception.

## V.      THE PLRA'S STANDARD FOR A CURRENT AND ONGOING EIGHTH AMENDMENT VIOLATION

What constitutes a "current and ongoing" violation under the PLRA is the subject of several legal opinions.  First, the current and ongoing inquiry is *not* synonymous with whether the Defendant has complied perfectly with the Consent Decree. *See, e.g., Plyler v. Moore,* 100 F.3d 365, 370 (4th Cir. 1996) (violation of provision of consent decree is not the equivalent of violation of "federal right.").  That is, for purposes of the PLRA's prospective relief provisions, "'federal rights' are limited to those rights created by federal law." *Benjamin v. Kerik,* 102 F.Supp.2d 157, 173 (S.D.N.Y. 2000); *Ruiz v. United States*, 243 F.3d 941, 943 (5th Cir. 2001); *Hadix v. Caruso*, 420 F. App'x 480, 485 (6th Cir. 2011).[17] This is logical, as consent decrees "generally are viewed as a mechanism pursuant to which relief is granted"[18] due to a separately existing violation of a federal right.

Second, and more importantly, current and ongoing violations are *not* violations that occurred in the past, or purported violations that may occur in the future.  To the contrary, the Fifth Circuit has held that a "'current and ongoing' violation is one that exists at the time the district court conducts the § 3626(b)(3) inquiry." *Castillo v. Cameron Cnty., Tex.*, 238 F.3d 339, 353-54 (5th Cir. 2001); *see also Cason v. Seckinger,* 231 F.3d 777, 784 (11th Cir. 2000); *Hadix v. Johnson,* 228 F.3d 662 (6th Cir. 2000).

---

[17] *United States v. Territory of the Virgin Islands*, 884 F. Supp. 2d 399, 419-20 (D.V.I. 2012) ("The Court recognizes that the reports submitted by the Special Master and the details proffered by Plaintiff paint a bleak picture of persistent infirmities at Golden Grove. However, the Supreme Court has made clear that "[t]he Eighth Amendment does not outlaw cruel and unusual 'conditions'; it outlaws cruel and unusual punishment." *Farmer,* 114 S.Ct. at 1979. Despite the extensive reports filed by the Special Master outlining the grim factual conditions at Golden Grove and Defendants' history of unsatisfactory compliance with Court Orders," the court must conduct the *Farmer* analysis).

[18] *See, e.g., Vazquez v. Carver*, 18 F. Supp. 2d 503, 509 (E.D. Pa. 1998) *aff'd*, 181 F.3d 85 (3d Cir. 1999).

That is, to make the required finding of a current and ongoing violation of a Federal right as required by § 3626(b)(3), a court must look at the conditions in the prison at the time termination is sought, not at conditions that existed in the past or at conditions that may possibly occur in the future. Defendant filed its termination motion on March 13, 2015, and the time of the motion to terminate governs the Court's analysis.

Defendant does not suggest that there is a hard and fast definition of "current" or "ongoing," or that the only evidence that may be considered is evidence that occurred on the precise date of the termination motion—March 13, 2015.  That would be irrational. The current and ongoing requirements are driven, in large part, by a case-specific inquiry and by the changes and improvements made by (or not made by) the particular facility. In *Lancaster v. Tilton*, No. C 79-01630WHA, 2007 WL 4570185, at *6 (N.D. Cal. Dec. 21, 2007), for instance, the court noted as follows:

> this Court agrees that it must inquire into current conditions-and specifically the conditions that exist **at the time termination is sought**. And, of course, plaintiffs must be (and have been) given an opportunity to show current and ongoing violations. In all litigation involving a decisive point in time, however, facts in **close temporal proximity** are probative. Instantaneous snapshots are impossible. **The extent to which recent evidence may have been superseded by intervening events must be critically assessed**, issue by issue.

*Id.* (emphasis supplied); *see also Graves v. Arpaio*, No. CV-77-00479-PHX-NVW, 2014 WL 4898717, at *9 (D. Ariz. Sept. 30, 2014) *amended,* No. CV-77-00479-PHX-NVW, 2014 WL 6983316 (D. Ariz. Dec. 10, 2014) ("[I]t must tend to show whether any current and ongoing violation existed on August 9, 2013, the date Defendants filed their motion. [ ] Relevant evidence could be obtained before or after August 9, 2013, but it must show conditions as they existed on August 9, 2013."); *Cason*, 231 F.3d at 784.

If the conditions were "current," it logically would make sense that more past evidence would be needed to find the conditions "ongoing."  But, the PLRA requirement is not one or the other—it is both. This is why the vast majority of Plaintiff's evidence, including evidence from December of 2013 (over 1 year before the termination motion) and July of 2014 (8 months before termination), is not relevant and

cannot defeat the motion to terminate under the PLRA.   It is not *just* because of the passage of time, but it also is because those conditions are not "current" due to critical (and undisputed) intervening changes.[19] *See Exhibit D-11 and Discussion Infra*. To evaluate current conditions, the improvements and steady changes made since July of 2014 have to be considered, and it is important to note that the "significant" changes made have gone unrefuted by Plaintiffs.   At the hearing, all parties appeared to agree that evidence from March of 2015 is relevant, and evidence of conditions at Walnut Grove during March of 2015 was presented and considered by the Court. Given the significant and undisputed changes, however, the conditions in July of 2014 and before cannot be considered "current" as of the time period in which Defendant moved to terminate to the Decree.

The evidence spanning the most recent Monitors' Report (the Sixth Report), as well as evidence from February and March of 2015, should be the guidepost. The Sixth Monitors' Report spans a four month period prior to the termination motion (*i.e.*, "facts in close temporal proximity"). Taking the time period of the Monitors' Report in conjunction with the months of February and March of 2015 provides the Court with a full six months of evidence on which to evaluate current conditions. That long of a time period certainly cannot be considered a temporary aberration, and Defendant has never suggested, and does not now suggest, that the proper standard only is that a facility needs to have a "lucky day," as Plaintiffs previously tried to brand the PLRA's standard. What is clear, however, is that reliance on only past evidence is inapt, unless that past evidence can be said to reflect "current" conditions.

---

[19] In *Graves v. Arpaio*, No. CV-77-0479-PHX-NVW, 2008 WL 4699770, at *3 (D. Ariz. Oct. 22, 2008), the court considered a time period of ten months. Importantly, however, that case was procedurally contorted. The Defendant sought termination in 1998, but then filed another motion to terminate in 2003. The court did not hear the case until five years from the filing of the second motion to terminate, and even the court noted that Congress's intent of a "prompt ruling" had "broken down."   In considering the time period, too, even Ninth Circuit cases have made clear that intervening events during the relative time period (*i.e.*, events altering what is "current") must be critically assessed because they alter the definition of "current."

21

Not only does case law interpreting "current and ongoing" establish this point,[20] but the PLRA expressly contemplates that even when a court denies termination after finding a current and ongoing constitutional violation, a facility can move again for termination—and the court must again assess current and ongoing—*just the following year. See* 18 U.S.C. § 3626(b)(1)(A)(ii).  Through its termination provisions, the PLRA explicitly contemplates that improvements may (and will) be made fairly rapidly, and a current and ongoing violation, even when found by a court, promptly may be cured.  For the Court to read the PLRA's termination provisions differently would, in turn, read §§ 3626(b)(1)(A)(i), 3626(b)(1)(A)(ii) and 3626(b)(3) entirely out of the PLRA. Put simply, then, the statutory language of "current and ongoing" means exactly what it says.

This also is why Plaintiffs' continued "sustainability" argument wholly is inapt. Several key points flow from Plaintiffs' focus on sustainability—or, more appropriately termed, the alleged inability of Defendant to sustain current conditions in the absence of a consent decree.   Proof of sustainability noticeably is missing from § 3626(b)(3). In fact, a sustainability requirement is not found in any provision of the PLRA governing consent decrees in prison conditions cases. The PLRA's focus on termination of prospective relief is unmistakable, and that focus is centered only on current conditions. Sustainability

---

[20] Defendant does not suggest, as Plaintiffs incorrectly stated in previous memoranda, that Defendant need only have a "good or lucky day." Obviously, that is not the standard, and the proper standard of "current and ongoing" is well defined in case law. The cases previously cited by Plaintiffs, however, are not cases that set forth *any* standard under § 3626(b)(3). For instance, Plaintiffs previously relied on *Gwaltney of Smithfield v. Chesapeake Bay Foundation*, 484 U.S. 49 (1987) for the "current and ongoing" standard.  *Gwaltney* was not an Eighth Amendment action, much less one under the PLRA. It, instead, was a citizen's suit under the Clean Water Act.

Plaintiffs also cited to a portion of *Gates v. Cook*, 376 F.3d 323 (2004) for the termination standard.  *Gates* was *not* a termination action under § 3626(b)(3), and the defendant there was attempting to argue that the injunctions could not be originally entered because the claims were "moot." *Id.* at 337. Given the argument, the defendant carried the "heavy burden of persuading the court that the challenged conduct c[ould not] reasonably be expected to start up again," as the mootness burden "lies with the party asserting mootness." *Id.*  The portion of Plaintiffs' prior response to Defendant's motion to terminate incorrectly conflated a mootness argument urged by a Defendant in the context of the original entry of an injunction—with the Defendant carrying the "heavy burden" of persuasion"—with the PLRA's termination requirement that the plaintiffs prove a "current and ongoing" violation.

The only portion of *Gates* previously cited by Plaintiffs (*i.e.*, "voluntary cessation") was the standard that the defendant had to prove to demonstrate its mootness defense, **_not_** what a plaintiff has to show to meet the Eighth Amendment or to satisfy the standards set forth in § 3626(b)(3).

(*i.e.*, *future* compliance) logically cannot substitute for a finding of a *current* Eighth Amendment violation. Sustainability is a focus on possible future problems, which simply is not allowed under the PLRA. Plaintiffs' argument, in addition, requires the Court to engage in pure academic guesswork as to what will, or will not, happen at some unidentified point in the future. Such a reading of the PLRA that permits courts to maintain prospective relief to prevent a right that currently is not being violated directly collides with and contradicts congressional intent to prevent courts from micromanaging state prisons where there is no federal right violation.

In focusing on sustainability—or the purported likelihood of an inability to sustain, Plaintiffs would have this Court adopt the "wait and see" approach to termination.  That is, that the Court should not terminate the prospective relief *yet*, but should instead wait for some unidentified period of time and see if future conditions resemble current conditions and reveal no constitutional violation. While Plaintiffs' contention seems to be rooted in a (misguided) public policy type of argument, what constitutes the best or most appropriate policy, much like beauty, is in the eye of the beholder. Here, the beholder is Congress, and no provision of the PLRA sanctions the "wait and see" approach, or permits a court to sustain prospective relief based upon a finding that there may be a violation at some unknown time in the future. *See Cason v. Seckinger*, 231 F.3d 777, 783 (11th Cir. 2000) (rejecting interpretation of PLRA that would allow relief to continue in cases of "'substantial and very real danger that a violation of rights will follow the termination of the injunction" and explaining that "[t]he legislative history of the enactment . . . clearly shows that Congress intended 'current and ongoing' to mean a **presently** existing violation, not a potential, or even likely, future violation.") (cited positively by the Fifth Circuit in *Castillo*); *see Transcript Day 3, Martin, p. 84* ("Q: The last real information -- the last solid information you've had is for this sixth report. Correct? A: Yes. Q: All right. Let's talk about for that time period. For the sixth

report was there a substantial risk of serious harm to inmates at Walnut Grove? A: A <u>present</u> risk of harm when we wrote this report, no.").[21]

Plaintiffs' apparent reading of the PLRA would render the PLRA's termination provisions utterly meaningless. It always will be convenient for a plaintiff to argue in opposition to termination that some purported federal right may be violated in the future due to the alleged inability to sustain current conditions. Taking such a focus on sustainability to its absurd extreme (*i.e.*, that the court should wait and view the conditions in the future), a consent decree never could be terminated—it could be maintained indefinitely. Also, from a practical perspective, where would the "sustainability" line be drawn? Would it have to be shown that the conditions could be "sustained" for one year? Two? Three? And which party would bear the burden of proof? In the Fifth Circuit, the substantive burden is on the prisoners, so would the inmates and/or their counsel have to read the tea leaves in an attempt to demonstrate that a violation may occur at some point in the future? Or would this be a new burden placed on the defendant and inserted into the PLRA?

Fortunately, Congress prevents all of these impracticable questions from being asked, as they already have been answered. In enacting the PLRA, Congress drew the proverbial line in the sand and limited the analysis to "current and ongoing" violations.[22] *See, e.g., Miller v. French*, 530 U.S. 327, 347,

---

[21] The question posed by Plaintiffs to Martin is telling of Plaintiffs' theory, and additionally telling of why this theory cannot be utilized to defeat termination under the PLRA. *See Transcript Day 3, Martin, pp. 60-61* (Q: . . .do you believe that today there is a substantial risk of serious harm at Walnut Grove Correctional Facility? A: . . . If you look at it in a straight-line projection method, which is to **look at what's happened in the past to predict what's going to happen in the future**, fairly simple methodology, there is no record that has been established that would allow somebody like me to project that over the next six months, three months, nine months that I would warrant that this facility is going to operate safely day in and day out over that period of time based on what we've seen in the past two and a half years. I don't have a basis to do that."). This is pure conjecture, and the exact type of conjecture the PLRA was meant to extricate.

[22] Plaintiffs' sustainability argument also is curious for other reasons. During the evidentiary hearing, Plaintiffs hurled allegations that Defendant allegedly would not be able to sustain current conditions if the decree were terminated. The only thing this argument does is concede the point that there is no "current and ongoing" violation of the Eighth Amendment. That is, a focus on a purported inability to sustain without the Decree can imply only that current conditions *should* be sustained. Plaintiffs certainly would not want to sustain the current conditions at Walnut Grove if the conditions were violative of the Constitution.

120 S. Ct. 2246, 2258, 147 L. Ed. 2d 326 (2000) ("By establishing new standards for the enforcement of prospective relief in § 3626(b), Congress has altered the relevant underlying law."); *Ruiz v. United States*, 243 F.3d 941, 949 (5th Cir. 2001) ("By enacting the termination provisions of the PLRA, Congress has properly invoked its legislative authority . . ."). This interpretation of the PLRA not only is rooted in case law, but it also expressly is supported by the statute's history.

As originally enacted in 1996, Section 3626(b)(3) provided that courts could avoid termination if the record showed a current *or* ongoing violation.  In 1997, the section was amended to require a current *and* ongoing violation. The House of Representatives Conference Report explains the reason for the change as follows:

> The provision also includes a change in subsection (b)(3) that corrects the confusing use of the word "or" to describe the limited circumstances when a court may continue prospective relief in prison conditions litigation to make clear that a constitutional violation must be "current and ongoing." **These dual requirements are necessary to ensure that court orders do not remain in place on the basis of a claim that a current condition that does not violate prisoners' Federal rights nevertheless requires a court decree to address it, because the condition is somehow traceable to a prior policy that did violate Federal rights, or that government officials are "poised" to resume a prior violation of federal rights**. If an unlawful practice resumes or if a prisoner is in imminent danger of a constitutional violation, the prisoner has prompt and complete remedies through a new action filed in State or Federal court and preliminary injunctive relief.

H.R. Conf. Rep. No. 105–405, at 133 (1997); *Castillo*, 238 F.3d at 353, n.20; *Cason,* 231 F.3d at 783.

The focus of the analysis purposely is restricted by Congress, and it is on only the current conditions at Walnut Grove at the time termination was sought.

## VI.    THE EIGHTH AMENDMENT ANALYSIS

**A.    Eighth Amendment Framework.**

The Eighth Amendment issue pending before the Court is one of prison conditions, not singular force on an inmate. Given that the relief sought in this matter is systemic, a current and ongoing systemic violation also must be shown. "The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones." *Gates v. Cook,* 376 F.3d 323, 332 (5th Cir. 2004). The Supreme Court has made

PD.17099813.1

clear that "[t]he Eighth Amendment does not outlaw cruel and unusual 'conditions'; it outlaws cruel and unusual punishment." *Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).  The Supreme Court also has explained that "[b]ecause routine discomfort is 'part of the penalty that criminal offenders pay for their offenses against society,' . . . 'only those deprivations denying the minimal civilized measure of **life's necessities** are sufficiently grave to form the basis of an Eighth Amendment violation.'" *Hudson,* 503 U.S. at 8-9 (*quoting Rhodes,* 452 U.S. at 347).

"The Constitution requires that inmates receive adequate food, clothing, shelter, medical care, and mental health care, and that detention facilities take **reasonable** measures to ensure the safety of the inmates." *Jones v. Gusman*, 296 F.R.D. 416, 430 (E.D. La. 2013) (citing *Gates*, 376 F.3d at 333 and *Farmer,* 511 U.S. at 832, 114 S. Ct. 1970).  To demonstrate a violation of inmates' constitutional rights, Plaintiffs must show a **substantial risk of serious harm** to which prison officials were **deliberately indifferent**.[23] *Farmer*, 511 U.S. at 834. (noting that once a deprivation is shown, plaintiffs must then demonstrate that the prison officials acted with deliberate indifference); *Ball v. LeBlanc*, 988 F. Supp. 2d 639, 662 (M.D. La. 2013) ("In condition of confinement cases, the Court is required to determine if the prison official acted with deliberate indifference, which the Supreme Court has defined as knowing of **and disregarding** an excessive risk to inmate health or safety.").[24]

The Supreme Court's seminal *Farmer* case is informative on the governing formulation:

> It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety. Our cases have held that a prison official violates the Eighth Amendment only when two requirements are met. First, the deprivation alleged must be, objectively, sufficiently serious; a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities. For a claim (like the one here) based on a failure to prevent

---

[23]  There have been no allegations of excessive force in this litigation. Yet, given that Plaintiffs' positions have been inconsistent throughout this litigation on multiple legal bases, Defendant notes that, to any extent there is an excessive force type of claim urged in the post-hearing memoranda, the standard that also should attach due to such an argument is the heightened "maliciously and sadistically for the very purpose of causing harm" standard. *See, e.g., Thomas v. Bryant*, 614 F.3d 1288, 1304 (11th Cir. 2010). This is discussed in more detail *infra*.

[24]  Plaintiffs concede that they must prove a current and ongoing substantial risk of serious harm and deliberate indifference. *See Doc. 137, p. 3.*

harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm.

The second requirement follows from the principle that "only the unnecessary and wanton infliction of pain implicates the Eighth Amendment." To violate the Cruel and Unusual Punishments Clause, a prison official must have a "sufficiently culpable state of mind." In prison-conditions cases[,] that state of mind is one of "deliberate indifference" to inmate health or safety[.]

511 U.S. at 834 (citations omitted); *see also Rhodes v. Chapman*, 452 U.S. 337, 346-47, 101 S. Ct. 2392, 2399, 69 L. Ed. 2d 59 (1981) ("The Court has held, however, that 'Eighth Amendment judgments should neither be nor appear to be merely the subjective views' of judges . . . judgment[s] should be informed by objective factors to the maximum possible extent.'").

In this case, Plaintiffs pursue a theory where they advance a constellation of conditions of confinement at Walnut Grove and claim that, in total, such conditions can violate the Eighth Amendment. *Wilson v. Seiter,* 501 U.S. 294, 304, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991) and its progeny govern this framework. In *Seiter*, the Court noted as follows:

Some conditions of confinement may establish an Eighth Amendment violation "in combination" when each would not do so alone, **but only when** they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need . . . .

501 U.S. at 304. The *Seiter* court balances this sentence with the two sentences that follow (less the intervening citation):

. . . such as food, warmth, or exercise – for example, a low cell temperature at night combined with a failure to issue blankets. . . . **To say that some prison conditions may interact in this fashion is a far cry from saying that all prison conditions are a seamless web for Eighth Amendment purposes. Nothing so amorphous as "overall conditions" can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists**.

*Id.*

Whether the standard advanced by Plaintiffs is phrased as "a constellation of conditions," "totality of the circumstances," or, more plainly, as "overall conditions," *Seiter* plainly says that "nothing so amorphous" violates the Eighth Amendment, a violation of which requires the "deprivation" of a **human**

27

**need**." Further, as noted by the court in *Hughes v. Judd*, No. 8:12-CV-568-T-23MAP, 2015 WL 1737871, at *25 (M.D. Fla. Apr. 16, 2015) most recently,

> *Seiter*'s signal contribution to the law is not the plaintiffs' impermissibly "amorphous" "constellation of conditions" hypothesis. *Seiter* famously and avowedly determines "what state of mind applies in cases challenging prison conditions." 501 U.S. at 302. *Seiter* decides the "deliberate indifference" standard, applied with respect to medical care, applies also to prison conditions . . .

*Id.* The Fifth Circuit's recent wording of the test for the Eighth Amendment is additionally instructive: "This circuit has worded the test as requiring **extreme** deprivation of any '**minimal** civilized measure of **life's necessities**.'" *Gates v. Cook*, 376 F.3d 323, 332 (5th Cir. 2004) (citing *Davis v. Scott,* 157 F.3d 1003, 1006 (5th Cir.1998) (emphasis supplied)).

During the questioning of witnesses at the hearing, Plaintiffs also appeared to focus some of their efforts on the alleged "risk" of harm needed to invoke the Eighth Amendment. Similar to *Seiter*, that standard is not amorphous, nor is it a standard that sets forth that any risk of harm may suffice.  For instance, in *Gates v. Collier*, 501 F.2d 1291, 1300-01 (5th Cir. 1974), the court noted that, even absent proof of injury, the obvious and imminent danger of "exposed electrical wiring, deficient firefighting measures and mingling of inmates with contagious diseases constituted an Eighth Amendment violation." *Gates* does not lend itself to ethereal generalities, as *Gates* has an essential and defining context. While Plaintiffs, including Plaintiffs' expert witness, Eldon Vail, loosely speak of the facility not being "safe,"[25] and of purported "unsafe conditions" that supposedly warrant an Eighth Amendment remedy, cases such as *Gates* speak of conditions of imminent, proximate, and catastrophic consequence, such as imminent electrocution, incineration, or contagion. One is not the other—fairly and objectively assessed—even nearly equal to the other, and none of the conditions discussed by courts, including the Fifth Circuit, are conditions even remotely alleged by, much less proven by, Plaintiffs in this case.

---

[25] Transcript Day 6, Vail, p. 234.

Without hesitation, courts also have explained that deliberate indifference is an "extremely high" standard to meet. *Gobert v. Caldwell,* 463 F.3d 339, 346 (5th Cir.2006) (quotation omitted); *Southard v. Texas Bd. of Criminal Justice*, 114 F.3d 539, 551 (5th Cir. 1997) (quoting *Board of County Comm'rs,* 520 U.S. at 410 (other quotations omitted)) (emphasis added) ("'deliberate indifference' is a *stringent* standard of fault.  A prison official shows deliberate indifference if "the official knows of **and disregards** an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837; *Brewster v. Dretke*, 587 F.3d 764, 770 (5th Cir. 2009). "Deliberate indifference," as it is used in the Eighth Amendment context, comprehends more than mere negligence but less than the purposeful or knowing infliction of harm; it requires a showing of "subjective recklessness" as used in criminal law. *Farmer*, 511 U.S. at 835.

Further, and significantly, the issue before the Court is termination under the standards of the PLRA. *Miller v. French*, 530 U.S. 327, 347, 120 S. Ct. 2246, 2258, 147 L. Ed. 2d 326 (2000) ("By establishing new standards for the enforcement of prospective relief in § 3626(b), Congress has altered the relevant underlying law."); *Ruiz v. United States*, 243 F.3d 941, 949 (5th Cir. 2001) ("By enacting the termination provisions of the PLRA, Congress has properly invoked its legislative authority . . ."). While the requirements of the Eighth Amendment (substantial risk of serious harm and deliberate indifference), of course, are unchanged by the PLRA, "[t]he PLRA altered the landscape of prison reform litigation" by "limit[ing] a court's authority to continue to enforce previously entered prospective relief in prison litigation reform cases." *Cason v. Seckinger*, 231 F.3d 777, 780 (11th Cir. 2000).

**B.**    **Deference to Prison Officials.**

In matters of prison administration, courts generally defer to prison officials who are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are

needed to preserve internal order and discipline and to maintain institutional security." *Whitley v. Albers*, 475 U.S. 312, 321 (1986) (quotation marks omitted). As the *Whitley* court noted:

> That deference extends to a prison security measure taken in response to an actual confrontation with riotous inmates, just as it does to prophylactic or preventive measures intended to reduce the incidence of these or any other breaches of prison discipline. It does not insulate from review actions taken in bad faith and for no legitimate purpose, but it requires that neither judge nor jury freely substitute their judgment for that of officials who have made a considered choice. Accordingly, in ruling on a motion for a directed verdict in a case such as this, courts must determine whether the evidence goes beyond a mere dispute over the reasonableness of a particular use of force or the existence of arguably superior alternatives.

*Id.* at 322; *Alberti v. Klevenhagen,* 790 F.2d 1220, 1223 (5th Cir. 1986) (noting that while not having to adopt a hands-off policy, "a federal court should not, under the guise of enforcing constitutional standards, assume the superintendence of jail administration.").  As noted by the Supreme Court in *Turner v. Safley*, 482 U.S. 78, 89, 107 S. Ct. 2254, 2261-62, 96 L. Ed. 2d 64 (1987):

> In our view, such a standard is necessary if "prison administrators ..., and not the courts, [are] to make the difficult judgments concerning institutional operations." *Jones v. North Carolina Prisoners' Union,* 433 U.S., at 128, 97 S.Ct., at 2539. Subjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration. The rule would also distort the decisionmaking process, for every administrative judgment would be subject to the possibility that some court somewhere would conclude that it had a less restrictive way of solving the problem at hand. Courts inevitably would become the primary arbiters of what constitutes the best solution to every administrative problem, thereby "unnecessarily perpetuat[ing] the involvement of the federal courts in affairs of prison administration." *Procunier v. Martinez,* 416 U.S., at 407, 94 S.Ct., at 1808.

*Id.*; *see also, e.g., Rhodes v. Chapman*, 452 U.S. 337, 351 n. 16 (1981) ("[C]ourts are ill equipped to deal with the increasingly urgent problems of prison administration and reform. Judicial recognition of that fact reflects no more than a healthy sense of realism.") (internal quotations and citations omitted); *Hughes v. Judd,* No. 8:12-CV-568-T-23MAP, 2015 WL 1737871, at *52 (M.D. Fla. Apr. 16, 2015) (*Bell* [*v. Wolfish,* 441 U.S. 520 (1979)] warns sternly about [the] unguided substitution of judicial judgment for that of the expert prison administrators").

30

None of this is to say that courts should adopt an all-inclusive hands-off approach to prison administration. Courts should not.  There are cases where judicial intervention on constitutional grounds is needed, and required. This simply is not one of those cases. Plaintiffs continually have asserted or implied that they know a better way to do things and that their way should be the only constitutional choice.  This is a presentation of a type of "best practices case," rather than a demonstration that the current conditions at Walnut Grove fall below the constitutional minimum.

## VII.     PERTINENT CASE LAW ON WHAT CONSTITUTES A SYSTEMIC EIGHTH AMENDMENT VIOLATION DUE TO PRISON CONDITIONS

An analysis of apposite case law finding a system-wide violation of the Eighth Amendment in prison condition cases, as well as an analysis of cases finding no violation, unmistakably reveals why there is not a current and ongoing systemic violation of the Eighth Amendment at Walnut Grove.  The underlying facts of the cases that prompted, or did not prompt, an Eighth Amendment violation are vital because broad generalities do not flow from these cases.  In prior briefs, including those discussing the standards under the PLRA, Plaintiffs demonstrated a strategy of plucking words from cases and then distorting them into sweeping generalities so they fit into whatever position Plaintiffs were advocating at that time. When it comes to the Eighth Amendment, words cannot be plucked out of their defining legal context and then simply transported into a more expansive, more pliable, and more favorable setting. All of the cases interpreting the Eighth Amendment's standards have a defining legal and factual context, and that context is discussed in detail below through an in-depth inquiry into what prison conditions do, and do not, trigger the Eighth Amendment.

## A.     Cases Finding An Eighth Amendment Violation.

In *Gates v. Collier*, 501 F.2d 1291, 1300-01 (5th Cir. 1974), the Fifth Circuit was faced with alleged constitutional deficiencies in the Mississippi prison system prior to the enactment of the PLRA (*i.e.*, prior to the current and ongoing standard). There were several layers of unconstitutional conditions

31

in the prison system leading to a finding of a violation of the constitution. Specifically, the following conditions were found to violate the constitution and require judicial intervention:

- *Physical Facilities and Medical Treatment*: **The housing units are unfit for human habitation under any modern concepts of decency**. Facilities for the disposal of human waste at all camps present an immediate health hazard; contamination of the prison water supply caused by inadequate sewage has led to the spread of infectious diseases . . . The electric wiring is frayed and exposed, representing a safety hazard . . . Unsanitary conditions are rampant. Some **inmates with serious contagious diseases are allowed to mingle with the general prison population**;

- *Solitary Confinement*: It is unassailable that the **solitary confinement of naked persons in MSU's dark hole, without any hygienic materials, any bedding, adequate food or heat, without opportunity for cleaning either themselves or the cell, and for longer than twenty-four hours continuously, is constitutionally forbidden under the Eighth Amendment**.

- *Corporal Punishment*: The record was replete with innumerable instances of physical brutality and abuse in disciplining inmates who are sent to MSU. These include **administering milk of magnesia as a form of punishment, stripping inmates of their clothes, turning the fan on inmates while naked and wet, depriving inmates of mattresses, hygienic materials, and adequate food, handcuffing inmates to the fence and to cells for long periods of time, shooting at and around inmates to keep them standing or moving, and forcing inmates to stand, sit or lie on crates, stumps, or otherwise maintain awkward positions for prolonged periods**.

- *Trusty System*: The responsibility of guarding other inmates was primarily performed by these trusties . . . **There was no formal program for training trusties. Trusties were instructed to maintain discipline by shooting at inmates who got out of gun line; in many cases trusties had received little training in the handling of firearms** . . . trusties shot, maimed or otherwise physically maltreated scores of inmates subject to their control. For example, during Superintendent Cook's administration, **thirty inmates received gunshot wounds, an additional twenty-nine inmates were shot at, and fifty-two inmates were physically beaten**.

- *Inadequate Protection of Inmates*: . . . The inmates **are *not* classified** according to the severity of their offense, resulting in the intermingling of inmates convicted of aggravated violent crimes with those who are first offenders or convicted of nonviolent crimes. In addition, the **custodial responsibility of inmates has been assigned to other inmates** . . .

Although many inmates possess weapons, **there is no established procedure for discovering and confiscating weapons, nor is possession of weapons reported or punished**. The record revealed at least **eighty-five** instances where inmates had physically assaulted other inmates;

32

twenty-seven of these assaults involved armed attacks in which an inmate was either stabbed, cut or shot.

> **Only one civilian guard is assigned to each camp**. The one civilian guard is prohibited from entering the cages. As stated by Superintendent Cook, penitentiary employees have **no control over inmates** after the lights are turned out. . .

*Id.*

In *Williams v. Edwards*, 547 F.2d 1206, 1211 (5th Cir. 1977), the Fifth Circuit also found that the conditions of confinement at the penitentiary violated Eighth Amendment.   In finding a violation, the Fifth Circuit relied on the following undisputed evidence:

> [**M**]**ore than 270 stabbings of inmates by other inmates were reported; 20 deaths resulted** . . . Numerous "forcible rapes" were committed on inmates by other inmates, the total number being unknown. Inmate dormitories were "terribly **overcrowded**" and **insufficient cell space existed to segregate dangerous prisoners from the rest of the inmate population** . . . Easy inmate access to unsupervised machinery and other resources resulted in **widespread possession of weapons**. **Fire and safety hazards** constituted an "immediate threat to the life and safety" of both inmates and staff. Multiple health and sanitation violations were in evidence, including accumulation of sewage under the main kitchen (since cleaned out) and including a "serious rodent problem."

*Id.*

In *Alberti v. Klevenhagen*, 790 F.2d 1220 (5th Cir. 1986), the court affirmed the district court finding of an Eighth Amendment violation due to the overwhelming prevalence of violence that created a prison "**where terror reigns**."   *Id.* at 1224.   The district court in that case found "a continuous pattern of deprivations which clearly reach constitutional dimensions." *See Alberti v. Heard*, 600 F. Supp. 443, 450 (S.D. Tex. 1984), *aff'd sub nom. Alberti v. Klevenhagen*, 790 F.2d 1220 (5th Cir. 1986). Because the Fifth Circuit's affirmance does not specifically detail the factors leading to the district court's conclusion that the prison was one "where terror reigns," a look at the conditions examined by the district court is important. Specifically, the following factors led to the district court's findings:

- A "**cross-section of inmates**" [*i.e.*, not only two] testified about the presence of "**widespread . . . violence**." The testimony provided "numerous graphic examples of assault, rape, and other violence." Importantly, the court first noted the "**inherent credibility problem normally attached to inmate testimony**."   However, in that case, the inmate testimony "was

33

**corroborated by all three outside expert witnesses**.” *See Alberti v. Heard*, 600 F. Supp. 443, 450 (S.D. Tex. 1984), *aff'd sub nom. Alberti v. Klevenhagen*, 790 F.2d 1220 (5th Cir. 1986). Further, there was noted to be a “**high degree of inmate control** within the housing units.” “**Inmate beatings and homosexual rapes and attacks** [were] prevalent.” *Id.* at 457.

- The only way to communicate with staff was through an ineffective electronic call-button system because there was no “human surveillance.” *Id.* at 451.

- “Primarily as a result of the physical design deficiencies, **deputies infrequently enter[ed] actual housing areas** as a routine part of their supervisory duties.” *Id.* at 454-55. “Certain areas of housing units (such as within multiple cells in the Central Jail) [were] **not directly observed** for long periods of time—routinely periods of several hours, and potentially **periods of days on end**. For example, the supervisor for the female units in the Central Jail stated that deputies actually **entered and inspected** within the cell areas of housing units approximately **once per week per shift** . . .” *Id.* at 455.

- The jail had a “highly compartmentalized physical design  . . . [and the criticism of] the jail’s physical lay-out was shared by the other experts as well . . . **the physical design contained so many blind spots or routinely unobservable areas that the officers were unable to supervise** . . . these blind spots, when coupled with the surveillance problems that they case, contributed to the **high number of assaults**.”

- “The physical environments of both facilities impede the abilities of deputies to provide for safety and security, due to inadequate sightliness, inadequate life safety conditions, and extensive use of multiple occupancy . . .

- **There was no classification system**. *Id.* at 452.

- The prison was **overcrowded**. The “overcrowded conditions” was observed to be the “worst” the experts “had ever witnessed.” *Id.* at 452 and n.7.  Indeed, **many “inmates sle[pt] on the floors, on tables and next to toilets**.” *Id.* at n.7.

In *Jones v. Diamond*, 636 F.2d 1364, 1373-75 (5th Cir. 1981) *overruled on other grounds by Int'l Woodworkers of Am., AFL-CIO & its Local No. 5-376 v. Champion Int'l Corp.*, 790 F.2d 1174 (5th Cir. 1986), the Fifth Circuit again demonstrated the “extreme” conditions necessary to trigger the Eighth Amendment’s prohibition on cruel and unusual punishment.  In that case, the pertinent and following conditions were proven:

Confinement in a prison **where terror reigns** is cruel and unusual punishment . . . While in our ultimate conclusion we consider the jail conditions as a whole, some specific facts assist in our evaluation. Prisoner abuse by other prisoners was common. During the Diamond administration, **prison management was in effect turned over to trusties fifteen to sixteen hours a day**. Deputies were on duty downstairs but, apart from

34

occasional patrols, **they had no knowledge of events in the jail and could not be summoned by prisoners**. The evidence satisfies us that there was constant violence, and, at least during part of the period, **a prisoner-run kangaroo court** that inflicted physical and sexual abuse on other prisoners.

The old jail was **grossly overcrowded** . . . In the daytime, prisoners were **confined** to the day room in such numbers that at times there was **little more than six square feet per inmate**.

Prisoners often slept on mattresses laid on the floor or on tables in the day room. Under the crowded conditions the jail was stifling in the summer. Diet, while minimally adequate, consisted mainly of starches and was not balanced. There was **no outdoor exercise**.

 . . . The constant and habitual **exposure of convicted prisoners to persons who are contagiously ill** is also reprobated as cruel and unusual punishment. The evidence convinces us that prisoners in the Jackson County jail were constantly exposed to both violence and disease.

**Prisoners were confined to the "padded cell" as a disciplinary measure without any kind of hearing** by Jailer Tootle during the Diamond administration . . . However, even in the Ledbetter regime **no disciplinary proceedings were conducted prior to the imposition of punishment**[.]

*Id.*

A recent decision from the Eastern District of Louisiana also exemplifies the type of extreme inhumane conditions that must be found before a systemic Eighth Amendment violation is demonstrated. *See Jones v. Gusman*, 296 F.R.D. 416 (E.D. La. June 6, 2013).  The *Jones* case, like *Gates*, was an entry of prospective relief case under § 3626(a) of the PLRA (not termination under § 3626(b)) due to prison conditions at Orleans Parish Prison ("OPP").  In that case, there were four categories of conditions that violated the Eighth Amendment: (1) safety and security; (2) medical care and mental health care; (3) environmental conditions; and (4) fire safety.  Because medical care was not at issue during the pertinent evidentiary hearing in the instant matter, *Jones*'s analysis of that issue is not examined in this memorandum.

The facts of *Jones* help clarify the contours of Eighth Amendment's cruel and unusual punishment clause as applied to safety and security issues. In that case, the following is only a sampling of the concrete facts that were demonstrated:

- *Assaults*: "In 2012, OPP had **over 600 transports to local emergency rooms** for physical injuries, of which far more than half were related to violence. A similarly sized jail in the Memphis, Tennessee area had 7 emergency room transports related to violence in a comparable period of time."

- *Staffing and Supervision*:   **A single officer** is sometimes left responsible for supervising **multiple floors of inmates**. Shift after shift, across facilities, security posts are left unstaffed . . . OPP does not maintain **any** policy or procedure with respect to minimum staffing levels . . . Watch commanders may be forced to schedule a shift with insufficient officers, and merely 'hope that nothing terrible happens' . . .

- *Contraband*: "Although the Court recognizes that possession of contraband in a correctional facility is not necessarily unusual . . . Despite repetitive problems with assaults and weapons, **OPSO does not conduct regular shakedowns in a manner that would minimize the presence of contraband . . . videos . . . show inmates brandishing a loaded gun, using intravenous drugs, gambling with handfuls of cash, displaying cell phones, drinking cans of beer, and cavorting on Bourbon Street, having escaped OPP for an evening of leisure . . . There was no suggestion that the staff members responsible for supervising these inmates were ever identified, much less disciplined.**"

- *Classification*: "[A]pproximately **35% [of inmates] had not been classified in any manner**. The unclassified inmates were scattered across all of the facilities and in just about all of the tiers . . . Of the inmates who were classified, **potential predators were mixed with potential victims, and high, medium, and low security inmates were housed together** . . ."

- *Sexual Assault*: "OPP has an extraordinarily high level of rapes and sexual assaults . . . In October, the only full month for which data is available, there were 30 grievances reporting sexual assault and no investigations . . . OPP staff members have a pattern of tolerating sexual misconduct, as demonstrated by the **lack of repercussions** for inmates who engage in such misconduct in plain view of deputies."

- *Environmental:* "Ventilation throughout OPP facilities is very poor, in part because inmates plug the vents. Rusted and poorly secured fixtures can be used to create and conceal weapons. Inmates, including inmates on suicide watch, have easy access to shards of broken tile, which may be ingested, thrown, or used as a weapon . . . Many toilets, sinks, and showers are not functional. Sewage seeps into cells, including cells where inmates eat . . . The acute psychiatric unit's showers have large amounts of black **mold** on the ceilings and walls. **Clouds of gnats** have resulted in an increased incidence of skin problems. Cells housing mentally ill inmates have **feces spread on the walls** . . .

- *Fire Safety:* Several fired hazards existed, "including **electrical sockets that had been burnt out**, perhaps by inmates tampering with them . . . to ignite something . . . [S]taff and prisoners reported that **emergency doors are frequently locked with shackles because during power outages, these doors pop open** . . .

36

*Id.*; *see also Hutto v. Finney*, 437 U.S. 678, 682-83, 98 S. Ct. 2565, 2569, 57 L. Ed. 2d 522 (1978).[26]

In *Marsh v. Butler County, Alabama*, 268 F.3d 1014, 1027 (11th Cir. 2001) (*en banc*), the Eleventh Circuit reversed the district court and found that from the complaint's allegations, the plaintiffs sufficiently stated a claim against the County and the Sheriff for the conditions at the Butler County Jail. *Marsh v. Butler Cnty., Ala.*, 268 F.3d 1014, 1040 (11th Cir. 2001) *abrogated on other grounds by Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007).  Because an en banc panel of the Eleventh Circuit found the allegations by the plaintiffs about the jail in Butler County, Alabama sufficient to constitute a systemic Eighth Amendment violation, at least at the motion to dismiss stage, a detailed description of the conditions in the facility is instructive:

> The Jail was an old **building that had become extremely dilapidated** . . . prisoners were **never locked down** . . . No visual or audio surveillance system was in place on the second floor, nor, did prisoners have means to contact guards other than by screaming or banging on the walls.
>
> Often, **only one jailer was on duty at the Jail at a time. This single jailer was responsible for controlling the entire inmate population, administering inmate intake and release, controlling the gate and fence surrounding the Jail, supervising visitation and outdoor exercise, handling mail, coordinating food service, dispensing medication, supervising trustees, answering the Jail telephone, and (at times) answering calls to the Butler County Sheriff"'s Department and operating the dispatch radio**. Because the Jail was understaffed, inmate trustees were given many responsibilities for taking care of other inmates and maintaining the operation of the Jail.
>
> By the time of the incidents underlying the complaint, **few jailers had been so trained**. Written procedures did not govern the Jail's operations.
>
> **No system of classification existed at the Jail**: pretrial detainees were housed with convicted inmates, nonviolent offenders with violent offenders, juveniles with adults, and mentally ill persons with those in good mental health.

---

[26] Plaintiffs previously have cited to *Brown v. Plata,* 131 S.Ct. 1910, 1928, 179 L.Ed.2d 969 (2011) in their briefs. For this reason, Defendant notes briefly that *Plata* was a complex, long-standing case dealing with prison population where the Supreme Court addressed issues of overcrowding. Importantly, "[i]n *Plata*, it was undisputed that constitutional violations still existed in the prisons at issue even though some remedial measures had been taken." *Kress v. CCA of Tennessee,* No. 1:08–cv–00431–LJM–DML, 2011 WL 3154804, *2 (S.D. Ind. July 26, 2011), *aff'd,* 694 F.3d 890 (7th Cir.2012):*Indiana Prot. & Advocacy Servs. Comm'n v. Comm'r, Indiana Dep't of Correction*, No. 1:08-CV-01317-TWP, 2012 WL 6738517, at *24 (S.D. Ind. Dec. 31, 2012).

PD.17099813.1

268 F.3d at 1024—25.

One plaintiff in *Marsh* was "struck in the head with a metal pipe, beaten for several minutes, and cut with a screwdriver" and remained helpless until a jailer arrived in "10 to 15 minutes." He suffered a broken bone and permanent eye and nerve damage. The attackers were not disciplined. Another plaintiff was "kicked, stomped, stabbed and beaten for 30 minutes to an hour" but remained helpless because only one jailer was "on duty." When summoned, the Sheriff and the Jail Administrator "refused" to respond. The victim was released on "his own bond" and allowed to wander, injured and barefooted, in the streets. These life-threatening, atrocious, unconscionable conditions in *Marsh* decisively present a substantial risk of serious injury, evidence the comprehensive failure and refusal of management to manage. These cases depart dramatically from the civilized and regulated conditions prevailing at Walnut Grove.

The *Marsh* case also is informative because of its discussion of deliberate indifference. The Eleventh Circuit articulated as follows:

> Plaintiffs also allege that Harris **was aware** of the risk . . . Still, a prison official will only violate the Eighth Amendment if the official's response to the conditions posing the substantial risk of serious harm is unreasonable. *See Farmer,* 114 S.Ct. at 1982–83. Plaintiffs allege that Harris **did absolutely nothing** to alleviate the conditions at the Jail, despite repeated warnings and recommendations for how conditions could be improved.

*Id.* at 1029. In *Marsh*, the facility did not act—at all—after being aware of the problems. This stands in stark contrast to the undisputed and significant progress and changes made at Walnut Grove, as discussed in more detail *infra*.

The combination of facts leading to an Eighth Amendment violation in *LaMarca v. Turner*, 995 F.2d 1526 (11th Cir. 1993) also are illustrative. The original plaintiff and a class representative, LaMarca, was an inmate at Glades County Correctional Institute (GCI) and was threatened and assaulted by other inmates "because [he] refused to participate in homosexual activities, or pay protection to be left alone." 995 F.2d at 1531. Additionally, the court found (1) that GCI comprised four dorms with three rows of twenty bunk beds with a shower at one end of the dormitory and an officer's "wicket" in the middle for

observation; (2) sheets and towels blocked the officer's view across the dorm and to the shower; (3) "the

cells lacked adequate ventilation, had poor lighting, and were infested with roaches and vermin"; (4)

prisoners received "little or no exercise, only three showers a week, [and] no canteen privileges"; (5) the

protective confinement facility was easily accessible by inmates in order to attack a "protected" inmate;

and (6) inmates regularly possessed contraband, including weapons, alcohol, and drugs. As *LaMarca*

concludes:

> While a minimal level of contraband may be an unavoidable aspect of prison life, excessive quantities of contraband flowed freely into and within the prison. Prison officials made "**little or no effort . . . to control illicit activity** at GCI, resulting in readily-available contraband." **Inmates carried knives** and openly used drugs. The contraband problem was compounded by staff corruption, as prison officials contributed to, and apparently profited from, the contraband, and **utilized prisoners to "control" and punish other prisoners**.

995 F.2d at 1532 (citation omitted). The GCI staff regularly permitted "**unsupervised showings of hard**

**core pornographic movies**." Referring to LaMarca and other members of the plaintiff class, *LaMarca*

summarizes other *undisputed* facts:

> A group of inmates, one **brandishing a bush ax**, made an unsuccessful attempt sexually to assault LaMarca in a dorm. Inmates raped Saunders in a small bathroom adjacent to the confinement area; he reported the incident but officials **did not investigate and refused his request for a medical examination**. **Inmates repeatedly attacked Johnson while he was in protective confinement**. Inmates raped Aldred and Durrance in shower areas. Aldred reported the incident to an officer, but there was no investigation. Bronson was sexually assaulted with the handle of a baseball bat on GCI''s recreation field. Cobb was stabbed by an inmate who, because of his cooperation with guards in conducting illicit activities, was protected.

995 F.2d at 1533.

   *LaMarca* includes another iteration of the proof required to prove a violation of the Eighth

Amendment:

> First, the condition must have inflicted unnecessary pain or suffering upon the prisoner . . .
>
> To be deliberately indifferent, a prison official must knowingly or recklessly disregard an inmate's basic needs so that knowledge can be inferred. Because the Eighth Amendment requires a subjective standard, to demonstrate an official's deliberate indifference, a plaintiff must prove that the official possessed knowledge both of the infirm condition and

PD.17099813.1

> of the means to cure that condition, "so that a **conscious, culpable refusal** to prevent the harm can be inferred from the defendant's failure to prevent it." Thus, if an official attempts to remedy a constitutionally deficient prison condition, but fails in that endeavor, he cannot be deliberately indifferent . . .

995 F.2d at 1534—35 (citations omitted). *LaMarca* determined that the district court erroneously applied a negligence standard ("knew or should have known") to the proof of "deliberate indifference" and reversed on the issue of "causation." 995 F.2d at 1526.

As one court recently put it in summarizing *LaMarca* as well as summarizing the plaintiffs' omission of the facts of *LaMarca*:

> *LaMarca* presents life at a jail that is effectively a lawless, brutal, malignant jungle; the plaintiffs generalize and reduce *LaMarca* to a case about 'adequate staff. That is not an uncharacteristic maneuver by the plaintiffs – to attempt to reduce a constitutional condemnation of deadly neglect and brutal malfeasance to a mere disagreement about trivial differences in staffing ratios or the provision of a happy selection of recreational activity.

*Hughes v. Judd*, No. 8:12-CV-568-T-23MAP, 2015 WL 1737871, at *22 (M.D. Fla. Apr. 16, 2015).

**B.      Cases Not Finding An Eighth Amendment Violation.**

In *Hughes v. Judd*, the plaintiffs were several juveniles, as representatives of other juveniles similarly situated, who brought suit asserting that the Sheriff of Polk County, Florida, and Corizon Health, Inc., a health care provider retained by the Sheriff, violated the juveniles' rights under the Fourteenth Amendment during the juveniles' detention at the Central County Jail ("CCJ") in Bartow, Polk County, Florida.[27] *Id.*  The plaintiffs in that case utilized a totality of circumstances approach and relied on Eighth Amendment cases in an attempt to prove that the defendants violated constitutional standards due to the failure to "protect prisoners from a substantial risk of harm, including harm from other prisoners." *Id.* at *16.  Notably, while some of the particular issues differ between *Hughes* and the instant case, many of the

---

[27] *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1326 (11th Cir. 2007) ("Correctional officers are, of course, bound by the Eighth Amendment's prohibition against cruel and unusual punishment. *Id.* Technically, the Fourteenth Amendment Due Process Clause, not the Eighth Amendment prohibition on cruel and unusual punishment, governs pretrial detainees like Goebert. *Snow ex rel. Snow v. City of Citronelle, Ala.,* 420 F.3d 1262, 1268 (11th Cir. 2005). However, the standards under the Fourteenth Amendment are identical to those under the Eighth. *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla.,* 402 F.3d 1092, 1115 (11th Cir. 2005)").

strategies and attempts to expand the Eighth Amendment present in this case were urged in *Hughes* and rejected outright by the court. Indeed, the *Hughes* court aptly noted the plaintiffs' strategy[28] as being one of "semantic inflation." *Id.* at **7, 23.

In *Hughes*, the U.S. District Court for the Middle District of Florida, in a thorough 182-page opinion issued on April 16, 2015, found that plaintiffs "failed to prove that either the Sheriff or Corizon was deliberately indifferent to any substantial risk of serious harm[.]" *Id.* at *93.  While *Hughes* was not a termination action under Section 3626(b)(3), the plaintiffs in that case painted drastically more "restrictive, dangerous, and punitive conditions of confinement" than is painted in this case. *See Plaintiffs' Post-Hearing Findings of Fact, Case No. 8:12cv568-SDM-MAP, Docket Entry No. [529].* Some of the pertinent allegations made and evidence presented by the plaintiffs during trial and in the post-hearing memoranda were as follows:

- In less than 2 years, there were more than 200 reported incidents of violence among children, including more than 120 reported fights and more than 90 reported assaults. The incidents ranged in size, involving anywhere from 2-12 youth at a time, and more than 500 children in all.  Plaintiffs alleged that many more incidents went "undetected and unreported." Even a Captain acknowledged that "children have been removed from the jail for their safety."

- During the same time period (2 years), "more than 180 boys and girls were pepper sprayed by detention deputies  . . . Children who are not pepper sprayed witness the effects of those who are  because those children come out of the dorm 'screaming and hollering,' with their heads down, and then they 'get taken to the cage [where] they'll be screaming in the cage holding their face.'"

- "Over just a 12-month period, children were placed in harsh isolation cells on more than 130 occasions, often for days, weeks or even months."

- "Deputies threatened, demeaned and cursed at children at the jail . . . Deputies derisively referred to protective custody as 'pussy control,' a reference to the purported weakness of the youth housed there."

- Since the litigation ensued, the plaintiffs contended that "[v]iolence ha[d] increased, not decreased . . . [and] [t]he use of pepper spray and isolation continue[d] to be systemic."

---

[28] It is noteworthy that counsel for Plaintiffs in this case, the Southern Poverty Law Center, also was Plaintiffs' counsel in *Hughes v. Judd*.

- "[T]he vast majority of incidents of violence and use of force occur where deputies are not posted, and when children are not engaged in programming . . . For reported violent incidents that occurred in the housing units, at least 74% (136 of the 184) began while no deputy was in the dorm, while only 14% (26 of the 184) began while a deputy was in the dorm." Plaintiffs alleged that the "failure to adequately supervise children also routinely allows stronger youth to prey on weaker youth, including by taking their food."

- Plaintiffs contended that the "failure to provide adequate staffing, and to post staff in the house units, allows youth to engage in dangerous behavior, and permits volatile situations to escalate into violence. As one deputy testified as to a developing situation he observed while outside a dorm, 'I said, oh, great, I said, we're going to have a riot. Who actually at the time, I really didn't know until once we got in.'" The allegations also were that "[o]ften deputes arrive too late to prevent an emerging conflict from degenerating into violence; they can only 'figure out what happened' after the situation is quelled, including through the use of force . . . When fights are detected, deputies often respond by resorting to pepper spray . . . Responding to a major incident in one of the six dorms often requires the intervention of two or three deputies, leaving even less staff to supervise the remaining five dorms."

- "From April through September 2012, there were at least 25 reported fights and assaults that occurred when no deputy was in the dorm . . . Of these, most were not detected at the time and were only discovered or reported after the fact."

- After additional cameras were installed, Plaintiffs alleged that the "level of violence at the jail has increased, not decreased . . . from October 2011 through September 2012, there were 90 fights involving 230 children . . . From October 2012 through September 2013, those numbers jumped to 127 fights involving 312 children . . . This is so even though the population at the jail has remained about the same. In 2013,  . . . the daily average population included 70-80 boys, and 3-10 girls . . . ranging from about 72-89 children total each day."

- As to staffing and supervision, Plaintiffs alleged that "no deputy . . . is stationed inside any of the boys' dorms . . . Instead, deputies are stationed in the common area, which contains two desks . . . When deputies are at their desks they are not able to hear what is happening inside the dorms or cells . . . From where deputies are stationed outside the housing units, there are line of sight problems into cells of every dorm . . . Boys go into these cells to fight, where they are not likely to be detected . . . No deputy is stationed inside the isolation area, and there are no desk for direct supervision there." The "failure to provide adequate staffing also means that when a child is threatened by other youth, the response is often to house the targeted child in a cell alone[.]"

- As to "inadequate programming," the Plaintiffs alleged that "[c]hildren . . . are left idle for hours." According to plaintiffs, the "failure to provide the structured programming necessary to the safety of a juvenile facility also results in avoidable violence and the unnecessary use of force and other restraints . . . That children require structure to stay out of trouble is not a novel proposition." At that facility, however, it was alleged that "children are left without structured facility programming for half or more of their waking hours on school days and most, if not all, waking hours on weekends and holidays."

PD.17099813.1

*Id.* at pp. 1- 61.

This is only *a sample* of the allegations urged by Plaintiffs in their findings of fact and conclusions of law memoranda in the *Hughes* case. *Id*. After several days of an evidentiary hearing, and once the court put the allegations in the context of the proper legal standards, no constitutional violation was found. The *Hughes*' opinion first exhaustively examined the applicable constitutional standards for prison conditions cases. The court then concluded that plaintiffs failed to show that the defendants were "deliberately indifferent to any substantial risk of serious harm." *Hughes v. Judd*, No. 8:12-CV-568-T-23MAP, 2015 WL 1737871, at *93 (M.D. Fla. Apr. 16, 2015). The following details some of the court's 182-page reasoning:

> The plaintiffs argue that the fights and other violence are caused by the Sheriff's policies. According to the plaintiffs, fights occur because deputies are not stationed in the dorms, because deputies are insufficient in number or training, because the cell cameras do not record, and because the environment is insufficiently "nurturing."
>
> The plaintiffs argue that the frequency of fighting at CCJ is unconstitutional. The plaintiffs argue without persuasive evidence that the fights identified in the evidence equate to a substantial risk of serious harm and that the Sheriff is deliberately indifferent to this risk. With only speculation to support the hypothesis that the number of fights among the juveniles at CCJ is materially reducible and regardless of whether the frequency and severity of fights at CCJ is normal, above normal, or below normal for a comparable juvenile detention facility (and the evidence remains stunningly silent on this heartland issue), the plaintiffs assert that the Constitution requires that the Sheriff follow their experts' favorite prescriptions for juvenile detention. But the plaintiffs presented no convincing evidence that the episodic fights at CCJ over two years present a substantial risk of serious harm to the juveniles, that the level of fighting is above normal, or that the experts' ideas would reduce the fighting in any respect.
>
> DeMuro [the expert] opined speculatively and unpersuasively that utilizing a certain staffing ratio, implementing "robust programming," and posting deputies in the dorms "would help reduce the violence." (V 91:5–17) Although DeMuro claimed that the number of fights at CCJ is "alarming" (V 175:5–14), DeMuro lacked any convincing basis in fact for his conclusion and could not document whether the number of fights at CCJ for its population was normal, above normal, or below normal . . .
>
> Even according to the plaintiffs' numbers, which reflect 200 fights over a 102–week period, the average number of fights is only <u>two per week</u>. Of course, the plaintiffs define "fight" in an implausibly broad manner to incorporate the routine, the trivial, and the otherwise inconsequential spat.

PD.17099813.1

. . .
The evidence at trial established that pepper spray combines a "low level of force"; an alternative clearly safer for both staff and inmates than achieving a forceful, physical submission; a significantly lower level of injury; a relatively short recovery time; and an effective means "for restoring and maintaining order." (DeLand, XIV 37:19–38:1, 65:1–2)

. . .
The predominant, persuasive evidence demonstrates that every time (or at worst, almost every time) the staff administered pepper spray, the sprayed juvenile was examined by a nurse, issued a clean uniform, and offered the opportunity to shower. (Marcum, III 45:11–13; Choquette, XII 186:24–187:3; Cranor, XII 249:10–23) . . . Even assuming the accuracy of T.H.2's version, pepper spray presents no risk of serious harm even without the "after spray" protocols . . .

. . .
The predominant evidence establishes that CCJ is adequately staffed. Much more important to the resolution of the present action is the plaintiffs' failure by a comfortable margin to demonstrate that the Sheriff is deliberately indifferent to the staffing needs of CCJ. Also, not a scintilla of evidence supports the notion that the Sheriff has a "deliberate intent" to inadequately staff CCJ . . .

The plaintiffs' theory that the Sheriff's policy governing the number and deployment of staff causes constitutional injury because another policy might result in fewer fights and fewer uses of pepper spray is speculative (perhaps even fanciful) and unsupported by the evidence in this action or any reliable and germane report from elsewhere.

. . .
Understanding the calculus of juvenile fighting exceeds the scope of this action (and exceeds the competence of the witnesses) . . . . the fighting at CCJ is not—by a long shot—shown by the plaintiffs to create a persistent, widespread pattern that creates a substantial risk of serious harm to the detainees, to all of which the Sheriff is deliberately indifferent. The plaintiffs' claim that fighting at CCJ is unconstitutionally fierce, frequent, and dangerous is wholly impressionistic, conclusory, and outside the scope of the evidence.

An alleged deficiency in training is not itself a constitutional violation. The plaintiffs must prove that any alleged deficiency reaches constitutional severity and causes some constitutional "harm." However, the plaintiffs presented no persuasive evidence that the training at CCJ is deficient or that the training creates any constitutional harm.

. . .
From his initial assumption of responsibility for juvenile detainees in the fall of 2011, the Sheriff has continuously improved the policies and practices and the facilities at CCJ. Some changes were to comply with the Florida Model Jail Standards—for example, each camera in the living area must record. (Allen, XVII 34:7–36:11) Other changes have responded to experience and advice. For example, after realizing that juveniles were using the "wing rooms" to fight, the Sheriff installed a camera in every cell . . . The cell cameras increase the deputies' ability to observe the juveniles. (Allen, XVII 122:25–124:2)

*Id.* at **76-83, 5.

An Eighth Amendment violation also was not found in *Rhodes v. Chapman*, 452 U.S. 337, 101 S. Ct. 2392, 69 L. Ed. 2d 59 (1981).  There, prisoners at a state prison brought a civil rights suit challenging the constitutionality of "double celling," whereby two prisoners are housed in one cell. The district court held that, under the circumstances, placing of two prisoners in one cell at the state prison was unconstitutional, and the Court of Appeals affirmed. The U.S. Supreme Court reversed, finding that the district court's conclusion that double celling at the prison constituted cruel and unusual punishment was unsupportable. In reversing the lower courts, the Supreme Court reasoned as follows:

> These general considerations fall far short in themselves of proving cruel and unusual punishment, for there is no evidence that double celling under these circumstances either inflicts unnecessary or wanton pain or is grossly disproportionate to the severity of crimes warranting imprisonment. At most, these considerations amount to a theory that double celling inflicts pain. Perhaps they reflect an aspiration toward an ideal environment for long-term confinement. But the Constitution does not mandate comfortable prisons, and prisons of SOCF's type, which house persons convicted of serious crimes, cannot be free of discomfort. Thus, these considerations properly are weighed by the legislature and prison administration rather than a court. There being no constitutional violation, the District Court had no authority to consider whether double celling in light of these considerations was the best response to the increase in Ohio's statewide prison population.
> . . .
> Respondents contend that the close confinement of double celling for long periods creates a dangerous potential for frustration, tension, and violence. In respondents' view, it would be an infliction of unnecessary and wanton pain if double celling led to rioting. The danger of prison riots is a serious concern, shared by the public as well as by prison authorities and inmates. ***But*** respondents' contention does not lead to the conclusion that double celling at SOCF is cruel and unusual . . . *Moreover, a prison's internal security is peculiarly a matter normally left to the discretion of prison administrators*.
> . . .
> Courts certainly have a responsibility to scrutinize claims of cruel and unusual confinement, and conditions in a number of prisons, especially older ones, have justly been described as "deplorable" and "sordid" . . . In discharging this oversight responsibility, however, courts cannot assume that state legislatures and prison officials are insensitive to the requirements of the Constitution or to the perplexing sociological problems of how best to achieve the goals of the penal function in the criminal justice system. . .

*Rhodes v. Chapman*, 452 U.S. 337, 352, n. 13-14, 101 S. Ct. 2392, 2402, 69 L. Ed. 2d 59 (1981); *see also*

*Cotton v. Taylor*, 176 F.3d 479 (5th Cir. 1999) (Fifth Circuit reversed the district court's finding of deliberate indifference where the district court had found that the efforts of facility officials were

ultimately unsuccessful and showed an "inability to resolve the problem" even though the defendant took steps and the district court had listed alternatives the facility could have taken); *Harrison v. Culliver*, 746 F.3d 1288, 1299-1300, 2014 WL 1304010, at *1 (11th Cir. Apr. 2, 2014) (finding that the defendants did not fail to provide adequate security on a back hallway, where an inmate had his throat cut, and where four previous incidents with weapons had occurred, and reasoning that "Holman housed between 830 and 990 inmates during the relevant time period—and the [33] incidents involving weapons, only four of which occurred on the back hallway, are hardly sufficient to demonstrate . . . a prison where violence and terror reign . . ..").[29]

The Fourth Circuit's opinion in *Taylor v. Freeman*, 34 F.3d 266 (4th Cir. 1994) also is instructive, on several different legal bases. In *Taylor*, the Fourth Circuit reversed the district court's grant of injunctive relief, and, like in this case, the Fourth Circuit made clear that there was not a finding of deliberate indifference. Before reaching the issue of deliberate indifference, the court first comprehensively detailed settled jurisprudence on the separation of powers type of issues that arise when the type of arguments urged by Plaintiffs here are made:

> It is well established that absent the most extraordinary circumstances, federal courts are not to immerse themselves in the management of state prisons or substitute their judgment for that of the trained penological authorities charged with the administration of such facilities.
>
> Focusing on the comity concern, the Court observed in *Preiser v. Rodriguez,* 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973), that,
>
> . . . [i]t is difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons . . . . The strong considerations of comity that require giving a state court system that has convicted a defendant the first opportunity to correct its own

---

[29] *See also Purcell ex rel. Estate of Morgan v. Toombs Cnty., Ga*, 400 F.3d 1313, 1321-23 (11th Cir. 2005) ("Inmates [ ] were segregated . . . officers were on duty . . . officials [ ] punish[ed] inmate violence . . . And while inmate fighting does happen. . . [including "serious fights"] . . . the record is insufficient to show that serious inmate-on-inmate violence was the norm or something close to it. Also, the fights that did occur were linked to no recurring specific cause: causes ran the gamut from disagreements over television channels, to retaliation for pre-incarceration street activity, to card games, to food.").

errors thus also require giving the States the first opportunity to correct the errors made in the internal administration of their prisons.

*Id.* at 491–92, 93 S.Ct. at 1837 (footnote omitted).

. . .

The district court failed, as the inmates do, even to acknowledge these bedrock principles governing federal equitable intervention into the peculiarly state function of prison administration . . . Over the years, federal courts have 'become increasingly enmeshed in the minutiae of prison operations. Judges, after all, are human. They, no less than others in our society, have a natural tendency to believe that their individual solutions to often intractable problems are better and more workable than those of the persons who are actually charged with and trained in the running of the particular institution under examination. But under the Constitution, the first question to be answered is not whose plan is best, but in what branch of the Government is lodged the authority to initially devise the plan.' *Bell v. Wolfish,* 441 U.S. at 562, 99 S.Ct. at 1886. The district court in this case simply failed to undertake this most basic of inquiries.

*Taylor v. Freeman*, 34 F.3d 266, 268-270, 274 (4th Cir. 1994).  This concern only is heightened given the

unambiguous directives of the PLRA.

After the court discussed the Eighth Amendment standard, the *Taylor* court explained as follows

as it relates to the element of substantial risk of serious harm:

Similarly suspect is the district court's conclusion—based largely *on testimony from inmates*—that the inmates have shown that they are exposed to an unconstitutional level of violence at Morrison. The district court found conclusorily that "[a]ssaults and fights between and among inmates result in disciplinary infractions at Morrison at five times the average rate for adult prisons in North Carolina" and that "the understaffed facility [at Morrison] is ill equipped to handle the potential, as well as, constant levels of violence." *Id.* at 2–3. The court, however, failed even to mention the prison officials' evidence that although young males such as those incarcerated at Morrison tend to fight each other more often than do older inmates incarcerated at adult prisons, they do so with an intensity less likely to cause harm.

At bottom, the inmates' constitutional claim rests on statistics showing that, among a population of some 300 young felons, there is on average one reported altercation per week (and perhaps only one fight per month in the segregated dormitories) and sixty-five arguably serious injuries in forty-five months. As the record before the district court disclosed, these figures compare favorably, if regrettably, to the level of violence at large urban public schools in North Carolina.

*Id*. at 273-74; *Shrader v. White,* 761 F.2d 975, 980 (4th Cir. 1985) (the record showed there had been

seven inmate murders, fifty-four stabbings, and twenty-four other serious inmate-on-inmate assaults at

Virginia State Prison in the five years preceding trial. Notwithstanding this level of violence, the panel

sustained the district court's determination that the prison was not marked by a pervasive risk of harm from violence, recognizing that "acts of violence by inmates against inmates are inevitable[, and] [n]o amount of money and no increase in the number of prison officers is going to completely eradicate inmate violence.").

Perhaps even more important, the Fourth Circuit went on to explain why there could not be a finding of deliberate indifference due to the actions taken by prison officials.  The court noted that "[p]rior to the hearing, [prison] officials made various attempts to address conditions at the prison," and the court listed those "various attempts" as follows:

- Assigning one intelligence officer to identify and track gang and predatory behavior, and another to review on a daily basis all incident reports and protective housing requests in order to identify incipient problems;

- Relocating nine correctional officer positions to alleviate staff fatigue;

- Spending money on overtime pay to ensure that all security posts were fully staffed at all times;

- Making improvements to the physical plant;

- Restricting the wearing of jewelry by inmates to reduce incentives to violence;

- Initiating regular, formal meetings between staff and supervisors to promote the exchange of information;

- Introducing a requirement that all custody supervisors document that they had sought out and talked to at least three inmates per day;

- Adopting a policy of "zero tolerance" for low-level incidents;

- Initiating group counseling on stress and anger management, group "complaint sessions," and a class on cultural diversity.

- "At the hearing before the district court, Morrison officials notified the court of additional remedial steps *planned* for the near future."

*Id*.   In noting these actions taken by officials, the Fourth Circuit made clear that "[t]hese substantial remedial measures, if anything, confirm that the officials were willing and fully prepared to address the

problems at Morrison. They are hardly 'token measures' supporting a finding of deliberate indifference, as the district court characterized them without explanation." *Id.*    The same is true for the host of measures taken by Walnut Grove. As discussed in more detail *infra*, the actions taken by prison officials in this case prohibit a finding of deliberate indifference, just as in *Taylor*. *Id.*

## VIII.   THERE IS NO CURRENT AND ONGOING SUBSTANTIAL RISK OF SERIOUS HARM UNDER THE EIGHTH AMENDMENT AT WALNUT GROVE

The finding of a constitutional violation in the instant case would open the door, for the first time, to a whole new subset of Eighth Amendment prison conditions cases.  Plaintiffs' evidence in this case does more than just fall woefully short of meeting the proper constitutional standard. Indeed, Plaintiffs' entire underlying position inherently is flawed from the outset, primarily because it is based on a presupposed but nonexistent constitutional basis. Instead of presenting evidence of a substantial risk of serious harm and deliberate indifference, Plaintiffs attempt to refashion the standard to a risk of any harm that, according to Plaintiffs, necessarily results in constitutional violations when Walnut Grove does not take what Plaintiffs consider, without constitutional foundation, to be the best practices to reduce those risks.

It is curious that in pointing out how Defendant possibly (and subjectively) could improve, Plaintiffs fail to prove the underlying violation—that their constitutional rights are being violated as a result of any of Walnut Grove's customs and policies. They compounded this error by presenting a best practices case. In fact, Plaintiffs' expert, Eldon Vail, conceded that his testimony is about "best practices."[30] Plaintiffs conflate the constitutional minimum with subjective best practices and contort the Eighth Amendment's commands into what Plaintiffs would "like to see"[31] happen or what they

---

[30] *See* Transcript Day 6, Testimony of Vail, p. 226 (Q: "so we're talking now about best practices. Correct? A: Fair enough. Q: Is that a yes? A: Yes.").
[31] Transcript Day 2, Vail, p. 83; *see also* Transcript Day 1, Vail, p. 179 ("just seems to me that it would be good").

subjectively believe are "good correctional decisions."[32] The constitutional question, however, **is not** whether there is an arguably better way to do things. A constitutional inquiry into how Walnut Grove is managed must be limited to the issue of whether the "particular system violates any prohibition of the Constitution." *Bell v. Wolfish*, 441 U.S. 520, 562 (1979). Because the "problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions," prison officials at Walnut Grove are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.* at 547.  Plaintiffs in this case have failed to even prove that their ideas of how to run Walnut Grove are preferable, much less how their ideas are of constitutional significance.

Plaintiffs additionally attempt to paint a grim and condemning portrayal of Walnut Grove, but such a painting is inconsistent with the current conditions at Walnut Grove. While in any case where there are two sides of testimony, conflicts between some facts will exist. In this case, though, once the proper federal standards are understood, and the facts necessary to prompt remedial action by the judiciary under the Eighth Amendment and the PLRA properly are appreciated, the insufficiency of the Plaintiffs' presentation of proof—although long on speculative opinion, purported best practices, and every arguable episode, great or small—becomes manifest and dispositive.

## SAFETY AND SECURITY AT WALNUT GROVE

The issue before the Court is not about medical care or mental health. It is not about sanitation, immediate electrocution, contagion, or any other environmental-type of concern. It is not about the lack of food and/or water, extreme coldness or heat, isolation, or overcrowding.  The issue presented concerns only safety and security due to some attenuated and ill-defined level of violence that supposedly exists at Walnut Grove.

---

[32] Transcript Day 1, Vail, p. 36.

PD.17099813.1

In an attempt to advance such a claim, Plaintiffs often refer to what (purportedly) contributes to the so-called "violence" at Walnut Grove. Plaintiffs, for instance, state that gangs can drive violence and that contraband "compromises security."  Plaintiffs then proceed to provide an array of suggestions on how to reduce that alleged violence.  Plaintiffs, for instance, contend that the facility may be able to improve one or two of its policies, reduce contraband, add some more robust programming, and increase training by a few hours.  According to Plaintiffs, because there is room for such improvement, there also must be room for the risk of harm at the facility. This theory incorrectly conflates a reach for the constitutional maximum with a failure to provide the constitutional minimum. It also warps and transmutes the Constitution into an ever-watching "Big Brother" ready to audit and condemn the prison system at every turn. The Eighth Amendment, however, places its focus on cruel and unusual *punishments*. While Plaintiffs offer suggestions on how to make Walnut Grove a "safer" facility, Plaintiffs do not ever, in the first instance, prove any systemic violence (or substantial risk of serious harm from that violence) that can summon the Eighth Amendment. Nor do Plaintiffs demonstrate deliberate indifference.  Put simply, Plaintiffs' proof is long on opinion, long on adjectives, and long on suggestions, but short on necessary facts.

**Alleged Violence.**

Plaintiffs' recurrent attempts to characterize Walnut Grove as a violent facility are wholly impressionistic and lacking in foundation.  Instead of focusing on the assaults or use of force at the facility, Plaintiffs state that they "doubt" the veracity of the data contained in the MTC monthly report. From this, Plaintiffs argue that because MDOC's and/or MTC's internal system of classifying assaults might not be accurate, the violence at Walnut Grove must be pervasive. This analysis is wrong.

Vail testified that he thinks MTC's figures are wrong, but he did not know what the correct numbers were and did not dispute the figures used by the Monitors and Tom Roth. *See Transcript Day 6, Vail, p. 219*. While MDOC and/or MTC may classify and define assaults and/or disturbances in one

51

manner (or even in an incorrect manner),[33] the Court need not rely on Defendant's figures. In an effort to rely on objective data—as opposed to one party's data—Defendant's expert, Tom Roth, did not rely only on the monthly reports submitted by MDOC/MTC.  The level of assaults provided by Roth match exactly the numbers provided by the Court's Monitors. *See Transcript Day 5, Testimony of Roth, pp. 183-185.* The Court's Monitors' (*i.e.*, the objective parties) data is different, and in fact higher, than Defendant's data, and *this* is the data on which Roth relied. *See id.; see Monitors' Sixth Report, D-5, Docket Entry No. [121].*

To this, Plaintiffs offer no contrary data, and no one ever suggests how or why the Monitors' independent data is wrong. *Transcript Day 6, Testimony of Vail, p. 219.*  In fact, there is not a shred of evidence contradicting the Monitors' data.[34] This is despite the fact that it is Plaintiffs' burden to prove—not guess—that a current substantial risk of serious harm exists at Walnut Grove.  Even after determined discovery, years of a consent decree allowing Plaintiffs nearly unfettered access to documents, inmates, videos, investigators, and the facility, litigation assistance by experts, and more than one week of trial, Plaintiffs offer no additional data, no comparable data to Walnut Grove, no data on what level of violence is necessary to invoke the Eighth Amendment, or why the level at Walnut Grove should be considered unconstitutional.

---

[33] Any allegation that the Eighth Amendment is violated due to any claimed violation of or deviation from any internal policy is meritless. *See e.g. Longoria v. Texas,* 473 F.3d 586, 593, FN9 (5th Cir. 2006) (finding no violation of Eighth Amendment right to protection and acknowledging "[d]eviation from policy alone might support a negligence claim, but is insufficient by itself to support an argument for deliberate indifference. . ."); *Baldwin v. Stalder,* 137 F.3d 836, 840 (5th Cir. 1998) (finding no Constitutional violation despite an intentional violation of DOC policy regarding washing off pepper spray); *Falls v. Nesbitt,* 966 F.2d 375, 380 (8th Cir.1992) ("Our decision today stands for the proposition that a prison official's violation of an internal regulation does not give rise to an Eighth Amendment claim of cruel and unusual punishment . . .").

[34] Plaintiffs attempted to insinuate during the evidentiary hearing that the veracity of the data was in question because Dr. Austin, the additional Court Monitor, did not conduct each and every inmate interview himself. *See Transcript Day 3, Martin, p. 65*. However, as Monitor Martin testified, when the interviews were not conducted by Dr. Austin, they were conducted "under [his] supervision," which is an "accepted practice and procedure." *Transcript Day 3, Martin, p. 77.*

PD.17099813.1

Instead of offering proof, Plaintiffs attempt to divert the Court's attention from the proper constitutional examination by focusing on what potentially may (or may not) happen at Walnut Grove in the unknown future. Plaintiffs, indeed, spend a considerable amount of time attempting to establish that the minimum and medium custody inmates housed at Walnut Grove are "capable of violence." *Transcript Day 1, Testimony of Vail, p. 116*; *see also Transcript Day 5, Testimony of Lt. Morgan, p. 21* (questions related to whether unstructured activity can lead to inmates looking for bad stuff to do).  Plaintiffs also were insistent on asking questions of their expert about the "possibility of a riot" in the future at Walnut Grove. *Transcript Day 6, Testimony of Vail, p. 154* ("I can't put a percentage on it but [the possibility of a riot] certainly could happen"); *Transcript Day 1, Testimony of Vail, p. 126* (Walnut Grove "may well be no better prepared").  While it should go without saying that any inmate (or any human for that matter) is "capable of violence," the Eighth Amendment is not a magic eight ball, and the PLRA is not focused on what possibly could occur at some later date. Further, as Plaintiffs' expert readily acknowledged, the "possibility of a riot is at every prison . . . [t]o a greater or lesser degree" and he (Plaintiffs' expert) "had riots at [his] prisons in Washington." *Transcript Day 6, Testimony of Vail, p. 217.*  None of these attempts at predicting future events can conjure up a violation of the Constitution.

Neither can Plaintiffs' focus on "compromised security." For example, Plaintiffs asked Warden Jenkins hollow questions about whether the "presence of contraband compromises security at the facility." *See Transcript Day 4, Testimony of Warden Jenkins, p. 112.*  Lieutenant Morgan also was asked questions about whether gangs in the prison can be a "security issue." *See Transcript Day 5, Testimony of Morgan, p. 32-33*. Obviously, the answer to both of these questions only can be yes, but the questions are non-sequiturs. The conclusion that flows from those questions, and the answers, is not that the Eighth Amendment is violated. It is, instead, that Walnut Grove *is a prison*. Prisons house convicted criminals who would not be in prison if not for someone or some institution believing the prisoners themselves are a compromise to security and, therefore, need to be detained. *See, e.g., Hudson v. Palmer*, 468 U.S. 517,

526, 104 S. Ct. 3194, 3200, 82 L. Ed. 2d 393 (1984) ("Prisons, by definition, are places of involuntary confinement of persons who have a demonstrated proclivity for antisocial criminal, and often violent, conduct. Inmates have necessarily shown a lapse in ability to control and conform their behavior to the legitimate standards of society by the normal impulses of self-restraint; they have shown an inability to regulate their conduct in a way that reflects either a respect for law or an appreciation of the rights of others."). To utilize Plaintiffs' specious questions and implied suggestions as a vehicle to reach the Eighth Amendment would, in turn, mean that every prison in the country runs afoul of the Constitution. And not just prisons—every city, county, state, and even high school would be in violation of the Constitution if "compromised security" or the presence of a "security issue" was the standard.  But it is not the standard, or the proper focus.

Placing the concrete facts of this case in the context of the Eighth Amendment reveals the lack of a current and ongoing substantial risk of serious harm. During the hearing, several incident reports spanning multiple months were introduced. These incidents break down into two categories: (i) incidents that occurred between October of 2014 and January of 2015, inclusive, and (ii) incidents that occurred during the months of February and March of 2015.  These two categories provide the Court with evidence of conditions over a six month period, and they are discussed in turn.

**Category One: Time Period Between October of 2014 and January of 2015, Inclusive:** The first category, those incidents occurring between October of 2014 and January of 2015, inclusive, are Plaintiffs Exhibits 25 through 31. These incidents may show that isolated events occur in a prison, but they do not demonstrate any systemic constitutional violation. *See Transcript Day 2, Vail, pp. 57-60 and Day 6, Vail, pp. 216-218* (recognizing that bad things happen in prison, including riots and deaths in his prison in Washington, but noting that you cannot focus on "isolated incidents"). What additionally can be gleaned from Plaintiffs' exhibits is that the inmates involved in the incidents were disciplined and that Walnut Grove took reasonable action in response. Indeed, the inmates involved in the November and

December 2014 incidents were reclassified and transferred out of Walnut Grove. *See Transcript Day 4, Testimony of Warden Jenkins, p. 178-180* (offenders involved in incidents in November and December of 2014 were disciplined, reclassified, and removed from Walnut Grove). It is undisputed, then, that Walnut Grove does not act with any deliberate indifference.

Significantly, too, all of these incidents were provided to the Monitors for evaluation and report, and they are considered in the Sixth Monitors' Report. In looking at that Report, which encapsulates the incidents referred to by Plaintiffs, the Monitors stated as follows:

> In previous reports we have noted that [Walnut Grove's] rate per 100 inmate population per month had declined and was comparable to the other MDOC major facilities.  The overall rate for [Walnut Grove] for 2014 is eight per 100 inmates per year . . .

> It is also noteworthy that 96 percent of the inmates at [Walnut Grove] in January 2015 have no DVRs for an assault, meaning 46 do have such a record. Further of the 42 inmates who were interviewed, four (10 percent) indicated that they 'feared for their safety.' Four inmates also stated that they have received verbal abuse in the form of cursing and one inmate stated that he had perceived physical abuse in the form of officers making him strip, bend over, and cough for them. He stated that this occurred a year ago.

> Collectively, these **data *consistently* <u>show</u>** <u>that the vast majority of the inmate population is not involved in assaultive or violent behavior</u>, but there remains a **<u>small</u>** and visible population that has exhibited violence, has the *potential* behavior, or who have been abused (mostly in the form of *verbal* abuse).

*Monitors' Sixth Report, D-5, Docket Entry No. [121]* ("the facility has made significant gains in each of the aforementioned core areas of operation").

The Monitors' Report does not state that the data "sometimes" shows low levels of violence—or that the data is some kind of temporary aberration. Rather, the Report states that the data "<u>consistently</u>" shows the lack of systemic violence. The Court Monitors compiled their own data, and that is the data that Defendant's expert relied on—and on which the Court may rely.  In addition, the Sixth Monitors' Report breaks down the rate of assaults at some additional facilities from January of 2014 through December of 2014. *Id.* Walnut Grove falls in the middle, and on the low end of the middle at that. *Id.*

55

Interestingly, too, the Monitors set their own standard in the Second Monitors Report for what the Court Monitors believed is an acceptable standard concerning assaults.  In 2012, the rate of assault at Walnut Grove was 27 per 100 inmates. *Monitors Second Report, Exhibit P-20.* The Monitors stated that an acceptable rate of assault would need to be reduced "by at least 50 percent" of that number. Walnut Grove currently is reduced, and has been reduced for a "consistent[ ]" period of time, by more than 50 percent per the Monitors' Report. In pointing this out, Defendant does not suggest that there is some enchanted number that once reached means there is no substantial risk of serious harm.  Yet, what the unrefuted Monitors' data "consistently [and currently] show" is that the level of assaults and violence is not "extreme," and that Walnut Grove, under any constitutional definition, cannot be considered a place "where terror reigns."  *Alberti*, 600 F. Supp. at 450, *aff'd*, 790 F.2d 1220; *Jones*, 636 F.2d at 1373-75.

**Second Category: Incidents in February and March of 2015**.  The second category of incidents on which Plaintiffs rely are incidents that occurred in February and March of 2015. There was no evidence presented by Plaintiffs, or anyone, of any incidents in February of 2015.  The so-called incidents in March of 2015 reveal only one thing: that, in a prison, isolated incidents will happen. Importantly, though, at Walnut Grove, these incidents do not demonstrate a *substantial* risk of *serious* harm, much less any deliberate indifference to any harm.  To reiterate this point, each incident is discussed:

March 12, 2015.  On March 12, 2015, there was a "code blue" at the facility, which indicates a medical emergency. *See Exhibit P-47; Exhibit D-50*; *Transcript Day 4, Testimony of Warden Jenkins, p. 72-77.*  On this date, the report indicates that the captain who arrived on the scene noticed that the offender was on the floor rolling around in his vomit.  After the captain entered the zone, the offender grabbed the captain by the arm, at which time the captain administered some OC spray. The offender was taken to the medical department for evaluation and decontamination.  As Warden Jenkins stated, the eye wash station was not used in this particular incident because, due to the location of the incident, the staff would have had to take the offender in "the opposite direction of the medical department."  It is

56

undisputed that the offender was taken to the medical department and decontamination procedures were followed there. Further, it is undisputed that the offender was offered a shower and refused. The officers on the scene acted appropriately and there were no injuries. *See Transcript Day 4, Testimony of Warden Jenkins, pp. 72-77; Exhibit P-47; Exhibit D-50.*

March 14, 2015.  On this date, an inmate was placed on suicide watch. *See Exhibit P-48*; *see Transcript Day 4, Testimony of Warden Jenkins, pp. 77-80.*  Being placed on suicide watch automatically rises to the level of an Extraordinary Occurrence Report (EOR). The offender did not commit suicide. *See Transcript Day 4, Testimony of Warden Jenkins, pp. 77-80*; *Exhibit P-48.* A review of this incident shows no use of force, much less a substantial risk of serious harm or deliberate indifference.

March 19, 2015.  The March 19, 2015 incident was reported and submitted on March 25, 2015. *See Exhibit P-49*; *Exhibit D-48.*  As Warden Jenkins made clear, the few days delay in submission was due to an "an electrical storm." *Transcript Day 4, Testimony of Warden Jenkins, p. 65.* This incident was an "inmate on inmate" altercation, and staff at Walnut Grove responded. *Transcript Day 4, Testimony of Warden Jenkins, p. 65-66.*  Staff timely arrived and separated the two offenders. *Id.*  The offender "had sustained some trauma to the facial and the head area. He was taken to the medical department [ ] for precautionary measures [and] was sent out to the local hospital to ensure that there would be no concussions." *Id.* The offender did not suffer a concussion; he was sent only as a precaution. The officers responded in a timely manner to the incident, and the fight broke up once officers arrived. *Id.*

As can be seen from this incident, inmates sometimes are transported to the hospital for off-site medical attention, but this does not mean that serious harm occurred, as Plaintiffs tried to insinuate during the hearing. Instead, inmates are transported for precautionary measures, and inmates are transported even if they need only a "stitch." *Transcript Day 4, Testimony of Warden Jenkins, pp. 83-84.* The reason for this is that the facility does not allow nurses (as opposed to facility doctors) to provide certain types of care, including stitches. *Id.*  If it had not been for this March 19 precautionary transport to the hospital,

there would not have been any transports in March of 2015. *Transcript Day 4, Testimony of Warden Jenkins, p. 84.*

The March 19 incident, like the March 12 medical incident and the March 14 inmate that was placed on suicide watch, does not reveal a substantial risk of serious harm at Walnut Grove. The incidents reveal the opposite of that, as well as the antithesis of deliberate indifference. Each of these incidents, in fact, demonstrate that inmates will fight or try to fight, or that a medical emergency may arise, but staff at Walnut Grove arrive and respond reasonably. *See Transcript Day 5, Testimony of Roth, p. 67* ("The only issue that I see is there's a continuous trend that I believe is initiated by [ ] the current warden to [ ] place more emphasis on preparing his staff to do a better job and the job that needs to be done. That's about the only [ ] thing that I [ ] can read and that I've [ ] heard.").

March 21, 2015 Targeted Cell Search.  On March 21, 2015, the facility conducted a targeted cell search. *See Exhibit D-49.*  This search shows that Walnut Grove pursues and receives information related to contraband and conducts targeted cell searches in an effort to reduce contraband. It also reveals a reasonable response by Walnut Grove staff:

> A:    On the day in question, we had received the information that a particular offender in this particular housing unit was in possession of some contraband. We initiated a targeted search consisting of the chief of security, captain and two male correctional officers entered the zone. Went up to the second tier where the cell 21 was located and started the targeted search.
>
> While up on the second tier, several inmates which was out in the dayroom area during regular out of cell time came up to the second tier. They were given orders to go back downstairs. They originally complied, but later returned, at which time they assaulted Officer Johnson. A total of six inmates was involved. Chemical agents was applied to disperse them.

*Transcript Day 4, Testimony of Warden Jenkins, p. 69-70*; *see Exhibit D-49.*  No inmates were injured, although one inmate who has asthma was sent to the hospital due the fact that OC spray was dispersed, but that inmate returned shortly thereafter. *Transcript Day 4, Testimony of Warden Jenkins, p. 71.*

Interestingly, while Plaintiffs' expert criticized Warden Jenkins for not separately watching the March 21 cell search video, Plaintiffs' expert went on to state that the decontamination procedure followed by the facility in this incident was the "right thing" and the "best thing they could have done at the moment." *Transcript Day 6, Testimony of Vail, p. 196.*[35]

Further, as it relates to the March 21 targeted cell search, the inmates involved properly were disciplined. Six inmates received RVRs, the inmates were reclassified to close custody, and they were transferred out of Walnut Grove. *Transcript Day 4, Testimony of Warden Jenkins, p. 71; see Exhibit D-49.* From this incident, the following is demonstrated: (i) a concerted effort to gather intelligence, conduct cell searches, and reduce contraband; (ii) a reasonable and timely response by staff that caused no inmates injury; (iii) a proper decontamination method, as even admitted by Plaintiffs' expert; (iv) proper discipline to the inmates involved; <u>and</u> (v) that Walnut Grove *is* utilizing (on its own) a reasonable inmate classification system.

<u>Incidents Regarding Alleged Sexual Misconduct</u>. Plaintiffs also rely on two incidents of inappropriate touching and one allegation of sexual misconduct. Each of these is discussed. Exhibit P-51 concerns an incident where a staff member was accused and questioned about her grabbing an inmate's pants in an inappropriate manner. *See Exhibit P-51; Transcript Day 4, Testimony of Warden Jenkins, pp. 80-81.* What is undisputed about this incident is that the officer was questioned, an investigation was

---

[35] It also is important to point out that, in these incidents, Plaintiffs do not complain about any uses of force committed by staff. According to Tom Roth, the only witness that testified to this at all, he watched videos and reviewed documents spanning an extensive period of time and only found one incident of use of force that was "questionable." *Testimony of Day 5, Roth, p. 109.* Further, the officer involved in the questionable use of force was terminated. *Id.*

While Plaintiffs' expert witness, at times, discusses the decontamination policy at Walnut Grove, there has been no proof of a substantial risk of serious harm (or deliberate indifference) resulting from the use of OC spray— or even testimony of such. *See, e.g., Hughes,* No. 8:12-CV-568-T-23MAP, 2015 WL 1737871, at *78. Indeed, on March 21, 2015, a targeted cell search was conducted and Vail concedes the contamination policy followed by staff was "right." *Transcript Day 6, Testimony of Vail, p. 196; see also Transcript Day 5, Roth, p. 110-113* (discussing Defendant's decontamination policy); *Exhibit D-14* (policy); *Exhibit D-32* (photo); *Exhibit D-33* (photo).

Plaintiffs' expert also discusses the audio-visual recording of uses of force. However, Vail concedes that officers are "pretty dedicated to try and go get that camera." *Transcript Day 1, Vail, p. 178.* Vail merely states that sometimes they "don't do a good job of keeping the focus." *Id.*

undertaken, and the facility determined that the officer acted inappropriately. *Id.* The employee was relieved of duty immediately and placed on leave without pay pending termination. *Id.* The next incident on which Plaintiffs rely is an incident that occurred between an on officer and an offender, where the offender was witnessed kissing and touching an officer inappropriately. *See Exhibit P-52*; *Transcript Day 4, Testimony of Warden Jenkins, p. 82.* An investigation was undertaken, and a recommendation for termination was made for the accused officer. *Id.* As can be seen from these two incidents, Walnut Grove does not disregard or otherwise not act in the face of misconduct, or even alleged misconduct. To the contrary, prison officials investigate and reasonably take proper action.

Plaintiffs additionally rely on the PREA complaint that involved an officer at Walnut Grove.[36] *See Exhibit P-46*; *Transcript Day 4, Testimony of Warden Jenkins, pp. 84-85*. This complaint currently is under investigation at Walnut Grove, and Walnut Grove has involved law enforcement given that it is an allegation of sexual misconduct. *Testimony of Warden Jenkins, pp. 84-85*; *137; 158-160* (Warden Jenkins testimony that he "personally" reviewed videos and that Brady Sistrunk, the investigator, investigated the incident). As of the evidentiary hearing, no determination had been made by Walnut Grove or law enforcement as to whether this officer did what he was alleged to have done. *Id.* But, importantly, the allegations are being investigated by both Walnut Grove and law enforcement, and the officer is on leave without pay pending the result of the investigation. *Transcript Day 2, Brown, p. 240.*

A review of these reports even in combination with the reports encompassed in the Sixth Monitors' Report reveal only the lack of a *substantial* risk of *serious* harm, and certainly the lack of deliberate indifference. *See Transcript Day 5, Testimony of Roth, p. 62-63* ("[W]hen you start dissecting the assaults, you know, one of the things you got to be careful about is the fact that all assaults are not the

---

[36] Plaintiffs' expert witness also has stated that there are "what *appear to be* discrepancies" in the Bureau of Justice's PREA audit. *Transcript Day 2, Vail, p. 105*. It is undisputed that Walnut Grove recently passed the federal government's PREA audit. *See id.; Exhibit D-11*. If there are so-called discrepancies, the discrepancies are not discrepancies at Walnut Grove. As Vail conceded: "Q: So if there are discrepancies inside the report, that's something that the auditors' responsible for isn't it. A: If there are discrepancies in the report, yes it would be the responsibility of the auditor [*i.e.*, the federal government, not Walnut Grove]." *Id.*

same. And there are assaults that sometimes may be [ ] an extremely aggressive act . . . There's a lot different types of scenarios that are assaults. And when it's reported you have to be careful about taking a look at that." No facility is free from assaults and "a good percentage of those assaults" at Walnut Grove "were assaults on staff without injury.").

At bottom, then, Plaintiffs' case boils down to one expert witness, who offers nothing more than suggested fixes for unproven problems and so-called (and admitted) best practices, and the conclusory and unreliable testimony from *two out of almost 1,000 inmates*. *See Transcript Day 6, Testimony of Vail, p. 226* (Q: "so we're talking now about best practices. Correct? A: Fair enough. Q: Is that a yes? A: Yes."); *see Alberti v. Heard*, 600 F. Supp. 443, 450 (S.D. Tex. 1984), *aff'd sub nom. Alberti v. Klevenhagen*, 790 F.2d 1220 (5th Cir. 1986) (noting the "inherent credibility problem normally attached to inmate testimony" in the context of prison conditions litigation). Despite the fact that the testimony provided from the two inmates does not establish any system-wide Eighth Amendment violation, each inmate's testimony nevertheless is discussed.

<u>Inmate Evans</u>.  Inmate Evans is in prison for armed robbery and serving a sentence of eight years. *See Transcript Day 3, Testimony of Evans, pp. 36*.  Evans reported two alleged incidents of inappropriate sexual activity. First, Evans stated that he saw one officer, Officer Bourrage, with his pants down at one time, and that Evans believed Bourrage *may* have been engaged in sexual activity with another employee. *See Transcript Day 3, Testimony of Evans, p. 40.* Evans also contended that a female CNA (certified nursing assistant), CNA Butler, sexually assaulted him by putting her mouth on his genitals. *See Transcript Day 3, Testimony of Evans, p. 41-42*.  Evans stated that he reported this to Officer Crouther. *See Transcript Day 3, Testimony of Evans, p. 26*.

It is undisputed that Evans did not call the PREA hotline to report any alleged sexual assault. *Transcript Day 6, Stipulation, p. 5*. Evans' testimony also was disputed by every other witness, including

even by non-MDOC and non-MTC employees.[37] Evans also testified about alleged prison conditions at Central Mississippi Correctional Facility ("CMCF") after he left Walnut Grove. While the alleged incidents occurring at CMCF are not relevant to the termination of the Consent Decree at Walnut Grove, Defendant points out that Evans' testimony altogether was refuted by all CMCF officials.[38]

Evans' testimony does not demonstrate a system-wide Eighth Amendment violation, and every other witness disputes the testimony. Evans' testimony also is noteworthy for additional reasons. Plaintiffs contend that the level of gangs could be reduced at Walnut Grove, but Evans testified that he is not gang affiliated and never has been. *See Transcript Day 3, Testimony of Evans, p. 6.* Plaintiffs argue that there is not enough robust programming and work opportunities at Walnut Grove. Inmate Evans, however, testified that he had a job while at Walnut Grove as a medical porter, and that he worked seven days a week from "*seven that morning to 10:00 that night*." *See Transcript Day 3, Testimony of Evans, p. 36-37.* Not only has Inmate Evans' testimony been refuted, but it is not credible on its face. First, it is undisputed that inmates are locked in their cells before 10:00 p.m. at night. *Transcript Day 5, Roth, p. 101.* Second, if Inmate Evans was working seven days a week from "seven that morning to 10:00 that night," he certainly could not have witnessed any of the events to which he testified about occurring in the housing units because he was not in the housing units; he was at work.

---

[37] *See Transcript Day 6, Testimony of Nurse Hogue, pp. 7-13, 19-20* (Nurse Hogue is not employed by MDOC or MTC. She is the Health Services Administrator and Evans worked under her as a medical porter. Nurse Hogue testified that Evans never told her he was subjected to a sexual assault and never told her or complained of an incident in which Officer Bourrage allegedly had his pants down); *Transcript Day 6, Testimony of Officer Crouther, pp. 123-129* (Crouther is a correctional officer at Walnut Grove and a Staff Sergeant in the National Guard who testified that Evans has never told her he had been sexually assaulted); *Transcript Day 5, Testimony of Officer Bourrage, pp. 196-197* (Bourrage is a correctional officer at Walnut Grove who testified that he has never been in or left a room with Nurse Bryant with his pants off or down); *Transcript Day 6, Testimony of ARP Coordinator Prathemus Henson, pp. 111-115* (Evans' ARP not stamped and filed).

[38] *See Transcript Day 6, Testimony of CMCF Superintendent Ron King, pp. 39-41* (Evans never complained to him and he located Evans a job); *Transcript Day 6, Testimony of CMCF correctional officer Akins, pp. 94-96* (Evans had bed sheet and had his personal property wrapped in sheet; Akins told the floater employee to get Evans a mattress on the day Evans came to CMFC; and Akins personally saw that Evans had a mattress the following day); *Transcript Day 6, Testimony of CMCF correctional officer Quist, pp. 103-106* (Had contact with Evans the first of April and Evans had a bed sheet and had his property wrapped in a bed sheet and had a mattress).

PD.17099813.1

Inmate Owens. Inmate Owens is serving a forty-year prison sentence for armed robbery and aggravated assault. *See Transcript Day 2, Testimony of Owens, p. 143*.   Inmate Owens proffers conclusory testimony about the presence of contraband, alleged staff misconduct, and the alleged ability to jam the facility's cell doors. *Transcript Day 2, Testimony of Owens, p. 139*. For instance, Inmate Owens testified that he has seen a guard, "Officer Carter," "smoke spice." *Transcript Day 2, Owens, p. 136*.   However, it is undisputed that Carter, a former officer, was terminated during his probationary period in or around October of 2014. *Transcript Day 4, Warden Jenkins, p. 100*.   As discussed *infra*, the fact that contraband exists is neither uncommon nor sufficient to invoke the Eighth Amendment.   Further, Owens testified that he does not partake in drugs or other contraband, and Owens is not a member in any gang. *Transcript Day 2, Testimony of Owens, pp. 136, 142-143*. Inmate Owens, like Inmate Evans, additionally offers testimony regarding his conditions at CMCF.   While, again, the alleged incidents occurring at CMCF are not relevant to the termination of the Consent Decree at Walnut Grove, Defendant points out that Owens' testimony altogether was refuted by a host of CMCF officials. In fact, Owens concedes that, to believe his testimony, five different individuals would have to be lying.[39]

Owens further testified that he has witnessed inmates being dragged back into their cells when they were unconscious. This testimony curiously is uncorroborated.   If this type of practice was occurring at Walnut Grove, it would be fairly easy for Plaintiffs to prove through evidence other than just the

---

[39] *See Transcript Day 6, Testimony of Owens, pp. 148-149*; *Transcript Day 6, Testimony of CMCF Superintendent Ron King, pp. 39-41* (Met with Owens and Owens did not complain to him about not having a sheet/blanket and Owens wanted to go back to Walnut Grove); *Transcript Day 6, Testimony of CMCF Deputy Warden James "Todd" Fillyaw, pp. 52-56* (Owens told him he had everything he needed; Owens asked for a new mattress because his was thin so Fillyaw made sure he got another mattress; Owens received a shower on the Monday following his transfer to CMCF; Owens allowed to make a phone call in Fillyaw's office); *Transcript Day 6, Testimony of CMCF correctional officer Cornelius Rawls, pp. 72-83* (Owens undisputedly signed a cell inspection form showing everything in cell was working properly; Rawls personally checked Owens' cell; Rawls personally got Owens a mattress); *Transcript Day 6, Testimony of ARP Coordinator Henson, p. 119* (Has never told offenders to stop filing ARPs); *Transcript Day 6, Testimony of CMCF correctional officer Akins, p. 92-98* (Owens says he also is accusing Akins of lying); *Transcript Day 6, Owens, p. 148* (accusing Akins of lying); *see also Exhibit D-53* (CMCF Cell Inspection Form admittedly signed by Owens); *Exhibits D-41 and D-42* (Emails from Owens' parents to Superintendent King).

unreliable testimony of a single inmate. Indeed, Plaintiffs have investigators, lawyers, and/or other personnel at Walnut Grove regularly. *Transcript Day 6, Vail, p. 203* (discussing how the "SPLC [has] advocates, [ ] who are <u>into the institutions once or twice or sometimes every week</u>"). Further, as Vail testified, these "SPLC advocates," who are in the facility "twice or sometimes every week," "get to know the population." *Id.* Never once have these "advocates" mentioned, much less proven, that this type of alleged practice occurs, and no one contends (or testified) otherwise.

Moreover, as Warden Jenkins testified in response to Owens' testimony, "First of all I got an officer in those zones. Even though they're allowed on a temporary basis to leave that zone there's an officer in pod control that's overseeing all four zones. On top of those two instances, you have routine viewing of the video footage of all my zones . . . So to answer the question, is it possible? All of these areas would have to malfunction in order for that [an inmate dragging an unconscious inmate into the cell] to happen*." See Transcript Day 4, Testimony of Warden Jenkins, pp. 99-100*. The Warden's testimony was supported by Vail's testimony:

> Q:     All right. Are you aware that there are cameras in the housing zones?
> A:     Absolutely. I looked through a lot of those videos.
> . . .
> Q.     Let me try again. The cameras if somebody was dragging folks in cells it would be on the camera. It would be caught by the camera, wouldn't it?
> A.     On the camera, yes.

*See Transcript Day 6, Testimony of Vail, p. 228.*

As Vail conceded, he had access to housing zone videos and watched "a lot" of them. Vail also acknowledged, if the practice that Inmate Owens' testified about was occurring, the housing zone cameras would capture the event occurring. So, after years of a consent decree being in place giving Plaintiffs' counsel access to documents, videos, inmates, and the facility, and after discovery has taken place in this particular portion of the litigation, Plaintiffs found a single inmate to testify about this alleged practice of inmates being unconscious and dragged into their cells.

64

This also is true for Owens' testimony about cell doors being jammed. The cell doors at Walnut Grove are discussed in more detail *infra*, but two points immediately are clear from Owens' testimony. First, if the cell doors were being jammed and inmates were able to escape and assault other inmates (or even freely roam the facility), Plaintiffs would have proof given their near unfettered access to the facility and to documents at the facility. Also, as Vail testified, it would be captured on the housing zone videos, to which Plaintiffs have access and have reviewed. Second, if this was occurring on a current and ongoing basis, Plaintiffs (and the Court's Monitors) would have the underlying use of force reports or other incident reports showing an inmate jammed the door and attacked another inmate. But, the record utterly is devoid of such evidence, and this is quite telling of the weakness of Plaintiffs' allegations. It also is determinative of the fact that Plaintiffs cannot meet their burden to show a current and ongoing constitutional violation.

Owens' testimony is undermined even more by a letter Owens himself authored to CMCF Superintendent King on March 16, 2015. *See Exhibit D-40.*  While Owens tried to explain away his letter, the handwritten letter speaks for itself, and it provides in pertinent part as follows:

> . . . Despite whatever other problems Walnut Grove may have, their PC zone is **safe** and **competently operated** . . . In short, I felt **100% safe** in the PC unit at Walnut Grove. I was content and relatively comfortable . . . Sir, please help me move back to Walnut Grove as soon as logistically possible . . . **I am practically begging you to get me back to Walnut Grove** ASAP.

*Id*.

The type of scarce, uncorroborated, and refuted inmate testimony on which Plaintiffs rest their case is what has led courts to explicitly note the "inherent credibility problem[s] [ ] attached to inmate testimony." *See Alberti v. Heard*, 600 F. Supp. 443, 450 (S.D. Tex. 1984), *aff'd sub nom. Alberti v. Klevenhagen*, 790 F.2d 1220 (5th Cir. 1986). In *Alberti*, the court relied, in part, on a "cross-section" of inmate testimony (as opposed to the testimony of two inmates), but only because it was "corroborated by

all three outside expert witnesses." *Id*. Here, that is not the case, and no evidence presented by Plaintiffs can reach, or even get close to, the Eighth Amendment.

The constitutional rights of inmates are not violated each and every time an incident report is filled out, a fight happens, or an inmate is injured. *See Transcript Day 5, Roth, pp 67* (noting that no correctional facility can be completely safe for its inmates); *Transcript Day 2, Vail, pp. 56-61* (bad things happen in prison and always will, including at Vail's Washington prison where riots occurred, a guard was killed, and an inmate was shot trying to escape). It only is where the level of violence becomes "so high" that it is cruel and unusual punishment. *Guallatte v. Potts*, 654 F.2d 1007, 1012 (5th Cir. 1981). The proper query is whether there is an unjustified, constant, and unreasonable exposure to violence, *see Lamarca*, 995 F.2d at 1535, not whether inmates are exposed to some potentially reducible level of violence.

As discussed in detail *supra*, the Fifth Circuit has reasoned that, while violence and sexual assaults may rise to the level of a substantial risk of serious harm, that level is not any level of violence or even a reducible level of violence, it is when the confinement in a prison evidences of conditions "where terror reigns." *Alberti v. Klevenhagen*, 790 F.2d 1220, 1224 (5th Cir. 1986); *Jones*, 636 F.2d at 1373. The facts of both *Alberti* and *Jones* are both discussed *supra*, and the facts in those cases reveal literally a prison of "terror" and a jail properly labeled as a "prisoner-run kangaroo court." Walnut Grove stands in stark and glaring contrast to cases where the extraordinary level of violence summoned the Eighth Amendment. In fact, during the "current" time period, there have been no deaths, few (if any) serious injuries, and only a single, and yet unproven, allegation of rape against an officer.[40]

Plaintiffs' legal theory rebukes proper constitutional standards, and it necessarily assumes that the level of—or lack thereof—fighting or assaults at Walnut Grove is unconstitutional, which Plaintiffs not

---

[40] Even if you include Inmate Evans' refuted allegations of sexual assault, this still would be only two unproven allegations of sexual assault out of almost 1,000 inmates during the pertinent time period.

only failed to prove, but which also was belied by the evidence of incident reports and the Court's own Monitors. Plaintiffs' theory also must, without proof, assume that the fighting reflected by the evidence equates to a substantial risk of serious harm, and that Walnut Grove is deliberately indifferent to this risk (discussed more *infra*). In fact, Plaintiffs' entire constitutional construction is that the number of fights at the facility may be reducible, and thus regardless of whether the number of fights at Walnut Grove is normal, above normal, or below normal, the Constitution requires that Walnut Grove follow Plaintiffs' expert's view on what the appropriate practices are. This theory is not supported by either case law or common sense.

Plaintiffs presented absolutely no evidence that the fights or assaults that have occurred on a current and ongoing basis at Walnut Grove present a substantial risk of serious harm. No one provided testimony of a high level of violence—or a substantial risk of serious harm of violence. No one provided testimony (nor could they) that the conditions were "extreme" or rose to the level of conditions "where terror reigns." No one, including Plaintiffs' expert, conducted an analysis or comparison to provide guidance on whether the frequency or type of fights reaches a level constitutional concern. *See, e.g.*, *Alberti*, 790 F.2d at 1224; *Jones*, 636 F.2d at 1373; *Hughes v. Judd*, No. 8:12-CV-568-T-23MAP, 2015 WL 1737871, at *3 (M.D. Fla. Apr. 16, 2015) (an estimated average of two fights *per week* among a population of only eighty to one hundred individuals did not rise to a constitutional level).[41]

---

[41] In *Hughes v. Judd*, No. 8:12-CV-568-T-23MAP, 2015 WL 1737871, at *3 (M.D. Fla. Apr. 16, 2015), the court noted as follows:

> For all that the evidence in this action proves, the two "fights" per week among eighty to a hundred teenage detainees living in close quarters at CCJ might constitute a historic high or a historic low. From the record, one cannot know; the omission by the plaintiffs is purposeful.

> The plaintiffs' failure to adduce comparable data is curious, indeed. If comparable data exists, a purposeful failure to introduce the data is most suggestive. If the data is non-existent, the plaintiffs' hypothesis is without foundation. And, of course, the data would depend on what counts as a "fight," especially when the count of "fights" occurs in an action attempting to invoke the force of the Constitution. This order is not required to define what counts as a constitutional "fight," but this order finds that the plaintiffs' have established no definition, proffered no reliable count for CCJ, and provided no comparable data from elsewhere.

If a substantial risk of serious harm could be based simply on the fact that any fight between inmates has the potential to result in serious harm, and with further, super-constitutional efforts the number of fights or assaults might be lessened, every detention facility or prison across the country would be, by definition, subjecting inmates to a substantial risk of harm. That is not, and never has been, the Eighth Amendment standard.

With there being no evidence of widespread violence, and no substantial risk of serious harm, the fact that Plaintiffs' expert has offered suggested best practices for correctional facilities can only be viewed as fixes for a non-constitutional problem.  The Court's analysis, therefore, does not even need to reach Plaintiffs' additional arguments, including those regarding reducing contraband, management of gangs, the classification system, the "organiz[ation]" of the emergency response plan, robust programming, adding a few more hours of training or one or two more staff, and the alleged need to reduce an after action report to writing. Those types of issues, even when examined by courts (as discussed *supra*), only are analyzed once plaintiffs demonstrate the underlying systemic violence (a place "where terror reigns") as well as deliberate indifference. Logically, that is, the analysis does not need to reach how to fix a problem (*e.g.*, reducing contraband, gang management) until what needs to be fixed— *i.e*, the problem—first is proven. This is the underlying step Plaintiffs skip. While the facility at Walnut

---

This absence of empirical substance in the plaintiffs' presentation on "fights" leaves the court in the posture of a hypothetical person who has no knowledge of baseball; who is told that a player, say, Babe Ruth, failed to hit successfully in about seven of every ten at-bats; and who is asked to decide what quality of batter Ruth was. Absent comparable data, the hypothetical person is without a rational means to judge, and the fact of seven outs in every ten at-bats is intrinsically neither a "Hall of Fame" performance nor a pathetic flop. Similarly, considered in isolation, the occurrence of two "fights" per week (however defined or if not defined at all, as in this instance) permits no informed and rational conclusion. (This judge's impression is that two "fights" per week is an admirably low to typical number among a large group of teenagers, almost all male, who qualify in Florida for juvenile detention.).

*Id*.; *Myers v. O'Leary*, No. 85 C 8315, 1987 WL 16011, at *2 (N.D. Ill. Aug. 18, 1987) ("Myers has introduced Stateville records, showing that 233 prisoner-on-prisoner assaults occurred at Stateville in 1984. That raw number is itself incapable of establishing that attacks were so frequent as to be pervasive. We do not know whether the reports include minor and immediately quelled disturbances such as a shoving in a meal line. . .").

PD.17099813.1

Grove is not perfect, the evidence does not get close to showing cruel and unusual conditions, much less cruel and unusual punishment. *See Farmer*, 511 U.S. 825, 114 S. Ct. 1970 (making clear that "[t]he Eighth Amendment does not outlaw cruel and unusual 'conditions'; it outlaws cruel and unusual punishment."). Accordingly, while Plaintiffs start their analysis with best practices, the Eighth Amendment ends that inquiry before it may begin.[42]

Nevertheless, in the interest of addressing all points raised, the issues discussed by Plaintiffs during the evidentiary hearing are addressed in turn in an effort to demonstrate further why there can be no finding of an Eighth Amendment violation in this case.

**Contraband.**

The fact that contraband exists at Walnut Grove—like every other prison in the United States—is neither disputed nor unusual.  As the court in *Jones v. Gusman*, 296 F.R.D. 416, 433 (E.D. La. 2013) noted, "the possession of contraband in a correctional facility is not necessarily unusual . . . ."; *see also Transcript Day 5, Testimony of Tom Roth, pp. 83-86* ("I'm not familiar with a facility that has never found contraband"). This is why much, if not all, of Plaintiffs' testimony concerning contraband does not get them where they need to go under the Eighth Amendment.

Out of the almost 1,000 inmates at Walnut Grove, Plaintiffs brought in a total of two inmates to support their case that there is a system-wide Eighth Amendment violation.  Both of these inmates testified that contraband exists at Walnut Grove, but neither had any evidence other than conclusory (and unreliable) statements, which (as discussed *supra*) were refuted and otherwise unproven. Plaintiffs' expert

---

[42] As noted *supra*, inmate Owens and Evans made several allegations regarding purported retaliation due to the conditions at a facility other than Walnut Grove. The conditions at CMCF entirely are unrelated to whether there is a current and ongoing Eighth Amendment violation at Walnut Grove.  The allegations made by Evans and Owens also have been entirely refuted by every single witness that took the stand.  To the extent the Court is considering these issues separately from the issues related to Walnut Grove, Defendant notes that it remained undisputed that there was no retaliatory intent on the part of any CMCF employee or official. It is not clear what kind of action the inmates were attempting to urge due to the conditions at CMCF. Plaintiffs, at one point, seemed to allege that the Court should hold someone (although who still is unknown) in "contempt." To any extent Plaintiffs levy such an argument in their post-hearing briefing, Defendant notes that contempt would require actual notice to the parties (presumably the parties at CMCF) and it is a higher standard and burden of proof.

witness's testimony concerning contraband also is wholly imprecise.  Vail testified that he disagrees with the Sixth Monitors' Report on the decrease in contraband, but Vail provides no testimony, at all, as to what he believes is the level of contraband at Walnut Grove, or how that unidentified level is violative of the Constitution.  Under Plaintiffs' analysis, and Vail's suggested practices, if the contraband level at Walnut Grove (or purportedly any facility) is above whatever level Plaintiffs subjectively think is too high, the Eighth Amendment is violated. This defies both legal standards and simple logic.

In cases where contraband has been considered in the context of an overall conditions analysis under the Eighth Amendment, the focus is not just on the fact that contraband exists.  For instance, in *Jones*, the Eastern District of Louisiana noted that "OPP is plagued to a marked degree with contraband," but the court did not end the analysis there. *Id.* It went on to find that "[s]hanks are 'rampant,' and the number of stabbings is 'extremely high' and 'very disturbing' for a facility the size of OPP . . . Three videos, apparently filmed by inmates around the calendar year 2009 and unearthed the weekend before the fairness hearing, show inmates brandishing a loaded gun, using intravenous drugs, gambling with handfuls of cash, displaying cell phones, drinking cans of beer, and cavorting on Bourbon Street, having escaped OPP for an evening of leisure." *Id.* Further, "[d]espite repetitive problems with assaults and weapons, OPSO *does not conduct* regular shakedowns in a manner that would minimize the presence of contraband." *Id.*; *see also Gates v. Collier*, 501 F.2d 1291, 1308-09 (5th Cir. 1974) ("Although many inmates possess weapons, *there is no established procedure for discovering and confiscating weapons, nor is possession of weapons reported or punished*. The record revealed at least eighty-five instances where inmates had physically assaulted other inmates; twenty-seven of these assaults involved armed attacks in which an inmate was either stabbed, cut or shot.").

What noticeably is missing from all of Plaintiffs' evidence is the proof that existed in the above-discussed cases.  In those cases, the contraband was *proven* to be rampant, the inmates were almost daily carrying around dangerous weapons, the level of violence from the weapons was proven, and, more

70

importantly, the prison officials altogether disregarded the issue. That is, the prison officials in those cases had no set procedures in place for the control of contraband. Walnut Grove cannot be compared to those cases, either based on the level of contraband or violence or the actions taken by prison officials.

A key concession on this came in the form of testimony from Plaintiffs' expert. Vail testified that Walnut Grove does "a number of things" to find and control contraband. *Transcript Day 6, Testimony of Vail, p. 227*. While Plaintiffs found (only) two inmates to testify that contraband exists, what Plaintiffs cannot dispute—and do not try to dispute—is what Walnut Grove does to control that contraband, some of which includes:

- Installing underlined perimeter fence netting to make the entry of contraband over the fence more difficult. *See Transcript Day 4, Testimony of Warden Jenkins, p. 90; Exhibit D-11; Transcript Day 5, Testimony of Tom Roth, pp. 84* ("Perimeter netting is not something you find in most institutions"); *Exhibit D-22 (policy); Exhibit D-23 (policy); Exhibit D-24 (policy).*

- Installing and implementing a front entry check point body scanner to detect contraband on staff and/or visitors. *Transcript Day 4, Testimony of Warden Jenkins, pp. 89-90; Exhibit D-25; Transcript Day 5, Testimony of Tom Roth, pp. 84, 90-91.*

- Installing and implementing a parcel scanner to detect contraband coming in mail and packages. *See Exhibit D-11.*

- Additional metal detectors also exist at the facility, including outside of the gymnasium, in the hallways leading to the housing unit, and in the area that leads into the education department. *See Transcript Day 5, Testimony of Tom Roth, pp. 84, 92-94* (facility has metal detectors and other scanning devices in locations other than just the front entry); *Exhibit D-28; Exhibit D-29; Exhibit D-34.*

- MTC has a K-9 unit that the Walnut Grove facility utilizes to conduct searches in an effort to aggressively identify contraband on a monthly basis. *Transcript Day 4, Testimony of Warden Jenkins, p. 91; Transcript Day 5, Testimony of Roth, pp. 97* (K-9 unit a "MTC initiative"; "another initiative of going in there and trying to seek out whether that contraband is located and using that resources").

- Targeted and random cell searches routinely are conducted. *Transcript Day 4, Testimony of Warden Jenkins, pp. 117*. This can be shown through the March 21, 2015 targeted cell search. *Transcript Day 4, Testimony of Warden Jenkins, p. 69; see Exhibit D-49.*

- Inmates found with contraband are <u>disciplined</u>. For example, in the March 21, 2015, inmates were given RVRs, reclassified, and transferred out of Walnut Grove. *Transcript Day 4, Testimony of Warden Jenkins, p. 71*; *see Exhibit D-49*.; *contra Transcript Day 6, Testimony of Crouther, p. 131* (not aware of any employees with Walnut Grove using or having possession of any illegal drugs or any contraband); *Transcript Day 6, Testimony of Nurse Hogue, p. 21* (not aware of any employees engaging in the use of marijuana and/or spice either among themselves or either with the prison population).

- Cleaning supplies and equipment have been removed from the housing zones and put into a staging area and kept away from inmates. The staging area is <u>behind locked doors</u>. *Transcript Day 5, Testimony of Tom Roth, p. 96; Exhibit D-30*.

- Walnut Grove is <u>pursuing prosecution</u> of individuals found introducing or attempting to introduce contraband. *Transcript Day 5, Testimony of Tom Roth, p. 97*.

These are the issues that are germane to an Eighth Amendment analysis—not simply whether the level of contraband, in theory, could be reduced. These also are the issues that are determinative of why there is no Eighth Amendment violation at Walnut Grove.

**Gangs.**

In the context of the Eighth Amendment, prison conditions have been found constitutionally deficient due to violence, including gang violence, when the conditions created circumstances "where terror reigns." *Alberti*, 790 F.2d at 1224; *Lewis v. Richards*, 107 F.3d 549, 554 (7th Cir. 1997) ("gang"—or other violence—must be "so prevalent . . . that it create[s] a virtual 'reign of terror.'"). There has been no testimony establishing (or even alleging) a reign of terror—or anywhere close to that—at Walnut Grove.

Plaintiffs' expert's discussion of why he believes gang management at Walnut Grove to be deficient is both curious, and dishonest. This is because Vail's opinions admittedly are not rooted in any fact. *See Transcript Day 1, Testimony of Vail, pp. 139-140*; *Transcript Day 2, Testimony of Vail, pp. 90-91*. Vail testified that the facility's policies allegedly are not "adequate" because Walnut Grove does not have a "comprehensive [ ] strategy" to manage the gangs. *See Transcript Day 1 at pp. 139-141*. This

PD.17099813.1

testimony from Vail reveals only a subjective "best practices" approach to gang management (*i.e.*, not anything constitutionally mandated), and Vail simply *and admittedly* is wrong.

Indeed, Vail conceded as follows:

Q:    . . . Do you think that MDOC and MTC should focus their efforts to minimize impacts of gangs on the safety and security of the facility. Do you believe that?

A:    In that broadest possible policy statement language, yes.

Q:    Okay.

A:    The question that matters is how they're going to do it.

Q:    All right. Now, are you aware that Walnut Grove has a security threat group Lieutenant?

A:    I am.

Q:    You never talked to him, did you?

A:    The position was just recently filled is my understanding but the answer is no.

Q:    No, you didn't.

A:    Correct.

Q:    Therefore, since you didn't talk to him, you couldn't possibly know what he does as far as gang validation or keeping up with intelligence or anything dealing with gangs. You don't know what he's doing since you didn't talk to him, correct?

A:    I don't know what he – that person is doing, correct.

*See Transcript Day 2, Testimony of Vail, pp. 90-91*; *see Transcript Day 5, Testimony of Lt. Morgan, pp. 6-7* (never spoke to Vail).

Vail does not hesitate to wear the hat of a professional critic but, at the same time, he acknowledges that he does not know what Walnut Grove's security threat group ("STG") Lieutenant does, or how the facility's STG policy is implemented. *Contra Transcript Day 5, Testimony of Tom Roth, pp. 70-79* (met with Lt. Morgan and noting that the policy with respect to STG is "proactive"); *see Exhibit D-44* (policy). This type of litigation strategy is what prompted criticism (*i.e.*, strategies labeled as "mischievous[ ]") from the court in *Hughes,* 2015 WL 1737871, at *10.

Vail attempts to excuse his baseless testimony by saying that STG Lieutenant Morgan was just hired. This, too, is false when put in context. Lieutenant Morgan was hired in October of 2014. *See Transcript Day 5, Testimony of Lt. Morgan, pp. 2-6.*   This is three months before Vail's in-person meeting at Walnut Grove in January of 2015; four months before Vail submitted his expert report; and six

months prior to Vail's in-court testimony.  Even before Lt. Morgan started his employment at Walnut Grove, "[t]he work was being done by an intake lieutenant [ ] and the investigative lieutenant. So it was shared responsibilities." *Transcript Day 5, Testimony of Tom Roth, p. 76-77.*  Currently, and for some time now, Walnut Grove has had a dedicated position.

Vail, with help from counsel for Plaintiffs, also tried to excuse the factual voids in his "expert" testimony by noting that he (Vail) was not given as much access to staff as Defendant's expert Tom Roth.[43] This strategy also rings hollow, and is, as the Florida court labeled, mischievous.  First, Plaintiffs were given the opportunity to take discovery, including depositions, during the course of this litigation. Second, Vail concedes that he **never asked to speak with staff** during his one-day tour of the facility. *Transcript Day 6, Testimony of Vail, pp. 219* ("Q:  In any regard you didn't request to talk to staff did you? A:  I did not.").

Gang management at Walnut Grove is "proactive" and, at bottom, certainly not constitutionally deficient. *See Transcript Day 5, Testimony of Lt. Morgan, pp. 7-38* (the process starts as soon as inmates enter the facility, and they validate inmates if they are part of a security threat group and send that validation form to MDOC); *Exhibit D-44.*  Some of the most pertinent gang management strategies at Walnut Grove include: (a) starting the process as soon as inmates enter the facility, validating inmates if they are part of a security threat group, and "[o]nce [STG members are] put into MDOC system . . . then that offender can then be tracked regardless of what facility at MDOC he's at"; (b) implementing a renunciation program; (c) having enhanced staff training for identifying and dealing with security threat groups; (d) aggressively identifying individuals who may be considered a threat; (e) transferring inmates out if they are disruptive; (f) providing input to classification case management personnel; (g) monitoring activities and property; (h) providing input into housing placement; (i) encouraging and utilizing shared

---

[43] It is noteworthy that while Vail criticizes the selection of randomly-selected inmates with which Roth spoke, Vail admits that "SPLC advocates" chose the inmates with which he spoke. *Transcript Day 6, Vail, p. 203.*

information and networking, including working closely with the corrections investigation division of MDOC; (j) identifying and confronting individuals considered in a leadership role; (k) not automatically transferring out all STG leaders because, in Lt. Morgan's experience, "with lack of true leadership the underlings fight for leadership"; (l) referring inmates for criminal prosecution when appropriate. Lt. Morgan works closely with investigator Brady Sistrunk, the facility investigator; and (m) producing status reports to management personnel, including on a monthly basis. *See Transcript Day 5, Testimony of Lt. Morgan, pp. 7-38.*  None of this is disputed.

In an abortive attempt to overcome their deficiencies in proof, Plaintiffs argue that Walnut Grove's renunciation process may "possibl[y]" lead to someone being considered a "snitch." *See Transcript Day 5, Testimony of Lt. Morgan, pp. 35-37.*  For instance, counsel for Plaintiffs asked a series of questions related to whether it is "impossible" for a snitch to be beaten and/or killed in "any prison." Under Plaintiffs' apparent constitutional construction, as long as it is not "impossible" that an event "possibl[y]" may happen, the Eighth Amendment is violated.  With due respect to Plaintiffs, and their counsel, this simply is absurd.

Plaintiffs also point to two instances where a security threat group member attempted to have their own security. Lt. Morgan addressed this in his testimony

> Q.     . . . are you familiar with the concept of gang members having their own security?
> A.     Yes, sir.
> . . .
> Q.     All right. How did you handle that?
> A.     Once they got to my office I welcomed in both parties, come in. And once they're in my office then if I have one offender, I'll pull both inmates up in offender track and if I have one offender that is validated let's say as a gangster disciple, this guy that he brought with him as a -- and the offenders tell us it's not my security, it's a witness.
> Q.     A witness to what?
> A.     A witness to make sure that the offender we called out isn't snitching on the rest of the members. So when he comes in, and I bring them both in, I'll either -- if one may be validated, one is not, then according to the criteria I have to meet I can then validate the one because he is now associating with a validated member of that particular gang.
> Q.     And what has that done to these folks bringing -- trying to bring security with them when they come to see you?

A.      They don't bring them any more.

Q.      You ended that?
A.      Yes, sir.

*See Transcript Day 5, Testimony of Lt. Morgan, pp. 19-20*; *see also Transcript Day 5, Testimony of Lt.*

*Morgan, pp. 25-26* (only aware of this happening one other time).

Plaintiffs' counsel, in questioning Lt. Morgan about this issue, played a game of smoke and

mirrors.  For instance, in the questioning, counsel asked a series of questions to Lt. Morgan concerning

whether "condon[ing]" gang members as security violates basic gang management principles. *See*

*Transcript Day 5, Testimony of Lt. Morgan, p. 28.*  Of course, the answer to that question is yes, but the

answer does not reveal any deficiency in gang management at Walnut Grove because the question is

deceptive. It implies, in the first instance, that Walnut Grove officials do condone such behavior. The

evidence, however, reveals precisely the opposite—that Walnut Grove does not condone the behavior and

that Lt. Morgan has ended the behavior. *See Transcript Day 5, Testimony of Lt. Morgan, pp. 20, 37-39;*

*Transcript Day 5, Testimony of Tom Roth, pp. 82-83, 177-179.*

With no proof that this security issue happened more than twice, and with no evidence suggesting

prison officials condoned such behavior,  Plaintiffs expert was left with only stating that he "doubts" that

it only happened twice. *See Transcript Day 6, Testimony of Vail, pp. 199-200.*  Plaintiffs' expert's

"doubts" do not substitute for evidence of how Walnut Grove's policies and practices are constitutionally

deficient.  These types of games played by Plaintiffs' counsel did not end there, though. Counsel for

Plaintiffs, for instance, honed in on questioning Lt. Morgan as to whether there may be some STG

members at Walnut Grove who have not yet been identified. *Transcript Day 5, Testimony of Lt. Morgan,*

76

*p. 37.* That is not the focus. Instead, what is key is that Walnut Grove undisputedly *is* taking reasonable and proper action concerning gang management and, therefore, does not act with deliberate indifference.[44]

In short, the Eighth Amendment is not a game of guesswork, smoke and mirrors, "impossibil[ities]," or "doubts," and the Constitution is not a force to censure the subjective (and, in this case, utterly speculative) "adequacy" of prison policies. Plaintiffs have no basis, in fact or in law, to condemn as inadequate the management of gangs at Walnut Grove.

**Staffing and Training.**

Plainly and simply, Walnut Grove is adequately staffed and trained. Plaintiffs utterly have failed to demonstrate that Defendant is deliberately indifferent to the staffing and/or training needs of Walnut Grove, and Plaintiffs further failed to show any link between any current and ongoing alleged harm—or substantial risk of serious harm—and the staffing/training at Walnut Grove.[45]

<u>Staffing</u>. Plaintiffs spend time equivocating over whether officers should or should not sometimes briefly leave the zone, or what the precise number should be for there to be to an "adequate number of officers." *See Transcript Day 4, Testimony of Warden Jenkins, p. 171.* However, the Eighth Amendment **<u>cannot</u>** be—and **<u>never has been before</u>**—reduced to this type of an inquiry. See *Hughes v. Judd*, No. 8:12-CV-568-T-23MAP, 2015 WL 1737871, at *22 (M.D. Fla. Apr. 16, 2015) (plaintiffs "attempt to reduce a constitutional condemnation of deadly neglect and brutal malfeasance to a mere disagreement about trivial differences in staffing ratios . . . ."). Plaintiffs do not, and cannot, demonstrate that any "staffing levels" at Walnut Grove cause a current substantial risk of serious harm. Further, there was not a scintilla of evidence that Defendant has a "deliberate intent" to inadequately staff Walnut Grove. This

---

[44] *See Taylor*, 34 F.3d 266 (assigned "one intelligence officer to identify and track gang and predatory behavior).

[45] Plaintiffs asked a series of questions to Marjorie Brown regarding the changes in wardens at Walnut Grove. Through the questions, Plaintiffs attempted to make it appear as if something sinister was occurring at Walnut Grove due to the changes in wardens. The former warden, however, left Walnut Grove due to "health problems." *See Transcript Day 4, Warden Jenkins, p. 102.*

should end the inquiry into the staffing levels at Walnut Grove. However, out of an abundance of caution,

Defendant discusses the staffing at Walnut Grove in more detail.

Starting with the Sixth Monitors' Report, the Court's Monitors found as follows:

The current line staff complement is 212, with 28 supervisory staff (captains, lieutenants, sergeants) . . . A review of the staffing rosters for this reporting period indicates that for two of the three shifts, all facility housing pod areas have assigned officers . . . Officers are more diligent in ensuring that cell doors are secure, rounding checks appear to be more frequent, and overall staff presence in the housing area is much improved . . . Each major housing unit has an assigned sergeant from 8:00 a.m. to 4:00 p.m. After 4:00 p.m., Unit 4 (segregation) has an assigned sergeant and two additional shift sergeants provide coverage for the remaining units.
. . .
Each shift now has CERT officers assigned to act as first responders to emergent incidents, e.g., on January 15, 2015, the second shift had four assigned CERT officers supported by a CERT sergeant.
. . .
While there continues to be too many unobserved altercations [*i.e.*, not serious harm or the substantial risk thereof] in the housing areas, there is evidence that officers, because they are more consistently present in the housing areas, are beginning to intervene in inmate altercations.

*See Sixth Monitors Report, Exhibit D-5, P-15, pp. 14-15.*

There has been a reduction in force ("RIF") since the Monitors' Report. *See Transcript Day 3, Testimony of Martin, p.78* (cannot warrant that the staffing is inadequate after the RIF because there also was a decrease in population). It is undisputed, however, that the RIF correlates directly with the reduction in inmate population.[46] As Warden Jenkins unrefuted testimony makes clear, Walnut Grove has a total of six housing units, two of them now are vacant, and, even with the decrease in inmate population, the facility only lost one sergeant in the RIF. *Transcript Day 4, Warden Jenkins, pp. 105-106; Transcript Day 2, Vail, p. 99* ("Q: But you haven't been over there to see how things are staffed now, have you? A. I

---

[46] In the Sixth Monitors' Report, there was a reference made to the housing plan at Walnut Grove after the reduction in population. *See Transcript Day 5, Roth, pp. 58-59*. Roth explained this in his testimony, which has remained unrefuted. *Id.* (updated housing plan).

have not been there to see. That's correct. Q. And you haven't talked to any of the commanders or any of the staff over there since the RIF, have you? A. I have not talked to any of those people.").

Warden Jenkins further testified, "I think if you look at the current staffing pattern we have, each one of our housing units, the four housing units that we spoke about earliest you'll see that each building is staffed with five officers. Okay. One up in the picket and one on each zone. All accept your third shift. And the reason you have that difference in the third shift is because a majority of inmates if not all of them are locked down. So you don't need that higher deployment." *Transcript Day 4, Testimony of Warden Jenkins, p. 172*; *see also Exhibit D-31 (Post Analysis); Transcript Day 5, Testimony of Tom Roth, p. 98-103, 115* (Warden's staffing schedule encompasses the RIF at Walnut Grove and is adequate and analyzing the post analysis); *Transcript Day 2, Vail, pp. 107-109* (admitting that he was at the facility for only one day during business hours [8:00am to 5:00pm], never has been at the facility after 5:00pm to know what occurs with the staffing levels, and has never spoke to any shift commanders about anything "of substance"); *Transcript Day 5, Testimony of Tom Roth, p. 101-102, 115* (Inmates are locked in their cells for the night at approximately 9:30 p.m. Therefore, the activity level at night is very low and fewer staff are needed on the night shift).

Plaintiffs' expert witness took issue with certain aspects of Defendant's staffing levels, but Plaintiffs again offer only suggested best practices on the staffing at Walnut Grove. For instance, Plaintiffs speak loosely of an officer leaving the zone, but they advance such an argument with no supporting evidence or argument as to how Defendant's practices or policies beseech a constitutional violation. Further, as Warden Jenkins testified, if an officer briefly leaves the zone, there is the "pod control officer" still "watching the zone." *See Transcript Day 4, Warden Jenkins, pp. 94-95, 102-103*; *Exhibit D-47 (Post Order).* Further, as Warden Jenkins testified:

A:      Temporary absence from this post shall only be authorized with proper approval from the immediate supervisor.

. . .

Q.    Okay. And I believe -- did you say that at muster this is something that is reviewed?

A.    Repeated on a regular basis, yes, sir.

. . .

Q:    Just to clarify the – is there always some eyes on the – on each zone, either the CO or the pod control or I mean the picket?

A:    Yes, sir.

Q:    The pod control?

A:    The temporary absence is applied only to those zone officers. There is no temporary absence for that pod control officer, the picket officer. That officer is always there 24/7. Obviously, not the same officer; but if that officer has to take a convenience break or to come down for whatever the purpose is, there must be a relief for that person.

*See Exhibit D-47* (Post Order); *Transcript Day 4, Testimony of Warden Jenkins, pp. 96, 102-103*;

*Transcript Day 3, Martin, p. 66* ("I don't subscribe to the theory that it's necessary for an officer to be literally inside a housing area for eight solid hours."); *Hughes v. Judd*, No. 8:12-CV-568-T-23MAP, 2015 WL 1737871, at *80 (M.D. Fla. Apr. 16, 2015) ("Much more important to the resolution of the present action is the plaintiffs failure by a comfortable margin to demonstrate that the Sheriff is deliberately indifferent to the staffing needs of CCJ."); *contra Gates*, 501 F.2d at 130001 ("custodial responsibility of inmates [ ] assigned to other inmates . . . ."); *Alberti*, 600 F. Supp. 443, *aff'd,* 790 F.2d 1200 ("deputies infrequently entered actual housing areas . . . [inmates] not directly observed for . . . periods of days on end"); *Jones*, 296 F.R.D. 416 (single officer left responsible for supervising multiple floors of inmates); *Marsh*, 268 F.3d 1014 ("only one jailer was on duty at the Jail at a time").

Training.  As with staffing, any alleged deficiency in training is not a stand-alone constitutional violation.  More importantly, though, there was absolutely no evidence presented by Plaintiffs that training was deficient in any way.  Because all officers are, at least, minimally trained and, in fact, more than minimally trained, the analysis ends here.  There is no evidence of a substantial risk of serious harm due to training, or that Defendant acts with deliberate indifference toward the training needs at Walnut

Grove.[47] *Transcript Day 5, Testimony of Roth, pp. 103-107* ("they're just getting better all the time with their continued initiatives on critical issue management as well as drills.").[48] A look at the training that officers at Walnut Grove do receive confirms this point, and the training that is provided is undisputed. Below is only a sample of the training provided as Walnut Grove:

• Walnut Grove provides pre-service training, and was accredited by the American Correctional Association within the last six months.  Pre-service training consists of approximately 120 hours. *Id.*

• Walnut Grove provides "on-the-job training" and "classroom training." *Id.*

• On an annual basis, Walnut Grove requires 40 hours of training. *Id.*

• All officers are trained on the updated emergency response plan, including training provided by agencies and/or individuals outside of the facility. *Transcript Day 4, Testimony of Warden Jenkins, pp. 44-48.*

• The emergency response also has been tested through real time drills. *Day 4 Transcript, Testimony of Warden Jenkins, pp. 47-52.*  There were a total of six drills for 2014, and one drill already has been accomplished already for the first quarter of 2015, which was accomplished in March 2015. *Day 4 Transcript, Testimony of Warden Jenkins, pp. 47-53.* After these real time drills, the facility has an administrative debrief. *Day 4 Transcript, Testimony of Warden Jenkins, p. 52-54* (. . . "after every drill we have an administrative debrief. We look at the drill itself. We looked at what took place. We looked at any weaknesses, any corrective actions that we need to make. Any best practices that we tend to identify . . . we have a requirement of one per quarter. My goal is to do six in addition to the required four, to do two additional."); *Transcript Day 2, Vail, p. 79* (Vail offers criticism regarding the real time drills but he admits he has never spoken to any officers involved in those drills: "Q. Did you talk to any of the people involved, any correctional officers involved in the realtime drill? A. I did not.").

• Walnut Grove also conducts table top drills, in addition to real time drills. *Day 4 Transcript, Testimony of Warden Jenkins, pp. 47-56.*  For table top drills, the Warden brings in various supervisors and department heads and he (the Warden) provides them with varying scenarios. The prison officials and supervisors then dissect the scenarios and analyze the best actions and responses. *Day 4 Transcript, Testimony of Warden Jenkins, p. 56.*

• Walnut Grove provides training sessions on the incident command center for staff, including trainings in 2014 and currently planned training for 2015. *Day 4 Transcript, Testimony of Warden Jenkins, pp. 56-58, 104-105; see also Exhibit D-10.*

---

[47] In a cursory fashion, Plaintiffs makes allegations that Walnut Grove staff do not have gas masks/respirators. It is undisputed that Walnut Grove has gas masks. *See Transcript Day 4, Warden Jenkins, 94.*

[48] *Transcript Day 6, Testimony of Hogue, pp. 21-22* (receives training); *Transcript Day 6, Testimony of Crouther, pp. 129-130* (receives training).

- Walnut Grove has a field training officer manual program. *Day 4 Transcript, Testimony of Warden Jenkins, pp. 85-87* ("The FTO as we call it field training officer is a – it's going to be a training correctional officer. As I've stated before, in our training process we go through a preservice training. Three weeks of classroom and one week of OJT on-the-job training. As we put these new cadets on the floor we would put them with a trained correctional officer and FTO to ensure that the policies and procedures that we a retaining the staff on is conducted by somebody that we feel comfortable that will ensure that it's done and done correctly.") The field training manual contains a "cross-reference of all our policies and procedures." *Id.; see also Exhibit D-13.*

- Walnut Grove, in addition, has a supervisory development program. *Transcript Day 4, Testimony of Warden Jenkins, p. 87.* This training consists of "training to enhance the employees' abilities to be a better supervisor." *Id.*

- Walnut Grove also, without dispute, conducts debriefs and implements what officials learn into the training: "[A]t the conclusion of every drill we do an administrative review a debrief if you will looking at what took place, what we can do better what the flaws were. If there were any type of issues related to that drill that we can improve upon . . . I do that same administrative review after every incident. A majority incident not a drill but the actual incident itself. Get key personnel, administrative staff, security." *Transcript Day 4, Testimony of Warden Jenkins, pp. 184-185.*

There is, without doubt, no evidence or even suggestion that all staff at Walnut Grove are not adequately trained to perform the job. *Contra, e.g., Gates*, 501 F.2d 1291 (no training). No case law—absolutely none—stands for the proposition Plaintiffs ask this Court to adopt. And, as noted originally, this is not the first time plaintiffs (and some of the same Plaintiffs' counsel) have advanced the arguments they are urging in this case. In prior cases, for instance, Plaintiffs relied on a patchwork of inapplicable legal authority for the proposition that the Eighth Amendment is violated in every instance where there is not "adequate staffing" or "reasonable training." *See, e.g.*, *Hughes*, 2015 WL 1737871, at *6. This theory rightfully has been rejected by courts.

One of the cases counsel for Plaintiffs has relied on in the past is *Youngberg v. Romeo*, 457 U.S. 307, 102 S. Ct. 2452, 73 L. Ed. 2d 28 (1982). While that case, factually and legally, is dissimilar to the instant matter, it also does not stand for the proposition for which it has been cited previously by Plaintiffs. For instance, in *Hughes*, the court recognized as follows:

> The plaintiffs next again cite *Youngberg* for the requirement of "adequate staffing" and "adequate services" and "reasonable training" without any reference to *Youngberg*'s fortifying and explanatory context, discussed earlier in this order. The plaintiffs seem to

82

suggest by this truncated and isolated citation to *Youngberg* that any "inadequacy" in staffing, services, or training creates a constitutional consequence, a notion negated by the whole of the applicable law.

*Hughes*, 2015 WL 1737871, at *25;[49] *see also, e.g., McDowell v. Brown*, 392 F.3d 1283, 1291 (11th Cir. 2004) (a plaintiff must prove more than, for example, "a generalized policy of understaffing" and must prove "a 'deliberate intent' to inadequately staff."); *Youngberg*, 57 U.S. 307 (addressing issues related to involuntarily and civilly committed persons and, in regards to training, finding that only "**minimally adequate training**" is necessary and noting the "deference due to the judgment exercised by a qualified professional.")[50]; *Hughes,* 2015 WL 1737871, at *81 ("An alleged deficiency in training is not itself a constitutional violation. The plaintiffs must prove that any alleged deficiency . . . causes some constitutional 'harm'" and that officials were deliberately indifferent); *see, e.g., Benavides v. County of*

---

[49] Plaintiffs also have before cited to *Harris v. Thigpen*, 941 F.2d 1495 (11th Cir. 1991) for the notion that inadequate staff may rise to deliberate indifference as to prisoner safety. *Harris* is an action "involving the [Alabama Department of Corrections'] policy of uniformly segregating from the general prison population those prisoners who test positive for exposure to [the HIV virus]." 941 F.2d at 1498. In discussing whether the DOC was "deliberately indifferent to the serious medical needs of seropositive inmates," *Harris* notes that both "[f]ederal and state governments have a constitutional obligation to provide minimally adequate medical care" to a prisoner and that "mere incidents of negligence or malpractice do not rise to the level of constitutional violations," although a "series of incidents closely related" or "repeated examples" may constitute a "pattern of conduct amounting to deliberate indifference."

*Harris* is about medical care for a seropositive inmate and, although the plaintiffs in *Harris* lose the Eighth Amendment claim (the district court is affirmed), Plaintiffs in this case have cited before to *Harris*. Plaintiffs previously have stated that *Harris* means that inadequate staff may rise to deliberate indifference as to prisoner safety. In fact, *Harris* states about staffing:

> Deliberate indifference to inmates'' health needs may be shown, for example, by proving that there are "such systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care."

941 F.2d at 1495. Whether Plaintiffs again cite to *Harris*, or some other case, the noteworthy point is that no case stands for the proposition for which Plaintiffs are urging in this litigation.

[50] *See also Youngberg*, 457 U.S. at 330-331 (Burger, J., concurring) ("I also point out that, under the Court's own standards, it is largely irrelevant whether respondent's experts were of the opinion that 'additional training programs, including self-care programs, were needed to reduce [respondent's] aggressive behavior,' *ibid.*— a prescription far easier for 'spectators' to give than for an institution to implement . . .  Thus, even if respondent could demonstrate that the training programs at Pennhurst were inconsistent with generally accepted or prevailing professional practice—if indeed there be such—this would not avail him so long as his training regimen was actually prescribed by the institution's professional staff.").

PD.17099813.1

*Wilson*, 955 F.2d 968, 973 (5th Cir. 1992) (in other Section 1983 contexts, declining to find governmental liability in a failure to train case where the law enforcement officers in question had successfully completed the minimum training mandated by state law and had been certified); *Williams v. City of Cleveland, M*iss., 2:10CV215-SA-JMV, 2012 WL 3614418 (N.D. Miss. Aug. 21, 2012) *aff'd*, 736 F.3d 684 (5th Cir. 2013).

In sum, Plaintiffs failed to present any cognizable evidence that their preferred external controls, such as staffing levels and a few more hours of training, and their rejection of those adopted by Walnut Grove, are constitutionally required, or that Walnut Grove's management is somehow constitutionally deficient.   Instead, Plaintiffs offer only proposals which they would like to see adopted.   Plaintiffs, however, utterly failed to prove the preference or effectiveness of their penological theories, much less their constitutional validity.   Plaintiffs' argument also is an example of the exact type of "micromanaging" that the PLRA intended to extricate from the analysis.   The Eighth Amendment is not a mechanism for dictating the best practice; it is a device to ensure that the altogether lack of training, or the gross and systemic deficiency in a complete lack of staff, does not result in *cruel and unusual punishments*.   This is a standard Plaintiffs cannot reach, even with their heavily stretched and fictional notions of constitutional law.

**Emergency Response Plan.**

In addressing Walnut Grove's emergency response plan ("ERP"), Plaintiffs' expert quibbles over hypothetical situations and ways that the response plan could be slightly better "organized." *Transcript Day 6, Vail, p. 184*. For instance, Vail complains that the ERP, to him, is not a "functional document," occasionally is not "internally consistent"[51] from his reading, and is not "organized in any kind of linear fashion." *Transcript Day 6, Vail, pp. 166, 167, 184*.   Vail also tries to reduce the Eighth Amendment to an

---

[51] An alleged (and unexplained) internal inconsistency in an internal prison policy does not equate to a violation of the Eighth Amendment. *See supra n. 32*.

audit of the ERP's "checklist" and "table of contents." *Transcript Day 6, Vail, p. 167, 182-183*. Indeed, Plaintiffs focus on the fact that the ERP checklist needs to include policies for a hazardous material spill, power outages, and radioactive contamination exposure. *Transcript Day 6, Vail, pp. 220-221*. Of course, Vail admits, however, that none of these things have occurred at Walnut Grove, and he simply is trying to predict future and hypothetical events and set forth what he, subjectively and admittedly, considers to be the best practice. *Id*.

It is undisputed that the Court Monitors have pointed out no deficiencies with Walnut Grove's emergency response plan ("ERP"). *Transcript Day 6, Vail, pp. 221-222*. It also is undisputed that expert Tom Roth has examined Walnut Grove's ERP and finds that it covers all of the basic elements that you would find in an ERP. *Transcript Day 5, Roth, pp. 115-116*; *Transcript Day 6, Vail, p. 225* (Vail admitting that among all of the professionals, including those at Walnut Grove and the Court Monitors, he is the only one taking issue with the ERP). Diverging from a single professional critic's so-called best practices is not synonymous with a violation of the Constitution.

**Cell Doors.**

In the interest of clarity, Defendant briefly describes the cell doors at Walnut Grove. All of the inmate housing units contain cells, and there is no dormitory housing at the facility. *See Report of Roth, Exhibit D-7*. Two of the housing units (eight zones) contain cells that are equipped with doors commonly referred to as sliding doors. *Id*. The remaining housing units contain cells that are equipped with swing doors that are connected to the wall through a hinge. *Id*. Both types of doors are powered electronically through an electronic control panel which is located in a secure pod control room. *Id*. If power is lost to the control panel, a manual release option is available. *Id*. Plaintiffs appear to focus their unsupported allegations on the swing/hinged doors at Walnut Grove, and not on the sliding doors.

Plaintiffs' allegations and purported proof (or, more appropriately, lack of proof) concerning these cell doors at Walnut Grove are dubious, at best. Vail testified that he found "startling" the fact that the cell

doors "were not secure" and that this was one of the "biggest concern[s]" he had and still has about the prison. *See Transcript Day 1, Vail, p. 57*. According to Vail, "it <u>seems to [him]</u> that it would be <u>good</u> to get a completely unbiased security expert in there <u>to identify the problem</u> that **may** be contributing to keeping people at risk of harm in the facility." *Transcript Day 1, Vail, p. 179*.[52]

Several points just from this testimony alone are key. First, this is another example of what Vail would like to see happen—not what is mandated by the Eighth Amendment. Second, Plaintiffs do not even know if there is a problem with the cell doors. Instead, they want the facility to hire an outside expert to "identify the problem."  Even aside from the incongruity of such a statement under Eighth Amendment jurisprudence, it is Plaintiffs' burden under the PLRA to prove a current and ongoing violation, not Defendant's burden to go search for and then "identify" a problem, if one even exists. Third, and along these same lines, Vail states that the doors "may" be contributing to a safety risk.

Vail's additional testimony is even more revealing:

Q:	You admit that the issues with the slider doors have been fixed. Correct?
A:	And that there's no – yes I do and there's no inmates living in those units right now is my understanding.
Q:	However you state that other problems *apparently* remain.
A:	I do.

. . .

Q:	And when you say that other problems apparently remain, that means you're not sure if they remain or not with these swinging doors, do you?
A:	The nature of the problem remains a mystery to me. But the consistent reports from the inmates thing is acknowledged in Mr. Roth's report as well is that those hinged doors *can be* jammed. Apparently – I don't know if its maintenance, I don't know if it's design. Like I said earlier today it would be great to get an outside independent security hardware expert in there to say, here's what the problem is. You can fix them or you can't fix them.

---

[52] In his export report, but not during the evidentiary hearing, Vail focused on the alleged inoperability of the facility's panic buttons/emergency call button. Vail also focused on this in his proposed remedial measures attached to Plaintiffs' amended memorandum. [Doc. 115-1].  At trial, however, Vail conceded that he only got this information from the inmates and has no further proof that any of the panic buttons are inoperable. *Transcript Day 2, Vail, pp. 83-84*. Further, Vail did not disagree with the Monitors Report, which states that they are "operable and functioning." *Id.*; *see also Expert Report of Tom Roth, Exhibit D-7*.

Q:      So going back to your statement, you don't know if there's a mechanical problem as you sit here today – *well first of all you're not a security expert, are you?*

A:      *Not a hardware expert, no sir.*

Q:      All right. *So as you sit here today, you don't know if anything's mechanically wrong with those cell door locks or not, do you?*

A:      *I don't know. That would be true.*

*See Transcript Day 2, pp. 80-83*; *see Transcript Day 6, Testimony of Vail, p. 231-232* (Vail admits he is not an expert in cell locks).

It is telling that Plaintiffs do not even try to link any current incidents at Walnut Grove to the cell doors, and this is after Plaintiffs have scoured the record evidence—and the facility—for years.  For example, as Vail concedes, the housing zones contain cameras, and he has "looked through a lot of those videos." *See Transcript Day 6, Testimony of Vail, p. 228*.  Additionally, Plaintiffs' counsel has access to documents, videos, inmates, and the facility, and there are Court Monitors in place to monitor the facility. Even with all of this, and even after discovery has taken place in this particular portion of the litigation, there is no proof the cell doors cause any substantial risk of serious harm, or even have caused any harm at all.  If inmates were able to daily escape from their cells and roam freely, or if inmates were able to easily jam the locks and attack other inmates, this would be something Plaintiffs could prove.  Of course, they did not do so.  *Contra Transcript Day 5, Roth, p. 66-74; Report of Roth, Exhibit D-7; Exhibit D-21* (photograph).

At the evidentiary hearing, Plaintiffs relied heavily on a report from the Department of Justice ("DOJ") from March of 2012. *See Exhibit P-7*.  Plaintiffs relied mainly on this report during their supposed proof concerning the cell doors at Walnut Grove, and presumably in an (unsuccessful) attempt at trying to show deliberate indifference. What Plaintiffs did not ever do, however, is tell the Court precisely what that DOJ report stated. In that report, as it relates to the cell doors, DOJ stated as follows: "Either the cell door locking devices are inferior **or security staff is not inspecting the cell door locking**

**mechanisms on a frequent enough basis**." *See Exhibit P-7, p. 000025.* It is undisputed that this concern

expressed by DOJ in 2012 has been addressed by both MDOC and MTC.

From an MDOC perspective, former Deputy Commissioner has set forth a cell door operation

practice for several prisons in Mississippi, including Walnut Grove, explaining that officers "are to be

present when a cell door is opened or closed to ensure its functionality and to prevent tampering . . . cell

doors are to be inspected each time and every time a cell door is opened or closed." *Exhibit P-25* (Memo).

This practice has been implemented, and followed, at Walnut Grove. As Warden Jenkins testified:

> A:   . . . [M]uster is where we convene our oncoming shift and have a – it's a combination of
> shift assignments, we conduct training, we also pass on information that's going to be
> pertinent to the operation of the on coming shift. We also pass on information as it relates
> to issues of concern that may generate from my office down to them.
> Q:   Al right. And in each of these musters, is checking these cell doors discussed?
> A:   Yes, sir.
> Q:   How often?
> A:   That's been mandated that they discuss – there's four items that I've mandated all shifts in
> all musters until future notice to be discussed. Securing and checking all cell doors is one
> of them. Removing all items from the cell fronts and windows, ensuring that staff remain
> on their post, those areas until further notice will be discussed in all musters.

*Transcript Day 4, Testimony of Warden Jenkins, p. 62.* Consequently, the issues from 2012 have been

addressed. It is undisputed that the facility takes the issue of cell door security seriously, and, at bottom,

does not act with deliberate indifference.

**Programming/Idleness.**

Plaintiffs' focus on the need for a few more hours of robust programming is another example of

Plaintiffs trying to create a new and amorphous conditions of confinement claim that has no basis in

constitutional law or the PLRA. First, it is undisputed that Walnut Grove does offer programming. *See*

*Transcript Day 5, Roth, pp. 116-122* (noting that between programs and work assignments, approximately

70% of inmates are involved, and that programming differs for facilities and the missions of the facilities

and Walnut Grove has a decent number); *Exhibit P-16* (Program Overview)[53];   *Transcript Day 3, Testimony of Evans, p. 36-37* (Inmate Evans conceded that, while at Walnut Grove, he had a job as a medical porter and that he worked seven days a week).

Second, there also is no proof that the programming offered at Walnut Grove amounts to a substantial risk of serious harm. In the *Hughes* case, for instance, Plaintiffs at least created and relied on data trying to establish a corollary between idle time and the number of fights. Even there, though, such an absurd reading of the Eight Amendment was rejected. *Hughes*, 2015 WL 1737871; *Rhodes v. Chapman*, 452 U.S. at 348 (1981); *Anderson v. LeBlanc*, No. CIV.A. 13-00541-BAJ, 2013 WL 6328221, at *3 (M.D. La. Dec. 4, 2013) (citing *Alberti v. Klevenhagen,* 790 F.2d 1220, 1228 (5th Cir. 1986) ("A prisoner has no constitutional right to vocational, educational and other programs."); *Lancaster v. Tilton*, No. C 79-01630WHA, 2007 WL 4570185 (N.D. Cal. Dec. 21, 2007).

Here, Plaintiffs do not even attempt to try to link idleness to any substantial risk of serious harm, much less deliberate indifference to that harm. They just, without support, state that idleness can contribute to a risk of violence.  This is an inapt argument, and Plaintiffs' suggestion that the Eighth Amendment guarantees a happy selection of "robust programming" simply is wrong.

**Classification System.**

Plaintiffs do not (and could not) dispute that Walnut Grove has and implements a classification policy.  There also is no proof, or even suggestion, that a failure to classify has led to harm or a

---

[53] This program overview is being cited as a sample of the programs at Walnut Grove. *See Taylor v. Freeman*, 34 F.3d 266 (4th Cir. 1994) (noting the facility had initiated group counseling on stress and anger management). However, Defendant notes that the numbers do not take into consideration a decrease in inmate population.

substantial risk of serious harm.  Significantly, too, it is beyond cavil that Walnut Grove does not act with any deliberate indifference toward classification of inmates.[54]

Walnut Grove classifies inmates and has a policy on classification. *See Exhibit D-18; Transcript Day 5, Roth, pp. 54-60* (policy identifies "all the critical issues").  Walnut Grove has a housing unit for the elderly and a privilege unit. *Id.* The facility, undisputedly, has separation between protective custody and general population.  *Id.* In addition, the facility has identified opportunities for inmates that are misconduct free. *Id.  Contra, e.g., Gates*, 501 F.2d at 1300-01 (inmates were not classified at all); *Jones*, 296 F.R.D. 416 (most inmates were not classified "in any manner"); *Marsh*, 268 F.3d at 1024-25 (no system of classification existed).

While Plaintiffs try (unsuccessfully) to suggest that prison officials at Walnut Grove only correctly classify inmates with pressure from the Court Monitors, Plaintiffs' own presented evidence belies this implication. *See Transcript Day 4, Warden Jenkins, p. 71* (discussing the March 21, 2015 incident where it is undisputed that offenders were given RVRs, reclassified, and transferred out of Walnut Grove).

**Prison Riot.**

It is Defendant's position that the past prison riots at Walnut Grove do not reflect "current" conditions at Walnut Grove and they cannot be used to defeat termination under the PLRA.   As previously noted, one of those riots took place over a year prior to Defendant's termination motion, and the other took place eight months prior to the termination motion. The conditions at Walnut Grove then are not reflective of the conditions at Walnut Grove now—*i.e.*, currently.  To find otherwise would read the termination provisions—specifically Sections 3626(b)(1)(A)(ii) and 3626(b)(3)—out of the PLRA. Indeed, those provisions would be rendered utterly meaningless if past conditions, such as those relied

---

[54] Classification is not a stand-alone constitutional tort. Many courts also have stated that the "mere act of classification does not amount to an infliction of pain" so "it is not condemned by the Eighth Amendment." *Lancaster*, 2007 WL 4570185.

upon by Plaintiffs, precluded termination when those conditions no longer are current due to changes made by the facility (*i.e.*, not merely due to a passage of time). The changes and intervening events at Walnut Grove since July of 2014 are significant and undisputed (changes discussed *supra* and *infra*).

Even if the Court were to consider the prison riots, however, a prison riot does **not** amount to an Eighth Amendment violation. *See Transcript Day 6, Vail, p. 217* (noting on several occasions that his prisons in Washington were not deficient, but admitting that he had riots at his facility in Washington and that he even could "foresee" those riots and still let them happen, but he took action "*afterwards*"). Although the deliberate indifference standard governs most claims, an even higher degree of culpability must be shown in one type of Eighth Amendment claim: when an inmate seeks to hold an individual prison officer liable for using excessive physical force against the inmate during a particular incident, such as a prison riot. *Whitley v. Albers,* 475 U.S. 312, 320 (1986). In *Whitley,* an inmate was shot and seriously wounded during the course of a prison riot. The Supreme Court held that to prevail, the plaintiff must show more than deliberate indifference; he must show that the force used against him was applied, not in a "good faith effort to maintain or restore order, [but] maliciously and sadistically for the very purpose of causing harm." *Id.* at 320–21, 106 S.Ct. at 1085 (internal quotations omitted).

On first analysis, *Whitley*'s "malicious and sadistic" standard, which considers the excessive use of physical force by prison officials in response to disturbances, would not appear relevant to Plaintiffs' conditions of confinement claim. Instead, conditions of confinement claims require only a showing of "deliberate indifference," as previously noted.  In addressing this issue, the Tenth Circuit in *DeSpain v. Uphoff*, 264 F.3d 965, 975-76 (10th Cir. 2001), however, provided useful analysis on the overlap between *Whitley*'s standard and conditions of confinement claims when those claims exist in conjunction with a prison riot. Specifically, the Tenth Circuit reasoned as follows:

> [W]hen the conditions of confinement exist in conjunction with a prison riot, the balancing considerations described in *Whitley* generally are present. Officials securing an unsafe situation cannot be expected to provide the same level of comfort demanded under normal

91

circumstances . . . As soon as the inmates are secure and present "no further danger to prison staff, the public, or each other," however, there is no longer a need for officials to "make split-second, life-and-death decisions." *Id.* Without this time pressure and need to balance competing safety considerations, the standard in the aftermath of a disturbance immediately reverts back to *Farmer's* "deliberate indifference." *Id.*

*Id.*

To be clear, in citing *Whitley*, the Defendant does not contend that *Whitley* governs all conditions of confinement claims.  What is notable about *Whitley*, though, is that the United States Supreme Court did not find the Eighth Amendment violated even with the existence of a prison riot. Even when an inmate was shot in that riot, the Supreme Court *heightened* the Eighth Amendment standard.  To any extent the Court does consider the past prison riot in its analysis of the conditions of confinement at Walnut Grove, the analysis provided by the Tenth Circuit and the balancing considerations described in *Whitley* should guide that analysis, along with *Farmer* and its progeny's governing standard.

### After-Action Report.

Plaintiffs devoted much of the evidentiary hearing to an inapposite discussion on the issue of Walnut Grove not putting together a <u>written</u> after action report after the prison riot.  Plaintiffs' expert witness takes issue with this because he believes it is "irresponsible" not to have a "written" report because the "corrections industry . . .[is] a public function." *Transcript Day 6, Vail, p. 160*.  What is not disputed—and has never been disputed—is that prison officials undertook an after action <u>review</u>, and that they implemented a host of changes after the prison riot.[55] *See Testimony Day 5, Roth, pp. 150-151* (Q: Will you agree that it is important . . . to have a written document? A: I think it's important to have a review. Q: But you don't see for purposes of accountability that it is important to have a document

---

[55] It is worth mentioning that, at the hearing, Vail focused on a "written" after-action report. He in fact said a "written" report was required by department policy. In his proposed remedies submitted in support of Plaintiffs' amended motion to modify, however, Vail focused on the need to complete an "after-action <u>review</u>." *See Doc. [115-1], p. 4*. In that same document, Vail never said he thought an after-action report was required by policy (because it is not and would not be an Eighth Amendment violation even if it did). *See id.*  It is undisputed that an after-action review was held, and it also is clear that even Plaintiffs and their expert waiver on what they subjectively think the Defendant should do.

memorializing what was found . . . A:  Whether it's advisable or recommended or not, the review is the important aspect.  A report [ ] is simply to track a record . . . The report aspect is that they review the activity and have some corrective action, and that's what they did.").

It is interesting to note that plaintiffs (and one of the same plaintiffs' counsel involved in this case) urged an almost identical argument to the Fifth Circuit in *Gates v. Cook*, 376 F.3d 323, 338 (5th Cir. 2004). In that case, the plaintiffs took issue with the fact that the prison failed to put in writing a preventive maintenance program. The lower court issued injunctive relief, finding that written documentation was required. *Id.* The Fifth Circuit entirely rejected this argument, reasoning as follows:

> "While federal courts can certainly enter injunctions to prevent Eighth Amendment violations, they are not to micromanage state prisons. [ ] The trial court entered injunctions to directly remedy each of the complained-of conditions that rise to the level of an Eighth Amendment violation. **Russell has cited no case that supports the proposition that the trial court can further affect the internal operations of MDOC by requiring it to produce a writing preventive maintenance program to which it will adhere. The additional requirement of a written preventive maintenance program, while desirable, is not independently supported by additional conditions that constitute an Eighth Amendment violation, and it cannot stand**. Thus, we vacate that injunction."

*Id*.  It is undisputed that Walnut Grove undertakes, and did undertake, after action reviews, and prison officials responded reasonably, as noted by the corrective actions and changes made.[56]

## IX.      PLAINTIFFS CANNOT DEMONSTRATE DELIBERATE INDIFFERENCE

Even if the Court did find a substantial risk of serious harm, the analysis does not end there. Deliberate indifference also must be demonstrated, and that is a burden that Plaintiffs cannot carry.  As noted, to demonstrate a violation of inmates' constitutional rights, Plaintiffs must show a **substantial risk of serious harm** to which prison officials were **deliberately indifferent**. *Farmer*, 511 U.S. at 834. "Deliberate indifference is an extremely high standard to meet." *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006) (internal citations omitted).

---

[56] Plaintiffs have discussed the contract monitoring performed by MDOC.  This internal contract monitoring does not violate the Eighth Amendment. There is no proof (instead only bald allegations) that the monitoring is deficient in any manner, much less that it causes a substantial risk of serious harm or that Defendant acts with deliberate indifference.

In this case, the decision on deliberate indifference is not complicated. To the contrary, it is very straightforward. While Plaintiffs can clutter the record with grisly (albeit false) descriptions of Walnut Grove, Plaintiffs cannot contest the facts that go toward why there cannot be a finding of deliberate indifference in this matter.  As the court in *Carter v. Tanner*, No. CIV.A. 11-2733, 2014 WL 1329784, at *6 (E.D. La. Mar. 31, 2014), put it:

> Under *Farmer,* prison officials cannot be found to have acted with deliberate indifference if: (1) "they were unaware of even an obvious risk to inmate health or safety," (2) "they did not know of the underlying facts indicating a sufficiently substantial danger," (3) "they knew of the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent," <u>or</u> "they knew of a substantial risk to inmate health or safety [and] responded **<u>reasonably</u>** to the danger, **<u>even if the harm was not ultimately averted</u>**." *Id.* at 845.

*Id.*  (quoting *Farmer,* 511 U.S. at 844-45) (emphasis added).

Plaintiffs' expert concedes that "bad things happen in prison and always will." *Transcript Day 2, Vail, pp. 53-60*. Plaintiffs' expert also concedes that bad things happened in the prison in Washington while he was there. *Id.* According to Vail, you do not focus on the incidents, you focus on "the response to them." *Id.*  While, as noted *supra*, Plaintiffs' evidence does not satisfy the substantial risk of serious harm prong of the Eight Amendment, the undisputed improvements and reasonable actions taken by Defendant (*i.e.*, the Defendant's "response" as Vail calls it) demonstrates the converse of deliberate indifference.[57]

When the Consent Decree was entered, Walnut Grove was a youth correctional facility. There no longer are any inmates under the age of 18 at Walnut Grove.  Further, a new contractor has taken over the daily operations of Walnut Grove since the time of the Decree. Even more important, the following

---

[57] During the hearing, Plaintiffs seemed to take issue with the fact that Marjorie Brown, who is in management at Walnut Grove, does not require a finalized copy of the monthly reports.  What is clear, though, is the reasoning behind why Brown does not require a finalized copy of those monthly reports.  Brown does not receive the finalized monthly reports because she receives all of the "underlying documents that go into [preparing] the report." *See Transcript Day 4, Warden Jenkins, p. 101*.  Further, Brown is at the facility every month and, many times, every week. *Transcript Day 4, Warden Jenkins, p. 100.*

94

provides a sample of the significant changes, improvements, and reasonable actions that have been initiated by prison officials at Walnut Grove:

- **Close Custody Inmates Removed**.[58] All close custody inmates (which were the only inmates involved in the two prison riots) have been moved out of Walnut Grove. *Day 4 Transcript, Testimony of Warden Jenkins, pp. 46-47, 92-94.* As Roth explained, "Close custody status is the designation given for those inmates in general population considered the highest risk status at the facility. Inmates at this level have been identified as possessing one or more of the following risk factors: escape; periodic demonstration as a threat to staff/inmates and or recent or serious disciplinary record." *See Roth Expert Report, D-7.* Walnut Grove houses only medium and minimum security custody offenders.

While Plaintiffs levy allegations that the Court should discount the fact that close custody inmates have been moved out of Walnut Grove, the rationale driving that allegation is nonsensical. Plaintiffs have suggested that because the actions taken by Defendant could be undone at some unknown time in the future, termination of the decree is inappropriate. First, that is not the deliberate indifference standard. Second, any action taken by any defendant in any type of litigation always could be undone at some point in the unidentified future. Third, this precise type of argument is what the PLRA prohibits. *See, e.g.,* H.R. Conf. Rep. No. 105–405, at 133 (1997); *Castillo*, 238 F.3d at 353, n.20; *Cason,* 231 F.3d at 783.

- **Long-Term Segregation Removed**. It is undisputed that all long-term segregation inmates have been removed from Walnut Grove. *Transcript Day 2, Brown, p. 189*; *see Roth Expert Report, D-7.* "Long-term segregation is an administrative status designed for an inmate who has demonstrated violent and aggressive behavior, requires separation from the general population and has received sanctions to be placed in segregation for more than 60 days." *Id.*

---

[58] Much reference has been made to the differing custody levels of inmates at Walnut Grove. For purposes of clarity, Tom Roth's expert report breaks down what these custody levels mean. *See Roth Expert Report, D-7.*

- **Inmate Population Decreased.**  The overall at Walnut Grove has been decreased and capped at 962. *See Exhibit D-11*; *Day 4 Transcript, Testimony of Warden Jenkins, pp. 92-94 (*population at Walnut Grove was 958 as of the evidentiary hearing).  This is a drop in population from, on the high end, approximately 1300. *See Transcript Day 2, Vail, p. 75*.

- **Removal of Objects:** All of the lights inside the cells that previously had been at the facility have been replaced.  In addition, the mirrors and the frames of mirrors were identified as a potential source of contraband, so the facility removed these mirrors. *See Exhibit D-11; Transcript Day 5, Roth, pp. 69-70; Transcript Day 4, Warden Jenkins, pp. 86-92*.

- **Cleaning Supplies and Equipment Secured:** Cleaning supplies and equipment have been removed from the housing zones and put into a staging area, which is secured and locked. *Transcript Day 5, Roth, pp. 95-96; Exhibit D-30*.

- **Focus on Cell Door Security.** Slider doors in Units 3 and 4 were modified to prevent manipulation of doors through access ports. MDOC and MTC developed and initiated a system of door lock inspection to hinder, identify, and discipline any attempted tampering with locks on swinging and sliding doors. *See Expert Report of Tom Roth, Exhibit D-7; Exhibit P-25* (Memo); *Exhibit D-21; Transcript Day 5, Roth, pp. 66-74; Transcript Day 4, Warden Jenkins, pp. 61-62.*

- **Staffing Plan After Population Decrease and RIF.** *See supra; Transcript Day 4, Warden Jenkins, pp. 94-97; 172; Transcript Day 5, Roth, pp. 98-108*.

- **Training and Drills Enhanced**.  As discussed *supra*, Walnut Grove's training is wholly adequate, and it certainly does not fall below the constitutional minimum. *See Transcript Day 5, Roth, pp. 90-110; Day 4 Transcript, Testimony of Warden Jenkins, pp. 47-48*; *see D-11* (Training Accomplishments); *Day 4 Transcript, Testimony of Warden Jenkins, pp. 85-87* (Field Training Officer manual)*; see also Exhibit D-13*.

- **Audits**. Passed PREA Audit with 100 percent. Awarded American Correctional Association ("ACA") Accreditation. Defendant does not suggest that ACA accreditation automatically equates to the lack of an Eighth Amendment violation. Instead, Defendant points out this accreditation because the Fifth Circuit has stated that it "may be a relevant consideration" *Gates v. Cook*, 376 F.3d 323, 337 (5th Cir. 2004).

- **Cameras Replaced**. Shortly after Warden Jenkins arrived at the facility, he heard complaints concerning the "inoperability of some of the camera equipment that [Walnut Grove] had, especially during uses of force." *Day 4 Transcript, Testimony of Warden Jenkins, pp. 88, 180-181.* In response, Warden Jenkins ordered new and more reliable cameras shortly after his arrival, and he just "recently approved another order for additional cameras." *Id.; Transcript Day 6, Vail, p. 228* (noting that the cameras are a "pretty good camera setup"); *Transcript Day 5, Roth, p. 58* (video equipment in each zone to provide a view of what is going on by video monitor at all times).

- **Emergency Response Plan Updated.** The emergency response plan ("ERP") has been updated "several" times by Warden Jenkins. *Day 4 Transcript, Testimony of Warden Jenkins, pp. 45-47.* Some of those changes include updates to the evacuation plan, the notification list (which provides contact numbers), all references to close custody in the notification list have been removed since close custody inmates are not housed at Walnut Grove, and the escape plan is updated. *See id.* All facility staff are trained on the ERP. *Day 4 Transcript, Testimony of Warden Jenkins, pp. 47-48.* Indeed, in 2014, there were two training sessions dealing with emergency preparedness. Id. The facility brought in an outside individual to provide the training to the staff, and another training currently is scheduled, and the facility has partnered with Mississippi Emergency Management Agency ("MEMA") to come to the facility the second week in May to do additional training for employees and supervisors that are involved in the emergency preparedness, including those who may not have received the training in 2014. *Id.*

97

- **Dedicated STG Officer Hired.**  *See supra; Transcript Day 5, Lt. Morgan, pp. 4-7; Transcript Day 5, Roth, p. 81.*

- **Proactive Gang Management.** *See supra; Exhibit D-44* (policy); *Transcript Day 5, Roth, p. 85* ("proactive" policies and practices); *Transcript Day 5, Lt. Morgan, 4-45.*

- **Parcel Scanner Installed.**  A parcel scanner was installed to detect contraband coming in mail and packages. *See Exhibit D-11.*

- **Metal Detectors.** The facility has metal detectors and other scanning devices in locations other than only in the front entry. *Transcript Day 5, Roth, pp. 92-98.*

- **Perimeter Lighting Replaced.**  Perimeter lighting was replaced with LED type fixtures to allow light coverage of larger areas. *See Exhibit D-11.*

- **Perimeter Fence Netting Installed.** Walnut Grove has installed perimeter fence netting to make the entry of contraband over the fence more difficult. *See Exhibit D-11*; *Day 4 Transcript, Testimony of Warden Jenkins, pp. 90-91.*  This has been done to prohibit contraband entering the facility by throwing objects, such as footballs containing contraband, over the facility's double fence. *Id.* The facility, therefore, put "huge netting around the compound, the perimeter compound that would prevent individuals from throwing these types of objects across the fence." *Id.*; *Transcript Day 5, Roth, p. 84* (initiative taken by Walnut Grove and is "not something you find in most institutions").

- **Body Scanner Installed.**  A front entry check point body scanner has been installed at Walnut Grove to detect contraband in the personal property of or on staff and/or visitors. *Transcript Day 5, Roth, 89-92*; *Transcript Day 4, Warden Jenkins, pp. 89-90* ("when you walk in you go through a series of scannings and checks  . . . Something similar to what you'll see in the airports. There is [ ] a parcel scanner that will scan any parcel, bags or whatever you might have. Then you go through a body scanner. It's a full body scanner. . .[you have to "take your shoes off . . . [and] unlike the airport . . . you [have to] pick up your feet so they can see the bottom of your free without your shoes on.").

PD.17099813.1

- **MTC K-9 Unit Initiated.**  Walnut Grove has a K-9 unit that conducts searches in an effort to aggressively identify contraband on a monthly basis. *See Exhibit D-11*; *Transcript Day 4, Testimony of Warden Jenkins, pp. 91*. There is a total of four K-9 dogs, and they are "trained for detection of drugs, cell phone and [ ] any other contraband. And they've been fairly successful in finding these contraband items." *Id.*; *Transcript Day 5, Roth, pp. 96-97, 105-107.*

- **Random/Targeted Cell Searches Conducted.**  *See supra.* The March 21, 2015 targeted cell search is an example. *Transcript Day 4, Warden Jenkins, 69-70, 117*; *Transcript Day 6, Vail, p. 227* (Walnut Grove does a "number of things" to find and control contraband).

- **Eye wash station for decontamination and updated decontamination policy:**  *See Exhibit D-11; Exhibit D-32; Exhibit D-33; Transcript Day 5, Roth, pp. 110-113; Exhibit D-14* (Policy).

- **Updated facility addressing reclassification of high risk offenders and case management plans.**  *See Exhibit D-11; see supra.*

- **Termination of Staff.**  The record evidence reveals that Walnut Grove does not condone any inappropriate staff behavior. Walnut Grove conducts investigations, places employees on leave without pay during investigations, and terminates staff when necessary. *See Transcript Day 2, Brown, p. 240* (staff accused of misconduct on leave without pay during PREA investigation); *Transcript Day 2, Brown, p. 230* (staff terminated); *Transcript Day 4, Warden Jenkins, pp. 81-82, 109-110* (staff accused of inappropriate behavior terminated).

- **Focus on Discipline and Reclassification of Inmates.**  It cannot be contested (and altogether would be unproven) that Walnut Grove consistently disciplines offenders when necessary, and also reclassifies them if necessary. Even Plaintiffs' evidence demonstrates this. *See, e.g., March 21, 2015 Targeted Cell Search* (discussed *supra*)*; Transcript Day 4, Warden Jenkins, p. 69-71* (March 21, 2015 targeted cell search: offenders given RVRs, reclassified, and transferred out of Walnut Grove). *See*

*Transcript Day 4, Warden Jenkins, pp. 177-179* (offenders involved in November/December of 2014 incidents disciplined and reclassified); *Exhibit P-51* (officer relieved of duty); *Exhibit P-52* (same).

Regarding these changes, it is clear that they always will be criticized or denigrated by Plaintiffs, and never will be good enough to satisfy professional critics. Yet, what Plaintiffs cannot contest is that these significant changes, efforts, and improvements have been made. The Monitors agree that the "significant reduction in the facility population, combined with limiting the population to more manageable Minimum-Medium Custody inmates, bodes well for the future safe operation of [Walnut Grove]." *Sixth Monitors Report, D-5, P-15, p. 5, Docket Entry No. [121].* The reasonable actions taken by Walnut Grove altogether negate any finding of deliberate indifference. *See Taylor*, 176 F.3d 479 (made repairs); *Hughes*, 2015 WL 1737871 (added cameras and updated policies); *Freeman*, 34 F.3d 266 ("remedial measures" cannot be considered "token measures").

Because the improvements and reasonable measures taken by Defendant cannot be disputed—in fact, Plaintiffs did not even try to disprove such actions—there cannot be a finding of deliberate indifference. Given the undisputed nature of the actions taken by Defendant, Plaintiffs' only retort is to make allegations that the changes only were being made due to the Consent Decree. This argument is rooted in circular logic, and it also only proves the opposite of deliberate indifference. More to the point, allegations that reasonable actions have been taken, due to the consent decree or any other reason, concedes only that improvements *have been made*. This is a concession of the absence of deliberate indifference and, from that, also a concession of the lack of an Eighth Amendment violation.

Similarly, such an argument is paradoxical and amounts to nothing more than a seductive appeal to the fallacy of *post hoc ergo propter hoc.* It would be illogical to think that Walnut Grove would not make changes and take reasonable actions in the right direction. *See Second Monitors Report, Exhibit P-20, Docket Entry No. [86]* (noting that both MTC and MDOC officials "are constantly seeking and adopting measures to improve facility"). Indeed, if Defendant did not do so—if Defendant consistently

PD.17099813.1

remained static since the entry of the Decree or the filing of the lawsuit in 2010—then the argument would be that Defendant did not make changes, and did not act reasonably, and thus *is* acting with deliberate intent.  Plaintiffs' allegations, therefore, amount to nothing more than a trap, as well as a disingenuous attempt to circumvent both the Eighth Amendment and the PLRA. Whatever Defendant does, Plaintiffs will find a way to critique it.  This precisely is why the Eighth Amendment is not an auditing tool, a way to evaluate best practices, or a brute force mechanism for criticism of each and every action taken by prison officials.

This, too, is why courts have rejected the same contentions that seem to be advanced by Plaintiffs in this case. For instance, in *Taylor v. Freeman*, 34 F.3d 266, 272 (4th Cir. 1994), the Court reasoned as follows:

> The inmates contend, and the district court apparently accepted, that the measures adopted prior to the hearing must be discounted because "each of these steps was taken after the class action lawsuit was filed," and that the planned measures must also be recognized as "mere intentions announced at the hearing, in a last-minute attempt to avoid injunction and refute the claim of indifference." Appellee's Br. at 39. Even if the inmates' characterization of the timing of these measures were accurate, which it is not, their argument that these measures should be discounted would still be without force. Regardless of when such actions are undertaken or committed to be undertaken by responsible authorities, they constitute evidence of interest in and concern over the dangers to which inmate populations are always exposed.

*Id.* at 272.

The argument in the case *sub judice* is even more incongruous than in *Taylor*, as, here, there is a consent decree in place—*i.e.*, court monitors are in place to make evaluations and recommendations. Stated differently, this case is not a case where plaintiffs are seeking initial injunctive relief (and, therefore, defenses such as mootness may be raised).  This is a case where there already is a decree in place, the relief already is "terminable" under the PLRA, and the burden is on the plaintiffs to prove a current and ongoing Eighth Amendment violation.  If the suggestion is that making improvements—or even agreeing with suggestions from monitors or other professionals—is somehow wrong or can be

utilized to continue a consent decree, all of the PLRA's provisions on termination are meaningless. In fact, Congress's entire intent in enacting the PLRA will be eroded.  Following Plaintiffs' suggestions, a consent decree never could be terminated whether or not changes were made.

The absurdity of this logic is boundless—as well as improper.  Indeed, it would altogether rewrite the deliberate indifference standard as well as the standard for termination under the PLRA. It also simply is wrong. Plaintiffs' expert names one or two best practice suggestions on which he and prison officials at Walnut Grove agreed and, from there, he makes the impossible leap to the conclusion that no changes would have been made absent his involvement. Even setting aside this ostentation, the conclusion reached is fabricated.  Prison officials have taken an array of steps to improve, without suggestion from Eldon Vail (*e.g.*, perimeter netting, replacing cameras, K-9 unit, dedicated STG officer, "proactive" gang management, body scanner). The evidence in this case conclusively shows that prison officials have engaged in a prudent and steady course of improvement—and they, at bottom, have acted and responded reasonably.  This is why Plaintiffs' Eighth Amendment claim is flawed.

## X.     THE RELIEF PROVIDED THROUGH THE CONSENT DECREE DOES NOT SATISFY THE PLRA'S "NARROWNESS-NEED-INTRUSIVENESS" TEST

Assuming, *arguendo*, Plaintiffs can show a current and ongoing Eighth Amendment violation, they then next must demonstrate the second "prong" of a PLRA analysis, which is that the remedy of the constitutional violation must pass the "narrowness-need-intrusiveness" test.  This is true not only for the entry of the relief under § 3626(a), but it is an analysis that also must be undertaken under § 3626(b)(3) after a motion to terminate has been filed. Per the language of § 3626(b)(3), an analysis of whether the "prospective relief remains <u>necessary</u> to correct a current and ongoing violation of the Federal right, extends no further than <u>necessary</u> to correct the violation of the Federal right, and that the prospective relief is <u>narrowly drawn</u> and the <u>least intrusive</u> means to correct the violation. *Id*.

PD.17099813.1

The Fifth Circuit's *Ruiz v. United States*, 243 F.3d 941, 951 (5th Cir. 2001) case is informative.  In addressing the analysis under Section 3626(b)(3), the court noted as follows:

> The court should then consider each provision of the consent decree in light of the current and ongoing constitutional violations, if there are any, and determine which aspects of the decree remain necessary to correct those violations. For example, if the court finds a constitutional violation in the area of inmate protection, a section of the consent decree regarding staffing issues may be necessary if under staffing is contributing to the unconstitutional conditions. However, if the excessive use of force is the only constitutional violation found, then a provision regarding crowding issues may no longer be necessary.
>
> Finally, if there are remaining aspects of the decree which are still necessary, the court should determine whether those parts of the decree are narrowly drawn and the least intrusive means to correct the applicable violation. For example, with respect to a violation in the area of inmate protection, if a staffing provision remains necessary, it might not involve relief that is narrowly drawn and the least intrusive if it covers positions that are not commonly associated with the protection of inmates, such as security positions or certain administrative positions dealing with the reporting and investigation of complaints from inmates.

*Id.*

The Consent Decree breaks down into several provisions, and Plaintiffs do not contest that some of those provisions must be terminated. In fact, counsel for Plaintiffs admitted that "[m]any of the[ ] provisions will go away." *Transcript Day 1, p. 201.* Specifically, the following chart outlines the provisions for which Plaintiffs' expert concedes should be terminated:

| Page Number | Remedies No Longer Necessary at Walnut Grove (per Plaintiffs) |
| --- | --- |
| 48 (Transcript Day 2) | Remedy regarding long-term cell confinement is no longer necessary because WGCF has no inmates in long-term segregation. [Decree: Page 7, Section C] |
| 48 (Transcript Day 2) | Remedy regarding programming and behavior management (Regimented Inmate Discipline – RID) is no longer necessary. [Decree: Page 8, Section D.1] |
| 48-49 (Transcript Day 2) | Remedy regarding out-of-cell time is no longer necessary because it is "no longer a problem." Although Vail thinks the inmates should be allowed to use the big recreation yard, he doesn't "think this is necessary" either. [Decree: Page 8, Section D.3] |
| 48 (Transcript Day 2) | Remedy regarding disciplinary due process and grievances is no longer necessary.  [Decree: Page 9, Section E] |
| 201 (Transcript Day 1) | Counsel for Plaintiffs admitted that this provision is not necessary.  [Decree: B. Protection from Harm, Section (15)] |

This leaves the following provisions:

| Provision of the Decree | Narrowness-Need-Intrusiveness |
|---|---|
| A. Classification and Housing System | This remedy no longer is necessary because there is not a current and ongoing violation of the Eighth Amendment at Walnut Grove for all of the reasons previously discussed. In addition, the way Plaintiffs are attempting to apply this provision of the Decree also is not narrow or the least intrusive. Plaintiffs do not want MDOC to "utilize" a classification system. They want to dictate the system and how it is utilized. |
| B. Protection from Harm: Section (1) | This remedy no longer is necessary because there is not a current and ongoing violation of the Eighth Amendment at Walnut Grove for all of the reasons previously discussed. Plaintiffs have not proven any systemic violence or other substantial risk of serious harm, or how Walnut Grove is deliberately indifferent to that harm. Prisoners are provided with a reasonably safe living conditions and will be protected from violence and other physical or sexual abuse by staff and other prisoners. Further, the way this provision is being applied is that it is violated each and every time Defendant does not adopt Plaintiffs' suggestions. This application of Section B of the Decree is, therefore, being applied in a way that is not narrow or the least intrusive. |
| B. Protection from Harm: Section (2) | This remedy no longer is necessary because there is not a current and ongoing violation of the Eighth Amendment at Walnut Grove for all of the reasons previously discussed. Plaintiffs have not proven any systemic violence or other substantial risk of serious harm, or how Walnut Grove is deliberately indifferent to that harm, due staffing or training at Walnut Grove. Further, the way this provision is being applied is that it is violated each and every time Defendant does not adopt Plaintiffs' suggestions on the precise hours of training or the exact staffing ratios. This application of Section B of the Decree is, therefore, being applied in a way that is not narrow or the least intrusive. |
| B. Protection from Harm: Section (3) | This remedy is no longer necessary because there is not a current and ongoing violation of the Eighth Amendment as it relates to "mechanical, physical or chemical restraints such as OC spray, pepper spray and mace" being used to "punish prisoners" for all of the reasons discussed *supra*. There has been no evidence presented that the Eighth Amendment is being violated based on this provision. *See Hughes v. Judd*, No. 8:12-CV-568-T-23MAP, 2015 WL 1737871, at *93 (M.D. Fla. Apr. 16, 2015) ("The evidence at trial established that pepper spray combines a low level of force; an alternative clearly safer for both staff and inmates than achieving a forceful, physical submission; a significantly lower level of injury; a relatively short recovery time; and an effective means for restoring and maintaining order . . . pepper spray presents no risk of serious harm even without the "after spray" protocols . . .). The application of this provision also is applied by Plaintiffs in a manner that is not narrow or the least intrusive manner. |
| B. Protection from Harm: Section (4) | This remedy is no longer necessary because there is not a current and ongoing violation of the Eighth Amendment as it relates to the "[p]hysical force and pain aversion behavior management techniques will not be used to punish prisoners" for all of the reasons discussed *supra*.  There was not a single type of evidence presented about any "physical force and pain aversion behavior management," much less evidence that such forces was used to "punish prisoners." The only type of force complained about was OC spray, which is discussed in Section (3).  The application of this provision also is applied by Plaintiffs in a manner that is not narrow or the least intrusive manner. Plaintiffs essentially seek to keep provisions of the Decree in place in case something may or may not happen in the future. |
| B. Protection from Harm: Section (5) | This remedy is no longer necessary because there is no current and ongoing violation of the Eighth Amendment regarding the use of force being captured on "an audio-visual recording" for all of the reasons discussed for all of the reasons discussed *supra*. Indeed, Vail concedes that officers are "pretty dedicated to try and go get the camera." *Transcript Day 1, Vail, p. 178*. Vail merely states that sometimes they "don't do a good job of keeping the focus." *Id.* Further, the fact that an event is or is not captured on video does not violate the Eighth Amendment. This provision is not necessary, and even from Vail's statements, it is clear this provision is being applied in a way that is not narrow or the least intrusive. |
| B. Protection from Harm: Section (6) | This remedy is no longer necessary because there is no current and ongoing violation of the Eighth Amendment for all of the reasons discussed *supra*, and there is no evidence that federal rights are being violated by the use of force and/or the Warden or Shift Commander |

| | |
|---|---|
| | not being notified. The application of this provision also is applied by Plaintiffs in a manner that is not narrow or the least intrusive manner.<br><br>As noted above, prison officials are entitled to a certain amount of deference in the operation of the facility. Plaintiffs seek to apply the Decree provisions in such a way that removes all deference from those responsible for the daily operation of the facility, so that Plaintiffs and their expert can dictate how the facility should be run, down to the last facet. This cannot be a reading that is narrow, and it certainly is not the least intrusive method of application. |
| B. Protection from Harm: Section (7) | This remedy is no longer necessary because there is no current and ongoing violation of the Eighth Amendment for all of the reasons discussed *supra*, and there is no evidence that federal rights are being violated by the lack of physical interventions being documented in writing. *See Gates v. Cook*, 376 F.3d 323 (5th Cir. 2004) (Eighth Amendment does not require a plan to be in writing). The application of this provision also is applied by Plaintiffs in a manner that is not narrow or the least intrusive manner.<br><br>As noted, prison officials are entitled to a certain amount of deference in the operation of the facility. Plaintiffs seek to apply the Decree provisions in such a way that removes all deference from those responsible for the daily operation of the facility, so that Plaintiffs and their expert can dictate how the facility should be run, down to the last facet. This cannot be a reading that is narrow, and it certainly is not the least intrusive method of application. |
| B. Protection from harm: Section (8) | This remedy is no longer necessary because there is no current and ongoing violation of the Eighth Amendment for all of the reasons discussed *supra*, and there is no evidence that federal rights are being violated by the use of force not being reviewed pursuant to MDOC's use of force and standard operating procedures. The application of this provision also is applied by Plaintiffs in a manner that is not narrow or the least intrusive manner for the same reasons stated in Sections (6) and (7). |
| B. Protection from Harm: Section (9) | This remedy is no longer necessary because there is no current and ongoing violation of the Eighth Amendment for all of the reasons discussed *supra*. The application of this provision also is applied by Plaintiffs in a manner that is not narrow or the least intrusive manner for the same reasons as stated in Sections (6) and (7). |
| B. Protection from Harm: Section (10) | This remedy is no longer necessary because there is no current and ongoing violation of the Eighth Amendment for all of the reasons discussed *supra*, and there is no evidence that federal rights are being violated by the use of chemical restraints. *See Hughes v. Judd*, No. 8:12-CV-568-T-23MAP, 2015 WL 1737871, at *93 (M.D. Fla. Apr. 16, 2015). Further, it is undisputed that MDOC has policies and procedures that are developed and implemented. The application of this provision also is applied by Plaintiffs in a manner that is not narrow or the least intrusive manner. |
| B. Protection from Harm: Section (11) | This remedy is no longer necessary because there is no current and ongoing violation of the Eighth Amendment for all of the reasons discussed *supra*. The application of this provision also is applied by Plaintiffs in a manner that is not narrow or the least intrusive manner for the same reasons as stated in Sections (6) and (7). |
| B. Protection from Harm: Section (12) | This remedy is no longer necessary because there is no current and ongoing violation of the Eighth Amendment for all of the reasons discussed *supra*, and there is no evidence that federal rights are being violated by decontamination procedures. *See Hughes v. Judd*, No. 8:12-CV-568-T-23MAP, 2015 WL 1737871, at *93 (M.D. Fla. Apr. 16, 2015). MTC has a decontamination policy in place, and so does MDOC. The application of this provision also is applied by Plaintiffs in a manner that is not narrow or the least intrusive manner. |
| B. Protection from Harm: Section (13) | This remedy is no longer necessary because there is no current and ongoing violation of the Eighth Amendment for all of the reasons discussed *supra*. There has been no evidence (at all) that MDOC utilizes, directs, or allows prisoners to enforce rules or impose discipline on other prisoners. The application of this provision also is applied by Plaintiffs in a manner that is not narrow or the least intrusive manner for the reasons stated in Sections (6) and (7). |
| B. Protection from Harm: (14) | This remedy is no longer necessary because there is no current and ongoing violation of the Eighth Amendment for all of the reasons discussed *supra*. There has been no evidence that this provision is violated, much less that there is an Eighth Amendment violation for which this provision is needed. The application of this provision also is applied by Plaintiffs in a manner that is not narrow or the least intrusive manner. |

PD.17099813.1

| D. Programming and Behavior Management – Section (2) | This remedy is no longer necessary because there is no current and ongoing violation of the Eighth Amendment for all of the reasons discussed *supra*. There has been no evidence that this provision is violated, much less that there is an Eighth Amendment violation for which this provision is needed. The application of this provision also is applied by Plaintiffs in a manner that is not narrow or the least intrusive manner. |
|---|---|
| F. Suicide Prevention | Defendant's motion to consolidate the hearings was denied, so this provision of the Decree was not at issue in the first portion of this hearing. |
| G. Medical Care | Defendant's motion to consolidate the hearings was denied, so this provision of the Decree was not at issue in the first portion of this hearing. |
| H. Contract Monitoring and Revisions: Section (1) and (2) | MDOC's internal contract monitoring is not violative of the Eighth Amendment, and there is no indication that this provision is necessary to correct the violation of any federal right, or that it is narrow or the least intrusive. |
| IV. Enforcement and Monitoring | Enforcement and Monitoring is no longer necessary, as termination of the Decree is required. |

Because all of the relief provided through the Consent Decree should be terminated under Section 3626(b) due to the lack of a current and ongoing Eighth Amendment violation, the Court need not reach Plaintiffs' motion to modify and enforce.[59]

## XI.   PLAINTIFFS' ENFORCEMENT/MODIFICATION MOTION AMOUNTS TO ONLY A NON-STARTER

Also pending before this Court is the motion filed by Plaintiffs to enforce and modify the Consent Decree. Separately from modification, this Court retains inherent authority to enforce the Consent Decree. *See United States v. Territory of the Virgin Islands*, 884 F. Supp. 2d 399, 408-09 (D.V.I. 2012). This is in part because enforcement alone, by its very nature, is not "prospective relief" under the PLRA. However, in light of Defendant's Motion to Terminate, and the fact that the termination motion should be granted, the issue is no longer one of simple compliance with the Consent Decree.[60] The issue, instead, is whether Plaintiffs can demonstrate a current and ongoing violation of a federal right and meet the PLRA's so-called "narrowness-need-intrusiveness" test under § 3626(b)(3). *See, e.g., Hadix v. Caruso*, 420 F. App'x

---

[59] The Consent Decree also allows a separate path to termination due to substantial compliance. It is clear that Defendant has been in substantial compliance with many portions of the Decree for the requisite period of time. Those provisions also must terminate. *See Consent Decree, Exhibit P-2, Docket Entry No. [75-3]; Exhibit P-22.*

[60] To the extent the Court does find a violation, the provisions regarding enforcement of the Decree have been complied with by Defendant. If Plaintiffs have tried to allege some type of contempt motion, which they have not expressly done, Defendant notes that such a motion would fail, and contempt motions are governed by a clear and convincing evidence standard. Further, as noted by the Sixth Monitors' Report, Defendant is not in non-compliance with any of the Decree provisions.

106

480, 489 (6th Cir. 2011) ("[I]n light of our determination that the district court did not err in concluding that there was no longer an ongoing violation of the Eighth Amendment, we need not address the plaintiffs' argument that the district court erred in failing to modify or find a breach of the Consent Decree."). With termination being required for the relief provided through the Consent Decree pursuant to the PLRA, Plaintiffs' motion for both enforcement and modification must be denied.

Despite the result that must be reached under the PLRA—termination, Defendant nonetheless addresses Plaintiffs' modification/enforcement motion.  Plaintiffs urged their motion to modify pursuant to *Rufo v. Inmates of Suffolk County Jail,* 502 U.S. 367, 378 (1992) in support of modification.  *See Motion, Memorandum, and Amendment Memorandum, Docket Entry Nos. [106, 107, 115].*  It is without dispute, however, that the relief Plaintiffs seek through modification constitutes "prospective relief." Given this, *Rufo* is not the only standard that must be satisfied. To the contrary, the PLRA's provisions, specifically § 3626(a), must be met. *See, e.g.*, *Castillo v. Cameron Cnty., Tex.*, 238 F.3d 339, 354 (5th Cir. 2001) ("[W]e note that any modification of the existing relief that constituted the entry of new relief would need to meet the requirements set out in § 3626(a)"). These are discussed in turn.

Courts may alter injunctive relief to take account of changed legal circumstances. The Federal Rules codify that authority in Federal Rule of Civil Procedure 60(b). From the case of *Rufo v. Inmates of Suffolk County Jail,* 502 U.S. 367, 381 n. 6, 112 S. Ct. 748, 116 L. Ed. 2d 867 (1992) is a requirement that the moving party must show a "significant change in circumstances," either legal or factual, that was not anticipated when the original decree was enacted. *Id.* at 383; *see also, e.g., Lancaster v. Tilton*, No. C79-01630 WHA, 2007 WL 1807825, at *24 (N.D. Cal. June 21, 2007).  Plaintiffs' modification motion is based on the fact that there were two prison riots at Walnut Grove.  One of those riots was over a year ago, and one was almost a year ago. If there have been any "significant change[s] in circumstances" at Walnut Grove, those changes certainly do not lead to modification. They, for all of the reasons discussed

*supra*, lead to termination.  Even under Rule 60 and *Rufo*, given the change in circumstances is not for the worse—and is drastically for the better—modification is unwarranted, and termination is proper.

Further, a prison riot is not synonymous with a violation of any federal right, much less the Eight Amendment. As detailed throughout this brief, there is not a violation of the Eighth Amendment, which is the only federal right on which Plaintiffs rest their case. Under § 3626(a), like § 3626(b), a violation of a federal right must be found to be violated before prospective relief may be granted. Because the Eighth Amendment is not violated, modification under § 3626(a) is unwarranted and termination is required.

Even if an Eighth Amendment violation was found, Section 3626(a) requires that a narrowness-need-intrusiveness test be conducted for the proposed and modified relief.  Plaintiffs' expert witness, Eldon Vail, provided a host of proposed micromanaging remedial measures in support of Plaintiffs' amended motion to modify, and during the evidentiary hearing. *Vail's Proposed Remedial Measures, Docket Entry No. [115-1].  None* of the proposed remedies even get close to satisfying Section 3626(a)'s narrowness-need-intrusiveness test. Indeed, while Vail's remedies are "Exhibit A" to Plaintiffs' amended motion to modify, they just as easily could be "Exhibit A" to why the PLRA was enacted.

Vail suggests remedies such as providing "programs so that 80% of the population is engage in program activities for 20 hours a week," establishing mandatory posts "for two 8/5 sergeants per general population housing unit," "establishing Mandatory Posts to provide for one officer in each zone when inmates are out of cells[;] Provid[ing] written direction to staff by memo and in  post orders that requires them to stay in the zones until relief is provided; [and] Document[in] in logs when such events occur." *See id*.  These micromanaging types of proposed remedies urged by Vail are the *exact* types of remedies the PLRA was supposed to extricate. *See, e.g., Gates v. Cook*, 376 F.3d 323, 338 (5th Cir. 2004). Vail wants to dictate what he believes (without proof) are the best practices for Walnut Grove to follow, but that is not the standard under federal law.  Vail's proposed remedies, indeed, amount to nothing more than a "wish list" for what Vail would like to see happen.  They are not narrow, by any stretch of the

definition, as each and every proposed remedy seeks to micromanage, down to the very last detail, how prison officials run the Walnut Grove facility.

For the same reasons, the remedies cannot be considered the least intrusive. For instance, Vail would like for Walnut Grove to "[r]etain [an] outside security to inspect [the facility], identify problems and have them corrected." *Vail's Proposed Remedial Measures, Docket Entry No. [115-1]*. Further, Vail proffers as a remedy that Walnut Grove should "[r]etain an outside security expert to inspect emergency call buttons in all units. Correct any and all problems identified." *Id.* A remedy, by definition, is to rectify an existing problem—not to have Walnut Grove hire an expert to inspect the entire facility to "identify problems" and determine if any actually exist. Further, Vail had no actual proof of some of his alleged issues. For example, he admitted that he had no actual proof the emergency call buttons were inoperable, or that there was any mechanical defect with the cell doors. *Transcript Day 2, Vail, pp. 83-84. See Transcript Day 2, pp. 80-83*; *see Transcript Day 6, Testimony of Vail, p. 231-232*.

None the remedies proposed are even close to the standards articulated in the PLRA. None are needed because there is no Eighth Amendment violation and, even if there was, none of the remedies are the least intrusive or even close to narrow. Further, under 18 U.S.C. § 3626(a), the PLRA directs that the court also "shall give substantial weight to any adverse impact on public safety *or the operation of a criminal justice system caused by the relief*." Allowing Plaintiffs and their expert, who all are professional critics with no accountability responsibilities at the facility, to dictate every facet of the operation of Walnut Grove will have a significant adverse impact on prison officials—*i.e.*, those with the actual obligations of daily operations.

To conclude, Plaintiffs' modification motion must be denied because Defendant's termination motion should be granted. Under the PLRA, the absence of a current and ongoing violation is conclusive as to all motions before this Court.

## XII.    CONCLUSION

The constitutional theory advanced by Plaintiffs presents a dangerous chipping away at the Eighth Amendment that falls out of step with more than a century's worth of law.  The arguments offered by Plaintiffs in this case, however, are not innovative. Through this litigation, Plaintiffs repeat their call for a new and improved best practices standard. This is a call Plaintiffs have urged before, but it is a call that the federal courts (and the Eighth Amendment) are not answering, never have answered, and should not answer.

Walnut Grove is a facility that houses convicted and often dangerous criminals. There always will be decisions made by prison officials which professional critics can audit and denounce and then subjectively suggest a "better" way to do things. But the supposed "best" way does not equate to the constitutional way and, at Walnut Grove, there is not a current and ongoing constitutional violation. That is the start of the analysis, and it is the end of the analysis.

For these reasons, the prospective relief ordered and approved through the Consent Decree must terminate.   Defendant's   termination   motion,   therefore,   must   be   granted,   and   Plaintiffs' modification/enforcement motion must be denied.

Dated: May 6, 2015.

Respectfully submitted,

**MARSHALL FISHER, IN HIS OFFICIAL CAPACITY AS THE COMMISSIONER OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS**

**BY:  JIM HOOD, ATTORNEY GENERAL STATE OF MISSISSIPPI**


*/s/ Krissy C. Nobile*
HAROLD E. PIZZETTA, III, MSB # 9752
ASSISTANT ATTORNEY GENERAL
KRISSY C. NOBILE, MSB # 103577
SPECIAL ASSISTANT ATTORNEY GENERAL
STATE OF MISSISSIPPI
OFFICE OF THE ATTORNEY GENERAL
Post Office Box 220
Jackson, MS   39205
knobi@ago.state.ms.us
hpizz@ago.state.ms.us

*/s/Gary E. Friedman*
GARY E. FRIEDMAN, MS BAR NO. 5532
W. THOMAS SILER, JR., MB #6791
PHELPS DUNBAR, LLP
4270 I-55 North
Jackson, Mississippi 39236-6114
friedmag@phelps.com
silert@phelps.com

**ATTORNEYS FOR DEFENDANT**

## <u>CERTIFICATE OF SERVICE</u>

I, Krissy C. Nobile, do hereby certify that on May 6, 2015, I electronically filed the above and foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following counsel of record:

Sheila A. Bedi
SOUTHERN POVERTY LAW CENTER
753 N. Congress Street
Jackson MS 39202
(601) 948-8882
sheila.a.bedi@gmail.com

Jacob W. Howard
MCDUFF & BYRD
767 North Congress
Jackson MS 39202
(601) 969-0802
jake@mcdufflaw.com

Jennie S.H. Eichelberger
SOUTHERN POVERTY LAW CENTER
111 East Capitol Street, Suite 280
Jackson MS 39201
(601) 948-8882
jennie.eichelberger@spcenter.org

Jody E. Owens, II.
SOUTHERN POVERTY LAW CENTER
921 North President Street, Suite B
Jackson MS 39202
(601) 948-8882
jody.owens@splcenter.org

Margaret Winter
NATIONAL PRISON PROJECT OF THE ACLU
915 15th Street, N.W., 7th Floor
Washington D.C. 20005
(202) 548-6605
mwinter@npp-aclu.org

PD.17099813.1

Robert B. McDuff
MCDUFF & BYRD
767 North Congress Street
Jackson, MS 39202
601/969-0802
Fax: 601/969-0804
Email: RBM@McDuffLaw.com
ATTORNEY TO BE NOTICED

ATTORNEYS FOR PLAINTIFFS

*/s/ Krissy C. Nobile*_____
KRISSY C. NOBILE

PD.17099813.1