# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

**C.B., by and through his**
**next friend, Charleston DePriest, et al.**     )
                                                 )
              **Plaintiffs,**           )
                                                  )     **Civil Action No. 3:10cv663-CWR-FKB**
**v.**                                          )
                                                  )
**WALNUT GROVE CORRECTIONAL**     )
**AUTHORITY, et al.**                           )
                                                  )
              **Defendants.**         )
_____ )

## PLAINTIFFS' CORRECTED POST-HEARING PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF PLAINTIFFS' MOTION TO MODIFY AND ENFORCE CONSENT DECREE AND IN OPPOSITION TO DEFENDANTS' MOTION TO TERMINATE

# TABLE OF CONTENTS

I.  INTRODUCTION……………………………………………………………………...1

II.  THE LEGAL STANDARDS GOVERNING THE PARTIES' MOTIONS……………..4
   A.  The PLRA Standard for Termination and Modification of Prospective Relief…..4
   B.  The Eighth Amendment Standard Governing Plaintiffs' Claims……………........6
   C.  The Timeframe for Determining "Current and Ongoing" Violations……………7

III.  PLAINTIFFS HAVE PROVED A CURRENT AND ONGOING VIOLATION OF THEIR EIGHTH AMENDMENT RIGHTS AND OF THE CORE PROVISIONS OF THE CONSENT DECREE……………………………………………….. ….…...19
   A.  Chronology of Defendants' Noncompliance with the Consent Decree and Violations of Plaintiffs' Eighth Amendment Rights………………………… …….11
      1.  October 2012: First Monitors' Report……………………………….11
      2.  April 2013: Second Monitors' Report………………………… ………12
      3.  July 2013: Plaintiffs Retain Corrections Expert…………………………...12
      4.  November 2013: Third Monitors' Report………………………………….13
      5.  December 31, 2013: The New Year's Riot………………………………….13
      6.  January 28-29, 2014: Parties' Meeting with Monitors……………………14
      7.  March 2014: Eldon Vail's Report and Recommendations……………….....14
      8.  April 2014: Fourth Monitors' Report…………………………………....16
      9.  May 2014: Parties' Meeting with Monitors……………………………...17
      10.  June 2014: Eldon Vail's Second Report and Recommendations………….19
      11.  July 10, 2014: The Second Riot……………………………………….19
      12.  August 2014: Plaintiffs' Motion to Enforce and Modify Decree………..23
      13.  July-September 2014: Lockdown of Walnut Grove, and Removal of Long-Term Segregation and Close Custody Inmates…………………………..25
      14.  October 22, 2014: Fifth Monitors' Report………………………………..26
      15.  March 3, 2015: Sixth Monitors' Report………………………………….28
      16.  March 13, 2015: Defendants File Motion to Terminate Prospective Relief ……………………………………………………………………………30
      17.  Expert Testimony at April 2015 Evidentiary Hearing…………………….30
         a.  The Testimony of Monitor Steve Martin………………………..30
         b.  The Testimony of Plaintiffs' Expert Eldon Vail…………………35
         c.  The Testimony of Defendants' Expert Tom Roth………………..48
      18.  Lay Witness Testimony at April 2015 Evidentiary Hearing……………52
         a.  The Testimony of Charles Owens……………………….……52
         b.  The Testimony of Jeremy Evans………………………………54

i

B.      A Summary by Subject-Matter of Defendants' Violation of the Core Provisions of the Consent Decree and of the Plaintiffs' Eighth Amendment Rights…………56
        1.      Classification and Housing System………………………………………...57
        2.      Reasonably Safe Living Conditions…………………………………….59
            a.      Unsecure Cell Doors……………………………………………59
            b.      Contraband……………………………………………………60
            c.      Sexual Assaults and Misconduct………………………………...62
            d.      Assaults in General……………………………………………64
            e.      Gang Influence and Control……………………………………...67
            f.      Programming and Behavior Management…………………………68
            g.      Staff Corruption………………………………………………69
        3.      Sufficient Numbers of Adequately Trained Staff…………………………70
            a.      Inadequate Supervision…………………………………………72
            b.      Inadequate Training……………………………………………...75
            c.      Emergency Response Plan………………………………………77
        4.      Use of Force…………………………………………………………..78

IV.      PROPOSED REMEDIES TO ABATE SUBSTANTIAL RISK OF SERIOUS HARM TO PLAINTIFFS………………………………………………………………………84
      A.      Substantive Remedial Measures in the Consent Decree…………………………85
        1.      Classification and Housing System………………………………………...85
        2.      Protection from Harm………………………………………………....86
        3.      Sufficient Numbers of Adequately Trained Staff…………………………86
        4.      Mechanical, Physical, or Chemical Restraints as Punishment …………..87
        5.      Audio-Visual Recording of Use of Force………………………………..88
        6.      Documentation of Physical Interventions………………………………..89
        7.      Review of Use of Force…………………………………………………89
        8.      Decontamination from Chemicals………………………………….90
        9.      Long-Term Cell Confinement…………………………………………90
        10.      Programming and Behavior Management………………………….91
        11.      Disciplinary Due Process and Grievances………………………….92
        12.      Contract Monitoring……………………………………………92
      B.      New Substantive Remedial Measures………………………………………...93

V.      THE COURT SHOULD FIND THAT DEFENDANTS VIOLATED THE TERMINATION PROVISION OF THE CONSENT DECREE………………………...94

VI.      CONCLUSION…………………………………………………………………98

# I.     INTRODUCTION

On March 26, 2012, the Court entered a Consent Decree approving and adopting remedies that the parties had agreed were needed to abate unacceptable risks to the health and safety of inmates housed at Walnut Grove Correctional Facility ("Walnut Grove").   By agreement of the parties, the Court retains jurisdiction to enforce the terms of the Decree. Consent Decree March 26, 2012 at 14, ECF No. 151-1.   The Consent Decree declares that the parties' purpose "is to protect certain constitutional and federal statutory rights of individuals who are now or in the future will be imprisoned at [Walnut Grove]" and that "the terms and requirements of this Consent Decree will be interpreted to be consistent with the remedial measures necessary to protect these rights of the prisoners, and consistent with applicable federal law."  Consent Decree at 3, ECF No. 151-1.

On August 6, 2014, Plaintiffs moved for enforcement and modification of the Decree, and for an evidentiary hearing.  Motion for Enforcement and Modification of Consent Decree, August 6, 2014, ECF No. 106; Amended Memorandum, January 13, 2015, ECF No. 115.  On March 13, 2015, about three weeks before the hearing was scheduled to begin, Defendants filed a motion pursuant to the Prison Litigation Reform Act ("PLRA") for termination of all relief. Motion to Terminate Prospective Relief, March 13, 2015, ECF No. 129.  The evidentiary hearing on both motions took place over six days, April 1, 2, 3, 23, 24, and 27, 2015.  The Court heard testimony from eighteen witnesses, viewed video recordings from surveillance cameras at the prison, and accepted 78 exhibits into evidence.

The background to the Consent Decree is set forth in this Court's findings in its March 26, 2012 Order approving the Decree.  Order Approving Settlement, March 26, 2012, ECF No. 75.  In approving the Consent Decree, the Court found that, without court intervention, the plaintiff class

would continue to suffer unconstitutional harms, and noted that "nothing has curtailed actions of the staff and indifference of management officials to the constant violations, even though the parties and their experts have been monitoring, investigating and conducting on-site visits constantly since before the lawsuit was filed and during the pendency of this action." *Id.* at 5.

The Court noted that not even a Department of Justice investigation during the pendency of the case, which resulted in findings that "the State of Mississippi is deliberately indifferent to the constitutional rights" of the prisoners confined at Walnut Grove, and that the evidence revealed "systemic, egregious and dangerous practices exacerbated by a lack of accountability and controls," caused Defendants to bring Walnut Grove into compliance with the Constitution. *Id.* at 4. It was even more astounding, the Court noted, that the notice of the fairness hearing itself did not cause Defendants to change course: "The testimony at the hearing established that only two days earlier the facility remained so understaffed that a teenage offender was brutally attacked by several other offenders while only one staffer was on site." *Id.* at 5.

At the time the Court approved the Decree, Walnut Grove was being operated by the GEO Group, a private for-profit contractor acting as agent for the Mississippi Department of Corrections ("MDOC") at Walnut Grove. *Id.* at 2. Since July 2, 2012, Walnut Grove has been operated by Management and Training Corporation ("MTC"), the most recent in a series of private prison operators at Walnut Grove. First Monitors' Report, April 7, 2014 at 3, ECF No. 152-4. MDOC, however, remains at all times legally responsible for the treatment of Mississippi prisoners housed in prisons operated by its private contractors. The sole defendant in this case is the Commissioner of the Department of Corrections in his official capacity.

The Decree's central provision on inmate safety and protection from harm[1] requires that "[a]t all times, prisoners will be provided with reasonably safe living conditions and will be protected from violence and other physical or sexual abuse by staff and other prisoners. Consent Decree at 4, ECF No. 151-1. In addition to the substantive remedial provisions, the parties agreed to the appointment of James Austin and Steven Martin as Monitors responsible for tracking compliance with the terms of the Consent Decree and for submitting reports every four months, their costs and fees to be borne by Defendants. *Id.* at 12-13

Twice within seven months riots erupted at Walnut Grove resulting in serious injuries to many prisoners, and which could easily have resulted in death. Fifth Monitors' Report at 3, ECF No. 151-7. On August 6, 2014, immediately following the second of these riots, Plaintiffs brought a Motion for Enforcement and Modification of the Consent Decree, and for an evidentiary hearing. *See* ECF No. 106; Amended Memorandum, ECF No. 115.

On March 13, 2015, approximately two weeks before the evidentiary hearing on Plaintiffs' motion was scheduled to begin, Defendants brought a Motion to Terminate the Consent Decree. ECF No. 129. That motion triggered the automatic stay provision of the PLRA. The Court subsequently entered an order for good cause postponing the operation of the automatic stay for ninety days, that is, until June 11, 2015. ECF No. 140.

The evidence adduced at that hearing, and the record of this case in its entirety, establish a current and ongoing violation of the Eighth Amendment rights of the inmates at Walnut Grove. They also establish that Defendants have been and remain to this day in violation of the core provisions of the substantive provisions of the Consent Decree that directly relate to protection

---

[1] The Decree contains substantive remedial measures relating to inmate health and safety. Consent Decree at 3-12, ECF No. 151-1. Because proceedings on the State's motion to terminate the health-care provisions have been deferred, Plaintiffs' Brief discusses only the provisions of the Decree relating to safety and protection from harm.

from substantial risk of serious injury.  Accordingly, Plaintiffs are entitled to prevail both on their motion to enforce and modify the consent decree, and on Defendants' motion to terminate the Decree.

## II.    THE LEGAL STANDARDS GOVERNING THE PARTIES' MOTIONS

### A.    The PLRA Standard for Termination and Modification of Prospective Relief

The Prison Litigation Reform Act (PLRA) generally provides that any party may move for termination of prospective relief in cases concerning prison conditions after two years from the court's grant or approval of relief.  18 U.S.C. § 3626(b)(1)(A)(i).  The PLRA provides, however, that the prospective relief "shall not terminate if the court makes written findings based on the record that prospective relief remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation."  *Id.* § 3626(b)(3).

If current and ongoing violations exist, but existing relief is no longer appropriate to current conditions, the court must amend the relief or design new relief appropriate to remedy the current violations.  *Ruiz v. United States,* 243 F.3d 941, 950-51 (5th Cir. 2001) (recognizing that prospective relief under the PLRA remains subject to modification); *Castillo v. Cameron Cnty.*, 238 F.3d 339, 357 (5th Cir. 2001) (remanding and instructing that if current and ongoing violations exist, plaintiffs are entitled to seek a modification of existing relief); *Laaman v. Warden*, 238 F.3d 14, 19 (1st Cir. 2001) (concluding that a "district court may modify the decree so that it both addresses the current violation and conforms to the statutory requirements" of being "no further than necessary"); *Gilmore v.  California*, 220 F.3d 987, 1008  ("If the existing relief qualifies for termination under 3626(b)(2), but there is a current and ongoing violation, the district

court will have to modify the relief to meet the Act's standards"); *Balla v. Idaho Bd. of Corr.*, 2005 WL 2403817 at *4 (D. Idaho Sept. 25, 2005) ("[I]f the Court finds current and ongoing constitutional violations, 'it cannot terminate or refuse to grant prospective relief necessary to correct a current and ongoing violation, so long as the relief is tailored to the constitutional minimum.'") (quoting *Gilmore*, 220 F.3d at 1007-08).

Likewise, when Plaintiffs seek modification of a consent decree in a prison case, the federal courts are not only permitted but required to grant suitable modification if plaintiffs demonstrate the existence of a current and ongoing violation of federal right. *Id.* The Supreme Court recently reiterated this principle regarding modification of prospective relief in *Brown v. Plata,* where the Court approved under the PLRA an extraordinary state-wide prisoner release order as a remedy for systemic deficiencies in the state's prison health care system caused by prison overcrowding. The Supreme Court explained:

> The three-judge court . . . retains the authority, and the responsibility, to make further amendments to the existing order or any modified decree it may enter as warranted by the exercise of its sound discretion. 'The power of a court of equity to modify a decree of injunctive relief is long-established, broad, and flexible.' *New York State Assn .for Retarded Children, Inc. v. Carey*, 706 F. 2d 956, 967 (C.A.2 1983) (Friendly, J.). A court that invokes equity's power to remedy a constitutional violation by an injunction mandating systemic changes to an institution has the continuing duty and responsibility to assess the efficacy and consequences of its order. [*Id.* at 969–71.] Experience may teach the necessity for modification or amendment of an earlier decree. To that end, the three-judge court must remain open to a showing or demonstration by either party that the injunction should be altered to ensure that the rights and interests of the parties are given all due and necessary protection.

131 S. Ct. 1910, 1946 (2011). *And see Hutto v. Finney*, 437 U.S. 678, 687, 690 (1978) (where prison officials had been given repeated opportunities to remedy unconstitutional conditions, the district court was justified in "entering a comprehensive order to insure against the risk of

inadequate compliance," and "in fashioning a remedy, the district court had "ample authority to go beyond earlier orders and to address each element contributing to the violation.")

**B.      The Eighth Amendment Standard Governing Plaintiffs' Claims**

Prisoners prove an Eighth Amendment violation when they show that they are incarcerated under conditions posing a substantial risk of serious harm to their health or safety, and officials acted with deliberate indifference, that is, with conscious disregard for that risk. *Farmer v. Brennan*, 511 U.S. 825, 833-34 (1994). That is the Eighth Amendment standard announced by the Supreme Court in *Farmer*, and applied by the Fifth Circuit in *Gates v. Cook*, 376 F.3d 323, 333 (2004):

> A prison official has violated the Eighth Amendment when he 1) shows a subjective deliberate indifference to 2) conditions posing a substantial risk of serious harm to the inmate. *Farmer*, 511 U.S. at 833-34[.] Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious. *Id.* at 842[.]

> Conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise - for example, a low cell temperature at night combined with a failure to issue blankets. *Wilson v. Seiter*, 501 U.S. 294, 304 [(1991)]. . . .

> It is also important to note that the inmate need not show that death or serious illness has occurred. [*Helling v. McKinney*, 509 U.S. 25, 32 (1993)] ('It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them.').

Prison officials may not "ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year" merely because no harm has yet occurred, and a "remedy for unsafe conditions need not await a tragic event." *Helling*, 509 U.S. at 33; *accord Farmer*, 511 U.S. at 845; *Cook*, 376 F.3d at 339 (holding that

plaintiffs "[do] not need to show that death or serious illness has yet occurred to obtain relief. [They] must show that the conditions pose a substantial risk of harm to which MDOC officials have shown a deliberate indifference.").

Corrections officials' treatment of prisoners violates the Eighth Amendment, whether or not it causes physical injury, when it "'offend[s] contemporary concepts of decency, human dignity, and precepts of civilization which we profess to possess.'" *Hope v. Pelzer*, 536 U.S. 730, 737 & n.6, 738 (2002) (quoting *Gates v. Collier*, 501 F.2d 1291, 1306 (5th Cir. 1974)) (holding that prison officials violated the Eighth Amendment by handcuffing a prisoner to a hitching post, thereby knowingly subjecting him to a substantial risk of physical harm, unnecessary pain, . . . prolonged thirst, taunting, and deprivation of bathroom breaks that created a risk of discomfort and humiliation; and finding that such treatment "violated the 'basic concept underlying the Eighth Amendment, which is nothing less than the dignity of man'" (quoting *Trop v. Dulles*, 356 U.S. 86, 100 (1958))); *Hutto v. Finney*, 437 U.S. 678, 685 (1978) (recognizing that the Eighth Amendment's ban on cruel and unusual punishments extends beyond physical punishment, and proscribes penalties that "transgress today's 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency'" (quoting *Estelle v. Gamble*, 429 U.S. 97, 102 (1976))).

**C.     The Timeframe for Determining "Current and Ongoing" Violations**

Defendants have suggested that the relevant time period for determining whether there is a "current and ongoing" violation commences with the period immediately preceding the filing of their motion to terminate prospective relief.  Memorandum in Support of Motion to Terminate Prospective Relief at 11, March 13, 2015, ECF No. 130 at 11.  That position is untenable.  Under *Farmer* and *Gates* the constitutional injury here is not a completed injury but a continuous and ongoing "substantial *risk* of serious harm."  As monitor Steve Martin testified, the ability to

maintain sustained compliance is a *sine qua non* of demonstrating that there is not a substantial

risk of serious harm, that it takes "appreciable time" to fully institutionalize system change in

prison, and that in most instances it takes years to accomplish that. *See* Martin, Hr'g Tr. 59:9 –

60:13, April 3, 2015.

"A current and ongoing violation" under the PLRA cannot be measured in a snap-shot on

the day defendants chose to file a motion to terminate relief; otherwise prison officials could

easily defeat the court's jurisdiction – for example, in a suit alleging egregiously filthy

conditions, by scouring the premises the day before the evidentiary hearing on a motion to

terminate. Of necessity the Court must examine evidence going back some period of time, as an

"instantaneous snapshot" of conditions inside a prison is impossible. *Lancaster v. Tilton*, No. C

79-01630WHA, 2007 WL 4570185, at *5 (N.D. Cal. Dec. 21, 2007).

There is no hard and fast rule on the relevant time period, but in the few reported

decisions the courts have considered evidence from roughly the twelve months preceding the

motion to terminate. Plaintiffs' research has disclosed no case in which the courts have

determined the relevant time-period to be less than a year. In *Lancaster*, the court considered

evidence from "the past thirteen months." *Id.* In *Graves v. Arpaio*, the court permitted evidence

on jail conditions over a one-year period, which allowed the court to "distinguish 'ongoing'

conditions from temporary aberrations." No. CV-77-0479-PHX-NVW, 2008 WL 4699770, at *3

(D. Ariz. Oct. 22, 2008). In *Skinner v. Lampert*, the Court examined evidence from the previous

year. 457 F. Supp. 2d 1269, 1281 (D. Wyo. Aug. 7, 2006).

Older evidence standing alone might be insufficient to establish ongoing violations, yet

still be relevant to determining current conditions. In *United States v. Territory of the Virgin

Islands*, the court found that a six-year-old report was "too dated to stand on its own" to establish

a current violation, but was an "extensive and well-documented account" that "if properly updated by current findings, could serve as an appropriate factual foundation." 884 F. Supp. 2d 399, 418 (D.V.I. Feb 8, 2012). In *Skinner*, the Court found evidence from the previous year that the Defendants had ignored an attack "especially worrisome considering the Penitentiary's historic indifference to inmate assaults." 457 F. Supp. 2d at 1281.

Plaintiffs submit that the Court should consider, at the very least, all evidence of Defendants' conduct since March 13, 2014 as probative of a current and ongoing violation of federal right. Furthermore, evidence of Defendants' failure to comply with the core provisions of the Consent Decree since it was entered in March 2012 is highly relevant since it is part of an unbroken continuum of nonfeasance, during a period of intensive monitoring, technical assistance and consultation provided by the Monitors and Plaintiffs' expert – powerful evidence of Defendants' deliberate indifference, since their stubborn refusal to heed critically important advice and warnings resulted in serious harm to the class.

The evidence shows that the December 2013 riot was not an aberration, but rather a predictable outcome of a number of systemic problems; and that the July 2014 riot was a predictable result of Defendants' obdurate failure to study and learn from the lessons of the earlier disturbance. Plaintiffs have amply demonstrated that for the past three years Defendants have so far been either unwilling or unable to sustain essential reform, increasing the current and ongoing substantial risk of serious injury.

## III. PLAINTIFFS HAVE PROVED A CURRENT AND ONGOING VIOLATION OF THEIR EIGHTH AMENDMENT RIGHTS AND OF THE CORE PROVISIONS OF THE CONSENT DECREE

The evidence adduced at trial and the entire record of this case shows that Walnut Grove is essentially a rudderless, pilot-less ship, manned by an inexperienced and poorly trained crew.

Those who are primarily responsible for the safety and well-being of prisoners and line staff – the Mississippi Department of Corrections and the high-level officials of management and Training Corporation who operate Walnut Grove – are conspicuous by their absence. Indeed, the failure of MDOC even to send a representative to the evidentiary hearing in this case[2] is a sad commentary on MDOC's abdication – in favor of a corporate for-profit operator – of its constitutional responsibility to the prisoners.

The corporate executives to whom MDOC has entrusted the operation of Walnut Grove seem even less involved, if that were possible. MTC's Regional Vice President, who oversees the operation of the prison, does not require notification of the development and implementation of policies and procedures. Brown, Hr'g Tr. 187:15-19, 187:24-25, 188:1-8, April 2, 2015. She does not even receive a copy of the actual policies and procedures after they are created by the facility. Brown, Hr'g Tr. 188:3-5, April 2, 2015. In fact, MTC does not review changes to existing policies nor does it approve new policies. Brown, Hr'g Tr. 187:4-11, April 2, 2015. MTC officials outside of the facility are not even necessarily notified of sexual assault complaints if the allegation does not concern a staff member. Brown, Hr'g Tr. 180:13-21, April 2, 2015

Virtually the only guidance Walnut Grove has ever received over the past three years in reaching compliance with the Decree and with the Constitution has come neither from MDOC nor from the responsible corporate officials at MTC, but instead from the Monitors and from Plaintiffs' expert, Eldon Vail. Defendants' decision to reject that assistance, which they so desperately need, and to move for termination of the Decree – in the face of massive evidence of their non-compliance with the Decree and with the Eighth Amendment – speaks volumes about

---

[2]When Plaintiffs' counsel asked Defendants to identify their representative at the hearing, Defendants' counsel responded, "We're not going to have one." Hr'g Tr. 6:9-12, April 1, 2015.

how far removed they are from the realities at Walnut Grove, and of their own deliberate indifference to the plight of the prisoners.

Plaintiffs provide first a chronological overview of the history of Defendants' failure to comply with the core provisions of the Consent Decree and their deliberate indifference to the ongoing and current risk of serious harm to the Walnut Grove prisoners (as well as to prison staff) from violence. *Point II.A, infra.* Plaintiffs then provide a summary, arranged by subject matter, of the evidence showing Defendants' noncompliance with each of the core provisions of the Decree relating to violence and protection from harm, and the risks of harm created thereby created. *Point II.B, infra.* Points A and B. are unavoidably over-lapping, since the core provisions of the Consent Decree are so closely linked to the Eighth Amendment standard.

### A. Chronology of Defendants' Noncompliance with the Consent Decree and Violation of Plaintiffs' Eighth Amendment Rights

The following is a chronology of major events since the Consent Decree has been in effect.

### 1. October 2012: First Monitors' Report

Following entry of the March 2012 Consent Decree, the Monitors submitted their First Report to the Court on October 1, 2012. ECF No. 152-4. They found that MDOC remained a troubled facility, but that MDOC, in collaboration with the Monitors, was "now in the process of identifying and implementing sound management strategies that will hopefully and steadily advance remedial measures intended to ameliorate these unsafe conditions." First Monitors' Report at 2, ECF No. 152-4.

The Monitors found Defendants to be in non-compliance with the core requirement of "reasonably safe living conditions," and in only partial compliance with the core requirement of "sufficient numbers of adequately trained staff." *Id.* at 3-4. The Monitors reported "alarming levels" of continued disruption in the facility through the first six months of the Consent Decree.

*Id.* at 2.  They reported that during the month of July 2012 alone, there were at least 15 prisoner-on-prisoner assaults, "seven of which involved prison-made weapons resulting in injuries to no less than four inmates."  *Id.* at 5.  They reported that a "number of these incidents involved multiple inmates assaulting a single inmate" and at least one incident involved officer complicity.  *Id.*  The Monitors also reported that "obvious staffing deficiencies . . . . remain in a transition period of hiring, training, and assigning new staff to the facility."  *Id.*

### 2.    April 2013: Second Monitors' Report

In their Second Report, submitted in April 2013, the Monitors observed that Walnut Grove "continues to be plagued with clear signs of instability," including "high rates of inmate assaults, lockdowns, contraband control issues, and management of special populations."  Second Monitors' Report at 2, ECF No. 152-5.  The Monitors noted that "assaults involving weapons continue to occur at alarming levels."  *Id*.  They said that in order to be found in compliance with the "reasonably safe living conditions" provision of the Consent Decree, violence rates would need to be reduced by "at least 50 percent."  *Id*. at 8.  They found that staff supervision of prisoners was lacking and inexperienced as a result of the high turnover rate and vacancies.  *Id*.  The Monitors concluded that these problems were alarming and would "no doubt require continued and more effective remedial measures."  *Id*. at 3.  They found that MDOC remained in non-compliance with the "reasonably safe living conditions" requirement, and in partial compliance with the "sufficient numbers of adequately trained staff" provision of the Decree.  *Id*. at 7-9.

### 3.    July 2013: Plaintiffs Retain Corrections Expert

In July 2013, Plaintiffs retained Eldon Vail as their correctional expert in this case.  Mr. Vail has been continuously involved in investigating conditions at Walnut Grove since mid-

2013. Vail, Hr'g Tr. 27:22 – 28-:17, April 1, 2015.

Mr. Vail served for over a decade first as Deputy Secretary and then as Secretary of the Washington State Department of Corrections. Vail's Resume, ECF No. 151. Prior to that, he served as Superintendent of three prisons, two of which housed maximum-security inmates. Vail, Hr'g Tr. 28:508, April 1, 2015. Since leaving the Department of Corrections, he has served as corrections expert in ten other states. Vail's Resume, ECF No. 151. Mr. Vail serves as Plaintiffs' corrections expert in a class-action case involving conditions at the East Mississippi Correctional Facility. Vail, Hr'g Tr. 27:22 – 28:17, April 1, 2015; Vail's Resume, ECF No. 151.

### 4. November 2013: Third Monitors' Report

In November 2013, the Monitors submitted their Third Report. ECF No. 152-6. They found that Defendants had made "significant gains in managing and stabilizing the facility," and that assault rates and use of force had been "significantly reduced." *Id.* at 3. They noted continuing problems of staff inexperience and the possibility that many assaults went unreported. Third Monitors' Report at 8-9, ECF No. 152-6. The Monitors found that Defendants were in partial compliance with the "reasonably safe living conditions," "sufficient numbers of adequately trained staff," and "use of force and chemical agents" provisions of the Consent Decree. *Id.* at 7-9.

### 5. December 31, 2013: The New Year's Eve Riot

The reduction in the level of violence during the period covered by the Third Monitors' Report was short-lived. On New Year's Eve 2013, a major disturbance erupted in Housing Unit 3D and quickly spread to the three surrounding pods, Units 3A, 3B, and 3C. Fourth Monitors' Report, April 7, 2014 at 7, ECF No. 151-2. According to MTC's After-Action Report, prison officials lost all control of four housing units for almost two hours and were unable to complete

the search of the zones until over seven hours later. MTC After-Action Report at 1, 3, ECF No. 151-2.

A total of sixteen prisoners were transported to off-site medical facilities for serious injuries sustained during the riot. *Id.* at 1; Fourth Monitors' Report at 8, ECF No. 151-2. Four of them required hospital admission. MTC After-Action Report at 3, ECF No. 151-4. Injuries included multiple stabbing and puncture wounds, lacerations, and fractures. Fourth Monitors' Report at 8, ECF No. 151-2. During the course of the riot, one officer was not able to exit the Unit and had to lock herself in a cell. MTC After-Action Report at 2, ECF No. 151-4.

### 6. January 28-29, 2014: Parties' Meeting with Monitors

On January 28-29, 2014, shortly after the New Year's Eve riot, Mr. Vail visited Walnut Grove to meet with prison officials, become acquainted with the facility, and learn the causes of the riot and what Defendants might be doing to improve the situation. Vail, Hr'g Tr. 47:14-25, April 1, 2015; Eldon Vail Report, Mar. 14, 2014 at 2, ECF No. 151-3. The Monitors attended the meeting, as well as a number of high-ranking MDOC and MTC officials. Vail, Hr'g Tr. 48:1-3, April 1, 2015. At the meeting the Monitors recommended that MTC consider further stratification of the close custody population; Mr. Vail disagreed, on the ground that that could lead to additional violence. Mr. Vail recommended instead that close custody inmates should be removed from the prison. Vail, Hr'g Tr. 52.7-21, April 1, 2015.

### 7. March 2014: Eldon Vail's Report and Recommendations

In March 2014, Mr. Vail submitted a report with findings on the causes of the New Year's Eve riot and recommendations for remedies. Vail, Hr'g Tr. 48:6-14, April 1, 2015; Vail March 2014 Report, ECF No. 151-3. He concluded that MTC is incapable of handling close custody inmates; officers were not staying in the zones to properly supervise the population

there; and generally that the skill level of the basic corrections staff was inadequate to manage inmates. Vail March 2014 Report at 9, ECF No. 151-3. He stated that "at a fundamental level, MTC is not in control of the living units, or of the facility in general." Vail March 2014 Report at 2, ECF No. 151-3. Mr. Vail recommended that if close custody was not removed from Walnut Grove, two officers should be required in each housing unit to provide backup; and for housing units for medium and minimum custody prisoners, there needs to be a constant presence of at least one officer. Vail, Hr'g Tr. 56:1-16, April 1, 2015.

Mr. Vail found that there is a profound level of idleness at Walnut Grove, and that the majority of the population was not productively occupied. Vail, Hr'g Tr. 56:12 – 57:34, April 1, 2015. He recommended additional incentives so that inmates would have something to weigh when they made decisions about whether to become involved with the gangs. Vail, Hr'g Tr. 57:19, April 1, 2015. He suggested that there should be an inquiry into the possible connection between idleness and violence at the facility. Vail March 2014 Report at 7, ECF No. 151-3.

Mr. Vail also made observations about physical plant security. Vail March 2014 Report at 3, ECF No. 151-3. He found that cell doors were not secure; this was startling to him and remains one of his biggest concerns about the prison. Vail, Hr'g Tr. 57:20-24, April 1, 2015; Vail March 2014 Report at 3, ECF No. 151-3. He found that furnishings and supplies, which had been used as weapons during the New Year's Eve riot, were still not being secured; that weapons were far too prevalent; and that security officers were not present consistently in the pods when inmates were out of their cells. Vail, Hr'g Tr. 57:25 – 58:8, April 1, 2015; Vail March 2014 Report at 3, ECF No. 151-3. Another causative factor was the lack of an Emergency Response Plan. Vail, Hr'g Tr. 73:7, 61:19-23, 62:2-9, April 1, 2015; Vail March 2014 Report at 3, ECF No. 151-3. He found that contraband flow into the facility was enormous,

and that inmates enter cells to which they are not assigned, with some regularity. Vail March 2014 Report at 4, 5, ECF No. 151-3.

Mr. Vail recommended that MDOC and MTC develop strategies that reward non-gang behavior and that an expert in security hardware be tasked with determining if there are other areas of physical plant construction that could place prisoners or staff at risk. *Id.* at 10.

### 8.    April 2014:  Fourth Monitors' Report

On April 17, 2014, the Monitors submitted their Fourth Report. ECF No. 151-2. They found that Defendants were in non-compliance with the provisions of the Consent Decree requiring reasonably safe living conditions and sufficient numbers of adequately trained staff. Fourth Monitors' Report at 7-8, ECF No. 151-2.

The Fourth Report addressed the New Year's Eve riot and analyzed underlying problems. ECF No. 151-2 at 3-4. The Monitors found that "it was the supervision of these inexperienced security staff members, which was revealed to be sorely deficient, that set the stage for not only the outbreak of the disturbance, but the actual mismanagement of the event and its aftermath." *Id.* at 4. Among a number of other contributing factors, the Monitors found that the security staff on duty during the riot was "very inexperienced," that almost half the officers had less than six months' experience, and that the officer assigned to the pod where the disturbance began had less than two months' service. Vail 2014 March Report at 8, ECF No. 151-3. Moreover, the average level of experience of security staff had markedly *declined* during the reporting period, while during the same period the numbers of Close Custody inmates at the facility had almost tripled:

> In March 2011, 33 percent of the security force at WGYCF had less than one year of experience. In December 2013, 48 percent of the security force had

16

less than one year of experience. Commensurate with an increasingly
inexperienced staff, between March 2-11 and December 2013, the Close
Custody population at the facility increased from 121 to 346.

Vail 2014 March Report at 8, ECF No. 151-3.

The Monitors pointed out that they had brought this issue to the attention of MTC and

MDOC in strong terms as far back as October 2012, in their Second Report, and that Walnut

Grove's Deputy Warden of Operations had advised MDOC's Deputy Commissioner that they

were implementing new operating procedures at the facility requiring the deployment of more

experienced staff. Fourth Monitors' Report at 9, ECF No. 151-2. The Monitors found that these

reforms, if implemented, were not sustained: "Clearly, at the time of the December [2013]

Disturbance, MTC management had abandoned the October 2012 Operating Procedures." *Id.*

In addition to the lack of experienced officers, the Monitors noted that seven staff

members were terminated or resigned in connection with the riot, for misconduct that included

passing contraband, refusing a vehicle search, failure to report known violations, fraternization,

and drug possession. *Id.* at 9.

The Monitors told Defendants to revise their gang membership flags, because inmates

whom they were listing as "inactive" members were still "very much affiliated with the

designated gang." Fourth Monitors' Report at 5, ECF No. 151-2.

The Monitors found once again that Defendants were in non-compliance with the

provisions of the Consent Decree requiring reasonably safe living conditions and sufficient

numbers of adequately trained staff. *Id.* at 7-8.

### 9. May 2014: Parties' Meeting with Monitors

On May 19, 2014, at the request of the Monitors, the parties, as well as Walnut Grove

officials and MTC leadership met with the Monitors to discuss the New Year's Eve riot and

implementation of the Consent Decree. Vail August 2014 Report at 4, ECF No. 151-6. Among the participants were MTC Vice President Odie Washington and MDOC's Deputy Commissioner. Vail, Hr'g Tr. 75:21 – 76:5, April 1, 2015; Eldon Vail Report, August 4, 2015 at 4, ECF No. 151-6.

The meeting included a frank discussion of the likely underlying causes of the riot, and recommendations by the Monitors and by Mr. Vail for remedial measures. Vail August 2014 Report at 4, ECF No. 151-6. The Monitors stressed the gravity of the event. Vail August 2014 Report at 4, ECF No. 151-6. Mr. Vail told MDOC and MTC that they needed to learn from their experience so it would not be repeated. Vail, Hr'g Tr. 76:18-25, April 1, 2015.

At the May 2014 meeting, Mr. Vail asked directly about the non-secure cell doors. The former MDOC Deputy Commissioner, Archie Longley, responded that it was a problem at a number of facilities and they "were working on it." Vail August 2014 Report at 8, ECF No. 151-6. In Mr. Vail's opinion, not being able to count on secure cell doors is an emergency situation that requires prompt attention at the highest levels and needs to be fixed. Vail, Hr'g Tr. 78:11-24, April 1, 2015.

MDOC has been on notice of the problem of insecure cell doors at least since the 2012 Department of Justice ("DOJ") Report. DOJ Report at 20, ECF No. 151-5The DOJ noted that "youth are able to sabotage their cell locking mechanisms and get out of their cells, resulting in a serious breach of security and safety to staff and other youth. This deficiency results in a high incident of youth-on-youth violence and severe injury to unsuspecting youth. Either the cell door locking devices are inferior or security staff is not inspecting the cell door locking mechanisms on a frequent enough basis." DOJ Report, March 2012 at 25, ECF No. 151-5.

### 10.    June 2014:  Eldon Vail's Second Report and Recommendations

Following the May 2014 meeting, Mr. Vail submitted a memo to MDOC and Plaintiffs' counsel and the Monitors, summarizing his recommendations.  Vail August 2014 Report at 19-21, ECF No. 151-6.   He concluded:

> Last, Dr. Austin said at the meeting that the disturbance, which occurred this past New Year's Eve, cannot happen again.  He was absolutely correct.  While bad events will always happen in the prison environment, what cannot happen is for Walnut Grove to lose control of one close custody pod after another, in rapid succession, and then be so completely ill equipped to manage the incident as they were this last time.  Conditions of confinement in the close units need to improve and the programs available need to be expanded.  But of equal importance is that MTC must greatly improve their capacity for emergency response so that future incidents do not get as out of control as we saw happen last New Year's.

*Id.* at 21.

Unfortunately, MDOC for the most part did not follow the recommendations offered by the Monitors and Mr. Vail.  Vail, Hr'g Tr. 80:13-18, April 1, 2015.

### 11.    July 10, 2014:  The Second Riot

On July 10, 2014, less than seven months after the New Year's Eve riot, another riot erupted at Walnut Grove.  Fifth Monitors' Report at 3, ECF No. 151-7.  The July 10 riot was more serious than the New Year's Eve riot.  Vail, Hr'g Tr. 32:25 – 33:2, April 1, 2015.  There was a very strong possibility that someone could have lost their life.  Vail, Hr'g Tr. 33:21-25, April 1, 2015.  The July riot showed that MDOC and MTC had learned nothing from the New Year's Eve disturbance.  Vail, Hr'g Tr. 81:18 – 82:1, April 1, 2015.

Mr. Vail's account of the riot is based on his review of the surveillance videos and his discussions with monitor Steve Martin.  Vail, Hr'g Tr. 82:3 – 85:14, 86:5-12, April 1, 2015.  At the hearing, Mr. Vail presented excerpts from the surveillance videos of the riot.  They show how inmates were able to chase staff from the unit and take command of a vestibule, a turning

point in the riot, and how the failure of staff in the control tower to employ respirators made it impossible for them to maintain a tactical presence in the tower, which would have greatly increased their chances of controlling the incident. Vail, Hr'g Tr. 86:6-25, 96:15 – 109:11, April 1, 2015; Pl. Ex. 9 – DVD of July 10, 2014 Riot (video excerpts from MDOC surveillance tapes).

The July riot, which involved four housing zones, started at approximately 9:40 p.m. Vail August 2014 Report at 5, ECF No. 151-6; Vail, Hr'g Tr. 82:6-7, April 1, 2015. Three of these four zones should have been locked up for the night at 9:15pm. Vail August 2014 Report at 5, ECF No. 151-6; Vail, Hr'g Tr. 82:23-25, April 1, 2015.

Once the riot erupted, the videos show prolonged violent skirmishes between two gangs of prisoners armed with broom handles and heavy objects, and the brutal, repeated beatings and stomping of certain inmates by others, without any effective response by security staff in Units 3 Charlie and Delta. Vail August 2014 Report at 6-10, ECF No. 151-6.

Within minutes, prisoners armed themselves with milk crates, broomsticks, food trays, a microwave, and any object they could lay hands on. Vail August 2014 Report at 8, ECF No. 151-6; DVD of July 10, 2014 Riot. While violence was widespread, the assaults that occurred in Unit 3 Charlie were particularly brutal. *Id.* The first victim is kicked and struck by another prisoner with a broomstick, blood becomes visible on the floor, and he is struck more than ten times. *Id.* Less than thirty seconds later, another prisoner uses a stick-like object to strike the victim in the head twice as he lies on the ground. *Id.* Eleven seconds later, another prisoner strikes the victim in the head with a tray. Vail August 2014 Report at 8-9, ECF No. 151-6; DVD of July 10, 2014 Riot. The victim attempts to run to escape the assaults. Vail August 2014 Report at 9, ECF No. 151-6; DVD of July 10, 2014 Riot. Later, he is seen dragged out of his cell, his head bloodied, his pants around his ankle, and accompanied by three assailants. *Id.*

Between the first victim running to his cell and dragged out, another prisoner is dragged across the bottom tier, leaving a visible trail of blood as he is being dragged and left behind the stairs. Vail August 2014 Report at 8-9, ECF No. 151-6; DVD of July 10, 2014 Riot.

At around 10:30 p.m., over thirty minutes after officers were chased off the unit, a prisoner is seen being dragged out of a cell on the lower tier and does not appear to be moving. Vail August 2014 Report at 9, ECF No. 151-6; DVD of July 10, 2014 Riot. Three prisoners, apparently using plastic crates, begin striking the victim on the floor. Ten seconds later, another prisoner joins the assault with a broomstick, striking the victim over a dozen times. *Id.* Another prisoner strikes the victim with two crates over ten times. *Id.* Another prisoner climbs onto a table and jumps onto the victim, stomping him as he lies on the floor. *Id.* Prisoners promptly resume beating the man in the head and face. Somehow the victim is able to run into a cell, but he is followed by five or six prisoners, and the subsequent activity in the cell is not visible. Vail August 2014 Report at 9; DVD of July 10, 2014 Riot.

Another prisoner is forced out of his cell and beaten by approximately ten other prisoners. *Id.* The assailants use trays, broomsticks, and other unidentifiable objects. *Id.* At 10:33:52, a microwave is dropped onto the man being assaulted. *Id.* This man is stomped, hit, kicked, stabbed with broomsticks, and beaten with the microwave until another prisoner instructs the assailants to back up. Vail August 2014 Report at 10; DVD of July 10, 2014 Riot. At this point it appears that the victim is urinated on and temporarily left alone. *Id.* A few minutes later, the bloodied victim, still lying immobile on the floor, is assaulted by a prisoner with a food tray before being dragged across the floor. *Id.* Another prisoner throws a tray at him, and he is subsequently dragged out of view of the camera. Vail August 2014 Report at 10, ECF No. 151-6; DVD of July 10, 2014 Riot.

On Unit 3 Delta, similar assaults take place. *Id.* One prisoner is seen covered in blood and being chased by seven or eight other prisoners with long sticks and milk crates before being cornered in the showers and severely beaten again. *Id.*

As the above violence unfolded, officers completely lost control of the living units: they were run off of the zone by prisoners and were forced to evacuate the control booth after they accidentally activated a gas grenade in the booth instead of launching it into the zone. Vail August 2014 Report at 6, ECF No. 151-6; DVD of July 10, 2014 Riot; Vail, Hr'g Tr. 97:22-25, 103:21-25, 104:1-7, April 1, 2015. The improper activation of the gas grenade caused officers to leave the booth unoccupied for over half an hour. If they had been properly equipped with respirators, they could have reentered the booth in only a few minutes. Vail, Hr'g Tr. 104:22-25, 105:1-3, April 1, 2015.

It is standard for officers to have and use a respirator. Vail, Hr'g Tr. 111:11-13, April 1, 2015. It is a very important tool to keep everyone safer because without a respirator officers have less ability to control the situation. Vail, Hr'g Tr. 111:14-15, April 1, 2015. Mr. Vail has been critical of MDOC and MTC for their failure to ensure that respirators are used by officers during planned use-of-force situations, including the failure to make respirators available in sufficient numbers during the July 10 riot. Vail, Hr'g Tr. 111:2-17, April 1, 2015. Neither MDOC nor MTC has ever explained why respirators are not provided to all security staff. Vail, Hr'g Tr. 110:24 – 111:17, April 1, 2015. This kind of information and analysis should appear in an After-Action Report. Vail, Hr'g Tr. 109:12-16, April 1, 2015. It eventually transpired that MTC never prepared an After-Action Report following the July riot. In the opinion of Mr. Vail, it is "dumbfounding" that MTC would not want to learn what went wrong and that MDOC would not have called its contractor on the carpet. Vail, Hr'g Tr. 109:17 – 110:8, April 1, 2015.

## 12.	August 2014:  Plaintiffs' Motion to Enforce and Modify Decree

On August 6, 2015, Plaintiffs moved for enforcement and modification of the Consent Decree, supported with a report by Mr. Vail.  ECF No. 106; Amended Memorandum, ECF No. 115.  He stated:

> The absence of officers in close custody living units when the inmates are out of their cells is deeply disturbing and completely irresponsible on the part of MDOC and MTC.  This group, Close Custody, is the most dangerous classification of prisoners, outside of those in segregation, housed at the prison.  To put a single staff person in the pod intermittently, and to allow inmates to be out of their cells without any officers in the pod at all, simply turns the operation of those units over to the inmates.

Vail August 2014 Report at 7, ECF No. 151-6.  Mr. Vail also pointed out that staff presence is required whenever inmates are out of their cells—not only in close custody units, but in medium and minimum custody units as well.  Vail August 2014 Report at 7, n.2, ECF No. 151-6.

Mr. Vail pointed out once more in very strong terms that the cell doors were still insecure.  *Id.* at 7-8.  Responding to MDOC's statement that they were "working on it," he reiterated:

> "Working on it" is not good enough.  It is astonishing to me that this enormous gap in basic security is not being treated as an emergency.  It is a basic and fundamental necessity for prisoners, staff and the community to know that a prison can actually keep prisoners locked in their cells.  Not having confidence that cells doors are secure can be terrifying to both staff and inmates and creates a severe risk of significant injury for the prisoners.  This is a problem that demands an immediate solution.

*Id.* at 7-8.

Mr. Vail stated that he had deep concerns about the operation of the prison, the escalating level of violence, and the ongoing extreme danger to the inmates housed there—as well as the staff who work there.  Vail August Report at 14, ECF No. 151-6.  He concluded:

> The monitors and I have already repeatedly made a number of strong recommendations to MDOC in the wake of earlier outbursts of violence, but

these recommendations, it appears, have largely been ignored. In my view, the most recent outburst on July 10 reinforces the urgent necessity for these remedial measures. It has been shown twice in the past seven months that MTC is incapable of controlling the living units that house close custody inmates. The result, especially in the most recent event, was extreme violence and serious injury to several prisoners. Loss of life could have easily occurred as a result of the July 10 riot – or for that matter, even during the disturbance last New Year's Eve.

*Id.* at 14. Mr. Vail made the following recommendations:

1) Close custody inmates should not be housed at Walnut Grove.

2) Unless and until close custody inmates are removed from Walnut Grove, there should be a mandatory staffing requirement, 24 hours per day, 7 days per week, of two security officers in each close custody pod at all times, absent an occasional break for one officer to use the rest room. Until the cell doors are fixed and are proven to be secure, the pods should never be without a staff member on the floor.

3) If close custody inmates are allowed to remain at Walnut Grove, sufficient supervisory staff should be deployed on each shift until the rules of the pod, such as the prohibition from entering a cell to which a prisoner is not assigned, is routinely followed.

4) The locking mechanism on the cell doors must be replaced with a system that cannot be readily defeated.

5) MDOC must require that MTC have an effective ERP in place, that officers have been trained to follow the plan and that their performance is tested in real time drills: Even if the close custody inmates are removed from Walnut Grove, this is a critical requirement. The ERP must include measures to ensure that officers have adequate safety equipment to respond to an emergency. Officers should be required to be actually present in the housing units at all custody levels whenever the inmates are out of their cells.

6) An independent security hardware expert should be retained to inspect the facility and identify risks, including the existence of items that could easily be turned into weapons.

7) Cleaning equipment should be secured when not in use and microwaves should be bolted down. Items such as milk crates should be removed from the units when not in use.

8) If MTC cannot attract and retain quality staff and fill their mandatory posts, then MDOC must recognize that this vendor is not qualified to house the inmates.

9) MDOC and MTC should remain focused on addressing serious allegations of staff corruption.

10) MTC officers must learn how to control the living units and the prisoners housed at their facility; they must be retrained in Direct Supervision of inmates.

11) MDOC and MTC should work to reduce the influence of gangs by offering inmates good programs as alternatives to participation in gangs.

12) Sufficient program opportunities for inmates should be offered so that they are productively occupied the better part of each day, five days a week.

Vail August Report at 14-18, ECF No. 151-6. Apart from the first three recommendations, which relate to close custody and are not currently relevant, the recommendations that Mr. Vail made on August 4, 2014 are essentially the same as those he made during the hearing in April 2015.

### 13. July-September 2014: Lockdown of Walnut Grove, and Removal of Long-Term Segregation and Close Custody Inmates

As a result of the July 10, 2014 riot, Walnut Grove was locked down from July 10, 2014 through September 10, 2014. Fifth Monitors' Report, Aug. 4, 2014 at 2, ECF No. 151-7.

On August 6, 2015, Plaintiffs moved to enforce and modify the consent decree. ECF No. 106; Amended Memorandum, ECF No. 115. On August 7, 2014, the Monitors met with the MDOC Commissioner, Deputy Commissioner, and MDOC counsel and MTC officials and their counsel, and the MDOC Commissioner "confirmed that Close Custody inmates would no longer be assigned to [Walnut Grove]." Fifth Monitors' Report, Aug. 4, 2014 at 2, 8, ECF No. 151-7. Beginning in early August 2014 and continuing through September 10, 2014, MDOC transferred close custody prisoners out of Walnut Grove to other prisons. MDOC also transferred all long-term segregation prisoners out of Walnut Grove to other prisons. *Id.* at 3, 12.

The Monitors reported that MTC had "retained a security consultant to inspect the facility to determine measures to improve the security operation. Fifth Monitors' Report at 9, ECF No. 151-7.

### 14. October 22, 2014: Fifth Monitors' Report

In their Fifth Report, the Monitors found that security staffing vacancies remained high, and varying shifts were relying on overtime to fill essential positions; the warden's position, which had been vacant since April 2014, was finally filled in August; introduction of contraband continued to be a significant problem; and the inmate population continued to spend a significant portion of their waking hours with un-programmed, unstructured time in the dayrooms of the housing units. *Id.* at 4. The Monitors found Defendants to be in non-compliance with the core provisions of reasonably safe living conditions, sufficient numbers of adequately trained staff, and use of force and chemical agents. *Id.* at 5, 9, 11.

The only core area in which they found compliance was the Classification and Housing category, largely because during the reporting period for the Fifth Report MDOC had moved close custody inmates out of Walnut Grove. *Id.* at 4. The Monitors noted, however:

> There is a concern that approximately 96 inmates at Walnut Grove who were formerly classified as Close Custody have been re-classified as Medium Custody by using a discretionary over-ride. The reason used most often for such over-rides was that the inmates were RVR free for a length of time or the inmates "do not deem the custody they score." These over-rides were made by the MDOC central classification unit and not the MTC. *These inmates need to be monitored to ensure they are not proving to be problematic in terms of their conduct and that the inmate classification system with respect to over-rides has not been compromised.*

*Id.* at 4-5 (emphasis added). It was to become clear by the Sixth Report that MDOC did not heed this strong warning.

The Monitors noted that, "to date," MTC has not provided a copy of an After-Action Report of the July disturbance," and also that "MDOC should require that MTC have an effective Emergency Response Plan in place, that officers been trained to follow the plan and that performance is tested in real-time drills. Fifth Monitors' Report at 8, ECF No. 151-7. The July riot, like the New Year's Eve riot, "exposed serious flaws in the ability of the facility officials to properly and safely manage the Close Custody population assigned to [Walnut Grove] (see also, Eldon Vail, plaintiffs' corrections expert, Document 105, Filed 08/08/14)." *Id.*

Most tellingly, although in the Fifth Report (as in their previous reports) the Monitors relied heavily on the data supplied to them by Defendants, the Monitors sounded an alarm bell about the accuracy of the data that Defendants were providing: they noted that there were "stark inconsistencies between the [Walnut Grove] audit findings and the Monitors' findings in such key areas as Protection from Harm, Staffing and Use of Force." Fifth Monitors' Report at 151-7, ECF No. 151-7. Among these "stark inconsistencies," they noted, was that MTC's monthly report showed only one assault for the month of July, "which was of course impossible given the large number of inmates who were assaulted during that one disturbance. *Id.* at 6; *see also* WGCF March 2015 Monthly Report at 4, ECF No. 153-4. The Monitors also noted:

> This discrepancy was brought to the attention of MDOC. As of this writing of the report, there has been no correction by MDOC. It is important that this problem be corrected so that the data represent the number of inmates who have been assaulted and not the number of assault events, which appears to be the case here."

Fifth Monitors' Report at 6, ECF No. 151-7.

The discrepancy still appeared in the monthly reports over six months later when the evidentiary hearing took place. The Monitors do not mention in their Fifth Report, and perhaps

did not notice, that the Monthly Report also showed that there had been *no* major disturbance in July 2014, and one "minor disturbance."  WGCF March Monthly Report at 3, ECF No. 153-4.

### 15.    March 3, 2015:  Sixth Monitors' Report

In their Sixth Report, upon which Defendants rely so heavily, the Monitors did not find Defendants to be in compliance in any of the core areas of the Decree.  Sixth Monitors' Report, March 6, 2015, ECF No. 152.  The Monitors praised Defendants for "significant gains."  They noted that the Deputy Commissioner had advised them that on February 4, 2015, that the population at Walnut Grove had been capped at 962 inmates.  *Id.* at 5.

 Despite these gains, the Monitors found Defendants to be in only Partial Compliance in each of the three core areas of the Decree: Reasonably Safe Living Conditions, Sufficient Numbers of Adequately Trained Staff, and Use of Force and Chemical Agents.  Sixth Monitors' Report, March 6, 2015 at 9, 14, 15, ECF No. 152.

The Monitors expressed displeasure that Defendants had failed to heed their warning in the Fifth Report concerning the close custody inmates that MDOC had reclassified as medium and allowed to remain at Walnut Grove:

> The Monitors stressed the need to monitor those inmates closely to ensure that they did not prove to be problematic in terms of their conduct.  During the last two site inspections, the Monitors identified a number of these inmates whose behavior was proving to be problematic.  Assessment of these inmates was completed on January 30, 2015 and 11 inmates were transferred to other facilities.

*Id.* at 5.  The Monitors noted that the eleven inmates whose custody level MDOC had over-ridden had been allowed to remain at Walnut Grove even after they were involved in other assaults on inmates or staff, and "it was disturbing that the Monitors discovered this situation and not the MDOC or MTC classification staff."  *Id.* at 6.

The Monitors also noted that gang activity "has been and continues to be a security issue" and that approximately fourteen percent of the December 2014 inmate population were identified by MDOC as being active gang members; and that they were widely distributed throughout the facility, including 17 in the RID program and 6 in the Privilege Unit. Sixth Monitors' Report, March 6, 2015 at 11, 14, 15, ECF No. 152. It later came to light only at the evidentiary hearing that the number of active gang members during the period in question was not fourteen percent but more nearly forty to forty-five percent. Morgan, Hr'g Tr. 33:12-25 – 34:1-3, April 24, 2015.

The Monitors relied in part on 42 inmate interviews to support a finding that to some extent safety was improving at the prison. Sixth Monitors' Report, March 6, 2015 at 10, 14, 15, ECF No. 152. They clarified to Mr. Vail that they had not conducted all the inmate interviews themselves but had delegated someone from MDOC to do so. Vail, Hr'g Tr. 192:16-20, April 1, 2015. They told Mr. Vail that no other prison staff should be present during the interviews. Vail, Hr'g Tr. 192:25-1, 193:2, April 1, 2015. Mr. Vail later discovered that MTC security staff was in fact present during at least one of these interviews. Vail, Hr'g Tr. 191:13 – 193:3-5, April 1, 2015.

The presence of security staff during the interviews could well have affected the reliability of the inmates' answers. Vail, Hr'g Tr. 193:6-8, April 1, 2015. In fact, inmate Charles Owens testified that he was interviewed by Ms. Dodd, the MDOC Compliance Monitor. Owens, Hr'g Tr. 128:10-16, April 2, 2015. At the beginning of the interview, Ms. Dodd told Mr. Owens that it was confidential and MTC staff would not know his responses. Owens, Hr'g Tr. 130:4-9, April 2, 2015. However, the Unit Manager and two security officers were present during the interview. Owens, Hr'g Tr. 130:12-17, April 2, 2015. Because of their presence and fear of

retaliation, Mr. Owens tailored his answers to be what he thought staff wanted to hear. Owens, Hr'g Tr. 130:23 – 131:13, April 2, 2015.

**16.**         **March 13, 2015: Defendants File Motion to Terminate Prospective Relief**

On March 13, 2015, approximately three weeks before the evidentiary hearing on Plaintiffs' motion to enforce and modify the decree was scheduled to start, Defendants moved to terminate all provisions of the Consent Decree, on the ground that there was no current and ongoing violation of any of the prisoners' federal rights. ECF No. 129.

**17.**         **Expert Testimony at April 2015 Evidentiary Hearing**

On April 1, 2, 3, 23, 24 and 27, 2015 the Court held an evidentiary hearing on Plaintiffs' Motion to Enforce and modify the Consent Decree and Defendants' Motion to terminate Prospective Relief. Over the course of the six-day hearing, the Court heard testimony from a total of 18 witnesses, and had an opportunity to make determinations as to their credibility and the weight to be accorded their testimony. The Court viewed excerpts of the video surveillance tapes from the July 10 riot. A total of 78 exhibits from both sides were entered in evidence.

The testimony of Monitor Steve Martin, Plaintiffs' expert Eldon Vail, Defendants' expert Tom Roth, and the testimony of two Plaintiffs, Charles Owens and Jeremy Evans, is summarized below.

*a.*         ***The Testimony of Monitor Steve Martin***

Although Defendants had relied heavily on the Monitors' Sixth Report in support of their Motion to Terminate – indeed, they repeatedly insisted that they were not fully aware that they had grounds to terminate until they reviewed the Sixth Report – Monitor Martin testified at the evidentiary hearing that there is a current and ongoing substantial risk of serious harm to the prisoners at Walnut Grove. Martin, Hr'g Tr. 60:20-25 – 61:1-7, April 3, 2015.

Mr. Martin testified that the "core areas" of the provisions of a consent decree are those areas where there is a direct linkage between the provision and the harm. Martin, Hr'g Tr. 56:16-24, April 3, 2015. He testified that the core areas in the Walnut Grove Consent Decree (apart from health care, not at issue in the April 2015 hearing) are classification and housing; reasonably safe living conditions; sufficient numbers of adequately trained staff; and use of force and chemical agents. Martin, Hr'g Tr. 56:25 – 57:15, April 3, 2015. He testified that looking at all four of those categories across the entire range of the Monitors' Reports, from the First Report through the Sixth Report, there has never been a Report where the Monitors have deemed Defendants to be in full compliance with the Consent Decree –save for one fleeting finding of compliance in a single category, Classification and Housing, in the Fifth Report, which was followed in the Sixth Report by a back-sliding to partial compliance. Martin, Hr'g Tr. 57:16 – 58:1, April 3, 2015.

Mr. Martin testified that with respect to the category of reasonably safe living conditions, the First Report found Compliance; the Second Report, Noncompliance; the Third Report, improvement to Partial Compliance; the Fourth Report, a backsliding to Noncompliance; the Fifth report, Noncompliance; and the Sixth Report, Compliance. Martin, Hr'g Tr. 58:2-13, April 3, 2015.

Mr. Martin testified that it has been his experience in monitoring Walnut Grove that there have been times of improvement, but that improvement has not been maintained. Martin, Hr'g Tr. 14-17, April 3, 2015. He testified that there is a direct relationship between the category of "reasonably safe living conditions" and a substantial risk of serious harm, in the sense that, if a facility is unsafe over time, there will be events that arise from those general conditions and manifest themselves in harm to the population at that facility. Martin, Hr'g Tr. 58:22 – 59:8,

April 3, 2015. He testified that without a reasonably safe living facility, there will of course be a substantial risk of serious harm. Martin, Hr'g Tr. 59:6-8, April 3, 2015.

Mr. Martin testified that sustained compliance and the ability to maintain sustained compliance with these requirements is a *sine qua non* of demonstrating that there is not a substantial risk of serious harm; without one, you will not have the other. Martin, Hr'g Tr. 59:9-14, April 3, 2015. He testified that there has not been sustained compliance at Walnut Grove. Martin, Hr'g Tr. 59:18-20, April 3, 2015.

Further, he noted that having had considerable experience in institutional reform matters over a broad spectrum of time, he believes that it takes "appreciable time" to fully institutionalize a process in a bureaucratic facility setting, so that those processes become the standard for operating the facility, to the point "where you do not have the management questioning that operation and you have line staff have bought into that and do it routinely and there are mechanisms in place, so that "if there are deviations or aberrations or rogue operations," the prison is able "to identify those matters and to be able to correct them, and bring them back into line." Martin, Hr'g Tr. 59:25 – 60:1-10, April 3, 2015. He testified that it can take, and in most instances does take, years to accomplish that, where there are systemic issues such as use of force; those issues "just take time to institutionalize." Martin, Hr'g Tr. 60:13, April 3, 2015. Mr. Martin testified that, with respect to sustainability, based on what he has seen in the past two and a half years, no record has been established that would allow him as a monitor to project that over the next three, six, or nine months the facility would be operating safely on a day-to-day basis. Martin, Hr'g Tr. 60:23 – 61:7, April 3, 2015.

Mr. Martin testified that there have been three or four wardens since MTC has been operating Walnut Grove and that that lack of stability has affected the ability to run the prison properly. Martin, Hr'g Tr. 62:19 – 62:2, April 3, 2015.

Mr. Martin testified that MDOC had provided data to the Monitors, which the Monitors had relied on in their Sixth Report, showing that only fourteen percent of the Walnut Grove prisoners were active gang members, Mr. Martin testified that he does not believe this data is accurate. Martin, Hr'g Tr. 61:19-22, April 3, 2015.

Mr. Martin recalled to a particularly startling and revealing gang-related incident that the Monitors had witnessed during a recent site visit and reported in their Sixth Report. They reported:

> The influence of the gangs was made apparent when one of the inmates to be interviewed by Monitor Austin during the December 1, 2014 site visit refused to come to the interview unless his own personal inmate security accompanied him. According to MTC security staff, it was common for high-level gang members to be "escorted" by their own inmate security.

Sixth Monitors' Report at 11, ECF No. 152; Martin, Hr'g Tr. 62:24 – 63:18, April 3, 2015.

Mr. Martin testified that the Monitors had a meeting quickly thereafter with the prison administration and central administration, including the Deputy Commissioner, and that the Monitors were "rather adamant that that type of open acknowledgement and condoning of a gang structure was – should not be permitted and tolerated under any circumstances at the facility." Martin, Hr'g Tr. 63:20 – 64:7, April 3, 2015. Mr. Martin testified that the Monitors had to inform prison officials that the practice was unacceptable and needed to cease immediately. Martin, Hr'g Tr. 63:23-25, 64:1-7, April 3, 2015. Similarly, in their Sixth Report, the Monitors commented that "as in the case of Close Custody inmates, it was the Monitor who discovered the unacceptable situation during a brief site visit rather than the MTC or MDOC officials." Sixth

Monitors' Report at 11, ECF No. 152.  The Monitors stated in their Sixth Report, "in order for the MDOC to reach compliance the provision on reasonably safe living conditions, "there must be no evidence of active gang members developing and operating their own inmate-based security system."  Sixth Monitors' Report at 12, ECF No. 152.

In the Sixth Report, the Monitors reported some improvement in the level of violence during that reporting period; almost immediately thereafter, however, between March 6, 2015 and March 21, 2015, there were four serious incident that required prisoners to be taken off-site for medical treatment.  Sixth Monitors' Report at 4, ECF No. 152; Martin, Hr'g Tr. 73:25 – 74:1-4, April 3, 2015.  These incidents caused Mr. Martin concern; after having just reported that incidents of violence were reduced, and then immediately afterwards "to have over the span of less than three weeks four of these off-site medical runs is bothersome."  Martin, Hr'g Tr. 73:11 – 74:13, April 3, 2015.  Mr. Martin continued:

> But more importantly, I think it illustrates and is related to this sustainability issue, and you know, can we warrant that because January, February, those incidents were down, that March, April, May, whatever, they're going to remain down.  Well, of course you can't, because now we've seen in March, of course, three weeks, four of those incidents.  And until we can with some reasonable judgment and record establish a record that that can be said, I ain't going to say it.  Simple.  Not to this court, not to any of the parties.

Martin, Hr'g Tr. 74:14-22, April 3, 2015.  Mr. Martin concluded that a record has not been achieved where he can say that there is no substantial risk of serious harm at Walnut Grove, and that in the three years since the Consent Decree has been implemented Walnut Grove has never been in compliance with the requirement of a reasonably safe living facility.  Martin, Hr'g Tr. 74:23 – 75:6, April 3, 2015.  Thus, there is today a substantial risk of harm at Walnut Grove.  Martin, Hr'g Tr. 75:7-9, April 3, 2015.

### b. The Testimony of Plaintiffs' Expert Eldon Vail

Plaintiffs' expert, Eldon Vail, testified at the hearing that in his opinion there is a current ongoing substantial risk to prisoners at Walnut Grove of serious injury from violence. Vail, Hr'g Tr. 31:21 – 32:1, April 1, 2015. He testified that Defendants are not in compliance with the core requirement in the Consent Decree that prisoners be provided reasonably safe living conditions and protection from violence and other physical or sexual abuse; provision. Consent Decree at 4, ECF No. 151-2; Vail, Hr'g Tr. 30:4-10, April 1, 2015. He testified that MDOC is also noncompliant with the provision of the Consent Decree requiring MDOC to develop comprehensive contract monitoring policies and procedures and to monitor the contracts with the operator of Walnut Grove in compliance with those policies and procedures. Vail, Hr'g Tr. 30:24 – 31:8, April 1, 2015.

Mr. Vail has considerable knowledge about how the December 2013 and July 2014 riots unfolded. Vail, Hr'g Tr. 38:22-25, April 1, 2015. He has been investigating conditions at Walnut Grove since mid-2013. Vail, Hr'g Tr. 35:14-15, April 1, 2015. He visited Walnut Grove shortly after each riot and spoke with inmates, MTC staff and MDOC staff there. Vail February 2015 Report at 1-2, ECF No. 152-2; Vail, Hr'g Tr. 39:2-7, April 1, 2015. He conferred with the Monitors, Steve Martin and James Austin, about the riots. Vail February 2015 Report at 1-2, ECF No. 152-2; Vail, Hr'g Tr. 29:8-10, April 1, 2015 He confers regularly with Plaintiffs' counsel's investigators about their observations from their frequent visits to Walnut Grove. Vail, Hr'g Tr. 39:10 – 40:1, April 1, 2015. He reviewed video surveillance tapes of incidents of violence that were occurring at the facility prior to the riots. Vail, Hr'g Tr. 35:14-17, April 1, 2015. He has been reading documents regarding Walnut Grove for a year and a half, and has been talking with both of the Monitors. Vail, Hr'g Tr. 156:17-19, April 1, 2015. He has

developed a wealth of knowledge about the prison, including watching, more than once, every use of force video that he has been given access to for about nine months, and has seen what has been reported as to all of them. Vail, Hr'g Tr. 165:22 – 157:1-4, April 1, 2015. He has looked with a critical eye at the information provided. Vail, Hr'g Tr. 156:9-14, April 1, 2015.

Mr. Vail was a highly credible witness, based on his qualifications and experience; his methodology; the thoroughness of his review of all available relevant materials including all available documents and video recordings; the consistency of his opinions; his methodology in choosing inmates to interview and in evaluating their accounts of events at Walnut Grove; his discussions with the Monitors concerning Walnut Grove throughout the relevant time period; his meetings before and after each of the riots with high-level officials from MDOC and MTC concerning Walnut Grove; and his responses on cross-examination.

Mr. Vail is of the opinion that the possibility of violence of the magnitude of the New Year's Eve riot was foreseeable. Vail, Hr'g Tr. 35:10 – 36:4, April 1, 2015. When he first started reviewing the Walnut Grove video surveillance tapes in 2013, he was troubled because he observed that there was no staff in the living unit to supervise the inmates, and that when violent incidents occurred, the violence went on without staff intervention, in one case for twenty minutes. Vail, Hr'g Tr. 35:14 – 36:4, April 1, 2015. They were not attending to the basics of correctional supervision. Vail, Hr'g Tr. 35:10-24, April 1, 2015.

Mr. Vail believes there is substantial risk that serious violence will recur at Walnut Grove because staff is not routinely and regularly expected to stay in the housing units to supervise the inmates, and they are not prepared to respond to any kind of serious group disturbance. Vail, Hr'g Tr. 36:5-12, April 1, 2015. The root cause of the lack of preparedness is, first, MTC's failure to make good correctional decisions on how to manage the institution: If they do

anything consistent with good corrections practices they do so not on their own initiative but only when there is considerable pressure and repeated warnings from the Monitors and Mr. Vail. Vail, Hr'g Tr. 36:15-25, April 1, 2015. Second, MDOC makes no meaningful effort to monitor Walnut Grove. Vail, Hr'g Tr. 36:15 – 37:8, April 1, 2015.

Mr. Vail testified about his findings and recommendations to Defendants on the causes of the New Year's Eve riot: not only that MTC was incapable of handling close custody inmates, but also that the officers were not staying in the housing zones and properly supervising the inmates there. Vail, Hr'g Tr. 54:24 – 55:5, April 1, 2015. The skill level of the corrections staff was not adequate to manage inmates. Vail, Hr'g Tr. 55:6-10, April 1, 2015. He recommended to Defendants that whenever the inmates are out of their cells, officers have to stay there, in order to identify when conflicts occur so as to be able to intervene in those conflicts and prevent the inmates from resorting to violence. Vail, Hr'g Tr. 55:15-20, April 1, 2015. "If you're not in the unit, then inmates control the unit." Vail, Hr'g Tr. 55:20-21, April 1, 2015. Mr. Vail recommended that in the close custody units two officers were needed to provide back-up, and in non-close custody units the medium and minimum units must have at least one officer. Vail, Hr'g Tr. 55:22 – 56:11, April 1, 2015.

Mr. Vail testified that he had flagged the issue of the profound level of idleness at Walnut Grove because this is a threat to security. Vail, Hr'g Tr. 56:12-16, April 1, 2015. "Left to your own devices you're probably not going to sit quietly in the dayroom . . . It's fundamental good practice that you need to keep inmates busy, working, going to school or in a program. And if you do that you'll have less violence. I did not and do not see that that is the nature of Walnut Grove." Vail, Hr'g Tr. 56:22 – 57:3, April 1, 2015. The gang problem at Walnut Grove is significant, and there is not a comprehensive strategy to manage it. Vail, Hr'g Tr. 57:6-8, April

1, 2015.  Inmates are human, and need recognition and activity; otherwise the gang influence will fill the vacuum.  Vail, Hr'g Tr. 57:13-14, April 1, 2015.  Therefore, Vail had recommended to Defendants additional incentives for inmates to weigh against gang involvement.  Vail, Hr'g Tr. 57:15-19, April 1, 2015.

Mr. Vail testified that for the most part the problems he identified to MDOC and MTC in his January 2014 report —including insecure doors and unsecured furnishings and supplies that can be used as weapons – remain problems today.  Vail, Hr'g Tr. 59:6-21, April 1, 2015.

Mr. Vail testified at some length about the significance and importance of two documents in safely administering a prison:  After-Action Reports and Emergency Response Plans.  He found grave deficiencies in both at Walnut Grove.

An After-Action Report is an important document: it is typically prepared whenever there is a serious incident in a prison, in order for prison officials to get the facts;  critically examine their own performance, staff performance, policies, and training; identify problems; develop a plan for addressing the problems that were identified; make a list of corrective actions; and finally, to make sure that the corrective actions decided upon are completed, so that those involved can learn from the experience and perform in an improved manner in the future.  Vail, Hr'g Tr. 40:16 – 41:4, April 1, 2015.  All those steps must be document, because otherwise people cannot be held accountable.  There are foreseeable consequences to not preparing an After-Action Report – primarily, you are simply much more likely not to learn anything from what went wrong.  Vail, Hr'g Tr. 41:9-13, April 1, 2015.  MTC's own safety policy requires an After-Action Report.  Vail, Hr'g Tr. 41:14-17, April 1, 2015.

MTC provided an After-Action Report on the New Year's Eve riot (MTC After-Action Report, ECF No. 151-4), but it was inadequate and left many questions unanswered.  Vail, Hr'g

Tr. 40:2-13, April 1, 2015.  The After-Action Report contained a list of 16 or 17 items to be followed up, but there is no evidence with respect to a large number of those items that there ever was a follow-up.  Vail, Hr'g Tr. 54:8-19, April 1, 2015.  Nor is there any evidence that MDOC monitored MTC after the New Year's Eve riot to make sure that MTC had corrected the problems they themselves had identified in their After-Action Report.  Vail, Hr'g Tr. 54:20-23, April 1, 2015.

For example, the After-Action Report for the New Year's Eve riot commented that the beds were not bolted to the floor in close custody, that that was a fundamental flaw and that they had developed a design and implementation plan to correct it, yet the documentation that that occurred is missing.  Vail, Hr'g Tr. 161:22 – 162:13, April 27, 2015.  Again, the After-Action Report notes that both the deputy warden and the chief of security saw themselves as the incident commander, which would add a significant amount of confusion to the problem; yet documentation is missing that a plan was developed and implemented to avoid the problem in the future.  Vail, Hr'g Tr. 162:18-163:7, April 27, 2015.

The information MTC provided about the July riot was even more incomplete: they did not prepare an After-Action Report at all on the July riot.  Vail, Hr'g Tr. 40:12-13, April 1, 2015.  In January 2015, Mr. Vail asked MTC and MDOC officials for a copy of the After-Action Report, and they said one had not been completed.  Vail, Hr'g Tr. 124:2-9, April 1, 2015.  MTC has never explained why they did not prepare an After-Action Report for the July riot; they simply refused to prepare one, and MDOC did not instruct MTC to prepare one.  Vail, Hr'g Tr. 41:18-23, April 1, 2015.  Former Deputy Commissioner Longley did suggest that they couldn't do an After-Action Report because there was an ongoing criminal investigation.  Vail, Hr'g Tr. 125:5-12, April 1, 2015.  But an ongoing criminal investigation is not justification because as in

Mr. Vail's experience, "you simply work with [the prosecutor] to make sure that nothing in your investigation gets in the way of the criminal investigation." Vail, Hr'g Tr. 15-20, April 1, 2015.

There were many issues that should have been addressed in an After-Action Report: For example, similar to what happened in the New Year's Eve riot, it took MTC nearly 90 minutes to establish a command center; thus, for the first 90 minutes of the incident, no one was in charge. Vail, Hr'g Tr. 132:8-14, April 1, 2015. That issue should have been highlighted and it should have been practiced and drilled, since a command center needs to be established within minutes. Vail, Hr'g Tr. 132:2-5, April 1, 2015; Vail, Hr'g Tr. 164:13-16, April 27, 2015. Another example involves the gas canister discharging inside the command tower; since the officers did not have respirators, they abandoned the control tower. Vail, Hr'g Tr. 164:21-23, April 27, 2015. The question that should have been asked was, why the officer administering the gas was not wearing a respirator, and why didn't he go to get one, return to the tower, and continue to provide supervision over the pods where the rioting continued long after it should have, had the officer stayed in the booth and continued to provide cover. Vail, Hr'g Tr. 164:25 – 165:6, April 27, 2015. The chances of controlling the incident would have been greatly increased if they had maintained a tactical presence in the control tower; that is exactly the sort of analysis one would expect to see highlighted and addressed in an After-Action Report. Vail, Hr'g Tr. 109:8-16, April 1, 2015.

Mr. Vail asked prison officials at the January 2015 meeting if they had identified the lessons they had learned from the July 10 riot. Vail, Hr'g Tr. 126:11-13, April 1, 2015. "They said that, yeah, that they had identified some things and that they had done that work. I asked them then if – *Did you write any of this down so that I can see what you learned?* And they said no, they didn't write it down." Vail, Hr'g Tr. 126:15-18, April 1, 2015.

An Emergency Response Plan is another critical document – the most critical document that a facility has to keep prisoners safe. Vail, Hr'g Tr. 42:3-7, April 1, 2015. It provides structure and detail on how the institution will respond should; an emergency occur. Vail, Hr'g Tr. 42:7-8, April 1, 2015. It usually contains contingency plans for a variety of emergencies, including riots and insurgencies. Vail, Hr'g Tr. 42:8-10, April 1, 2015. Walnut Grove has an Emergency Response Plan, but it is not an adequate plan. Vail, Hr'g Tr. 42:11-17, April 1, 2015. It is disorganized; it is non-specific; it leaves out very important items; it is not a document that would be useful if something serious occurred, because it offers little guidance. Vail, Hr'g Tr. 42:20-25, April 1, 2015.

MTC did not update their Emergency Response Plan after the riots except for a bit of updated information the week before the evidentiary hearing. Vail, Hr'g Tr. 43:5-14, April 1, 2015. It should have been updated because there had been two serious events that demonstrated "profound levels of incompetence . . . from the command level to the officer level on the line. And you would want to go back and take a look at your plan to figure out if there was an inadequacy in the document that was contributing to your inability to respond to a riot." Vail, Hr'g Tr. 128:21 – 129:4, April 1, 2015. When Mr. Vail last saw the polices, in mid-March, they were all dated 2012 and 2013 and the Emergency Response Plan contained obsolete information, including a notification roster with contact information for key officials to call in case of a riot; the roster listed administrators who no longer even worked at the prison. Vail, Hr'g Tr. 43:5-11, 128:18 – 129:20, April 1, 2015.

Furthermore, the Emergency Response Plan did not cover all the areas that it was supposed to cover. The Table of Contents listed 16 chapters covering different emergencies. But seven of those chapters were missing from the Plan. Vail, Hr'g Tr. 129:21 – 130, April 1,

2015.  Mr. Vail testified that he was "baffled why that document wasn't completely reworked after the January 2014 riot, let alone the July riot."  Vail, Hr'g Tr. 43:17-19, April 1, 2015.  The failure to do so illustrates the lack of seriousness in MTC's commitment to keep people safe at Walnut Grove.  The policy itself requires annual updates.  Vail, Hr'g Tr. 43:12-24, April 1, 2015.

MTC's Emergency Response Plan requires regular meetings by a safety committee.  Their purpose is to identify whether safety inspections are occurring, safety policy is being followed, hazards have been identified and what to do about them.  Vail, Hr'g Tr. 127:11-16, April 1, 2015.  "It is a core function to keep an institution safe."  Vail, Hr'g Tr. 127:16-17, April 1, 2015.  At the January 2015 meeting, Mr. Vail asked to see the safety committee minutes for calendar year 2014; minutes were eventually provided, but for only two months in 2014.  Vail, Hr'g Tr. 127:20-25, April 1, 2015.  They gave Mr. Vail a copy of a memo from Warden Jenkins to MTC Regional Vice President Marjorie Brown, stating that they had not been following the policy "but they were going to start doing it from now on."  Vail, Hr'g Tr.128:3-6, April 1, 2015; Memo from Warden Jenkins to Vice President Marjorie Brown re: Safety Committee, Jan. 22, 2015, ECF No. 151-9.

Two weeks before the hearing Defendants updated their Emergency Response Plan, but even with those changes the Plan is not even close to being a guide if another disturbance occurs.  Vail, Hr'g Tr. 131:11-17, April 1, 2015.  The Emergency Response Plan provides for how to evacuate the prison.  Vail, Hr'g Tr. 130:7-9, April 1, 2015.  When Mr. Vail first got a copy of the Plan, it had not been updated to reflect the configuration of the prison.  Vail, Hr'g Tr. 130:12-15, April 1, 2015.  It was finally updated two or three weeks before the evidentiary hearing.  Vail, Hr'g Tr. 130:18-20, April 1, 2015.  But whole sections of the evacuation plans listed in the table of contents are still simply missing from the Plan.  Vail, Hr'g Tr. 130:21 – 131:5, April 1, 2015.

A Command Center is a predetermined location for managing a specific emergency, with communications equipment, manuals, blueprints, floor plans, and all the supplies that would be needed to manage an emergency. Vail, Hr'g Tr. 131:20-24, April 1, 2015. A prison should be able to establish a command center within several minutes after a serious incident. Vail, Hr'g Tr. 131:25 – 132:3, April 1, 2015. An incident commander is the person who at the present moment is in charge of the response to the emergency. Vail, Hr'g Tr. 132:12-14, April 1, 2015. MTC's Emergency Response Plan does not give adequate guidance to incident commanders. Vail, Hr'g Tr. 132:15-17, April 1, 2015. It is missing emergency post orders, also known as emergency checklists, developed for specific emergencies. Vail, Hr'g Tr. 132:19-23, April 1, 2015. It is essentially a single piece of paper that lists the critical things that the incident commander has to worry about during a riot or other emergency. Vail, Hr'g Tr. 132:24 – 133:3, April 1, 2015. There is only one checklist in the Walnut Grove Emergency Response Plan, and it is "not organized in an effective or useable way." Vail, Hr'g Tr. 133:4-7, April 1, 2015. There is not enough specific guidance for any of the predetermined roles that people will be assigned in a serious situation. Vail, Hr'g Tr. 133:9-12, April 1, 2015. During his January 2015 meeting with MDOC and MTC, including MTC Vice President Odie Washington, Mr. Vail asked whether the missing post orders and checklists existed; they seemed puzzled, and finally said no, they didn't. Vail, Hr'g Tr. 133:13 – 134:1, April 1, 2015.

Mr. Vail testified that none of the big changes that Defendants have made at Walnut Grove between the July riot and today – with the sole exception of the installation of additional netting, body scanners and x-ray machines– were made on Defendants' own initiative; rather, these changes were driven by the Monitors' intervention or by the work of Plaintiffs. Vail, Hr'g Tr. 193:9-16, April 1, 2015. That fact is significant because it speaks to the leadership of the

organization when so many changes are driven from the outside and Defendants seem to have no internal capacity to want to correct problems to make people safer. Vail, Hr'g Tr. 193:17-23, April 1, 2015.

For example, Defendants take credit for removing long-term segregation from Walnut Grove, but that was in response to the Fourth Monitors' Report, in which they found that MTC is "totally ill-equipped or ill-trained on how to operate a long-term segregation program or to manage these inmates." Fourth Monitors' Report at 13, ECF No. 151-2; Vail, Hr'g Tr. 61:24 – 62:9, April 1, 2015. Yet MDOC continues to this day allow MTC to house long-term segregation prisoners at East Mississippi Correctional Facility (EMCF). Vail, Hr'g Tr. 72:17-25, April 1, 2015. Mr. Vail toured EMCF in March 2014 and found to be the worst segregation unit he has ever seen in his entire career. Vail, Hr'g Tr. 71:12-14, 72:17-25, April 1, 2015. This indicates, in Mr. Vail's opinion, that the recent changes Defendants have made at Walnut Grove are not being driven by good corrections but only in response to the heat and pressure brought to bear by the Consent Decree, the Plaintiffs, and the Monitors. Vail, Hr'g Tr. 73:1-12, April 1, 2015.

The same symptoms of indifference appear in the incident the Monitors highlighted in their Sixth Report, of the eleven inmates whose custody level had been over-ridden yet were allowed to remain at Walnut Grove after they were involved in another assault on another inmate or staff. Sixth Monitors' Report at 6, ECF No. 152. The Report states, "it was disturbing that the Monitors discovered this situation and not the MDOC or MTC classification staff." Sixth Monitors' Report at 6, ECF No. 152. Mr. Vail testified that this incident shows that MDOC and MTC are not paying attention to the correctional basics that are necessary to keep people safe; the Monitors couldn't have made it more clear, and yet no attention was paid. This "speaks

poorly to both MTC's performance and to the monitoring by MDOC."  Vail, Hr'g Tr. 114:3-22, April 1, 2015.

Mr. Vail testified that it also raises concerns about the integrity of how the classification system at Walnut Grove is being utilized, that MDOC would downgrade from close to medium custody  almost a third of the close custody population in August-September 2014.  Vail, Hr'g Tr. 115:4-6, April 1, 2015.  A thirty-percent error rate is double the typical error rate in classification.  Vail, Hr'g Tr. 115:7-10, April 1, 2015.  This questionable implementation of the classification system at Walnut Grove implicates safety issues, since classification involves housing like inmates together so that the more vulnerable inmates are not preyed upon.  Vail, Hr'g Tr. 115:16-25, April 1, 2015.

Defendants have made much of the fact that there are no longer close custody inmates housed at Walnut Grove, and their expert Mr. Roth has gone so far as to opine, largely based on that change, there is no substantial risk of serious harm to inmates at Walnut Grove.  Roth, Hr'g Tr. 53:9-15, April 24, 2015.  Mr. Vail testified that even if MDOC has now properly classified the inmates, and is no longer housing at Walnut Grove inmates who ought to be classified close custody, that does not mean that Walnut Grove is a safe facility.  Vail, Hr'g Tr. 116:1-7, April 1, 2015. Classification systems "are not a diagnostic tool like an x-ray machine.  They're an actuarial machine.  They are accurate to a certain percentage point.  So they aren't precise about individual offenders.  But inmates in medium and even minimum custody are certainly capable of serious violence."  Vail, Hr'g Tr. 116:10-15, April 1, 2015.  Violence, riots, and a variety of things occur in medium and minimum custody.  Vail, Hr'g Tr. 116:16-18, April 1, 2015.  In fact, at Walnut Grove, right before the July riot, a female officer was first verbally abused and then seriously assaulted.  Vail, Hr'g Tr. 116:19-25, April 1, 2015.  Mr. Vail also testified from his

personal experience about a riot that occurred in a medium custody unit and that resulted in a prisoner's death. Vail, Hr'g Tr. 118:19 – 119:4, April 1, 2015. He gave as another example of a full-blown riot that occurred riot in a medium-security private prion facility in Colorado, where Washington State had sent prisoners to relieve overcrowding. Vail, Hr'g Tr. 119:10 – 120:9, April 1, 2015.

Mr. Vail challenged the claim of Defendants' expert Tom Roth that there was any significant downward trend in assaults at Walnut Grove since the July riot. Relying on the data provided by MDOC in their Monthly Report (MTC February 2015 Monthly Report, ECF No. 152-3), Mr. Vail demonstrated that the only noticeable drop in assaults was in the month of February 2015 – a one-month drop, hardly a downward "trend." Vail, Hr'g Tr. 39:23, April 2, 2015.

Mr. Vail pointed out that a close look at the data that MDOC provides in its Monthly Report (MTC February 2015 Monthly Report, ECF No. 152-3) also proves that there was no significant "downward trend" in contraband (defined as cell phones, weapons, drugs and alcohol) since the July riot. Vail, Hr'g Tr. 40:3 – 41:19, April 2, 2015.

Mr. Vail testified that in his opinion the principle indicators that a prison has a problem with violence are fights involving more than two inmates, which likely indicates gang activity; inmate assaults on staff; and use of a weapon. Vail, Hr'g Tr. 186:15 – 187:5, April 1, 2015. Mr. Vail testified that based on MDOC's own data, including the MTC monthly report and MDOC's Extraordinary Occurrence Reports, there were more than 15 multi-person assaults in the period covered by the Sixth Report (November, December, January, and February). Vail, Hr'g Tr. 42:18 – 43:19, April 2, 2015. As recently as two weeks before the evidentiary hearing, on March 21, a staff member was assaulted in one of the medium-security units when a group of inmates

challenged the authority of officers to conduct a targeted cell search.  Vail, Hr'g Tr. 43:21 – 44:4, April 2, 2015.

Mr. Vail doubts the accuracy of information that MTC has provided.  Vail, Hr'g Tr. 38:18-21, April 2, 2015.  He has become more skeptical of its accuracy, including the accuracy of the Monthly Reports, from information he learned sitting in the courtroom during the six days of the trial.  Vail, Hr'g Tr. 150:13 – 151:2, April 27, 2015.  He questions the assault data; he questions the employee misconduct data; and he has more questions than ever sitting in the courtroom about the accuracy of the Prison Rape Elimination Act ("PREA") numbers.  Vail, Hr'g Tr. 15:18-22, April 27, 2015.  The internal inconsistencies in the Monthly Report include the employee misconduct column— which shows zero.  Vail, Hr'g Tr. 159:1-3, April 27, 2015.  The July 10, 2014 riot continues to be counted in the Monthly Report as a minor disturbance.  Vail, Hr'g Tr. 159:4-6, April 27, 2015.  In March 2015 there was an event that, according to the warden's own definition of a major incident, should have been categorized as a major incident yet is listed in the Monthly Report as a minor disturbance.  Vail, Hr'g Tr. 159:7-10, April 27, 2015.

Mr. Vail testified about the measures he took after a prisoner in Washington State died during a riot in a minimum security unit.  Vail, Hr'g Tr. 44:15-20, 45:8 – 46:11, April 2, 2015.  He had been warden of the prison for about six months when the riot occurred, and he found out on the night of the riot that the prison did not have the capacity to respond to a serious emergency.  Vail, Hr'g Tr. 45:2-5, April 2, 2015.  In contrast to the passivity that Defendants have shown, Mr. Vail took vigorous action, immediately and over a period of years, to prevent another serious disturbance in Washington State.  Vail, Hr'g Tr. 45:8-46:11, April 2, 2015.  He participated in a training session with the Department of Justice on how to build a good

emergency response system and helped revamp not only the Emergency Response Plan for that prison but for the entire department of corrections. Vail, Hr'g Tr. 45:8-14, April 2, 2015. After he became deputy secretary, he had the tactical response teams train together to ensure that their tactical plans complemented each other. Vail, Hr'g Tr. 45:15-23, April 2, 2015. He developed an academy where incident commanders and tactical leaders went off-site for a two-day training sessions to engage in multiple real-time drills. Vail, Hr'g Tr. 46:5-11, April 2, 2015. Defendants have been unwilling even to prepare an After-Action Report for the July 2014 riot, which could easily have resulted in a death. Vail, Hr'g Tr. 33:21-25, 40:12-13, April 1, 2015.

### c. The Testimony of Defendants' Expert Tom Roth

Defendants' expert Tom Roth was not a credible witness. Mr. Roth accepted uncritically all data provided to him by Defendants, and adopted their version of every event, even when their version was utterly implausible. It was apparent from his testimony both on direct and on cross-examination that he had not reviewed the available data with anything like the thoroughness that Mr. Vail brought to the task. The three days that Mr. Roth spent at the prison were not well spent, since he turned a blind eye to egregious conduct by Defendants, even when it had been strongly condemned by the Monitors in their most recent Report.

Mr. Roth relied on his interview with the maintenance supervisor and maintenance technician at Walnut Grove, who assured him that there is not now and never has been a problem with the security of the hinged cell doors. Report of Tom Roth at 19, ECF No. 154-2. They told him that "they have worked on these doors and locks for 14 years," and they "reported that the locking devices have been in place since the opening of the facility and there has been no indication that the locking device is ineffective . . . or there has been a pattern where the control panel fails to identify whether the door is open or secure." Report of Tom Roth at 19, ECF No.

154-2.  Mr. Roth does not question their word.  Mr. Roth went on to explain that that according to staff working in the housing units, "the issue is not with the locking device but the fact that inmates occasionally stick an item in either the locking bolt or 'pocket' to prevent the door from locking when it is closed."  Report of Tom Roth at 19-20, ECF No. 154-2.  For example, inmates use "toilet paper, a battery, broken domino, toothpaste container, toothpaste cap or miscellaneous debris."  Report of Tom Roth at 20, ECF No. 154-2.  Mr. Roth was oblivious to the possibility that there is a security problem with a cell door when the lock can be readily defeated with a bit of toilet paper or a toothpaste cap.  Although Mr. Roth was at Walnut Grove in 2011, the year when the DOJ investigation as taking place and testified that he had a "wealth of information" about Walnut Grove before his visit, Mr. Roth was unaware of the 2012 Department of Justice report finding that it was highly problematic that the inmates "are able to sabotage their cell locking mechanism and get out of their cells, resulting in a serious breach of security and safety to staff and other youth.  This deficiency results in a high incidence of youth-on-youth violence and severe injury to unsuspecting youth."  Roth, Hr'g Tr. 51:25-52:1, April 24, 2015; March 2012 DOJ Report at 25, ECF No. 151-5.  Mr. Roth testified that he further confirmed that there was no problem with the locks by calling the manufacturer: "I personally spoke with Southern Folger . . . to see if there was any issues at all. . . . And their response was no it's not—not that they were familiar with and that's the response I got."  Roth, Hr'g Tr. 71:5-22, April 24, 2015.

Even MTC's Regional Vice President Marjorie Brown conceded that during the entire time that MTC has operated Walnut Grove there have been concerns over the security of cell doors.  Brown, Hr'g Tr. 205:10-12, April 2, 2015.  Mr. Roth's steadfast defense of the notoriously unsecure cell doors at Walnut Grove speaks volumes about his credibility – or lack thereof.

Mr. Roth's testimony was exceedingly shallow in a number of other ways. For example, he testified that Walnut Grove's internal classification policy meets all national standards because "it is consistent with what you would see in places that would meet national standards." Roth, Hr'g Tr. 55:19-24, April 24, 2015. (By "national standards," Mr. Roth means ACA standards. Roth, Hr'g Tr. 124:2-5, April 24, 2015. When asked if there was any problem with Defendants' application of the policy, he responded simply, "Not that I see. No." Roth, Hr'g Tr. 57:10-14, April 24, 2015. He did not acknowledge in any way the major problem the Monitors had stressed in their Sixth Report: Defendants' failure to notice, even after the Monitors' stern warning that eleven of the inmates that MDOC had upgraded from close to medium custody were continuing to commit assaults on other inmates and staff. Sixth Monitors' Report at 6, ECF No. 152.

When asked, "how does Walnut Grove's housing situation compare on a national basis," Mr. Roth responded "I think it compares the same," and that there was nothing in that system that poses a substantial risk of serious harm, because "They've created separation between protective custody and segregation. Roth, Hr'g Tr. 60:9-15, April 24, 2015. They've identified opportunities for those people that are conduct free, misconduct free. They identified the RID program which has to be maintained separately. So I think it's consistent." Roth, Hr'g Tr. 60:15-18, April 24, 2015. Mr. Roth did not mention that the Monitors found in their Sixth Report that active gang members were housed throughout the prison, including in the privilege unit and the RID program. Sixth Monitors' Report at 12, ECF No. 152. Mr. Roth was also evasive and unresponsive even to Defendants' counsel when asked a question to which he did not know or remember the answer: when asked by Defendants' counsel whether "there is anything about the level of gang activity at Walnut Grove that strikes you as being alarming or

materially different from other facilities of its size around the country," he responded, "What you don't find a lot of that you may find in other institutions throughout the nation is . . . an awful lot of graffiti. There's an awful lot of paraphernalia. . . . that's not something that you generally find at Walnut Grove." Roth, Hr'g Tr. 79:13-25, April 24, 2015.

In reaching his opinion that there is no substantial risk of serious harm to the prisoners at Walnut Grove, Mr. Roth relied on the fact that Walnut Grove had been accredited by the American Corrections Association (ACA) in 2015. Roth, Hr'g Tr. 125:7-9, April 24, 2015. However, he was unaware that the ACA had previously accredited Walnut Grove in January 2012, shortly before the DOJ issued its damning report on the Eighth Amendment violations to which the inmates there were being subjected, or that the ACA again accredited Walnut Grove in January 2014, immediately after the New Year's Eve Riot. Roth, Hr'g Tr. 126:8-10, April 24, 2015; Vail, Hr'g Tr. 189:6-8, April 27, 2015. The Fifth Circuit has already noted that ACA accreditation does not prove that conditions do not violate the Eighth Amendment. *See Gates v. Cook*, 376 F.3d at 337 ("MDOC also argues . . . that Parchman's accreditation by the [ACA] is proof that the conditions in question don't violate the Eighth Amendment. But it is absurd to suggest that the federal courts should subvert their judgment as to alleged Eighth Amendment violations to the ACA whenever it has relevant standards. Additionally, the ACA's limited inspections are not binding as factual findings on the magistrate or on this court. While compliance with ACA standards may be a relevant consideration, it is not *per se* evidence of constitutionality.")

Mr. Roth's credibility was not enhanced by his testimony about the inmate "security escorts" for gang leaders. Roth, Hr'g Tr. 82:9-28, April 24, 2015. When asked, "Did you have any indication that the management of the facility was condoning such things," he responded,

"No, my impression was that a line officer may have allowed that unbeknownst to somebody, but I don't know that to be the fact." Roth, Hr'g Tr. 82:24 – 83:3, April 24, 2015. But Mr. Roth knew from the Monitors' Sixth Report that "according to MTC security staff, *it was common* for active high-level gang members to be 'escorted' by their own inmate security." Sixth Monitors' Report at 11, ECF No. 152. Mr. Roth also knew from the Sixth Report that the Monitors deplored the fact that, 'as in the case of the misclassification of Close Custody inmates, it was the Monitors who discovered the unacceptable situation during a brief site visit rather than the MTC or MDOC officials.'" Sixth Monitors' Report at 11, ECF No. 152.

### 18.     Lay Witness Testimony at April 2015 Evidentiary Hearing

Two members of the Plaintiff Class testified at the hearing, class representatives Charles Owens and Jeremy Evans. Mr. Owens and Mr. Evans were both highly credible witnesses. Their testimony was internally consistent as well as consistent with facts established by extrinsic evidence, and it was completely unshaken by the eleven impeachment witnesses called by Defendants. Their demeanor under extremely harsh and at times demeaning cross-examination powerfully added to their credibility. Their credibility was also supported by their willingness to proceed with their testimony despite the treatment to which they were subjected at Central Mississippi Correctional Facility, where they were held pending their court appearance. That treatment, which included deprivation of bedding, deprivation of prescribed medications for several days, and placement in a particularly dangerous housing unit, might well have intimidated and deterred less committed witnesses from going forward.

### a.     *The Testimony of Charles Owens*

Mr. Owens, who is housed on the protective custody unit, described the risks that he lives with daily at Walnut Grove. The items that were used as weapons during the riots remain readily

available to prisoners, including milk crates, trays, broomsticks, and mop sticks. Owens, Hr'g Tr. 146:7-14, April 27, 2015. Marijuana, pills described as Xanax, Lortab and Vicodin, alcoholic beverages and spice continuously enter the housing unit. Owens, Hr'g Tr. 135:3-7, April 2, 2015. On Mr. Owens' unit, officers constantly introduce contraband, and he has seen at least one officer consume spice with a prisoner. Owens, Hr'g Tr. 135:12-20, 135: 5-11, April 2, 2015. As prisoners succumb to the effects of the drugs, Mr. Owens witnesses semi-conscious or completely unconscious prisoners left in the housing zone without treatment. Owens, Hr'g Tr. 137:4-9, April 2, 2015. Instead of calling medical, officers instruct other prisoners to drag these unconscious or semi-conscious inmates into cells or otherwise out of view of the security camera. Owens, Hr'g Tr. 137:7-21, April 2, 2015.

Mr. Owens testified that officers blatantly exploit the insecurity of doors, leaving them open as long as they are showing secure in the tower. Even where there are electronic scanners in place to detect contraband, staff often ignore signals indicating the presence of contraband, Owens, Hr'g Tr. 145:14-21, April 27, 2015. For example, Mr. Owens's inhaler sets off the detectors that are established in the hallway of the facility; however, "the vast majority of the time [he is] not stopped, questioned, [or] patted down." Owens, Hr'g Tr. 145:19-21, April 27, 2015. Otherwise, prisoners are able to avoid the scanners altogether by using back exits and entrances to move from their housing unit to other portions of the facility. Owens, Hr'g Tr. 145:22 – 146:6, April, 27, 2015. Understandably, Mr. Owens told the Court that "[w]ithout continued intervention and oversight, I would fear for my safety and live at Walnut Grove Correctional Facility as well as the safety and lives of the others." Owens, Hr'g Tr. 141:23-25, 142:1.

## b. The Testimony of Jeremy Evans

Until March 13, 2015, Jeremy Evans was housed at Walnut Grove. Evans, Hr'g Tr. 4:3-8, April 3, 2015. Shortly after arriving at Walnut Grove, Mr. Evans started working in the medical department as a porter. Evans, Hr'g Tr. 9:1-2, April 3, 2015. Prior to his incarceration, Mr. Evans received training in the medical field and was a certified nursing assistant (CNA) and pharmacy technician. Evans' Certificates, ECF No. 153-3; Evans Hr'g Tr. 7:1-5, April 3, 2015. In the medical department, Mr. Evans had numerous responsibilities, including performing general janitorial tasks, organizing medications, monitoring IVs and vital signs, and sometimes drawing blood. Evans, Hr'g Tr. 9:10-15, April 3, 2015.

In his testimony, Mr. Evans recalled the aftermath of the July 2014 riot. Evans Hr'g Tr. 10:17-23, April 3, 2015. On that day, he had already left work for the day when Ms. Hogue, the Health Services Administrator, called him back from his housing unit to assist in medical. Evans, Hr'g Tr. 10:21 – 11:12, April 3, 2015. As he approached the medical unit, he observed a trail of blood on the floor and a thick cloud of gas. Evans Hr'g Tr. 11:22-24, April 3, 2015. In describing the scene, he said, "It was something you would think to see on a movie, but only this was reality, you know, watching guys with stab wounds and lacerations over their head and, you know, just constantly bleeding and in and out of consciousness. It was a sight." Evans, Hr'g Tr. 12:7-11, April 3, 2015.

On one occasion, while working in medical, Mr. Evans witnessed Officer Sandy Bourrage exiting the break room in the medical unit while pulling up his pants. Evans, Hr'g Tr. 13:11-20, April 3, 2015. Immediately after, Nurse Bryant exited the break room as well. Evans, Hr'g Tr. 13:15-18, 13:21-23, April 3, 2015. Because Mr. Evans was concerned about possible misconduct, he reported what he had seen to the security officer working in medical, Sebrina

Peebles. Evans, Hr'g Tr. 15:10-17, April 3, 2015. Officer Peebles told him that the previous officer had noted in the log that those two employees had been spending quite a bit of time in the break room. Evans, Hr'g Tr. 15:21-25, April 3, 2015. A few weeks later, gang members approached Mr. Evans and accused him of snitching. Evans Hr'g Tr. 15:25 – 16:1-3, 16:9-14, April 3, 2015. He reported the incident, including the officer misconduct to Deputy Warden Mabry and Warden Jenkins. Evans, Hr'g Tr. 16:19-20, April 3, 2015. Warden Jenkins merely told him to be mindful and careful when reporting misconduct. Evans, Hr'g Tr. 16:25 – 17:1-7, April 3, 2015. He later discovered that Nurse Bryant had been fired because of a sexual relationship with a prisoner. Evans, Hr'g Tr. 17:17-21, April 3, 2015.

In February 2015, Mr. Evans was sexually assaulted by a Ms. Butler, a certified nursing assistant, who touched his genitals and performed oral sex on him. Evans, Hr'g Tr. 22:21-25 – 23:1-7, 25:18-21, April 3, 2015. Mr. Evans tried to resist her as best he could, fearful that if he laid hands on her she could report that he assaulted her, laying him open not only to being fired but to being prosecuted. Evans, Hr'g Tr. 25:22-25, April 3, 2015. When she failed to make him responds to her assault with an erection, she stopped after about 40 seconds. Evans, Hr'g Tr. 26:1-2, April 3, 2015. Mr. Evans reported this incident to Officer Crouther, the medical security officer; however, she dismissed his complaint and made a mockery of it. Evans, Hr'g Tr. 26:3-9, April 3, 2015. A couple weeks after he was assaulted, Officer Crouther had a physical altercation with another medical staff member regarding whether Officer Crouther was allowed in a restricted area. Evans, Hr'g Tr. 27:5-12, April 3, 2015. When the captain came to resolve the issue, Officer Crouther stated that she needed to be in that area to confirm that medical staff were not engaged in inappropriate sexual conduct with Mr. Evans. Evans, Hr'g Tr. 27:14-18, April 3, 2015. The following day Mr. Evans lost his job in the medical department without any

further investigation regarding the allegations or the misconduct he reported to Officer Crouther. Evans, Hr'g Tr. 27:19-20, April 3, 2015.

Mr. Evans, a minimum-security prisoner, is housed in a unit where day-to-day life is controlled by gangs. If a member of a gang violates a gang's code of conduct, the prisoner is subject to a "violation," meaning that the prisoner must fight two gang members at once for an entire sixty seconds. Evans, Hr'g Tr. 29:15-17, 31:24 – 32:1, April 3, 2015. This kind of gang-imposed discipline occurs on a daily basis, when officers are on breaks, tending to other zones, or when prisoners go to the showers to be outside of sight of officers. Evans, Hr'g Tr. 32:2-3, April 3, 2015. When officers witness these injuries, they do not seek medical attention for the prisoners. Evans, Hr'g Tr. 32:16 – 33:2, April 3, 2015. Even prisoners like Mr. Evans, who are not affiliated, must know the rules of conduct of the gangs to avoid being subjected to violence. Evans, Hr'g Tr. 33:14-21, April 3, 2015.

**B.  A Summary by Subject-matter of Defendants' Violation of the Core Provisions of the Consent Decree and of the Plaintiffs' Eighth Amendment Rights**

Over the past three years, Defendants have had an abysmal record of non-compliance with the core substantive provisions of the Consent Decree –that is, with those provisions relating directly to inmate safety:  classification and housing; protection from harm; adequate staffing; and health care. The Monitors have never found the Defendants to be in compliance with any the core provisions of the Consent Decree, save on one single isolated occasion with respect to one single provision. *See* Comparison Chart of Monitors' Compliance Ratings, ECF No. 152-7.

### 1. Classification and Housing System

The Monitors only found Defendants to be in compliance with the core provision of the Decree regarding Classification and Housing in their Fifth Report, but the rating returned to partial compliance in the Sixth Report. Comparison Chart of Monitors' Compliance Ratings at 1, ECF No. 152-7. In their first four Reports, the Monitors found Defendants to be in partial compliance concerning an adequate classification and housing system. Comparison Chart of Monitors' Compliance Ratings at 1, ECF No. 152-7. The Monitors found them in compliance in the Fifth Report, only to find them once more in the Sixth Report to be in only partial compliance. Comparison Chart of Monitors' Compliance Ratings at 1, ECF No. 152-7.

In the First Report, the Monitors' noted that Walnut Grove did not have "an effective internal classification system that ensures prisoners are properly assigned to various housing units based on their risk and security needs." First Monitors' Report at 4, ECF No. 152-4. In the Second Report, the Monitors noted that "prison gangs were gaining control of certain program/work assignments and housing areas." First Monitors' Report at 4, ECF No. 152-4. Aside from this problem, prisoners' classifications were inappropriately being over-ridden, allowing them to be placed in custody levels that were too low. First Monitors' Report at 5, ECF No. 152-4.

In their Third Report, the Monitors criticized Defendants for not having a case management plan for each prisoner; prisoners were not receiving structured programming necessary to lower their risk of recidivism, and case manager meetings with prisoners to discuss the progress of their case management plan almost never took place. Third Monitors' Report at 7, ECF No. 152-6. In the Fourth Report, the Monitors expressed concern about "a large number

of inmates for whom a needs assessment was not completed" until after the Monitors noted the issue. Fourth Monitors' Report at 5, ECF No. 151-2.

The Monitors also encouraged Defendants to revise their gang membership flags as "inactive" members were still "very much affiliated with the designated gang." Fourth Monitors' Report at 5, ECF No. 151-2.

The Monitors recommended "a major reduction in the Close Custody and Long-Term Segregation populations" if a housing plan was not implemented to separate Close Custody prisoners by their disciplinary conduct. Fourth Monitors' Report at 7, ECF No. 151-2. Defendants followed the Monitors' recommendation by removing close-custody and long-term segregation prisoners from the facility, and in the Fifth Report the Monitors found Defendants in Compliance. Fifth Monitors' Report at 4, ECF No. 151-7.

In the Sixth Report, the Monitors found that MTC and MDOC's failure to properly and independently review housing and classification assignments following serious misconduct continued to place prisoners at a substantial risk of harm. Sixth Monitors' Report at 7, ECF No. 152. They once again found that Defendants were having problems maintaining a housing plan, implementing case management plans, and ensuring that prisoners' placements were not improperly overridden. Sixth Monitors' Report at 7-8, ECF No. 152.

The Monitors observed that when MDOC removed close custody prisoners from Walnut Grove they reclassified ninety-six prisoners from close to medium custody and allowed 58 of them to remain, and subsequently allowed eleven of those 58 inmates to remain at Walnut Grove after they assaulted another prisoner or staff member. Sixth Monitors' Report at 6, ECF No. 152. The Monitors pointedly noted, "While the MDOC immediately transferred these inmates to close

security facilities, *it was disturbing that the Monitors discovered this situation and not the MDOC or MTC classification staff.*" *Id.* (emphasis added).

### 2. Reasonably Safe Living Conditions

In their First and Second Reports, the Monitors found Defendants in non-compliance with the requirement of "reasonably safe living conditions." Comparison Chart of Monitors' Compliance Ratings at 1, ECF No. 152-7. In their Third Report the Monitors made a finding of Partial Compliance but in the Fourth and Fifth Reports the Monitors again made findings of Noncompliance. Comparison Chart of Monitors' Compliance Ratings at 1, ECF No. 152-7. In the Sixth Report, the Monitors once again found Defendants in only Partial Compliance. Comparison Chart of Monitors' Compliance Ratings at 1, ECF No. 152-7.

#### a. Unsecure Cell Doors

Despite the constant repetition of this concern over the past four years by Plaintiffs, the DOJ, and Plaintiffs' expert, Defendants have yet to hire an independent expert to analyze the problem and recommend a solution. Vail, Hr'g Tr. 171-75, April 1, 2015.

By January 2015, Defendants had repaired the sliding doors in Units 3 and 4; however, Unit 4 is currently vacant and Unit 3 only houses prisoners on two of the four zones. Vail, Hr'g Tr. 183:13-21, April 1, 2015. In the rest of the facility where prisoners are actually housed, the cells all have hinged doors, which remain unsecure. The locking mechanisms can be defeated by such simple items as toilet paper, a toothpaste cap, or miscellaneous debris being placed in the bolt slot. Report of Tom Roth, ECF No. 154-2; Vail, Hr'g Tr. 34:23-25, 35:1, 35:21-23, April 3, 2015. Prisoners are easily able to sabotage the locking mechanisms in order to open the door themselves and to rig the door so that the control tower does not know the door is unsecured. Owens, Hr'g Tr. 139:11-24, 140:5-7, 140:11-17, April 2, 2015.

Instead of securing doors, some officers call the control tower to ensure that doors are showing secure before walking away, leaving the door wide open. Owens, Hr'g Tr. 140:11-17, April 2, 2015; Evans, Hr'g 35:8-16, April 3, 2015.

After recommendations to consult an outside security expert, MTC represented to the Monitors that they had hired a consultant but Plaintiffs' expert later learned that this was a misrepresentation: they had not in fact done so. Vail, Hr'g Tr. 172-176, April 1, 2015. Instead, MTC simply issued a memo instructing officers to check each and every door any time that a door is opened or closed, an unrealistic expectation that is highly unlikely to be followed. Vail, Hr'g Tr. 181:5 – 182:7, 184:20-25, April 1, 2015.

### b.    Contraband

Contraband, including cell phones, drugs, and weapons, continuously flows in the facility, placing prisoners at a substantial risk of harm. Report of Tom Roth at 25, ECF No. 154-2; Owens, Hr'g Tr. 135:3-7, 9, 15, April 2, 2015; Evans, Hr'g Tr. 28:15-16, 29:7-9, April 3, 2015. Warden Jenkins acknowledged the presence of contraband at Walnut Grove. Jenkins, Hr'g Tr. 112:14, April 23, 2015. The presence of major contraband including cell phones, drugs, and weapons compromises the security of Walnut Grove. Jenkins, Hr'g Tr. 112:14-24, 113:11-13, April 23, 2015. Drugs include marijuana, prescription medications, cocaine, and spice (synthetic marijuana), all brought into the facility by officers. Owens, Hr'g Tr. 135:3-7, April 2, 2015; Evans, Hr'g Tr. 28:9-13, 15-16, April 3, 2015; Vail August 2014 Report at 26, ECF No. 151-6.

Contraband control has been a serious ongoing issue throughout the life of the Consent Decree was put into place. In the Second Monitors' Report, they noted that "in December 2012, a cache of contraband was detected that included, among other things, eight hack-saw blades, 12

cell phones, 22 cell phone chargers, five bags of tobacco, and one knife." Second Monitors' Report at 2-3, ECF No. 152-5. In the Fourth Monitors' Report, before the July 2014 riot, they noted that "[t]he control of contraband during the reporting period was a serious management issue, especially given that no fewer than three officers were detected attempting to introduce contraband into the facility." Fourth Monitors' Report at 7, ECF No. 151-2.

In their Fifth Report, the Monitors noted that Defendants' inability to control the introduction of contraband by its own staff was a direct cause of the July 10, 2014 riot, resulting in nine prisoners being transported to the hospital due to serious injuries. Fifth Monitors' Report at 7, ECF No. 151-7; *see also* Brown, Hr'g Tr. 222:21, April 2, 2015. The contraband officers attempted to introduce included knives, cell phones/chargers, tobacco, and marijuana. Fifth Monitors' Report at 3, ECF No. 151-7.

In their Sixth Report, The Monitors noted that "contraband control remains a problem," even though some steps have been taken to curb the flow. Sixth Monitors' Report at 15, ECF No. 152. As evidenced by MDOC's February 2015 Monthly Report, Defendants have been unable to sustain or even create a decrease in the presence of contraband in the facility. MTC February 2015 Report at 4, ECF No. 152-3; Vail, Hr'g Tr. 37, April 2, 2015. In March 2015, the Defendants' own report indicates that 39 items of contraband were confiscated. WGCF March 2015 Monthly Report at 4, ECF No. 153-4. Of those items, there were four finds of illicit substances, nineteen weapons, and sixteen cell phones. *Id.* at 16.

Defendants claim that increased searches are dealing with this problem, but contraband is still being introduced on an almost daily basis. Owens, Hr'g Tr. 135:9, April 2, 2015. Prisoners smoke spice causing them to become aggressive, semi-conscious, and sometimes completely unconscious. Owens, Hr'g Tr. 137:4-6, April 2, 2015. Even though prisoners consume spice

and lose consciousness on an almost daily basis, medical staff is almost never called to provide attention. Owens, Hr'g Tr. 137:10-19, April 2, 2015.

c.        <strong><em>Sexual Assaults and Misconduct</em></strong>

In early January 2015, Defendants only produced two documents in response to Mr. Vail request for "all information relating to all complaints regarding sexual abuse at the facility since the consent decree was entered in 2012." Vail February 2015 Report at 36, ECF No. 152-2. At that time, Defendants did not produce any documentation for 2012 or 2013 concerning sexual assaults. Vail February 2015 Report at 37, ECF No. 152-2. For 2014, MTC has produced inconsistent records: their internal summary reports nine PREA allegations, with three substantiated, while the BJA audit reports only two allegations, with neither substantiated. Vail February 2015 Report at 38, ECF No. 152-2. The BJA audit was done in August 2014 and the MTC report covers all of calendar year 2014, perhaps accounting for some of the discrepancy; but according to MTC's own report there were still five PREA complaints filed *prior* to the BJA audit, with one of them substantiated. Vail February Report at 38, ECF No. 152-2.

Further, according to MTC and MDOC's contract, any allegation involving sexual abuse requires that the MDOC CID be notified immediately to assume control of the investigation, yet the PREA Audit Report states that "none [of the complaints] required investigation by the MDOC CID." Vail February 2015 Report at 37, ECF No. 152-2. Officers fail to acknowledge the gravity of allegations reported by prisoners of sexual misconduct, including assaults committed by staff. Vail February 2015 Report at 38, ECF No. 152-2; Evans, H'rg Tr. 26:5-7, 26:13-15, April 3, 2015 MTC officials outside of the facility are not even necessarily notified of sexual assault complaints if the allegation does not concern a staff member. Brown, Hr'g Tr. 180:13-21, April 2, 2015.

At least one prisoner, Jeremy Evans, has faced retaliation after reporting sexual misconduct between staff members, a nurse and an officer.  Evans, Hr'g Tr. 15:25-26, 9-10, April 3, 2015; ARP Submitted by Jeremy Evans, Sep. 25, 2014, ECF No. 153-2.  When the retaliation was reported to the Deputy Warden, instead of taking corrective action, staff informed the prisoner that he should be careful about those who receive his reports.  Evans, Hr'g Tr. 17:2-7, April 3, 2015.  The nurse reported by the prisoner was subsequently fired for a separate incident of having sex with a prisoner.  "Woman Arrested for Having Sex With Jail Inmate" Article, Oct. 2, 2014, ECF No. 153-1; Evans, Hr'g Tr. 17:17-21, 18:3-9, April 3, 2015.

In February 2015, Mr. Evans was sexually assaulted by a certified nursing assistant.  Evans, Hr'g Tr. 25:5-7, 18:25 – 26:5, April 3, 2015.  Immediately after the incident, Mr. Evans reported it to a security officer, who made a mockery of Evan's complaint and dismissed him.  Evans, Hr'g Tr. 26:5-9, April 3, 2015.  The officer made another disparaging comment two weeks later about needing to check that Mr. Evans was not having sex with the nurses.  Evans, Hr'g Tr. 26:20-21, 27:5-18, April 3, 2015.  Mr. Evans subsequently lost his job at the facility.  Evans, Hr'g Tr. 27:20, April 3, 2015.

In early March 2015, prisoners filed a complaint against Officer Howard, alleging that he was exchanging oral sex for favors with at least three prisoners.  UOR 13-638, Dec. 31, 2013 at 9, ECF No. 151-17.  In addition, one prisoner reported that he was anally raped by Officer Howard.  EOR 15-084, March 7, 2015 at 9, ECF No. 153-5.  While the investigation remains pending, a surveillance tape shows Officer Howard remaining in a prisoner's cell for an excessive amount of time correlating with the allegations.  Brown, Hr'g Tr. 241:14-19, April 2, 2015.  Equally troubling is the facility's failure to conduct a thorough investigation of Officer Howard's alleged misconduct.  Jenkins, Hr'g Tr. 85:12-22, April 23, 2015.

There were two other incidents in March 2015 where officers were observed engaging in inappropriate sexual interaction with prisoners. EOR 15-124, Mar. 28, 2015, ECF No. 153-10; EOR 15-118, Mar. 31, 2015, ECF No. 153-11. On March 28, 2015, Officer Alston was seen grabbing a prisoner's pants near his groin area. EOR 15-124 at 4, Mar. 28, 2015, ECF No. 153-10; Jenkins, Hr'g Tr. 138:24 – 139:3, April 23, 2015. In the video, Officer Alston was seen exchanging something with the prisoner and she was arrested after a green leafy substance, suspected to be marijuana, was found in her vehicle. EOR 15-124, Mar. 28, 2015 at 3, ECF No. 153-10. On March 31, 2015, a captain and sergeant personally witnessed Officer Bell kissing a prisoner on the housing unit. EOR 15-118, Mar. 31, 2015 at 3, ECF No. 153-11.

In March 2015, Walnut Grove reported three instances of staff-on-inmate sexual misconduct. WGCF March 2015 Monthly Report at 16, ECF No. 153-4. Similar to the way MTC characterized the July riot as a single assault, they count the instances of sexual misconduct by staff based on the number of staff involved, instead of the number of prisoners assaulted by staff. WGCF March 2015 Monthly Report at 16, ECF No. 153-4; Jenkins, Hr'g Tr. 144:5-20, April 23, 2015. There were three prisoners assaulted in the incident involving Officer Howard. EOR 15-084, Mar. 7, 2015, at 9, ECF No. 153-5. There was one prisoner involved in the incident with Officer Alston. EOR 15-124, Mar. 28, 2015 at 3, ECF No. 153-10. There was one prisoner in involved in the incident with Officer Bell. EOR 15-118, Mar, 31, 2015, ECF No. 153-11. Therefore, the number of incidents of staff-on-inmate sexual misconduct should have been properly reported as five.

### d. Assaults in General

Levels of violence continue to be high at Walnut Grove with no real progress in decreasing this trend. Vail, Hr'g Tr. 38:15-19, 39:11-16, 39:21-23, April 2, 2015; MTC

February 2015 Monthly Report at 4-5, ECF No. 152-3. Mr. Roth's report indicates a downward trend since 2012, but apart from a one-month drop there has not been any downward trend since the July 2014 riot. Vail, Hr'g Tr. 38:21-225, 39:11-16, April 2, 2015.

In their Sixth Report, the Monitors noted that there were fewer serious incidents requiring off-site treatment. Martin, Hr'g Tr. 74:8-9, April 3, 2015. However, between March 5, 2015 and March 21, 2015, after the Sixth Report had already been submitted, there were four serious incident requiring prisoners to be transported off-site for medical treatment. Martin, Hr'g Tr. 73:25, 74:1-4, April 3, 2015. As Mr. Martin testified, "it illustrates and is related to this sustainability issue." Martin, Hr'g Tr. 74:14-18, April 3, 2015.

Despite the changes that have occurred at Walnut Grove in the last several months, including the removal of close custody inmates and the population reduction, serious incidents continue to occur. On November 12, 2014, there were two separate incidents involving weapons. UOR 14-551, Nov. 12, 2014, ECF No. 152-11; UOR 14-550, Nov. 12, 2014, ECF No. 152-13. In one incident, a prisoner was chased by several other prisoners who had weapons. Jenkins, Hr'g Tr. 146:5-7, April 23, 2015; UOR 14-551, Nov. 12, 2014, ECF No. 152-11 at 2. He suffered multiple wounds and had to be transported to the hospital and five weapons were recovered. Jenkins, Hr'g Tr. 147:4-9, April 23, 2015; UOR 14-551, Nov. 12, 2014 at 2, ECF No. 152-11. In the other incident on November 12, 2014, there was an altercation due to a debt that was owed gang members. Jenkins, Hr'g Tr. 148:6-12, April 23, 2015; UOR 14-550, Nov. 12, 2014 at 4, ECF No. 152-13. The prisoner suffered multiple puncture wounds and the weapon was found lodged in his back. Jenkins, Hr'g Tr. 149:18-23, April 23, 2015; UOR 14-550, Nov. 12, 2014 at 22. On December 7, 2014, there was a large fight that involved approximately thirteen prisoners. Jenkins, Hr'g Tr. 151:2-4, 151:11-13, April 23, 2015; UOR 14-585, Dec. 7,

2014 at 4, ECF No. 152-12. All of these incidents occurred after close custody prisoners were removed from Walnut Grove. Jenkins, Hr'g Tr. 147:10-12, 150:16-18, 153:7-9, April 23, 2015.

Even in the days immediately preceding the hearing, incidents of violence required off-site medical treatment. On March 19, 2015, a prisoner at Walnut Grove required transportation to UMC for medical treatment as a result of an assault at the facility. March 23, 2015 Email from Harold Pizzetta re: S. Heatherly, ECF No. 151-15; Brown, Hr'g Tr. 233:2-4, April 2, 2015. When officers responded to the incident, one prisoner was "on the ground in a pool of blood." EOR 15-106, Mar. 19, 2015 at 7, ECF No. 153-8. On March 21, 2015, a prisoner had to be transported by ambulance after experiencing asthmatic complications as a result of officers using chemical munitions following a targeted cell search. Material Safety Data Sheet, ECF No. 152-9; Brown, Hr'g Tr. 234:3-9, April 2, 2015; EOR 15-109, Mar. 21, 2015, ECF No. 153-9.

Defendants have previously misrepresented the level of violence by reporting the entire July 10, 2014 riot as a single assault. Sixth Monitors' Report at 9, ECF No. 152. For the purposes of the monthly report, a minor disturbance is defined as an altercation that involves less than four prisoners. Jenkins, Hr'g Tr. 118:9-10, April 23, 2015; WGCF March 2015 Monthly Report at 3, ECF No. 153-4. A major disturbance is defined as an incident that includes serious injury, property damage and more than four individuals. Jenkins, Hr'g Tr. 118:25 – 119:1, April 23, 2015. WGCF March 2015 Monthly Report at 3, ECF No. 153-4. Based on their own definition, the July riot should have been categorized as a major disturbance, but instead there are zero major disturbances listed in July 2014 and one minor disturbance in July 2014. WGCF March 2015 Monthly Report at 3, ECF No. 153-4. Further, the monthly report reflects there were zero offender-on-offender assaults with a weapon in July 2014. WGCF March 2015 Monthly Report at 4, ECF No. 153-4.

###### e.    *Gang Influence and Control*

Defendants have not adopted a comprehensive gang management policy that would effectively deal with the risk of violence presented by gangs.  Vail, Hr'g Tr. 57:6-8, April 1, 2015; Monitors Sixth Report at 11-13, ECF No. 152.      Gang affiliation is pervasive, with members controlling certain areas of the facility, such as shower or television viewing areas. Vail, Hr'g Tr. 143:17-25, April 1, 2015.  Group fights can indicate gang activity.  Jenkins, Hr'g Tr. 152:20-22, April 23, 2015; Vail, Hr'g Tr. 186:23 – 187:5, April 1, 2015.  When an assault occurs, William Morgan, the STG Lieutenant, is supposed to examine it from an STG standpoint. Morgan, Hr'g Tr. 18:3-4, April 24, 2015.  In December 2014, an altercation between two prisoners quickly escalated into a large fight involving approximately thirteen inmates.  UOR 14-585, Dec. 7, 2014 at 4, ECF No. 152-12.  However, Mr. Morgan did not investigate the incident as a possible gang fight.  Morgan, Hr'g Tr. 25:1-3, April 24, 2015.

The Monitors noted in their Sixth Report that "there remains a significant presence of active gang members who are attempting on a daily basis to control certain aspects of the facility's operations."  Sixth Monitors' Report at 13, ECF No. 152.  If Defendants persist with their current "zero-tolerance" policy without positive reinforcement systems and programming opportunities, gangs will continue to be a significant threat to the institution.  Vail, Hr'g Tr. 57:9-19, April 1, 2015.

Gangs have been allowed to establish a "security escort" system where active high-level gang members are escorted by fellow prisoners acting as their security.  Sixth Monitors' Report at 11, ECF No. 152; Vail February 2015 Report at 19, ECF No. 152-2.  MTC security staff admitted that this practice is common.  Sixth Monitors' Report at 11, ECF No. 152; Vail February 2015 Report at 20, ECF No. 152-2.  The Monitors had to inform MTC that the practice

was unacceptable and needed to cease immediately.  Martin, Hr'g Tr. 63:23 – 64:7, April 1, 2015.

If a member of a gang violates a gang's code of conduct, the prisoner is subject to a "violation," meaning that the prisoner must fight two gang members at once for an entire sixty seconds.  Evans, Hr'g Tr. 29:15-17, 31:24 – 32:1, April 3, 2015.  This kind of gang-imposed discipline occurs on a daily basis when officers are on breaks, tending to other zones, or when prisoners go to the showers to be outside of sight of officers.  Evans, Hr'g Tr. 32:2-3, April 3, 2015.  When officers witness these injuries, they do not seek medical attention for the prisoners.  Evans, Hr'g Tr. 32:16-25, 33:1-2, April 3, 2015.  Even if prisoners are not affiliated, they must know the rules of conduct of the different gangs to avoid being subjected to violence.  Evans, Hr'g Tr. 33:14-21, April 3, 2015.

### f.      Programming and Behavior Management

Prisoner idleness continues to contribute to a substantial risk of harm.  The level of idleness at Walnut Grove has been "profound.  Without adequate programming, prisoners have no alternative to participating in gang-related activities and no incentive to improve behavior so they can take advantage of the positive programming.  Vail, Hr'g Tr. 56:19 – 57:19, April 1, 2015.

The Monitors noted in their Fifth Report, "While facility officials have a variety of programming plans being considered, the inmate population spends a significant portion of their waking hours with un-programmed/unstructured time in the dayrooms of the housing units." Fifth Monitors' Report at 4, ECF No. 151-7.  In their Sixth Report, the Monitors found, based on MTC's program listings, that approximately 70 percent of prisoners were engaged in some kind of work, educational, or rehabilitative assignment.  Monitors Sixth Report at 18, ECF No. 152.

However, MTC's own documents show that only half the population was involved in organized activity for even 15 hours per week, and idleness thus remains at a dangerous level. Vail, Hr'g Tr. 152:1-16, April 1, 2015, WGCF Program Overview at 2, ECF No. 152-1.

MTC is not fully utilizing its resources to provide programming to a maximum number of prisoners. Based on MTC's monthly reports to MDOC, there are large numbers of vacancies in many programs. For instance, in December 2014 and January 2015, there were 101 vacant spots in the GED program and 14 vacant slots in the adult basic education program. Vail, Hr'g Tr. 157:23 – 158:4, April 1, 2015; February Monthly Report at 8, ECF No. 152-3. There were 178 vacancies in the substance abuse programs and 22 vacancies in vocational education. Vail, Hr'g Tr. 158:10-20, April 1, 2015; February Monthly Report at 8, ECF No. 152-3. If MTC were fully using its program resources it could have offered programming to 275 additional prisoners in December 2014 and 177 prisoners in January 2015. Vail, Hr'g Tr. 158:16-23, April 1, 2015; February Monthly Report at 8, ECF No. 152-3.

### g. Staff Corruption

Currently, there are two officers on administrative leave pending termination for sexual misconduct and another officer is on administrative leave without pay pending the outcome of an investigation. Jenkins, Hr'g Tr. 75:24 – 76:4, 77:2-6, 79:12-16, April 23, 2015. Since starting at Walnut Grove in late July 2014, Warden Jenkins has terminated between ten and twenty employees for misconduct. Jenkins, Hr'g Tr. 109:21-22, 110:3-4, April 23, 2015.

The Criminal Investigations Division (CID) investigation of the July 2014 riot revealed that at least four staff members, including a lieutenant, were involved in the riot to varying degrees. Monitors Fifth Report at 3, ECF No. 151-7. Officers allowed prisoners out of their

housing units to retrieve contraband, and six officers were terminated due to their involvement. Brown, Hr'g Tr. 214:7-19, April 2, 2015.

Officers routinely bring contraband into the prison, including cell phones, drugs, and alcohol. Evans, III.28:15-29:1-9, April 3, 2015. The protective custody zone at Walnut Grove, a zone to which general population prisoners have virtually no access, is awash in synthetic marijuana, alcohol, and other drugs, all provided by staff members. Owens, Hr'g Tr. 135:3-20, April 2, 2015. Prisoners on the protective custody zone can be observed consuming spice on a daily basis. Owens, Hr'g Tr. 135:3-13, 135:20, April 2, 2015. Use of the drug causes prisoners to become aggressive, semi-conscious, or completely unconscious, yet officers do not intervene when prisoners exhibit these symptoms. Owens, Hr'g Tr. 137:4-11, April 2, 2015. Instead, officers instruct other prisoners to drag the incapacitated prisoners into their cells, so they are out of the view of camera and any monitoring by staff. Owens, Hr'g Tr. 137:12-15, April 2, 2015. In approximately seven months on the protective custody zone, officers have only sought medical attention for a prisoner on one occasion, where he observes prisoners semi-conscious or unconscious from spice use on an almost daily basis. Owens, Hr'g Tr. 137:12-19, April 2, 2015.

Walnut Grove terminated twelve employees in 2013 and eleven employees in 2014 for staff misconduct. Report of Tom Roth at 7, ECF No. 154-2

### 3. Sufficient Numbers of Adequately Trained Staff

Inadequate staffing has been an ongoing problem throughout the life of the Consent Decree. In their First Report, the Monitors noted that there were "obvious staffing deficiencies." First Monitors' Report at 5, ECF No. 152-4. In their Second Report, the Monitors concluded that the staffing complement did not "constitute a stable workforce." Second Monitors' Report at 9, ECF No. 152-5. In their Third Report, the Monitors noted that additional training was provided

to try to address the issue of inexperienced staff. Second Monitors' Report at 9, ECF No. 152-6. In the Fourth Report, they found that staffing deficiencies were a contributing cause of the New Year's Eve riot. Fourth Monitors' Report at 8-9, ECF No. 151-2. In the Fifth Report, the Monitors reported the highest number of staff vacancies since the entry of the Consent Decree and found that staff vacancies and inexperience evidenced inadequate staffing. Fifth Monitors' Report at 10, ECF No. 151-7. The Monitors' Sixth Report noted an increase in staffing during the monitoring period. Sixth Monitors' Report at 14, ECF No. 152. However, after the Monitors' visit, MTC implemented a reduction in force when the prisoner population was reduced, and because the Monitors had not received updated information the Sixth Report did not reflect that RIF. Martin, Hr'g Tr. 66:5-8, April 3, 2015. Despite an ongoing problem maintaining adequate staff coverage, Vice President Brown did not consult with the Monitors before laying off 70 employees. Brown, II.198:14-18, April 2, 2015; Martin, Hr'g Tr. 66:5-8, April 3, 2015.

Walnut Grove continues to have a high staff turnover rate due to a combination of staff resignations and terminations. Brown, Hr'g Tr. 199:12-14, April 2, 2015. Throughout MTC's tenure at Walnut Grove, it has struggled to maintain appropriate staff ratios. Brown, Hr'g Tr. 197:9, April 2, 2015.

When MTC took over the operation of the Walnut Grove Correctional Facility, correctional officers made less than ten dollars per hour. Brown, Hr'g Tr. 200:16-17, April 2, 2015. Former MDOC Deputy Commissioner of Institutions, Archie Longley, recommended increasing the starting pay of MTC officers. Brown, Hr'g Tr. 200:22-25, 201:1-3, April 2, 2015. Based on that recommendation, MTC increased the starting salary for correctional officers somewhere between $10 and $10.50 per hour. Brown, Hr'g Tr. 200:6-9, 201:4-5, April 2, 2015.

Vice President Brown testified that a salary increase would help retain more officers at Walnut Grove. Brown, Hr'g Tr. 201:16-18, April 2, 2015. Although they are performing the same duties, MTC pays correctional officers less than MDOC and offers them a less valuable benefits package. Brown, Hr'g Tr. 200:18-19, 201:14-15, April 2, 2015.

As Mr. Vail noted, "Low salaries very likely contribute to the problem of retaining qualified staff." Vail February 2015 Report at 24, ECF No. 152-2. "A living wage is critical to attracting and retaining a professional cadre of correctional officers. Increasing their salaries and improving their working conditions will, in my experience, improve officer retention. *Id.*

Even since the reduction in prisoner population, officers are absent from the housing units. Owens, Hr'g Tr. 139:13-15, April 2, 2015. Sometimes officers leave the zone for several hours at a time. *Id.* In fact, officers instruct and encourage prisoners to rig their doors so that they will not need the officers to let prisoners in and out of their cells. Evans, Hr'g Tr. 35:11-16, April 3, 2015.

### a. *Inadequate Supervision*

There have been four wardens at Walnut Grove in the last three years since MTC took over the contract. Brown, Hr'g Tr. 187:24 – 188:2, April 2, 2015. MTC delegates to the wardens at Walnut Grove almost complete unmonitored autonomy to supervise all facility employees and approve all policies and procedures related to the operation of the facility. Brown, Hr'g Tr. 186:19 – 187:18, April 2, 2015. Vice President Brown admits that consistent leadership is critical to running a safe prison, but that consistent leadership has been absent from Walnut Grove. Brown, Hr'g Tr. 176:24-25, 177:1, 177:7`, 186:21-25, 187:4-11, April 2, 2015.

Even with knowledge of this inconsistent leadership and the ongoing serious incidents of violence, staff corruption, and sexual assaults, Vice President Brown has not taken any action to

ensure appropriate review and approval of policies and procedures beyond the facility level. She does not even require notification of the development and implementation of policies and procedures. Brown, Hr'g Tr. 187:15-19, 187:24-25, 188:1-8, April 2, 2015.

As noted in the Fifth Monitors' report, at the end of August 2014, a third of the staff at Walnut Grove has less than six months' experience. Fifth Monitors' Report at 10, ECF No. 151-7. Currently, thirty-nine percent of the officers have less than a year of experience working in a correctional environment. Report of Tom Roth at 39, ECF No. 154-2.

The inexperienced line staff does not have adequate leadership since the supervisory staff receives no specialized training in supervisory duties. Vail February Report at 26-27, ECF No. 152-2.

Walnut Grove's Supervisory Development Program does not include any corrections-specific training, and instead is a generally applicable curriculum for anyone working in a business or government setting. Vail February Report at 26, ECF No. 152-2.

Following the December 2013 and July 2014 riots, MTC should have taken decisive action to prepare shift commanders to serve as incident commanders in the face of another emergency. Vail February Report at 10-11, ECF No. 152-2. Since the end of July 2014, there has not been any training for shift commanders or other staff who would be expected to serve as the incident commander in an emergency. Jenkins, Hr'g Tr. 57:10-18, April 23, 2015. But they failed to ensure that the Emergency Response Plan included appropriate post orders or checklists to guide staff during an emergency. Vail February 2015 Report at 10, ECF No. 152-2. In January 2015, five months after the most recent riot, MDOC and MTC officials admitted to Mr. Vail that these documents are not part of their Emergency Response Plan. Vail February 2015 Report at 10-11, ECF No. 152-2.

During the July 2014 riot, it took prison officials over an hour to establish an incident command center, something that should have been established within minutes. In fact, by the time MTC was able to establish the command center, most of the incident was over. Vail, Hr'g Tr. 132:2-3, 132:6-10, April 1, 2015.

Another serious problem is that shift commanders receive no formalized training to perform the responsibilities of incident commanders. Vail February Report at 11, ECF No. 152-2. There is no curriculum prepared and vetted by someone with expertise in emergency response; instead, the current training amounts to no more than a presentation by the warden, of which there is no documentation. *Id.* Based on the lack of an adequate Emergency Response Plan, incident commander training, and documentation, shift commanders are not any better equipped to effectively respond to an emergency than they were prior to the two recent riots. *Id.*

Over six months after the removal of close custody prisoners, Walnut Grove did not update its evacuation plan to accurately reflect the current population until the end of March or early April. Jenkins, Hr'g Tr. 45:12-15, 46:17-25 – 47:1-2, April 23, 2015. The notification list that includes the contact information for everyone who must be notified in an emergency was not updated until after January 2015. Jenkins, Hr'g Tr. 45:16-25 – 46:1-4, April 23, 2015.

Since 2013, Mr. Vail has reviewed on a monthly basis numerous surveillance videos revealing routine incidents of violence occurring in the housing units when staff were absent for extended periods of time. Vail, Hr'g Tr. 35:14-24, April 1, 2015. Yet Defendants still fail to ensure a consistent staff presence in the housing units. Vail, Hr'g Tr. 36:8-10, April 1, 2015.

According to MTC Regional Vice President Brown, an officer does not have to remain on the zone for minimum and medium custody inmates. Brown, Hr'g Tr. 232:6-8, April 2, 2015. However, Warden Jenkins, on the other hand, says that a post order dated March 10, 2015,

requires officers to remain on their post, including a housing zone, unless approved by a supervisor. Def. Ex. 47 at 7; Jenkins, Hr'g Tr. 96:9-25 – 97:1-3, April 23, 2015. Officers are permitted to leave the zone for a variety of reasons such as convenience breaks, assisting with an incident or search, and conducting count. Jenkins, Hr'g Tr. 95:5-20, April 23, 2015. When the officer leaves the zone, the pod control officer is supposed to watch the zone, but that officer cannot see all of the zones at once. Jenkins, Hr'g Tr. 96:25 – 97:1-3, April 23, 2015; Vail, Hr'g Tr. 201:6-16, April 27, 2015.

The lack of staff presence on the housing units contributes to ongoing violence among gang members, such as physical assaults as punishment for violating a gang rule. Evans, Hr'g Tr. 29:15-17, April 3, 2015. Regardless of prisoners' custody level, gang fights continue to occur on the housing units on an almost daily basis through March 2015. Evans, Hr'g Tr. 30:6-25, 31:1-2, April 3, 2015. These daily fights continue to occur in part because there is no officer present on the zone. Evans, Hr'g Tr. 32:13-15, 32:19-20, April 3, 2015. In the most recent Monitors' report, they noted that there continue "to be too many unobserved altercations in the housing areas. . ." and that officers are only "beginning to intervene in inmate altercations." Sixth Monitors' Report at 15, ECF No. 152.

### b. Inadequate Training

Even after two major disturbances where officers lost control of multiple housing units for extended periods of time, Defendants have failed to develop a written training protocol for incident commanders. Vail, Hr'g Tr. 134:4-13, April 1, 2015. Instead, the senior officer who is expected to lead others to dispel the incident receives no formalized training. *Id.*

Further, Defendants have made little if any adjustments to their staff training plan in response to the riots. Vail, Hr'g Tr. 135:23 – 136:8, April 1, 2015.

The record is rife with examples of how the lack of staff training has directly placed prisoners at risk of substantial harm and allowed that risk of harm to be realized on numerous occasions. Vail, Hr'g Tr. 165:12-25, 166:1-18, April 1, 2015.

MTC Regional Vice President Marjorie Brown noted that the New Year's Eve riot offered numerous examples of systemic failures of staff to perform their responsibilities, including failure to follow policies and procedures, improper placement of chemical restraints, and inadequate officer call back system. Brown, Hr'g Tr. 209:22-25, 210:1, April 2, 2015. Ms. Brown summed up the officers' actions by stating, ". . . we forgot how to do our jobs." Brown, Depo. Tr. 93:1, Mar. 26, 2015.

During the July 2014 riot, officers' lack of training significantly contributed to the violence that persisted for over an hour. When officers released a grenade within the control booth, they had to evacuate the booth for about thirty minutes and were unable to take tactical action to dispel the violent activity that reignited once officers were unable to respond. Vail, Hr'g Tr. 103:21 – 104:3, April 1, 2015. As a result of the officers' mistake and lack of respirators, prisoners continue to be assaulted with milk crates, homemade weapons, and a microwave oven. Vail, Hr'g Tr. 101:19 – 102:1, 103:21 – 104:11, April 1, 2015.

In response to systemic issues with new officers, MTC initiated a field training program that was supposed to supplement the three weeks of existing training; however, this training was implemented in a manner that lacked written manual and protocols. Brown, Depo. Tr., 74:1-6, Mar. 26, 2015.

Examples abound of staff incompetency and lack of basic custody and security skills. During targeted searches, where staff have some reason to believe that the prisoner is in possession of contraband, staff do not remove the prisoner from the cell. Vail, Hr'g Tr. 165:20 –

166:4, April 1, 2015. Instead, they conduct the search with the prisoner in the cell, predictably leading to an avoidable use of force incident. Vail, Hr'g Tr. 165:23-25, April 1, 2015. Other examples include removing leg restraints by kneeling in front of the prisoner and opening the cell to administer OC spray, putting the officer at further risk. Vail, Hr'g Tr. 166:5-7, 166:13-18, April 1, 2015. These systemic failures evidence an inadequate staff training program that contributes to the unsafe environment. Vail, Hr'g Tr. 165:12 – 166:18, April 1, 2015.

The Monitors have never yet found Defendants in compliance with the provision regarding sufficient numbers of adequately trained staff. Comparison Chart of Monitors' Compliance Ratings, ECF No. 152-7. Since the Monitors' last visit, both the prisoner population and staff have been greatly reduced, and the Monitors cannot determine if the staffing levels are sufficient. Martin, Hr'g Tr. 13-16, April 3, 2015.

### c. *Emergency Response Plan*

As of January 2015, MTC had not updated a critical document—the Emergency Response Plan. Vail February 2015 Report at 9, ECF No. 152-2. Almost five months after the second riot where officers lost control of multiple living units, Walnut Grove's Emergency Response Plan included no information concerning how to regain control of a housing unit. *Id.* In light of the two riots in 2014, there should have been an update to specifically incorporate instructions as to what staff should do in an instance where they lose control of a living unit. *Id.* Nor had MTC updated its evacuation plan as of February 2015 to properly reflect the current populations and custody levels housed in each living unit. It was not updated until late March or early April 2015. Vail, Hr'g Tr. 43:10-11, April 1, 2015; Jenkins, Hr'g Tr. 45:12-15, April 23, 2015. If staff followed the evacuation plan in place in January 2015, staff would have placed minimum security prisoners in restraints, an unnecessary security practice. Vail February Report

at 9, ECF No. 152-2.  MTC's own policy requires an annual update.  Vail, Hr'g Tr. 43:16-24, April 1, 2015.

Despite a history of serious riots and disturbances, Walnut Grove has taken very little action to make changes and increase staff preparedness for such emergencies.  Both the court Monitors and Mr. Vail have recommended that real time drills are necessary to adequately train existing staff as to how to respond to an emergency.  Vail, Hr'g Tr. 136:13-17, April 1, 2015; Fifth Monitors' Report at 8, ECF No. 151-7.  Throughout 2014, MTC conducted only a handful of real time drills.  Vail, Hr'g Tr. 137:-22-25, April 1, 2015; Fifth Monitors' Report at 8, ECF No. 151-7.

In his January 2015 meeting, Mr. Vail pointed out serious concerns regarding the adequacy of the few drills that were conducted.  Vail, Hr'g Tr. 138:1-2, April 1, 2015.  Most striking was that MTC included very few security officers in the drills.  Vail, Hr'g Tr. 138:4-10, April 1, 2015.  Thus, the officers who are expected to immediately respond and dispel an incident were not part of the simulated incidents.  Further, MTC failed to properly document the drills and who participated, making it impossible for supervisors and the wardens to track who has not participated in a drill.  Vail, Hr'g Tr. 138:8-18, April 1, 2015The training documentation only included those who were responsible for working the incident command center.  Jenkins, Hr'g Tr. 52:18-20, April 23, 2015.  Without conducting adequate real time drills with appropriate documentation, staff at Walnut Grove will remain unable to respond to emergency situations.  Vail, Hr'g Tr. 138:1-18, April 1, 2015.

### 4. Use of Force

The Monitors have never found Defendants to be in compliance with the core Consent Decree provisions on use of force.  Comparison Chart of Monitors' Compliance Ratings at 1,

ECF No. 152-7; Vail February 2015 Report at 27, ECF No. 152-2. In the first four Monitors'
Reports, Defendants were in partial compliance. Comparison Chart of Monitors' Compliance
Ratings at 1, ECF No. 152-7. Defendants then regressed to non-compliance in the Fifth Report
before returning to partial compliance in the Sixth Report. Comparison Chart of Monitors'
Compliance Ratings at 1, ECF No. 152-7.

In the First Monitors' Report, they reported that Defendants did not check the weight of
chemical agents, did not check for contra-indications for use of chemical agents in a planned use
of force, violated training and certification requirements for staff members utilizing chemical
agents, and used excessive amounts of chemical agents. First Monitors' Report at 5-6, ECF No.
152-4; Vail, Hr'g Tr. 170:24-25, 171:1-9, April 1, 2015.

When use of force incidents decreased during the reporting period for the Second
Monitors' Report, there were still violations of the standard operating procedures for use of force
and chemical agents, requiring discipline of several officers/supervisors. Second Monitors'
Report at 10, ECF No. 152-5; Vail, Hr'g Tr. 171:13-15, April 1, 2015. In the Third Report, the
Monitors stressed issues with "proper use of OC spray, videotaping, escorting of restrained
inmates, and detached supervision of applications of force by supervisors." Third Monitors'
Report at 10, ECF No. 152-5; Vail, Hr'g Tr. 171:16-22, April 1, 2015.

The Monitors focused their critique on the December riot response in the Fourth Report.
Fourth Monitors' Report at 11, ECF No. 151-2. Defendants failed to video use of force
encounters, reports were not completed in a timely fashion, and reports from the Deputy Warden
and Major were missing in the After Action Reports. Fourth Monitors' Report at 11, ECF No.
151-2; Vail, Hr'g Tr. 172:3-9, April 1, 2015. The incident packet also failed to document
decontamination of prisoners and the housing units despite the high level of chemical munitions

utilized. Fourth Monitors' Report at 11, ECF No. 151-2; Vail, Hr'g Tr. 172:10-17, April 1, 2015.

Defendants' response to the concerns the Monitors expressed in the Fourth Report was largely dismissive and ignored the gravity of their failures during the riot. Fourth Monitors' Report at 28, ECF No. 151-2.

After finding Defendants in partial compliance through the first four reporting periods, the Monitors found Defendants to be in non-compliance for the Fifth Monitors' Report. Fifth Monitors' Report at 11, ECF No. 151-7; Vail, Hr'g Tr. 172:24-25, 173:1-4, April 1, 2015. The Monitors noted in their Fifth Report that use of force "skyrocketed from five in July to 23 in August." Fifth Monitors' Report at 3, ECF No. 151-7. While most of the incidents were planned uses of force, there was no video available for five of the incidents, and in seven of these planned incidents there were camera or operator malfunctions with the recording." Fifth Monitors' Report at 11, No. 151-7. Nor was it documented whether staff contacted medical staff for contra-indications prior to utilizing chemical agents. Fifth Monitors' Report at 11, No. 151-7.

One incident appeared to be an administration of OC at an unsafe distance and another incident included a dangerous takedown. Fifth Monitors' Report at 11, No. 151-7; Vail, Hr'g Tr. 173:6-18, April 1, 2015. "Disturbingly, neither of these incidents reflected completion of the administrative review process" and "none of these aforementioned issues were addressed" in the August Analysis Use of Force by Defendants. Fifth Monitors' Report at 11, No. 151-7; Vail, Hr'g Tr. 73:17-21, April 1, 2015.

The dangerous takedown referred to in the Fifth Report involved an officer lifting a prisoner into the air and slamming the prisoner on his back on the cement floor in the living unit.

Vail February 2015 Report at 30, ECF No. 152-2. In response, the camera operator laughs, and the prisoner twitches, shakes, and appears to convulse on the floor before being transported on a gurney to medical. Vail February 2015 Report at 30, ECF No. 152-2.

In the Sixth Report, Monitors documented Defendants' continuing struggles with reviewing officials to fully document their reviews of use of force incidents, ensuring that each incident was properly reviewed, and providing timely decontamination of prisoners subjected to OC spray. Sixth Monitors' Report at 15-16, ECF No. 152. One use of force incident in January 2015 included a closed-fist strike to a prisoner. Sixth Monitors' Report at 16, ECF No. 152. As summed up by Mr. Martin, "It's been a frustrating exercise to get the facility officials to properly document their review of use of force incidents." Martin, Hr'g Tr. 69:24-25, 70:1, April 3, 2015.

Mr. Vail noted that even though Defendants are engaging in a review process, Defendants rarely identify performance problems. Vail February 2015 Report at 30, ECF No. 152-2. Concerning the dangerous takedown mentioned above, there was no criticism of the incident by supervisors. Vail February 2015 Report at 30-31, ECF No. 152-2. In other incidents, Defendants ignore basic custody practices such as removing cuffs through ports, having the prisoner kneel during cuff removal, opening the shower door to administer chemical spray rather than administering it through the port. Vail February 2015 Report at 31-32, ECF No. 152-2.

Even after such violent riots, Defendants were unable to assess their mistakes or disregarded the need to document such mistakes and steps to prevent such violence in the future. The After-Action Report for the New Year's Eve Riot left several questions unaddressed and was not a thorough document reviewing the incident. Vail, Hr'g Tr. 40:2-9, April 1, 2015; Vail March 2014 Report at 5, ECF No. 151-3. Mr. Vail lists pages of questions that remained open

following a review of the After-Action Report. Vail March 2014 Report at 5-7, ECF No. 151-3. Concerns include missing basic information such as where officers were stationed at different times during the riot, the rank of those officers who were present, and specific actions taken in preparation to enter the unit. Vail March 2014 Report at 5-6, ECF No. 151-3. Nor is there any follow-up document that shows whether any of the necessary changes identified in the report actually occurred. Vail, Hr'g Tr. 54:14-18.

After the July incident, no After Action Report was completed. Brown, Hr'g Tr. 227:24-25, 228:1, April 2, 2015. According to MTC's Regional Vice President Brown, they "did not see the same kind of issues that [they] saw after the December incident." Brown, Hr'g Tr. 228:11-12, April 2, 2015. However, Vice President Brown recognized that After Action Reports are important and help prevent a facility from making the same mistakes in the future. Brown, Hr'g Tr. 228:13-20, April 2, 2015.

Defendants' cavalier refusal to prepare an After-Action Report not only demonstrates their indifference to learning from past mistakes, but also violates their own written policies which require an After-Action Report. Vail, Hr'g Tr. 134:5-11, 124:23-25, 125:1-7, April 1, 2015; MTC Safety Committee Policy at 2, ECF No. 151-8. Defendants attempted to sidestep the breach of their own policy by citing an ongoing criminal investigation but an After-Action Report and a criminal investigation are not mutually exclusive. Vail, Hr'g Tr. 125:11-21, April 1, 2015. Without a written report documenting lessons learned and the changes to take place in the future, if Defendants encountered the same set of circumstances which triggered either riot, they would be no better prepared. Vail, Hr'g Tr. 126:19-24, April 1, 2015.

When incidents are recorded, Mr. Vail noted that in almost every recording "the camera wanders, is out of focus, stops and starts and does not stay on the actual activity taking place." Vail February 2015 Report at 32, ECF No. 152-2; Vail, Hr'g Tr. 178:21-24, April 1, 2015.

When conducting targeted cell searches, Defendants do not even ensure that prisoners are removed from their cells. Vail February 2015 Report at 32, ECF No. 152-2 (citing EOR WGCF-14-325).

Defendants' promises to improve their decontamination procedures, as recommended in the Monitors' Sixth Report, have proved to be hollow. Typically after using chemical spray security staff . . . place inmates in restraints and escort them on a long walk to the medical clinic, without first offering any opportunity to decontaminate." Vail February 2015 Report at 33, ECF No. 152-2. Prisoners are then weighed, their temperature and blood pressure are taken, and then they may be allowed access to an eye wash station. Vail February 2015 Report at 33, ECF No. 152-2. "In some cases there is no attempt to decontaminate the prisoner at all." Vail February 2015 Report at 34, ECF No. 152-2 (citing EOR WGCF-14-405; EOR WGCF-14-486l EOR WGCF-14-537; EOR WGCF-14-521).

Walnut Grove's decontamination policies do not comply with the manufacturer's material safety data sheet. Vail, Hr'g Tr. 176:16-25, 177:1-12, April 1, 2015; Material Safety Data Sheet at 2. Walnut Grove did update their written policy a few weeks before the hearing; however, Defendants did not utilize the policy in an incident on March 21, 2015, where it does not appear that decontamination was offered. Vail, Hr'g Tr. 177:15-20, April 1, 2015.

Officers are rarely properly fitted with respirators during planned uses of force. Vail February 2015 Report at 35, ECF No. 152-2. This creates a heightened risk for all involved as

the staff members react to the spray themselves.  Vail February 2015 Report at 36, ECF No. 152-2.

## IV.    PROPOSED REMEDIES TO ABATE SUBSTANTIAL RISK OF SERIOUS HARM TO PLAINTIFFS

Plaintiffs' expert, Eldon Vail, testified as to the need for particular remedies to address the significant risk of substantial harm from violence.  Mr. Vail addressed each substantive remedial measure in the Consent Decree relating to safety and protection from harm; he gave his opinion as to whether each remained necessary to reduce the risk of harm, and if so whether it needed to be modified to address current circumstances.

Neither Defendants' expert witness Tom Roth nor any of their other witnesses addressed the issue of remedy. Nor did Defendants offer any credible testimony proposing less intrusive or more narrowly tailored remedies. Indeed, when Plaintiffs sought to cross-examine Warden Jenkins on remedy, Defendants' counsel objected. Jenkins, Hr'g Tr. 169:24 – 171:13, April 23, 2015. The Court noted, "the State will argue about what are the least intrusive ways to remedy things through their expert witnesses I believe. . . . If they waive their right to talk about it, then they've waived their right."  Jenkins, Hr'g Tr. 175:23-25, 176:5-6, April 23, 2015.

There is ample evidence that the remedies Plaintiffs have proposed are necessary to correct a current and ongoing violation of Plaintiffs' Eighth Amendment right, and are the least intrusive and most narrowly tailored remedy to correct that violation.  The Court may of course decide on remedies other than those suggested by the parties: Equitable relief is flexible and is intended to be tailored to the circumstances.  *Stukenberg v. Perry*, 294 F.R.D. 7, 48 (S.D. Tex. 2013), citing *Lemon v. Kurtzman*, 411 U.S. 192, 199–201 (1973); *Hecht Co. v. Bowles,* 321 U.S. 321, 329–30 (1944).

The Court may consider Defendants' history of failure to address risks of serious harm, in deciding on appropriate remedies. *See Plata v. Schwarzenegger*, 603 F.3d 1088, 1097-98 (9th Cir. 2010) (affirming appointment and continuation of a receiver for prison medical care system where less drastic measures had failed); *Morales Feliciano v. Rullan*, 378 F.3d 42, 54-56 (1st Cir. 2004) (finding remedy of privatization of medical care appropriate in light of failure of less intrusive measures; "[d]rastic times call for drastic measures."), *cert. denied*, 543 U.S. 1054 (2005); *Clark v. California*, 739 F.Supp.2d 1168, 1233-35 (N.D.Cal. 2010) (granting further relief based on showing of ongoing violation and non-compliance with prior orders); *McBean v. City of New York*, 2007 WL 2947448, *3 (S.D.N.Y., Oct. 5, 2007) (approving detailed requirements for ensuring compliance with law regarding strip searches; noting violation of previously adopted policy and resistant "culture" within correction department); *Skinner v. Uphoff*, 234 F.Supp.2d 1208, 1218 (D.Wyo. 2002) (stating that a remedy for inmate-inmate violence must address the admitted "culture" impeding the effective supervision and discipline of staff; "systematic and prophylactic measures" may be ordered if necessary to correct the violations); *see Skinner v. Lampert*, 2006 WL 2333661, *9-12 (D.Wyo., Aug. 7, 2006) (discussing operation of remedy for "culture" found in *Skinner v. Uphoff*).

Plaintiffs first address the existing remedies relating to inmate safety and protection from harm set forth in Part III of the Consent Decree. Consent Decree at 3-12, ECF No. 151-1. Plaintiffs then discuss the proposed additional remedies.

### A. Substantive Remedial Measures in the Consent Decree

#### 1. Classification and Housing System (Consent Decree at 3, ECF No. 151-1)

The Consent Decree provides that "MDOC will utilize a classification system that ensures prisoners are appropriately and safely housed within Walnut Grove."

Mr. Vail testified that this provision remains necessary because it is fundamental to safety at the facility, and based on Defendants' recent struggle with these issues. Vail, Hr'g Tr. 194:18-24, April 1, 2015.

Defendants offered no rebuttal to Mr. Vail's testimony and no credible evidence that this provision does not meet the PLRA needs-narrowness-intrusiveness standard.

Based on the entire record in this case, the Court should find that this provision remains necessary to correct a current and ongoing violation of Plaintiffs' Eighth Amendment rights, and is the least intrusive and most narrowly tailored remedy to correct that violation.

### 2.     Protection from Harm (Consent Decree at 4, ECF No. 151-1)

The Consent Decree provides that "At all times, prisoners will be provided with reasonably safe living conditions and will be protected from violence and other physical or sexual abuse by staff and other prisoners."

Mr. Vail testified that this provision remains necessary. Vail, Hr'g Tr. 194:25-195:9, April 1, 2015.

Defendants offered no rebuttal to Mr. Vail's testimony and no credible evidence that this provision does not meet the PLRA needs-narrowness-intrusiveness standard.

Based on the entire record in this case, the Court should find that this provision is narrowly drawn, extends no further than necessary to correct the violation of Plaintiffs' Eighth Amendment right, and is the least intrusive means necessary to correct the violation.

### 3.     Sufficient Numbers of Adequately Trained Staff (Consent Decree at 4, ECF No. 151-1)

The Consent Decree provides that "MDOC will ensure that there are sufficient numbers of adequately trained direct care and supervisory staff, and sufficient numbers of professional

staff … to ensure that prisoners are adequately supervised and protected from harm . . . ." Consent Decree at 4, ECF No. 151-1.

Mr. Vail testified that this provision remains necessary, but that to address the current risk of harm, it must be modified to specify that (1) an adequate number of staff means a sufficient number to allow for the presence of an officer at all times in the housing zones; and (2) sufficient training requires an additional eight hours per year in academy training, and an additional eight hours per year in verbal de-escalation skills. Vail, Hr'g Tr. 195:10-196:4, April 1, 2015.

Defendants offered no rebuttal to Mr. Vail's testimony and no credible evidence that this provision does not meet the PLRA needs-narrowness-intrusiveness standard.

Based on the entire record, this provision should be modified to specify that (1) an adequate number of staff means a sufficient number to allow for the presence of an officer at all times in the housing zones; and (2) sufficient training requires an additional eight hours per year in academy training, and an additional eight hours per year in verbal de-escalation skills. The Court should find that, as so modified, this provision is narrowly drawn, extends no further than necessary to correct the violation of Plaintiffs' Eighth Amendment right, and is the least intrusive means necessary to correct the violation.

### 4. Mechanical, Physical, or Chemical Restraints as Punishment (Consent Decree at 4, ECF No. 151-1)

The Consent Decree provides that "Mechanical, physical, or chemical restraints . . . will not be used to punish prisoners. If any restraint is necessary, the force must be the minimum amount required to safely contain the prisoners, and the restraints must be removed as soon as they are no longer necessary. Except in emergency circumstances, no prisoner should be subject

to restraints until staff have first attempted verbal de-escalation techniques."  Consent Decree at 4, ECF No. 151-1.

Mr. Vail testified that these provisions remain necessary.  Vail, Hr'g Tr. 196:16-22, April 1, 2015.

Defendants offered no rebuttal to Mr. Vail's testimony and no credible evidence that this provision does not meet the PLRA needs-narrowness-intrusiveness standard.

Based on the entire record in this case, the Court should find that this provision remains necessary to correct a current and ongoing violation of Plaintiffs' Eighth Amendment right, and finds that it is narrowly drawn, extends no further than necessary to correct the violation, and is the least intrusive means necessary to correct the violation.

### 5.  Audio-Visual Recording of Use of Force (Consent Decree at 4-5, ECF No. 151-1)

The Consent Decree provides:

> Except in exigent circumstances where no delay is possible because of the risk of bodily injury or serious damage to property creating a threat to security or except when totally impracticable, use of force will be captured on an audio-visual recording.  MDOC will provide sufficient audio-visual recording equipment at [Walnut Grove] to ensure that use of force as specified above will be recorded. The summary use of force reports will be provided to Plaintiffs' counsel on a monthly basis, and copies of videotapes will be available for inspection by Plaintiffs' counsel.  If the use of force was not recorded, the use of force report must document why a recording was not made.

Consent Decree at 4-5, ECF No. 151-1.

Mr. Vail testified that this provision remains necessary but needs to be slightly modified to specifically require that copies of the videotapes be provided to Plaintiffs' counsel along with the monthly reports.  Vail, Hr'g Tr. 197:3-14, April 1, 2015.

Defendants offered no rebuttal to Mr. Vail's testimony and no credible evidence that this provision does not meet the PLRA needs-narrowness-intrusiveness standard.

Based on the entire record in this case, the Court should find that this provision, modified to require that the recordings be provided directly and promptly to Plaintiffs' counsel, remains necessary to correct a current and ongoing violation of Plaintiffs' Eighth Amendment right, and is the least intrusive and most narrowly tailored remedy to correct that violation.

**6.      Documentation of Physical Interventions (Consent Decree at 5, ECF No. 151-1)**

The Consent Decree provides,

> All physical interventions, including use of force and mechanical and chemical restraints, must be documented in writing. The written documentation will include a detailed description of the physical intervention and the verbal de-escalation attempts that occurred prior to the intervention. MDOC will use this documentation to review each physical intervention and to analyze patterns of use of force and restraint in an effort to reduce such incidents.

Consent Decree at 5, ECF No. 151-1.

Mr. Vail testified that these provisions remain necessary. Vail, Hr'g Tr. 197:15-17, April 1, 2015.

Defendants offered no rebuttal to Mr. Vail's testimony and no credible evidence that this provision does not meet the PLRA needs-narrowness-intrusiveness standard.

Based on the entire record in this case, the Court should find that this provision remains necessary to correct a current and ongoing violation of Plaintiffs' Eighth Amendment right, and is the least intrusive and most narrowly tailored remedy to correct that violation,

**7.      Review of Use of Force (Consent Decree at 5, ECF No. 151-1)**

The Decree provides, "All physical including use of force and mechanical and chemical restraints, must be documented in writing." Consent Decree at 5, ECF No. 151-1.

Mr. Vail testified that these provisions remain necessary but need to be expanded and made more explicit to require review of four elements for each use of force: whether the force

was necessary; whether the use of force was commensurate with the need; an evaluation of the threat; and efforts to diminish use of force. Vail, Hr'g Tr. 197:18- 198:8, April 1, 2015.

Defendants offered no rebuttal to Mr. Vail's testimony and no credible evidence that this provision does not meet the PLRA needs-narrowness-intrusiveness standard.

Based on the entire record in this case, the Court should find that this provision as modified remains necessary to correct a current and ongoing violation of Plaintiffs' Eighth Amendment rights, and is the least intrusive and most narrowly tailored remedy to correct that violation.

> **8.** **Decontamination from Chemicals (Consent Decree at 6, ECF No. 151-1)**

The Consent Decree provides,

> All prisoners who have been exposed to chemical restraints will be immediately removed from the contaminated area, will promptly be permitted to shower, and will be examined by medical staff to see if transport to the clinic is needed. Any contaminated living area will be decontaminated before a prisoner is returned to it. If emergency circumstances create an imminent threat to security and prevent staff from immediately removing prisoners from contaminated areas, MDOC will promptly provide prisoners who have been exposed to the chemical agents with an adequate supply of appropriate decontaminating agents.

Consent Decree at 6, ECF No. 151-1.

Mr. Vail testified that these provisions remain necessary. Vail, Hr'g Tr. 48:1-13, April 27, 2015.

Defendants offered no rebuttal to Mr. Vail's testimony and no credible evidence that this provision does not meet the PLRA needs-narrowness-intrusiveness standard.

Based on the entire record in this case, the Court should find that this provision remains necessary to correct a current and ongoing violation of Plaintiffs' Eighth Amendment right, and is the least intrusive and most narrowly tailored remedy to correct that violation.

9.        **Long-Term Cell Confinement (Consent Decree at 7-8, ECF No. 151-1)**

Plaintiffs do not contend that the Consent Decree provisions regarding long-term segregation are necessary to remedy a current and ongoing violation of federal right. Consent Decree at 7-8, ECF No. 151-1.

10.        **Programming and Behavior Management**

**RID** (Consent Decree at 8, ECF No. 151-1): Plaintiffs do not contend that the Consent Decree provision involving the Regimented Inmate Discipline Program remains necessary to remedy a current and ongoing violation of right.

**Out-of-cell hours** (Consent Decree at 8, ECF No 151-1): Plaintiffs do not contend that the Consent Decree provision that "the norm will be that prisoners will be allowed out of their cells most of the hours of the day" is necessary to remedy a current and ongoing violation of federal right.

**Positive incentives** (Consent Decree at 8, ECF No. 151-1): The Consent Decree provides that "MDOC will develop a behavior management policy that incorporates graduated sanctions for rule violations, and positive incentives for good behavior." Consent Decree at 8, ECF No. 151-1. Mr. Vail testified that these provisions remain necessary to the extent that they require more programs. Vail, Hr'g Tr. 48:23-49, April 27, 2015. Based on the entire record in this case, the Court should find that this provision, to the extent that it requires more programs, remains necessary to correct a current and ongoing violation of federal right; however, Plaintiffs propose that the Court incorporate the programming issue in a new, narrowly tailored provision, discussed *infra*.

**11.     Disciplinary Due Process and Grievances (Consent Decree at 9, ECF No. 151-1)**

Plaintiffs do not contend that these particular Consent Decree provisions regarding disciplinary due process and grievances are necessary to remedy a current and ongoing violation of federal right.

**12.     Contract Monitoring (Consent Decree at 12, ECF No. 151-1)**

The Consent Decree provides that "MDOC will develop comprehensive contract monitoring policies and procedures and will monitor the contracts with the operator of [Walnut Grove] . . . in compliance with these policies and procedures." Consent Decree at 12, ECF No. 151-1.

Mr. Vail testified that this provision remains necessary and that it needs more structure: MDOC's audit or monitoring activities need to be documented, problems identified and communicated in writing to MTC; MTC should respond in writing as to its corrective action, to create a reviewable record of MDOC's monitoring activity and MTC's compliance with that direction. Vail, Hr'g Tr. 49:19-50:3, April 27, 2015. The documentation should be quarterly, and should cover every substantive area in the new decree. Vail, Hr'g Tr. 50:4-11, April 27, 2015.

Defendants offered no rebuttal to Mr. Vail's testimony and no credible evidence that this provision does not meet the PLRA needs-narrowness-intrusiveness standard.

Based on the entire record in this case, the Court should find that this provision, modified to require that MDOC's audits be documented, quarterly; problems identified and communicated in writing to MDOC's contractor; and that the contractor respond in writing as to its corrective action, to create a reviewable record of MDOC's monitoring activity and MTC's compliance with that direction, is necessary to correct a current and ongoing violation of Plaintiffs' Eighth

Amendment right and is the least intrusive and most narrowly tailored remedy to correct that violation.

**B.    New Substantive Remedial Measures**

In addition to certain of the remedies contained in the Consent Decree, set forth above, Mr. Vail testified that the following additional remedies were necessary:

1.    Defendants must monitor their contractor's performance for two years before permitting long-term segregation or close custody inmates to be housed at Walnut Grove, and before increasing the current population cap. Vail Hr'g Tr. 50:22-51:5, April 27, 2015.

2.    Defendants must maintain a functional, tested Emergency Response Plan for Walnut Grove, and staff must be made familiar with that plan.

3.    Defendants must develop a comprehensive gang management strategy that includes not only suppression of gang activity but also incentives that reward non-gang behavior.

4.    Defendants must retain an independent, qualified security hardware expert to determine why the cell doors are not secure and to report to the parties on remedial options.

5.    Copies of all complaints of sexual abuse or sexual harassment, and all follow-up documentation, must be forwarded to plaintiffs' counsel.

The necessity for each of these proposed remedies is abundantly supported by the record and each is necessary to correct a current and ongoing violation of Plaintiffs' Eighth Amendment right and is the least intrusive and most narrowly tailored remedy to correct that violation.

# V. THE COURT SHOULD FIND THAT DEFENDANTS VIOLATED THE TERMINATION PROVISION OF THE CONSENT DECREE

The final provision in the Consent Decree, Section IV(8), governs termination of the Decree. It provides:

> (8) This Consent Decree will terminate five years from the date it is filed with the Court. The Consent Decree may also terminate earlier than five years from the date it is filed with the Court if the Court determines that MDOC substantially complied with each of the provisions of the Consent Decree and has continuously maintained substantial compliance for at least two years. Noncompliance with mere technicalities, or a brief lapse in compliance during a period of otherwise sustained compliance, will not constitute failure to maintain substantial compliance. The Court may extend this Consent Decree and/or any of its provisions twice, and each extension may be no longer than one year upon a finding that MDOC failed to substantially comply.

Consent Decree at 15, ECF No. 151-1.

Plaintiffs contend that Defendants' March 2015 motion to terminate the Consent Decree constituted an unjustified repudiation and violation of this provision. Defendants insist that the language of the Decree permitted them to move for termination at any time after the passage of two years – and furthermore, that whatever the termination provision may mean, the PLRA not only permitted but even required them to move for termination.

No matter what the reach of the PLRA may be,[3] no federal court has ever gone so far to hold that the PLRA entitles state defendants to repudiate their own solemn, freely negotiated

---

[3] Congress passed the PLRA as a court-stripping measure: its purpose was "to oust the federal judiciary from day-to-day prison management," *Inmates of Suffolk Cnty. Jail v. Rouse*, 129 F.3d 649, 655, and to "protect[] states from overzealous supervision by the federal courts in the area of prison conditions litigation." *Plyler v. Moore*, 100 F.3d 365, 374 (4th Cir. 1996). The courts have upheld the statute in the face of numerous constitutional challenges. *See, e.g.*, *Miller v. French*, 530 U.S. 327, 348 (2000) (rejecting separations of powers challenge to automatic stay provision); *Polanco v. Hopkins*, 510 F.3d 152, 156 (2d Cir. 2007) (rejecting a Fifth Amendment challenge to the PLRA's three strikes provision); *Gavin v. Branstad*, 122 F.3d 1081, 1084 (8th Cir. 1997) (rejecting challenge to immediate termination provision under separation of powers, equal protection, and due process arguments); *Benjamin v. Jacobson*, 172 F.3d 144, 163 (2d Cir. 1999) (en banc) (rejecting challenge to the termination provision under the finality principle of separation of powers).

agreement, duly approved by a federal court, and adopted by a court as its own order, after an evidentiary hearing and formal findings that the agreement was fair, reasonable, and adequate to protect the interests of the Plaintiff class.  If there is no case law on the subject, it may be because no other litigants have had the temerity to conduct themselves as Defendants have done.

This dispute may prove to be hypothetical.  By moving not only to enforce but to modify the Consent Decree, Plaintiffs subjected themselves to the identical burden of proof as is applicable to motions to terminate:  proof of a current and ongoing violation of a federal right. *See* 18 U.S .C. 3626(b)(3); *see also, e.g.*, *Lancaster v. Tilton*, No. C 79-01630 WHA, 2006 WL 2850015, at *12 (N.D. Cal. Oct. 4, 2006) ("The PLRA bars the modification unless it is shown that the modification is needed to meet a 'current and ongoing violation' of the prisoners' constitutional rights").  Whether or not Defendants' motion to terminate was proper, if Plaintiffs have proved a current and ongoing violation of Plaintiffs' federal right, the Court must find in Plaintiffs' favor on both Plaintiffs' motion to modify prospective relief, and Defendants' motion to terminate relief.  In that case, the propriety of Defendant's repudiation of their agreement, which was embodied and solemnized in the Consent Decree, will be moot.

A consent decree has the attributes both of a contract and of a court order.  *Firefighters v. Cleveland*, 478 U.S. 501, 519 (1986).  It is a negotiated, voluntary agreement of the parties, and like any negotiated document, it must be interpreted first by a review of its terms.  But since it is approved, adopted, monitored, and enforced by the judiciary, it is an especially solemn obligation, particularly in an institutional reform case like this one; the court may approve it only after a fairness hearing and on finding that it is fair, reasonable, and adequate.  Fed. R. Civ. P. 23(e).

Defendants argue that the termination provision of the Decree did not limit their right to move to terminate under the PLRA but merely provided Defendants with "additional avenues" to termination. ECF No. 136 at 4. That argument cannot withstand the plain language of the decree's termination provisions. The parties agreed to a sunset provision that favors Defendants ("This Consent Decree will terminate five years from the date it is filed with the Court"). ECF No. 151-2 at 15. Absent this provision, Plaintiffs would have been able to prevent the termination of prospective relief for as long as they could prove a current and ongoing violation of federal right even if that period lasted longer than five years or seven years or even ten years. In other words, the parties agreed to a finite termination date that will occur no matter what, and that favors the Defendants. But the very next clause favors Plaintiffs: it provides that Defendants cannot achieve termination of prospective relief until the Court finds they have maintained substantial compliance with *each* of the substantive provisions of the decree *continuously* for two years – limitations on termination that do not appear in the PLRA. ECF No. 151-2 at 15. If the Consent Decree's termination provision were read to do no more than give Defendants "an additional avenue to termination," it would render utterly meaningless and futile the clause that gives Plaintiffs the right to resist termination until the Court finds they have maintained substantial compliance with *each* of the substantive provisions of the decree *continuously* for two years.[4] ECF No. 136 at 4.

---

[4] Consent decrees are construed according to general principles of contract interpretation. *Frew v. Janek*, 780 F.3d 320, 327 (5th Cir. 2015). An interpretation which gives effect to all provisions of the contract is preferred to one which renders part of the writing superfluous, useless or inexplicable." 11 Williston on Contracts § 32:5 (4th ed.) *See also Facilities, Inc. v. Rogers-Usry Chevrolet Inc.*, 908 So. 2d 107, 111 (Miss. 2005) ("When construing a contract, we will read the contract as a *whole,* so as to give effect to all of its clauses") (emphasis in original); *In re Estate of Fitzner*, 881 So. 2d 164, 169 (Miss. 2003) (same); *Diogenes Editions, Inc. v. State By & Through Bd. of Trustees of Institutions of Higher Learning*, 700 So. 2d 316, 320 (Miss. 1997) (same); *Warwick v. Gautier Util. Dist.*, 738 So. 2d 212, 215 (Miss. 1999) (same).

Defendants suggest that even if they had attempted to waive the PLRA's termination provision they cannot be bound by such a waiver because the provision is mandatory ("When the reason for the grant of the relief (a 'violation of [a] federal right') no longer exists, the PLRA mandates that the relief not continue," ECF No. 136 at 5; "the termination provisions require that relief convert from 'terminable' to terminated when there is no current and ongoing federal violation," ECF No. at 11.). This reading of the statute is incorrect. The statute provides that prospective relief is "terminable upon the motion of any party." 18 U.S.C.A. § 3626(b)(1)(A). It does not require defendants to move for termination; it permits them to do under certain circumstances. Nor does the PLRA ever require a court to terminate prospective relief in the absence of a motion to terminate. Defendants may choose to exercise their option under the statute to move for termination after the passage of two years; or they may choose to operate under a consent decree indefinitely without ever moving to terminate. "Subsection (b)(1)(A) says that 'relief shall be terminable' on a party's motion, but 'shall be terminable' does not mean 'the district court must terminate.' Subsections (b) and (e) must be read together; each provides context for the other. What subsection (b)(1) does is identify a class of cases that are *eligible* for termination." *Berwanger v. Cottey*, 178 F.3d 834, 838 (7th Cir. 1999) (emphasis in original).[5]

Defendants argue that there is a tension between the Decree's termination provision and the provision that "[n]othing in the Decree alters the requirements of the Prison Litigation Reform Act." ECF No. 151-2 at 6. No such tension exists. The termination provision of the

---

[5] The only authorities Defendants cite for their novel interpretation of 3626(b) are *Ruiz v. United States*, 243 F.3d 941 (5th Cir. 2001) and *Hadix v. Caruzo*, 420 F. App'x 480 (6th Cir. 2011). Neither case provides any support for their argument. In *Ruiz*, defendants moved to terminate under the PLRA and the district judge found the statute unconstitutional. 243 F.3d at 943. The Fifth Circuit reversed, finding the statute constitutional. *Id.* *Ruiz* cannot possibly stand for the proposition that termination is mandatory given that the defendant in that case had the unquestioned right to move to terminate, and then exercised that right. *Hadix v. Caruso* is inapt for the same reason.

PLRA does not require the courts to terminate prospective relief if no party moves for termination; the relief is merely terminable, should a party move to terminate. Defendants may choose to operate under a consent decree indefinitely without ever moving to terminate. Here, they chose to operate under the Consent Decree for five years (or less, if they could show continuous compliance for two years with each of the Decree's substantive provisions), and they made a solemn commitment to the Court to do so.

Given that the Defendants may choose to operate under a consent decree without moving to terminate, it follows that Defendants may agree in advance to a different termination period with different termination conditions than what is contained in the PLRA. That is what happened here as part of the give and take of the negotiations that led to this Consent Decree that was adopted by the Court.

The Court should therefore make a finding for the record that Defendants have violated their own agreement and the termination provision of the Decree. Even if the issue proves to be moot because the Court finds that Defendants have violated the Eighth Amendment, such a finding is nevertheless warranted in case it should become relevant in the future course of this litigation. Such a finding is also warranted in order to alert other litigants of the Department's conduct in repudiating its own agreement, which was approved, adopted, and solemnized by a federal court as a consent decree.

## VI.   CONCLUSION

Plaintiffs respectfully submit that based on the entire record of this case, the Court should find that Defendants have been and are currently violating Plaintiffs' Eighth Amendment rights, by subjecting them to an ongoing substantial risk of serious harm from violence; the Court should deny Defendants' motion to terminate.

The Court should also find that Defendants have been and are in violation of core provisions of the Consent Decree relating to safety and protection from violence, and should grant Plaintiffs' motion to modify the Decree.

The Court should enter an order granting new relief, suitably tailored to address the current and ongoing violations of Plaintiffs' rights, based on the record.

Finally, the Court should find that Defendants' Motion to Terminate the Consent Decree was brought in violation of their own contractual agreement, and in derogation of the provisions of the Consent Decree they asked this Court to approve, adopt, and enforce as the Court's own Decree.

Dated this 8th day of May, 2015.

Respectfully submitted,

/s/Margaret Winter
Margaret Winter
National Prison Project of ACLU
915 15th Street, NW, 7th Floor
Washington, DC 20005
Phone: (202) 393-4930
Fax: (202) 393-4931
mwinter@npp-aclu.org

(admitted *pro hac vice*)

/s/Jody E. Owens, II
Jody E. Owens, II, MSB No. 102333
Jennie Eichelberger, MSB No. 102522
Southern Poverty Law Center
111 East Capitol Street, Suite 280
Jackson, Mississippi 39201
Phone: (601) 948-8882
Fax: (601) 948-8885
jody.owens@splcenter.org
jennie.eichelberger@splcenter.org

Robert B. McDuff
Jacob W. Howard
McDuff & Byrd
767 N. Congress Street
Jackson, Mississippi 39202
Phone: (601) 969-0802
Fax: (601) 969-0804
rbm@mcdufflaw.com
jake@mcdufflaw.com

## CERTIFICATE OF SERVICE

I, Jody E. Owens, hereby certify that a true and correct copy of the foregoing document was filed electronically. Notice of this filing will be sent by electronic mail to all parties by the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

SO CERTIFIED, this the 8th day of May, 2015.

/s/Jody E.  Owens, II
Jody E. Owens, II, MSB No. 102333