**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

**CHARLTON DEPRIEST, ET AL.**                                    **PLAINTIFFS**

**v.**                                    **Civil Action No. 3:10-cv-663-CWR-FKB**

**WALNUT GROVE CORRECTIONAL**
**AUTHORITY, ET AL.**                                    **DEFENDANTS**

## <u>ORDER</u>

Before the Court are Plaintiffs' Motion for Enforcement and Modification of Consent Decree and Defendant's Motion to Terminate Prospective Relief Granted and Ordered by the Court's Approval of the Consent Decree. Dkt Nos. 106, 129. Following an evidentiary hearing over six days, April 1, 2, 3, 23, 24 and 27, 2015, the Court received the parties' proposed findings of facts and conclusions of law in support of their respective positions. Dkt Nos. 161 and 165. After careful consideration of the submissions of the parties, the testimony of the witnesses, the arguments of counsel presented at hearing, and the applicable law, the Court finds that Plaintiffs' motion is granted in part and denied in part, and the Defendant's motion is denied.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The lawsuit in this case was filed on November 16, 2010, but the genesis of it began quite some time earlier. At the heart of the class action complaint was Plaintiffs' contention that Defendant Walnut Grove Correctional Facility, which housed youth offenders between the ages of 13 and 22, who had been convicted in Mississippi's adult criminal justice system, were being subjected to violations of the Eighth Amendment. *See* Compl., Docket No. 1. Settlement negotiations began even before the lawsuit was filed. Dkt No. 75. After reaching several

agreements, the parties filed for Preliminary Approval of the Proposed Agreement, requested a fairness hearing and sought other relief.

The Court conducted a fairness hearing on March 22, 2012, "and allowed the parties to provide testimony and to submit evidence and argument in support of their [joint] request for entry of the proposed consent decrees." *Id*. at 3-4. In support of their request for approval of the settlement, the parties informed the Court that they had negotiated over a nine-month period with the assistance of the magistrate judge and their experts, who "were very much involved in creating the settlement documents." *See* Transcript of Mot. Hrg. at 5. The Court also heard from class members, who testified about extreme violence - inmate on inmate assaults as well as staff on inmate violence, which constituted excessive force and violations of the Eighth Amendment. *Id*. at 13, 16, 17 and 20. There was also testimony about contraband at the facility, the lack of sufficient staffing, and a February 27, 2010 riot. *Id*. at 23, 24 and 35. Counsel for the State explained:

> The consent decrees and the memoranda of agreement are the product of [sic] since this lawsuit was [filed] back in 2010, late 2010, the parties have spent obviously months and months and months negotiating the provisions, studying the provisions, and ensuring that the provisions are tailored to remedy what has been determined to be the constitutional violations or the constitutional claims under the Eighth Amendment and other constitutional claims that plaintiff[s] alleged in their complaint.
>
> There's been experts from both sides involved, including the commissioner [sic] had a nationally recognized panel of experts come in and give him an independent report about the conditions at Walnut Grove that was - - when completed shared with counsel for the other side.
>
> And as the court is aware from being provided the proposed consent decrees, the experts - - an expert from plaintiff[s'] side and an expert from the defendant's side will be participating in developing protocols and monitoring the facility once - - and if the consent decrees are put in place.

********

An important feature about the consent decrees and the agreements is that it - - of course, MDOC is responsible, but - - it also makes MDOC's contractors responsible, and it's expressly stated in that agreement. So it gives MDOC the responsibility to ensure that the detailed changes and provisions in the decree are made. And that's an important feature of this because we are dealing with a privately run facility.

*Id*. at 54-55. The following colloquy also occurred:

The Court:    With respect to the question that I asked [counsel for the plaintiffs'], they have been involved in this matter, according to her, since about 2006.  The lawsuit was filed in 2010.  We have evidence today that something happened two days ago.  I realize the parties negotiated the agreement and it was give and take in it, and I realize the agreement as worded now expires after five years.  Does the agreement itself at the end of the five-year term allow for the court to determine whether or not it should remain beyond the five-year period after the five-year term?

Will the monitoring that the court will do, will it authorize the court to say . . . the court is not allowing the consent decree to expire at this time because there is evidence - -  assuming that there would be evidence - -  at the end of the day that the agreement should not be terminated.

[Counsel for State]:    Your Honor, that particular provision, of course - - I mean, the way that it has been negotiated, drafted, it speaks for itself.  My understanding of it is that the - - it is a five-year termination, but it can be extended before that five years even expires based upon meeting certain criteria that's in the provision.

So for example, if two years from now things aren't going the way that the court expects and that the monitoring and stuff reveals it, then I think that you have to look at the provision, and there is a way that the decree would last more than five years.

Another important thing - - and [counsel for the Plaintiffs] mentioned this.  But the parties have had to be very careful in ensuring that the remedies crafted in this agreement are consistent with what Congress has said in the PLRA, and the way that that provision and the other provisions in the agreement are set up with regard to how you show compliance, how the agreement ends, we believe that comports with the PLRA in that regard, Your Honor.

*Id*. at 57-59.

There is more:

[Counsel for Plaintiffs]:  Just a few points, Your Honor. . . .  On your question about termination, I just wanted to clarify that that provision states that the court has the authority to extend the consent decree twice for a period of no longer than a year. So the consent decree could conceivably be in place for seven years before it is terminated. . . . [i]f they are not in compliance and based on the terms of this agreement as currently drafted. . . .

*Id*. at 62-63.

**** ****

[The Court]:   . . . the court is going to take the request under advisement. . . . So the court realizes that a ruling needs to be made expeditiously, but one thing stands out in my mind, however.  And the court preliminarily is likely going to enter the decree because I believe that the state has committed to - - through the last two years of trying to work out this agreement.

But what's troubling about some of the testimony that I heard today, even though this lawsuit is pending, you still have staffing issues, and you don't need a court order to provide more than what an agreement - - the perfected agreement requires.  You don't need a court order.  You don't need a court order to give somebody more rights than what they might be entitled to.

The fact  [that you had] an incident that occurred two days ago, I wonder if we had had this hearing on Monday would that incident still have occurred on Tuesday. . . . Again too when the parties leave this courtroom today, it sounds as if the place is still going to be understaffed and that they are not going to do anything until this order is in place.

I can assure you of this.  If the court signs on to this agreement, this court will monitor.  This court will be involved in it.  And this court will want to know what is happening.  And this court will want to make sure that the rights of the, whatever you want to call them, offenders, inmates, students, children, grown folk, whatever you want to call them, that they have rights irrespective of the reason why they may be there.  And we have and the state has an obligation to make sure that they are protected and treated in a humane way based on - - and I think I can rely on the DOJ report because it has been submitted to the court as part of these proceedings.  Based on that, the state, as the Department of Justice has said, has been egregious, has been brazen, has been all of those things against these offenders and the state has not lived up to its obligation in protecting these individuals.

*Id*. at 64-65.

4

The parties presented to the Court the well-crafted Consent Decree, which states that "[i]n order to resolve the allegations in the Complaint related to the protection from harm and violence, excessive use of force, punitive isolation and inadequate medical care . . . the parties have entered into this Consent Decree." Dkt No. 75-3, at 1. "This Consent Decree refers to actions and inactions that will be undertaken by Commissioner Epps, his staff and contractors under his direction." *Id.* at 2.[1] The purpose of this Consent Decree, it continues, "is to protect certain constitutional and federal statutory rights to individuals who are now or in the future will be imprisoned at WGYCF." *Id.* at 3. The agreement allows for the appointment of James Austin and Steve Martin to serve as monitors who are "responsible for tracking compliance with the terms of this Consent Decree." *Id.* at 12. Furthermore, the parties agreed that the terms of the Consent Decree "are narrowly drawn . . . extend no further than necessary to correct the violations of federal rights at issue, [and] are the least intrusive means necessary to correct the violations of federal rights at issue. . . ." *Id.* at 14.

When there are disagreements about whether the defendants are in substantial compliance with any obligation under the Consent Decree, its terms are not silent. Most notably, under the agreement, litigation was meant to be the last option. The parties first had to engage in good faith discussion to resolve the dispute. If that did not resolve the issue, they would "submit the dispute to the magistrate judge who is assigned this case." *Id.* at 14.

After the fairness hearing, the Court made its findings and approved the settlement agreement. En route to its approval, the Court noted the testimony it received at the fairness

---

[1] The Court notes the Defendant is Marshall Fisher, who is now Mississippi's Commissioner of the Department of Corrections ("MDOC"). Also, MDOC is now contracting the operation of Walnut Grove to Management Training Corporation ("MTC"). This company took over the facility after the Consent Decree was entered. The Court will refer to them collectively as "Defendant."

hearing, the arguments of counsel and the other evidence, including all pleadings which had been filed up to that date, and a report issued by the Department of Justice. That review and consideration left "the Court with the firm and unshakeable conviction that the Consent Decrees[2] must be entered WITHOUT DELAY." *See* Dkt No. 75, at 4 (emphasis in original). The settlement agreement, the Court noted, "'secures an adequate advantage for the class in return for the surrender of litigation rights against the defendants.'" *Id.*, at 6 (citations omitted). The Court also commented that the "State's cooperation in crafting the agreement assures that the State limits its exposure and the significant expenses that would be incurred with prolonged litigation." *Id.*, at 7.

Upon entry of the Order Approving Settlement, the parties began implementing its provisions and the Monitors began their work. Between the submission of the Third and Fourth Status Reports, a riot occurred at the facility. *See* Dkt Nos. 97, 100 and 101. The monitors described it as a "serious disturbance." Dkt No. 101 at 3. However, it was the more extreme riot which occurred on July 10, 2014, that prompted the Plaintiffs to file their Motion for Enforcement and Modification of Consent Decree. Dkt No. 106.[3] In that motion, the Plaintiffs requested an evidentiary hearing in order to take testimony on whether additional remedial measures are required to provide reasonably safe living conditions and freedom from violence for the inmates at Walnut Grove. *Id.* Plaintiffs argued that if the Court determines additional

---

[2] In addition to the Consent Decree, which is the subject of these motions, the Court entered other consent decrees, which are not in  issue.

[3] The riot was captured on video cameras throughout four housing zones and a recording was placed in evidence. *See*, Pl. Ex. 9- DVD of July 10, 2014 Riot; *see also* Vail, Hr'g Tr. 82-96 and Vail August 2014 Report, Docket No. 151-6. The events captured can best be described as shocking. The staff lost complete control of the zones for a significant period of time.  Inmates were brutally assaulted repeatedly with hands, feet, and objects including sticks, trays and a microwave. Some of the attackers stood over their victims and urinated on them. *See, e.g.*, Monitor Report Dkt. No. 151-7, at 7-8.

measures are needed, it should modify the decree "to provide for whatever narrowly and suitably tailored relief is necessary to achieve that goal." *Id.*, at 1-2.

Primarily, at the urging of the Defendant (who chastised the Plaintiffs for instituting this action before meeting its mediation obligations and their demand for discovery), no hearing was immediately set. The Court allowed for the parties to pursue their mediation obligations between themselves and through the magistrate judge. The Court also set a discovery deadline and set the hearing on the Plaintiffs' motion to begin on April 1, 2015. In the interim, the Defendant, on March 13, 2015, filed its Motion to Terminate Prospective Relief Granted and Ordered by the Court's Approval of the Consent Decree. Docket No. 129. The hearing on both motions was held over the course of six days, April 1 – 3 and April 23, 24 and 27.

Before delving into the testimony and other evidence, however, the Court must speak about the importance and legal effect of the Consent Decree.

## II. CONSENT DECREE

The United States Supreme Court has explained that "[a] consent decree embodies an agreement of the parties and is also an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgment and decrees. *Frew ex rel Frew v. Hawkins*, 540 U.S. 431 (2004) (internal quotation and citation marks omitted). "A consent decree," the Fifth Circuit notes, "is akin to a contract yet also functions as an enforceable judicial order." *U.S. v. Chromalloy American Corp.*, 158 F.3d 345, 349 (5th Cir. 1990). "General principles of contract interpretation govern the interpretation of a consent decree . . . [which] is to be construed only by reference to the 'four corners' of the order itself." *Id.* at 349-50 (citations omitted).

As mentioned above, the parties negotiated at length the terms of the Consent Decree. They negotiated the remedial steps to be taken by MDOC. Every term was submitted to the scrutiny of counsel opposite, and the parties presented the document to this Court for its blessing. Before the Court gave its seal of approval, it held a fairness hearing to determine whether the decree was fair, reasonable and adequate.

During the hearing, the Court questioned counsel and heard their arguments on why the Court should adopt the Consent Decree. The hearing evinced to the Court that the inmates at the facility were "at risk every minute, every hour, every day." Dkt No. 75 at 4. In its Order Approving Settlement, the Court explained:

> Without Court intervention, [the inmates] will continue to suffer unconstitutional harms, some of which are due to aberrant and criminal behavior. Nothing has curtailed actions of the staff and indifference of management official to constant violations, even though the parties and their experts have been monitoring, investigating and conducting on-site visits constantly since before the lawsuit was filed and during the pendency of this action. Moreover, the fact that the DOJ dared to begin its investigation in October 2010 has not caused the defendants to transform the facility into one that complies with the United States Constitution. But even more astounding is that fact that the notice of the fairness hearing itself did not cause the defendants to change course. . . . [Walnut Grove] has allowed a cesspool of unconstitutional and inhuman acts and conditions to germinate, the sum of which places the offenders at substantial ongoing risk.

*Id.* at 4-5. Finally, the Order Approving Settlement closed with this thought:

> The Court appreciates the fact that the terms of the settlement agreement and consent decrees were reached after months of exhaustive investigation and non-collusive negotiation, both of which began even before the lawsuit was filed. The results reached fall within the range of possible relief, and there are no obvious deficiencies in the terms that have been proposed. In fact, the Consent Decrees address and seek to rectify the issues raised in the Complaint, the matters uncovered during discovery, the testimony received at the fairness hearing and the matters addressed by counsel in their arguments requesting approval.

*Id.*

With respect to the negotiation of the parties and the specific terms of the Consent Decree, the Court finds instructive the termination provision of the Consent Decree, which is found at Section IV(8):

> The Consent Decree will terminate five years from the date it is filed with the Court.  The Consent Decree may also terminate earlier than five years from the date it is filed with the Court if the Court determines that MDOC substantially complied with each of the provisions of the Consent Decree and has continuously maintained substantial compliance for at least two years. Noncompliance with mere technicalities, or a brief relapse in compliance during a period of otherwise sustained compliance, will not constitute failure to maintain substantial compliance. The Court may extend this Consent Decree and/or any of its provisions twice, and each extension may be no longer than one year upon a finding that MDOC failed to substantially comply.

*Id*. 151-1.

The parties disagree about whether this language of the Consent Decree authorizes the Defendants to move for termination at any time after the passage of two years. Defendants argue that it does and that they were in fact *required* to move for termination. The Court agrees with the Plaintiffs, however. As argued by the Plaintiffs, there is a sunset provision which favors the Defendants: the Consent Decree terminates in five years. Dkt No. 163, at 95 (citing Dkt No. 151-2 at 15). On the other hand, the next clause of Paragraph IV(8) circumscribes when defendants can achieve termination of prospective relief:  only after they have maintained substantial compliance with each of the substantive provisions of the decree continuously for two years, a limitation which is not in the PLRA. *Id*.

The parties freely negotiated this language, and they are bound by it. Nothing about the PLRA prohibits parties from agreeing to termination conditions different than those contained in the PLRA.  Moreover, it has been done in other jurisdictions. *See, e.g., Cody v. Hillard*, 88 F.Supp.2d 1049, 1058-59 (D.S.D. 2000) (the consent decree established procedure for continued

9

monitoring and avoided the limited duration of having a modification subject to termination in a
year);  Stipulated Settlement Agreement  Between Plaintiffs and Defendants at 7, *McLendon v.
City of Albuquerque*, No. 6:95-cv-24 (D.N.M. June 30, 2005) ("The Defendant will not file any
motion in the future asserting that this Stipulated Settlement should be terminated under the
Prison Litigation Reform Act."); Settlement Agreement at 5, *Duffy v. Riveland*, No. 2:92-cv-
01596 (W.D. Wash. June 4, 1998), available at

http://chadmin.clearinghouse.net/chDocs/public/PC-WA-0003-0004.pdf ("In order to give the
provisions contained herein an opportunity to be implemented and evaluated, both parties agree
not to challenge this agreement for a period of four years."); Consent Order at 2, *Duvall v.
Glendening*, No. 1:76-cv-01255 (D. Md. Aug. 22, 2002) available at

http://chadmin.clearinghouse.net/chDocs/public/PC-MD-0006-0003.pdf ("Defendants have
agreed that they will neither challenge nor otherwise seek to modify the terms of this Order,
without Plaintiffs' consent, for a period of 14 months from date of entry."). Conditioning
termination of decree on compliance is also not rare. *See e.g.*, Consent Injunction at ¶ 56, *Prison
Legal News v. Berkeley County Sheriff*, No. 2:10-cv-02594 (D.S.C. Jan. 13, 2012), at Dkt No.
201 ("Defendants shall not provide such notice or file such motion until they have achieved a
minimum of one year of substantial compliance with the provisions of the Consent Injunction . . .
'Substantial Compliance' shall mean that defendants have achieved compliance with most or all
of the components of the relevant provision of the Consent Injunction for a period of one year.").

    Defendant's attempt to repudiate the Consent Decree that it jointly drafted and negotiated
with the Plaintiffs is rejected.

### III. LEGAL STANDARD

    A defendant seeking termination, must initially establish the requisite passage of time. 18
U.S.C. § 3626(b)(1)(iii) (relief terminable upon motion of any party, but "in the case of an order

issued . . . before the date of enactment of the [PLRA], 2 years after such date of enactment").
*Guajardo v. Texas Dep't of Crim. Justice*, 363 F.3d 392, 395 (5th Cir. 2004). The burden of
proof then shifts to the prisoners to demonstrate ongoing violations and that the relief is narrowly
drawn. 18 U.S.C. § 3626(b)(3). *Id*. Section 3626(b)(3) places a limitation on the termination of
prospective relief under a consent decree if the court makes the requisite written findings based
on the record; but the burden of proof to support these findings is obviously on the party
opposing termination. *Id.*

In determining whether this consent decree should be terminated, the Fifth Circuit
explains as follows:

> The PLRA provides three methods for terminating such consent decrees:
> (1) the passage of time, 18 U.S.C. § 3625(b)(1)(A); (2) agreement by the
> parties, 18 U.S.C. § 3626(b)(10(B); or (3) 'if the relief was approved or
> granted in the absence of a finding by the court that it was narrowly
> drawn, extended no further than necessary to correct the violation of the
> Federal right, and was the least intrusive means necessary to correct a
> current and ongoing violation' of a federal right (ongoing violation), and
> that, consistent with subpart (b)(2) above, the relief is narrowly drawn,
> extends no further than necessary, and is the least intrusive means, 18
> U.S.C. § 3626(b)(3).

*Id*., at 394.

## IV. DISCUSSION

Occurrences suggesting an increase in the inmate violence and overall chaos at Walnut
Grove prompted Plaintiffs' August 2014 motion. The worst moments saw this perilous
environment explode into mayhem and MDOC lost complete control of the facility. Plaintiffs
have moved to modify the Consent Decree on the grounds that the recurrent violence over a two
year period indicates the lack of efficacy in the order's aim -- securing a reasonably safe
environment for the prisoners housed at Walnut Grove.

As discussed *supra*, Defendants responded by moving to terminate the Consent Decree. They contend that pursuant to the PLRA, termination is now appropriate because the Consent Decree is no longer required to cure a current and ongoing violation of any federal right.

In relevant part, the Consent Decree stipulates that it "will terminate five years from the date it is filed with the Court," or it "may also terminate earlier than five years from the date it is filed with the Court if the Court determines that MDOC substantially complied with each of the provisions of the Consent Decree and has *continuously maintained substantial compliance* for at least two years." Consent Decree at 15, ECF No. 151-1 (emphasis added).

The evidence before the Court paints a picture of a facility struggling with disorder, periodic mayhem, and staff ineptitude which leads to perpetual danger to the inmates and staff. The dangers that inmates face are not simply limited to assaults by other inmates but also from the guards.  The Monitors' Reports validate that the sometimes chaotic conditions are more than mere snapshots of disruption, as they span a time period of almost two years. Each of these reports, with the exception of the third and most recent, conveys findings of noncompliance with the core requirement of "reasonably safe living conditions."[4] In fact, in the core areas of the

---

[4] The First Monitors' report found that "disruptive incidents at the facility through the first six months of the Consent Decree [] continued at alarming levels," and concluded with the findings that Defendant remained in **non-compliance** with the core requirement of reasonably safe living conditions. (First Monitors' Report, October 1, 2012) Dkt. No. 152-4, at 2 -4. Finding that the facility was still in **noncompliance** with reasonably safe living conditions, the Second report notes that there remained to be "too many serious incidents of assaults, too much contraband, and ineffective management of special needs inmates." (Second Monitors' Report, April 1, 2013) Dkt. No. 152-5, at 7. The Third report shows that Defendant was only in **partial compliance** with reasonably safe living conditions but it conveys that recent reports indicate an overall decline in assaults. (Third Monitors' Report, October 19, 2013) Dkt. No. 152-6, at 8. Noting a significant "sharp rise in assaults and fights and also in staff applications of force," the Fourth report found Defendant in **non-compliance** with reasonably safe living conditions. (Fourth Monitors' Report, April 7, 2014) Dkt. No. 151-2, at 47. The Fifth report indicates that Defendant was still in **non-compliance** with reasonably safe living conditions; importantly, it notes that Defendant was reporting assaults according to the number of events instead of the number of inmates involved. (Fifth Monitors' Report, October 22, 2014) Dkt. No. 151-7, at 5-6. With this method of tabulation, the Defendants counted the July riot as one assault. Finally, although, the final report determined that the

Consent Decree, the Defendant has yet to reach substantial compliance. It is difficult for the Court to formulate its analysis of the conditions at Walnut Grove without according some weight to the fact that the Defendant has not maintained substantial compliance with specific provisions the  parties agreed were necessary to improve those conditions. Yet, the mere passage of  two years provides an avenue for the Defendant to be relieved from the obligations of the Consent Decree. 18 U.S.C. § 3626(b)(1)-(3).

On the issues of whether Defendant's motion to terminate and whether the Court should modify the existing Consent Decree, the threshold question is whether there are any current and ongoing violations of a federal right at the facility. If there are, then the question becomes whether a remedial plan is necessary to correct the violations, and is it narrowly drawn and the least intrusive means to correct the violations. *Guarjardo*, 363 F.3d at 392. On defending against termination and seeking their modification, the burden is on the Plaintiffs. *Id*. at 396.

### A.  Current and Ongoing

The Court must consider only those findings which reflect conditions as they exist at the time of its § 3626(b)(3) inquiry. *Castillo v. Cameron County, Tex.*, 238 F.3d 339, 353 (5th Cir. 2001). As a result, the Defendant argues that any analysis of the events which lead to Plaintiffs' motion to modify the Consent Decree is improper. The only relevant facts Defendant argues are those revealed at the evidentiary hearing that represent facts in "close temporal proximity." Defendant says that "[t]he evidence spanning the most recent Monitors' Report (Sixth Report), as well as evidence from February and March 2015, should be the guidepost." Docket No. 161, at 21. This gives the Court a full six months of evidence to evaluate current conditions, the

---

"vast majority of inmate population is not involved in assaultive or violent behavior," it found Defendant in partial compliance with the reasonably safe living conditions requirement. (Sixth Monitors' Report, March 5, 2015) Dkt. No. 121, at 9-10.

Commissioner argues. *Id.* This, he contends, constitutes temporal proximity. *Id.* at 20 (citing *Lancaster v. Tilton*, No. C-79-01630-WHA, 2007WL 4570185, at *6 (N.D. Cal. Dec. 21, 2007)). Thus, Defendant's presentation of the relevant facts seeks to limit the Court's analysis to no more than a six-month period.

While too dated to stand on its own, the factual findings from the previous Monitors' Reports, After Action Reports, and other related documents provide an extensive and well-documented account of conditions at Walnut Grove following the Court's adoption of the Consent Decree. If properly updated by current findings, they serve to help establish an appropriate factual foundation. Although these past accounts standing alone cannot qualify as current and ongoing, they provide a reference point that must be considered. "Instantaneous snapshots are impossible." *Id.* "In all litigation involving a decisive point in time . . . facts in close temporal proximity are probative." *Id.* In *Lancaster*, for example, the court considered evidence over a thirteen-month period. *Id.* at 5. But in *Skinner v. Lampert*, 457 F. Supp. 2d 1269 (D. Wyoming 2006), the court determined that evidence within the last year should be considered, because that evidence was "especially worrisome considering the penitentiary's historic indifference to inmate assaults." *Id.* at 1281; *See also Benjamin v. Schriro*, 370 F. Appx. 168, 170 (2d Cir. 2010) (affirming districts court's new orders based on nearly eight-year "troubling pattern of noncompliance" with the court's previous order).

This Court acknowledges that a much more narrow view of current and ongoing is adhered to by some courts. *See*, *e.g.*, *Cason v. Seckinger*, 231 F.3d 777, 783 (11th Cir. 2000) (current and ongoing means a presently existing violation, not a potential, or even likely future violation); *Hadix v. Johnson*, 228 F.3d 662 (6th Cir. 2000). But as the court appointed monitor in this case explained, the ability to maintain sustained compliance is a *sine qua non* of

14

demonstrating that there is not a substantial risk of serious harm. He added that it takes an "appreciable time" to fully institutionalize systematic change in a prison, and that in most instances it takes years to accomplish. *See Martin*, H'rg Tr. 59:9-60:13, April 3, 2015. The Court, therefore, is of the view that to get a complete picture of the prison's ability to demonstrate that it has and can substantially comply with the agreement it crafted jointly with the Plaintiffs and that no current and ongoing violations exist, evidence beyond the six-month period advocated by the Defendant is probative.[5]

For sure, Defendant has improved upon the conditions which existed at the time of the most recent riots as evidenced by the Monitors' Reports and the testimony, but the Court finds that current and ongoing violations of Plaintiffs' Eighth Amendment right to reasonable protection remain. The findings contained herein are based upon current violations. *See Castillo*, 238 F.3d at 354.

## B.    Eighth Amendment Right to Reasonable Protection

The Court's analysis of a federal right violation is controlled by the Eighth Amendment's protection against cruel and unusual punishment. *Helling v. McKinney*, 509 U.S. 25, 31 (1993) ("[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment."). The Eighth Amendment, as applied to states by reason of the Fourteenth Amendment's Due Process Clause, provides inmates protection from cruel and inhumane treatment. U.S. CONST. amend. VII; *see also Robinson v. California*, 370 U.S. 660, 675 (1962). This protection includes the duty of prison officials to take "reasonable

---

[5] The Court notes that Defendant could have filed his motion to terminate as early as March 2014, which would have been within three months after the New Year's riot. He could have filed it before the July riot or he could have filed it immediately in response to Plaintiffs' motion to modify filed in August. He chose to file it in March, 2015, but that filing does not denigrate the probative value of the evidence and conditions of the facility which existed in the last 12 months prior to his filing of the motion to terminate.

measures to guarantee the safety of the inmates." *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984). The Fifth Circuit instructs that for prisoners to demonstrate an Eighth Amendment violation, they must prove that they are incarcerated under conditions that pose a substantial risk of serious harm to their health or safety, and that prison officials have acted with deliberate indifference to that risk. *See Gates v. Cook*, 376 F.3d 323, 333 (5th Cir. 2004).

**C.      Current and Ongoing Violations of the Eighth Amendment**

The profound history of violence[6] at Walnut Grove has been a central point of interest throughout this case's existence. As such, the risk of serious harm to inmates is extremely important to the Court's evaluation of whether it is appropriate to terminate the Consent Decree at this time. Given the general nature of prison environments – an atmosphere filled with a volatile mixture of prisoners ranging from nonviolent to violent offenders with temperaments that fluctuate from peaceful to murderous –, concerted efforts to provide protection from harm are essential to maintain order. *See Farmer v. Brennan*, 511 U.S. 825, 858 (1994) ("Prisons are necessarily dangerous places; they house society's most antisocial and violent people in close proximity with one another."). "[P]rison officials have a duty . . .  to protect prisoners from violence at the hands of other prisoners" and that "[b]eing violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offense against society." *Id.*, at 833-34 (Stevens, J., concurring) (citations and internal quotations omitted). Adequately trained prison officials are required to quell the victimization and predation of the more vulnerable individuals by aggressive offenders.

---

[6] Following the December riot, reports indicate that "[a] total of 16 offenders were treated at outside medical facilities for injuries … includ[ing] "multiple stabbing and puncture wounds, lacerations, and fractures." Dkt. No. 151-2, at 8 (Fourth Monitors' Report). This level of violence was duplicated during the July riot, wherein "[n] o fewer than nine inmates required off-site medical attention" for injuries, some of which included: "lacerations to hands," "lacerations to head," "broken arm," "surgery for eye," "puncture wound to back," and "collapsed lung." Dkt. No. 151-7, at 7 (Fifth Monitors' Report).

A substantial risk of serious harm in a prison setting cannot be delineated through the application of any particular formula. *Horton v. Cockrell*, 70 F.3d 397, 400 (5th Cir. 1995) (reasoning that "[t]here is no concise definition of what types of prison conditions pose a substantial risk of serious harm") (citation and internal quotations omitted); *but see Gates v. Cook*, 376 F.3d 323, 332 (5th Cir. 2004) (explaining that the test for *inhumane* conditions is whether there exists "extreme deprivation of any minimal civilized measure of life's necessities") (citations and quotations omitted). Courts instead draw guidance from a holistic review of the confinement conditions to determine whether, "contextually," prisoners are receiving treatment that comports with "the evolving standards of decency that mark the progress of a maturing society." *See Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (citation omitted).

1.     *Deliberate Indifference*

Conditions posing a substantial risk of serious harm are necessary to the Eighth Amendment analysis, but they are not sufficient to find a violation because inmates must also show that prison officials were deliberately indifferent. *Farmer*, at 834. Before discussing those conditions evincing current and ongoing violations of the inmates' federal rights, however, it is important for the Court to recognize the remedial measures taken by the Defendant to address some of the problems at Walnut Grove. The most significant of these was the removal of close custody inmate population.[7] These inmates were indicated as the key instigators and participants in many of the past assaults at the facility, including both riots. Following the July 2014 riot, it

---

[7] It is worth noting that many ("approximately 96") of the inmates formerly classified as Close Custody were re-classified as Medium Custody as a result of officials at Walnut Grove using their discretionary override authority. *See* (Fifth Monitors' Report) Dkt No. 151-7, at 4-5. These inmates remained at Walnut Grove.

was determined that the facility was not equipped to house these individuals.[8] Thereafter, Defendant responded by effectively completing their removal from the prison.[9] There were also other measures taken to increase the facility's safety, such as: replaced security cameras, decreased inmate population, and the  installation of a body scanner and a perimeter netting.

Defendants have made significant advancements with staffing as well. Inadequately trained staff and insufficient numbers has been an ongoing problem at the facility.[10] Indicated as a contributing factor to the December riot, as well as other dangers, the Sixth Monitors' Report notes an increase in staffing for that monitoring period.[11]

Also important is that the MDOC records show a significant improvement in the number of assaults that occur at the facility. Monitors' reports note these findings and indicate that the Walnut Grove rate per 100 inmate population declined over the months and was comparable to other MDOC major facilities.[12] Specifically, the records kept by MDOC indicate that eight percent of the inmate population will be involved in an assault in a 12-month period.[13]

---

[8] Dkt. No. 160, at 59. The monitor also opined that a facility cannot protect inmates from a substantial risk of serious harm without maintaining *sustained* compliance with the protection from harm mandate.

[9] From August 2014 to September 2014,  the MDOC transferred close custody prisoners, as well as all long-term segregation prisoners, out of Walnut Grove and placed them in other facilities within its control. *See* (Fifth Monitors' Report) Dkt No. 151-7, at 3,12.

[10] *See* (First Monitors' Report) Dkt. No. 152-4, at 5 (noting that there were obvious staffing deficiencies); *see also* Dkt. No. 152-5, at 9 (Second Monitors' Report) (concluding that the staff did not "constitute a stale workforce").

[11] Dkt. No. 121, at 14 (observing that the staffing numbers represent a "very sizeable increase over the prior reporting period"). The Court must also note the numbers relied on by the monitor may not have been accurate since MTC implemented a reduction in force following the removal of some Closed Custody inmates and the information reflecting this change was not provided to the monitor. Dkt. No. 160, at 65-66.

[12] Dkt. No. 121, at 9 (Sixth Monitors' Report).

[13] *Id.*

While giving due credit to Defendants for the significant improvements made at Walnut Grove, the Court nonetheless finds that current and ongoing violations of the Eighth Amendment exist at the facility. In order to adhere to its constitutional duty to the inmates, the Court cannot ignore the persistent threat to inmate safety.

The deliberate indifference analysis under the Eighth Amendment requires "more than an ordinary lack of due care for the prisoner's . . . safety." *See Whitley v. Albers*, 475 U.S. 312, 319 (1986). Deliberate indifference exists if "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. "The legal conclusion of 'deliberate indifference,' therefore, must rest on facts clearly evincing 'wanton' actions on the part of the defendants." *Hall v. Thomas*, 1909 F.3d 693, 697 (5th Cir. 1999) (quoting *Farmer*, at 834). If there is circumstantial evidence indicating an obvious risk to inmates, it may be relied on to show that the official must have known of the risk. *See Hope v. Pelzer*, 536 U.S. 730, 738 (2002).

Plaintiffs assert that continued judicial supervision is needed to ensure against the mere appearance of commitment to reform, as many of the more significant measures have only come following monitors' intervention. Plaintiffs also contend that some of the statistics indicating improvements are skewed due to deceptive reporting practices by Defendant. These allegations warrant some discussion. The record contains noticeable discrepancies which raise serious questions concerning the veracity of some of the Defendant's reports in core areas. For example, the Sixth Monitors' Report indicates that MDOC reports that only fourteen percent of the prisoners were active gang members. This number is suspicious in light of the wealth of evidence

19

indicating significant gang influence at the facility.[14] Another instance occurred after the July

riot. Defendants are required to provide monitors with an After-Action Report following major

disturbances in the prison so officials can gather facts, identify problems, examine staff

performance, and develop a plan to prevent future developments.[15] The monitors have notified

the Court that this document has not yet been provided.[16]

Monitors also note that the re-classifications of many Close Custody inmates were

troubling due to the discretionary manner in which they were performed.[17] Misleading or missing

status reports prevent the monitors from efficiently performing their tasks because it limits their

knowledge of the real problems that may persists at the prison. This is a dangerous practice that

creates a substantial risk of harm to inmates by perpetuating an indifference to conditions as they

may really exists. *See Skinner v. Lampert*, 457 F. Supp. 2d 1269, 1278 (D. Wyo. 2006)

("Deliberate indifference may exist if "the evidence show[s] that [prison officials] . . . refused to

verify underlying facts that [they] strongly suspected to be true, or declined to confirm inferences

of risk that [they] strongly suspected to exist.") (quoting *Farmer v. Brennan*, 511 U.S. 825, 842

n. 8 (1994)).

Because Defendant was aware of the need to protect inmates from serious threats to their

safety, the continuous inaction was more than negligence. *Davidson v. Cannon*, 474 U.S. 344,

---

[14] Given  previous reports on the gangs' control at Walnut Grove, it is difficult to believe that 86 percent of the inmate population are none affiliated. The Court's monitor testified that he does not believe the numbers to be accurate and he is not sure what method MDOC used to obtain them. Dkt No. 160, at 62.

[15] *See* Vail, Trans. Dkt. No. 141, at 41.

[16] *Id.* at 40. According to its safety policy, MTC is responsible for providing MDOC with an After-Action Report on the July riot, as it did following the December riot. *Id.* at 41.

[17] *See* Fifth Monitors' Report, Dkt. No. 151-7, at 4-5 (stating that "[t]here is a concern that approximately 96 inmates at WGCF who were formerly classified as Close Custody have been re-classified as Medium Custody by using a discretionary over-ride").

357 (1986) ("When officials have actual notice of a prisoner's need for physical protection, administrative negligence can rise to the level of deliberate indifference to or reckless disregard for that prisoner's safety.") (citation and internal quotation marks omitted). Here, Defendant's knowledge of circumstances posing a substantial risk of serious harm was informed by past events. There are a host of incidents at Walnut Grove from which Defendant could have drawn inferences regarding potential breaches to inmate protection. Also, monitors' reports informed Defendant about areas of noncompliance and the dangers these digressions present to inmates. Officials at Walnut Grove were undoubtedly forewarned of conditions that increased the chances of harm to inmates. Still, Defendant had to be prodded to take remedial measures in most instances[18] and there has not yet been full compliance with instructions from monitors on how to alleviate threats to prisoner safety.

The failure to fully comply with directives aimed at improving inmate safety implies indifference on the part of Defendant. And though they contend that some affirmative steps taken by them negate a finding of deliberate indifference, this position is belied by recently reported incidents at Walnut Grove that can be traced directly to Defendant's security failures and staff corruption.[19] Also, between March 6, 2015 and March 21, 2015, almost immediately following a report showing reduction in assaults, there were four serious incidents that required prisoners to

---

[18] *See* Dkt. No. 141, at 193 (Testimony of Eldon Vail) (stating that, by his recollection, the only changes between July 2014 and April 2015 that Defendants made of their own initiative were "additional netting and body scanners and x-ray machines").

[19] On March 7, 2015, three inmates at Walnut Grove allege that an officer forced them to perform sexual acts on him, promising them that refusal would result in retaliation by gang members. *See* Dkt. No. 153-5, at 7. The incident is still under investigation but video surveillance shows the officer in the cell of two of the inmates for an extended period during the time in question, a fact that was confirmed at the hearing. *See* (Testimony of Marjorie Brown) Dkt. No. 142, at 241.

be taken to hospitals for medical treatment.[20] The inmates involved in these incidents were individuals who had been reclassified from Close Custody to Medium Custody through the discretion of Defendant. Because of their previous status, they were supposed to be under close observation to ensure that future problems with their conduct did not arise.[21]

As discussed *supra*, inmate's protection from harm was a central concern when this lawsuit was first initiated. The record establishes that there is a history of nonfeasance by Defendant in this regard. The Monitors' reports as well as the record generated by the evidentiary hearing indicate two areas of concern on which the substantial risk of harm analysis should be focused: gang activity and employee fitness. The most recent records show that at the time Defendant filed to terminate the Consent Decree, Walnut Grove remained in partial compliance with "Reasonably Safe Living Conditions" and "Sufficient Numbers of Adequately Trained Staff," core areas of the "Protection from Harm" instructions found in the parties' agreement. These categories are essential to inmate protection and will be discussed by the Court in kind.

  2.    *Reasonable Safe Living Conditions*

According to the latest monitors' report, Walnut Grove is yet to fully comply with improvements necessary for providing "Reasonable Safe Living Conditions."[22] The finding echoes reviews on the subject from previous reports, all of which concluded that Walnut Grove

---

[20] *See* (Testimony of Steve Martin) Dt. No. 160, at 73-74 (stating that it was "bothersome' to have four off-site medical runs over a span of less than three weeks and that the incidents support his opinion that a record at the facility has not been achieved to establish the absence of a substanitla risk of serious harm).

[21] *See* (Fifth Monitors' Report) Dkt No. 151-7, at 4-5.

[22] *Id*. (finding the facility in "Partial-Compliance" under the category of "Reasonable Safe Living Conditions").

was in either partial or noncompliance with this requirement.[23] One of the key factors weighed

by monitors for this assessment is the number of inmate assaults reported at the facility on a

monthly basis. Given the level of violence notoriously associated with Walnut Grove, protection

from inmate on inmate assaults is fundamental to Defendant ensuring reasonably safe living

conditions. According to the Defendant, their recently assigned STG (Security Threat Group)

Coordinator develops strategies to better manage gang members.[24] The record before the Court

establishes that this method has been ineffective and is inadequate to prevent assaults.[25]

Much of the danger still prevalent at Walnut Grove is attributable to gang activity and the

influence these organizations have over daily prison operations.[26] Because gang involvement is

largely a symptom of a societal illness and many members enter prison already affiliated,

completely eradicating gangs and their inherent violence is an unrealistic aim. *See Lewis v.

Richards*, 107 F.3d 549, 557 (7th Cir. 1997) (Flaum, J., concurring) ("far from being unusual,

gang violence remains an ever-present reality of prison life"). At Walnut Grove, however, there

---

[23] *See supra*, n. 2.

[24] *See* Morgan Trans. Dkt. No. 158, at 6.

[25] *Id.* at 25. The STG lieutenant testified that he is aware of gang security escorts because gang members come to him with escorts.

[26] The Sixth Monitors' Report notes that, "while it appears that the vast majority of inmates . . . are not being subjected to personal safety issues . . . there remains a significant presence of active gang members who are attempting on a daily basis to control certain aspects of the facility's operations." (Sixth Monitors' Report) Dkt. No. 121, at 13. It concluded that "[i]n order for the MDOC to reach compliance with [the protection from harm] part of the *Consent Decree*, there must be no evidence of active gang members developing and operating their own inmate-based security system." *Id.* at 12. The February 2015 report from Plaintiffs' expert covers his January visit to the facility. He notes that, when he asked inmates about the practice of "security escorts," they responded that it was a common practice, with one inmate exclaiming that it occurred "all day, every day." Dkt. No. 152-2, at 19. He was also informed that "certain gangs control specific showers in some living units, posting bodyguards at the showers when some gang members are using them, as well as controlling certain television viewing areas." *Id.*

is a history and present-day firmly established tradition of gangs operating with impunity.[27]
Indeed, much of the violence which led to the parties entering into the Consent Decree, as well
as those extremely brutal acts demonstrated during the riots, can be traced to the lack of power
and control over gangs at the facility.[28] The gang problem is pervasive, and Defendant has failed
to overcome its stronghold of the prison. *See* Vail, Hrg Tr. 57:6-8. April 1, 2015.

       With their penchant for using violence and the threat of harm as a form of intimidation
and control, gang members, left unchecked, have proven that the havoc they can cause at the
prison is substantial.[29] Inmate Evans provided testimony on methods of violence and tactics that
the gangs use to intimidate and control. For example, he explained how gang members are
subjected to discipline in the form of physical assaults by multiple members whenever the
"violation" of a gang code occurs.[30] He also testified that prisoners not affiliated with any
particular gang must be knowledgeable of the various gangs' rules and abide by them; otherwise,
they too become victims of similar violence.[31]

       When gangs run amok and control a facility, as they do here, it certainly can lead to
riots,[32] but it also can lead to significant underreporting of assaults and other crimes that occur at
the prison. For example, when officers witness gang-imposed discipline, they do not seek

---

[27] *See*, *e.g.*,  Dkt. No. 151-4, at 2 (Walnut Grove Correctional Facility After Action Report) (The December riot began as a fight between two inmates who were affiliates of the prison's two major opposing gangs – "Gangster Disciples" and "Vice Lords." The altercation quickly spread to other housing units as other offenders joined in by "siding up" and "split[ting] into two groups supporting each of the fighters."

[28] *Id*.

[29] *See* Docket No. 151-4, at 2.

[30] Evans, Hrg Tr. 29:15-17, 31:24-32:1, April 3, 2015.

[31] *Id*. at 33:14-21.

[32] *See* Docket No. 151-4, at 2.

medical attention for the prisoners.[33] Other courts have noted that assaults go unreported because of a prevalent code of silence when inmates are afraid to report witnessing or becoming the victim of assaults. *See e.g.*, *Skinner*, 457 F. Supp. 2d at 1282 (referencing "a culture of silence – sometimes referred to as a 'code of silence'—that prevented administrators from ostensibly knowing much of what is happening at the [p]enitentiary"); *Alberti v. Heard*, 600 F. Supp. 443, 450 (S.D. Tex. 1984) ("it is apparent that the inmates have an unwritten code of silence which results in most of the acts of violence going undetected"); *Grubbs v. Bradley*, 552 F. Supp. 1052, 1078 (M.D. Tenn. 1982) ("evidence is absolutely clear that the inmate code exists and that it prevents the reporting of a great many episodes of actual or threatened violence"); *Smith v. Ulman*, 874 F. Supp. 979, 985 (D. Neb. 1994) (noting that naming one's assailant is an act of snitching, a practice "often brutally discourage[d] in the general [prison] population").

   As indicated in the Monitors' Reports and the testimony of the witnesses, the gangs and their leaders maintain a privileged position at the prison. They have their own "security escort" system and the practice is known and condoned by prison officials.[34] Obviously, this alone demonstrates the power and the entrenchment of the gangs -- a current and ongoing violation. It took the monitors to inform the Defendant that the practice was completely unacceptable and must cease immediately.[35] Prisons are commonly thought of as dangerous places; however, to provide the expectations of a humane society, inmates cannot be subjected to conditions where assaults are imminent. *See Jensen v. Clarke*, 94 F.3d 1191, 1198 (8th Cir. 1996) ("Assault at the hands of fellow inmates . . . is a 'serious harm.'"). Reasonable measures must be taken to

---

[33] *See* Evans Tr., Dkt. No. 143, at 29, 31.

[34] *See* Sixth Monitor's Report, Docket No. 152; Vail February 2015 Report, Docket No. 152-2, at 19-20.

[35] *See* Martin Tr., Dkt. No. 143, at 63-64.

guarantee their safety. Fifth Circuit precedent instructs that "the Eighth Amendment is intended to protect against both present and future dangers to inmates," and, as a result, "[p]rison authorities must protect not only against current threats, but also against 'sufficiently imminent dangers' that are likely to cause harm in the 'next week or month or year.'" *Horton*, 70 F.3d at 401 (citation omitted).

There is still a substantial threat of serious harm posed by gangs at Walnut Grove. No more plainly is this reality evinced than by an incident documented in the Sixth Monitors' Report, where the monitor explains how Defendant has facilitated the practice of high-level gang members traveling throughout the prison with their personal inmate security.[36] The apparent need for inmates to procure personal security guards and the fact that this practice is condoned by prison staff imply that a serious threat to the inmates' physical health exists, and that the staff is ill-equipped to provide the necessary protection. Gang-related physical assaults are the type of imminent dangers that the Eighth Amendment charges Defendant with protecting against, not the inmates themselves.

Also relevant to this assessment are security issues caused by the malfunctioning cell doors at Walnut Grove. Often a topic of concern, the locking mechanisms on the cell doors at Walnut Grove were easily compromised by inmates, which thwarted the staff's ability to secure or protect.[37] It is impossible for Defendant to provide protection from harm in a facility where inmates are aware that they can freely escape their cells. After multiple assaults possibly linked

---

[37] *See* Dkt No. 151-5, at 25. The Department of Justice reported that the cell doors were a problem in its 2012 Report. The report notes that "youth are able to sabotage their cell locking mechanisms . . . resulting in a serious breach of security and safety to staff and other youth." *Id*.

to this dangerous situation,[38] and reports from monitors' imploring resolution to the problem,

MDOC issued an instruction stating the following:

> Please notify staff that an officer is to be present when a cell door is opened or closed to ensure its functionality and to prevent tampering. It is imperative that cell doors are operational; therefore, cell doors are to be inspected each time and every time a cell door is opened or closed.[39]

Despite the directive for staff to inspect doors on a frequent basis, at the hearing the Court received testimony that the locking mechanisms on cell doors are still readily defeated by inmates.[40] It is foreseeable that inmates will continue to unlock cell doors at their own liberty. Instructing guards to check doors each time they open and close is only a short-term and impracticable solution that does not rectify the problem. It also places too much responsibility, in an area where mistakes can be fatal, on human error. The only guaranteed remedy is to fix the doors, and to date, Defendant has only done so in *some* of the units.[41]

---

[38] Opining that it is likely that the ineffective cell doors contributed to the assaults during the riots, Plaintiffs' expert testified that, in viewing the videos of the incidents, the "detention hardware … didn't appear to be strong enough for a prison." Simple logic instructs that this is a reasonable assumption. When an incident occurs between a number of inmates, how can the officers prevent other inmates from joining the fray if the cell locks do not function properly?

[39] Dkt. No. 152-10.

[40] Inmate Owens testified that the cell doors still do not work properly and that "[inmates] will stick toothpaste caps off in part of the door where it latch[es] closed so it's impossible . . . to keep the doors just locked." Dkt No. 160, at 34-35. He also testified that other items such as spoons and folded pieces of paper are used to rig doors and that officers are aware that the doors are frequently compromised but still do not regularly check them. *Id.*

[41] Dkt. No. 141, at 183-84. On April 1, 2015, Plaintiff's expert provided testimony confirming that that most of the cell doors at Walnut Grove are essentially in the same state they were in 2012, when the Department of Justice first issued notice detailing how the doors were not secure and the dangers posed by this condition. He acknowledged that the hinged doors in Units 3 and 4 had been replaced with sliding doors (apparently fixing the problem), but revealed that the units with the new doors were not occupied when he visited the facility; thus, the units housing inmates are those with the malfunctioning hinged doors.

3.    *Employee Fitness*

The evidence gleaned from the latest monitors' report and information provided at the evidentiary hearing demonstrate that the ability of staff tasked with overseeing the inmates at Walnut Grove remains a problem. The Sixth Monitors' Report lists the facility as only being in partial compliance with the "Sufficient Numbers of Adequately Trained Staff" requirement. This is an area critical to the overall substantial risk of serious harm analysis. In the past, inexperienced staff has contributed to the assaults of inmates and inmate misconduct.[42] There is also an ample history of staff corruption at the facility, ranging from sexual and physical assaults by guards,[43] to guards assisting inmates in the assault of other inmates.[44] The report acknowledges areas of considerable improvement with staffing, however, it still advises that correctional officers continue to be deficient in the areas of contraband control and unobserved altercations.[45]

Although the Court has acknowledged Defendant's efforts to increase staffing, the fact that this is still an area of deficiency contributes to the facility being dangerous for inmates as

---

[42] Insufficient numbers of officers and lack of experience were contributing factors to both the December 2013 and July 2014 riots. *See* Fifth Monitors' Report, Dkt. No. 151-7, at 10 (observing that "[t]he high vacancy rate, the inexperience of the staffing complement, and the complicity of four officers in the July disturbance strongly suggest that MTC management continues to struggle with maintaining sufficient numbers of adequately trained staff").

Testimony from Eldon Vail provided an example of how inadequate training can result in a violent situation intensifying uncontrollably. He opined that it is concerning that following both riots, it took nearly 90 minutes for officers to establish a control center. *See* Dkt. No. 159, at 164. This deficiency in responding to emergency situations was also illustrated by reports from the July riot of a gas canister going off in the command tower when officers attempted to discharge it, an incident which led to the officers abandoning the tower because they were not wearing respirators. *Id.*

[43] *See* DOJ Report, Dkt No. 74; *See also* Order Approving Settlement, Dkt No. 75.

[44] *See, e.g.,* Fifth Monitors' Report, Dkt No. 151-7, at 10. The complicity of officers is illustrated in video footage from the July 2014 riot which shows inmates being allowed to freely enter the cells of other inmates to assault them. *Id.*

[45]*See* Sixth Monitors' Report, Dkt. No. 121-7, at 15.

well as officers relevant to this discussion. Walnut Grove continues to have a problem with understaffing, a condition linked to staff resignations and terminations.[46] The Court understands the challenge of retaining employees with the salaries offered and the dangers that the job presents. The low wages also contribute to terminations, as some officers find an incentive to introduce contraband and participate in other illegal activities as they see them as other sources of income. Regardless, being adequately staffed is imperative to Defendants providing a reasonably safe environment.

Obviously, prison officials cannot perform their "constitutional duty to protect inmates from violence at the hands of other prisoners" if they are inadequately trained or if their numbers are too scarce to properly supervise. *See Horton*, at 400. Given its history of violent incidents resulting in serious injuries to inmates and staff corruption and ineffectiveness, the pivotal role of maintaining order held by correctional officers at Walnut Grove is considerably heightened. Therefore, Defendant's failure to resolve this area of deficiency cannot be excused. Until the facility is in full compliance in this respect, Defendant cannot protect inmates against "sufficiently imminent dangers." *Id*.

Collectively, the facts establish that inmates at Walnut Grove are still exposed to a substantial risk of serious harm. The Sixth Monitors' report and supporting testimony is a reflection of the conditions within the facility at the time Defendant moved to terminate the Consent Decree, and it indicates less than full compliance in core areas which are essential to the protection of inmates. Specifically, Defendant has not been in substantial compliance with the "Reasonably Safe Living Facility" requirement since the Court entered the Consent Decree During the evidentiary hearing, the Court's monitor testified that without a reasonably safe living

---

[46] (Testimony of Marjorie Brown) Dkt. No.  142, at 199.

facility, there will always be a substantial risk of serious harm.[47] This testimony confirms

aforementioned reasons, detailing why a current and ongoing threat of serious injury still exists

at Walnut Grove.  Accordingly, Plaintiffs have met their burden for this aspect of the federal

right violation analysis. The Defendant's Motion to Terminate is denied.

**D.      Consent Decree and the Need-Narrowness -Intrusiveness Test**

In prison litigation suits, a court granting prospective relief must determine "that such

relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal

right, and is the least intrusive means necessary to correct the violation of the Federal right." 18

U.S.C. § 3626(a)(1)(A). The Court has found continuing and ongoing violations of the inmates'

federal right to reasonable protection from harm in the areas of reasonably safe living conditions

and employee fitness. The first violation stems from Defendants' failure to adequately address

two recognized impediments to inmate safety: gang activity and unsafe cell doors. The second

violation is a result of Defendants' failure to adequately abate staffing deficiencies. Having

found current and ongoing violations, the Court must now decide whether the provisions set

forth in the parties' Consent Decree are necessary to resolve them. *See Ruiz v. United States*, 243

F.3d 941, 950-51 (5th Cir. 2001) (finding that pursuant to 3626 (b)(3), a consent decree will

continue to be enforced by the federal court only if "particularized findings" indicate that "each

requirement imposed by the consent decree [] satisfies the need-narrowness-intrusiveness criteria

given the nature of the current and ongoing violation") (citation omitted). "[T]he district court

should engage in specific, provision-by-provision examination of the consent decree, measuring

each requirement against the statutory criteria." *Id.* (citation omitted).

---

[47] *See* Martin Trans. Dkt. No. 143, at 59.

30

Based on the discussed violations, the Court finds that a majority of the Consent Decree's provisions are no longer necessary. However, those pertaining to the inmates' Eighth Amendment right to reasonable protection are still relevant and shall remain in force.

1.    *Classification and Housing System*

This "Substantive Remedial Measures" provision mandates that "MDOC will utilize a classification system that ensures prisoners are appropriately and safely housed within [Walnut Grove]."[48] Given Defendant's difficulties with inmate security and this provision's bearing on safety, the requirement remains relevant and it is not unnecessarily intrusive.

2.    *Protection from Harm*

This provision is also found under the "Substantive Remedial Measures" requirements, and it lists a number of stipulations the parties determined necessary to guarantee inmates' protection from harm.[49] In general, the section consists of directives created to address inmate on inmate assaults, officers' abuse of inmates, and acceptable use of force by officers. Given that the majority of ongoing violations are concentrated on Defendant's failure to protect inmates, these requirements remain relevant and are not unnecessarily intrusive.

3.    *Enforcement and Monitoring*

This provision covers the parties agreement appointing James Austin and Steve Martin as monitors responsible for tracking compliance with the Consent Decree.[50] Since the decree has not been terminated, the requirement remains relevant and is not unnecessarily intrusive.

---

[48] Dkt. No. 75-3, at 3.

[49] *Id.*

[50] Dkt. No. 75-3, at 12.

## V. CONCLUSION

The Court appreciates the efforts by both parties in this matter, but there is no question that, based on the record, there are current and ongoing violations of the inmates' federal rights, as discussed in this opinion. The Court also understands its very limited role as the PLRA strongly disfavors continuing relief. Because of the current and ongoing violations, however, it is the Court's obligation to supervise the continued work of the Defendant so that the necessary changes are implemented in the Walnut Grove facility to ensure that violations do not persist. The protection of prisoner rights greatly impacts prisoners, the prison staff in charge of overseeing the prison facility, and even those who may visit the facility. And we cannot overlook the impact the treatment of prisoners has on the rest of society. We know that most prisoners do not die in prison; they serve their sentences and are subsequently released. How they are treated while in prison affects how they will reintegrate into society upon their release. As such, public confidence in our criminal justice and public safety systems is vital. To this end, the Court will continue to enforce the consent decree in this matter as necessary.

The Court holds that the Plaintiffs have made all the showings set forth in 18 U.S.C. § 3626(b)(3), and, as a result, the consent decree will not be terminated at this time, consistent with the limitations set forth in that provision of the PLRA.

**IT IS SO ORDERED AND ADJUDGED**,  this the 10th day of June, 2015.

s/ Carlton W. Reeves
UNITED STATES DISTRICT JUDGE