## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## JACKSON DIVISION

_____

| | | |
|---|---|---|
| **C.B. by and through his next friend,** | ) | |
| **Charleston DePriest, et al.** | ) | |
| | ) | **Civil Action No. 3:10cv663** |
| **Plaintiffs,** ) | | **7th REPORT OF MONITORS** |
| | ) | **Pursuant to:** |
| | ) | **CLASS ACTION** |
| | ) | **CONSENT DECREE** |
| | ) | |
| | ) | |
| | ) | |
| **V.** | ) | |
| | ) | **September 2, 2015** |
| | ) | |
| **Walnut Grove Correctional** | ) | |
| **Authority, et al.** | ) | |
| | ) | |
| **Defendants.** ) | | |

_____)

## I. INTRODUCTION

Pursuant to Section IV of the above-referenced *Consent Decree*, the Monitors are to

submit reports to counsel every four months on the defendants' compliance with the

substantive remedial provisions of the decree.  On June 11, 2015, the Court issued an Order

wherein it found "that a majority of the Consent Decree provisions are no longer necessary. However, those pertaining to the inmates' Eighth Amendment right to reasonable protection are still relevant and shall remain in force."  As a consequence, this 7th Report is limited, pursuant to the Court's June 11, 2015, ORDER, to reporting on defendants' compliance with Section III. A. *Classification and Housing System*, and Section III. B. *Protection from Harm*.  This Report provides the Monitors' observations and findings on these specific provisions of the *Consent Decree* for March through June 2015.

## II.  METHODOLOGY

During this reporting period, the Monitors received and reviewed monthly information and data provided by the Mississippi Department of Corrections (MDOC) and Walnut Grove Youth Correctional Facility (WGYCF). This monthly submission included information and data related to provisions no longer subject to monitoring in accord with the June 11 ORDER.   After meeting with facility officials and MDOC agency counsel, an agreed-upon revision to those documents required for the monthly submission was conducted.  The following monthly information and data reviewed for this Report was:  1) Extraordinary Occurrence Reports (EORs), 2) Monthly Staffing Count, 3) Daily Shift Rosters,

4) WGCF Breakdown by Count and Custody for the 1st and 15th of each month, 5) MDOC

Monthly Reports WGCF, 6) Offenders Out of Cell Time Memos, 7) Restraint/Chemical Agent

Issuance Log, 8) Use of Force Incident Packets (with videos), and 9) WGCF Monthly

Statistical Charts.  In addition to these materials provided during this reporting period, the

Monitors also received the following reports and materials:

- WGCF "Critical Incident Review," WGCF-15-109, July 28, 2015;

- Snapshot of the WGCF inmate population as of  July 7, 2015; and

- Revised housing plan dated July 29, 2015.

During this reporting period the Monitors also conducted the following site

inspection and in-person meeting at MDOC headquarters.

- **July 16, 2015:** Site inspection at WGYCF conducted by both Monitors; and

- **July 17, 2015:** Monitors met with the MDOC Deputy Commissioner and
  General Counsel.

### III. SUMMARY

As was noted in the 6th *Monitors' Report*, facility officials made significant gains in

core areas of operation for that reporting period.   Nonetheless, as detailed below, there

remains a need for certain operational improvements.

3

Inmate assaultive behavior continues to trend downward.  Between February 2015 and July 2015, the average number of assaults (inmate-on-inmate and inmate-on-staff) have averaged four, which is significantly below the past nine months average.  In fact, there were only four inmate-on-inmate assaults for the months of June and July 2015.  There were no off-site hospital transports from inmate assaults during May-June 2015.

Since the facility population was capped at 962, the average daily population for the reporting period has remained approximately 900 with two housing units (HU-3 & 4) completely vacated.  The RID population was moved from HU-3 to Unit-9, which was formerly the close observation unit.  With this reduction in population and the closing of two housing units, the staffing complement was reduced from 212 correctional officers (January 2015) to 147 as of June 2015.  The quality of staff continues to pose issues for the facility administrators (see discussion, below).

The timely identification and transfer of inmates who are reclassified for Close Custody is an issue the facility staff and monitors continue to refine.  The development of a more detailed housing plan, likewise, is in process (see discussion, below).

Finally, while facility staff have begun to provide more immediate decontamination

of inmates subjected to OC, a March incident involving a serious assault of an officer

resulting in a large of amount of OC deployed to control the event, raised serious issues of

incident management and after-action review (see discussion, below).

## IV. OBSERVATIONS AND FINDINGS OF SUBSTANTIVE REMEDIAL MEASURES

### A. Classification and Housing System
Recommended Compliance Finding: **Partial Compliance**

<u>Observations</u>:

The MDOC continues to use a validated objective classification system that meets

national standards. Inmates are classified by the MDOC prior to transfer to the

WGCF.  Upon arrival at the WGCF, the inmate's classification records are reviewed

and a needs assessment is completed.  Inmates are then reclassified on an annual

basis to determine if the inmate's custody level should be adjusted. The classification

system allows for an inmate's scored custody level to be over-ridden at the

discretion of the case manager with a review by the Supervising Case Manager. The

previous report listed several areas that were not allowing the facility to reach

compliance with this part of the Consent Decree.  Further, the July site visit

uncovered other areas of concern.

First, in 2014, it was agreed by the parties that no Close Custody inmates shall be assigned to WGYCF.  As shown in Table 1, the custody levels of WGYCF are now indeed limited to Minimum and Medium Custody. Significantly, the inmate population has been reduced by over 400 inmates.   However, there must be assurances that none of these inmates have been over-ridden from a Close Custody score to Medium Custody  after having been found guilty of serious institutional misconduct.

### Table 1. Inmate Custody Levels
### July 2012 – July 2015

| Custody | July 2012 | | January 2014 | | August 2014 | | December 2015 | | July 2015 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Inmates | Percent | Inmates | Percent | Inmates | Percent | Inmates | Percent | Inmates | Percent |
| CLOSE | 253 | 24.3 | 327 | 25.9 | 197 | 25.0 | 0 | 0.0 | 0 | 0.0 |
| MEDIUM | 591 | 56.7 | 737 | 58.4 | 470 | 59.6 | 1,105 | 85.2 | 817 | 91.0 |
| MINIMUM-NON-COMM | 190 | 18.2 | 178 | 15.6 | 66 | 8.4 | 189 | 14.6 | 0 | 0.0 |
| MINIMUM-COMM | 3 | 0.3 | 0 | 0 | 5 | 0.6 | 2 | 0.2 | 81 | 9.0 |
| UNCLASSIFIED | 6 | 0.6 | 0 | 0 | 50 | 6.3 | 1 | 0.1 | 0 | 0.0 |
| Total | 1,043 | 100 | 1,261 | 100 | 788 | 100.0 | 1,297 | 100.0 | 898 | 100.0 |

Source : MDOC Monthly Facility Reports

In the last report, the Monitors identified 96 inmates whose scored custody level had been over-ridden by the MDOC central classification unit and WGCF staff

from Close to Medium Custody. However, 11 of the inmates whose custody level had been over-ridden remained at WGYCF during this monitoring period even after they were involved in an assault on another inmate or staff.   While the MDOC immediately transferred these inmates to close security facilities, it was disturbing that the Monitors discovered this situation and not the MDOC or MTC classification staff.

During the July site visit this issue was again addressed.  It was again noted that there were several inmates who have had their Close Custody level in-appropriately classified to Medium Custody by WGCF staff.  Such reasons as "RVR Free" for less than 12 months were being used in several cases, which is not an appropriate use of the discretionary over-ride mechanism.

It was also observed that some inmates had not been reclassified according to the 12-month rule due to a MDOC policy that does not allow for an inmate to be reclassified unless an updated NCIC "rap sheet" has been produced. Apparently there is a substantial backlog in MDOC's central classification unit to produce updated NCIC documents.  MDOC is the only entity that is allowed to produce such

a document.  This is also resulting in some inmates with negative conduct reports remaining at Medium Custody when they may qualify for Close Custody.

It was also observed that when an inmate is found guilty of a serious RVR by the disciplinary hearing process, there is no immediate review by the WGCF supervising case manager to determine if the inmate's conduct warrants a change from Medium or Minimum to Close Custody. Part of the problem is that the Disciplinary Hearing Officer does not have access to the inmate's custody level at the time of the hearing. This problem can also allow inmates who are truly Close Custody to remain at WGCF and in the general population until they are formally reclassified.

Finally, it is required that the WGCF maintain a housing plan that separates inmates by custody level and other operational/programmatic features of the facility. The WGCF does has such a plan that identifies housing units by the following attributes:

1. General Population – Medium and Minimum Custody;

2. General Population – Privilege Unit;

    3.  General Population – RID Program; and

    4.  Disciplinary Segregation

While this document does technically constitute a housing plan, it should be refined to take into account the need to further refine the housing units according to custody and programmatic needs.  In particular, there should units that are listed as only Medium Custody–not a mixture of the two.  The Monitors would also like to see a unit(s) that only house protective custody inmates.  The WGCF is planning to make such refinements.

To remedy these problem areas, the MDOC and WGCF have agreed to the following changes:

*1.* At the end of each month all inmates who have had their scored custody level over-ridden from Close to Medium will be audited by the Supervising Case Manager Supervisor, MTC facility monitor, and the MDOC facility monitor to ensure there are no inmates who have been inappropriately classified as Medium Custody.

*2.* The MDOC will eliminate the NCIC backlog and ensure that all inmates are

reclassified within the prescribed 12-month time frame.

3.   The MDOC will also revise its classification policy so that the provision that does not allow an inmate to be reclassified unless an updated NCIC rap sheet is generated is removed. All inmates must be formally reclassified every 12 months whether they have an updated NCIC report or not.

4.   The MTC will modify its information system so that the WGCF Disciplinary Hearing Officer will have access to the inmate's classification level and score. All inmates who have been found guilty of a serious RVR (assault, fighting, gang activity, possession of a weapon) will be immediately referred to the Case Manager Supervisor who will have a reclassification review completed prior to the inmate being released from disciplinary segregation.

5.   Any inmate who is reclassified from Medium to Close Custody shall be immediately transferred to another MDOC facility.  If the inmate was placed in disciplinary segregation for the RVR, he shall remain in segregation until he is transferred.

6.   Refine the current housing plan so that housing units are designated as

"pure" Medium and Minimum Custody and only accommodate Protective Custody inmates.

Meeting these six recommendations will allow the WGCF to reach substantial compliance with this portion of the consent decree.

## B. Protection From Harm

### (1) Reasonable Safe Living Conditions
Recommended Compliance Finding: **Substantial Compliance**

<u>Observations</u>: There are several measures that are employed to assess the level of safety within the WGYCF.  On a macro-level, the MDOC records the number of assaults that are reported by each facility on a monthly basis.   In previous reports we have noted that the WGYCF rate per 100 inmate population per month had declined and was comparable to the other MDOC major facilities.   As noted earlier, since February of 2015, there has been a steady decline in the number of inmate assault (staff and inmates).  This decline is shown in Figure 1.

11



The overall rate for WGYCF for 2014 was eight per 100 inmates per year, which means that eight percent of the average inmate population will be involved in an assault in a 12-month period. The 2015 year-to-date rate has declined to six per 100 inmates.

Gang activity has and continues to be a security issue. Approximately four percent of the December 2014 inmate population were listed by the MDOC as being an active gang member, with most of them being affiliated with the various factions of the Vice Lords or Gangster Disciples. In July 2015, that number had increased to

12

22 percent.  Table 3 shows the housing location of the active gang members, which is widely distributed throughout the facility as of July 2015.  It is noteworthy that some units have high percentages of gang members.

**Table 3. Gang Members by Housing Unit**

| Unit | Function | Inmates | Percent |
|------|----------|---------|---------|
| 3A | Closed | 0 | 0.0 |
| 3B | Closed | 0 | 0.0 |
| 3C | Closed | 0 | 0.0 |
| 3D | Closed | 0 | 0.0 |
| 4A | Closed | 0 | 0.0 |
| 4C | Closed | 0 | 0.0 |
| 4D | Closed | 0 | 0.0 |
| 5A | GP | 14 | 7.0 |
| 5B | Privilege Unit | 1 | 0.1 |
| 5C | GP | 22 | 11.1 |
| 5D | GP | 16 | 8.0 |
| 6A | GP | 16 | 8.0 |
| 6B | GP | 9 | 4.5 |
| 6C | GP | 10 | 5.0 |
| 6D | GP | 18 | 9.0 |
| 7A | GP | 17 | 8.5 |
| 7B | GP | 9 | 4.5 |
| 7C | GP | 14 | 7.0 |
| 7D | GP | 12 | 6.0 |
| 8A | Protect Custody | 15 | 7.5 |
| 8B | GP | 11 | 5.5 |
| 8C | GP | 5 | 2.5 |
| 8D | Segregation | 8 | 4.0 |
| 9 | RID | 2 | 1.0 |
| Clinic | Clinic | 0 | 0.0 |
| Total | | 199 | 100 |

Source: MDOC December 4, 2014 Snapshot data file

It would be prudent to evaluate these data by gang to ensue no particular gang is dominating a particular housing unit.  Very small percentages of the privilege and RID units have active gang members.  Conversely, there are 15 active gang members in the "protection" unit.

As reported previously, it appears that the vast majority of inmates at the WGYCF are not being subjected to personal safety issues.   Such issues have been significantly impacted by the removal of the Close-Custody inmates and a lowering of facility population by over 300 inmates.  The population reduction has allowed a greater inmate-to-staff ratio and better supervision.   However, there remains a significant presence of active gang members who are attempting on a daily basis to control certain aspects of the facility's operations.  Development of a housing plan that identifies these gang members and then manages them using a variety of methods including a gang intervention program, internal classification methods that takes gang membership into account, and removal of high level gang members from the facility is recommended.  Despite these issues, the number of inmate-on-inmate and inmate-on-staff assaults have dropped significantly to a level that allows a

finding of substantial compliance.

A review of this draft report resulted in a detailed memorandum from plaintiff's counsel Margaret Winters in which 45 incidents are said to have occurred in the protective custody unit (8A) between April and August 16, 2015.  As noted earlier, this unit houses approximately 50 inmates or about five percent of the total facility population. According to the plaintiff's counsel, these incidents are based on interviews with class members during facility tours by attorneys representing class members.  The Monitors have requested the names of the inmates interviewed and the interview schedule that is being used to interview inmates.  Given the nature of these reported incidents, the Monitors also agreed to conduct confidential interviews with certain class members selected by plaintiff's counsel.  In addition, the Monitors will also conduct confidential interviews with a representative sample of other inmates assigned to Unit 8A to determine the validity of these allegations.

The plaintiff's memorandum lists five incidents where a total of six inmates were assaulted and/or involved in a fight and one inmate-on-staff assault over the five-month period.  It appears that most of these alleged incidents were not

15

reported as official assaults to MTC or MDOC. There are also reports of staff facilitating/allowing the delivery of contraband/drugs, gang activity, and gambling. The memorandum also states that on four occasions staff failed to provide medical care, and failed to be present in the housing areas to maintain a secure environment. All of these allegations of staff misconduct and inmate assaults were not provided to the Monitors until August 16, 2015, nor have they been reported to the facility's contract monitors, Warden, or the MDOC.  The Monitors will conduct a review of these reported incidents.

Finally, the Monitors will be requesting a representative sampling of video tapes of the housing unit during the shifts to determine if staff are present and properly performing security tasks.  The Monitors have also requested that the Warden conduct a personal assessment of the Unit-8A operation and report his findings to us.

Based on the findings of this review, the rating of "substantial compliance" will be reviewed and may be adjusted as necessary.

**(2) Sufficient Numbers of Adequately Trained Staff**

Recommended Compliance Finding: **Partial Compliance**

Observations: The current line staff complement is 147, with 27 supervisory staff (captains, lieutenants, sergeants).  This represents a significant reduction of line staff over the prior reporting period (212 line staff in January 2015) but not for supervisory staff.  However, this reduction is not inconsistent with the reduction in population and the closure of two housing units (eight pods).  Just as for the prior reporting period, a review of the staffing shift rosters for this reporting period indicates that for two of the three shifts, all facility housing pod areas typically have assigned officers.  Moreover, each of the four main housing units is assigned a supervisory sergeant.  While on-site, Monitor Martin inspected a number of the housing unit control towers and interviewed officers on duty there.  The control panels were in adequate working order and tower officers were fully aware of their responsibilities to ensure floor officers were diligent in securing cell doors. Each shift continues to have CERT officers assigned to act as first and second responders for emergent incidents, e.g., on June 24, 2015, the first shift had eight assigned 1st & 2nd Responders.

Contraband control remains a problem. While facility staff continue to conduct frequent searches of both inmates and staff, the detection and seizure of cell phones, drugs, and weapons often are a daily occurrence.  Terminations for cause of correctional officers continue at an alarming rate.  At least one officer during the reporting period was charged with attempting to smuggle in a cell phone.  Four additional officers were terminated during the reporting period for possession of drugs and inappropriate relations with inmates.

It was noted in the *6th Monitors' Report* that officers were beginning to intervene more often in altercations due to an increased presence in the housing units.  However, for the month of March 2015, there were three unobserved altercations, all three resulting in injuries that required the inmates to be taken off-site to the hospital.  It should be noted that the Monitors were not advised of two of these three incidents in a timely fashion (off-site hospital transports are required to be reported within twenty-four hours).

Finally, it should be noted that on May 7, 2015, an inmate was discovered unresponsive in his cell on pod 7-A at approximately 8:00am (see Incident WGCF 15-

169).  The inmate was pronounced dead by Emergency Medical Services personnel at 8:32am.  While the investigation into this death has not been completed, the inmate appears to have died of natural causes.  The officer who first learned of the unresponsive inmate made the following log-book entry when she signed on to her post as floor officer of pod 7-A at 7:00am: "there was no officer on post when I took post."   The post log indicates that the officer assigned to the previous shift had signed off the post at 6:15am.  Deputy Warden Jessie Streeter, during a follow-up call initiated by the Monitor, advised the Monitor that the officer taking up her post at 7:00am had worked the previous shift as the Tower 7 officer and was working a double shift to fill the 7-A floor post due to a staff shortage.  The Monitors will review the investigation of this incident once it is completed to determine how facility management addressed what appears to be a post vacated for some 45 minutes prior to finding the inmate unresponsive in his cell.

**(3-12) Use of Force and Chemical Agents.**
Recommended Compliance Finding: **Partial Compliance**

Observations: Staff use-of-force incidents for the reporting period have averaged

less than four per month.  The level of force employed by personnel has not resulted in serious injuries to staff or inmates and more often than not involves the use of modest amounts of OC.   Facility staff have clearly improved their decontamination practices as a result of the revised protocols requiring more immediate decontamination (rather than awaiting movement to the facility infirmary).

As discussed in prior monitoring reports, facility officials have not consistently fully documented their use-of-force reviews and after-action assessments.  This continues to be an issue as evidenced by staff failure to conduct a documented review/after action report on a March 21, 2015, incident involving multiple inmates who were subjected to a large quantity of OC dispersed from a crowd-control fogger.  A number of these inmates were involved in a serious assault on an officer resulting in the officer sustaining multiple head injuries (Incident WGCF-15-109).  In reviewing this incident, Monitor Martin identified a number of serious security lapses on the part of staff in managing this incident.  While this matter was investigated, the facility investigator limited his findings and conclusions to establishing culpability of the inmates who assaulted the officer.  In discussing this matter with

the Warden, Deputy Warden of Operations, and the Major of Security, each contended that the matter was reviewed and that staff deficiencies were identified for corrective measures.  They also acknowledged that there was no documentation to confirm their actions.  After the site work, facility officials provided a copy of a "Critical Incident Review" dated July 28, 2015.  The review did indeed identify a number of security issues with accompanying corrective actions taken by facility officials.   It should be noted that in another use of force incident that occurred on April 2, 2015, (WGCF-15-120), the video revealed that the escorting officer employed improper escort procedures after an inmate had been subjected to OC.  The Major of Security after reviewing the video counseled the officer on escort procedures and properly documented the after-action steps.

**(13) Use of Prisoners to Enforce Rules or Impose Discipline**

Recommended Compliance Finding: **Compliance**

**(14) Protection of Inmates from Abuse, Harassment, and Punishment on the Basis of their Actual or Perceived Sexual Orientation, Gender Identity, and Gender Non-Conformity**
Recommended Compliance Finding: **Compliance**

**(15) Prohibition of Forcing Inmates to Engage in Physical Exertion that Inflicts Pain or Discomfort**

Recommended Compliance Finding: **Compliance**

**CERTIFICATE OF SERVICE**

I, Harold E. Pizzetta, III, Assistant Attorney General, hereby certify that on September

3, 2015, I electronically filed the foregoing Sixth Report of Monitors with the Clerk of the

Court using the ECF system which sent notification of such filing to all counsel of record.

SO CERTIFIED this 3rd day of September, 2015.

/s/Harold E. Pizzetta, III
Harold E. Pizzetta, III, MS Bar No. 99867

23