# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## JACKSON DIVISION

| | |
|---|---|
| **C.B. by and through his next friend,**<br>**Charleston DePriest, et al.**<br><br>Plaintiffs,<br><br><br><br><br><br><br><br>**v.**<br><br><br>**Walnut Grove Correctional**<br>**Authority, et al.**<br><br>Defendants. | **Civil Action No. 3:10cv66**<br>**8th REPORT OF MONITORS**<br>**Pursuant to:**<br>**CLASS ACTION**<br>**CONSENT DECREE**<br><br><br><br><br>**December 23, 2015** |

## I. INTRODUCTION

Pursuant to Section IV of the above-referenced *Consent Decree*, the Monitors are to submit reports to counsel every four months on the defendants' compliance with the substantive remedial provisions of the decree. On June 11, 2015, the Court issued an Order wherein it found "that a majority of the Consent Decree provisions are no longer necessary. However, those pertaining to the inmates' Eighth Amendment right to reasonable protection are still relevant and shall remain in force." As a consequence, this 8th Report is limited, pursuant to the Court's June 11, 2015, *Order*, to reporting on defendants' compliance with Section III. A. *Classification and Housing System*, and

Section III. B. *Protection from Harm*. This Report provides the Monitors' observations and findings on these specific provisions of the *Consent Decree* for July through October 2015.

A draft of the *8th Report* was provided the parties on December 4, 2015. Plaintiffs' counsel provided their comments on December 9, 2015 (attached hereto). Defendants provided their comments on December 18, 2015 (attached hereto, "MTC Response to 8th Monitors' Report").

## II. METHODOLOGY

During this reporting period, the Monitors received and reviewed monthly information and data provided by the Mississippi Department of Corrections (MDOC) and Walnut Grove Correctional Facility (WGCF). The following monthly information and data reviewed for this Report was: 1) Extraordinary Occurrence Reports (EORs); 2) Monthly Staffing Count; 3) Daily Shift Rosters; 4) WGCF Breakdown by Count and Custody for the 1st and 15th of each month; 5) MDOC Monthly Reports WGCF; 6) Offenders Out of Cell Time Memos; 7) Restraint/Chemical Agent Issuance Log; 8) Use of Force Incident Packets (with videos); and 9) WGCF Monthly Statistical Charts. In addition to these, the Monitors also received the following reports and materials during this reporting period:

- Memo to Monitors RE: Inmate Reports of Unsafe Conditions, Margaret Winter, August 26, 2015;
- Series of video recordings from fixed cameras for Housing Unit 8-A for

August/September 2015;
- Series of video recordings from fixed cameras for Housing Units 5-A, 7-A-D, 8-A-C for September 2015;
- MTC WGCF "Third Quarter Accomplishments"; and
- MTC "Telephone Conference Talking Points for November 17, 2015.

During this reporting period the Monitors also conducted the following on-site inspections and in-person meetings with MTC and MDOC officials:

- **October 6-7, 2015:** Site inspection at WGCF conducted by Monitor Martin; and
- **November 11, 2015:** Site inspection at WGCF conducted by Monitor Austin.

## III. SUMMARY

The inmate population ranged from 924 in July 2015 to 856 in October 2015, with two main housing units vacated for the reporting period (HU3 and HU4). For three of the four months in the reporting period there were four inmate-on-inmate assaults per month. There was only a single assault in September, but it resulted in an off-site medical transport due to injuries and it occurred when an officer vacated the housing unit after leaving the victim's cell door open. Officials continue to having difficulty in accurately reporting inmate assaults, as two were reported for October when, in fact, there were four. Incidents of staff use of force continue to occur at a rate of three to four per month and typically involve applications of OC spray for fight interventions. For the month of September 2015, there were no applications of force at the facility. It should also be noted that on September 15, 2015, an officer was conducting routine security checks when he observed an unresponsive inmate and immediately summoned

medical staff, while another officer began performing emergency life saving procedures (chest compressions).   Medical personnel were able to stabilize the inmate for his transfer to the facility infirmary.

The dominant compliance issue for the reporting period was staffing, both in terms of sheer numbers of staff (or lack thereof) and the quality of staff supervision in the housing units.  During the month of September 2015, the facility operated with ten vacant officer positions, which was due, in part, to four officers having been suspended or terminated in August as a result of their involvement in serious security breaches (introduction of contraband, vacating posts, and leaving cell doors unsecured).   There were three separate inmate-on-inmate assaults from August to October 2015 that were directly attributable to staff complicity.  In addition to these staff complicit/unobserved assaults, a review of video recordings from fixed cameras in a number of select housing units revealed staff-supervision lapses that ranged from leaving doors unsecured to officers vacating their housing units and congregating with one another in housing unit vestibules.   These videos also confirmed that lack of proper staff supervision was particularly acute on the Protective Custody Housing Unit 8-A.

After having briefed defendant's counsel on our preliminary findings related to these staffing issues, a telephone conference call was conducted with facility officials, and included, among others, the MDOC Deputy Commissioner and MTC corporate officials.   During the course of this telephone conference call, officials advised the

Monitor of a series of actions they have initiated to improve staff supervision of the housing units, especially HU 8-A (see detailed discussion, below).

## IV. OBSERVATIONS AND FINDINGS OF SUBSTANTIVE REMEDIAL MEASURES

### A. Classification and Housing System
*Recommended Compliance Finding:* **Partial Compliance**

### B. Protection From Harm
**(1) Reasonable Safe Living Conditions**
*Recommended Compliance Finding:* **Partial Compliance**

Observations:

The MDOC continues to use a validated objective classification system that meets national standards. Nonetheless, the last status report listed the following issues that needed to be addressed in order for the Defendants to reach substantial compliance with the *Consent Decree*:

1. At the end of each month all inmates who have had their scored custody level over-ridden from Close to Medium will be audited by the Supervising Case Manager Supervisor, MTC facility monitor, and the MDOC facility monitor to ensure that no inmates have been inappropriately classified as Medium Custody.

2. The MDOC will eliminate the NCIC backlog and ensure that all inmates are reclassified within the prescribed 12-month time frame.

3. The MDOC will also revise its classification policy so that the provision that does not allow an inmate to be reclassified unless an updated NCIC rap sheet is generated is removed. All inmates must

be formally reclassified every 12 months whether they have an updated NCIC report or not.

4. The MTC will modify its information system so that the WGCF Disciplinary Hearing Officer will have access to the inmate's classification level and score.  All inmates who have been found guilty of a serious RVR (assault, fighting, gang activity, possession of a weapon) will be immediately referred to the Case Manager Supervisor who will have a reclassification review completed prior to the inmate being released from disciplinary segregation.

5. Any inmate who is reclassified from Medium to Close Custody shall be immediately transferred to another MDOC facility.  If the inmate was placed in disciplinary segregation for the RVR, he shall remain in segregation until he is transferred.

6. Refine the current housing plan so that housing units are designated as "pure" Medium and Minimum Custody and only accommodate Protective Custody inmates.

In reviewing progress achieved in these six areas, a site visit was conducted on November 10, 2015.  During this visit, a meeting was held with representatives of the MDOC and MCI to review issues concerning the use of over-rides, the WGCF Housing Plan, conditions of confinement in the Protective Custody unit (HU 8-A), and other matters.  A random sample of 22 inmates of the 35 inmates housed on HU 8-A on November 22, 2015, was also drawn and confidential interviews were conducted by Monitor Austin, MTC Monitor Beverly Patrick, and MDOC Monitor Alfredo Dodd. These interviews were conducted in a private room with no MDOC security staff present.

An audit of all inmates who had their classification level over-ridden from Close to Medium was completed.  As discussed below, a large number of these inmates had their Close Custody score over-ridden by using the over-ride reason of "RVR free" for less than 12 months (this is not an authorized over-ride reason).

Monitor Austin also reviewed all grievances that had been filed by inmates from HU 8-A.  An updated data snapshot file was forwarded to Monitor Austin on November 23, 2015, and used for analysis. Finally, an updated spreadsheet of inmate assaults through October 2015 was also received from the MDOC.  What follows is a status review of the key issues raised during the last report.

1. *No Close Custody Inmates at WGCF*

In 2014, it was agreed by the parties that no Close Custody inmates shall be assigned to WGYCF. The November 23, 2015, snapshot data file shows that there were no Close Custody inmates at the facility on that date (Table 1).  This is a pattern that has continued since December 2014.  However, there were a number of prisoners who had scored Close Custody but had been over-ridden to Medium Custody.  In the November snapshot there were 44 prisoners who had Close Custody scores but had been over-ridden to Medium.  The issue reviewed in the last report was that many of the over-rides were not acceptable as the reasons given included rationales such as "RVR free for six months" or "RVR free for none months."  This pattern was verified in the interviews with HU 8-A

7

Protective Custody inmates.

Per MDOC policy, the only acceptable rationale is "RVR free for 12 months." Any inmate scored as Close Custody cannot have their custody level reduced to Medium using a discretionary over-ride reason of "RVR free" for less than 12 months.

**Table 1. Inmate Custody Levels**
**July 2012 – November 2015**

| Attribute | Jul-12 | Jan-14 | Aug-14 | Dec-14 | Jul-15 | Nov-15 |
|---|---|---|---|---|---|---|
| Total Inmates | 1,043 | 1,261 | 788 | 1,297 | 898 | 906 |
| Custody Level | | | | | | |
| Close | 24% | 26% | 25% | 0% | 0 | 0% |
| Medium | 57% | 58% | 60% | 85% | 91% | 89% |
| Minimum-Non-Community | 18% | 14% | 8% | 15% | 0% | 11% |
| Minimum-Community | 0% | 0% | 1% | 0% | 9% | 0% |
| Unclassified | 1% | 0% | 6% | 0% | 0% | 0% |
| Total | 100 | 100% | 100 | 100% | 100% | 100% |

Source : MDOC Monthly Facility Reports

2. *The MDOC will eliminate the NCIC backlog*

The MDOC is now reporting that the NCIC backlog has been significantly reduced and should be eliminated this month.

3. *The MDOC will also revise the NCIC reclassification policy*

Related to issue #2 above, it was recommended that the provision in MDOC policy that does not permit an inmate to be reclassified unless an updated NCIC rap sheet is generated be removed. All inmates must be formally

reclassified every 12 months whether they have an updated NCIC report or not. This is recommended as there were a number of inmates at the facility who had engaged serious misconduct and should have had their Medium Custody score upgraded to Close Custody, but that had not occurred due to the MDOC policy. This policy revision has not yet been formulated. As of November 2015, there were still several inmates who had not had a reclassification within the mandatory 12-month window.  This needs to be corrected during the next reporting period.

*4. Modify data base so Disciplinary Officer has access to Classification Data*

This modification has been made.

*5. Any inmate who is reclassified from Medium to Close Custody shall be immediately transferred to another MDOC facility*

As of December 10, 2015, there was only one inmate in Close Custody who was awaiting transfer.  In reports sent to Monitor Austin, the WGCF makes a transfer request to the MDOC the following day.  It is up to the MDOC to complete the inter-institutional transfer.

The MDOC and WGCF have done an excellent job in implementing this policy. Once a prisoner is found guilty of a serious RVR, which results in an increase in his custody level from Medium to Close Custody, he is quickly transferred to a Close Custody security facility (typically the next day).  Plaintiff's counsel has expressed concern that there are several instances where inmates

who are reclassified from Medium or Minimum to Close remain at the WGCF for several weeks or months. While this may have occurred in the past, it is not the current practice. Nonetheless, Monitor Austin will continue to assess this process and ensure that all inmates reclassified as Close Custody are a) housed appropriately within the WGCF and b) are transferred in a timely manner (certainly within a week).

*6. Modified Housing Plan*

Finally, it is required that the WGCF maintain a housing plan that separates inmates by custody level and other operational/programmatic features of the facility. The WGCF has such a plan that identifies housing units by the following three major categories:

1. General Population – Medium and Minimum Custody;

2. General Population – Privilege Unit; and,

3. Disciplinary Segregation.

While this document does technically constitute a housing plan, it should be amended to further refine the housing units according to custody and programmatic needs. In particular, there should units that are listed as only Medium Custody – not a mixture of Medium Custody and Minimum Custody.

The Monitors specifically recommended a unit that only houses Protective Custody inmates. This recommendation has been fulfilled with the establishment

of HU 8-A.  Relative to HU 8-A, concerns were raised by the Plaintiff's Counsel that many inmates in the Protective Custody unit were being subjected to ongoing dangerous conditions and extreme security breaches throughout the prison and, in particular, in HU 8-A (see Plaintiff's Memorandum dated August 26, 2015).   In particular, inmates were reporting that other inmates were blatantly smoking spice; staff was leaving the housing units on breaks, meaning that no staff was present in the unit for substantial periods of time; and active gang members were being placed in the Protective Custody unit.   Plaintiff's Counsel was also concerned that active gang members are housed in HU 8-A and, thus, pose a threat to other Protective Custody inmates.

Of the 35 inmates who were in HU 8-A on November 22, 2015, these are the relevant attributes:

1.  No inmates in HU 8-A had a RVR for an assault on another inmate or staff since being assigned to WGCF;

2.  Nine are active gang members (3 Aryan Brotherhoods; 1 Black Gangster Disciple; 1 Imperial Insane Vicelords; 1 Simon City Royal; and 3 Vicelords); and,

3.  32 (91%) have no history of institutional violence.

The major findings from the interviews conducted during the latter part of November 2015, with 22 inmates on HU 8-A, are as follows:

1. About 60% were involved in at least one program;

2. About 10% feared for their personal safety;

3. About 10% had witnessed staff physically abuse a prisoner (usually part of a use of force event);

4. About 60% witnessed staff verbally abuse inmates;

5. None of the interviewees had been physically abused by staff;

6. Only about 10% stated they had been verbally abused by staff;

7. Only 25% stated they had received a copy of their case plan;

8. About 50% stated they had received a copy of their classification record (more stated they were shown a copy but were not allowed to keep it);

9. 90-95% stated they were in good or satisfactory medical or mental health;

10. 80% stated that officers leave the unit for substantial periods of time – this was almost always associated with the 2nd Shift;

11. Many inmates complained about the unit being too cold -- but most stated it is kept clean; and

12. Many inmates complained about the presence of a very few inmates who they referred to as "C" (or Close Custody) inmates who were causing most of the problems on the unit.

While one cannot take the inmates' responses at face value, there seems to be a pattern that the MDOC and MTC need to address to reach the status of substantial compliance.  In particular, the high number of inmates reporting that they have witnessed staff verbally abusing other inmates, not receiving copies of

their case plans and current classification record, and the absence of security staff during the 2nd shift.

Regarding the active gang members in HU 8-A, Monitor Austin requested that Warden Jenkins and his WGCF executive staff (Classification Supervisor Stephanie Patrick, STG Coordinator William Morgan, and Facility Investigator Brady Sistrunk) review each case and verify that all gang members are properly assigned to the Protective Custody unit.  On the date of that review, there were 14 active gang members in HU 8-A.  "Active" gang status means that they have not completed the required gang renunciation program.  Of the 14 inmates, 12 were transferred by the MDOC to WGCF from another Protective Custody unit. Only two were placed in Protective Custody by the WGCF staff and for the reasons of "being extorted by other inmates" or "fear for life and safety".  All 14 inmates have been reviewed and cleared by WGCF Facility Investigator Sistrunk as "posing no threat to other inmates" in HU 8-A.  Nonetheless, Monitor Austin will continue to vigorously assess this situation during the next monitoring period to ensure that no inmates in HU 8-A pose a threat to other Protective Custody inmates.

**Summary**

Collectively, progress that has been made in these areas is reflected in reductions in the number of assaults reported each month (Table 2).  Moreover the annualized rate

of assaults per 100 inmates is now the lowest of all major MDOC facilities (6 per 100 inmates).  If the current numbers of assaults for June – September continue as reported over the next eight months, the annualized rate will declined to about 2-3 per 100 inmate population.

Table 2. Assaults and Assault Rates – Past 12 Months By Facility

| Facility | Ave. Pop. | 2014 | | | 2015 | | | | | | | | | Total Assaults | Assault Per 100 Prisoners |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | | |
| State Facilities | | | | | | | | | | | | | | | |
| MSP | 3,201 | 31 | 31 | 33 | 24 | 15 | 36 | 41 | 45 | 53 | 37 | 38 | 19 | 403 | 13 |
| CMCF | 2,321 | 15 | 10 | 11 | 37 | 22 | 48 | 34 | 22 | 23 | 12 | 24 | 12 | 270 | 12 |
| SMCI | 2,620 | 14 | 11 | 15 | 22 | 23 | 10 | 16 | 23 | 8 | 17 | 15 | 21 | 195 | 7 |
| Private Facilities | | | | | | | | | | | | | | | |
| East MS | 1,165 | 17 | 8 | 10 | 12 | 11 | 17 | 10 | 13 | 11 | 12 | 14 | 12 | 147 | 13 |
| Marshall | 996 | 5 | 5 | 7 | 8 | 9 | 6 | 3 | 9 | 7 | 3 | 2 | 5 | 69 | 7 |
| **Walnut Grove** | 952 | 3 | 9 | 11 | 9 | 2 | 6 | 6 | 3 | 2 | 1 | 3 | 1 | 56 | 6 |
| Wilkinson | 830 | 22 | 18 | 25 | 28 | 15 | 11 | 23 | 25 | 35 | 15 | 24 | 10 | 251 | 30 |

MDOC and MTC continue to make significant progress in reaching substantial compliance in this area of the *Consent Decree*.  In order to reach that goal, the follow five areas need to be addressed:

1. *No Close Custody Inmates at WGCF*

There cannot be any prisoners at the WGCF who have been scored as Close Custody and had their custody level reduced to Medium by using any reason except "RVR free for 12 months or more."  In other words, being "RVR free" for less than 12 months is not an acceptable reason for

14

over-riding the scored custody level from Close to Medium.

During the next reporting period, all inmates who have an over-ride reason of "RVR free" for less than 12 months need to be reviewed and a determination made of what appropriate over-ride factors are applicable. If none apply, then the inmate must be transferred to a suitable MDOC facility.   The MTC, in its response to this issue, has indicated that it will comply with this standard going forward (MTC Response dated December 18, 2015, p. 4).

2.   *MDOC will also revise the NCIC reclassification policy*

All inmates must be reclassified every 12 months regardless of whether an updated NCIC criminal record has been received.  Here again, prisoners who are scoring Close Custody on the reclassification instrument due to other factors must be transferred from the WGCF regardless of the availability of an NCIC criminal record.  (MTC Response dated December 18, 2015, p. 4-5).   The Monitor's position is that other equally relevant factors (especially inmate conduct) need to be formally reviewed every 12 months.  For example, Medium and Minimum Custody inmates who have received serious and assaultive RVRs could remain at Medium and Minimum Custody and at WGCF for an extended period of time simply because an updated NCIC has not been generated by MDOC.   It is

puzzling to the Monitors why it would require such a delay for the MDOC to provide this information to the WGCF for any inmate being re-classified. For these reasons, the Monitors respectfully disagree with the MTC and urge the MDOC to provide updated NCIC data for all inmates being reclassified for their annual reviews.

3. *Modified Housing Plan*

The current housing plan should be modified to create a few pure Medium Custody housing units that would hold inmates who are most problematic in terms of inmate misconduct. The Monitors would also recommend the creation of a second pure Minimum/Privilege housing unit that only houses Minimum Custody inmates. This recommendation is advisory in nature and is not a requirement of reaching substantial compliance with the *Consent Decree*. MTC has indicated in its response that a modification of its current housing plan is not required to reach compliance with the Consent Decree, which is correct (MTC Response dated December 18, 2015, p. 5).

4. *Verbal Abuse by Some Staff*

Inmate reports during the HU 8-A interviews revealed an excessive pattern of verbal abuse by staff on inmates. While this is not the norm, it seems to be occurring at a disturbing level. It is recommended that all

security staff receive some form of in-service refresher training to reinforce the policy that such behavior will not be tolerated. Further, staff should be instructed to immediately report such incidents to their immediate supervisor. MTC, in its response, has stated that it is responding to these allegations with additional training, supervision, and monitoring of such allegations (MTC Response dated December 18, 2015, p.5).

5. *Second Shift staff leaving their posts without relief*

This is clearly happening in HU 8-A and needs to cease. The MDOC and MTC auditors should perform several unannounced visits during the 2nd shift to determine if this practice is still occurring. A summary report by the MDOC and MTC auditors needs to be filed with the Monitors on the extent to which this practice has ceased. The MTC, in its response, has stated it is responding to these allegations with additional training, supervision, and monitoring of such allegations (MTC Response dated December 18, 2015, p.6).

## B. Protection From Harm

### (2) Sufficient Numbers of Adequately Trained Staff
***Recommended Compliance Finding:*** **Partial Compliance**

Observations:

The current approved line-staffing complement for WGCF is 147. The

September 2015, line-staffing count was 137.  As of November 16, 2015, the line-staffing count was 131, with 11 cadets in Pre-Service training, with a graduation date of November 20, 2015.  As a consequence of these vacancies, mandated positions must be filled with both volunteers and mandated overtime.  It should be noted that overtime hours for line staff increased from 3,727 in September, to 4,761 in October.

On October 6, 2015, Monitor Martin conducted an unannounced site inspection, arriving at approximately 7:00 p.m.  The shift commander and Monitor Martin utilized the *2nd Shift Roster* to review and confirm all housing assignments.  While the shift commander had done a commendable job in covering his mandated positions by asking certain 3rd-shift officers to come in early and holding over some 1st-shift officers, at least two housing areas were vacated for part of the second shift.  It is noted, in correspondence provided to Monitor Martin on November 20, 2015, that, according to MTC officials, the WGCF approved staffing for line staff is 137, which is 10 positions below the approved staffing level on the MDOC Monthly Staffing Count for October 31, 2015.  Moreover, it is unclear whether MTC officials sought and received approval from the MDOC for this staff reduction (see *Consent Decree*, at Section III.B.2.).  The MTC Response to *8th Monitors' Report* cited the MDOC contract in support of this reduced staffing complement (at page 8).  Regardless of whether this

reduced number has been approved, it appears to be inadequate, as evidenced by the number of overtime hours needed to fill mandatory posts. The reduced staffing complement may be a product of both too few positions and the shift relief factor employed by the MTC. The staff shortage is aggravated by the lack of positions allocated for supervisory sergeants on the 2nd and 3rd shifts (see also Plaintiffs' counsel comments, Number 3). It is noted that the discussion below with respect to HU 8-A centered around the 2nd Shift, which was operating largely without sergeant supervision.

These staffing shortages are, of course, troublesome. However, it is the overall quality of line-staff supervision of the housing units for the reporting period that was clearly lacking and was, in some instances, directly related to inmates having been subjected to needless risk of harm and actual injury. There were at least three inmate assaults in which staff was directly complicit in the incident (see WGCF 15-298, 15-346 & 15-363). In one incident, two inmates requested a housing change due to threats from other inmates (WGCF 15-291). The day following this request, the two inmates were assaulted, an event unobserved by staff. One of these two inmates sustained multiple injuries, including a possible rib fracture. In another incident, an inmate was observed in HU 8-A falling to the floor from a seated position outside his cell in an apparent loss of consciousness (see video 9/1/15 8-A 1950-2010). At the time, there was

no officer in the housing unit.  By the time officers arrived, the inmate had been placed in his cell by other inmates.   Within minutes, the officers exited the housing unit and no medical assistance was requested to examine the inmate.

On August 26, 2015, Plaintiffs' Counsel submitted a memorandum detailing a variety of inmate allegations of unsafe conditions at the facility.  Many of these allegations centered on the unsafe operation of HU 8-A.   Having reviewed numerous videos of HU 8-A and other housing units, provided pursuant to plaintiffs' counsel requests, the Monitor was able to confirm a number of these allegations.

The video reviews reflected frequent security lapses, such as officers vacating the housing areas to congregate in the central vestibule of a housing pod; allowing inmates to operate and secure pod doors; allowing multiple pod doors to be unsecure at the same time and for extended periods; officers not securing cell doors; and officers allowing inmates to enter and congregate in cells to which they are not assigned.   Facility officials acknowledged that a number of officers then assigned to HU 8-A 2nd shift are no longer employed at the facility, including the officer who failed to summon medical personnel when the aforementioned inmate fell to the floor.   It is noted that one of the 15 inmates randomly selected for interviews by the Monitor was housed on HU 8-A and he was very critical of 2nd shift officers and claimed that officers frequently left the

housing unit for extended periods. Facility officials have recently initiated heightened supervision of HU 8-A, including daily viewing of live-feed cameras by facility managers, daily visits to the unit by facility managers, and interviews with inmates concerning the operation of the unit. The heightened supervision initiated for HU 8-A would serve the other housing units equally well. Of the 15 random interviews Monitor Martin conducted during his site work (all housing units were represented), inmates were consistent on the following: 1) cell doors are often not secured by officers; 2) officers often vacate housing units for varying periods of time; and 3) there are too few programs/too much idle time.

**(3-12) Use of Force and Chemical Agents**
***Recommended Compliance Finding:* Substantial Compliance**

<u>Observations</u>:

Staff use of force for the reporting period again averaged less than four incidents per month. There were no use-of-force incidents in the month of September. The level of force employed typically occurred when officers intervened with OC spray during the course of an inmate-on-inmate assault/fight. Injuries to inmates and staff have been few in number and not of a serious nature. Facility staff continue to employ decontamination procedures in a timely fashion. Most importantly, facility officials are now routinely conducting Critical Incident Reviews, when appropriate, on use-of-force incidents and, as a result, are

identifying issues to be addressed through varying levels of corrective action.

**(13) Use of Prisoners to Enforce Rules or Impose Discipline**
*Recommended Compliance Finding:* Compliance

**(14) Protection of Inmates from Abuse, Harassment, and Punishment on the Basis of their Actual or Perceived Sexual Orientation, Gender Identity, and Gender Non-Conformity**
*Recommended Compliance Finding:* Compliance

**(15) Prohibition of Forcing Inmates to Engage in Physical Exertion that Inflicts Pain or Discomfort**
*Recommended Compliance Finding:* Compliance

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

JACKSON DIVISION

| | | |
|---|---|---|
| C.B. by and through his next friend, | ) | |
| Charleston DePriest, et al. | ) | |
| | ) | Civil Action No. 3:10cv66 |
| Plaintiffs, | ) | |
| | ) | MANAGEMENT & TRAINING |
| | ) | CORPORATION RESPONSE TO 8th |
| V. | ) | MONITOR'S REPORT |
| | ) | Pursuant to: |
| | ) | CLASS ACTION |
| | ) | CONSENT DECREE |
| Walnut Grove Correctional Authority, | ) | |
| et al. | ) | December 18, 2015 |
| Defendants. | ) | |

**Introduction**

This is the Management & Training Corporation (MTC) response to the 8th Monitor's Report concerning Defendant's compliance with the provisions of the Consent Decree. The reporting period covers activities from July 2015 through October 2015.

As the Monitors have documented, during this period the MTC/Mississippi Department of Corrections (MDOC) Team at Walnut Grove Correctional Facility (WGCF) have made significant gains in core areas of operation toward substantial compliance with provisions of the Decree. Again, in the 8th Report, zero areas were graded as non-compliant. This response will further document that progress.

The Monitors rate sections of the Decree as follows:

- **A. Classification and Housing System** remains Partial Compliance.
- **B. Protection from Harm:**
    - **(1) Reasonably Safe Living Conditions:** is downgraded to Partial Compliance;
    - **(2) Sufficient Numbers of Adequately Trained Staff:** remains Partial Compliance;
    - **(3-12) Use of Force and Chemical Agents:** is upgraded to Substantial Compliance.

MTC continues to maintain that the facility is operating in a manner that meets not only constitutional but industry standards. This is evidenced through third party audits that demonstrate adherence to national accreditation standards (ACA), Department of Justice standards for sexual safety (PREA), as well as internal audits of consent decree items using an objective audit tool. We are committed to continually improve operations to further limit the brief lapses that occasionally surface in otherwise sustained compliance.

Based on these criteria, MTC rates as follows:

- **Classification and Housing** is Compliance.
- **Protection from Harm:**
  - ○ **(1) Reasonably Safe Living Conditions** is Substantial Compliance.
  - ○ **(2) Sufficient Numbers of Adequately Trained Staff** is Substantial Compliance.
  - ○ **(3-12) Use of Force and Chemical Agents** is Compliance.

In support of Monitors' ratings, they suggest that MTC and MDOC alter policies and procedures related to Consent Decree elements **A. Classification and Housing** and **B. Protection from Harm.** However, it is also clear that WGCF policies and procedures are consistent with current approved MDOC and MTC written policy and procedure. As Monitors have noted in the past, these policies and procedures already meet national American Correctional Association (ACA) Standards. WGCF remains fully accredited by the American Correctional Association and the Correctional Education Association (CEA), with scores of 100% compliance.

The Consent Decree provides that "MDOC retains the final authority over the drafting and wording of the policies and staffing plans. . . ", at Page 13. Therefore, WGCF's compliance with current MDOC policy would mean meeting the essential baseline measure for substantial compliance with the elements of the Consent Decree now.

Any faults in the practices at WGCF are in the application and enforcement of these approved nationally recognized policies and procedures. This Response will address the corrective action that has been taken to remedy those faults.

Below Defendants address each issue evaluated by the Monitors.


**AREAS EVALUATED BY MONITORS**

**A.      Classification and Housing System**

Consent Decree:  "MDOC will utilize a classification system that ensures prisoners are **appropriately and safely** housed within WGYCF."

Monitor's Recommended Compliance Finding: **Partial Compliance**

Walnut Grove Compliance Audit Findings:

| | | |
|---|---|---|
| July | 96% | Compliance |
| August | 95% | Compliance |
| September | 98% | Compliance |
| October | 94% | Compliance |

MTC's Recommended Compliance Finding        **Compliance**

WGCF had an average rating of almost 96% compliance with all objective **Classification and Housing System** elements of the Consent Decree during this reporting period, based on the Court Order and the current policies and procedures of MDOC.

This response will first address Classification issues. Then the response will address Assault Rates, which in prior reports were the Monitor's measure for **Protection from Harm: (1) Reasonably Safe Living Conditions.**

<u>A-1. MDOC Classification Policy Governing Walnut Grove Correctional Facility</u>

Prior to responding to the Monitor's recommendations for Classification, this Response will outline relevant MDOC policies and procedures.

## Classification Handbook

As the Monitors have observed, MDOC and MTC continue to use a validated objective classification system that meets national standards for **appropriate and safe housing** and classification of offenders. Offenders are classified by MDOC **prior** to transfer to WGCF. Offenders are then reclassified on an annual basis to determine if the custody level should be adjusted. The validated classification system allows for an offender's scored custody level to be over-ridden, with the final approval resting with MDOC Offender Services. Monitors acknowledged in several prior reports that "MDOC already has an external classification system that has been evaluated and validated some years ago" (1st, 2nd, 3rd, 6th, and 7th Monitor Reports). In the Third Report, Monitors stated that "once an internal classification system has been fully implemented the MDOC will be able to reach full compliance with this Consent Decree requirement."

In 2014, it was agreed that the Close Custody Unit at WGCF would be closed to reduce violence, and the population would be transferred. This was a situational solution to the problem, and it was accomplished. Since then the systems and staffing have undergone adjustments. This has been noted by the Monitors in their evaluations, and the progress has been reflected in compliance ratings.

The offender population at WGCF, like all other institutions in Mississippi, remains subject to the procedures of the standard, validated Mississippi Department of Corrections Institutional Classification Handbook, Revised October 19, 2012. Individual offender classification is fluid, frequently changing depending on many factors, including offender behavior, and subject to overrides under carefully defined criteria, to maximize public safety. (Classification Manual, pp. 22-23). The goal of offender classification is placement in the least restrictive environment while ensuring public safety and the security of the institution, staff, and all offenders. (MDOC Classification Handbook, p. 17).

Improvements in offender and staff safety documented in the next section, **B. Protection from Harm** demonstrates that MTC Walnut Grove is safely managing offenders in this population.

Under current MDOC policy, offenders with Close Custody points may, with approval from MDOC Headquarters Offender Services, be appropriately and safely overridden to Medium Custody anywhere in MDOC, including WGCF, under the following circumstances:

> "**Exceptional Institutional Conduct for more than 12 months.** The inmate has not received a RVR during the last 12 months and has made positive contributions to the facility, housing unit, and/or program, such as taking on extra, unpaid duties or services." (MDOC Classification Handbook, p. 23)

3

### MDOC Classification Plan

MDOC also maintains a separate Classification Plan, updated 8/1/2015, which meets ACA standards, and which contains offender housing policies by custody level. This plan requires that only Close Custody offenders be housed "with the same custody offenders." (MDOC Classification Plan, p.2). This plan, which is effective across the entire State, has no barrier to mixing custody levels, except for Close, in any housing unit. This is normal correctional practice for the following reasons: (1) individual offender custody levels vary frequently, and the controls necessary for the highest present custody level are routinely maintained inside each housing unit, but they will vary as needed on work sites. (2) Often because of demographics the prison physical plant has been constructed for one custody level, but currently houses different custody levels. (3) The prison population may not have sufficient numbers to operate separate housing units for individual custody levels. The priority is safe management of the prison population, and having security in a particular housing unit consistent with the custody level of the highest custody level offenders housed in the unit.

With the nationally validated baseline standards of the current Mississippi Department of Corrections Offender Classification Handbook and Offender Classification Plan for **appropriate and safe housing** in mind, this Response will address the proposals the Monitors have listed regarding **Classification and Housing.**

<u>A-2. Monitor Classification Issues to be Addressed:</u>

The Monitors recommend altering policy and procedure in several classification related areas:

1. *No Close Custody Inmates at WGCF*

    MDOC Classification Procedures do not permit overrides of Close Custody status by using any reasons except "The inmate has not received an RVR during the last 12 months. . ." During this reporting period, WGCF met with the Monitors in person and by phone, and clarified this issue. Former Close Custody inmates who did not have one year RVR free, and who had Close Custody points, and who had this score overridden by MDOC classification staff to Medium custody, have been identified, reclassified, and transferred to a suitable facility.

2. *MDOC will also revise the NCIC reclassification policy*

    As outlined below, WGCF has devised an alternative plan, an **Exception and Tracking Report** to monitor and prevent any classification anomalies to ensure that offenders meet both goals of annual National Crime Information Center (NCIC) review and annual reclassification.

    The Monitors in their Recommendation are suggesting a change of policy which would affect the entire State of Mississippi Corrections system, not just offenders with custody potentially being raised to Close at WGCF. All inmates must be reclassified every 12 months, as outlined in the MDOC Classification Handbook, with the goal of ensuring placement in the least restrictive environment, while ensuring public safety. With this goal in mind, as discussed in a meeting with the Monitor, MTC, and MDOC, it is simply unsafe to confirm the annual inmate custody review without reviewing an updated NCIC report. Other jurisdictions are often slow to post information to NCIC, and new convictions, sentence

modifications, detainers, warrants, or notices may be posted which may affect the security of the institution, staff, and all offenders. Without periodic review of an offender's NCIC status, consequences can, and occasionally have been serious, and even lethal, especially if custody level is reduced.

As outlined in the Consent Decree, page 13, Monitors collaborate "in a non-binding manner" with MDOC to promulgate the policies, procedures, classification, and staffing plans necessary to effectuate this Consent Decree.

3. *Modified Housing Plan*

The Monitor's advisory proposal to establish "pure" housing units is contrary to MDOC policy, as outlined above, which places no barriers to mixing custody levels in any housing unit, except for Close Custody. This is normal correctional practice. Monitors have received both the July 2015 and February 2016 Housing Plans for WGCF which show unit missions including General Population Units, Privilege Zones, Protective Custody, and Administrative Segregation. All are Medium and Minimum Custody, consistent with MDOC policies and procedures, which MDOC has sole authority to modify.

### Gang Members in Protective Custody

Under the category Modified Housing Plan, Monitors also discuss placement of validated gang members in the Protective Custody Unit. Placement in Protective Custody (PC) is governed by MDOC Procedure 19-01-02, dated 9/1/2010. This procedure meets rigorous national ACA Standards for screening offenders for placement, retention, and release from Protective Custody. Placement can only be when there is documentation that Protective Custody is warranted and no reasonable alternatives are available, and must receive the approval of the MDOC State Classification Authority. Review of the placement is within 72 hours, and again every seven days for the first two months, and every 30 days thereafter. There is a required Mental Health assessment. There is no requirement for renunciation of gang membership. Indeed, the inmates named in the Monitor's Report arrived at WGCF already approved by MDOC Classification Authority for PC status. The priority is the continuing documented staff assessment that the placement is necessary to protect the safety of the inmate. (See MDOC SOP 19-01-02, Attachment A)

Under this heading, Modified Housing Plan, Monitors also propose four other issues which are identified as being priorities to reach the status of substantial compliance:

1. Alleged Verbal Abuse by Some Staff

   Allegations of verbal abuse by staff are, of course, very troubling and taken seriously. But they are difficult to address without specifics. Management is addressing this allegation in shift briefings, in-service training (Interpersonal Communication and Staff/Inmate Relations), and through more intensive supervision in Zone 8A, Protective Housing Unit, which is outlined in the next segment of this Response, under **(2) Protection from Harm: Sufficient Numbers of Adequately Trained Staff.**

2. Offenders not receiving copies of their case plans.

3. Offenders not receiving copies of their classification records. Caseworkers and supervisors report that offenders routinely receive copies of their case plans and classification records, and this fact is noted in the electronic case file. WGCF interviewers have validated that offenders simply do not know the technical title of the documents, and so deny knowledge of them during formal structured interviews. However, to validate this receipt and as proof of practice, WGCF staff will now stamp the retained copy of the case plan and classification records, and have the offender sign, acknowledging he has received his copy. If the offender refuses to sign, the Caseworker will note the refusal and date, and deliver the document to the inmate. (See Attachment B, Acknowledgement of Receipt)

4. Second Shift staff leaving their posts without relief. This is a complex issue. As Monitors have observed, there have been employee errors in judgment and misbehavior, and corrective action has been taken by management. Also, this issue has been fraught with confusion, reporting errors, and misunderstanding of the prison design and staff post orders. Since this identical issue also appears under **(2) Protection from Harm: Sufficient Numbers of Adequately Trained Staff**, it will be addressed under that heading.

Defendants note that apparently these and other allegations concerning staff performance in Housing Zone 8A were first addressed in Plaintiff's Memorandum dated August 26, 2015, referred to three times in Monitor's report. Defendants do not have a copy of this Memorandum, and do not know its contents. Defendants are being subjected to various allegations without the basic ability to see the specifics of the allegations in writing so that they can be analyzed, properly investigated, properly validated or refuted. As has been outlined in prior Responses to Monitor's reports, in any situation of potential injury, we all have a long established mutual duty to warn and to protect. If the Plaintiffs allege situations, such as "dangerous conditions and extreme security breaches throughout the prison" without specifics, the WGCF Team has insufficient information to act to protect potential victims or correct alleged assailants, as is our duty.

A-3. MTC Classification Action Initiative: The Monthly Exception and Tracking Report

In order to insure compliance with MTC/MDOC Classification Policies and Procedures, especially those related to Close B Custody, WGCF has begun a monthly process of tracking the following.

1. Cases which are transferred into WGCF or which remain in the population which were overridden to Medium Custody by MDOC under the criteria of **RVR free for less than 12 months**, and arrange for their immediate transfer.
2. Offenders who have appropriately been classified as Close Custody, awaiting transfer out, who have been waiting for 30+ days from day of decision to date of transfer.
3. Offenders who are approaching their 12 month reclassification date, at the 11 month point, who are at risk of being delayed because an NCIC is pending.
4. Alert the Warden when a backlog of NCIC screening is developing at MDOC.

5. Any other interagency factors which may impact full compliance with Classification Policy and Procedure

Any exceptions that develop will be referred to the Director of Private Prisons for MDOC and the MTC Regional Administrator for consultation and immediate correction.

**B-1    Protection from Harm: (1) Reasonable Safe Living Conditions**

Consent Decree: "At all times prisoners will be provided with reasonably safe living conditions and will be protected from violence and physical or sexual abuse by staff and other prisoners."

Monitors Recommended Compliance Finding:    **Partial Compliance**

Walnut Grove Compliance Audit Findings:

| July | 91% | Compliance |
|------|-----|------------|
| August | 85% | Substantial Compliance |
| September | 81% | Substantial Compliance |
| October | 81% | Substantial Compliance |

WGCF had an average rating of 85% compliance with all objective elements of **Protection from Harm** of the Consent Decree, which are now split into separate sections (Classification and Protection from Harm) in the Monitor's Report during this reporting period.

MTC's Recommended Compliance Finding:    **Substantial Compliance***

*based on objective WGCF audit.

As the Monitors point out, the continuing reduction in assaults reported each month is evidence of the considerable progress made each month at WGCF. The annualized rate of assaults is now the lowest of all major MDOC facilities, and declining. There was one assault in July, three in August, one in September, and four in October. **WGCF is a safe institution.**

There has been a technical debate on how to report situations where there is an inmate-on-inmate fight and an immediate use of force in the same event (use of pepper spray). MTC counted such an event in October as Use of Force. When the matter was questioned by the Monitors, Defendants sought interpretive guidance from the Principal at the Association of State Correctional Administrators (ASCA), who ruled that each situation would be counted as both a Use of Force and an Assault, for statistical purposes. Therefore, the future such events will be reported by MTC according to this standard, and they will **not** be considered double reporting, even though the same event is reported under two categories. (See Attachment C) The net effect of this guidance for all of 2015 is an increase of five (5) inmate-on-inmate assaults.

B-2     **Protection from Harm: (2) Sufficient Numbers of Adequately Trained Staff**

Consent Decree: "MDOC will ensure that there are sufficient numbers of adequately trained direct care and supervisory staff, and sufficient numbers of professional staff. Within 90 days of the Court's approval of this Consent Decree, MDOC will develop and implement a staffing plan for direct care, supervisory, and professional staff to ensure that prisoners are **adequately supervised and protected from harm,** that prisoners have adequate access to medical services and adequate time out of their cells."

Monitors Recommended Compliance Finding: **Partial Compliance**

MTC Recommended Compliance Finding: **Substantial Compliance**

The current approved line correctional officer staffing for WGCF is 136.61. See the official WGCF 962 population MDOC approved Staffing Schedule (Attachment D). This compliment is designed to cover 89 posts; 38 on first shift, 32 on second shift, and 19 on third shift. This results in 47.61 relief staff. These relief staff cover scheduled and unscheduled leave as well as training time when officers are not on post. These relief positions can be filled by full time hires, part time hires, on-call staff, overtime, or a combination thereof. It is **mandatory** for all 89 posts to be filled as listed on this Master Schedule. The weekly Mandatory Staffing Report documents the number of **mandatory** posts which have gone unfilled. Attached are the Mandatory Staffing Reports for the month of October. It can be seen that vacancies in **mandatory** posts are rare. Some vacancies did occur during the week of October 5th, the week that a Monitor visited the institution during the evening shift when there is little offender movement. (See Attachment E)

MTC Regional Vice President did authorize the WGCF Warden to augment correctional officer staff to provide more flexibility in keeping posts filled. These 10 positions are not part of the mandatory positions required by the contract with MDOC, and may not be considered as part of the WGCF required position count. In error, WGCF has reported the approved staffing for correctional officers on the MDOC Monthly Staffing Count as 147. As the official MDOC contract document shows, that is simply wrong. The correct number is 136.61, rounded to 137.

### WGCF is an Indirect-Supervision Facility

Along with the actual correct count of mandatory correctional officer posts at WGCF, there is a great deal of confusion concerning the duties of correctional officers, and the requirements for officer presence in the zones at WGCF. This situation requires clarification.

WGCF was designed as an **Indirect-Supervision** facility. Indirect-Supervision designed facilities are different than Direct-Supervision facilities as they have a permanent secure work stations located outside the housing zones which are staffed on a continuous basis. The work stations, commonly referred to as a **Pod Control** Centers, provide a 360 degree view of each of the respective four housing zones within the unit.

A Direct-Supervision facility in contrast has an officer work station built within the housing zone. This is **not** the case at WGCF. At WGCF there is no permanent officer podium in the housing unit, no floor officer access control panels, no floor secure storage, no floor staff telephones, and no floor staff washroom. The primary workstation is the **Pod Control**, which supports the floor officers. The officers

assigned to **Pod Control** are responsible for monitoring activity levels in each of the zones which each house a small offender population, recording activity within the unit, supporting floor staff, controlling access to the zone including the cell doors, and monitoring CCTV's and radio communications.

In addition to the mandatory **Pod Control** Officers, separate correctional officers are assigned to rove the floor of the housing zones and escort offenders **when needed.** The number of staff assigned varies by shift and zone. During periods of time when there is formally scheduled offender movement there are routinely more floor officer posts being filled. Floor officers conduct offender count, escort offenders outside the unit, and conduct welfare checks on offenders assigned to the zone.

This Indirect-Supervision design, which is used in other prisons in Mississippi, is a standard "New Generation" jail and prison design, used throughout the country, and recognized by the National Institute of Corrections (NIC), and American Jail Association (AJA), the American Correctional Association (ACA), and the Committee on Architecture for Justice of the American Institute of Architects. (See Attachment F).

In their Standards and Compliance Monitoring Visit on January 12-13, 2015, the Visiting Committee Members of the Commission on Accreditation for Corrections commented on the indirect supervision design at WGCF:

> "Housing unit supervision is indirect, by observation from an elevated satellite control center and **hallway officers who enter the unit on a random basis."** (our emphasis)

This common corrections model as operated at WGCF was accepted as meeting ACA Standards for supervision of an inmate housing unit, as of January 2015 by the Commission on Accreditation for Corrections.

**Indirect Supervision: Post Orders**

With this clarification of the numbers of correctional officers, and the "New Generation" Indirect-Supervision prison design used at Walnut Grove, this Response will address the actual duties of correctional officers in zones, such as 8A which has been a source of discussion in the Monitor's Report, with extracts from Post Orders.

**Pod Control** Officer (Attachment G)

    a. B. "The **Pod Control** is staffed 7 days a week, 24 hours a day."

    b. B. 5. "Remain on Post until you are physically relieved by another Correctional Officer. An officer will remain in **Pod Control** at all times."

    c. C. 2. "Monitor all fields of view to include the assigned housing zones, day room area, shower area, assigned inmates, and all assigned staff."

    d. D. 3. "At no time will two doors leading into the hall (unit entrance, Housing Unit doors, or **Pod Control** door) be opened at the same time."

    e. E. 1. "The **Pod Control** Officer is responsible for monitoring all inmate movement."

**Tier Officer** Post (Attachment H)

    a. B. 1. "Conduct a security and safety inspection. . ."

b. C. 7. "All officers are expected to make at least 2 security rounds an hour at staggered intervals not to exceed 30 minutes."

c. D. 1. "The Housing Unit Officer will ensure that all entrance and exit doors remain secure at all times."

d. E. 5. "The Housing Unit Officer will ensure that the inmate's cell door is secure and free from debris that will prohibit the door from securing."

e. Q. a. "Temporary absences from this Post shall only be authorized with proper approval from the immediate Supervisor."

f. Q. b. "When deemed necessary by the immediate supervisor temporary absences shall be authorized to satisfy minimal staffing."

With permission, with doors, including unit doors and inmate cell doors secured, staff may leave housing zones to assist with counts, to participate in searches, for personal convenience breaks, and if they are on designated posts to respond to emergency codes.  If an employee leaves a post without prior approval, or fails to return in a timely manner, they are subject to corrective action.  In the absence of a floor officer, the **Pod Control** Officer is always on post, with a clear view supervising the housing zone.

As outlined above, the design, the policies, the procedures, the post orders, and the staffing of WGCF meet National and MDOC Standards.  The challenge is enforcement and operational compliance with those standards.

The Monitors cite five incidents of staff error: four assault incidents and one medical incident.  In three of the assault incidents and in the medical incident staff behavior was found to have been substandard, and corrective action was taken, including termination in two cases.  One assault event was not observed by staff, and no corrective action has been taken. It should be noted that WGCF management took corrective action in these cases **prior** to receiving complaints about these incidents from Plaintiffs and notification from the Monitors.

Apparently there are a number of allegations made by Plaintiffs in an August 26, 2015 Memorandum. As stated earlier, Defendants have never been provided with a copy of this document, and therefore cannot validate or refute any of Plaintiff's comments. Defendants reiterate our belief that we have a mutual duty to share information and act expeditiously if Plaintiffs have specific, verifiable information which may help prevent injury to staff, inmates, or the public.

**MTC Staff Accountability Action Initiative**

As the Monitors state, in an effort to increase enforcement and operational compliance with MDOC and MTC policy and procedure in housing zone 8 A, the Warden has directed the following:

1. Daily review of the live video feed by senior managers, from zone 8 A.
2. Daily review of recorded video footage by managers from zone 8 A.
3. Daily visits to zone 8 A by senior managers.
4. Administrative Duty Officer and Major will spend one day per week on evening shift, to include time in 8 A.
5. Administrative Staff visit 8 A and interview offenders.

The Seventh Monitor's report discussed in detail WGCF Incident 15-169, dated May 7, where an offender was discovered unresponsive in the cell.  The Leake County Coroner reports as of 12/11/2015,

that the investigation remains incomplete, awaiting a toxicology report from the State Laboratory, which is very far behind and understaffed. There is no anticipated completion date for this report from the State Crime Laboratory.

With the clarifications and enforcement outlined above, the elements of **Sufficient Numbers of Adequately Trained Staff** are sufficient to demonstrate compliance with the policies and procedures of MDOC ensuring offenders are **adequately supervised and protected from harm,** and MTC is in Substantial Compliance with this provision of the Consent Decree.


**B-3.     Protection from Harm: (3-12) Use of Force and Chemical Agents**

Consent Decree: "Each use of force will be reviewed pursuant to MDOC's use of force policy and standard operating procedures."

Monitor's recommended Compliance Finding:     **Substantial Compliance**

MTC's Recommended Compliance Finding:     **Compliance**

According to the Association of State Correctional Administrators reporting standards, as documented in MDOC statistics, WGCF had zero Planned Use of Force events during this reporting period. WGCF is also the lowest, and declining number of spontaneous Use of Force events of comparable institutions in the Mississippi correctional system, an average of 3 per month, usually with a modest amount of OC. There are no indications in this reporting period that MTC has deviated from strict observance from MDOC and national ACA Standards, policy, and procedure on Use of Force.


**B-4.     Protection from Harm: (13) Use of Prisoners to Enforce Rules or Impose Discipline**

Consent Decree: "MDOC will not utilize, direct, or allow prisoners to enforce rules or impose discipline on other prisoners."

Monitor's Recommended Compliance Finding:     **Compliance**

MTC's Recommended Compliance Finding:     **Compliance**


**B-5.     Protection from Harm: (14) Protection of Offenders from Abuse, Harassment, and Punishment on the Basis of their Actual or Perceived Sexual Orientation, Gender Identity, and Gender Non-Conformity**

Consent Decree: "MDOC will take reasonable steps to protect prisoners at WGYCF from verbal abuse and harassment. MDOC will develop policies, procedures and practices that protect prisoners from abuse, harassment; and punishment on the basis of their actual or perceived sexual orientation, gender identity, and gender non conformity."

Monitor's Recommended Compliance Finding:     **Compliance**

MTC Recommended Compliance Finding:     **Compliance**

**B-6.**    **Protection from Harm: (15) Prohibition of Forcing Offenders to Engage in Physical Exertion that Inflicts Pain or Discomfort**

Consent Decree: "MDOC will prohibit staff from forcing prisoners at WGYCF to engage in physical exertion that inflicts pain or discomfort, for example the practice of forcing prisoners to "alligator walk" and to "duck walk.""

Monitor's Recommended Compliance Finding:    **Compliance**

MTC's Recommended Compliance Finding:    **Compliance**

## Summary

The Walnut Grove Correctional Facility is accredited and has met the national industry standards of the American Correctional Association. Compliance was reaffirmed during an audit of policy, procedures, and practice in January of 2015, and confirmed by the Commission on Accreditation for Correction during this reporting period. We also remain certified as 100% compliant under the Prison Rape Elimination Act (PREA) based on guidelines established by the Department of Justice.

Monitors assessments regarding Classification and Protection from Harm (Reasonably Safe Living Conditions and Sufficient Number of Staff) remain static. Monitors assessment of Use of Force has progressed to Substantial Compliance consistent with the dramatic decline in the rate of assaults at WGCF. Walnut Grove is a Safe Institution.

Monitors believe progress in Classification and Protection from Harm requires change in State Policy, while MTC will show compliance by Management Actions.

Objective Walnut Grove Compliance Audit Tool has consistently shown compliance over the last 12 months in the area of Classification (95%). It has also documented consistent substantial compliance in the areas of Protection from Harm (83%). We are committed to continually improve operations to further limit the brief lapses that have surfaced in otherwise sustained compliance.

**ATTACHMENT A - REDACTED**

**ATTACHMENT B**

https://print.staples.com/trudec/review.espc?abc_det

**Review Your Self-Inking Stamp - 1"x 2-3/4" - T4915**

You're almost done. Review your design and approve it below, or click edit to make changes.

View Larger | Edit

---

**Walnut Grove Correctional Facility**

*Acknowledgement of Receipt*

Date_____

Received By:_____

---

**Things to check for:**

- Information is accurate and spelled correctly
- Text is legible and contrasts against background
- Images are clear and don't appear blurry
- Nothing is overlapping or too close to the margins

☐ **I have reviewed and approve my d**

Next

ATTACHMENT C

**ASCA Interpretive Guidance**



Fri 11/20/2015 8:47 PM

Patricia Hardyman <phardyman@asca.net>

Re: Counting rules - request for interpretive guidance

To   Mark Lee

🔵 You forwarded this message on 11/23/2015 12:20 PM.

Mark,

I have to say C– an inmate-on-inmate fight AND an immediate use of force

patricia



Patricia L. Hardyman, Ph.D.
*Principal*

**Association of State Correctional Administrators (ASCA)**
1193 Glen Court, Suite 5
Hagerstown, MD 21242

Phone: 800-990-1212
Cell:    (11)-439-9274
Email:  phardyman@asca.net

**From:** Mark Lee <Mark.Lee@mtctrains.com>
**Date:** Friday, November 20, 2015 at 4:33 PM
**To:** Patricia Hardyman <phardyman@asca.net>
**Subject:** Counting rules – request for interpretive guidance

Hi Patricia,

Hope this finds you well. I have a question related to the counting rules that I would like interpretation on.

Scenario:
Two inmates start fighting and command staff give orders to stop. Inmates refuse to comply and the command staff use OC spray to gain compliance. No one was hurt. Should this be counted as:
A – an inmate-on-inmate fight
B – an immediate use of force
C – an inmate-on-inmate fight AND an immediate use of force

Thanks,
Mark

**ATTACHMENT D - REDACTED**

ATTACHMENT E



# MEMO

To:     DCI Jerry Williams

From:   Deputy Warden Jessie Streeter

Cc:     Warden Lepher Jankins, Deputy Warden Mabry, Rick McCarty, Alfredia Dodd, Tony Compton, Arthurine
        Harris, Chandra Berryman- Willis, Jacqueline Bush, Paula Melton, Evangeline Harvey, and Melissa
        Ferguson

Date:   Monday, October 5, 2015

Re:     Mandatory Staffing Report

The following are the number of vacant mandatory posts:

| Date | Shift | Total Vacant Mandatory Posts |
|---|---|---|
| 28-Sept-2015 | 6-2 | 0 |
| | 2-10 | 0 |
| | 10-6 | 0 |
| 29-Sept-2015 | 6-2 | 0 |
| | 2-10 | 0 |
| | 10-6 | 0 |
| 30-Sept-2015 | 6-2 | 0 |
| | 2-10 | 0 |
| | 10-6 | 0 |
| 01-Oct-2015 | 6-2 | 0 |
| | 2-10 | 0 |
| | 10-6 | 0 |
| 02-Oct-2015 | 6-2 | 0 |
| | 2-10 | 0 |
| | 10-6 | 0 |
| 03-Oct-2015 | 6-2 | 0 |
| | 2-10 | 0 |
| | 10-6 | 0 |
| 04-Oct-2015 | 6-2 | 0 |
| | 2-10 | 0 |
| | 10-6 | 0 |

Jessie Streeter
Deputy Warden



# MEMO

To:     DCI Jerry Williams

From:   Warden Lepher Jenkins

Cc:     Deputy Warden Jessie Streeter, Deputy Warden Mabry, Rick McCarty, Alfredia Dodd, Tony Compton, Arthurine Harris, Chandra Berryman- Willis, Jacqueline Bush, Paula Melton, Evangeline Harvey, and Melissa Ferguson

Date:   Monday, October 12, 2015

Re:     Mandatory Staffing Report

The following are the number of vacant mandatory posts:

| Date | Shift | Total Vacant Mandatory Posts |
|------|-------|------------------------------|
| 05-Oct-2015 | 6-2 | 0 |
| | 2-10 | 1 |
| | 10-6 | 3 |
| 06-Oct-2015 | 6-2 | 0 |
| | 2-10 | 0 |
| | 10-6 | 0 |
| 07-Oct-2015 | 6-2 | 0 |
| | 2-10 | 0 |
| | 10-6 | 0 |
| 08-Oct-2015 | 6-2 | 0 |
| | 2-10 | 0 |
| | 10-6 | 0 |
| 09-Oct-2015 | 6-2 | 0 |
| | 2-10 | 0 |
| | 10-6 | 0 |
| 10-Oct-2015 | 6-2 | 0 |
| | 2-10 | 3 |
| | 10-6 | 1 |
| 11-Oct-2015 | 6-2 | 0 |
| | 2-10 | 3 |
| | 10-6 | 0 |

Lepher Jenkins
Warden



# MEMO

To:      DCI Jerry Williams

From:   Deputy Warden Jessie Streeter

Cc:      Warden Jenkins, Deputy Warden Mabry, Rick McCarty, Alfredia Dodd, Tony Compton, Arthurine Harris, Chandra Berryman- Willis, Jacqueline Bush, Paula Melton, Evangeline Harvey

Date:    Monday, October 19, 2015

Re:      Mandatory Staffing Report

The following are the number of vacant mandatory posts:

| Date | Shift | Total Vacant Mandatory Posts |
|---|---|---|
| 12-Oct-2015 | 6-2 | 0 |
| | 2-10 | 0 |
| | 10-6 | 0 |
| 13-Oct-2015 | 6-2 | 0 |
| | 2-10 | 0 |
| | 10-6 | 0 |
| 14-Oct-2015 | 6-2 | 0 |
| | 2-10 | 0 |
| | 10-6 | 0 |
| 15-Oct-2015 | 6-2 | 0 |
| | 2-10 | 0 |
| | 10-6 | 0 |
| 16-Oct-2015 | 6-2 | 0 |
| | 2-10 | 0 |
| | 10-6 | 0 |
| 17-Oct-2015 | 6-2 | 0 |
| | 2-10 | 0 |
| | 10-6 | 0 |
| 18-Oct-2015 | 6-2 | 0 |
| | 2-10 | 0 |
| | 10-6 | 0 |

Jessie Streeter
Deputy Warden



# MEMO

To:     DCI Jerry Williams

From:   Warden Lepher Jenkins

Cc:     Deputy Warden Jessie Streeter, Deputy Warden Mabry, Rick McCarty, Alfredia Dodd, Tony Compton,
        Arthurine Harris, Chandra Berryman- Willis, Jacqueline Bush, Paula Melton, Evangeline Harvey

Date:   Monday, October 26, 2015

Re:     Mandatory Staffing Report

The following are the number of vacant mandatory posts:

| Date | Shift | Total Vacant Mandatory Posts |
|------|-------|------------------------------|
| 19-Oct-2015 | 6-2 | 0 |
| | 2-10 | 0 |
| | 10-6 | 0 |
| 20-Oct-2015 | 6-2 | 0 |
| | 2-10 | 0 |
| | 10-6 | 0 |
| 21-Oct-2015 | 6-2 | 0 |
| | 2-10 | 0 |
| | 10-6 | 0 |
| 22-Oct-2015 | 6-2 | 0 |
| | 2-10 | 0 |
| | 10-6 | 0 |
| 23-Oct-2015 | 6-2 | 0 |
| | 2-10 | 0 |
| | 10-6 | 0 |
| 24-Oct-2015 | 6-2 | 0 |
| | 2-10 | 0 |
| | 10-6 | 0 |
| 25-Oct-2015 | 6-2 | 0 |
| | 2-16 | 0 |
| | 10-6 | 0 |

Lepher Jenkins
Warden



# MEMO

To:     DCI Jerry Williams

From:   Deputy Warden Mabry

Co:     Warden Lepher Jenkins, Deputy Warden Jessie Streeter, Rick McCarty, Alfredia Dodd, Tony Compton, Arthurine Harris, Chandra Berryman- Willis, Jacqueline Bush, Paula Melton, Evangeline Harvey

Date:   Monday, November 2, 2015

Re:     Mandatory Staffing Report

The following are the number of vacant mandatory posts:

| Date | Shift | Total Vacant Mandatory Posts |
|------|-------|------------------------------|
| 26-Oct-2015 | 6-2 | 0 |
|  | 2-10 | 0 |
|  | 10-6 | 0 |
| 27-Oct-2015 | 6-2 | 0 |
|  | 2-10 | 0 |
|  | 10-6 | 0 |
| 28-Oct-2015 | 6-2 | 0 |
|  | 2-10 | 0 |
|  | 10-6 | 0 |
| 29-Oct-2015 | 6-2 | 0 |
|  | 2-10 | 0 |
|  | 10-6 | 0 |
| 30-Oct-2015 | 6-2 | 0 |
|  | 2-10 | 0 |
|  | 10-6 | 0 |
| 31-Oct-2015 | 6-2 | 0 |
|  | 2-10 | 0 |
|  | 10-6 | 0 |
| 01-Nov-2015 | 6-2 | 0 |
|  | 2-10 | 0 |
|  | 10-6 | 0 |

Shaniece Mabry
Deputy Warden

ATTACHMENT F



*Justice Concepts Inc.*

# DECIDING ON A NEW JAIL DESIGN
## by Allen R. Beck, Ph.D.

### NEW GENERATION JAIL DESIGN - A SHIFT AWAY FROM 200 YEARS OF THINKING

1983 was a milepost that signaled a departure from nearly 200 years of jail design philosophy. In that year the concept of direct supervision was formally recognized by the National Institute of Corrections, NIC. Subsequently, the concept and its design implications were endorsed by the American Jail Association, AJA, the American Correctional Association, ACA, and the Committee on Architecture for Justice of the American Institute of Architects. Even though "new generation" jail concepts have gained wide acceptance among informed professionals, there are many law enforcement, jail, and county officials who have not had the benefit of being in the communication channel on reforms in jail design.

Unfortunately, jail design becomes easily entangled in moral debates which push the issues of staff safety and rights of the confined to the background. As will be pointed out in this article, new generation jails are much safer than old style jails. In addition, decision makers must hold in mind that their jails will house unconvicted as well as convicted persons. About 60% of most jail populations consists of unconvicted defendants, many of whom are held on relatively low bonds and would be out on bail if they had the money.

Making a decision about the design of a new jail may be difficult for county commissioners because of the unfamiliarity of concepts about jail design and inmate supervision. The path to selecting a jail design is filled with the risk of embracing mistakes that will affect liability, safety of staff and inmates, efficiency in daily operations, and effectiveness in functioning. Long after the dollar savings obtained by selecting a less expensive, flawed design have been forgotten, the problems of a bad design will remain as painful and costly reminders of the shortsightedness of county commissioners' decisions. Counties in which this sore memory lingers are not difficult to find.

This article will investigate three strategies for inmate supervision and their impact on jail design. Graphically, jail designs will be displayed, how these designs are employed will be discussed, and various considerations in decision making about selecting designs will be examined.

### THE GUIDING PRINCIPLE OF JAIL DESIGN

**Jail design should be based on direct or indirect supervision of inmates.**
**Linear design should be absolutely avoided.**

As will be explained in this article, this principle acknowledges that one of the basic tenets of new generation jail design is the need for continuous observation of inmates. The Standards of the American Correctional Association, ACA, for example, are very specific in this regard:

*Written policy and procedure should require that all living areas be constructed to facilitate continuous staff observation, excluding electronic surveillance, of cell or detention room fronts and areas such as dayrooms and recreation spaces. Continuous observation of inmate living areas is a fundamental requirement for maintaining safe, secure custody and control. The physical plant should facilitate the performance of this operational function.* [1]

The reader should be aware that the ACA is not just a small interest group, but the largest organization of correctional professionals in the United States. Standards of this organization are based on substantial study by special ACA committees. Adherence to ACA standards is one of the best ways to insulate against legal challenges about jail conditions.

### DIRECT SUPERVISION DESIGN

Continuous observation is provided in two types of design, direct and indirect supervision. Direct supervision places the correctional officer's station within the inmate living area, or "pod" as it is often called. This is shown in Exhibit 1.

Exhibit 1. Direct Supervision in a Medium Custody Housing Unit



In this picture the officer is shown standing before an in-pod control station. By placing the officer in the pod he or she has immediate visual observation of inmates and unrestrained ability to receive information from and speak to inmates. During the day, inmates stay in the open area (dayroom) and are not usually permitted to go into their rooms except with permission and must quickly return. The officer controls door locks to cells from the control panel. Functions of this panel can be switched to a panel at a remote location, usually known as "central control," when the officer leaves the station for an extended time. The officer also is wearing a small radio on his shirt-front that permits immediate communication with the jail's central control center if the need should arise. In addition, the dayroom area is covered by a video camera that is also monitored in the central control room.

By placing the officer in the pod, there is an increased awareness of the behaviors and needs of the inmates. This results in creating a safer environment for both staff and inmates. Since interaction between inmates is constantly and closely monitored, dissension can be quickly detected before it escalates. Inmates who show signs of becoming unruly also can be quickly identified and removed to a more secure living unit/pod. In addition, maintenance costs are lower in direct supervision pods because the close supervision reduces misuse and harm to equipment, furnishings, and walls. This style of inmate supervision performed by well-trained officers creates a more positive environment than other types of supervision methods. The stress on officers and inmates alike is greatly reduced. From a liability standpoint, the jail and county's liability will be reduced as a result of less litigation arising from unobserved behavior, e.g., suicide, fights, sexual assaults, accidents, and unexpected medical emergencies.

In summary, direct supervision involves three important aspects. First, the inmates are aware that they are being constantly supervised. Second, they are aware that if they create problems they will be quickly removed to a higher custody pod having fewer privileges, such as ability to come out of their cells. Third, they are aware that the officer is backed up by a personal radio alarm system and video monitoring.

Direct supervision design is most relevant to the housing of medium and minimum supervision inmates. These are inmates who are not considered to be violent or disruptive in the jail environment. This design is not usually employed for the supervision of maximum custody inmates.

## INDIRECT SUPERVISION DESIGN

Indirect supervision, sometimes called "remote surveillance," also provides continuous observation of inmates. The layout of the inmate living area is similar to that of direct supervision. The design is "indirect" in that the officer's station is separated from the inmate living area.

Exhibit 2. Indirect Supervision Housing Unit



The officer's station is inside a secure room. Observation is enabled through protective windows in front of the console/desk. A microphone, long black tube, is visible in front of the right portion of the console. Microphones and speakers inside the living unit permit the officer to hear and communicate with inmates.

An indirect supervision pod, when used for medium and minimum custody inmates, is similar in design and size to direct supervision pods. However, indirect supervision in a maximum supervision pod (shown in Exhibit 2, above) usually involves a smaller housing area. In a maximum pod, inmates are not permitted to congregate in an open dayroom, but must spend most of their time in their cells and are let out individually to exercise. For this reason maximum cells are usually larger and require more durable hardware, doors, and fixtures.

Sometimes the indirect design is arranged so that an officer can observe and control two or more adjacent pods. The adjacent pods are configured so that the officer can see into them but the inmates have no visual or auditory access between pods.

In indirect supervision, as in direct supervision, the officer does not leave his/her post and has an uninterrupted view of inmates at all times. As might be expected, the indirect design does not foster the same immediate capability of controlling inmates that is achieved through direct supervision.

**LINEAR DESIGN**

Linear design, also known as "intermittent surveillance design," does not provide continuous observation. The design is similar in concept to that of a hospital in which long rows of rooms are placed along a corridor. A common variation is to situate housing units, instead of individual cells, along the corridor. Exhibit 3 shows such a linear design found in an older jail.

Exhibit 3. Linear Positioning of Housing Units



The jail officer, barely visible at the back of the corridor, must patrol the hall and look through windows to observe each housing unit. A set of narrow observation windows for one of the housing units has been labeled with a "1" and the entry door, also containing a window, is marked with a "2." While walking the corridor the officer may look into a unit or enter as part of the surveillance. Sounds from within the units are muffled by the closed doors and are not readily heard in the hallway.

This design introduces an element of high risk into the management of inmates because interpersonal problems between inmates is most likely to occur when staff are not present. Thus, inmate problems cannot be detected early and prevented from escalating. Video surveillance cannot make up for the problems arising from this type of design. Due to the intermittent nature of staff supervision, inmates are essentially in control of the living area. Studies show that the linear design is associated with an increased frequency of contraband, coercion of inmates by other inmates, assault, rape, suicide, and even homicide. [2] A drawback of this design is that, in practice, the jail officer may not patrol constantly, perhaps only every 20 to 30 minutes and sometimes longer. As a result, officers may become involved in other activities such as escorting inmates, supervising cleanup in another area of the jail, and assisting in booking. Such involvement turns their attention from supervision of inmates and extends the times between surveillance patrols of cell areas.

Electronic surveillance has been used to attempt to compensate for the weakness of the linear design. Experience with video surveillance cameras indicates that the officers monitoring banks of video screens are often unable to maintain effective constant watchfulness due to fatigue, preoccupation with other activities, and too many cameras to view. Furthermore, the effectiveness of video surveillance is compromised when inmates determine what is and is not being monitored. When this happens, trouble makers move their illicit activities to off-camera areas. The use of video surveillance in lieu of the presence of jail officers is commonly associated with efforts of decision makers to drastically reduce staffing costs. Such efforts often contribute to serious security problems because when problems arise, as they more often do in this type of jail, there may be an insufficient number of officers available to effectively respond.

Well-informed jail administrators avoid the linear design. Architects who advocate the linear design claim that it is less expensive to build and staff than direct or indirect designs. However, the same argument could be used for other problematic designs, such as tents.

## HOW THE DESIGN OF HOUSING UNITS IS PROPERLY USED

The cornerstone of effective jail security lies in the classification of inmates according to their supervision needs. The most obvious classification-driven housing assignment is that of separating inmates according to gender. Similarly, hostile

inmates should be separated from non-hostile inmates. The identification of who will be difficult to control is achieved through a system of jail classification that includes ongoing observation and reevaluation. Under such a system, classification screening begins when an inmate enters the jail. After the initial classification decision is made using an objective, i.e., written and validated, assessment instrument, the inmate is constantly observed so that staff can quickly remove him/her to a different, usually more restrictive, pod if disruptive behaviors are exhibited. In this manner, housing units (living areas) of a jail designed as minimum, medium, and maximum supervision can be filled with appropriately matched inmates. Without this system, the supervision of inmates will be marked by inconsistent and poorly justified inmate management practices.

## THE INTERPLAY OF INMATE BEHAVIOR AND SUPERVISION STYLE

Within the inmate population will be persons having varying levels of social maturity and, thereby, differing abilities to control their behavior. Immaturity of social behavior has parallels in both adults and children. For example, placing ten small children in a room in which there is no parent or other adult, will usually result in the outbreak of problems. Even sporadic monitoring by an adult who occasionally opens the door is not as effective as a constant presence. This does not mean that all children are bad, but that the dynamics of interaction can be influenced by the whims and antisocial behavior of one or two persons. Similarly, groups of inmates often contain one or more socially immature individuals, who because of their physical size or manipulative capabilities, will contribute to dissension within the group if there is not a supervising staff member present. The presence of a jail officer combined with the ability to remove inmates to other housing areas, is much more effective in controlling fights and assaults on correctional officers than sporadic monitoring. Thus, direct supervision in combination with classification provides a safer environment for both staff and inmates. A safer jail is not only beneficial in light of reduced legal liability but contributes to a better work environment and lower staff absenteeism.

Indirect supervision does not afford the same level of control over inmate behavior as direct supervision. The correctional officer loses much of the immediate sensitivity about communication within the inmate group by being separated in a control room. Such separation, of course, is appropriate in the design of maximum custody housing units. To compensate for separation of the correctional officer, a "rover" should be used. A rover moves in and out of several housing units in order to temporarily make personal contact with the inmates. This arrangement improves the performance of indirect supervision, but is still not equivalent to direct supervision in inmate management effectiveness.

## WHICH TO CHOOSE?

Making the choice between direct and indirect supervision should be based upon several considerations. Of course, selecting a linear design is not an option considered by the astute decision-maker.

**Consideration One: Staff Preference** -- For several reasons, staff preference should not be the deciding factor in selecting a jail design. First, experience has shown that administrators and staff who have worked only in old style linear jails, are usually unfamiliar with other designs and are unaware of how to supervise inmates in new generation jails. Generally, biases against direct and indirect supervision are based on minimal knowledge. Jail administrators who have been exposed to well-run direct and indirect supervision jails or have been through training/familiarization with those types of facilities will relinquish preference for linear design. Second, the experience of working in a linear design jail often results in the development of a "negative correctional culture" that is marked by self-created fictions about how inmates should be treated and managed. Since fights among inmates and verbal and physical assaults on officers are more frequent in linear design jails, jail staff tend to develop a negative, fearful, and more punitive attitude about inmate management. In turn, this negative attitude is often expressed in ways that reinforce hostility among the inmates. Thus, ineffective behavior management often creates some of its own problems. Among trainers of jail staff, this phenomena has come to be recognized as the negative culture of linear jails. This culture, once established, is difficult to change, even when a new direct or indirect supervision jail is constructed. Not only will training be required to alter this culture, but staff changes may also be required.

**Consideration Two: Size** -- Size of the jail will affect the relevancy of direct and indirect designs. As the size of a jail's capacity moves beyond 180 to 200 inmates the applicability of indirect design diminishes. In a small jail, indirect supervision pods are often designed to house 8 to 16 inmates. In larger jails it is more practical to expand the capacity of pods to house about 40 to 50 inmates than it is to build more of the small pods. From an architectural standpoint, small pods are more readily configured around an enclosed observation station than are large pods. Also, from an inmate management standpoint, small groups are easier to control from an external officer's station than larger groups. As a rule of thumb, as the size of a jail's capacity increases, the relevancy of direct supervision design increases. For this reason, direct supervision pods generally range from about 24 to 50 beds.

**Consideration Three: Cost** -- Given the ability of indirect supervision to manage several small living units, it is not generally considered to be cost-effective to use direct supervision in small jails. However, the cost advantage diminishes as jail size increases.

## DORMITORIES

A dormitory is different from the designs described previously. New jails will usually have fewer dormitories than medium and maximum pods. Cost-wise, dormitories are much less expensive to build. However, their applicability is limited to the housing of minimum custody inmates, such as trusties and persons on work release.

The term, "dormitory," usually implies a different style of housing than a pod. As might be expected a dormitory is a large room into which a number of single or bunk beds are placed. However, instances can be found in which the term, "dormitory, " is applied to rooms in a podular-design housing unit that have been configured to accommodate four to eight beds. Exhibit 4 shows a new, unfurnished dormitory that will contain 24 beds.

Exhibit 4. A Large Dormitory Before Being Furnished



Management of inmates in a dormitory can be accomplished by either direct or indirect supervision. In the dormitory shown above, the layout is a modified direct-indirect supervision design. Two dorms are situated across a hallway from each other. Observation into the dorms is through a window shown at the right rear of the picture. Next to the window is a doorway. An open officer's station (not enclosed as in an indirect supervision pod) is placed so that an officer can view both dorms and have immediate access through the doorways. In this particular layout the officer's station is located at the end of the hall so that no one will be approaching from the back of the station. This design is feasible because the lower custody level of inmates reduces the need to place an officer in the living area or to enclose the external observation station.

In a small jail, a small dormitory could be arranged around an indirect supervision station along with one or more medium and maximum custody pods. Although many old style jails use intermittent surveillance for dormitories, the same concerns about adequacy of supervision, previously discussed, would apply.

## BE GUIDED BY BEST PRACTICES

The design should abide by ACA's Standards for Adult Local Detention Facilities.[33] These standards provide important guides for both minimum design features and operational practices in jails. Such standards are particularly important because a local detention facility must provide for the custody and care of persons accused but not convicted of a crime, as well as those who are sentenced. The standards are respected not only by correctional professionals but by the courts as well. The easy to read format of the standards will help county decision makers, as well as jail administrators, understand what should be included in a jail design, such as:

- Occupancy and space requirements for inmate sleeping areas
- Space requirements for dayrooms
- Furnishings
- Special management housing
- Housing for the handicapped
- Light levels (natural and artificial)
- Noise levels
- Indoor air quality
- Law library
- Food service

Using the standards as guidelines for investigation, a jail committee and/or county commission should challenge architects both during the selection process and during the process of designing their new jail. The committee should request that the architect(s) explain how the proposed design concepts will respond to ACA standards. By making a simple checklist of the standards, county decision makers can intelligently pursue this investigation. [4] [5] Such steps are merited because, most likely, the county will be party to a suit in instances of legal problems fostered by poor design.

### FOOTNOTES

1. American Correctional Association, *Standards for Adult Local Detention Facilities*, 3rd Edition. Lanham, MD. 1991, Standard 3-ALDF-2B-03, p. 32.

2. A critique of linear design is found in the *Small Jail Design Guide*. Washington, D.C.: National Institute of Corrections, U.S. Department of Justice; March 1988, pp. 3-37 to 3-42.

3. American Correctional Association, *Standards for Adult Local Detention Facilities*. 3rd Edition. Lanham, MD. 1991. Updates of the 3rd Edition are contained in the *Standards Supplements* for 1994 and 1998 which are companion publications. To obtain these publications call ACA at (800) 222-5646, ask for the Publications Department.

4. For detention facilities of 50 beds or less, ACA's *Standards for Small Jail Facilities* should be used.

5. Some counties have opted to hire a special project manager to ensure their concerns about ACA and other construction standards are followed.

### ABOUT THE AUTHOR

Allen Beck has consulted in planning of jails, staffing of jail staff in new and older design jails, and staffing analysis of direct, indirect, and linear design jails. Dr. Beck is a principal of Justice Concepts Incorporated. He holds a Ph.D. in Criminal Justice and has been a full-time criminal justice consultant since 1983.

Copyright © 2006 by Allen R. Beck, 417 W. 87th Place, Kansas City, MO, 64114. Upon notification of the author, this article may be duplicated and disseminated to county decision makers and other officials, to the public for use in meetings, and to college classes. This article may not be published in a newsletter, organizational literature, magazine, textbook, or electronic media or as part of marketing literature without written consent of the author.

Return to JCI Homepage



# A Look at the "New-Generation" Jail
*By Adrian Smith*
**Published: 04/08/2013**



What is meant by describing a new generation jail? How does the new model of managing a jail system differ from the evolution time period of corrections? In this article we will take a look at some of the characteristics of the new generation jail and also look at the aspects of direct and indirect-supervision jails.

According to Siegel and Worrall (2010), to relieve overcrowding and improve effectiveness, a jail-building boom has been underway. Many of the new jails are using modern designs to improve effectiveness; these are referred to as new-generation jails. Traditional jails are constructed on what is referred to as the linear/intermittent surveillance model. Jails designed this way are rectangular, with corridors leading to either single-or multiple-occupancy cells arranged at right angles to the corridor. Correctional officers must patrol to see into cells or housing areas; and when they are in a position to observe one cell, they cannot observe others; unobserved inmates are essentially unsupervised.

In contrast, new-generation jails allow for continuous observation for inmates. There are two types: direct-supervision and indirect-supervision jails. Direct supervision jails contain a cluster of cells surrounding a living area or "pod", which contains tables, chairs, and televisions. A correctional officer is stationed within the pod. The officer has visual observation of inmates and maintains the ability to relate to them on a personal level. Placing the officer in the pod increases the officer's awareness of the behaviors and needs of the inmate. This results in a safer environment for both staff and inmates. Because interaction between inmates is constantly and closely monitored, dissension can be quickly detected before it escalates. During the day, inmates stay in the open area (dayroom) and typically are not permitted to go their rooms except with permission of the officer in charge. This aspect can vary from jail to jail.

The officer or civilian type employee controls the door lock to cells from the control panel. In case of trouble or if the officer leaves the station for an extended period of time , command of this panel can be switched to a panel at a remote location, known as central control. Again this can vary from jail to jail depending of your facilities standard operation procedures. The officer usually wears a device that permits immediate communication with central control in case of trouble, and the area is also covered by a video camera monitored by an officer in the central control room.

Indirect-supervision jails are similar construction; however, the correctional officer's station is located inside a secure room. Microphones and speakers inside the living unit permit the officer to hear and communicate with inmates. Although these institutions have not yet undergone extensive evaluation, research shows that they may help reduce post release offending in some situations. However, some critics suggest new-generation jails have failed to live up to their promise because they lack important components, such as normalized living environment, in their facilities.

What's your take on the new-generation jail system?

*Corrections.com author, Adrian Smith, is a Classification Officer for Orange County Corrections in Orlando, Fl. He holds a Bachelors of Science Degree in Criminal Justice from Upper Iowa University and a Masters of Science Degree in Criminal Justice from Everest University. He is currently obtaining his Doctorial Degree in Public Safety Leadership from Capella*

**ATTACHMENT G - REDACTED**

**ATTACHMENT H - REDACTED**

## HAROLD PIZZETTA

| | |
|---|---|
| **From:** | Margaret Winter <mwinter@aclu.org> |
| **Sent:** | Wednesday, December 09, 2015 12:51 PM |
| **To:** | Steve J. Martin |
| **Cc:** | Jody Owens - SPLC; Robert B. McDuff; Eldon Vail ; Alesha Judkins |
| **Subject:** | RE: 8th Monitors' Report |

Steve,

We are happy with the draft 8th Report and don't believe a telephone call is necessary.  We have just a few comments, observations and suggestions we wanted to share with you.

1. We are very glad that you are using the surveillance video as an objective measure of what has been going on in the housing units.  And we also think it's important and valuable that you showed up unannounced for your last site visit.  We hope that you continue to use these methods -- they are so useful in revealing what is actually happening at Walnut Grove.

2. The level of violence at the facility does continue to trend low for any facility, but we have some distrust in their numbers. First, the officers don't do a great job of staying in the units and routine supervision is periodic at best, so it's likely that some assaults are going undetected.  Second, we wonder why it has been so long that they have reported a planned use of force. Does that mean there has been no need? If so, that's great. Or, does it mean staff ignore some situations and/or let the inmates deal with them? We mention this in case you think it appropriate to note these issues in your report.

3. You have highlighted the lack of supervision of the officers and we agree with everything you say that MTC/MDOC should do.  But we continue to believe that with such a difficult time historically attracting, retaining and training officers, MDOC should hire more sergeants to provide increased direct supervision to officers working the living units.  We do believe it would be helpful for you to make such a recommendation in your report.

4. We believe that the issue of verbal abuse by staff is directly related not only to the lack of direct supervision but also to the training and orientation of the officers. In your draft you recommend that Defendant "reinforce the policy of such behavior not being tolerated," but we would suggest that that is simply putting the officers on notice; training is more than that, it is skill development in how to interact and supervise inmates and it needs to be practiced and reinforced and expressed as the values of the institution. So we believe it would be helpful if the report could suggest something of that kind.

5. We believe that the monitors' firmness with MDOC/MTC on the issue of classification and housing has paid off in reducing the level of risk at Walnut Grove.  But your report does leave hanging what the monitors think about the nine active gang members in PC. Is that OK or not OK?

6. Finally, we just want to call to your attention that SPLC advocates have received reports from Unit 8A that when prisoners are re-classified to close custody at their annual review, the transfer doesn't happen right away; there is a delay of weeks, sometimes over a month, after reclassification, and some of those prisoners act out, unconcerned about repercussions because they're already re-classified.  The advocates are happy to discuss this issue with you if you would like further details.

Thank you, Steve, for all your efforts.  Don't hesitate to call us or Eldon if you have any questions or concerns about our comments.

Best always,
Margaret

**From:** Steve J. Martin [mailto:sjmart@sbcglobal.net]
**Sent:** Friday, December 04, 2015 4:39 PM
**To:** 'HAROLD PIZZETTA'; Margaret Winter; 'Jody Owens - SPLC'; 'Rob McDuff'
**Cc:** 'Williams, Jerry J.'
**Subject:** 8th Monitors' Report

All, attached hereto is the 8th Monitors' Report.  After you've had a chance to review, please contact us in order to set a time to receive your comments.  Steve J. Martin