## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## JACKSON DIVISION

| | | |
|---|---|---|
| **C.B. by and through his next friend, Charleston DePriest, et al.** | ) ) ) | |
| **Plaintiffs,** | ) ) ) ) ) ) ) ) | **Civil Action No. 3:10cv66** **9th REPORT OF MONITORS** **Pursuant to:** **CLASS ACTION** **CONSENT DECREE** |
| **V.** | ) ) ) | **May 5, 2016** |
| **Walnut Grove Correctional Authority, et al.** | ) ) ) | |
| **Defendants.** | ) ) | |

## I. INTRODUCTION

Pursuant to Section IV of the above-referenced *Consent Decree*, the Monitors are to submit reports to counsel every four months on the defendants' compliance with the substantive remedial provisions of the decree. On June 11, 2015, the Court issued an Order wherein it found "that a majority of the Consent Decree provisions are no longer necessary. However, those pertaining to the inmates' Eighth Amendment right to reasonable protection are still relevant and shall remain in force." As a consequence, this *9th Report* is limited, pursuant to the Court's June 11, 2015, *Order*, to reporting on defendants' compliance with Section III. A. *Classification and Housing System*, and

1

Section III. B. *Protection from Harm*.  This Report provides the Monitors' observations and findings on these specific provisions of the *Consent Decree* for November 2015 through March 2016.

A draft of the *9th Report* was provided to the parties on April 19, 2016.  Plaintiffs' counsel provided their comments on May 5, 2016 via a telephone conference call while Defendants provided their comments in written form on April 29, 2016 (attached hereto, "MTC Response to 9th Monitors' Report").

**II. METHODOLOGY**

During this reporting period, the Monitors received and reviewed monthly information and data provided by the Mississippi Department of Corrections (MDOC) and Walnut Grove Correctional Facility (WGCF).  The following monthly information and data reviewed for this Report covering the time period November 2015 thru March 2016, includes: 1) Extraordinary Occurrence Reports (EORs); 2) Monthly Staffing Counts; 3) Daily Shift Rosters; 4) WGCF Breakdown by Count and Custody for the 1st and 15th of each month; 5) MDOC Monthly Reports WGCF; 6) Offenders Out of Cell Time Memoranda; 7) Restraint/Chemical Agent Issuance Logs; 8) Use of Force Incident Packets (with videos); and 9) WGCF Monthly Statistical Charts.  In addition to these, the Monitors also received the following reports and materials during this reporting period:

- Video recordings from fixed cameras for Housing Unit 5-A for February 8, 2016, 4:00 p.m. to 10:00 p.m.;
- Inmate Injury Reports for December 2015 thru March 15, 2016; and

- Facility documents related to a January 21, 2016 incident involving Offender #1250, including medical and administrative remedy records.

During this reporting period, the Monitors conducted an on-site inspection on March 21, 2016, that included meetings/briefings with MTC and MDOC officials prior to and after the site inspection work.   Monitor Martin also conducted random interviews with inmates assigned to Housing Unit (HU) 5A.  Monitor Austin completed an audit of the classification records of inmates who had been involved in an assault over the past 60 days.

## III. SUMMARY

The inmate population ranged from 892, in November 2015, to 933, in March 2016, with two main housing units vacated for the reporting period (HU3 and HU4).  It is noted that in addition to the Privilege Unit on HU5B, HU9 is being converted to a Preferred Unit primarily for older inmates.   All remaining housing units, with the exception of segregation unit HU8D, are general population units housing minimum and medium custody inmates.  From November 2015 thru March 2016, the number of inmate-on-inmate assaults averaged less the three per month.  The current assault rate for WGCF is now down to three per 100 inmates for the past 12 months.  This is the lowest rate among all of the MDOC's public and private facilities. A review of inmate injury reports for the reporting period indicate no off-site medical transports due to injuries from inmate assaults. Incidents of staff use of force have averaged one per month for the reporting period, although one incident in January was not reported that

should have been (see below, Section IV.B. Use of Force).

As was reported in the *8th Monitors' Report*, staff supervision of inmates continues to be a problem. The *8th Report* also noted that there were three separate inmate-on-inmate assaults that were directly attributable to officers' failure to properly supervise housing units. In this reporting period there were also at least three such incidents. There continues to be a shortage of sergeants on the second shift after 4:00 p.m. (see below, Section IV. Sufficient Numbers of Adequately Trained Staff). Such a shortage results in a lack of supervisory personnel needed for housing unit coverage during the time of day when inmates have completed the program day and are often idle in housing units. While key indicators suggest modest-to-low levels of overall violence at the facility, facility officials, in order to minimize risk of harm to the inmate population, must have first line supervision of their housing unit officers to ensure that line officers are properly supervising their assigned housing units.

## IV. OBSERVATIONS AND FINDINGS OF SUBSTANTIVE REMEDIAL MEASURES

### A. Classification and Housing System
   **Recommended Compliance Finding**: *Compliance*

### B. Protection from Harm
   **(1) Reasonable Safe Living Conditions:** *Compliance*

Observations

The MDOC has made several changes to the classification system, as recommended by the Monitors, to ensure that: 1) all inmates at WGCF are properly

4

classified; and 2) no close-custody inmates are assigned to that facility. When an inmate's custody level is changed from minimum or medium to close custody due to serious misconduct or new information that warrants such a change, that inmate is quickly transferred from WGCF to an appropriate MDOC close-security facility. Further, when an inmate receives a serious disciplinary report, the case is referred by the Disciplinary Officer to the inmate's assigned case manager to review the inmate's classification level and to determine if any change is warranted.

The MDOC and WGCF has also corrected a problem with the reclassification process whereby some inmates were being reclassified too early (prior to the 12-month window), resulting in an incorrect lower custody level. This problem has been corrected and all of the inmates that fell into that category have been transferred to other facilities.

Inmates whose custody level is over-ridden from close to medium are being reviewed by the Case Manager Supervisor to ensure that the over-ride has been appropriately applied.

The only area where there has not been any change was the Monitor's recommendation to separate, as much as possible, the minimum-custody inmates from the medium-custody inmates. There is no rule not to mix minimum with medium custody inmates. And with a facility that is nearly 90 percent medium custody it may not be practical to do so (see Table 1). One unit (HU5B) has the highest percentage of

minimum custody inmates (34 percent); all of the other units have low percentages of minimum-custody inmates which matches overall minimum-custody level for the entire facility (about 12 percent). Given the low level of assaults that are now occurring, the requirement to further separate the minimum-custody inmates is less important.

Table 2 shows the assault rates for WGCF for the past year and compares them with other MDOC facilities. The current rate for WGCF has now reached three per 100, inmates which is a 50 percent decrease, from the last quarter. Further, the WGCF rate is the lowest rate among all of the MDOC facilities, public and private. The reduced rate is no doubt related to the transfer of close-custody inmates from WGCF and other security and programmatic enhancements that have occurred over the past 12 months. The Plaintiffs in their comments noted that they have continuing concerns about unreported violence. The Monitors share this concern and will continue to review randomly selected video tapes from select housing units.

### Table 1.  Inmate Custody Levels
### July 2012 – March 2016

| Attribute | Jul-12 | Jan-14 | Aug-14 | Dec-14 | Jul-15 | Nov-15 | Mar-16 |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| Total Inmates | 1,043 | 1,261 | 788 | 1,297 | 898 | 906 | 937 |
| Custody Level | | | | | | | |
| Close | 24% | 26% | 25% | 0% | 0% | 0% | 0% |
| Medium | 57% | 58% | 60% | 85% | 91% | 89% | 88% |
| Minimum-Non-Community | 18% | 14% | 8% | 15% | 0% | 11% | 12% |
| Minimum-Community | 0% | 0% | 1% | 0% | 9% | 0% | 0% |
| Unclassified | 1% | 0% | 6% | 0% | 0% | 0% | 0% |
| | | | | | | | |
| Total | 100% | 100% | 100% | 100% | 100% | 100% | 100% |

Source: MDOC Snapshot Extract Data Files

**Table 2.  Inmate on Inmate and Staff Assaults**

| Facility | Ave. Pop. | Feb 15 | Mar 15 | Apr 15 | May 15 | Jun 15 | Jul 15 | Aug 15 | Sep 15 | Oct 15 | Nov 15 | Dec 15 | Jan 16 | Total Assaults last 12 months | Assault Rate Per 100 Prisoners |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| State Facilities | | | | | | | | | | | | | | | |
| MSP | 3,252 | 15 | 36 | 41 | 45 | 53 | 37 | 38 | 19 | 16 | 13 | 17 | 28 | 358 | 11 |
| CMCF | 2,321 | 22 | 48 | 34 | 22 | 23 | 12 | 24 | 12 | 22 | 22 | 28 | 40 | 309 | 13 |
| SMCI | 2,620 | 23 | 10 | 16 | 23 | 8 | 17 | 15 | 21 | 24 | 14 | 11 | 18 | 200 | 8 |
| Private Facilities | | | | | | | | | | | | | | | |
| East MS | 1,156 | 11 | 17 | 10 | 13 | 11 | 12 | 14 | 12 | 5 | 15 | 10 | 8 | 138 | 12 |
| Marshall | 996 | 9 | 6 | 3 | 9 | 7 | 3 | 2 | 5 | 4 | 2 | 1 | 2 | 53 | 5 |
| Walnut Grove | 945 | 2 | 6 | 6 | 3 | 2 | 1 | 3 | 1 | 3 | 2 | 1 | 1 | 31 | 3 |
| Wilkinson | 848 | 15 | 11 | 23 | 25 | 35 | 15 | 24 | 10 | 17 | 10 | 20 | 25 | 230 | 27 |

Source: MDOC

## (2) Sufficient Numbers of Adequately Trained Staff
***Recommended Compliance Finding:*** Partial Compliance

Observations:

As of March 31, 2016, there was a single vacancy in the line-staffing complement of 137; however, it is noted that approximately 40 officers have been hired and trained since October 2015.  A review of the most recent shift rosters (March 25-31, 2016) reflect a very high number of overtime hours on the second shift, which is also the same shift that suffers from a shortage of sergeants after 4:00 p.m.  This sergeant shortage is the result, in part, from the scheduling of at least four sergeants on a five-day work schedule.  Monitor Martin discussed this with the Chief of Security while on-site and he agreed to meet and work with the executive facility staff to revisit and possibly revise

this scheduling practice.  The Defendants advised through their written comments that the Warden has redirected two sergeants to the 2nd shift to provide more direct supervision to housing unit officers.  The Monitors view this as a very positive move by the Warde.

As aforementioned, there were at least three incidents during the reporting period that were attributable to line-staff supervision deficiencies (see, WGCF-16-037, WGCF-16-014, and WGCF-16-029).   Improved first-line supervision from sergeants would very likely minimize these lapses.  During the reporting period, Monitor Martin reviewed video tape from fixed cameras in HU5A for February 8, 2016, for the time period 4:00 p.m. to 10:00 p.m.  This review was prompted by allegations provided by plaintiffs' counsel after their staff conducted an interview with a class member housed on HU5A.  It is evident from this review that housing unit officers are simply lax in their supervision practices, such as leaving the housing unit for extended periods, leaving doors unsecured and allowing inmates to freely enter and exit cells to which they are not assigned.  Mid-level and upper-level managers would be well advised to periodically and randomly review video to assess line-staffs' supervision of housing units and communicate their findings to the supervising sergeants.

### (3-12) Use of Force and Chemical Agents
**Recommended Compliance Finding:** *Substantial Compliance*

<u>Observations:</u>

Staff use of force at the facility has averaged one per month for the reporting period, down from four per month in the previous reporting period. None of these incidents involved high levels of force and none resulted in serious injuries to inmates or staff. The facility officials and staff have been successful in moderating the need to apply force and continue to conduct effective post-incident reviews to identify corrective measures and teachable moments.

The single incident that merited corrective measures by facility officials was brought to the Monitors' attention by plaintiffs' counsel as a result of a class member having reported to them that he had been subjected to staff use of force on January 21, 2016. Monitor Martin's initial inquiry revealed that no such force had been reported by facility personnel--there was no Extraordinary Occurrence Report (EOR) nor was there any Use of Force Incident Report. The inmate had filed a grievance and received a response that the allegations could not be verified. Information from the facility medical staff indicated that the inmate was seen in the infirmary on the date in question for "seizure like activity" and nurse's notes indicated minor injuries to the inmate's forehead and scratches around one eye and his nose. Subsequent inquiry through the Deputy Warden established that a facility captain had indeed used force on the inmate when he placed the inmate in restraints and thereafter escorted him to his cell. According to the Deputy Warden, the captain had failed to report the matter as a use of force because

the inmate's refusal to cuff-up involved low-level resistance and he was able to apply the restraints with minimal force.  Notwithstanding the captain's explanation, there should have been, at the very minimum, an EOR on the matter as the inmate had been transported to the facility infirmary for evaluation due to his medical condition.  While on-site, Monitor Martin met with the Deputy Warden and Chief of Security and discussed this incident in detail and with a full understanding that the incident clearly should have been reported as a staff use of force and the medical transport should have been reported via the EOR reporting format.  Moreover, after the restraints were applied and the inmate was returned to his cell while continuing to exhibit some degree of medical distress, officers failed to immediately provide medical attention.  It was emphasized with the facility officials that while this may have been an isolated incident, the total failure to report the incident when coupled with the delay in medical attention, constituted serious lapses in facility operations and clearly created an undue risk of harm to the inmate in question.

> **(13) Use of Prisoners to Enforce Rules or Impose Discipline**
> **Recommended Compliance Finding***: Compliance*

> **(14) Protection of Inmates from Abuse, Harassment, and Punishment on the Basis of their Actual or Perceived Sexual Orientation, Gender Identity, and Gender Non-Conformity**
> **Recommended Compliance Finding***: Compliance*

> **(15)Prohibition of Forcing Inmates to Engage in Physical Exertion that Inflicts Pain or Discomfort**
> **Recommended Compliance Finding***: Compliance*

It is noted that the facility has continued to maintain compliance with the above-referenced provisions ((13)-(15)) since the Monitors' *2nd Report* (April 1, 2013).

## CERTIFICATE OF SERVICE

I, Harold E. Pizzetta, III, Assistant Attorney General, hereby certify that on May 5, 2016, I electronically filed the foregoing Ninth Report of Monitors with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

SO CERTIFIED this 5th day of May, 2016.

/s/Harold E. Pizzetta, III
Harold E. Pizzetta, III, MS Bar No. 99867

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

JACKSON DIVISION

C.B. by and through his next friend,       )
Charleston DePriest, et al.                )
                                           )          Civil Action No. 3:10cv66
                          Plaintiffs,      )
                                           )     MANAGEMENT & TRAINING
                                           )     CORPORATION RESPONSE TO 9th
             V.                            )         MONITOR'S REPORT
                                           )            Pursuant to:
                                           )            CLASS ACTION
                                           )          CONSENT DECREE
Walnut Grove Correctional Authority,       )
et al.                                     )            April 26, 2016
                          Defendants.      )

**Introduction**

This is the Management & Training Corporation (MTC) response to the 9th Monitor's Report concerning Defendant's compliance with the provisions of the Consent Decree. The reporting period covers activities from November 2015 through March 2016.

As the Monitors have documented, during this period the MTC/Mississippi Department of Corrections (MDOC) Team at Walnut Grove Correctional Facility (WGCF) again made significant gains in core areas of operation toward compliance with provisions of the Decree. Again, in the 9th Report, zero areas were graded as non-compliant. This response will further document that progress.

The Monitors rated sections of the decree as follows:

   A. **Classification and Housing System** is upgraded to Compliance.
   B. **Protection from Harm**
       a. **(1) Reasonably Safe Living Conditions:** is upgraded to Compliance;
       b. **(2) Sufficient Numbers of Adequately Trained Staff:** remains Partial Compliance;
       c. **(3-12) Use of Force and Chemical Agents:** remains Substantial Compliance.

MTC continues to maintain that the facility is operating in a manner that meets not only constitutional, but industry standards. This is evidenced through third party audits that demonstrate adherence to national accreditation standards (American Correctional Association), Department of Justice standards for sexual safety (PREA), as well as internal audits of Consent Decree items using an objective method: the WGCF Compliance Audit Tool. Any problems which inevitably occur are consistent with those expected considering the mission and population housed at this prison facility. We are committed to

1



EXHIBIT
1

continually improving operations to further limit the brief lapses that occasionally surface in otherwise sustained compliance.

Based on these criteria, MTC rates compliance as follows:

- A. **Classification and Housing System** is upgraded to Compliance.
- B. **Protection from Harm**
  - a. **(1) Reasonably Safe Living Conditions:** is upgraded to Compliance.
  - b. **(2) Sufficient Numbers of Adequately Trained Staff:** is upgraded to Compliance.
  - c. **(3-12)Use of Force and Chemical Agents (Sic), (3-7):** is upgraded to Compliance.

In support of their ratings, Monitors continue to suggest that MTC and MDOC alter policies and procedures related to the Consent Decree element **Protection from Harm**. However, it is also clear that Walnut Grove policies and procedures are consistent with current approved MDOC and MTC written policy and procedure. As Monitors have noted in the past, these policies and procedures already meet national American Correctional Association (ACA) Standards. WGCF remains fully accredited by the ACA and the Correctional Education Association (CEA), with scores of 100% compliance.

The Consent Decree provides that "MDOC retains the final authority over the drafting and wording of the policies and staffing plans. . . ", at Page 13. Therefore, Walnut Grove's full compliance with current MDOC policy would mean meeting the essential baseline measure for compliance with the elements of the Consent Decree now.

Any faults in the practices at WGCF are in the application and enforcement of these approved nationally recognized policies and procedures. This Response will address the corrective action that has been taken to remedy those faults.

Below Defendants address each issue evaluated by the Monitors.

## AREAS EVALUATED BY MONITORS

**A.     Classification and Housing System**

Consent Decree:  "MDOC will utilize a classification system that ensures prisoners are **appropriately and safely** housed within WGYCF."

Monitor's Recommended Compliance Finding: **Compliance**

Walnut Grove Compliance Audit Findings:

| | | |
|---|---|---|
| November | 98% | Compliance |
| December | 94% | Compliance |
| January | 96% | Compliance |
| February | 95% | Compliance |
| March | 98% | Compliance |

MTC's Recommended Compliance Finding          **Compliance**

2

WGCF had an average rating of 96.2% compliance with all objective **Classification and Housing System** elements of the Consent Decree during this reporting period, based on the Court Order and the current policies and procedures of MDOC.

**B.** **Protection from Harm:** Consent Decree: "At all times prisoners will be provided with reasonably safe living conditions and will be protected from violence and physical or sexual abuse by staff and other prisoners."

Monitors Recommended Compliance Finding: **Compliance**

Walnut Grove Compliance Audit Findings:

| | | |
|---|---|---|
| November | 90% | Compliance |
| December | 90% | Compliance |
| January | 93% | Compliance |
| February | 97% | Compliance |
| March | 97% | Compliance |

WGCF had an average rating of 93.4% compliance with all objective elements of **Protection from Harm** of the Consent Decree.

MTC's Recommended Compliance Finding: **Compliance\***

\*based on objective WGCF audit.

**B-1** **Protection from Harm: (1) Reasonable Safe Living Conditions**

As the Monitors point out, the continuing reduction in assaults reported each month is evidence of the considerable progress made each month at WGCF. The annualized rate of assaults is now the lowest of all major MDOC facilities, public and private, and declining.

As a measure of the major accomplishments of WGCF staff in improving facility living conditions, in March 2016 the institution received a first place award for having the best Impact Innovation out of 26 MTC facilities for 2015. The final results of the innovation was that WGCF reduced Major Incidents by 77.78%, Use of Force by 54.79%, Contraband by 44.55%, and offender-on-offender assault by 50.91%. (MDOC Monthly Report Stats). Walnut Grove also received the 2015 Operational Excellence Award for significant improvement in key areas including overall performance, staff turnover, and cleanliness. (Attachment A)

**WGCF is a safe and secure institution.**

**B-2** **Protection from Harm: (2) Sufficient Numbers of Adequately Trained Staff**

Consent Decree: "MDOC will ensure that there are sufficient numbers of adequately trained direct care and supervisory staff, and sufficient numbers of professional staff. Within 90 days of the Court's approval of this Consent Decree, MDOC will develop and implement a staffing plan for direct care, supervisory, and professional staff to ensure that prisoners are **adequately supervised and protected from harm,** that prisoners have adequate access to medical services and adequate time out of their cells.

Monitors Recommended Compliance Finding: **Partial Compliance**

MTC Recommended Compliance Finding: **Compliance**

The current MDOC approved line correctional staffing for WGCF is 136.61 correctional officers (which is coverage for 89 posts), plus supervisory Sergeants, Lieutenants, Captains and Administrators. This is documented in the official WGCF 962 Population MDOC Approved Master Staffing Schedule. Compliance with the approved MDOC staffing plan constitutes compliance with this element of the Consent Decree.

As reported in the MTC Response to the 8th Report of the Monitors, it is Mandatory for the institution to fill all 89 correctional officer posts daily. The weekly Mandatory Staffing Report documents the number of mandatory posts which have gone unfilled. Again, review of the Mandatory Staffing Report for this five month reporting period shows that there were limited vacancies in Mandatory posts. Such vacancies are unusual, since vacancies are filled with part-time hires, on-call staff, overtime, supervisors, or a combination. These brief lapses are a minor technicality. MTC rigorously follows the approved MDOC Staffing Plan, as required by the Consent Decree.

<u>Increased Sergeant Supervision on Second Shift</u>

Most offender movement throughout the institution occurs during the 1st Shift. For that reason, most correctional officer supervision has been concentrated on that shift. Offenders are primarily in the Housing Units on Second and Third Shifts. As the Monitors have observed in their review, a very limited number of problems in the housing units do occur on both 1st and 2nd Shifts. Therefore, the Warden has redirected two Sergeants to 2nd Shift to provide more direct supervision to Housing Units on that shift

The Monitors cite three incidents during this five month reporting period, described as attributable to line-staff supervision deficiencies. MTC staff identify only two:

(1) Incident WGCF 16-037 was scrutinized at a WGCF Critical Incident Review, and was found have **no** line-staff supervision deficiencies and to be in total compliance with MDOC Policies and Procedures.

(2) Incident WGCF 16-014 had been investigated by the WGCF Office of Investigation. A correctional officer appeared to have left the doors of the unit unsecured for at least one hour, and the officer received corrective action.

(3) Incident WGCF 16-029 also had been investigated by the WGCF Office of Investigation, and was found to also have a correctional officer deficiency. The correctional officer opened unit cell doors, appropriately, for a routine unlock (in and out), but then left the unit at the request of the Sergeant without securing the cell doors. Corrective action also had been initiated for this failure.

These reports document two incidents in a period of five months identified by both the institution and the Monitors where a correctional officer left unit doors unsecured, and received corrective action.

Monitors also reviewed videotape from a fixed camera taken during one evening in Housing Unit 8 A, and commented on officers leaving the housing unit, and cell doors being unsecured, potentially allowing offenders to enter cells to which they were unassigned.

4

As mentioned earlier, the Warden has redirected more intensive supervision to the second shift to evaluate staff performance.

However, Institution Senior Managers, including the Warden, viewed the identical video, and did not observe a security breech. Periodically on First and Second Watches cell doors are opened for offenders to enter and exit for feeding, day room activities, bathroom breaks, mass movement to program activities, and other events. This is normal. However, offender cell doors being open for long periods is inappropriate, and requires corrective action. This corrective action was taken by the Warden in the two incidents reviewed by the Monitor, immediately after each incident.

<u>Primary Unit Supervision is the Pod Control Officer</u>

Additionally, it is expected that floor officers will, as part of their duties, rove outside of individual housing units. It is important to remember that the primary supervision of housing units is the **POD Control Officer. WGCF is designed as an accredited indirect supervision facility.** Because of the small numbers of offenders in the unit, Indirect-Supervision facilities have permanent, secure work stations located outside the unit, referred to as a **Pod Control Center,** with a continuous, 24 hour supervision of each offender unit. The primary work station is the Pod Control, which supports the floor officers who rove the floor of the housing zones, conduct count, feed, conduct welfare checks, and escort offenders **when needed. Continuous supervision of the offender population is from the POD Control, not from the floor officers.**

In their Standards and Compliance Monitoring Visit on January 12-13, 2015, the Visiting Committee Members of the Commission on Accreditation for Corrections commented on the indirect supervision design at WGCF:

"Housing unit supervision is indirect, by observation from an elevated satellite control center and **hallway officers who enter the unit on a random basis."** (our emphasis)

With permission, with doors, including unit doors and offender cells doors secured, staff may leave housing zones to assist with counts, to participate in searches, for personal convenience breaks, and if they are designated posts, to respond to emergency codes. In the absence of a floor officer, the **Pod Control Officer** is always on post, with a clear view supervising the housing zone.

<u>MTC Staff Accountability Action Initiative</u>

Monitors recommended that Mid-level and Upper-level managers review videos to assess supervision of housing units. As documented in the MTC Response to the 8th Monitor's Report, this program began November 10, 2015, and continues. The structure of the program was reemphasized to all senior staff on April 22, 2016, and expanded from Housing unit 8A to all other Housing units. The program includes the following:

1. Daily review of live video feed by senior managers of Housing Unit 8-Alpha as well as other housing units.
2. Daily review of recorded video footage by senior managers of Housing Unit 8-Alpha as well as other housing units.
3. Daily visits to Housing Unit 8-Alpha as well as other housing units.

4. Administrative Duty Officer (ADO) and the Major will spend one day per duty week on the evening Shift to include time in 8-Alpha as well as other housing units.
5. Administrative staff to visit 8-Alpha and interview assigned offenders as well as other housing units. (Attachment B)

One fixed camera in Housing Unit 5, 6, 7, and 8 has been retrofitted with a PTZ (pan-tilt-zoom) camera, which will allow more focused supervision of those housing units by the Camera Room, Central Control, and the Pod Control Officer, and eliminate blind spots.

Since November 2015, the Warden has made review of the results of the MTC Staff Accountability Action Initiative video reviews and staff unit visits an agenda item of the Daily Warden's Meeting, with any problem areas to be noted in the Warden's Meeting notes for accountability.

<u>Conclusion: Protection from Harm (2) Sufficient Numbers of Adequately Trained Staff</u>

The MDOC, as ordered by the Court has approved a WGCF staffing plan to comply with the requirement to provide **Sufficient Numbers of Adequately Trained Staff.** MTC's success in safely and securely managing WGCF, following the policies of MDOC and the MDOC staffing plan, at the current level of compliance with the Consent Decree is sufficient to demonstrate that offenders are **adequately supervised and protected from harm,** and MTC is in Compliance with this provision of the Consent Decree. MTC has demonstrated that when staff occasionally have deviated from procedure during this five month reporting period, corrections are made. As the Court Order outlines, "brief lapses" do not suggest a pattern of non-compliance.


**B-3**   **Protection from Harm: (3-12)(sic) (3-7) Use of Force and Chemical Agents**
Consent Decree: "Each use of force will be reviewed pursuant to MDOC's use of force policy and standard operating procedures."

Monitor's recommended Compliance Finding:   **Substantial Compliance**

MTC's Recommended Compliance Finding:   **Compliance**

According to the Association of State Correctional Administrators (ASCA) reporting standards, as documented in MDOC statistics, WGCF had zero Planned Use of Force events during this reporting period. WGCF is also the lowest, and declining number of spontaneous Use of Force events of comparable institutions in the Mississippi correctional system, an average of 3 per month, usually with a modest amount of OC. There are no indications in this reporting period that MTC has deviated from strict observance from MDOC and national ACA Standards, policy, and procedure on Use of Force.

In reviewing the issues discussed by the Monitors in this section, it is apparent that the primary issue is post-incident review, documentation, and corrective action. Documentation and Review are covered in the Consent Decree in Protection from Harm, Section 7. We believe that this is the relevant compliance citation for this report. Section 12 is chemical agent decontamination.

As the Monitors state, WGCF has been successful in moderating the need to apply force, and continues to conduct effective post-incident reviews to identify corrective measures. Therefore the institution is in Compliance with this element of the decree.

### Routine Application of Restraints Is Not Reportable Use of Force

Under this heading, the Monitors focus on a single occurrence on January 21, 2016, of an offender being placed in handcuffs, and a response by the Facility Captain to gain cooperation by the offender. (Attachment C). Whether this incident requires formal documentation depends on the definition of Use of Force in written MDOC Policy and Procedure. Review of the available documentation, and MDOC Procedure 16-13-01 **Use Of Force**, indicates that this incident qualifies as a Level One Use of Force (Show of Force/Verbal Intervention). This level of response does not require any reporting. (MDOC 16-13-01, page 4, line 166; page 9, line 411) (Attachment D).

In response to a Grievance by the offender and as a courtesy to the Monitor for clarity, staff did prepare an Extraordinary Occurrence Report (EOR) on 2/23/2016. The report states that the offender became combative by swinging his arms. However, there is no indication of any actual touching. Consistent with MDOC Policy, the staff "Show of Force/Verbal Intervention" was sufficient for the offender to submit to hand restraints. Taking the offender's arm and placing it in restraint is not a reportable Use of Force. The offender offered no resistance, or at worst "low level resistance" to quote the Monitor's report. This situation was a routine use of restraints, not requiring an EOR report though the chain of command to the Commissioner of Corrections.

### A Medical Code Requiring No Treatment Does Not Require an EOR

The Monitors suggest that if the matter was not reportable as a Use of Force, at a minimum it should have been reported as an Extraordinary Medical Occurrence. A Medical Code Blue was called after the offender was released to his cell. He was assessed at his cell front, and then he was taken to the Medical Department and reassessed. This was all within less than 20 minutes of being placed in restraints, and then being released to his cell. A very prompt medical response. Medical staff noted two facial scratches and a facial bump on the screening form, but their record did NOT tie their screening examination to any Use of Force or recent injury. Vital signs were normal. Medical staff released the offender back to his unit, without diagnosing a need for a treatment plan.

Mississippi State policy (MDOC SOP 16-04-02 Attachment E) only requires an Extraordinary Occurrence Report, which is a report though the chain of command to the Commissioner of Corrections, for a "Medical Incident" specifically requiring treatment (MDOC EOR Category 6: Medical Incidents: Medical Treatment). In this case the offender was assessed at the cell front and in the infirmary at the Medical Department, but no treatment plan was developed, and the offender presented no diagnosed illness to treat. This kind of situation does not merit a report to the Commissioner of Corrections, MDOC and MTC chain of command.

However, after discussions with the Monitors, MTC staff as a courtesy agreed that it might be prudent to document any Code Blue or request for Medical intervention as an EOR to avoid later questions. Of course the actual event is always logged in multiple locations: the offender medical record, Radio Call system, the unit log, the Pod Control Log, and the Medical Department documents. The purpose of the EOR is to initiate outside review of the incident. In the interest of maintaining a document trail, the Chief

of Security has now emphasized to all custody staff in memoranda that as of 2/23/2016 all Medical Code Blue calls now require documentation with an EOR, a vast expansion of outside reviews beyond current statewide Mississippi Written Policy and Practice.

### Conclusion: Protection from Harm: (3-7) Use of Force and Chemical Agents

The Consent Decree outlines that "Noncompliance with mere technicalities, or a brief lapse in compliance during a period of otherwise sustained compliance, will not constitute failure to maintain substantial compliance." This situation, which the Monitors characterized as "isolated" during this five month period, does not even rise to the level of a "lapse in compliance" with MDOC Policy on Use of Force documentation.

The intent of **B: Protection from Harm (3-7)** is to provide appropriate documentation to review uses of force, pursuant to MDOC Use of Force Policy. MTC provides that documentation, and has agreed to expand that documentation beyond that required by MDOC Policy and Procedure, the baseline for the Court Order.

Confusion on whether documentation is required for routine restraint, the lowest level of "Use of Force", and expanding reporting of offender movement to medical screening on one occasion in five months does not impair a finding of Compliance with this element of the Consent Decree.

### Follow-up: 7th Monitor's Report WGCF Incident Report 15-169

Note: MTC can now bring to closure WGCF Incident Report 15-169█████████ where an offender was found unresponsive in his cell. The Leake County Coroner had reported that the result of the May 8, 2015 Autopsy was delayed, pending results of a toxicology report from the State Laboratory. The autopsy results have now been released, stating the cause of death as the following:

> "Cause of Death: Hypertensive and atherosclerotic cardiovascular disease."

> "Manner of death: Natural." (Attachment F)

B-4    **Protection from Harm: (13) Use of Prisoners to Enforce Rules or Impose Discipline**

Consent Decree: "MDOC will not utilize, direct, or allow prisoners to enforce rules or impose discipline on other prisoners."

Monitor's Recommended Compliance Finding:    **Compliance**

MTC's Recommended Compliance Finding:    **Compliance**

B-5    **Protection from Harm: (14) Protection of Offenders from Abuse, Harassment, and Punishment on the Basis of their Actual or Perceived Sexual Orientation, Gender Identity, and Gender Non-Conformity**

Consent Decree: "MDOC will take reasonable steps to protect prisoners at WGYCF from verbal abuse and harassment. MDOC will develop policies, procedures and practices that protect prisoners from abuse, harassment; and punishment on the basis of their actual or perceived sexual orientation, gender identity, and gender non conformity."

Monitor's Recommended Compliance Finding: **Compliance**

MTC Recommended Compliance Finding: **Compliance**

**B-6** **Protection from Harm: (15) Prohibition of Forcing Offenders to Engage in Physical Exertion that Inflicts Pain or Discomfort**

Consent Decree: "MDOC will prohibit staff from forcing prisoners at WGYCF to engage in physical exertion that inflicts pain or discomfort, for example the practice of forcing prisoners to "alligator walk" and to "duck walk.""

Monitor's Recommended Compliance Finding: **Compliance**

MTC's Recommended Compliance Finding: **Compliance**



## Gone for the gold

Warden Lepher Jenkins shows off two awards won by the Walnut Grove Correctional Facility, presented by the parent company, Management and Training Corporation.

# 'Grove prison wins company recognition

Management and Training Corporation (MTC) has announced the Walnut Grove Correctional Facility has received two awards at MTC's recent Wardens' Conference.

MTC operates the Walnut Grove prison, which took the first place 2015 Impact Innovations Award and the first place, 2015 Operational Excellence Award.

The Impact Innovations Award is given facilities that develop innovations that significantly improve performance of the facilities, including employee morale and wellness.

The 'Grove facility won the top prize of $10,000.

The Operational Excellence Award is given facilities that demonstrate significant improvement in key areas, including overall performance, staff turnover and cleanliness.

The Walnut Grove facility won the top prize of $5,000.

Senior Vice President of Corrections Odie Washington said, "We're extremely proud of Warden Lepher Jenkins and his entire staff for the excellent work they do every day.

"These awards speak for themselves. The facility is operated by professionals who take their jobs seriously and strive for perfection in everything they do."

The Walnut Grove Correctional Facility won the honors in competition among 26 MTC correctional facilities across the United States.

MTC is a Centerville, Utah-based contractor that manages private prisons. MTC's core business is in corrections, education and training, MTC medical, and economic and social development.

EXHIBIT
A



**Corrections 2015**
**Impact Innovations Result Form**
**Due: January 15, 2016**

**Facility:** IWalnut Grove Correctional Facility

**Innovation Title:** Back to the Basics

**Category:** ☐ Cost Savings ☐ Occupancy ☒ Operational Performance ☐ Programmatic Performance

**Expected Outcome:** There will be a reduction in Major Incidents by 50%, Use of Forces by 50%, Contraband Finds by 25%, and Inmate-on-Inmate Assaults by ~~(50%)~~ 50%

Note: Pull from initial submission form.

**Final Outcome:** During 2015, there was a reduction in Major Incidents by 77.78%, Use of Forces by 54.79%, Contraband Finds by 44.55%, and Inmate-on-Inmate Assaults by 50.91%.

|  | # of 2014 Incidents | # of 2015 Incidents | Goal | % of Decrease |
|---|---|---|---|---|
| Major Incidents | 9 | 2 | 50% | 77.78% |
| Use of Force | 73 | 33 | 50% | 54.79% |
| Contraband | 936 | 519 | 25% | 44.55% |
| Inmate-on-Inmate Assault | 55 | 27 | 50% | 50.91% |

**Measurement Tool(s):** Mississippi Department of Corrections (MDOC) Monthly Report

Note: Attach the measurement tool(s) so the outcome can be verified.

1. **Goal was exceeded or met and produced a significant impact.**
   ☒ Goal was exceeded  ☐ Goal was met  ☐ Goal was not met

2. **Result provided significant value to our customer (FBOP, IDOC, etc.).**
   *(Describe how your innovation result provided significant value to your customer.)*
   During 2015, the significant reduction in disruptive events at Walnut Grove Correctional Facility (WGCF) resulted in more positive community relationships and a decrease in costs incurred by the Mississippi Department of Corrections (MDOC). The decline in negative media coverage and the increase in community relations events resulted in an overall improvement of the perception of MDOC and WGCF. Also, financial liability for MDOC was decreased due to fewer medical claims resulting from injuries, less property damage, and fewer legal costs.

3. **A substantial percentage of employees were involved in the innovative solution.**
   *(Include the number and percent of employees involved. Describe how these employees were involved in your innovation.)*



# MEMO

To:   Jessie Streeter, D/W of Operations
      Shaniece Mabry, D/W of Programs
      Terry Daniel, Chief of Security

From: Lepher Jenkins, Warden

Date: Friday, April 22, 2016

This memo is submitted to you to reiterate my verbal instructions to you back in November 2015, of functions to be conducted by senior management.  Please insure that these functions are continually being performed as previously instructed. Please note the below functions:

(1) Daily review of live video feed by senior managers of Housing Unit 8 Alpha as well as other housing units.
(2) Daily review of recorded video footage by senior managers of Housing Unit 8 Alpha as well as other housing units.
(3) Daily visits to Housing Unit 8 – Alpha by senior managers as well as other housing units.
(4) Administrative Duty Officer (ADO) and Major will spend one day per duty week on the evening shift to include time in 8 – Alpha as well as other housing units.
(5) Administrative staff to visit 8 – Alpha and interview assigned offenders as well as other housing units.

If you have questions or concerns please don't hesitate to contact this office.



EXHIBIT

B

**Exhibit C**

**Redacted in its entirety**

**Exhibit D1**

**Redacted in its entirety**

# Exhibit D2

# Redacted in its entirety

**Exhibit E**

**Redacted in its entirety**

# Exhibit F

# Redacted in its entirety