**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

**CHARLTON DEPRIEST, ET AL.**                    **PLAINTIFFS**

**VS.**                    **CIVIL ACTION NO.: 3:10-cv-663(CWR)(FKB)**

**WALNUT GROVE CORRECTIONAL AUTHORITY, ET**
**AL.**

                    **DEFENDANTS**

**DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION**
**FOR ATTORNEYS' FEES**

## I.      PRELIMINARY STATEMENT

The Inmates' motion seeks nearly $600,000.00 for the alleged work of at least 27

different individuals.[1]  *See* Doc. No. 196.  All for litigation that gave them less than they had

before it began.  It would shock the conscience to grant the Inmates' requested relief.

As they have been prone to do in this and other cases,[2]  the Inmates mischaracterize the

factual record.   In an effort to manufacture some basis for prevailing party status, their

memorandum claims that this Court's June 2015 order "adopt[ed]" their requested relief,

constituted a "new, enforceable judgment[,]" and even extended the consent decree.  *Id*.  Their

memorandum also claims that they are the ones who requested termination of the portions of the

consent decree that this Court ended.  *Id*.  None of this is true.

In August 2014, the Inmates combined a motion to enforce the consent decree with a

motion to modify it.  *See* Doc. Nos. 106 & 107.  Walnut Grove, in turn, moved to terminate the

consent decree because the Inmates' modification motion necessarily placed constitutional issues

---

[1] The Inmates' bills include entries for attorneys, community advocates, law clerks, and IT.  (The "IT" designation is not broken down into different individuals.)   The Inmates seek compensation for 14 different attorneys, even though eight of the attorneys have never even entered an appearance in this case.

[2] One recent example is *Hughes v. Judd*, 2015 WL 1737871 (M.D. Fla. 2015), where a Florida district court remarked that the conditions of the prison in that case were "not consistent with the plaintiffs' dark, grim, and condemning portrayal."  Counsel for the inmates in this case served as counsel for the inmates in *Hughes*.

before the Court.  *See* Doc. No. 130.  The resulting order terminated various provisions of the consent decree, modified none of them, and left the remaining provisions unchanged.  *See* Doc. No. 170.  This Court specifically held that "the majority of the [c]onsent [d]ecree's provisions [were] no longer necessary" after reviewing evidence showing that "significant advancements" had been made since the consent decree's entry, including that "the vast majority of the inmate population [wa]s not involved in assaultive or violent behavior" and that Walnut Grove's efforts "boded well for the future safe operation" of the facility.  *Id.*

A central purpose for awarding attorney's fees awards is to "ensur[e] the effective prosecution of meritorious claims."  *See Kay v. Ehrler*, 499 U.S. 432 (1991).  That purpose is not advanced, and fairness is not served, when litigants seek exorbitant fees without justification. The Inmates' motion for attorneys' fees should be denied outright because their litigation efforts placed them in a worse, not better, position than they were in prior to filing their motion to enforce and to modify the consent decree.  In the alternative only, the Inmates certainly are not entitled to anything close to the $600,000.00 they request.

## II.      BACKGROUND

This litigation began in 2010, with an Eighth Amendment prison conditions complaint filed on behalf of youth inmates housed at Walnut Grove.  *See* Doc. No. 1.  After negotiations between the parties, this Court approved a consent decree pursuant to the PLRA in March 2012. *See* Doc. No. 75.

The consent decree contained eight substantive topics, and each topic included a selection of remedial provisions.  *Id.*  In addition, it contained an enforcement and monitoring provision. *Id.*  Pursuant to the enforcement and monitoring provision, two independent and neutral court monitors were appointed for the purpose of tracking compliance with the consent decree.  *Id.* Counsel for the Inmates also played a role in the monitoring, as they entered into an agreement

by which Walnut Grove would pay up to $30,000.00 for the first year of monitoring and up to $20,000.00 each subsequent year.  *See* SPLC Memorandum, Ex. A.

In August 2014, the Inmates filed a motion to enforce and to modify the consent decree. *See* Doc. Nos. 106 & 107.  The impetus for the motion was two prison riots that occurred in December 2013 and July 2014, respectively.  *Id*.  According to the Inmates, the motion was necessary because Walnut Grove had refused to adopt recommendations made by Expert Witness Eldon Vail.  *Id*.

Walnut Grove objected to the August 2014 motion because the Inmates had not satisfied the consent decree's notice and mediation requirements and because the Monitors' Sixth Report had not been issued.  The parties subsequently participated in a settlement conference, at which Walnut Grove was willing to agree to many of the recommendations provided by Vail in an effort to prevent further litigation.  *See* 2/09/2015 Text Entry.  The Inmates were uninterested in settlement, however, and instead insisted upon the evidentiary hearing that took place in April 2015.

On March 6, 2015, prior to the evidentiary hearing, the monitors filed their sixth report. *See* Doc. No. 121.  In light of the report depicting conditions at Walnut Grove that did not rise to the level of a current and ongoing Eighth Amendment violation, and in light of the Eighth Amendment inquiry already having been placed before this Court because of the Inmates' request for modification,[3] Walnut Grove filed a motion to terminate, in whole and/or in part, on March 13, 2015.  *See* Doc. Nos. 129 & 130.  The motion to terminate included both the

---

[3] The difference between enforcement, modification, and termination previously has been explained.  On the one hand, modification under the PLRA, as opposed to enforcement, placed a burden on the Inmates to prove an Eighth Amendment violation rather than simply a burden to prove noncompliance with the consent decree.  *See* 18 U.S.C. § 3626(a).  On the other hand, the constitutional inquiry with respect to modification is encompassed within the termination inquiry of 18 U.S.C. § 3626(b)(3).  Given the mirrored constitutional inquiries, courts have warned that modification and termination should be addressed all at once.  *See, e.g., Lancaster v. Tilton*, 2007 WL 1807825, *6 (N.D. Cal. 2007) ("Defendants have . . . no one to blame but themselves for neglecting to move and to obtain an order under the PLRA to terminate[.]").

safety/security and medical care provisions of the consent decree and was filed pursuant to §
3626(b) of the PLRA. *Id.*

Following the termination motion, Walnut Grove requested consolidation of all pending
issues. This Court, however, split the safety and security provisions of the consent decree from
the medical care provisions of the consent decree. The six-day evidentiary hearing was held in
April 2015 on the enforcement, modification, and termination motions as they related to safety
and security only.

This Court issued a single order resolving the enforcement, modification, and termination
requests in June 2015, taking a three-fold approach. *See* Doc. No. 170. First, this Court rejected
the Inmates' request for prospective relief, thereby denying their modification motion. *Id.*
Second, this Court partially terminated the safety and security provisions of the consent decree
after finding "that a majority of the [c]onsent [d]ecree's provisions [were] no longer necessary."
*Id.* Third, this Court held that it would "continue to enforce" the remaining provisions of the
consent decree that had not been terminated "as necessary." *Id.* The net result was that only two
components of the safety and security portions of the consent decree remained, along with the
enforcement provision.[4]

Walnut Grove appealed, seeking termination of the remaining portions of the consent
decree pertaining to safety and security.[5] Briefing was complete in December 2015, and a three-
judge panel held oral argument in February 2016. By June 2016, the panel had not issued a
decision, and the Mississippi Department of Corrections announced that the Walnut Grove
would close in September 2016. The Fifth Circuit panel dismissed Walnut Grove's appeal as

---

[4] In particular, the portions of the consent decree that were terminated were as follows: III.(C.) Long-Term
Cell Confinement, III.(D.) Programming and Behavior Management, III.(E.) Disciplinary Due Process and
Grievances, and III.(H) Contract Monitoring and Revisions.

[5] In particular, termination was sought on the following portions: "III.(A.) Classification and Housing
System," "III.(B.) Protection from Harm," and "IV. Enforcement and Monitoring."

PD.20815933.1

moot on September 27, 2016. *See Depriest v. Fisher*, 2016 WL 5400415 (5th Cir. Sept. 27, 2016).

### III.     ARGUMENT & AUTHORITIES

A multi-step analysis applies to the Inmates' motion for attorney's fees. When, as here, fees are requested in a prison litigation case, the requesting party must satisfy both the requirements of Section 1988 of the Civil Rights Act <u>and</u> the requirements of Section 1997e(d) of the PLRA. *See, e.g., In re Litigation Relating to Conditions of Confinement at Montana State Prison*, 1999 WL 33208662, *2 n.1 (D. Montana 1999) ("[A] plaintiff may only recover fees under the PLRA if he proves both that he is eligible for fees under 42 U.S.C. § 1988 and that he meets the requirements of 42 U.S.C. § 1997e(d)(1)."). The Inmates' motion for attorney's fees fails at both steps of the analysis.

### I.     The Inmates' motion for attorney's fees fails under §1988.

The analysis under §1988 is straightforward. First, it must be determined whether the requesting party is a "prevailing" one. If the requesting party does not qualify as a prevailing party, then no fees at all are awardable. *See Hughes v. Rowe*, 449 U.S. 5, 14 (1980). Second, even if the requesting party is determined to be a prevailing one, it must be determined whether there are "special circumstances" that would make awarding fees unjust. *See Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983). If there are special circumstances, then no fees at all are awardable. Third, if the party requesting fees is determined to be a prevailing one and it is determined that the special circumstances doctrine is inapplicable, it must be determined what fee award is "reasonable." *Id.* at 433. The burden of proof to obtain fees is on the requesting party. *See, e.g., Walker v. City of Mesquite, Tex.*, 313 F.3d 246, 251 (5th Cir. 2002).

**Prevailing Party Status.** The Inmates contend that "there can be no question" that they are prevailing parties. *See* Doc. No. 196 at 5. This contention, however, is meritless. It is telling

that much of the Inmates' discussion about the prevailing party prerequisite focuses on the consent decree's entry in 2012. *Id.* at 6. It is irrelevant what happened back then, for the focus of the current motion before the Court is the litigation that resulted from the Inmates' subsequent enforcement/modification motion. *Id.* at 4-5 ("[Plaintiffs] seeks fees and costs [for] the preparation of the . . .motion to enforce . . . ."). What matters for purposes of the attorneys' fees issue is whether the Inmates obtained actionable relief as a result of this Court's June 2015 order. *See, e.g., Duvall v. O'Malley*, 2014 WL 1379787, *9 (D. Maryland 2014) (rejecting the plaintiffs' argument that a "'prevailing party' status [ ] obtained earlier in the litigation persisted throughout the [remainder of the] litigation").

No fees are awardable here because this Court's order provided no "material alteration of the legal relationship between the parties" that benefitted the Inmates. *See Buckhannon Bd. & Care Home, Inc. v. W. Virginia Dep't of Health & Human Res.*, 532 U.S. 598, 604-05 (2001). To the contrary, the order benefitted Walnut Grove, in that it terminated the following consent decree provisions: III.(C.) Long-Term Cell Confinement, III.(D.) Programming and Behavior Management, III.(E.) Disciplinary Due Process and Grievances, and III.(H) Contract Monitoring and Revisions. *See* Doc. No. 170. Although the Inmates claim that these portions were terminated "at the[ir] request[,]" *see* Doc. No. 196 at 7, such a statement is false.[6] A simple review of the Inmates' motion and memorandum in support of enforcement/modification reveals that nowhere in it did they urge this Court to terminate any provisions of the consent decree. *See* Doc. Nos. 106, 107 & 115  The terminated provisions came about because of Walnut Groves' motion to terminate. *See* Doc. No. 129 & 130.

---

[6] Presumably, this claim is based on testimony from the Inmates' expert, Eldon Vail, that certain provisions of the consent decree should be terminated. But it is improper for the Inmates to characterize the testimony as a "request" for termination. Vail's testimony plainly was a concession to certain portions of Walnut Grove's termination motion.

The Inmates' argument necessarily hinges on the "enforcement" portion of their motion because it is undisputed that this Court denied *in toto* the "modification" portion.[7]  The problem for the Inmates, though, is that the enforcement portion did not constitute a "material alteration of the legal relationship between the parties[.]"  *See Buckhannon*, 532 U.S. at 604-05.  Although the order purportedly granted the Inmates' request for enforcement, this Court held only that it would continue to enforce, "as necessary[,]" the remaining provisions of the consent decree that had not been terminated.  *See* Doc. No. 170.  "Continue[d]" enforcement "as necessary" was not an alteration of the relationship between the Inmates and Walnut Grove because this Court would have continued to enforce the consent decree in any event had the Inmates never filed a motion requesting court intervention.  *See Gary G. v. El Paso Ind. Sch. Dist.*, 632 F.3d 201, 207 (5th Cir. 2011) (explaining that "material alteration" requires both a remedy and some judicial imprimatur).

Cases like *United States v. Territory of the Virgin Islands*, 884 F.Supp.2d 399 (D. V.I. 2012) help clarify the point.  There, the court analyzed the difference between enforcement motions and other motions seeking prospective relief.  *See Territory of the Virgin Islands*, 884 F.Supp.2d at 408-11.  Enforcement motions, the court explained, are ones which only seek compliance while other motions – such as a modification motion – may seek new relief not contemplated by an existing consent decree.  *Id*.  Here, the Inmates obtained only continued compliance with the portions that were not terminated and not any "new" relief.

Further underscoring the point is the impetus behind the Inmates' enforcement/modification motion.   Their expert, Eldon Vail, proposed 12 different

---

[7] The Inmates correctly do not argue that they obtained prevailing party status by successfully defending against some of Walnut Grove's termination motion.  *See* Doc. No. 196 at 5-8 (discussing the prevailing party requirement).  While defense of the termination motion may have some relevance to the PLRA's additional requirements, it has no relevance to the threshold requirement of showing that they qualify for fees under §1988.  This Court need not reach the additional PLRA requirements because the Inmates cannot satisfy their threshold burden of showing that they were "prevailing parties" under §1988.

"recommendations" that he believed were necessary following the December 2014 and July 2015 riots.  *See* Doc. No. 152.  Even though Walnut Grove was willing to agree to many of the recommendations in an effort to prevent more litigation and expense, *see* 2/09/2015 Text Entry, the Inmates insisted upon the six-day evidentiary hearing that was held in April 2015.  At the conclusion of the hearing, this Court did not order any of the recommendations made by Vail, and Walnut Grove did not implement any of the recommendations made by Vail.  *See* Doc. No. 170.

The Inmates' own appellate brief before the Fifth Circuit highlights the disingenuous nature of their argument.  At page seven, the Inmates confessed that "[t]he trial court did not enter any of the new relief Plaintiffs had requested, or any other new relief, and it terminated the majority of the existing remedial provisions of the [consent] [d]ecree[.]"  *See* Br. of Plaintiffs-Appellees, 2015 WL 7596127, *7 (5th Cir. Nov. 17, 2015).  It is therefore false for the Inmates to maintain that this Court "adopt[ed] remedial measures[.]"

Equally false is the Inmates' attempt to manufacture a win by arguing that their "efforts extended the life of the" consent decree.  *Id.*  Although they acknowledge that the consent decree was set to expire by its own terms on March 26, 2017, they then suggest that this Court's order would have extended such expiration until June 2017.  *Id.*  The Inmates cite no authority for such a bizarre proposition because none exists.  Their suggestion plainly confuses two different concepts: when the consent decree was set to expire by its own terms and when termination motions are permitted under the PLRA.[8]  These concepts are mutually exclusive, demonstrated by the fact that nothing in this Court's order said anything about an "extension" of the consent

---

[8] Title 18, Section 3626(b)(1)(A)(iii), is the PLRA provision that permits a party to move for termination two years after a consent decree is approved.  A termination motion that is denied, however, does not affect a termination provision contained within the consent decree itself.  Nowhere, in any motion, have the Inmates ever requested that the consent decree be extended.

decree.  *Id*.  It is concerning that the Inmates would misrepresent an order entered by the very Court from which they seek a fee award.

Consider the consequences if plaintiffs are allowed to recover fees by obtaining no relief other than an order requiring defendants to continue complying with a consent decree that already is in place.  The entry of a consent decree necessarily means that the parties have agreed to corrective measures, but that does not mean that correction need be immediate.[9]  If a plaintiff believes that a defendant's efforts are not good enough, then the plaintiff can request modification or move for an extension if it is believed that the consent decree should last longer.  Such circumstances may result in "prevailing party" status.  But a party who files a motion to enforce that results only in an order requiring that the status quo be maintained cannot be said to have obtained a material alteration that qualifies for a fee award.  Such a twisted result would incentivize parties to perpetually run to the court for what would amount to an advisory opinion rather than allowing the consent decree to operate as it was intended to operate.  *Cf. Preiser v. Newkirk*, 422 U.S. 395, 401 (1975) (explaining that federal courts have no power to render advisory opinions).

The Inmates have not proven that they were prevailing parties for purposes of §1988.  That is so because this Court's June 2015 order did not result in a "material alteration of the legal relationship between the parties" that benefitted the Inmates.  *See Buckhannon*, 532 U.S. at 604-05.  Because the Inmates have not shouldered their threshold burden, this Court need not reach the remaining portions of the analysis.  The Inmates' motion for attorneys' fees should be denied outright.

**Special Circumstances.**  In any event, the Supreme Court has explained that, even when a party technically may be characterized as a prevailing one, there may exist special

---

[9] This is demonstrated by the fact that, by its terms, the consent decree was intended to last for five years, unless terminated after the two-year period contemplated by the PLRA.

circumstances that warrant "no fee at all." *See Farrar v. Hobby*, 506 U.S. 103, 115 (1992). Such special circumstances include (1) requesting a grossly exaggerated fee, (2) requesting relief that confers no significant civil rights benefit, or (3) engaging in litigation efforts that were unnecessary to obtaining the resulting relief. *See Scham v. Dist. Courts Trying Criminal Cases*, 148 F.3d 554 (5th Cir. 1998) (overruled on other grounds) (analyzing exaggerated fee situation); *Riddell v. National Democratic Party*, 624 F.2d 539 (5th Cir. 1980) (analyzing no significant benefit and unnecessary litigation situations).  All of these circumstances apply to the Inmates in this case.

Here, like in *Scham*, the Inmates have requested fees that should "'shock[ ] the conscience' of the [C]ourt."  *See* 148 F.3d at 559.  They have requested approximately $600,000.00 for a motion that gave them nothing that they did not already have before it was filed. *See* Doc. No. 196.  They have submitted bills for the work of 26 different individuals and claim that those individuals collectively worked more than 2,871 hours.[10]  *Id.*  Like in *Scham*, this Court should determine that the Inmates are entitled to no relief "at all."

Although the Inmates might suggest that their excessiveness speaks only to a reduction and not a total bar, such an argument directly was rejected in *Scham*.  The Fifth Circuit persuasively explained that, if "the court were required to award a reasonable fee when an outrageously unreasonable one has been asked for, claimants would be encouraged to make unreasonable demands, knowing that the only unfavorable consequence of such conduct would be reduction of their fee to what they should have asked for in the first place." *Id.* at 558.  This Court similarly should not condone the Inmates' exaggerated fee request.

The second and third referenced circumstances – the no significant benefit and unnecessary litigation exceptions – apply as well.  As explained in the prevailing party section

---

[10] A detailed breakdown of the Inmates' excessive billing can be found in the forthcoming PLRA section of this memorandum.

previously, the Inmates gained no benefit that would significantly advance civil rights law.  The end result of their efforts was that part of the consent decree would continue being enforced, "as necessary[,]" which is something that would have happened regardless of whether they had filed their motion.  *See* Doc. No. 170.  This brings into focus the third circumstance: unnecessary litigation.  Because the Inmates would have been in a better position had they not filed their motion to enforce/modify, it is clear that their tactics merely wasted the time and money of the parties and the resources of this Court.

The Inmates, even if they somehow could be categorized as prevailing parties, should take nothing under the special circumstances doctrine.  The facts of this case fit nicely within the purpose behind the doctrine's creation.   The Inmates' motion for attorneys' fees may alternatively be denied because they do not qualify for fees under §1988 due to the special circumstances doctrine.

**Reasonableness of the Fee Request**.  Even if the Inmates were able to prove that they qualify for a fee award under §1988, they still would be required to prove that the requested amount is "reasonable."   In traditional §1988 cases, reasonableness is determined through the lodestar methodology combined with any necessary adjustments under the factors articulated by the Fifth Circuit in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974).  *See, e.g., Watkins v. Fordice*, 7 F.3d 453, 457 (5th Cir. 1993).  In prison litigation cases, even more stringent requirements must be satisfied because of the PLRA.  *See* 42 U.S.C. § 1997e(d).  If this Court determines that the Inmates qualify for a fee award, only then should this Court consider how much they may be awarded.  Reasonableness is addressed in the PLRA section below.

II.     **The Inmates' motion for attorney's fees fails under the PLRA.**

Again, it is well settled that "[a]n inmate does not qualify for attorneys' fees under the PLRA merely by obtaining prevailing party status" under §1988.  *See, e.g., Kimbrough v. California*, 609 F.3d 1027, 1031 (9th Cir. 2010).  Rather, fees may be awarded only if they also are "directly and reasonably incurred" in proving an "actual statutory violation," and the amount of the fee is  "proportionally related to the court ordered relief for the statutory violation" or "directly and reasonably incurred in enforcing the relief ordered."  *See* 42 U.S.C. § 1997e(d). Section 1997(e)(d), simply put, adds additional requirements beyond those required under Section 1988 for non-prisoners.  *See Johnson v. Daley*, 339 F.3d 582, 583 (7th Cir. 2003) (en banc) (explaining that the PLRA "establish[es] relative limits" that go beyond the limits in ordinary civil rights cases).

**PLRA Qualifiers.**  The Inmates are ineligible for relief due to subsection (1)(A)'s requirement that there be proof of an "actual violation of the plaintiff's rights protected by a statute[.]"  *Id.*  The Inmates have two problems under this subsection.  First, it is significant that this Court only granted the enforcement motion and not the modification motion.  *See* Doc. No. 170.  While the modification request implicated a statute, specifically the PLRA's prospective remedial measures, the enforcement motion only implicated the consent decree that already was in place.  Nothing in the plain language of §1997e(d) contemplates fees for proving a consent decree violation as opposed to a statutory violation.  *See Davis v. Johnson*, 158 F.3d 806, 810 (5th Cir. 1998) (quoted case omitted) ("When the language of a statute is unambiguous we must follow its plain meaning.").  Second, it is significant that this Court's order held only that  it would "continue [ ] enforce[ing] the consent decree . . . as necessary."  *See* Doc. No. 170.  While a plaintiff need not always obtain a final judgment to prove an "actual violation[,]" *see* 42 U.S.C. § 1997e(d), he certainly must obtain something "which affects the behavior of the defendant

towards the plaintiff." *See Hewitt v. Helms*, 482 U.S. 755, 761 (1987).  Nothing in this Court's order affected Walnut Grove's behavior towards the Inmates because this Court only vowed to "continue [ ] enforce[ing] the consent decree . . . as necessary [,]" just as it previously had done before the Inmates filed their motion. *See* Doc. No. 170.

Any suggestion that the Inmates are entitled to fees for defending against Walnut Grove's termination motion is especially ill reasoned.  A defendant would not be entitled to fees under §1988 for such defensive measures, *see, e.g., Hanrahan v. Hampton*, 446 U.S. 754, 758-59 (1980) (refusing to award fees under §1988, even though plaintiff's appeal successfully reversed an earlier decision and the appellate court determined that the plaintiff was entitled to a trial), and, as explained previously, §1997(e)(d) establishes even tougher requirements in prisoner cases.  Thus, if a prevailing defendant would not be entitled to fees under §1988, the Inmates should not be entitled to fees for only partially defeating Walnut Grove's termination motion under the PLRA.  That is especially so when, as here, the constitutional inquiry already was placed before this Court by the Inmates' modification motion.

Likewise, the Inmates are not entitled to any relief due to subsection (1)(B).  That provision provides that, even if the Inmates could prove an actual statutory violation, they still would have to show that they obtained "court ordered relief for the violation" or that they "enforce[ed] the relief ordered for the violation."  No "court ordered relief" was obtained, for Walnut Grove was not instructed to do anything. *See* Doc. No. 170.  The status quo was instead kept in place, except with respect to the provisions that were terminated as requested by Walnut Grove. *Id*.  Nor did the Inmates "enforce" any relief under this Court's order.  Defending an appeal is not "enforcement," which is defined by BLACK'S LAW DICTIONARY as "[t]he act or process of compelling compliance with a law, mandate, command, decree, or agreement." *Cf.*

13

*Rolland v. Cellucci*, 151 F.Supp.2d 145, 153-54 (D. Mass. 2001) (distinguishing enforcement and monitoring).

The Inmates have not proven that they qualify for attorney's fees under the PLRA.  That is so because they did not prove a statutory violation, obtain court ordered relief, or enforce an order from this Court.  Because the Inmates have not shouldered their burden of proving that they are eligible for fees under the PLRA, this Court need not reach the remaining portions of the analysis.  The Inmates' motion for attorneys' fees should be denied outright.

**Reasonableness of the Fee Request**.  Even if the Inmates were able to prove that they are eligible for a fee award, they still would be required to prove that the requested amount is compatible with §1988 and the PLRA.  Calculation of the lodestar is the starting point for determining the reasonableness of an attorney's fees request.  *See Hensley*, 461 U.S. at 432.  In ordinary cases, the lodestar constitutes "the number of hours reasonably expended on the litigation multiplied by a reasonably hourly rate."  *Id.*  In prisoner cases like this one, however, these factors are augmented by the PLRA.  *See, e.g., Kelly v. Wengler*, 822 F.3d 1085, 1099 (9th Cir. 2016).  With respect to the reasonableness of the hours expended, fee hours must be limited to those "(1) directly and reasonably incurred in proving an actual violation of the plaintiff's rights and (2) either proportionately related to court-ordered relief or directly and reasonably incurred in enforcing such relief."  *Id.* (citing 42 U.S.C. § 1997e(d)(1)).  With respect to the reasonableness of hourly rates, "the hourly rate used as the basis for a fee award is limited to 150 percent of the hourly rate used for paying appointed counsel under the Criminal Justice Act[.]"  *Id.* (citing  42 U.S.C. § 1997e(d)(3)).

Inexplicably, the Inmates proffer 2,871.1 as the reasonable number of hours expended, and $219 per hour for attorneys, $160 per hour for law clerks, and $75 per hour for community

advocates as reasonable hourly rates.  *See* Doc. No. 196.   These amounts are patently unreasonable.

*Hours Expended.*  Subsections (1)(B)(i) and (1)(B)(ii) of § 1997e(d) require that "the amount of the fee [be] proportionately related to the court ordered relief for the violation[ ] or [that] (ii) the fee [be] directly and reasonably incurred in enforcing the relief ordered for the violation."  Although the burden is on the Inmates to demonstrate that all of their requested fees satisfy these requirements, they have merely dumped voluminous billing information into the record with no breakdown of how the entries supposedly are proportional or related to the success they believe they have achieved.  Walnut Grove will attempt to address the Inmates' unreasonable time entries, but this tactic alone should defeat the Inmates' motion.

With respect to subsection (1)(B)(i), the nearly $600,000.00 fee request certainly is disproportional to any court ordered relief that possibly could be said to have been obtained.  As explained throughout, this Court's order merely held that it would "continue to enforce the consent decree . . . as necessary."  *See* Doc. No. 170.  That would have happened regardless of the Inmates' motion, so $600,000.00 necessarily is disproportionate.

Courts have made clear that the PLRA limitation mandates "that district courts award only fees related to successful claims and commensurate with the extent of success."  *See, e.g., Graves v. Arpaio*, 633 F.Supp.2d 834, 844 (D. Ariz. 2009).[11]  Thus, even if this Court were to determine that the Inmates achieved any success at all, the "extent" of that success would still guide the determination of how much should be awarded.  When considered alongside this Court's termination of certain portions of the consent decree and this Court's modification of none of them, $600,000.00 simply is unjustified.

---

[11] Countless cases demonstrate that fees must be proportional to the degree of success. *See, e.g., Montcalm Pub. Corp. v. Commonwealth of Va.*, 199 F.3d 168 (4th Cir. 1999) (affirming 25% fee reduction where plaintiff prevailed only on one of four claims); *Rodriguez v. Zavaras*, 22 F.Supp.2d 1196 (D. Colo. 1998) (reducing plaintiff's fee award by 33% where plaintiff was unsuccessful on several claims).

PD.20815933.1

The Inmates' defense of certain portions of Walnut Grove's termination motion cannot be utilized to support proportionality either.  As the Inmates concede on page 12 of their memorandum, *see* Doc. No. 196, Walnut Grove's termination motion merely teed up an issue that the Inmates themselves already had brought before the Court through their modification request.  In other words, no extra work – of any materiality – was performed in defense of termination.  The Inmates already had done that work in preparation of the modification motion that they lost.  As such, it is unreasonable for the Inmates to claim approximately $121,333.41 in fees and costs for a time period prior to Walnut Grove even filing its termination motion.

Reducing the Inmates requested fees as disproportional is entirely consistent with the PLRA's underlying purposes.  The Congressional House Report, for example, explains that the proportionality requirement was aimed at "discourage[ing] burdensome litigation of insubstantial claims where the prisoner can establish a technical violation of a federal right but he suffered no real harm from the violation."  *See* Lynn S. Branham, *Toothless in Truth? The Ethereal Rational Basis Test and the Prison Litigation Reform Act's Disparate Restrictions on Attorney's Fees*, 89 CAL. L.REV. 999, 1020 (2001) (citing H.R. Rep. No. 104-21, at 28).  It also explains that the proportionality requirement was aimed at "remind[ing]" judges that the attorney's fees they award should not 'unreasonably exceed' the relief obtained by a prisoner.  *Id.*  Courts frequently have relied on legislative history to show that the PLRA was intended to curb prison litigation.  *See, e.g., Boivin v. Black*, 225 F.3d 36, 41 (1st Cir. 2000) (explaining, while citing to legislative history, that "Congress enacted the PLRA out of a concern that prisoner litigation, much of it frivolous, was wasting taxpayer money and clogging the courts").

The primary reason that the Inmates' fee request is so disproportional is because they obtained no relief.  No fees is the only thing that is proportional to no relief.  Nonetheless, the Inmates plainly exercised no "billing judgment," even if it could be said that they obtained any

relief.  *See, e.g., Chatin*, 1998 WL 293992 at \*3.  What follows are a sample of the unreasonable time entries included within the Inmates' motion:

- The Inmates seek approximately $46,652.70 for prison interviews conducted <u>prior to</u> the enforcement/modification hearing being held.  This amount encompasses approximately 316.5 hours.  The Inmates fail to explain why these proffered fees are proportional, or even related, to the relief they believe they obtained.  Most of the entries are vague and redundant, with little to no explanation of what work supposedly was being performed.  Any fees for prison interviews in preparation for the enforcement/modification hearing are unreasonable, for starters, because the Inmates' counsel already were under agreement to receive up to $20,000.00 per year to monitor Walnut Grove.  *See* SPLC Memorandum, Ex. A.  Allowing the Inmates to recover fees for pre-hearing monitoring would constitute a double recovery.  Such recovery also makes little sense because the Inmates called only <u>two</u> inmate witnesses at the evidentiary hearing.  It is astounding that the Inmates would claim that so much time was needed to interview prisoners when they chose to only call two of them for testimony.  Plus, the Inmates attribute at least $11,344.80 of the requested $46,652.70 to travel time.  Courts have made clear that travel time should be billed at half of the hourly rate.  *See, e.g., Clark v. Phillips*, 965 F.Supp. 331 (N.D. N.Y. 1997).

- The Inmates seek approximately $3,315.00 for prison interviews conducted <u>after</u> the enforcement/modification motion was filed.  This amount encompasses approximately 44.2 hours.  The Inmates fail to explain why these proffered fees are proportional, or even related, to the relief they believe they obtained.  Most of the entries are vague and redundant, with little to no explanation of what work supposedly was being performed.  Any fees for prison interviews conducted <u>after</u> the hearing was over is not compensable because they could not possibly be related or proportional to any relief the Inmates believe they obtained.  Such information, of course, was not even before the Court.  The amounts also are covered by the monitoring agreement, which permit the Inmates' counsel to receive up to $20,000.00 per year.  *See* SPLC Memorandum, Ex. A.  Again, allowing the Inmates to recover fees for monitoring would constitute a double recovery.  Plus, the Inmates attribute at least $742.50 of the requested $3,315.00 to travel time.  Courts have made clear that travel time should be billed at half of the hourly rate.  *See, e.g., Clark*, 965 F.Supp. 331.

- The Inmates seek approximately $4,475.70 for depositions conducted prior to the hearing.  This amount encompasses approximately 30.3 hours.  No explanation is provided for why these amounts were reasonable and necessary.  Notably, the time entries show that at least two, and sometimes three, individuals attended all of the depositions.  Courts frequently have explained that plaintiffs "cannot recover fees for multiple attorneys attending a single deposition[.]"  *See, e.g., Sipe v. Project Execution and Control Consulting*, 2016 WL 893687, \*4 (D. Md. March 8, 2016).

- The Inmates seek approximately $27,409.50 for attendance at the evidentiary hearing.  This amount encompasses approximately 217.1 hours.  Notably, the time entries show that, for the majority of the hearing, four individuals were in attendance and billed for

their time.  No explanation is provided by the Inmates as to why so many people would have been necessary, and courts frequently have explained that plaintiffs "cannot recover fees for multiple attorneys attending a single . . . hearing[.]"  *See, e.g., Sipe*, 2016 WL 893687 at *4.

- For the post-hearing brief that followed the hearing, the Inmates claim approximately $51,782.40.  This amount encompasses approximately 243.9 hours.  The Inmates' attorneys' fees memorandum is silent as to why 7 different individuals would be needed to draft the post-hearing brief or why it would take approximately 243.9 hours to prepare one such filing.  Most of the entries are vague and redundant, with little to no explanation of what work supposedly was being performed.

- The Inmates seek approximately $3,697.50 for clerical tasks, such as technology support.  This amount encompasses approximately 130.3 hours.  It is well settled that such clerical tasks are not compensable.  *See, e.g., Barrow v. Greenville Ind. Sch. Dist.*, 2005 WL 6789456, *12 (N.D. Tex. 2005) (reducing fee award for clerical work), aff'd by 2007 WL 3085028 (5th Cir. 2007).

- The Inmates seek approximately $564.00 for tasks related to the Eighth and Ninth Monitors' reports, which were issued after the April 2015 hearing.  This amount encompasses approximately 5.6 hours.  The Inmates fail to explain why these proffered fees are proportional, or even related, to the relief they believed they obtained.  Most of the entries are vague and redundant, with little to no explanation of what work supposedly was being performed.  Any fees for events related to the Eighth and Ninth Monitors' Reports are not compensable because they could not possibly be related or proportional to any relief the Inmates believe they obtained.  Such information, of course, was not even before the Court.

With respect to subsection (1)(B)(ii), the nearly $600,000.00 in fees requested by the Inmates similarly was not "directly and reasonably incurred in enforcing [any] relief" ordered by this Court.  Temporal logic shows that a large portion of the Inmates' requested fees cannot possibly be supported by subsection (1)(B)(ii) because only fees incurred after this Court's June 11, 2015 order might qualify for enforcement purposes.  In other words, until this Court entered its ruling on June 11, there was nothing for the Inmates to "enforce" on appeal.  The bills included along with the Inmates' memorandum indicate over 926 hours of work for a total of nearly $195,000.00 in fees during the time frame of June 11, 2015 (the date of this Court's order) to September 27, 2016 (the date of the Fifth Circuit's decision).  The Inmates want this Court to

believe that it took 11 different individuals to prepare one Fifth Circuit brief and prepare one attorney for oral argument.

The proffered amounts most certainly do not satisfy the "directly and reasonably incurred" component of the PLRA.  Again, courts have reduced fees where litigants fail to exercise "billing judgment."  *See, e.g., Chatin*, 1998 WL 293992 at *3.  Such examples include performing duplicative work, billing for unnecessary phone calls between co-counsel, and sending multiple attorneys to judicial proceedings when one attorney would have been sufficient. *Id.* (duplicative work); *Blisset v. Casey*, 1999 WL 1034502 (N.D. N.Y. 1999) (unnecessary phone calls and attendance at judicial proceedings).  These same issues pervade the Inmates' request for fees.

What follows is merely a sample of the unreasonable time entries that allegedly relate to the Inmates' "enforcement" argument:[12]

- Eleven different people supposedly assisted with the Fifth Circuit proceedings, for which the Inmates claim a grossly unreasonable amount of $178,542.30.

- For the appellees' brief alone, the Inmates claim approximately $130,014.60.  The Inmates' attorneys' fees memorandum is silent as to why 10 different individuals would be needed to draft one appellees' brief or why it would take approximately 595.1 hours to prepare one such filing.  Most of the entries are vague and redundant, with little to no explanation of what work supposedly was being performed.

- An example of the Inmates' exaggerated billing is apparent from the entries of Attorney Owens, who supposedly assisted in "editing" the brief.  Although Attorney Owens claims to have begun "editing" the brief on September 28, 2015, that cannot possibly be true.  The entries of the other attorneys who actually drafted the brief show that they had not even started their drafting efforts by September 28, 2015.  Attorney Owens, simply put, could not have "edited" a non-existent brief.  Nor is it believable that Attorney Owens spent so much time editing.  His billings indicate approximately 104.6 hours' worth of editing.  The Inmates' attorneys' fees' memorandum is silent as to why one individual would find it necessary to do so much editing of a brief that 9 other individuals supposedly were preparing.

- For the oral argument portion of the proceedings, the Inmates claim approximately $45,483.60.  The Inmates' attorneys' fees' memorandum is silent as to why six

---

[12] These examples likewise support the Inmates' lack of proportionality as well.

different individuals would be needed to prepare one person for a single 20 minute oral argument.  Most of the entries are vague and redundant, with little to no explanation of what work supposedly was being performed.

- An example of the Inmates' exaggerated billing is apparent from the entries of Attorney Winter, who presented the Inmates' oral argument to the Fifth Circuit.  She claims, for instance, that she was "[i]n court for oral argument" on February 29, 2016 for 3.9 hours.  That is implausible, for the parties were second on the Fifth Circuit's docket and the oral argument lasted only 43 minutes and 29 seconds.  *See* Fifth Circuit Oral Argument Page, http://www.ca5.uscourts.gov/oral-argument-information/oral-argument-recordings (last visited February 6, 2017).

- At least 25.7 hours are claimed for travel related to the Fifth Circuit proceedings, with no discount of the proposed hourly rates.  Courts have made clear that travel time should be billed at half of the hourly rate.  *See, e.g., Clark*, 965 F.Supp. 331.  And again, it makes no sense that the Inmates sent so many people to New Orleans for one attorney to present an oral argument.

- For the mootness portion of the proceedings, the Inmates claim approximately $3,044.10.  The Inmates' attorneys' fees' memorandum is silent as to why 4 different individuals were needed to address the Fifth Circuit's questions about mootness.

The facts of this case are, to be sure, far worse than other cases where fees have been reduced.  *See Montcalm* 199 F.3d at 174.  In *Montcalm*, the Fourth Circuit had "difficulty believing" that so many hours had been expended in the appellate phase of the case, noting that fees had been requested for what would have been "the equivalent of one attorney working over eight forty hour weeks."  *Id*. at 174.  The situation here is even more egregious.  For the appellate phase of this case alone, the Inmates have requested what would be the equivalent of an attorney working over 23 forty-hour weeks just on this case.

*Hourly Rate.*  The reasonable hourly rate for the Inmates' attorneys is not, as they suggest, $219.00 per hour.  The PLRA caps the hourly rate at 150% of the CJA rate, and CJA rates vary from jurisdiction to jurisdiction.  *See, e.g., Hernandez v. Goord*, 2014 WL 4058662, *12 (S.D. N.Y. 2014).  In the Southern District of Mississippi, the CJA rate is $126.00 per hour. *See* CJA Rates, http://www.mssd.uscourts.gov/criminal-justice-act (last visited January 31, 2017).  That means that the relevant PLRA rate is $189 per hour, not $219.00 per hour.

20

Courts within the Fifth Circuit have rejected the Inmates' contrary argument – namely, that the CJA rate should be tied to the Judicial Conference approved rate rather than Congressional approved rate.  In *Leonard v. Louisiana*, 2013 WL 3558291, *4 (W.D. La. 2013), for example, it was explained that "a judiciary request for an increase in funding is just that—the judiciary's request for more money.  This request cannot be construed as an actual, effective increase in the hourly rate paid to CJA attorneys."  The same reasoning should be employed by this Court, for any contrary conclusion would implicate serious separation of powers concerns. *Cf. Gomez v. United States*, 490 U.S. 858, 864 (1989) ("It is our settled policy to avoid an interpretation of a federal statute that engenders constitutional issues if a reasonable alternative interpretation poses no constitutional question.").

The hourly rates posed for non-attorney "law clerks" and "community advocates" are problematic as well.  As an initial matter, the PLRA does "not address the issue of the hourly rate for work performed by [non-attorneys]." *See, e.g., Chatin*, 1998 WL 293992 at *2.  Such silence implicates the "[o]mitted-case [c]anon[,]" which provides that "a matter not covered is to be treated as not covered." *See* Antonin Scalia & Brian A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 93–100 (2012).[13]  Nonetheless, Walnut Grove acknowledges that the Fifth Circuit held in *Volk v. Gonzalez*, 262 F.3d 528, 535 (5th Cir. 2001) that the work of legal assistants is not always out-of-bounds under the PLRA.

Legal assistants, though, must be contrasted with volunteers.  Courts have held that the work of unpaid volunteers is not compensable, *see Ilick v. Miller*, 68 F.Supp.2d 1169, 1179 (D. Nev. 1999) (abrogated on other grounds), and the Inmates have not shown what, or if, their "law clerks" and "community advocates" were paid.  Because "there is no evidence in the record that the law [clerks and community advocates] that billed time to this case were compensated for

---

[13] Courts frequently have cited Scalia's and Garner's discussion of the "omitted-case canon" when interpreting statutes.  *See, e.g., United States v. McEligot*, 2015 WL 1535695, *4 (N.D. Cal. 2015).

their efforts[,]" no hourly rate need be assigned to the law clerks.  *Id.*  Their proposed billings simply are not compensable.

But even if this Court were willing to overlook the Inmates lack of proof and assign an hourly rate to the non-attorneys, it should be significantly lower than the $160.00 per hour and $75.00 per hour rates proffered by the Inmates.  *See* Doc. No. 196.  "Since the fees paid to attorneys have been greatly diminished by the PLRA's provisions, the fees allowed to [non-attorneys] must also be adjusted downward to avoid a vastly disproportionate and inappropriate discrepancy between attorneys and their [assistants]."  *See* Deborah F. Buckman, 165 A.L.R. Fed. 551 (2000).  Courts that have assigned a PLRA rate to non-attorneys have used rates between $25.00 and $45.00 per hour.  *See Jackson v. Austin*, 267 F.Supp.2d 1059, 1066 (D. Kan. 2003) (using a $40.00 rate for legal assistants, investigators, and law clerks); *Searles v. Van Bebber*, 64 F.Supp.2d 1033, 1037 (D. Kan. 1999) (using a $30 per hour rate for legal assistants and a $45 per hour for law clerks); *Roberson v. Brassell*, 29 F.Supp.2d 346, 353 (S.D. Tex. 1998) (using a $30 per hour rate for paralegals); *Chatlin v. State of New York*, 1998 WL 293992 (S.D. N.Y. 1998) (using a $25 per hour rate for paralegals).  At most, then, similar rates would apply to any non-attorneys in this case who performed proportional and reasonable work.

**Downward Adjustment.**  There also are further grounds for reducing the Inmates' fee request, even if this Court were to determine that the Inmates qualify for any fees at all.  As the Inmates acknowledge on page 19 of their memorandum, the 12 relevant factors are as follows: (1) the time and labor required for the litigation; (2) the novelty and difficulty of the questions presented; (3) the skill requisite to perform the legal services properly; (4) the preclusion of other employment; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) limitations imposed by the client or circumstances; (8) the amount involved and the result obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the

nature and length of the professional relationship with the client; and (12) the awards in similar cases. *See* Doc. No. 196. These factors provide a further limitation on the Inmates' fee request.

Although courts have explained that many of the adjustment factors are subsumed within the previously conducted reasonableness inquiry, *see, e.g., Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 564 (1986), several of the factors need to be highlighted in this case. Among them are the time and labor required, the results obtained, the skill set of the attorneys involved, and the awards from similar cases.

The first three of these factors are related and support a downward adjustment. On the one hand, the Inmates describe their attorneys as highly competent, skillful, and experienced. *See* Doc. No. 196. On the other hand, however, they allege that over 2,871.1 hours were expended in this litigation. *Id.* These two contentions are incompatible when considered alongside the results obtained. Because the Inmates gained nothing through their efforts that they did not already have to begin with, and because they in fact lost a portion of what they did have, it cannot be said that the time and efforts of their experienced counsel were justified.

In the same vein, the awards from the cases that the Inmates attempt to rely on highlight their lack of success in this case. Their lead case is *Graves v. Arpaio*, 633 F.Supp.2d 834, 845-46 (D. Ariz. 2009), but the inmates in *Graves* obtained "substantial prospective relief" over the course of a "thirteen-day evidentiary hearing[.]" Likewise, in *Lancaster v. Cate*, 3:79-cv-1630, Docket No. 1555 (N.D. Cal. 2008),[14] certain California inmates obtained an order requiring the prison "to create a detailed plan to cure [a litany] of violations" after the court's hearing. *Scott v. Clarke*, 2016 WL452164, *18 (W.D. Va. 2016)[15] is of the same ilk, as the inmates obtained a settlement agreement that provided "affirmative relief that [had to] be undertaken and

---

[14] Notably, the parties in *Lancaster* stipulated to the amount of attorneys' fees awarded to the plaintiffs. *See* Doc. No. 1561.

[15] Like in *Lancaster*, there was no dispute between the parties over the amount of the attorneys' fees. *See* 2016 WL452164 at *18.

implemented by Defendants . . . in order to raise the quality and quantity of medical care at FCCW to a level satisfying Eighth Amendment standards[.]"  And in *Rosas v. McDonnell*, No. 2:12-cv-428-DDP-SH, Doc. No. 135 (C.D. Cal. 2015)[16] certain California inmates obtained a settlement agreement that required the prison to develop a comprehensive plan "addressing [ ] allegations of a pattern of excessive force[.]"  Contrary to all of these cases, the Inmates in this case were left with less – not more – as a result of their attorneys' efforts.  There is no case in all of the federal reporters where a court has awarded so much for so little.

**Fees on Fees.**  Walnut Grove does not dispute that, if the Inmates were to qualify for fees under §1988 and the PLRA, they would be eligible for certain "attorney's fees incurred in recovering attorney's fees" under Fifth Circuit precedent.  *See Volk*, 262 F.3d at 535-36.  Again, however, this Court need not reach this portion of the analysis because the Inmates cannot overcome the threshold §1988 and PLRA obstacles.

If this Court does reach the fees-on-fees issue, though, the Inmates' proffered amounts should be rejected.  Like with other portions of their motion, the Inmates alleged amounts for attempting to obtain fees are grossly exaggerated.  They claim, in particular, a total of approximately 164.4 hours for an overall amount of approximately $25,780.90 for the work of six different individuals.  Most of the entries are vague and redundant, with little to no explanation of what work supposedly was being performed or why so many different people would be required to prepare it.  The entries provide such lackluster descriptions as "Work on WG fees brief[.]"  It is well settled that courts "have an obligation to scrutinize the hours spent preparing the fee petitions to insure that the total is reasonable and that it does not represent a windfall for the attorneys."  *See, e.g., Elec. Privacy Info. Ctr. v. FBI*, 80 F.Supp.3d 149, 162 (D. D.C. 2015) (citations omitted).

---

[16] Like in *Lancaster* and *Scott*,  there was no dispute between the parties over the amount of the attorneys' fees.  *See* Doc. No. 135.

III.     **The Inmates' are not entitled to any costs.**

In addition to their enormous fee request, the Inmates seek $45,926.73 in litigation expenses.  They necessarily are not entitled to these because they are not eligible for fees under §1988 and the PLRA.  Because the Inmates are not prevailing parties under §1988, and because they do not satisfy the qualifiers of the PLRA, no costs should be considered or awarded.

Nonetheless, even if the Inmates qualified for costs, they would not be entitled to the $45,926.73 amount they have requested.  Like with fees, to recover costs and expenses, the Inmates must show that all proffered costs are both "proportional" and "reasonably related" to the relief obtained.  *See, e.g., Laube v. Allen*, 506 F.Supp.2d 969, 1001 (M.D. Ala. 2007).  What follows is a sample of the Inmates' unreasonable expense entries:

- The Inmates seek approximately $6,418.85 in expenses for prison interviews conducted prior to the enforcement/modification hearing being held.  Inmates fail to explain why these proffered expenses are proportional, or even related, to the relief they believe they obtained.  Any expenses for prison interviews in preparation for the enforcement/modification hearing are unreasonable because the Inmates' counsel already was receiving up to $20,000.00 per year to monitor Walnut Grove.  Allowing the Inmates to recover money for pre-hearing monitoring would constitute a double recovery.

- The Inmates seek approximately $31.87 in food expenses for depositions conducted in Jackson.  Inmates fail to explain why these proffered amounts are reasonable.

- The Inmates seek approximately $4,154.60 in expenses for prison interviews conducted <u>after</u> the enforcement/modification motion was filed.  The Inmates fail to explain why these proffered costs are proportional, or even related, to the relief they believed they obtained.  Any amount for prison interviews conducted after the hearing was over is not compensable because they could not possibly be related or proportional to any relief the Inmates believe they obtained.  Such information, of course, was not even before the Court.  Also, any expenses for prison interviews after the hearing are unreasonable because the Inmates' counsel already was receiving up to $20,000.00 per year to monitor Walnut Grove.  Allowing the Inmates to recover more money would constitute a double recovery.

- The Inmates seek $61.60 for a November 11, 2015 dinner.  The Inmates fail to explain why these proffered costs are proportional, or even related, to the relief they believed they obtained.  Walnut Grove does not understand why the Inmates would seek reimbursement for this dinner.

- The Inmates seek travel expenses for multiple individuals who attended the same events. As explained previously, the Inmates cannot recover money for duplicative work. *See, e.g., Sipe*, 2016 WL 893687 at *4.

## IV.   CONCLUSION

All aspects of the Inmates' motion should be denied. The most straightforward avenue for reaching that result is to hold that the Inmates did not achieve "prevailing party" status under §1988. They did not achieve such status because the majority of the consent decree's provisions were terminated, because the modification request was completely denied, and because this Court's order only vowed to "continue enforcing the consent decree as necessary." Alternative avenues for achieving the same outcome are available under §1988's "special circumstances" doctrine and under the PLRA's qualifying requirements. In the alternative only, the Inmates certainly are not entitled to anything close to $600,000.00 because they have not satisfied their burden of demonstrating that such an amount is reasonable under §1988 and the PLRA.

Dated: February 13, 2017.

Respectfully submitted,

**MARSHALL FISHER, IN HIS OFFICIAL CAPACITY AS THE COMMISSIONER OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS**

**BY:  JIM HOOD, ATTORNEY GENERAL STATE OF MISSISSIPPI**

*/s/ Gary E. Friedman*
GARY E. FRIEDMAN, MS BAR NO. 5532
W. THOMAS SILER, JR., MB #6791
G. TODD BUTLER, MB # 102907
PHELPS DUNBAR, LLP
4270 I-55 North
Jackson, Mississippi 39236-6114
friedmag@phelps.com
silert@phelps.com
butlert@phelps.com

PD.20815933.1

*/s/ Krissy C. Nobile*

HAROLD E. PIZZETTA, III, MSB # 9752
ASSISTANT ATTORNEY GENERAL
KRISSY C. NOBILE, MSB # 103577
SPECIAL ASSISTANT ATTORNEY GENERAL
STATE OF MISSISSIPPI
OFFICE OF THE ATTORNEY GENERAL
Post Office Box 220
Jackson, MS   39205
knobi@ago.state.ms.us
hpizz@ago.state.ms.us

**ATTORNEYS FOR DEFENDANT**

## <u>CERTIFICATE OF SERVICE</u>

This will certify that undersigned counsel has filed this *MEMORANDUM* with the Clerk of the Court, utilizing the Electronic Case Filing system, which sent notification of such filing to all counsel of record.

Dated: February 13, 2017.

*/s/ Gary E. Friedman*
GARY E. FRIEDMAN

PD.20815933.1